**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

COMMUNITY HOUSING IMPROVEMENT
PROGRAM, RENT STABILIZATION
ASSOCIATION OF N.Y.C., INC.,
CONSTANCE NUGENT-MILLER, MYCAK
ASSOCIATES LLC, VERMYCK LLC, M&G
MYCAK LLC, CINDY REALTY LLC,
DANIELLE REALTY LLC, FOREST
REALTY, LLC,

          Plaintiffs,

   v.

CITY OF NEW YORK, RENT GUIDELINES
BOARD, DAVID REISS, CECILIA JOZA,
ALEX SCHWARZ, GERMAN TEJEDA, MAY
YU, PATTI STONE, J. SCOTT WALSH,
LEAH GOODRIDGE, AND SHEILA
GARCIA, IN THEIR OFFICIAL CAPACITIES
AS CHAIR AND MEMBERS,
RESPECTIVELY, OF THE RENT
GUIDELINES BOARD, AND RUTHANNE
VISNAUSKAS, IN HER OFFICIAL
CAPACITY AS COMMISSIONER OF NEW
YORK STATE HOMES AND COMMUNITY
RENEWAL, DIVISION OF HOUSING AND
COMMUNITY RENEWAL,

          Defendants.

Case No. _____

**COMPLAINT**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ........................................................................... 1

PARTIES ...................................................................................................... 9

JURISDICTION ........................................................................................... 12

VENUE ........................................................................................................ 12

STANDING .................................................................................................. 13

BACKGROUND .......................................................................................... 16

I.      HISTORY OF THE NEW YORK RENT STABILIZATION LAWS ........................... 16

     A.    Rent Stabilization Laws Triggered Upon Declaration of Emergency ................ 20

     B.    Rent Stabilization Laws Dramatically Limit Rents ............................................ 21

     C.    The Rent Stabilization Laws Deprive Owners of The Rights to Exclude and to Use, Occupy, and Possess their Properties ................................................. 23

     D.    The 2019 Amendments Stripped Property Owners of Many of Their Few Property Rights .......................................................................................... 25

II.     THE RSL SOLUTION—HOUSING COSTS FOR SOME TENANTS SUBSIDIZED BY SOME PROPERTY OWNERS—IS NOT RATIONALLY RELATED TO THE STATED PROBLEMS TO BE SOLVED, AND CONSEQUENTLY HAS NOT SOLVED THOSE PROBLEMS .................................. 28

     A.    The Justifications for the Claimed Housing Emergency Have Changed Over Time ..................................................................................................... 30

     B.    The RSL Does Not Target Affordable Housing to Those In Need ..................... 33

     C.    RSL is Not a Rational Means of Ensuring Socio-Economic or Racial Diversity .................................................................................................. 39

     D.    The RSL is Not a Rational Means of Increasing the Vacancy Rate .................. 40

     E.    The RSL Has a Deleterious Impact on the Community at Large ....................... 50

     F.    Alternatives to the RSL Are Available That Are More Narrowly Tailored to the Goals Claimed to Underlie the RSL. ....................................................... 51

III.    THE NEW YORK CITY HOUSING "EMERGENCY" DECLARED EVERY THREE YEARS FOR THE LAST 50 YEARS WITH NO RATIONAL BASIS FOR THE DECISION—MOST RECENTLY IN 2018—VIOLATES DUE PROCESS ............................................................................................... 55

# TABLE OF CONTENTS
(continued)

Page

IV.  THE RSL RESULTS IN UNCOMPENSATED PHYSICAL TAKINGS OF
     PRIVATE PROPERTY ....................................................................................... 63

     A.  The RSL Requires Owners to Permit Tenants and Their Successors to
         Occupy Private Property for Lengthy and Indeterminate Periods of Time,
         Denying Owners the Right to Exclude. ............................................................ 67

     B.  The RSL Denies Owners the Right to Occupy, Possess, and Use the
         Property. .......................................................................................................... 72

     C.  The RSL Denies Property Owners the Right to Freely Dispose of Their
         Property. .......................................................................................................... 80

     D.  The 2019 Amendments Have Eliminated the Few Remaining Options for a
         Property Owner to Remove a Property from Rent Stabilization. ....................... 85

V.   THE RSL EFFECTS UNCOMPENSATED REGULATORY TAKINGS OF
     PRIVATE PROPERTY ....................................................................................... 88

     A.  The Legal Framework for Regulatory Takings ................................................ 90

     B.  Even Before the 2019 Amendments, The RSL Resulted in a Substantial
         Diminution in Value of Regulated Properties and Deprived Owners of a
         Reasonable Market Return on Investment .......................................................... 92

     C.  The 2019 Amendments Expanded the Regulatory Taking by Eliminating
         Rent Increases Beyond the RGB-Permitted Rates, Effectively Preventing
         the Recovery of Investments for Improvements, and Essentially
         Eliminating Rent Increases for Units Offering Preferential Rents ................... 101

     D.  The Hardship Exceptions in the RSL Do Not Alleviate any Takings ............... 107

     E.  The RSL Provides No Average Reciprocity of Advantage to Regulated
         Property Owners, But Is An Off-budget Welfare Program Funded Solely
         by Regulated Owners. ....................................................................................... 112

     F.  The RSL Does Not Prevent a Nuisance or Noxious Use of the Property .......... 114

     G.  The RSL Has the Character of a Physical Invasion of Owners' Private
         Property of Indefinite Duration ......................................................................... 114

VI.  AN ORDER ENJOINING THE RSL AS A VIOLATION OF DUE PROCESS
     AND DECLARING IT TO BE A TAKING OF PRIVATE PROPERTY WOULD
     IMPROVE, NOT HARM, NEW YORK CITY'S RENTAL HOUSING
     MARKET ........................................................................................................... 114

CLAIMS FOR RELIEF .............................................................................................. 116

     Claim I (Against All Defendants): Due Process (U.S. Const. Amend. XIV; 42
         U.S.C. § 1983) ................................................................................................. 116

**TABLE OF CONTENTS**
(continued)

**Page**

Claim II (Against All Defendants):  Physical Taking (U.S. Const. Amends. V and XIV; 42 U.S.C. § 1983) ................................................................................... 118

Claim III (Against All Defendants):  Regulatory Taking (U.S. Const. Amends. V and XIV; 42 U.S.C. § 1983) ............................................................................. 119

PRAYER FOR RELIEF ...................................................................................................... 119

Plaintiffs Community Housing Improvement Program, Rent Stabilization Association of N.Y.C., Inc., Constance Nugent-Miller, Mycak Associates LLC, Vermyck LLC, M&G Mycak LLC, Cindy Realty LLC, Danielle Realty LLC, and Forest Realty LLC (together, "Plaintiffs"), by their undersigned attorneys, for their Complaint allege as follows:

## NATURE OF THE ACTION

1.      This action challenges the constitutionality of the New York Rent Stabilization Laws that govern nearly one million apartments in New York City. These laws, together with the actions of the City Council making the law applicable in New York City and the decisions of the New York City Rent Guidelines Board setting permissible rent increases, violate the United States Constitution. They are arbitrary and irrational in violation of the Fourteenth Amendment's Due Process Clause; they effect a physical taking of property in violation of the Constitution's Takings Clause; and they constitute a regulatory taking of property in violation of the Takings Clause. The Rent Stabilization Laws are therefore facially unconstitutional.

2.      The Rent Stabilization Laws are codified in several places, including the administrative code for the City of New York § 26-501 *et seq.* (also published as N.Y. UNCONSOL. LAW TIT. 23 § 26-501 *et seq.* (McKinney) (constituting the Rent Stabilization Law of 1969), and section 4 of chapter 576 of the laws of 1974 (constituting the Emergency Tenant Protection Act of 1974), which is found in Chapter 249-B of the Unconsolidated Laws (also published in N.Y. UNCONSOL. LAW TIT. 23 §§ 8621 *et seq.* (McKinney)). Further, regulations promulgated under the 1974 Act, as amended can be found at 9 NYCRR §§ 2520 *et seq.* Those laws will be referred to throughout the Complaint as the "Rent Stabilization Laws" or "RSL."

3.      The RSL was first enacted in 1969, and built upon (and provided an alternative to) the rent control laws then in existence. The RSL has been amended on multiple occasions, culminating in the most recent amendments, which were enacted in June 2019 (the "2019

Amendments"). Even prior to the 2019 Amendments, the RSL violated multiple provisions of the federal Constitution. With these amendments, those violations became even more apparent, and there can be no doubt that the RSL's irrationality and arbitrariness, and its web of restrictions override core rights of property owners and impose unconstitutional burdens on property owners of pre-1974 buildings with six or more units.

4.      The RSL's harmful effects are not limited to the subset of property owners that are subject to its requirements. To the contrary, the law:

- Exacerbates New York's housing shortage by preventing the redevelopment of existing buildings to the full capacity permitted by zoning regulations;

- Makes market-rate apartments more expensive for the millions of New Yorkers not lucky enough to reside in or find a rent-stabilized apartment;

- Allows wealthy New Yorkers to continue to benefit unfairly from rent stabilization while penalizing low- and middle-income tenants; and

- Deters property owners from making improvements to existing stabilized apartments, the majority of which pre-date World War II, by imposing significant restrictions on their ability to recover the cost of improvements, which will leave tens of thousands of apartments frozen in the past, with plumbing and wiring that is lawful but does not comply with current code requirements—and in addition will substantially reduce employment in New York's construction industry.

5.      *First,* **the RSL violates Due Process**. State and City representatives have advanced a variety of claimed justifications for the RSL, including that it helps provide affordable housing for persons of limited means, that it is needed to maintain socio-economic and racial diversity in the city, and that it will help abate a "housing crisis" that otherwise exists in New York City. The RSL states that its purpose is to prevent unwarranted, speculative, and abnormal increases in rent that result from a housing shortage and that lead to dislocation and

pose threats to the public health and welfare while also promoting a transition from a regulated housing market to a free market of normal bargaining between owner and tenant.

6.  The RSL has applied in New York City continuously for 50 years, and the evidence is overwhelming that the RSL is not rationally related to achieving any of those objectives. The RSL on its face therefore violates the federal Constitution's guarantee of Due Process:

- The RSL does not in any way target its relief to low-income populations. There is no financial qualification standard at all for retaining or obtaining a rent stabilized unit. Rather, stabilized units are awarded to those who have the good fortune either to find an available stabilized unit or to have a relationship with someone who resides in one. As frequent news reports demonstrate, and studies confirm, hundreds of thousands of stabilized units are rented by New Yorkers who can afford to pay market rents. The percentage of low-income families living in RSL units is only marginally greater than those living in market-rate units, which further demonstrates that the RSL's benefits are not focused on low-income individuals and families. And the 2019 Amendments eliminated a provision in pre-2019 law that decontrolled an apartment once the rent exceeded $2,774 per month and the tenant's income was $200,000 or greater. This expansion, and the program's other characteristics, makes clear that the RSL is in no way rationally related to providing affordable housing for low-income individuals or families.

- For similar reasons, the RSL is not rationally related to promoting socio-economic or racial diversity. Nothing in the law directs RSL-regulated units to individuals and families who would increase diversity. Studies show that the RSL reduces diversity.

- Finally, the RSL is not rationally related to increasing the supply of housing in New York. The law has the opposite effect, operating to further reduce the availability of vacant apartments by preventing property owners from redeveloping properties to create additional apartments by making full use of permissible zoning density and incentivizing tenants to stay in units, even if the units are no longer appropriately

sized for the tenants' needs. These restrictions on supply and availability of apartments in New York exacerbate the low vacancy rates that the government claims it is attempting to address. Indeed, the vacancy rate has remained below 5% City-wide for the entire 50 years the RSL has been in effect—a vacancy rate similar to that in many other major metropolitan areas around the country—confirming the lack of any rational relationship between the RSL and alleviation of a housing shortage.

7. The RSL applies in New York City as a result of the New York City Council's reflexive declaration of a housing emergency every three years for the past 50 years, most recently in 2018. Those declarations on their face separately violate Due Process because they are arbitrary and irrational.

8. The governing statute permits the New York City Council to declare a housing emergency when there is a vacancy rate of 5% or less—but provides that "[a]ny such determination" is to be made not just "on the basis of the supply of housing accommodations within such city," but also "the condition of such accommodations and the need for regulating and controlling residential rents within such city . . ." N.Y. UNCONSOL. LAW § 8623.a (McKinney). The statute also allows the Council to limit its emergency finding to specified classes of the properties subject to the RSL.

9. The New York City Council has made its every-three-years emergency determinations without any meaningful support for or analysis of whether a housing emergency actually exists, whether only a particular class of housing is experiencing an emergency, and whether an emergency would be ameliorated by "regulating and controlling residential rents." The Council did not establish any rational basis for determining that a housing emergency exists—the finding required by the statute. In fact, Defendants have failed to even identify the variables that should be used to determine whether an emergency exists (let alone the threshold

at which those variables might be indicative of an emergency). That renders the Council's determinations arbitrary and violative of Due Process.

10.     ***Second*, the RSL effects a physical taking of the properties subject to rent stabilization regulation.** The RSL deprives property owners of their core rights to exclude others from their property and to possess, use, and dispose of their property. That physical taking without compensation renders the RSL on its face a per se violation of the federal Constitution's Takings Clause.

11.     The RSL accomplishes this taking through a web of regulations that individually and in their combined effect physically take rental properties just as clearly as if New York City commandeered a leasehold interest or easement in RSL-regulated apartments outright:

- The government mandates the continued, indefinite occupation of rental properties by tenants. Owners cannot refuse to renew leases except in very narrow circumstances. The elimination of this right to exclude is not limited to the original tenant—the tenant may give his or her right to the unit to another person, and the property owner must allow that "successor" to renew his or her lease on government-dictated terms. The law thus confers a life estate with inheritance rights once an apartment is rented. And the 2019 Amendments further limit a property owner's ability to evict a tenant, including a stay of eviction for up to one year.

- The RSL effectively denies property owners the right to possess and use their own property. Although the law appears to give owners the right to recover possession for personal use, that provision is hedged with restrictions: the unit must be used as a primary residence, recovery of possession is not available to owners who hold property through a corporate form, and extends to only one owner even if the property is owned by multiple owners. The 2019 Amendments add a one-unit limitation and impose other new restrictions, replacing the previous "good faith" requirement with a showing of "immediate and compelling necessity" (a demanding standard), and precluding the recovery of possession for personal use if the tenant has

lived in the building for 15 years, unless the owner offers equivalent housing accommodation at the same stabilized rent in a nearby building.

- Property owners may not withdraw their buildings from the housing rental market to convert them to non-housing uses. Nor may they simply stop renting their property unless it presents a hazard or the owner will use it for his or her own business (and not rent any of the property to others). The owner may not demolish the building unless he or she pays to relocate all tenants (including payment of a moving expenses and a stipend and any increased rent).

- Prior to the 2019 Amendments, property owners could convert buildings into cooperatives or condominiums using either eviction or non-eviction plans. For non-eviction plans, owners had to obtain purchase agreements from only 15% of the tenants or bona fide purchasers, as long as the conversion would not result in eviction of any tenants. The 2019 Amendments eliminated eviction plans and require purchase agreements from 51% of tenants (without including other bona fide purchasers) under non-eviction plans. That effectively transfers from the property owner to the tenants the power to decide whether to dispose of the property through a cooperative or condominium conversion.

Physical occupation accomplished by regulation, as much as by direct seizure, violates the federal Constitution.

12.    ***Third*, the RSL on its face effects an uncompensated regulatory taking of private property.** Each of the factors relevant to the Constitution's Takings Clause weighs strongly in favor of finding a regulatory taking.

- The RSL has a significant adverse economic effect on property values. A study assessing the impact of the law prior to the 2019 Amendments found that buildings with predominantly rent-stabilized units have 50% of the value of buildings with predominantly market-rate units. Even the City's property assessment guidelines concede that unregulated properties have a significantly greater value than regulated properties. The 2019 Amendments will further increase the economic burden on

regulated properties, because they, among other things, impose restrictions on recovering the cost of improvements and by their express terms prevent owners from recovering anything close to the real cost of those improvements—even improvements that are required by law to, for example, comply with the City's building and housing codes. Recovery for improvements to individual apartments, for example, is limited to $15,000 in aggregate over a 15-year period, even if the actual cost was two, three, or more times that amount, and any such rent increase is materially limited and must be removed after 30 years, making full recovery of the value of the improvement implausible.

- For the same reasons, the RSL interferes substantially with investment-backed expectations. Moreover, amendments to the RSL, culminating in the 2019 Amendments have imposed greater and greater limitations on property owners' ability to recover the reasonable expenses associated with maintaining apartment units. And the de minimis rent increases permitted by the Rent Guidelines Board each year—below the Board's own calculation of the increase required to equal the growth in property owners' operating costs, and including two consecutive years of rate freezes—contribute to that interference.

- The RSL does not provide *any* reciprocal benefits to property owners. Regulations that impose restrictions on property—such as zoning—may be upheld because the restricted property also benefits from the restrictions on neighboring property. Rent stabilized properties receive no tax breaks or other government assistance. They are subject to the same expenses as properties with market-rate rentals. Moreover, the New York Court of Appeals has authoritatively determined that "a tenant's rights under a rent-stabilized lease are a local public assistance benefit." *Santiago-Monteverde v. Periera*, 22 N.E.3d 1012, 1015 (N.Y. 2014). It stated that "[w]hile the rent-stabilization laws do not provide a benefit *paid for* by the government, they do provide a benefit *conferred by* the government through regulation aimed at a population that the government deems in need of protection." *Id.* at 1016. The government "has created a public *assistance* benefit through a unique regulatory scheme applied to private owners of real property." *Id.* at 1017 (emphasis added).

But, as the Supreme Court has explained, the purpose of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960). The RSL is thus a public assistance benefit program paid for by a discrete group of property owners, who themselves receive no benefit at all from the stabilization program, which weighs heavily in favor of finding a taking.

- The RSL is not targeted to prevent a nuisance or other noxious uses of property.

- Finally, as already discussed, the RSL effects a physical invasion of property, another factor pointing toward the existence of a taking.

13.     Plaintiffs bring these claims under the Fifth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983 and 28 U.S.C. § 1331, and seek attorneys' fees pursuant to 42 U.S.C. § 1988(b). Plaintiffs seek declaratory and injunctive relief; they do not in this suit seek damages or compensation for Defendants' violation of their constitutional rights. See 28 U.S.C. § 2201(a) (district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought"); Fed. R Civ. Proc. 57 ("[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate"). Declaratory and injunctive relief against future enforcement of the rent-stabilization scheme will not only halt the deprivation of the constitutional rights of property owners, but will result in increased development of rental properties, better housing for a larger universe of renters, the amelioration of a constrained housing market, and will force New York City and State governments to adopt fairer and more efficient means of providing housing to those most in need.

14.     Plaintiffs recognize that the requested relief would result in changes in the rental market. Relief issued by this Court can and should be crafted to address any hardship on tenants

currently occupying rent-stabilized units, and Plaintiffs will support such an approach. In addition, Defendants will have the opportunity to withdraw or modify the RSL to eliminate the constitutional violations.

15.     Plaintiffs acknowledge that prior cases challenging the constitutionality of the RSL on various grounds have been unsuccessful, including *Harmon v. Markus*, 412 Fed. App'x 420 (2d Cir. 2011). Plaintiffs believe, however, that the factual allegations and legal claims in this Complaint, including recent changes in state law, distinguish *Harmon* and other cases.

## PARTIES

16.     Plaintiff Rent Stabilization Association of N.Y.C., Inc. ("RSA") is a not-for-profit trade association composed of over 25,000 managing agents and property owners of both rent stabilized and non-rent stabilized properties in New York. Among its core functions, RSA advocates on behalf of its members before the New York City Council, the New York State Legislature, and City and State agencies, including the Defendants New York City Rent Guidelines Board and State Division of Housing and Community Renewal, on an array of housing policy issues, including the issue of rent regulation. RSA also fills an informational and educational role, providing updates in the form of a monthly newsletter, seminars, and e-mails to its members relating to the requirements of State and City laws and regulations which impact upon the ownership and management of apartment buildings in the City. In addition to a staff of customer service agents, RSA provides compliance services to its members—and sometimes to non-members—to assist in their efforts to comply with statutory and regulatory requirements, including, but not limited to, annual rent registrations with the State Division of Housing and Community Renewal.

17.     Plaintiff Community Housing Improvement Program ("CHIP") is a not-for-profit trade association representing owners and managing agents of more than 4,000 apartment

buildings in New York City. Founded in 1966, CHIP has been a key participant in City and State housing policy for over 50 years, educating, advising and advocating on such diverse issues as lead paint, property taxes, water rates, and rent regulation. CHIP provides its members with a variety of services, including advice relating to regulatory compliance and assistance to members who are facing legal challenges. CHIP advocates on behalf of its members at the local, City and State levels and provides regular updates on issues of importance to property owners.

18.    Plaintiff Constance Nugent-Miller ("Nugent-Miller") is a resident of Brooklyn, New York. Ms. Nugent-Miller owns, and lives in, a six-unit residential apartment building located in Brooklyn, New York. Three of the units in Ms. Nugent-Miller's building are stabilized pursuant to the RSL. The property has been in Nugent-Miller's family since 1957, and she has owned it since 2005.

19.    Plaintiff Mycak Associates LLC ("Mycak Associates") is a limited liability company organized under the laws of New York. Mycak Associates owns a residential apartment building located in Queens, New York. The building is comprised of 52 units, 21 of which are stabilized pursuant to the RSL. Mycak Associates has owned this property since 1972.

20.    Plaintiff Vermyck LLC ("Vermyck") is a limited liability company organized under the laws of New York. Vermyck owns a residential apartment building located in Queens, New York. The building is comprised of 84 units, all of which are stabilized pursuant to the RSL. Vermyck has owned this property since 1973.

21.    Plaintiff M&G Mycak LLC ("M&G") is a limited liability company organized under the laws of New York. M&G owns a residential apartment building located in Manhattan. The building is comprised of 20 units, three of which are stabilized pursuant to the RSL.

22.     Plaintiff Cindy Realty LLC ("Cindy Realty") is a limited liability company organized under the laws of New York. Cindy Realty owns a residential apartment building located in Jackson Heights, New York. The building is comprised of 84 units, 81 of which are stabilized pursuant to the RSL. Cindy Realty has owned the property since 1983.

23.     Plaintiff Danielle Realty LLC ("Danielle Realty") is a limited liability company organized under the laws of New York. Danielle Realty owns a residential apartment building located in Brooklyn, New York. The building is comprised of 42 units, 37 of which are stabilized pursuant to the RSL. Danielle Realty has owned the property since 1998.

24.     Plaintiff Forest Realty LLC ("Forest Realty") is a limited liability company organized under the laws of New York. Forest Realty owns a residential apartment building located in Forest Hills, New York. The building is comprised of 72 units, 61 of which are stabilized pursuant to the RSL. Forest Realty has owned the property since 1977.

25.     Defendant City of New York is the government entity given the responsibility by the state of New York to determine the existence of a housing emergency and to establish and implement rent stabilization.

26.     Defendant New York City Rent Guidelines Board ("Rent Guidelines Board") is the New York City government agency that determines what those stabilized rents should be each year and determines any rate changes.

27.     Defendant David Reiss is a Member and Chair of the Rent Guidelines Board.

28.     Defendants Cecilia Joza, Alex Schwarz, German Tejeda, May Yu, Patti Stone, J. Scott Walsh, Leah Goodridge, and Shelia Garcia are Members of the Rent Guidelines Board.

29.     Defendant Ruthanne Visnauskas is the Commissioner of the New York State Division of Housing and Community Renewal ("DHCR"). DHCR (through its Office of Rent

Administration-ORA) oversees the administration of the two rent regulatory systems—rent stabilization and rent control—in the City of New York (there are approximately 20–30,000 rent control units and around 966,000 rent-stabilized units). That administration includes but is not limited to the system for the annual registration of all rent-stabilized apartments, the processing of major capital improvement rent increase applications by owners, the processing of overcharge, service and other complaints by tenants, administrative hearings arising from challenges by owners and tenants to the determinations of such applications and complaints, and the promulgation of regulations, policy statements, fact sheets and operational bulletins supplementing and interpreting the State and City rent regulation statutes.

## JURISDICTION

30.     This Court has personal jurisdiction over each Defendant in New York and in this judicial district because they each regularly transact business in this judicial district.

31.     This Complaint alleges that Defendants have violated Plaintiffs' rights protected by the United States Constitution. Accordingly, this Court has subject-matter jurisdiction under the Supremacy Clause of the United States Constitution, Art. VI, Clause 2, and 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiffs seek declaratory and equitable relief under 28 U.S.C. § 2201 and 42 U.S.C. § 1983, and the award of attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## VENUE

32.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims alleged herein have occurred, and will continue to occur, in this district, and because a substantial portion of the property that is the subject of this action is located in this district.

12

**STANDING**

33.     CHIP and the RSA each has organizational standing to bring this claim. They each (i) have suffered and continue to suffer an imminent injury in fact to their organization which is distinct and palpable; (ii) those injuries are fairly traceable to the Rent Stabilization Laws; and (iii) a favorable decision would redress their injuries. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017).

34.     As a result of the Rent Stabilization Laws, both CHIP and RSA have been forced to devote substantial time and resources to counsel their members about how to register their properties under the law, how to abide by the maze of regulations governing the owners of rent-stabilized properties, and how to react to claimed violations of the Rent Stabilization Laws. Both organizations have participated in the Rent Guidelines Board process as well as in the triennial renewal process. The RSA was responsible for the rent regulations set forth in the rent stabilization code until the transfer of jurisdiction for rent regulations (for both rent control and stabilization) in 1984 pursuant to the Omnibus Housing Act of 1983. Both RSA and CHIP counseled their members regarding advocacy related to the 2019 Amendments to the RSL, and RSA president Joseph Strasburg testified at an Assembly Housing Committee hearing concerning those amendments. Since the passage of the 2019 Amendments, the RSA and CHIP have expended considerable time and effort advising their members on the requirements of the revised law and how to comply with those modified requirements.

35.     The time and money CHIP and the RSA have spent helping their members address the Rent Stabilization Laws has prevented them from spending those same resources assisting their members with other matters. This includes time and money that could be spent working on state and city legislative and regulatory issues, advising members on safety regulations, providing seminars for their members, and researching and advocating for housing

policies that benefit both owners and tenants. This expenditure of time and resources constitutes an organization injury. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (equal housing non-profit would have organizational standing to challenge discriminatory policies that forced it to expend time and resources investigating instances of discrimination and providing counseling to victims); *Nnebe v. Daus*, 644 F.3d 147, 156–57 (2d Cir. 2011) (counseling just a few suspended taxi drivers a year would grant association of taxi workers organizational standing to challenge New York City's taxi driver suspension policy). Here, both the RSA and CHIP have been forced to take action and spend resources advising their members on compliance with the Rent Stabilization Laws. This burden has been particularly great with respect to the 2019 Amendments, given the significance of those changes and novel legal questions that arise from these changes. These organizational injuries would be remedied by the relief sought in this action.

36.     In addition, CHIP and RSA each have standing to challenge the Rent Stabilization Laws because their members are directly regulated by, and suffer injury as a result of, those laws, as demonstrated by their members who have appeared as Plaintiffs in this action. Those members, along with other CHIP and RSA members who own property subject to rent stabilization, have been and continue to be subjected to an invasion of a legally protected interest that is concrete and particularized, actual or imminent and not conjectural or hypothetical, and that will be redressed by the injunctive and declaratory relief sought in this suit without the need for participation of individual members as plaintiffs. See *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992); *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000).

37.    Plaintiff Nugent-Miller is a member of RSA, and has been since 2005. Nugent-Miller joined RSA in order to take advantage of the educational benefits, advocacy, and support that RSA offers to property owners in New York City. Like other RSA members, Nugent-Miller owns a residential apartment building with units subject to the RSL, and has been injured as a direct result of the RSL. Among other things, Nugent-Miller has been forced to offer renewal leases to stabilized tenants at rental rates far below the market, and has twice been denied the opportunity to occupy a first floor unit in her own building in favor of a stabilized tenant. The value of Nugent-Miller's property has been substantially diminished by the RSL. As discussed herein, these injuries have been deepened by the 2019 Amendments to the RSL. She has standing to sue in her own right.

38.    Plaintiffs Mycak Associates, Vermyck, and M&G are limited liability companies owned and controlled by the Mycak family, who have been members of CHIP and RSA for over 30 years. The Mycak family joined CHIP and RSA in order to take advantage of the educational benefits, advocacy and support that these trade associations offer to property owners in New York City. Mycak Associates, Vermyck, and M&G own residential apartment buildings with units subject to the RSL, and have been injured as a direct result of the RSL. Among other things, Mycak Associates, Vermyck, and M&G each have been forced to offer leases to tenants in stabilized units at levels far below market rates and have been afforded limited ability to recover the costs of repair and improvements. For several units, limits on rent increases and recoverable repair costs make continued rental of those units prohibitive. Once the current tenants vacate, those units will not be re-rented and instead will be left vacant. The value of the property of Mycak Associates, Vermyck, and M&G has been substantially diminished as a result

15

of the RSL. These injuries have been exacerbated by virtue of the 2019 Amendments to the RSL.

Mycak Associates, Vermyck, and M&G have standing to sue in their own right.

39.     Plaintiffs Cindy Realty, Danielle Realty, and Forest Realty are limited liability

companies owned and controlled by the Katz family, who have been members of CHIP and RSA

for over 30 years. The Katz family joined CHIP and RSA in order to take advantage of the

educational benefits, advocacy and support that these trade associations offer to property owners

in New York City. Cindy Realty, Danielle Realty, and Forest Realty own residential apartment

buildings with units subject to the RSL and have been injured as a direct result of the RSL.

Among other things, each has been forced to rent units at levels far below market rates, often to

strangers who claim "succession" rights to occupy stabilized units decades after the original

tenant took occupancy. Cindy Realty, Danielle Realty, and Forest Realty have limited or no

ability to oust these strangers from their property. The value of the property of Cindy Realty,

Danielle Realty, and Forest Realty has been substantially diminished as a result of the RSL.

These injuries have been magnified by the 2019 Amendments to the RSL. Cindy Realty,

Danielle Realty, and Forest Realty have standing to sue in their own right.

## BACKGROUND

## I.     HISTORY OF THE NEW YORK RENT STABILIZATION LAWS

40.     There are two different systems that operate in New York City to regulate the

relationship between property owners and tenants, regardless of the tenant's income or wealth:

rent control and rent stabilization.

41.     Both systems follow a lineage of rent regulation all the way back to 1943 (and

before that to World War I), when federal rent control was imposed. As federal rent controls

were repealed, New York City and New York State continued the policy through to the present.

The regulatory system of rent control is separate and distinct from that of rent stabilization, and

the two regulatory schemes apply to different units and have different rules. This Complaint deals solely with the system of rent stabilization.

42.     Rent control places limits on the rents charged to tenants living in apartments in buildings that were built before February 1, 1947. The rent-control system that exists today was originally enacted in 1951. Prior to this, rent control laws had gone into effect in New York City following World War I, and after a period of de-regulation, rent control returned in the form of federal regulations during and after World War II. When the federal regulations expired in 1951, New York State rent regulations went into effect. Over the next few decades, the state and city both de-regulated a variety of apartments and buildings from the scheme based on price and size.

43.     Today, rent-controlled apartments still exist, but only for tenants (or their successors) who have lived in their apartments since 1971 and who live in buildings that were constructed prior to 1947. Because of this requirement, by 2017 the number of rent-controlled apartments had dwindled to roughly 22,000, or 1.2% of rental units.

44.     In 1969, New York City passed the first Rent Stabilization Law. This law placed limits on the rents that property owners could charge individuals living in apartments that were constructed after February 1, 1947 and before March of 1969 and that contained six or more units (buildings that failed to join a "real estate industry stabilization association" such as RSA, remained subject to rent control). This law also created Defendant Rent Guidelines Board ("RGB") to regulate whether and by how much the rents of stabilized units may be increased going forward. It also created the Conciliation and Appeals Board ("CAB") to deal with disputes arising from the statute, which was funded by the real estate industry stabilization association.

45.     In 1971, the state legislature enacted vacancy decontrol measures, pursuant to which apartments that were previously subject to rent stabilization and rent control became

17

deregulated once they became vacant. This permitted property owners to charge new tenants market rate rents for their units.

46.     In January 1974, at the request of the Governor, the Temporary State Commission on Living Costs and the Economy of the State of New York issued a Report on Housing and Rents. In his introduction to the report, the Chairman of the Commission explained that its recommendations were "based on an awareness of the effects of inflation and on the belief that no one sector should be asked to bear all the costs."

47.     Although the report recommended abrogation of vacancy decontrol, it recognized that any return to rent stabilization should not disincentivize the very increase in supply of quality housing needed to address vacancy and affordability issues. The report explained that its recommendations were intended to allow "the minimum impact required by today's inflation to be passed on to the tenant population without either endangering the proper delivery of services, or inhibiting long term growth and renovation of our valuable housing stock." The Report explained that "increased costs must be reflected in the rent, otherwise essential services will be curtailed," and that "[t]he importance of permitting increased rents for essential capital improvements cannot be overemphasized. An owner should never be penalized for improving his property if such modifications either raise the level of services provided to the tenants or permit those services to be maintained at present levels."

48.     In June of 1974, the New York State legislature passed the Emergency Tenant Protection Act of 1974 ("ETPA"), which amended the New York City Rent Stabilization Laws. The ETPA law applies to buildings that contain six or more units and were constructed prior to 1974 and are no longer subject to rent control. It also reinstituted rent stabilization for a variety

of units that had been either de-controlled or de-stabilized due to vacancy between 1971 and 1974.

49.     The Omnibus Housing Act of 1983 transferred administration of rent control from New York City, and of rent stabilization from the CAB, to DHCR.

50.     Under the Rent Regulation Reform Act of 1993, the state began vacancy deregulation for high-rent apartments (termed "Luxury Decontrol"). *See* N.Y. REAL PROPERTY LAW Ch. 249-B, § 5(a)(13) (LexisNexis). In 1993, a unit with a legal regulated monthly rent of $2,000 at the time it became vacant would be excluded from rent stabilization. The Rent Act of 2011 raised the Luxury Decontrol threshold to $2,500 per month. The Rent Act of 2015 raised the threshold to $2,700, and provided that the threshold would continue to increase at the same rate as the one-year renewal adjustment adopted by the RGB (thereby making Luxury Decontrol a moving target that could be met only in limited circumstances because both the target and the permissible rent moved at the same rate each year). The threshold stood at $2,774.76 before Luxury Decontrol was completely repealed in the 2019 Amendments.

51.     The Rent Regulation Reform Act of 1993 also adopted a high-income deregulation provision (termed "High Income Decontrol"). *See* N.Y. REAL PROPERTY LAW, Ch. 249-B, § 5(a)(12) (LexisNexis); Admin. Code of the City of New York §§ 26-504.1–26.504.3. Under that provision, units that are occupied with tenants whose household income exceeded $250,000 (later reduced to $200,000) ***and*** whose rents exceeded the Luxury Decontrol threshold would also be subject to decontrol.

52.     In 2014, the New York Court of Appeals conclusively determined that "a tenant's rights under a rent-stabilized lease are a local public assistance benefit." *Santiago-Monteverde*, 22 N.E.3d at 1015. The Court specifically held that the "rent-stabilization program has all the

characteristics of a local public assistance benefit." *Id.* "Rent stabilization provides assistance to a specific segment of the population that could not afford to live in New York City without a rent regulatory scheme. And the regulatory framework provides benefits to a targeted group of tenants—it protects them from rent increases, requires owners to offer lease renewals and the right to continued occupancy, imposes strict eviction procedures, and grants succession rights for qualified family members." *Id.* at 1016.

53.     The Court observed that "the rent-stabilization laws do not provide a benefit *paid for* by the government, they do provide a benefit *conferred by* the government through regulation aimed at a population that the government deems in need of protection." *Id.* (emphasis added). It concluded that the government "has created a *public assistance benefit* through a unique regulatory scheme applied to private owners of real property." *Id.* at 1016 (emphasis added).

A.     **_Rent Stabilization Laws Triggered Upon Declaration of Emergency_**

54.     The 1974 Act establishes that a municipality may determine that there exists a "public emergency requiring the regulation of residential rents" if the vacancy rate in the municipality is 5% or less. N.Y. UNCONSOL. LAW § 8623.a (McKinney). The statute requires that "[a]ny such determination shall be made by the local legislative body of such city . . . on the basis of the supply of housing accommodations within such city . . . , the condition of such accommodations and the need for regulating and controlling residential rents within such city . . ." *Id.* The applicability of Rent Stabilization Laws in New York City depends on the City Council making such an emergency determination. *Id.* § 8622.

55.     That statutory scheme imposes a substantive obligation on the City of New York to go beyond merely declaring an emergency when vacancy rates are less than 5%, but rather to formulate a rational basis for determining whether that vacancy rate warrants the declaration of a public emergency, whether the existence of such emergency triggers "the need for regulating and

controlling residential rents," whether there are specific classes of housing accommodations that should not be subject to the emergency, and whether the regulation of rents serves to abate the emergency. The City must rationally apply existing facts and data to make each determination.

56.     Since the Emergency Tenant Protection Act of 1974 was passed, the New York City Council has voted to declare a "public emergency" every three years, thereby permitting the system of rent stabilization to continue indefinitely.

### B.     *Rent Stabilization Laws Dramatically Limit Rents*

57.     Rent stabilization mandates that owners offer below-market rents to tenants for indefinite and lengthy periods of time. Owners of rent-stabilized units may increase the rent to existing tenants for any particular one- or two-year lease period only by the amount set by the Rent Guidelines Board. *See* 9 NYCRR § 2522.5.

58.     The Board determined in 2018 and again in June of 2019 that property owners would be permitted to increase rents by 1.5% for one-year leases and 2.5% for two-year leases. For the six-year period from 2014 through 2019, the maximum one-year rent increases have been limited to 1.5% or less, with two years in which no rent increases were permitted. Over the 20-year period from 1999 through 2019, the RGB-permitted rent increases averaged 2.7% annually while expenses for property owners increased more than twice that rate, at 5.5%. The compounded effect of those sub-cost permitted rent increases over that 20-year period has been to increase stabilized rents by a total of 66%, while costs have increased over the same period by 169%.

59.     Prior to 2019, owners had only very limited means to raise rents beyond the increases set by the RGB. Those included:

(a)     **Statutory Vacancy Allowance:** Under the Rent Regulation Reform Act of 1997, when a tenant vacated a rent-stabilized unit, the property owner could increase the rent

for the next tenant by 20% for a two-year lease. 9 NYCRR § 2522.8; Admin. Code of the City of New York §26-511(c)(5-a). For one-year leases, the Statutory Vacancy Allowance permitted a 20% increase less the difference between the two-year rate increase permitted by the RGB and the one-year rate increase permitted by the RGB. 9 NYCRR § 2522.8; Admin. Code of the City of New York §26-511(c)(5-a).

(b)      **Longevity Increase:** The Rent Regulation Reform Act of 1997 also permitted an additional increase in rent for tenants who had remained in a unit for a long period (known as a "Longevity Increase"). If there had been no vacancy increase in the prior eight years, the owner could increase the rent based on the following formula: 0.6% multiplied by the number of years since the last vacancy increase multiplied by the vacating tenants' legal rent. 9 NYCRR § 2522.8; see ETPA of 1974 § 10.a.1; Admin. Code of the City of New York §26-511(c)(5-a).

(c)      **Major Capital Improvements** ("MCI's): When an owner undertook a major capital improvement to a building meeting certain statutory requirements, the owner could petition the DHCR for a rent adjustment amounting to the cost of the MCI amortized over an eight-year period (for buildings with 35 or fewer units), or a nine-year period (for buildings with more than 35 units). *See* Admin. Code of the City of New York §26-511(c)(6); 9 NYCRR § 2522.4. Any rent increase based on an MCI could not exceed 6% of the tenant's rent. The owner was required to document the costs of those improvements and was subject to DHCR audits of those improvements.

(d)      **Individual Apartment Improvements** ("IAIs"): When an owner made a substantial modification or improvement to an individual apartment, the owner was permitted to adjust monthly rent by the amount of one-fortieth the cost of the

improvement (for a building with 35 or fewer units) or one-sixtieth the cost of the improvement (for a building with more than 35 units). *See* Admin. Code of the City of New York §26-511(c)(13).

(e)     **Preferential Rent Increases.** Where owners charged tenants less than the legal regulated rent for a unit, the owner retained the right—upon lease renewal or vacancy of the tenant—to charge up to the legal regulated rent, as adjusted by applicable guideline increases. *See* Admin. Code of the City of New York §26-511(c)(14).

**C.      *The Rent Stabilization Laws Deprive Owners of The Rights to Exclude and to Use, Occupy, and Possess their Properties***

60.     As discussed in more detail below, the RSL (even prior to the 2019 Amendments) deprives owners of the right to exclude tenants from their property, dramatically limits the owners' right to use or occupy their own property, and even significantly limits the owners' right to freely dispose of their property.

61.     The RSL, with very few exceptions, requires the property owners to renew the leases of their tenants at RGB-approved rates. Admin. Code of the City of New York § 26-511(c)(9); N.Y. UNCONSOL. LAW § 26-511(c)(9) (McKinney); 9 NYCRR § 2524.4. Given that all (or nearly all) RSL units were tenant-occupied at the time the RSL came into existence in 1969, the obligation to renew leases prevented owners from excluding such tenants from their properties. The principal permissible reasons for tenant eviction all remain within the tenant's control, such as the tenant's non-payment of rent, the tenant's violation of a substantial obligation of his tenancy, the tenant's committing a nuisance, or the tenant's use of the unit for an illegal purpose. 9 NYCRR §§ 2524.3. And renewal of a tenant's lease is mandatory unless a court determines that a tenant is not occupying the unit as his primary residence. Although non-renewal of a lease is permitted in certain circumstances where the owner seeks to occupy a unit,

withdraw the unit from the market, or demolish a building, as discussed further below, those exceptions are limited to the point of impracticability by the RSL.

62.     The lease renewal obligation extends not only to the tenant, but also to "successors," such as the tenant's family members or any person residing with the tenant as a primary residence who can prove emotional or financial commitment and interdependence with the tenant. 9 NYCRR §§ 2520.6, 2523.5(b)(1). And the tenant's right to renew the lease persists even if the tenant subleases the apartment for up to two years in any four-year period, and even if the sublease extends beyond the term of the tenant's lease.  9 NYCRR §§ 2525.6.

63.     The RSL also dramatically limits owners' rights to use or occupy their own property. The RSL (prior to the 2019 Amendments) permitted an owner to decline to renew a lease if the owner or his or her immediate family member sought to occupy the units. Admin. Code of the City of New York § 26-511(b)(9). But those rights did not extend to any person who owns a building through an LLC or corporation, applied to only one owner of a building even if the building was owned through partnership, were materially limited if the tenant was older than 62 or disabled, and did not apply unless the owner could show a good-faith need for the unit.

64.     The RSL also substantially limits an owner's ability to dispose of its own property. Among other limitations, owners may not refuse to renew a lease in order to withdraw a property from the market for purposes of non-housing rentals, nor even to permit the building to sit empty. *See, e.g.,* 9 NYCRR § 2524.5. A building may only be withdrawn from the market to be used for the owner's own (non-rental) business, or if the building represents a safety hazard and the cost of repair exceeds the value of the building. *Id.* Owners also may not demolish their own buildings without finding each and every tenant suitable housing and paying for all relocation expenses.

D.   _**The 2019 Amendments Stripped Property Owners of Many of Their Few Property Rights**_

65.     On June 14, 2019, the New York State legislature passed what the New York Senate Majority leader termed "the strongest tenant protections in history." Assembly member Linda Rosenthal, the sponsor of one of the bills resulting in the 2019 Amendments, stated that "[w]e are losing affordable housing at an alarming rate." "My bills would help prevent the loss of thousands of units of affordable housing by making it harder to deregulate rent-stabilized units . . ." Assembly member Latoya Joyner echoed that purpose, stating that "we need to ensure that rent stabilized apartments remain rent stabilized."

66.     Legislators confirmed that the purpose of preserving those rent-stabilized units was to subsidize the cost of housing for New Yorkers, particularly for low- and moderate-income New Yorkers. In fact, the justification offered in support of the 2019 Amendments emphasized the need to "protect their regulated housing stock, which provides and maintains affordable housing for millions of low and middle income tenants."

67.     As stated by Lucy Joffe, the Assistant Commissioner of Policy, New York City Department of Housing, Preservation & Development, "[r]ent stabilized apartments are both the largest source of low cost housing in the city and provide critical tenant protections that enable residents to remain in their homes and exercise the choice to stay in their neighborhoods."

68.     In furtherance of its goal of precluding owners from using their properties for any purpose other than rent-stabilized housing, the legislature adopted several amendments, including:

(a)     **Personal Use Exemption Dramatically Reduced.** The 2019 Amendments eliminated property owners' ability to recover possession of more than one unit within their own property for their own personal use and occupancy. Chapter 36 of the Laws of

25

2019, Part I. Even the right to recover one unit for use as the owner's primary residence is permitted only if the owner can show an "immediate and compelling necessity" for that one unit.

(b)      **Luxury Decontrol Eliminated.** Part D of Chapter 36 of the Laws of 2019 repealed sections 26-504.1, 26-504.2, and 26-504.3 of the Administrative Code of the City of New York, which had deregulated units upon their vacancy when the rents reached a luxury threshold. Now, regardless of the rent levels of the units, the units will remain subject to the limitations imposed by rent stabilization.

(c)      **High Income Decontrol Eliminated.** Part D of Chapter 36 of the Laws of 2019 also repealed Sections 26-504.1, 26-504.2, and 26-504.3 of the Administrative Code of the City of New York, which deregulated units when the tenant had a high-income ($200,000 or more), and the rent met the Luxury Decontrol threshold. Now, regardless of the income of the tenants, the units will remain subject to the limitations of rent stabilization.

(d)      **Cooperative and Condominium Conversion Dramatically Limited.** Part N of Chapter 36 of the Laws of 2019 amended the laws governing conversion of rental units to cooperative or condominium ownership. The Amendments eliminated the availability of eviction plans, and with respect to non-eviction plans now require written purchase agreements from 51% of all existing tenants. Previously, non-eviction plans required written purchase agreements from only 15% of units, which could be met through commitments by bona fide purchasers rather than tenants. By requiring purchase agreements from a majority of tenants, the 2019 Amendments literally transfer to the tenants the right to dispose of property through cooperative or condominium conversion.

Given that bona fide purchasers no longer count toward the threshold, and the low likelihood that 51% of the existing rent-stabilized tenants—who are guaranteed subsidized, below-market rents—would opt to purchase a condominium unit (assuming they could afford it), the Amendments effectively eliminate owners' ability to dispose of their building through cooperative or condominium conversion.

69.     Consistent with the goal of ensuring that owners of rent-stabilized units continued to subsidize the housing costs of tenants, the Legislature also eliminated most (if not all) of the means for increasing rents beyond the amounts permitted by the RGB. Specifically:

(a)     **Statutory Vacancy Allowance Eliminated.** The 2019 Amendments repealed the law permitting statutory vacancy allowances. Chapter 36 of the Laws of 2019, Part B, §§ 1, 2.

(b)     **Longevity Increase Eliminated.** The 2019 Amendments repealed the law permitting longevity increases. Chapter 36 of the Laws of 2019, Part B, §§ 1, 2.

(c)     **Increases for Major Capital Improvements Dramatically Reduced.** The 2019 Amendments dramatically reduced the owners' ability to recover the costs of Major Capital Improvements (as explained in greater detail below). First, the Amendments extended the amortization period for reimbursement of major capital improvements from eight years to twelve years for buildings with 35 or fewer units, and from nine years to twelve and one-half years for buildings with more than 35 units. Chap. 36 of the Laws of 2019, Part K, §§ 4, 11. Second, the Amendments specified that any rent increases were temporary (compelling owners to disentangle and remove such increases as compounded over the years by RGB increases), and capped the period during which such increased rents could be charged to 30 years. *Id.* Further, the Amendments preclude owners from

increasing rents on any existing tenant by more than 2 percent in any year to recover the MCI, which is one-third of the 6 percent annual increase permitted prior to the 2019 Amendments.

(d) **Increases for Individual Apartment Improvements Dramatically Reduced.** The 2019 Amendments dramatically reduced the value associated with IAIs. The Amendments cap at $15,000 in the aggregate the recoverability of IAIs over a 15-year period. Chapter 36 of the Laws of 2019, Part K, §§ 1, 2. They also significantly decrease the amount of any rent increase to one one-hundred-sixty-eighth (1/168th) of the cost of the IAI (for buildings with 35 or fewer units) and to one one-hundred-eightieth (1/180th) of the cost of the IAI (for buildings with more than 35 units). *Id.* They also make such rent increase temporary (compelling owners to disentangle and remove such increases as compounded by RGB increases), and cap any rent increase to 30 years. *Id.*

(e) **Preferential Rent Increases Eliminated.** The 2019 Amendments eliminated the right of owners who were charging rents below the legally regulated amount to increase those rents upon the lease renewal to the legal regulated rent, as adjusted by applicable guideline increases. Rather, the amount that may be charged to an existing tenant can be no more than the rent charged prior to renewal, adjusted by the most recent applicable guidelines increases. *See* Chapter 36 of the Laws of 2019, Part E.

## II. THE RSL SOLUTION—HOUSING COSTS FOR SOME TENANTS SUBSIDIZED BY SOME PROPERTY OWNERS—IS NOT RATIONALLY RELATED TO THE STATED PROBLEMS TO BE SOLVED, AND CONSEQUENTLY HAS NOT SOLVED THOSE PROBLEMS

70. The RSL violates Due Process because it is an irrational, arbitrary and demonstrably irrelevant means to address its stated policy ends. Under the Fifth and Fourteenth Amendments to the Constitution, individuals may not be deprived of their property without due

28

process of law. This protection of property rights is deeply rooted in American history and traditions, and is a fundamental right on which America was founded. *See, e.g.*, Federalist No. 10, at 78 (Madison) (C. Rossiter ed. 1961) (describing protection of property rights, especially in land, as "the first object of government"); Federalist No. 54, *supra*, at 339 (Madison) (government is "instituted no less for protection of the property than of the persons of individuals"). When, as here, Plaintiffs are being deprived of their property rights without any rational relationship between that deprivation and a legitimate government interest, the deprivation violates the Fifth and Fourteenth Amendments to the United States Constitution. Indeed, given the fundamental nature of the right to property—a right that is expressly articulated in the Constitution itself—Defendants must demonstrate that the RSL is narrowly tailored to achieving a compelling governmental purpose. Defendants cannot satisfy that standard.

71.    Over the 50 years that the RSL has been in effect, Defendants have provided varying justifications for the restrictions imposed by the RSL. The RSL is not rationally related—let alone narrowly tailored—to achieve any of the ends that have been used to justify the extreme measures taken under the law.

72.    *First,* the RSL has been justified as a means to provide affordable housing to low-income families, as confirmed by New York State's highest court. But the law's operative provisions are wholly disconnected from that goal. There is no requirement that RSL units can be rented only to low-income families. In fact, the only financial qualification for the application of the RSL—the provision permitting decontrol of a unit if the owner earns an income over $200,000 ***and*** the rent was above the Luxury Decontrol threshold—was removed from the RSL in the 2019 Amendments. As a result, there are numerous documented reports of stabilized units

leased by families least in need of assistance. The data confirms that the RSL has not been targeted at all—let alone effectively or narrowly targeted—to families with low incomes.

73.     *Second,* the RSL has also been justified by the need to increase the vacancy rate, and thereby remedy a purported "housing emergency." Even if there were evidence that any housing emergency existed (Defendants have failed to generate any record in support of the "emergency" finding, as discussed in the next section), the RSL not only fails to increase the vacancy rate, it exacerbates the vacancy problem by disincentivizing property development and incentivizing existing tenants to remain in units that may no longer suit their needs. Such a law is not rationally related—let alone narrowly tailored—to remedying the low vacancy rate that purportedly underlies the housing emergency.

74.     *Third,* there are other available alternatives that would help provide affordable housing to low-income families or help to increase the supply of housing generally. But, those alternatives would require support from all New York taxpayers, and therefore lack the apparent allure of imposing the financial burden entirely on a small subset of property owners, which underpins the RSL. As a result, the Defendants continue to use a subset of New York property owners to fund an RSL that is not rationally related to, and fails to, achieve the ends that it is claimed to serve.

A.     ***The Justifications for the Claimed Housing Emergency Have Changed Over Time***

75.     Defendants justify the RSL by reference to a claimed "housing emergency." But the nature of that asserted "emergency"—*i.e.*, the aspect of the housing market that supposedly gives rise to a state of emergency—has shifted significantly over the 50 years the law has been in effect.

76.     The federal government initially enacted rent control during World War II as an effort to address the "emergency created by war, the effects of war and the aftermath of hostilities." *See* Emergency Housing Rent Control Law § 1.

77.     When the RSL was first enacted in New York City in 1969—some 25 years after the allied victory in World War II—the initial declaration of a housing emergency in New York City carried the same rationale: to address the "emergency created by war, the effects of war and the aftermath of hostilities." *See* RSL, Local Law 16 of 1969, §§ YY51-1.0 (later codified at Admin. Code of the City of New York § 26-501).

78.     In 1974, when the New York State legislature enacted the Emergency Tenant Protection Act, language invoking the war-time rationale for rent regulation was retained. However, the legislature began to shift the basis of the housing emergency to an "acute shortage of housing accommodations." N.Y. UNCONSOL. LAW § 8622 (McKinney). In the ETPA, the legislature, for the first time, permitted the declaration of a housing emergency only when the vacancy rate fell below a specific minimum. Section 8623(a) delegated to the New York City Council the authority to declare a housing emergency when "the vacancy rate for the housing accommodations within such municipality is not in excess of five percent." As noted above, the legislature gave no basis for its decision to select 5% as the vacancy rate that could trigger an emergency. Nor has it ever revisited whether that threshold is appropriate given the changes in the economy, job market, and housing market since 1974.

79.     The vacancy rate threshold to declare a housing emergency—5%—remains the same today as when it was arbitrarily adopted in 1974. But the nature of the "housing emergency" has again shifted. Testimony during the City Council's 2018 emergency declaration hearing by proponents of continuing the RSL scheme centered on the need for quality affordable

housing for low-income individuals, reducing homelessness, and maintaining cultural, racial and socio-economic diversity in New York City.

80.     For example, the Chair of the Committee on Housing and Buildings began the hearings concerning the emergency determination by declaring that "New York City's housing stock is increasingly becoming unaffordable for those, for the many seniors and families who live here and the housing vacancy survey shows that it is crucial for us to extend rent regulation for the next three years. . ." New York City Council Speaker Corey Johnson described rent regulation as "the most critical tool we have for maintaining affordable housing in New York City." After noting that the City "is struggling with a homelessness crisis," he then explained—before any testimony was provided—that "[t]oday we are taking the first step by renewing the findings that we are still in a housing crisis . . ."

81.     The Deputy Commissioner of Policy and Strategy at the New York City Department of Housing, Preservation and Development then testified that "[r]ent stabilization laws are a critical resource for about one million New York City households that must be protected and strengthened in order to provide lower income households the choice to live" in New York City. He explained that rent stabilization provides "the largest source of low cost housing in the City," and "supports our affordable housing work."

82.     The war-time emergency rationale—already an anachronism more than 70 years after the end of World War II—was officially discarded in the 2019 Amendments. While the Legislature still purports to justify its law on the basis of an asserted "public emergency," it has now officially discarded its assertion that the emergency "was at its inception created by war, the effects of war and the aftermath of war."

83. As discussed in more detail below, the RSL is not a rational means to achieve *any* of the ends advanced in support of the emergency rationale.

**B.** **_The RSL Does Not Target Affordable Housing to Those In Need_**

84. Matt Murphy, then-Deputy Commissioner of Policy and Strategy at New York City's Department of Housing, Preservation, and Development stated: "Rent stabilization laws provide a critical resource for about one million New York City households that must be protected and strengthened in order to provide lower income households the choice to live in our great City amidst our housing crisis."

85. The RSL is not rationally related to (much less narrowly tailored to) the goal of ameliorating a lack of affordable housing for low-income individuals and families.

86. Rent-stabilized units are not awarded based on financial need. There is no part of the RSL that targets its relief to low-income populations. There is no means testing, financial qualification, or other requirement that rent-stabilized apartments be rented to persons or families at particular levels of area median income (AMI). Rather, stabilized units are awarded to those who have the good fortune either to find an available stabilized unit or to have a relationship with someone who resides in one. Indeed, given that the RSL requires owners to perpetually renew the lease of their tenants, the RSL incentivizes owners with multiple potential tenants to choose tenants who may have higher incomes.

87. Not surprisingly, there are a plethora of examples—highlighted in the news with some frequency—of RSL units occupied by tenants who otherwise have substantial assets. Plaintiffs (and the association Plaintiffs' members) are frequently called upon to subsidize housing for well-heeled tenants. Data and studies confirm that the RSL is not benefiting low-income households, but is randomly benefitting those who win the RSL lottery.

88.     **Examples of Misdirected RSL Benefits**. An analysis by the Wall Street Journal recently concluded that the "biggest beneficiaries of rent regulation in New York aren't low-income tenants across New York City, but more affluent, white residents of Manhattan." The analysis noted that renters in Manhattan received steep rent discounts of $1,000 to $2,000 per month, and that in all of Manhattan, median regulated rents were 53% below median market-rate rents.

89.     The Wall Street Journal analysis demonstrated that more affluent renters of regulated units received bigger discounts from market rents. It noted that a typical renter with an income in the top quarter of all New York households paid about $1,650 in rent for regulated units, compared with $2,700 in rent for a similar renter paying market rents, a discount of 39%. For a renter in the bottom quarter of income, the difference was 15%.

90.     For example, one report stated that a polo-playing multimillionaire whose family owned a 300-acre estate in North Salem, NY lived in a rent-stabilized apartment for several years before it was decontrolled. A former Philip Morris executive lived in a rent-stabilized apartment for nearly 20 years, while he and his wife bought a weekend home in the Berkshires. A former magazine editor and her husband who owned a photo agency lived in a rent-stabilized unit in the Upper West Side for 27 years, while at the same time owning a cottage on a 7-acre property in upstate New York.

91.     The New York Times also reported in 2015 about one couple, both college professors who teach in Queens, NY, who each had separate rent-stabilized apartments in New York. Although the couple desired to move in together, neither wanted to give up their separate rent-stabilized apartments, for which they were respectively paying $2,070 and $1,500 a month. As one of them, who had been living in his duplex for 22 years, noted "it's the kind of thing that

you don't give up without a really good reason." Rather than vacate their rent-stabilized apartments, the couple together bought a $188,000 vacation home in the Catskills.

92.     **Data Confirm the Misallocation of RSL Subsidies.** One study found that in 2010, there were an estimated 22,642 rent-stabilized households that had incomes of more than $199,000, and 2,300 rent-stabilized households with incomes of more than $500,000. According to 2017 HVS data, there were 37,177 rent-stabilized units occupied by households with incomes of at least $200,000 and 6,034 with incomes of at least $500,000.

93.     It has been reported that rent-stabilized households that earn more than $200,000 and live in below market-rate units pay a total of $271 million less annually than the average cost of an unregulated unit of the same size in a similarly priced neighborhood, an average savings of $13,764 per household per year.

94.     The 2019 Amendments only exacerbate that problem by eliminating the High Income Decontrol provision, with the result that households earning more than $200,000 per year will be able to continue to enjoy rent-stabilized rates. Further, by eliminating the Luxury Decontrol provision, units with rents exceeding $2,774 per month will remain stabilized, even though (according to the Wall Street Journal) the median household income of tenants in such units was $150,000 per year, and the average household income was around $210,000 per year.

95.     **Research Confirms that RSL Subsidies are Randomly Distributed.** A mountain of scholarly research regarding the New York City housing market consistently shows that the rent regulation windfall is not targeted to low-income residents, but rather is dispensed quite randomly.

96.     In a 1987 study in the Journal of Urban Economics, Peter Linneman concluded, using data from the 1981 New York City Housing and Vacancy Survey ("HVS"), that both the

City's rent control and rent stabilization programs were targeted haphazardly, with benefits distributed quite randomly, leading Linneman to conclude that "the targeting of these benefits was poor." *See* Peter Linneman, *The Effect of Rent Control on the Distribution of Income among New York City Renters*, 22 J. of Urban Economics 14-34 (1987).

97.     A 2000 study by Dirk Early (using data from 1996) concluded not only that rent control and rent stabilization in New York City were poorly targeted, but also that the city's laws induced property owners to change the way they recruited tenants, giving preference to older and smaller households. *See* Dirk Early, *Rent Control, Rental Housing Supply, and the Distribution of Tenant Benefits*, 48 Journal of Urban Economics 185-204 (2000).

98.     Data from 2010 published by New York University's Furman Center confirm that the percentage of low-income households living in rent-stabilized and controlled units (65.8%) is only 12% higher than the percentage of low-income households living in market-rate units (53.1%). And outside of core Manhattan, there is only an 8% difference, meaning that both market-rate and rent-stabilized units serve low income households in similar proportions. *See* https://cbcny.org/sites/default/files/REPORT_RentReg_06022010.pdf

99.     Also in 2010, the Citizens Budget Commission ("CBC") published an analysis of rent-regulated units in New York City using 2008 data, and reached the same conclusion as the preceding studies: the subsidy associated with rent regulation in New York City is poorly targeted. *See* Rent Regulation: Beyond the Rhetoric, Citizens Budget Committee (2010) at 11, available at https://cbcny.org/research/rent-regulation-beyond-rhetoric. The CBC found that

> Overall the average discount is about 31 percent or $5,500 annually. However, the discounts vary by income group. The greatest percentage discounts are for those with incomes below $20,000 annually and for those with incomes between $125,000 and $175,000.

100.     These New York-specific studies are corroborated by research in other U.S. cities as well. In a 2007 study involving the effects of the end of rent regulation in Boston, David Sims concluded that low-income families were not well-served by rent regulation, with 26% of rent-controlled units occupied by tenants with incomes in the bottom quartile of the population, while 30% of rent-controlled units were occupied by tenants in the top half of the income distribution. *See* David P. Sims, *Out of Control: What Can We Learn from the End of Massachusetts Rent Control?*, 61 J. of Urban Economics 129-51 (2007). Margery Turner reached a similar conclusion regarding the Washington DC rental market. She determined that rent regulation did not benefit low-income renters efficiently and favored long-term renters (regardless of income level) over frequent movers. Margery A. Turner, *Housing Market Impacts of Rent Control: The Washington, D.C. Experience*, Urban Institute Report 90-1 (1990).

101.     **2017 HVS Data Confirms that RSL Fails to Target Households in Need.** Plaintiffs have examined the 2017 HVS data (the most recent HVS data available) to compare the characteristics of tenants in stabilized and unstabilized units to the characteristics of the population of severely cost-burdened renters in New York City. This examination produced to several conclusions.

102.     *First*, tenants in rent-stabilized units have much higher incomes than the population of severely cost burdened renters. While almost 90% of severely cost-burdened renters have incomes less than $35,000, only 37.7% of stabilized tenants have incomes below $35,000. Thus the RSL does a particularly poor job at connecting the lowest-income renters (incomes below $35,000) with affordable housing.

103.     *Second,* rent-stabilized units also do not do a significantly better job of serving lower-income tenants than do unregulated units. For example, 12% of residents of unregulated

units have incomes between $20,000 and $34,999 compared to 16.5% of stabilized tenants. The RSL similarly fails to target moderate-income tenants at a rate substantially greater than unregulated units. 78% of stabilized units are rented by households with incomes under $100,000, but so are 64% of unregulated units.

104.    *Third,* the RSL distributes a significant portion of its benefits to higher-income renters. For example, over one third (34.2%) of stabilized units (and half of post-1947 stabilized units) in Manhattan are occupied by tenants with incomes of $100,000 or more. Twenty-two percent of all stabilized units, over 200,000 units, are rented to households with a family income of $100,000 or more.

105.    *Fourth*, the RSL does not target the households most likely to face cost burdens due to rent. Married couples without children constitute the household type least likely to face a severe rental-cost burden—yet they are *overrepresented* among stabilized renters. *Underrepresented* among stabilized renters are single-parent households. Indeed, the average regulated tenant is only 34 years old, three years older than the average market-rate tenant.

106.    The RSL therefore cannot be justified on the ground that it is rationally related to (much less narrowly tailored to) the goal of ameliorating a lack of affordable housing for low-income individuals and families. It simply bears no rational relationship to achieving that goal because it does not match below-market-rent units with rent-burdened/low-income individuals nor does it help create a single new unit of housing.

107.    Under Section 8623(b), a municipality that has declared a housing emergency may declare that the regulation of rents does not serve to abate the emergency, and in that way may remove one or more (or all) classes of accommodations from rent regulation. Yet,

Defendants have failed to exercise that authority to determine whether rent regulation serves to abate any purported emergency.

108.    The Council's repetitive declaration of a housing emergency across the entire city, despite the lack of data to support a housing emergency for apartments renting at $2,000 or more per month, exacerbates the poor targeting of households. According to the 2017 NYC HVS, apartments renting between $2,000 and $2,499 per month have a vacancy rate of 5.2%. Apartments renting at $2,500 or more per month have a vacancy rate of 8.74%. By declaring a city-wide housing emergency despite evidence that only certain segments of housing have a sub-5% vacancy rate, the Council ensures that the RSL will apply to broad swaths of rental housing for which there is no emergency.

109.    The data shows overwhelmingly, in stark contrast to the scant record developed by the New York City Council, *see infra*, that the RSL is poorly targeted to address the supposed "emergency" of a shortage of affordable housing, and hence irrational and arbitrary. If Defendants had exercised the authority vested in them by the statute to investigate the issue, that conclusion would be readily apparent. Defendants' failure and refusal to exercise that statutory authority further deprives the Plaintiffs of their substantive right to Due Process.

### C.    *RSL is Not a Rational Means of Ensuring Socio-Economic or Racial Diversity*

110.    For many of the same reasons that rent regulation does not effectively target low-income households in need of affordable housing, it is not reasonably related to the goal of promoting socio-economic or racial diversity. The RSL is not targeted to assist underserved groups and, in fact, has instead been shown to increase gentrification.

111.    For example, the recent Wall Street Journal analysis explained that white renters in rent-protected apartments benefited more than any other racial group, with a discount of 36% from market rates, compared with 16% for black renters and 17% for Hispanic renters.

112.     In a 2002 study of rent regulation in New Jersey, Harvard researcher Edward Glaeser concluded that regulation was associated with an *increase* in economic segregation in municipalities. *See* Edward L. Glaeser, *Does Rent Control Reduce Segregation?*, Harvard Institute of Economic Research Discussion Paper No. 1985 (2002). Regulation was similarly found to be an ineffective tool for economic and racial integration in California and Massachusetts. *See* Ned Levine, et al., *Who benefits from rent control? Effects on tenants in Santa Monica, California*, 56 J. of the American Planning Association 140-52 (1990); David P. Sims, *Rent Control Rationing and Community Composition: Evidence from Massachusetts*, 11 B.E. J. of Economic Analysis & Policy 1-30 (2011).

113.     The RSL similarly does a poor job of targeting the racial or ethnic groups most in need. Rent-stabilized units serve disproportionately high shares of white renters compared to the race and ethnicity of severely cost burdened renters. For example, although only 27% of severely cost-burdened renters are white, 35% of stabilized units are occupied by white tenants.

### D.     *The RSL is Not a Rational Means of Increasing the Vacancy Rate*

114.     To the extent that the "housing emergency" is predicated on a low vacancy rate, it is not rationally related to remediating that vacancy rate. Rather, the RSL has the opposite effect, operating only to further reduce the availability of vacant apartments.

115.     Rent stabilization acts as a price control, reducing the incentive for property owners to develop their properties to create additional space. Further, by imposing a permanent physical occupation of buildings, it deters owners from being able to re-develop their properties to take advantage of a lot's unused zoning capacity (*i.e.*, air rights). By giving tenants the rights of ownership, rent stabilization deters the very rebuilding of properties necessary to increase the housing stock.

116.    The 2019 Amendments exacerbate the RSL's adverse effect on supply in two ways. *First*, by eliminating opportunities for rent increases at times of vacancy or upon decontrol of units, the law makes continued operation and leasing of such units less attractive and precludes the additional income needed to fund creation of new units. *Second*, by capping the ability to recover investments for individual apartment improvements and major capital improvements, it deters the re-development necessary both to the return of units to market after vacancy and to the maintenance of quality housing stock.

117.    The RSL also incentivizes tenants to stay in units longer, even if the units are no longer appropriately sized for the tenants' needs. The result is reduced turn-over and availability of apartments in New York, exaggerating the very impact—low vacancy rates—that the law was purportedly intended to address.

118.    **RSL Deters Development in New York City.** Economic theory has demonstrated over and over that price controls (such as the RSL) will inevitably depress the supply of the goods being controlled. One economist who formerly served as an advisor to the U.S. Department of Housing and Urban Development described rent controls as "self-defeating" and explained: "stringent rent controls inhibit the development of additional new rental units needed to remedy the problem that led to the adoption of the controls."

119.    According to a poll of economists by the American Economic Review, a resounding 93% agree that "a ceiling on rents reduces the quantity and quality of housing available." *See* Richard M. Alston, et al., *American Economic Review, Is There a Consensus Among Economists in the 1990s?*, 82 American Economic Review 203-209 (1992). "The most fundamental criticism of rent regulation is that it perpetuates the very problem it was designed to address: a housing shortage," according to the Citizens Budget Commission. *See* Peter D. Salins,

*Rent Control's Last Gasp*, CITY JOURNAL, Winter 1997, https://www.city-journal.org/html/rent-control%E2%80%99s-last-gasp-11951.html.

120.    Studies in San Francisco and Boston confirm this effect. In their 2018 study of the San Francisco rental market, Diamond, McQuade and Qian concluded that rent regulation reduced the stock of rental housing, as property owners substitute away from supply of rent-controlled housing. They conclude that rent control produced a 15 percent reduction in the rental supply of small multi-family housing, leading to rent increases in the long run and the gentrification of San Francisco. Likewise, David Sims observed a similar impact in Boston, where it was estimated that rent regulation held thousands of units off the rental market. See David P. Sims, *Out of Control: What Can We Learn from the End of Massachusetts Rent Control?*, 61 J. of Urban Economics 129-51 (2007).

121.    The same impact can be observed in the New York City housing market—the RSL aggravates the very problem it is claimed to address by inhibiting re-development of existing properties and the creation of *new* rental units. Despite the fact that existing zoning regulations provide sufficient unused development envelope to dramatically expand the City's stock of apartments on property occupied by rent-stabilized units, that additional housing stock is not being built. Rent stabilization plays a key role in inhibiting that development. The RSL both reduces earnings from buildings that could be reinvested into further development of the buildings, and also tightly restricts owners' ability to demolish and rebuild their own buildings to provide additional capacity. As a result, research confirms that properties containing buildings subject to significant rent stabilization tend to be significantly less developed than properties containing unregulated buildings.

122.    To begin with, existing zoning regulations, while contributing to the city's low vacancy rate, nonetheless still provide substantial room for the development of additional units. Using data from the New York City Department of City Planning, one report estimates that "[t]here is 1.8 billion square feet of unused development rights in residential zones alone. Built to their maximum envelope, these properties could accommodate more than a million units of housing."

123.    Despite the available zoning capacity, data demonstrates that buildings subject to RSL regulation are not developed to that capacity. Plaintiffs have analyzed 100 properties chosen at random within Manhattan, assessing the development of the properties in comparison with the zoned capacity of the properties. Half of those properties were 75% or more rent stabilized ("heavily stabilized properties"), and the other half were properties containing no stabilized units.

124.    Of the 50 buildings that were heavily stabilized, the analysis showed that those buildings were underbuilt by an average of 18% (and a median of 22%). Put another way, these properties had roughly 20% of their capacity remaining available for development. Buildings on unregulated properties, by contrast, typically were built to a level that exceeded the zoned capacity (likely due to grants of special exceptions, acquisition of air rights, or grandfathered buildings built under different zoning rules). On average, the unregulated properties were developed to a level 22% greater than the zoned capacity.

125.    If the heavily stabilized properties were developed to the same extent as the unregulated peer group, the result would be 420,487 additional square feet of living space. In other words, over 600 units of 700 square feet apiece would be available. This disparity of development between regulated and unregulated properties evidences that the RSL significantly

contributes to the underdevelopment of properties and the reduction of housing stock, creating the very purported scarcity of units that are then used to justify continuing their existence.

126.    The additional capacity within the sample set of the 50 heavily stabilized buildings represents approximately 20% of the developed living space within that sample set. If the number of units in heavily stabilized buildings across New York (e.g., those with 75% or more stabilized units) were increased by 20%, it would add well over 100,000 additional units.

127.    The underdevelopment of RSL-regulated properties is a direct result of the restrictions imposed by the RSL. As discussed, *infra*, mandatory lease renewals, succession rights, and limitations on an owner's ability to recover units under the RSL create massive barriers to redeveloping a building. Stabilized tenants—imbued by the RSL with a de facto property right in the stabilized unit—can simply refuse to leave unless convinced to do so with outsized buy-out payments.

128.    As one report from New York University's Furman Center observed, "most incremental residential development will, by necessity, require the demolition of existing buildings and new construction on assembled sites. However, under state law, rent-regulated tenants have certain rights which make it difficult and costly for the owners of buildings to gain vacant possession of their properties for redevelopment."

129.    Stories of hold-out tenants and large property owner buy-outs are commonplace. In 2015, two tenants in a small townhouse on Manhattan's west side stood in the path of the Hudson Yards mega-development. The two individuals refused to vacate, leveraging the threat of continued litigation over the stabilization status of their units. The developer eventually was forced to pay them $25 million in a huge buy-out. As one New York Times article notes, when a unit stands in the way of a large development, "a buyout can be like winning the lottery

44

(complete with taxes). Lawyers for some tenants now look down at anything under $10 million for a single resident."

130.    Another infamous tenant held out for $17 million when his unit stood in the way of a development on Central Park West. He had waited until the other tenants accepted payments to maximize the amount of his own.

131.    **The 2019 Amendments Exacerbate the RSL's Significant Adverse Impact on Housing Supply.** As noted above, the 2019 Amendments remove the few avenues of deregulation available to owners, such as Luxury Decontrol and High Income Decontrol, and thus magnify substantially the development-limiting impact of the RSL.

132.    The 2019 Amendments also eliminate statutory vacancy and longevity rent increases. The elimination of those rent increases, combined with the exceedingly low rent increases permitted by the RGB, dramatically reduces income from properties that might be used to fund the redevelopment of properties.

133.    As explained above, the 2019 Amendments also materially limit the ability to recover expenditures for IAIs by (i) placing a $15,000 aggregate cap on the recoverability of IAIs over a 15-year period, (ii) significantly increasing the amortization period for recovering those investments, and (iii) capping the total period for recovering those investments to 30 years, after which the rent increases must be removed (requiring owners to disentangle those increases from all other rent increases over the 30-year period). After accounting for the taxes owed on any rent increases, an owner will no longer be able to fully recover the present value of significant investments made in IAIs.

134.    As one example, when tenants depart after years of occupancy, units often may need $50,000 or more in repairs and restorations to prepare that unit for the market. Under the

2019 Amendments, only $15,000 of those repairs could be passed along to tenants. Further, on a $15,000 investment, only $83 per month would be recoverable per month for buildings over 35 units, and after taxes, the amount recovered is closer to $62 per month. If that investment is funded with a loan to be repaid at 4% annually, the property owner will fail to recover even the full net present value of the $15,000 investment. As a result of those combined effects, building owners will either choose to re-let with minimal (if any) improvements, resulting in the gradual deterioration of the building, or they will simply choose not to re-let the unit at all. Under either scenario, either the quality of the housing stock, or the supply of that stock (or both) will be further restricted as a result of the 2019 Amendments.

135.    For example, one CHIP and RSA member owns a twelve-unit apartment building in the East Village. Each of the twelve units is stabilized pursuant to the RSL. One of these units (a studio that rents for less than $600 per month) has been occupied by the same tenant for more than four decades. Despite multiple complaints about the tenant—including repeated complaints that the tenant keeps several dogs that are rarely taken out of the unit, emitting an unbearable odor in the summertime—the member has been unable to evict the tenant. Under the RSL, the tenant (and her dogs) have enjoyed an automatic right of renewal in the Village for four decades, at a rent far below market levels. When this unit becomes vacant, the member will face a decision. The unit needs substantial repairs before it can be re-rented, and in light of the 2019 Amendments, (1) the member can recoup only $15,000 of the costs of those repairs and (2) the unit will remain stabilized post-vacancy. The economics have made the decision. The member will turn off the lights and leave the unit vacant.

136.    This is not an isolated case. Plaintiffs Mycak Associates, Vermyck, and M&G own buildings with stabilized units, long occupied by tenants at depressed rent levels, that they

do not plan to repair and re-rent once vacated. The substantial investment required to renovate these units far exceeds the expected return, in light of the $15,000 cap on IAIs and the fact that the units will remain stabilized.

137. In addition to the limit on recovery of IAI expenditures, the 2019 Amendments also dramatically limit the recovery of expenditures on Major Capital Improvements (MCIs), by (i) increasing the amortization period for recovering those investments, (ii) capping the total period for recovering those investments to 30 years (after which they must be disentangled from other increases and removed from the rent), and (iii) limiting any rent increase needed to pay for such MCI to 2% per year (e.g., $30 on a $1,500/month lease).

138. Those collective limitations on MCIs will prevent owners from recovering the cost of many significant MCIs. For example, if an owner of a 30-unit building with an average rent per unit of $1,300 per month invested $200,000 in an MCI financed at 6% interest, the present value to the owner of the permissible rent increases per unit would be less than the present value of the MCI investment. As a result, many owners will choose not to reinvest through MCIs in their buildings. Absent investments in MCIs, building maintenance will be limited to only necessary improvements, resulting in dilapidated housing units and eventually the likely withdrawal of housing units from the housing stock.

139. Indeed, according to one recent analysis, changes under the 2019 Amendments could put over 414,000 units at risk within five years for heating outages, vermin infestations, mold or other housing quality issues.

140. The private equity firm Blackstone Group has reportedly halted renovations in Stuyvesant Town and Peter Cooper Village—comprising more than 11,000 units—due to the IAI and MCI restrictions in the 2019 Amendments. According to the report, Blackstone has ceased

renovations on vacant units as well as larger construction projects. Only urgent maintenance, such as leaks or hot water service, will continue.

141.    Despite a stated goal of increasing quality housing stock in New York City, the 2019 Amendments (and in particular the caps on the IAIs and MCIs) will result in either a deterioration of the quality of the housing stock or an elimination of units from available capacity. Both outcomes demonstrate that the RSL is not rationally related to achieving its desired ends.

142.    **RSL Reduces Turnover of Apartments, Resulting in Misallocation of Space.** Studies of the New York City market have consistently shown that rent regulation decreases residential mobility. Put another way, tenants fortunate enough to obtain rent-stabilized units stay in them, regardless of the suitability of the unit for the tenant in terms of size, location, and affordability relative to tenant wealth.

143.    In that way as well, the RSL itself further decreases the vacancy rate. Indeed, in the 2017 HVS survey, the vacancy rate for private non-regulated units was 6.07%—above the threshold that would trigger the ability to declare a housing emergency. But the vacancy rate for rent-stabilized units was only 2.06%.

144.    Longer tenancy duration among regulated renters is plainly illustrated in the City's 2017 HVS data. Controlling for characteristics of residents, tenants of rent-subsidized units stay in their apartments 3.43 years longer, on average, compared to residents of market-rate units.

145.    Such increased duration of tenancy results in reduced turnover of apartments, and therefore exacerbates both the low vacancy rate and reduces the availability of units for individuals and families seeking apartments. Further, this reduced turnover also results in tenants

staying in units that are no longer appropriate for their needs, thereby resulting in a misallocation of available rental space or even safety risks due to overcrowding.

146.    In 2003, using data on both rent-controlled and rent-stabilized units in 1990, Edward Glaeser and Erzo Luttmer examined household sizes and housing unit sizes (measured both by rooms and bedrooms) and found that "21 percent of New York apartment renters live in apartments with more or fewer rooms than they would if they were living in a free market city." *See* Edward L. Glaeser and Ezro F.P. Luttmer, *The Misallocation of Housing Under Rent Control*, 93-4 Am. Econ. Rev. 1027, 1028–29 (2003).

147.    The Citizens Budget Committee reached a similar conclusion in 2010 regarding the misallocation of housing space in New York City resulting from rent regulation. It found that households in stabilized units under-consume space relative to those in the unregulated market, in order to take advantage of lower rents in the regulated sector. Conversely, it found that households in rent-controlled units over-consume space when compared to the unregulated market, as these renters tend not to move to smaller units when the number of members in the household declines. And the CBC observed a corresponding mismatch effect in the unregulated sector: households in the unregulated sector likely consume less space than they would absent rent regulation, due to reduced supply and higher market rents.

148.    This "mismatch" effect is illustrated in the latest HVS data, which shows that stabilized tenants live in smaller units (as measured by number of rooms or number of bedrooms) than analogous market rate tenants.

149.    For all of these reasons, the RSL cannot be justified as rationally related to the goal of increasing the apartment vacancy rate so that more apartments are available to

individuals and families seeking to move to New York City and to New Yorkers seeking to move to a new apartment. Rather, the RSL's effect is to increase the housing shortage in the City.

### E.    *The RSL Has a Deleterious Impact on the Community at Large*

150.    The irrational and arbitrary relationship between the RSL and the "housing emergency" it is claimed to address is further evidenced by the law's *negative* impacts on New York City, including higher rents in the unregulated market and reduced tax revenues for New York City.

151.    **RSL Leads to Higher Rents in Unregulated Units.** The shortage of available rental housing caused by the RSL produces higher rents in the unregulated market. In a 2000 study, researcher Dirk W. Early determined that rent regulation in New York City increased rents in uncontrolled units and actually placed rent-regulated tenants in a worse position than they would be in the absence of rent regulation. Early found that lower rents in the uncontrolled market would provide the tenants in regulated units with more options, and options that better suited their needs than the regulated units. *See* Dirk W. Early, *Rent Control, Rental Housing Supply, and the Distribution of Tenant Benefits*, Journal of Urban Economics 48(2).

152.    Other researchers have found a more profound impact on market rents. A 1993 study by Steven B. Caudill, concluded that rents in uncontrolled units in New York City were between 22% and 25% higher than they would be in the absence of New York's rent regulatory scheme.  *See* Steven B. Caudill 1993. Estimating the Costs of Partial-Coverage Rent Controls: A Stochastic Frontier Approach. Review of Economics and Statistics 75(4): 727-731.

153.    **RSL Reduces Property Taxes.** The RSL also reduces property tax revenue available to New York City. Indeed, in the 2018 Fiscal Report for the bill extending the RSL, the City admits, "If . . . wholesale deregulation occurred, the City could see some increase in property tax revenue once property assessments were fully increased to reflect higher rents."

154.    The Citizens Budget Committee, using 2010 data, estimated that the City loses $283 million in property tax revenue a year as a result of rent regulation.

155.    The tax impact of the 2019 Amendments is far more drastic. A 2019 analysis estimated that these changes—and the steep drops in property values that they cause—will result in a ***$2 billion per year*** loss in property tax revenue. The tax revenue losses will be further exacerbated by an anticipated steep decrease in economic activity spurred by MCIs and IAIs that no longer make economic sense for property owners. To put these figures in context, a $2 billion dip in tax revenue (not even taking account of MCI- and IAI-related losses) could support a $500 monthly subsidy for over 300,000 rental units in New York City, almost a third of the rent-stabilized units in New York.

F.    ***Alternatives to the RSL Are Available That Are More Narrowly Tailored to the Goals Claimed to Underlie the RSL.***

156.    Requiring a relatively small set of private property owners to subsidize housing costs for individuals with no demonstrated need for rental assistance is not only grossly inequitable, but also diverts valuable City and State resources away from programs that could actually help address the vacancy rates and provide low-income individuals with housing assistance.

157.    Viable measures currently in place in New York and also employed elsewhere, such as housing vouchers or tax abatements, are rationally related to the challenges that the RSL purports to ameliorate but does not address or instead exacerbates. These alternatives not only come closer to furthering the stated goals of the RSL but also distribute the costs and benefits in an equitable manner. Unlike the RSL, they do not impose the burden of a costly "public assistance benefit" on the property rights of individual owners, but rather equally distribute the

costs for these programs among society as a whole. And also, unlike the RSL, they actually target and help individuals who demonstrate a need for rental assistance.

158.    **Housing Subsidies.** One alternative to the RSL is the use of direct housing subsidies. These are already provided in the form of housing vouchers under the federal Section 8 program, which targets low-income individuals for housing assistance. Section 8 provides subsidies for individuals to use toward housing based on income and family size. There are approximately 100,000 households in New York City that benefit from this program. Rather than rely on off-balance sheet funding for housing subsidies, New York City and State could implement an analog of Section 8 to provide vouchers or other subsidies to renters.

159.    These vouchers can be general, enabling the tenant to select any apartment, or "project-based," in which the voucher must be used for a certain property. Under the Section 8 program, the agency issuing the voucher ensures that the rent for the rental unit selected is reasonable for the area, and recipients of housing vouchers are expected to pay 30% of their income toward rent and utilities, or a minimum rent payment of up to $50, whichever is greater. Allowing individuals to choose where they use their housing vouchers enables lower-income families to move out of high-poverty neighborhoods and would increase diversity in New York City neighborhoods. Studies have shown that children who grow up outside of high-poverty neighborhoods do better in school, attend college at high rates, and earn more money as adults.

160.    Other examples of subsidy programs that might be expanded to address housing costs are the SCRIE and DRIE programs offered by New York City. The Senior Citizen Rent Increase Exemption (SCRIE) freezes rent for seniors who are in rent-regulated units, are the head of the household, make less than $50,000, and pay more than one-third of their income to rent. The amount that the senior tenant is exempted from paying is returned to the owner as a property

tax abatement credit. The Disability Rent Increase Exemption (DRIE) exists for disabled individuals and also provides owners with tax credits. There is no reason these programs cannot be extended to any elderly or disabled people who meet the income qualifications, not just those who live in rent-stabilized units. Clearly, programs already exist that are rationally related to accomplishing the goal of providing affordable housing without effecting an uncompensated taking from other private individuals.

161.    Subsidies could also be provided through a more robust program providing assistance for home purchases, which would direct financial assistance to those who need it and would also promote home ownership. New York City's HomeFirst Down Payment Assistance program provides a forgivable loan of up to $40,000 to a handful of residents each year, but only first-time home buyers can participate. In Chicago and elsewhere, residents can receive down payment assistance even if they purchased a house before, so long as their income falls below a certain level. Unlike the RSL, which reduces housing stock and perpetuates permanent renting, a down payment assistance program available only to low-income residents would make housing more affordable to New Yorkers. Some experts have also advocated government-funded rent insurance programs, similar to other types of insurance policies.

162.    **Tax Credits.** Another alternative to the RSL is a State renter's tax credit. New York State already provides a tax credit of up to $500 to New York City renters whose household income does not exceed $200,000. Rather than fund low-income housing through stabilized tenancies and compelling property owners to bear the burden, this tax credit program could be increased and better targeted at those lower-income tenants who spend more than 30% of their income on rent.

163.   **Increasing Supply of Housing.** The best answer to a shortage of high-quality affordable housing is *more housing*. In August 2018, a study by researchers Vicki Been (currently the newly appointed Deputy Mayor of Housing and Economic Development), Ingrid Gould Ellen and Katherine O'Regan of New York University's Furman Center concluded that "from both theory and empirical evidence, that adding new homes moderates price increases and therefore makes housing more affordable to low- and moderate-income families." *See* Supply Skepticism: Housing Supply and Affordability, Vicki Been, Ingrid Gould Ellen and Katherine O'Regan, August 20, 2018; available at http://furmancenter.org/research/publication/supply-skepticismnbsp-housing-supply-and-affordability.

164.   There are many well-tested ways for states and cities to increase the supply of housing. For example, New York already operates the largest Public Housing Authority in the country, which provides affordable, subsidized housing to more than 400,000 people. Expanding that housing, or promoting partnerships between the Housing Authority and the private sector, would both address the vacancy issues and could also be targeted to low-income tenants.

165.   Direct government subsidies or innovative financing programs can also encourage new construction to be provided to would-be tenants. In Denver, Colorado, for example, the city instituted a Revolving Affordable Housing Loan Fund in order to bridge the gap for developers between the federal government's 4% Low-Income Housing Tax Credit and the amount of financing needed to make certain low-income housing projects feasible. As developers pay back their loans, money goes back into the fund to pay for future affordable housing projects. New York City has developed similar financing programs, including the Extremely Low and Low Income Affordability (ELLA) program and the HPD "Mix and Match" program. Each of those programs are much more focused than is rent stabilization on providing benefits to low- and

middle-income tenants. The ELLA program targets development of housing for those with incomes between 30% and 50% of the area median income, and the Mix and Match program targets development of housing serving households with 60% to 130% of area median income.

166.    In addition, zoning changes would enable developers to build more housing. Currently, New York State's Floor Area Ratio ("FAR") regulation prohibits building housing that is 12 times larger than the property it sits on. Though there are some exceptions to this rule, the overall impact is to artificially limit housing stock and increased density, which could otherwise be provided by the market. Indeed, one study identified 149 census tracts, mainly in Manhattan, that have the infrastructure and resources to support the creation of additional housing but which cannot add the needed residential density due in part to the FAR regulations. Modification of the FAR regulations would enable the market to increase the housing supply to better meet demand.

## III. THE NEW YORK CITY HOUSING "EMERGENCY" DECLARED EVERY THREE YEARS FOR THE LAST 50 YEARS WITH NO RATIONAL BASIS FOR THE DECISION—MOST RECENTLY IN 2018—VIOLATES DUE PROCESS

167.    The RSL applies in New York City as a result of the New York City Council's declaration of a housing emergency every three years for the past 50 years, most recently in 2018. Those declarations violate Due Process because they are arbitrary and irrational.

168.    The RSL, as amended, permits but does not compel the New York City Council to declare a housing emergency when there is a vacancy rate of 5% or less. It provides that "[a]ny such determination" is to be made not just "on the basis of the supply of housing accommodations within such city," but also based on "the condition of such accommodations and the need for regulating and controlling residential rents within such city. . ." N.Y. UNCONSOL. LAW § 8623.a (McKinney).

169.    The RSL provides that a municipality may declare an emergency as to any class of housing accommodations if the vacancy rate for accommodations in that class is not in excess of 5%, and may declare an emergency as to all housing accommodations if the overall vacancy rate for housing accommodations in the municipality is not in excess of 5%. *Id.*

170.    Section 8623.b provides that a municipality that has declared a housing emergency may at any time declare that the emergency is wholly or partially abated, or that the regulation of rents does not serve to abate the emergency, and in that way may remove one or more (or all) classes of accommodations from rent regulation.

171.    By its terms, the New York statute permits, but does not require, the declaration of an emergency if the vacancy rate is at or below 5%. Put another way, the mere fact that there is a 5% (or lower) vacancy rate does not by itself provide a justification for declaring a housing emergency, but is instead a precondition to making a determination of whether such an emergency exists and there is "the need for regulating and controlling residential rents." N.Y. UNCONSOL. LAW § 8623.a (McKinney). Even when the vacancy rate in New York City is shown to be less than 5%, the City Council must separately consider and decide whether a housing emergency exists.

172.    But the City Council turned that standard on its head, declaring a housing emergency because the overall New York City vacancy rate is 5% or less, regardless of whether the evidence supports that there is "the need for regulating and controlling residential rents" in the City or whether doing so would improve the "condition of [housing] accommodations" in the City. *Id.*

173.    For five decades the New York City Council has simply authorized (and reauthorized) an "emergency" status in the City's housing market whenever the vacancy rate is

less than 5%, without providing any meaningful support for or analysis of whether a housing emergency actually exists that would be ameliorated by "regulating and controlling residential rents."

174.   The Council has failed to make any assessment as to whether the regulation of rents pursuant to the RSL serves to abate the emergency that it has found to exist. To the contrary, after 50 years-plus of rent stabilization, the Council continues to find every three years that the "emergency" continues—an admission that the RSL has failed in its purposes.

175.   The New York City Council made its most recent triennial housing emergency finding in 2018. The hearing it conducted leading to that 2018 finding shows the cavalier manner in which the Council imposes the RSL on the City's residents and property owners, without any rational demonstration that the statutory standard is satisfied.

176.   Before declaring a housing emergency for 2018-2021, the New York City Council heard oral testimony from eighteen members of the public and three City officials. The majority of the speakers focused principally on reforms to the rent-stabilization system, such as eliminating vacancy deregulation, preferential rent, and major capital improvements increases. To the extent that questions were posed by City Council members, those questions focused on these issues of reform, rather than whether an emergency actually exists in the New York City housing market and whether the RSL addresses that emergency.

177.   Roughly half of the speakers at the 2018 emergency finding hearing shared personal anecdotes about their own experiences as rent-stabilized or rent-controlled tenants. To the extent that speakers referenced any specific data at all, it was derived from the initial findings of the HVS—the same data used to establish the 5% vacancy threshold necessary—but not

sufficient—to authorize an emergency finding in the first place. Both CHIP and RSA submitted written testimony in opposition to the declaration of the emergency.

178.   The HVS is conducted by the Census Bureau every three years and is sponsored by the New York City Department of Housing Preservation and Development ("DHPD"). While the HVS collects data on various characteristics of New York City's housing market, including population, households, housing stock and neighborhoods, the primary focus of the HVS is the rental vacancy rate. Since 1965, when the Census Bureau began conducting the HVS, the rental vacancy rate in New York City has never risen above 5%. A chart of the vacancy rates reported in the HVS from 1965 to the most recent report in 2017 is below:

| Year | Vacancy Rate |
|------|--------------|
| 1965 | 3.19% |
| 1968 | 1.23% |
| 1970 | 1.50% |
| 1975 | 2.77% |
| 1978 | 2.95% |
| 1981 | 2.13% |
| 1984 | 2.04% |
| 1987 | 2.46% |
| 1991 | 3.78% |
| 1993 | 3.44% |
| 1996 | 4.01% |
| 1999 | 3.19% |
| 2002 | 2.94% |
| 2005 | 3.09% |
| 2008 | 2.88% |
| 2011 | 3.12% |
| 2014 | 3.45% |
| 2017 | 3.63% |

179.   The HVS does not provide a definition for the term "housing emergency." It does not present data or analyses aimed at establishing whether a housing emergency exists, or

purport to propose a methodology for making that determination. Nor does it address the express statutory factors that must be applied to determine whether there is a need for rent regulation or how rent regulation affects the condition of residential housing. N.Y. UNCONSOL. LAW § 8623.a (McKinney).

180.     Virtually no data other than the HVS was considered before the 2018 emergency finding was made. Oksana Miranova, a housing policy analyst from the Community Service Society, introduced some meager non-HVS data generated through her organization's annual survey. That survey found a 13% decrease in the number of rent-regulated renters reporting a very serious or somewhat serious problem with housing affordability from 2015 to 2017. This study also found that in the same period, there was only a 2% decrease among unregulated renters. Ellen Davidson, a staff attorney at the Legal Aid Society, offered another statistic (based partially on HVS data): "In 1999, there were 1.1 [million] low income households that needed affordable apartments renting for under $800. At the time, there were 1.35 million apartments which rented for under $800 a month. Today, there are 867,000 households who need apartments that are renting for under $800 a month and[,] according to the recently released HVS, there are now 350,000 apartments renting for under $800."

181.     The 2018 emergency finding received scant support from City witnesses. The City Council heard from three members of the DHPD. Matt Murphy, the then-Deputy Commissioner of Policy and Strategy, focused on New York City programs outside the RSL aimed at providing affordable housing, including financing the construction and preservation of affordable homes and providing counsel for low-income tenants facing eviction. Elyzabeth Gaumer, the Assistant Commissioner for Research and Evaluation, described the initial findings of the 2017 HVS. Francesc Marti, the Assistant Commissioner for Government Affairs,

answered questions about the Department's policy on certain state-level reforms, including the repeal of vacancy decontrol.

182.    The DHPD presented data that the overall City-wide vacancy rate was 3.65% in 2017, rents had increased 6.2% since 2014, and there were 3,600 more vacant units in 2017 than in 2014. In addition, DHPD explained that an additional 69,000 units had been created since 2014. The DHPD also presented data based on self-reporting of individual tenants. It stated that 76.1% rated the condition of residential structures in their neighborhood as "Excellent" or "Good."

183.    The written hearing record relating to the City Council's 2018 emergency finding was similarly meager. It contained statements from an additional eight people and organizations, including four statements advocating against renewal of the emergency finding. Of the statements in the written record favoring an "emergency" declaration, only two cited statistics not included in the HVS. Oksana Miranova (referenced above) provided a written statement including additional statistics from the Community Service Society's survey, such as: in 2014, the median rent burden for low-income rent-regulated tenants was 48% of income, compared to 50% for unregulated tenants. The Legal Aid Society's written statement also included statistics from the 2018 Income and Affordability Study published by the NYC Rent Guidelines Board and a report from the Coalition for the Homeless. In each instance, the focus of the so-called emergency was the low vacancy rate—a factor already established by the HVS.

184.    Defendants did not establish any rational basis for determining that a housing emergency exists—the finding required by the statute. In fact, Defendants have failed even to identify the variables that should be used to determine whether an emergency exists (let alone the threshold at which those variables might be indicative of an emergency).

185.    Prior emergency declarations were supported by similarly underdeveloped records. In 2015, for instance, the City Council heard from twenty-two people, including two City officials. Every speaker supported renewing the rent-stabilization laws. As in 2018, half of the speakers shared stories about either their own experiences as a rent-regulated tenant or their clients' experiences with rent regulation. To the extent that speakers referenced statistics, they primarily recited information from the initial findings of the HVS. In 2015, DHPD provided information that the City-wide vacancy rate was 3.45% for 2014, that the number of vacant available rental units had increased 7,000 since 2011, and that median rents had increased 4.3% since 2011.

186.    In 2012, the City Council heard from twelve people, including two City officials. Eleven of the twelve supported renewing the RSL. In 2012, DHPD reported that the City-wide vacancy rate for 2011 was 3.12%. The number of vacant units had increased 6,000 since 2008, and median rents had increased by 4%. Before that, in 2009, DHPD reported the vacancy rate for 2008 was 2.88%. The median rent increased 4.2% (if adjusted for inflation) since 2005, and DPHD reported a decrease of 3,000 vacant units over that same time.

187.    Details of the record from the last three "emergency finding" hearings are reflected in the chart below.

| Year | Speakers | Speakers Favoring Renewal | Speakers Against Renewal | Additional Written Statements | Written Statements Favoring Renewal | Written Statements Against Renewal |
|------|----------|---------------------------|--------------------------|-------------------------------|-------------------------------------|------------------------------------|
| 2018 | 21 | 21 | 0 | 8 | 17 | 4 |
| 2015 | 22 | 22 | 0 | 2 | 11 | 1 |
| 2012 | 12 | 11 | 1 | 1 | 9 | 2 |

188.    On the strength of this record, the New York City Council did in 2018 what it has done for the last 50 years: declared a housing emergency in New York City requiring the renewal of the RSL invasive and confiscatory statutory framework.

189.    The City has failed to offer either a rational explanation or justification for its determinations. The City has failed to identify any thresholds constituting an "emergency," failed to articulate the criteria or bases for its triennial determination, and failed to explain, or even consider, whether the rent regulation that follows from its rote triennial determinations actually addresses the perceived housing emergency. As a result, the determinations on which the rent stabilization system rests are arbitrary and irrational and a violation of the Due Process and property rights of Plaintiffs and their members.

190.    Certainly the mere fact that the vacancy rate is less than 5% does not justify the conclusion that a housing emergency exists in New York City. Data from the United States Census Bureau shows that at least eighteen of the top 75 metropolitan areas in the country have posted rental vacancy rates of less than 5% between 2015 and 2017. The statute provides that a vacancy rate below 5% is necessary but not sufficient to establish an emergency, and the record from the City Council emergency hearings does not address how the actual City-wide vacancy rate is indicative of a market in a state of emergency. The City seems incorrectly to believe that so long as the vacancy rate is below 5%, an emergency exists regardless of other circumstances, just as the Council has done for decades despite a changing housing market.

191.    Moreover, using the HVS data to establish a 5% vacancy rate for the entire city of New York is irrational. The vacancy rate varies across boroughs and type of housing—with vacancies for some areas and some types of housing well in excess of 5%. For example, the vacancy rate for rental properties with rents above $2,000 was 7.42%. The vacancy rate for all

private non-regulated units (56% of the rental stock) was 6.07%. Even though the governing statute, Section 8623.b, provides that a municipality may at any time declare that an emergency is wholly or partially abated, Defendants failed to apply that authority with respect to those portions of the market for which the vacancy-rate threshold for an emergency determination has ceased to exist, such as for high-rent stabilized units.

192.     The arbitrary 5% vacancy-rate threshold established by statute as authorizing a municipality to consider making a housing emergency determination only emphasizes the need for careful consideration by the New York City Council—separate and apart from the vacancy rate itself—whether a housing emergency *actually exists*. But the sparse record compiled in connection with the 2018 emergency finding, as in each of the prior findings, provides no basis whatsoever for the Council to do so. While perhaps politically popular, the rote renewal of the RSL on the basis of such an "emergency finding" violates Due Process.

## IV.    THE RSL RESULTS IN UNCOMPENSATED PHYSICAL TAKINGS OF PRIVATE PROPERTY

193.     "That government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of a legislative body, without any restraint. The fundamental maxims of a free government seem to require, that the rights of personal liberty and private property should be held sacred." *Wilkinson v. Leland*, 27 U.S. 627, 657 (1829) (Story, J.). Through the RSL, Defendants are violating this fundamental principle, depriving New York City property owners of their fundamental property rights, including their rights to exclude others from their property, and to possess, use and dispose of that property.

194.     A government-sanctioned physical invasion of private property is a per se taking requiring compensation. The category of per se takings is not limited to physical seizure of property by the government; it also encompasses government-mandated placement of an object

or a person on private property (e.g., *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36 (1982)), access easements of indefinite duration (*Dolan v. City of Tigard*, 512 U.S. 374 (1994)), and even flyovers that appropriate airspace (*United States v. Causby*, 328 U.S. 256 (1946)). The Supreme Court has held specifically that granting a "permanent and continuous right to pass to and fro'" over private property is a "permanent physical occupation." *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831–32 (1987). As described below, multiple provisions of the Rent Stabilization Laws (including those from the 2019 Amendments) subject property owners to such physical invasions.

195.     Rent stabilization imposes unconstitutional conditions on building owners' use of their property. In order to rent out a pre-1974, six-unit-plus building covered by the RSL, a building owner must acquiesce in a set of rules that impose on the owner the indefinite physical occupation of rented units by tenants and their successors at below-market rents with any increases controlled by government regulation. An owner cannot participate in the rental market without acquiescing in that regulatory system, which (as discussed in detail below) effects a per se taking. And once a property is placed into that rental market, the owner's ability to leave the market is severely restricted. Government cannot condition an owner's ability to rent its property on the elimination of the owner's rights to exclude others from its property, and to possess, use and dispose of that property. *See Loretto*, 458 U.S. at 439 n.17 (holding that New York law effected a taking because "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation"); *Dolan*, 512 U.S. at 385 ("had the city simply required petitioner to dedicate a strip of land along Fanno Creek for public use, rather than conditioning the grant of her permit to redevelop her property on such a dedication, a taking would have occurred").

196.     Each individual provision of the Rent Stabilization Laws (including those from the 2019 Amendments), and the combined effect of all the provisions, constitutes a per se taking.

197.     *First,* the RSL mandates the continued occupation of rental properties by tenants, and owners cannot refuse to renew leases to those tenants except under the narrowest of circumstances. Not only do owners have no way to remove the original tenant in the property, but they must suffer the intrusion of strangers—sub-lessors and successors of the tenant—the selection and admission of whom the owner is given no right to oppose. The "right to exclude others" from "one's property" is "'one of the most essential sticks in the bundle of rights'" that characterize property. *Dolan*, 512 U.S. at 393 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)). That the Rent Stabilization Laws deprive property owners of that "essential stick" demonstrates that the laws effect a per se taking of the owner's property.

198.     *Second,* the Rent Stabilization Laws complete their physical occupation of New York City property by taking from the property owners the right to possess, use, and dispose of property. "Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.' To the extent that the government permanently occupies physical property, it effectively destroys *each* of these rights." *Loretto*, 458 U.S. at 435 (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945)). The RSL not only denies property owners the fundamental right to exclude others, but also denies them the rights of use, possession, and disposal, leaving property owners with only the shell of ownership.

199.     *Third,* the RSL also dramatically limits the property owner's ability to dispose of his or her own property. Tenants may not be denied a lease renewal even if the owner wants to repurpose the building to non-housing rental purposes. *See* 9 NYCRR § 2524.5. If an owner wanted to cease offering the property for rent entirely—if the owner effectively wanted to go out

of business and not use the property for any purpose—the RSL denies the owner the right to not renew his tenants' leases in all but the most extreme circumstances. *See* 9 NYCRR § 2524.5. If prior to the 2019 Amendments, the owner wanted to convert a building to cooperatives or condominiums, the owner could do so as long as he obtained purchase agreements from 15% of tenants or bona fide purchasers, and tenants did not have to give up any rights. The 2019 Amendments now give the right to decide on a condominium conversion to the tenants, 51% of whom must enter into purchase agreements. And even if the owner wanted to demolish his building, the owner cannot do so unless he relocates his tenants and potentially pays them a stipend for six years.

200.    By denying property owners their right to exclude others, and stripping them of their right to possess, use and dispose of their own property, the RSL effects a physical taking of their property. This physical invasion of property is not a temporary action needed to address some fleeting emergency, but rather is a rule of indefinite duration. Indeed, after 50 years in existence, and with ritualistic renewal every three years during that period, the RSL has become a permanent fixture of New York City real estate. To underscore that point, in passing the Housing Stability and Tenant Protection Act of 2019, New York has eliminated almost every avenue that allowed a transition from regulation to free market, eliminated any sunset period for the law, and imposed obligations on owners that extend more than thirty years into the future. *See* Thomas W. Merrill, *The Character of the Governmental Action*, 36 Vt. L. Rev. 649, 658 (2012) ("Very little in property law is 'permanent' in the sense of lasting forever"; *Loretto* instead had in mind as a permanent physical invasion "governmental action that amounts to the imposition of an easement of indefinite duration").

201.    Unlike other rent control ordinances that merely fix a cap on the rents that can be charged, the RSL imposes a physical occupation on the nominal property owner, denying the owner all the significant elements of the bundle of property rights. Thus, "the government does not simply take a single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand." *Loretto*, 458 U.S. at 435. In so doing, the RSL constitutes a per se taking, for which the property owner receives no compensation at all.

A.    ***The RSL Requires Owners to Permit Tenants and Their Successors to Occupy Private Property for Lengthy and Indeterminate Periods of Time, Denying Owners the Right to Exclude.***

202.    "[T]he 'right to exclude,' so universally held to be a fundamental element of the property right, falls within th[e] category of interests that the Government cannot take without compensation." *Kaiser Aetna*, 444 U.S. at 179–80 (holding that a government order that the owner of a marina open it to the general public imposed "an actual physical invasion of the privately owned marina").

203.    The Rent Stabilization Laws ***require*** property owners, with few exceptions, to provide tenants the option *to renew* their lease at RGB-prescribed rates. Admin. Code of the City of New York § 26-511(c)(9); 9 NYCRR § 2524.4. By requiring the owner to renew the lease of the existing lessee, the law deprives the owner of his or her fundamental right to exclude others from his or her own property. This imposition of a right for the tenant to renew his or her lease into the indefinite future, and fixing the terms of the offer for renewal, is a physical taking for which the Fifth Amendment requires just compensation. Yet owners receive ***no*** compensation for the forced housing of individuals not of their choosing at below-market rents.

204.    That elimination of the right to exclude is not limited to the original tenant. There are a host of legal requirements that allow the tenant to give to another person the tenant's rights to the unit. These "succession" rights prevent owners from excluding strangers from the

property, because they are forced to continue permitting the new "successor" tenant to renew his or her lease at below market rates.

205.    The original tenant, for example, retains the right to give the rent-stabilized unit and the right to lease renewal to "any member of such tenant's family … who has resided with the tenant in the housing accommodation as a primary residence for a period of no less than two years, or where such person is a 'senior citizen,' or a 'disabled person' … for a period of no less than one year, immediately prior to the permanent vacating of the housing accommodation by the tenant, or from the inception of the tenancy or commencement of the relationship, if for less than such periods, shall be entitled to be named as a tenant on the renewal lease." 9 NYCRR § 2523.5(b)(1).

206.    Family members who can receive this benefit include not only a "spouse, son, daughter, stepson, stepdaughter, father, mother, stepfather, stepmother, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, mother-in-law, son-in-law or daughter-in-law of the tenant or permanent tenant," but also include "[a]ny other person residing with the tenant or permanent tenant in the housing accommodation as a primary or principal residence, respectively, who can prove emotional and financial commitment, and interdependence between such person and the tenant or permanent tenant." 9 NYCRR § 2520.6.

207.    If any of these individuals move in with the original tenant and then wish to inherit the lease—and receive the right to automatic lease renewals at below market prices—the owner has *no control* over whether these individuals can live in his or her apartment unit. Instead, the owner is forced to continue perpetually renting the unit to individuals that he or she has no power to exclude from his or her property.

208.     By way of illustration, Plaintiff Danielle Realty has stabilized units, occupied since 1975 that have now spanned three generations of the tenant family. The original tenants' granddaughter now occupies the unit. Her current rent is $1,289.10 per month. The market rental value is more than double that amount.

209.     The RSL system of succession is also ripe for abuse. For instance, Plaintiff Cindy Realty has husband and wife tenants who have occupied a stabilized unit since 1994. Cindy Realty became aware that several strangers were occupying the apartment and the tenant couple had moved to Florida. The couple claimed that the Florida home belonged to their son, and that he was the stranger living in the apartment in New York. It is too difficult and costly for Cindy Realty to prove the residence of the couple, and the son is likely to claim succession rights. Cindy Realty is thus saddled with a tenant it never approved.

210.     In addition, the tenant also has the right at any time to sublet his or her rent-stabilized unit for two out of any four years and still have the right to renew, so long as the tenant "has maintained the unit as his or her primary residence and intends to occupy it as such at the expiration of the sublease." N.Y. UNCONSOL. LAW § 26-511(c)(12) (McKinney); 9 NYCRR § 2525.6.

211.     The tenant even has the right to charge the sublessee a 10% rent premium for providing the sublessee with his or her own furniture. N.Y. UNCONSOL. LAW § 26-511(c)(12)(a) (McKinney); 9 NYCRR § 2525.6(b). On a $2,000 per month lease, the premium received by the tenant for the use of that furniture would be $200 per month. By contrast, an owner of a building with more than 35 units who invests $15,000 in IAIs for new furniture or furnishings would be capped at receiving $83 per month, less than half the amount the law permits his tenant to receive.

212.    By denying the property owner the right to exclude a tenant upon the expiration of the tenant's lease, by denying the property owner the right to exclude successor tenants, and by denying the property owner the right to exclude sublessee tenants, the RSL has fundamentally constricted to the point of nonexistence the property owner's "right to exclude," a fundamental stick in the bundle of the tenant's property ownership rights.

213.    This deprivation is even greater than an access easement (as in *Dolan*) where individuals are permitted to pass periodically. Under the RSL, individuals (many not of the owner's choosing) are permitted to take up permanent residency on a property, go to and fro as they wish, and for all practical purposes treat the property as their own – renting out the property, bequeathing to family members, or even selling their interest in the property back to its rightful owner. As the Supreme Court has noted, "an owner suffers a special kind of injury when a *stranger* directly invades and occupies the owner's property. . . To require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury." *Loretto*, 458 U.S. at 436.

214.    Nor do the few exceptions to the renewal obligation create any meaningful relief for owners. The RSL purports to create exceptions if the owner seeks to recover possession for his own occupancy, the owner seeks to withdraw the unit from the rental market, a court determines that a tenant is not occupying the unit as his or her primary residence, or the owner seeks to demolish the building. But, as explained below, the limitations applicable to each of those exceptions render the exceptions illusory.

215.    That the RSL eliminates the property owner's "right to exclude" and transfers the owner's property rights to the tenant is highlighted by the many reported instances in which tenants have leveraged their rent-stabilization status to extract a large buyout from owners

looking to convert their property. For example, one family of four received $1,075,000 to move out of their rent-stabilized Upper East Side two-bedroom apartment. The family had been paying $1,500 in rent. Another tenant received $425,000 to vacate his one-bedroom walk-up apartment in the East 50s. One Williamsburg property owner paid three tenants $188,000 each to leave their $1,800 per month apartments. One tenant even managed to secure a "five-figure buyout" for an apartment that she had moved out of and had been subletting for years.

216.    If the RSL regulations truly permitted owners a means to exclude others from their properties, such large buyouts should never be necessary: The owner could exercise his or her available remedies. The existence of such substantial buyouts confirms the practical reality— the RSL transferred the owners' property rights and gave them to the tenant, who now has the ability to resell those rights.

217.    The RSL does not only significantly limit the owner's right not to renew a tenant's lease; it also substantially eliminates the owner's ability to evict a tenant. Even before the 2019 Amendments, the property owner could only evict a tenant for failing to pay rent, creating a nuisance, or for violating the law—conduct that is solely within the tenant's control.

218.    As a result of the 2019 Amendments, the property owner's ability to evict a tenant is even more significantly constrained. For example, Chapter 36 of the Laws of 2019, Part M, Section 21 permits a stay of execution of eviction for a period of one year if the tenant can demonstrate an inability to obtain other housing or to prevent hardship. Thus, even tenants who are breaking the law or failing to pay the lease on time may be entitled to a year of tenancy upon a showing of "hardship."

219.    Not only do the 2019 Amendments make it more difficult to evict a tenant, but they also make it more difficult to select tenants in the first place. For example, the 2019

Amendment precludes property owners from refusing to lease to a tenant due to the tenant's past or pending landlord/tenant action, seals records of evictions, and precludes the sale of data regarding judicial proceedings related to residential tenancy. By precluding owners from refusing to offer leases to tenants with prior rental violations, the 2019 Amendments turn tenants with bad rental backgrounds into "protected classes," and preclude owners from excluding such tenants from their units. Through these revisions, the 2019 Amendments dramatically reduce the ability of owners to exercise their right to exclude through due diligence, making all the more significant the RSL's near-mandatory obligation to renew such tenants' leases.

220.    Further, under the 2019 Amendments, units that were rented to charitable organizations to house vulnerable individuals or those who were homeless or at risk of becoming homeless (which units had previously been exempted from rent stabilization) will become subject to stabilization, and the individuals living in those units are deemed to be tenants under the RSL. By extending the lease renewal protections to such tenants, the Amendments further impair owners' ability to select the tenants who live in their buildings

**B.**    *The RSL Denies Owners the Right to Occupy, Possess, and Use the Property.*

221.    Even prior to the 2019 Amendments, the RSL effectively denied property owners the right to possess and use their own property. Although the law nominally permits owners to recover possession "for his or her own personal use and occupancy as his or her primary residence in the city of New York" (N.Y. Unconsol. Law § 26-511(9)(b) (McKinney); 9 NYCRR § 2524.4), the limitations applicable to that provision—including those adopted in the 2019 Amendments—have effectively denied that precise right to property owners.

222.    For example, owners who held properties through a corporate form were denied any right to recover property for their own use, and if the property was owned by a partnership, only one owner could claim the occupancy right. Owners were limited in their right to recover

units leased by those who were older than 62 or disabled. N.Y. UNCONSOL. LAW § 26-511(9)(b) (McKinney). And owners that did recover units for their personal use were prevented for a period of years from subletting those units—a right that is freely given to other tenants.

223.    The 2019 Amendments substantially undercut even the limited rights owners previously enjoyed to take possession of their own property for their own use. Most critically, the 2019 Amendment prevents owners from recovering possession of more than one unit in their own building for the owner's own use and occupancy. Chapter 36 of the Laws of 2019, Part I, § 2. Thus, even if an owner desired to recover multiple units to serve as the owner's primary residence, the 2019 Amendments deny the owner that right. Moreover, even to obtain that one unit, the owner now must demonstrate an "immediate and compelling necessity" for the unit, a standard that has been very difficult to satisfy under the case law. And if the occupant of a unit has lived in the building for 15 years, an owner may not recover possession of that unit unless the owner can provide an equivalent accommodation at the same stabilized rent in a closely proximate area—which is an almost impossible task. Thus, the RSL effectively denies property owners the right to occupy, use and possess their own property.

224.    **Not Available to Corporate Holders.** In the first instance, the right to recover possession of units applies only to properties held by "natural persons," not those held by corporate entities. *See* 9 NYCRR § 2524.4 (granting right to owner who intends to use property as "his or her" primary residence); N.Y. UNCONSOL. LAW § 26-511(9)(b) (McKinney) (granting rights to owner where "he or she" seeks to recover possession). *See also Henrock Realty Corp. v. Tuck*, 52 A.D.2d 871, 872, 383 N.Y.S.2d 47, 47 (1976) (an owner seeking to recover possession of a dwelling for his own personal use must be a natural person); *1077 Manhattan Assocs., LLC v. Mendez*, 798 N.Y.S. 2d 714 (App. Div. 2004)("[O]nly a natural person and not a corporation

can recover an apartment for personal use . . . even when the principal of the corporation is its sole stockholder."). And where the unit is owned by more than one individual, only one of the owners may recover a unit for personal use. N.Y. Unconsol. Law § 26-511(9)(b) (McKinney).

225.    For liability and other reasons, most owners of rent-stabilized properties hold those properties through a corporate form. They include Plaintiffs Mycak Associates LLC, Vermyck LLC, M&G Mycak LLC, Cindy Realty LLC, Danielle Realty LLC, and Forest Realty LLC. Where those corporate entities are owned by individuals, the individual would have to sacrifice all the protections of the corporate form, including protection from personal liability, trigger a taxable event by transferring the property into his personal name, and incur all the other costs of a major real estate transfer simply to be allowed to take possession and use his own property.

226.    **Unable to Recover More than One Unit.** Even if a property is held by a natural person, that person may not recover possession of more than one unit for his or her own personal occupancy. Even before the 2019 Amendments (which expressly preclude the recovery of more than one unit), it was often difficult for owners to obtain possession of more than one unit for their own use or the use of their immediate family. For example, in *Raffo v. McIntosh*, 3 Misc. 3d 127(A) (N.Y. App. Term. 2004), where a property owner sought to recover an additional unit so that his elderly parents would have room to house a caretaker, the court determined that the owner had additional room in his own unit to house the caretaker, and therefore did not demonstrate the requisite good faith need for the rent-stabilized unit.

227.    The inability to take possession and use of one's own building deprives building owners of a fundamental right of property ownership, and leads to significant personal suffering, as would be expected when the government seizes a person's property.

228.     Plaintiff Constance Nugent-Miller has experienced firsthand the toll that a denial of physical occupation can take. Nugent-Miller is a disabled owner of a six-unit walk-up in Brooklyn and has lived on the second floor of that building for thirteen years. She has twice been denied the ability to occupy a first-floor unit in her own building.

229.     In 2013, Nugent-Miller (also a registered nurse) was the primary caregiver for her terminally ill husband, who was painfully suffering from congestive heart failure, HIV, and Chronic Obstructive Pulmonary Disease (COPD). Climbing the stairs to the couple's second floor apartment became difficult, even dangerous, as his heart condition and overall health deteriorated. A solution existed. Nugent-Miller could simply move into one of her first floor apartments. She issued a notice of nonrenewal to a tenant in one of her first floor units—one of three stabilized apartments in the building. She even offered her own second floor stabilized unit to the first floor tenant she would be displacing. The tenant refused to cede the apartment. So Nugent-Miller took her case to housing court to recover possession of the unit. With her husband dying, the court dismissed her claim on a technicality. The RSL entitles the tenant to another lease term, the court found, because Nugent-Miller was late when sending an earlier lease renewal notice, rendering the notice of non-renewal defective. Nugent-Miller and her husband were forced to stay on the second floor, and her husband's health worsened. She took him to the hospital shortly thereafter, where home hospice was recommended. He would be carried up the stairs after returning home. Nugent-Miller's husband died fifteen days later, on the second floor of her building.

230.     In the aftermath of her husband's passing, Plaintiff Nugent-Miller developed physical ailments of her own. She began experiencing crippling nerve pain in her right leg in February 2015 and it progressively worsened. She also developed severe knee pain in the same

leg. In November 2015, Nugent-Miller's doctor diagnosed her with a severely torn meniscus. She had it surgically repaired in November 2015. The surgeon identified arthritic tissue during the surgery, and told Nugent Miller she would soon need a total knee replacement. She has walked with the assistance of a cane since. Following the meniscus surgery, she scaled the stairs to her apartment sitting on each step. In light of her deteriorating medical condition, she again sought a first-floor unit in her building for personal use. And she was again denied in housing court. Her pain was not severe enough, the court found, to trump her stabilized tenant's right to remain in her building. The judge offered:

> while the court does not want to make light of [Nugent-Miller's] pain and health issues, it does not find that the record establishes that [Nugent-Miller] has demonstrated that her condition is such to warrant her recovery of the subject premises for her own use from a rent stabilized tenant that has resided there for more than 20 years.

231.    Ms. Nugent-Miller has since qualified as "disabled" by the Social Security Administration. She continues to reside in her second floor apartment.

232.    The 2019 Amendments now make impossible what was previously only implausible—the owner's ability to refuse lease renewal in order to obtain possession of more than one unit in his or her own building. Chapter 36, Part I § 2 amends New York Administrative Code Section 25-511(b)(9) such that the right to recover possession of a dwelling unit for the property owner's own personal use and occupancy is limited to "recovery of only one dwelling unit" per building. Thus, in even the smallest rent-stabilized buildings (those with six units or more) the owner is deprived of the right to obtain possession or use of over 80% of his own building through non-renewal of tenant leases. For larger buildings, the owner could be deprived of the right to possess or use nearly 100% of his or her own building.

233.    The immediate impact of that physical taking is exemplified by the circumstances of Bryan Liff, a nonparty property owner. Liff had been living in a co-op building with his wife

and young daughter in Manhattan when they decided that they would buy a building of their own. For years Liff and his wife researched the New York City real estate market, monitored listings and financially planned with the goal of buying a building that would become their family home.

234.    Finally, in 2019, the Liffs found a building in Harlem with eight studio-sized units. Four of the units could be renovated and combined into what would become their new home. The remaining four could be rented to defray costs. While all of the units in the building were stabilized, the Liffs' research told them of their right to occupy the units as owners. So the Liffs set about hiring architects and engineers, spending upwards of $25,000 to prepare for the buildout. They closed on the building on March 15, 2019, purchasing it for approximately $2.1 million.

235.    To effectuate their plan, they promptly issued notices of non-renewal. Weeks later, the 2019 Amendments were passed, limiting personal use exception to a single unit. The Liffs' tenants—all young professionals—formed a tenants association and threatened legal action if they were forced to vacate his building. The Liffs were left without recourse. While they would gladly re-sell the building at a break-even price, the Liffs estimate that their three-month-old investment lost 20-25% in value when the 2019 Amendments were passed.

236.    When the government decrees that a tenant's rights take precedence over the owner's own use and occupancy of a unit or building, the government has effectively seized that property to the same extent as if it had taken over the building as a government housing facility.

237.    **Unable to Recover Units Held by Specific Tenants.** An owner is also limited in recovering an apartment "where a tenant or the spouse of a tenant lawfully occupying the dwelling unit is sixty-two years of age or older, or has an impairment which results from

anatomical, physiological or psychological conditions" which prevents "substantial gainful employment." N.Y. UNCONSOL. LAW § 26-511(9)(b) (McKinney). It does not matter whether the owner also is 62 or older, or has an impairment, or is even decades older than the tenant—the tenant still receives priority over the property owner.

238.   When the tenant is over 62 or disabled, the owner must "offer[] to provide and if requested, provide[] an equivalent or superior housing accommodation at the same or lower stabilized rent in a closely proximate area" in order to regain his property for his own use. N.Y. UNCONSOL. LAW § 26-511(9)(b) (McKinney). Such an obligation effectively turns the owner into tenant—obligated to search out the next unit, and constrained even in the options he might consider.

239.   The 2019 Amendments transferred even more rights of ownership from the property owners to the tenants. Specifically, the Amendments vest tenants living in a building for 15 years or more with tenure rights, such that their claim to living in that unit thereafter takes precedence over the owner's own right to take possession of the unit for his or her own personal use. *See* Chapter 36, Part I, § 2 (excluding from owner's right to recover possession those dwelling units where a tenant "has been a tenant in a dwelling unit in that building for fifteen years or more.").

240.   Granting such tenure rights to the elderly, the infirm, and the long-term tenant does not even purport to address price gouging or some other purported market distortion, but confirms that the purposes of the RSL are to transfer the rights of property ownership from those the legislature disfavors—property owners—to those class of individuals the legislature favors, as well as to use the property of a small group of owners to provide a public assistance benefit, which should otherwise be funded by the public.

241.    **Obligation to Show Immediate and Compelling Necessity.** Even the ability to recover possession of that one dwelling unit has been substantially limited by the 2019 Amendments. It is no longer sufficient to simply show that the owner of the property or his immediate family seeks to occupy the property for his or her own personal use as his or her primary residence. Under the recent amendments, the owner must demonstrate some "immediate and compelling necessity" just to justify the ability to possess and use his or her own property.

242.    Decisions in the analogous rent control context highlight how great a burden the "immediate and compelling necessity" test imposes on property owners. For example, in *Boland v. Beebe*, 62 N.Y.S.2d 8, 12 (Syracuse Municipal Court, 1946), the court found that "the landlord and her family are seriously overcrowded," with several children and their spouses living in one flat, and found that access to the rented unit was a "necessity," but deemed it not to be an immediate compelling necessity.

243.    Similarly, in *Cupo v. McGoldrick*, 278 A.D. 108 (N.Y. App. Div. 1951), a property owner with an enlarged heart attempted to move from the fourth floor of her walk-up to the ground floor. Despite sworn testimony from the property owner's doctor that the fourth-floor apartment would "become increasingly dangerous to her health," the court affirmed a finding of no "immediate and compelling" necessity after the tenant claimed that he once saw the property owner "climbing the stairs unnecessarily." *Id.* at 109–10.

244.    Thus, under the 2019 Amendments, not only would Plaintiff Nugent-Miller have no ability to obtain for her own use a second (or alternative) unit in her own building, if she had not already lived in that building, she would likely be unable to even meet the showing of "immediate and compelling" necessity to obtain the use of a single unit in her own building.

245.    **Limited Rights Upon Possession.** Even in the rare circumstance in which the owner is able to demonstrate an immediate and compelling necessity, the unit is not occupied by a tenured, elderly or infirm tenant, and the owner regains possession over one of his units, the owner is still limited in his rights to use that property. The owner is forbidden for three years from "rent[ing], leas[ing], subleas[ing] or assign[ing]" the unit "to any [other] person" except for "the tenant in occupancy at the time of recovery under the same terms as the original lease." N.Y. Unconsol. Law § 26-511(9)(b) (McKinney). In other words, the owner cannot even sublease the property during that three-year period, a right that his tenants would enjoy if they occupied the property.

246.    These multiple restrictions on an owner's ability to regain possession of units for the owner's personal use separately and together deny owners the right to occupy, possess and use their own property and effect an uncompensated physical taking of the property.

C.    **_The RSL Denies Property Owners the Right to Freely Dispose of Their Property._**

247.    The RSL also limits property owners' ability to freely dispose of their property. Property owners may not withdraw their buildings from the rental market to rent those buildings for non-residential purposes, nor can they simply withdraw their property from the rental market unless it presents a hazard or they seek to use the building for their own (non-rental) business. If a property owner wants to demolish its property, it must pay to relocate all its tenants. And under the 2019 Amendments, property owners now are very significantly constrained from converting rental buildings into cooperatives and condominiums. By dramatically limiting the ability of property owners to dispose of their own property, the RSL effects a physical taking of the property.

248. ***Withdrawal from the Market.*** One way to dispose of one's property might be to convert the property to other income-producing purposes, or even to exit the rental business entirely. The RSL drastically limits owners' ability to so dispose of their property.

249. The RSL includes a provision permitting the non-renewal of tenant leases in order to withdraw a building from the rental market. 9 NYCRR § 2524.5. But that provision so narrowly cabins the right of withdrawal as to deny that right almost entirely. For example, a building owner cannot withdraw a property from the market for purposes of non-housing rental (*e.g.*, for commercial rental). 9 NYCRR § 2524.5 (withdrawal permitted only if the owner proves to the "satisfaction of the DHCR" that the owner "seeks in good faith to withdraw any or all housing accommodations from both the housing and *nonhousing* rental market without any intent to rent or sell all or any part of the land or structure") (emphasis added).

250. The owner also cannot refuse to renew tenant leases in order to withdraw the property from the rental market for the purpose of allowing it to remain empty. Rather, the only time an owner can withdraw a property from the rental market (other than when the building is a safety hazard) is if the owner intends to use the property in connection with a business that he or she owns. 9 NYCRR § 2524.5 (owner must demonstrate "(i) that he or she requires all or part of the housing accommodations or the land for his or her own use in connection with a business which he or she owns and operates"). If the owner simply wants to retire from the business of apartment leasing and building maintenance, close his building to tenants, and hold the property in order to reap its appreciation in value, the owner may neither evict tenants nor refuse to renew their leases in order to do so.

251. Even the ability to withdraw a building that represents a safety hazard from the rental market is materially constrained. A property owner can only remove a building with

substantial safety and health violations and hazards if the "cost of removing such violations would substantially equal or exceed the assessed valuation of the structure." 9 NYCRR § 2524.5. Thus, even if a building is a safety hazard, so long as the cost of repairs is less than the entire assessed value of the structure, the owner is still *required* to spend money to fix the property and cannot simply close the building down. 9 NYCRR § 2524.5. Unlike other rent control regulations, the RSL precludes owners from simply evicting their tenants and changing the use of his or her land. Rather, owners are compelled to permit the continued physical invasion of their property by tenants. Indeed, this "preservation" of rent-stabilized units is the stated goal of the 2019 Amendments.

252.    ***Demolition.*** Under the RSL, property owners are deprived even of their right to freely demolish their own buildings. N.Y. UNCONSOL. LAW § 26-511(c)(9)(a) (McKinney); 9 NYCRR § 2524.5. As an initial matter, owners wishing to demolish must obtain necessary permits and demonstrate proof of financial ability to complete the undertaking—actions that can consume years.

253.    Even if the owner can obtain the necessary permits, before the property owner can demolish his own property, he must still pay to relocate his tenants. The owner must pay a $5,000 stipend to the tenant and pay to relocate the tenant to comparable housing at the same or lower regulated rent in the same area (or pay the tenant a stipend for six years to make up the difference), provide the tenant with housing at the new building (with payment for interim housing, a stipend, and moving expenses), or provide the tenant with a set demolition stipend for *six years*. 9 NYCRR § 2524.5.

254.    Specifically, pursuant to 9 NYCRR § 2524.5, owners who get approval for their demolition project must:

(1)      relocate the tenant to a suitable housing accommodation . . . at the same or lower legal regulated rent in a closely proximate area, or in a new residential building if constructed on the site, in which case suitable interim housing shall be provided at no additional cost to the tenant; plus in addition to reasonable moving expenses, payment of a $5,000 stipend, provided the tenant vacates on or before the vacate date required by the final order;

(2)      where an owner provides relocation of the tenant to a suitable housing accommodation at a rent in excess of that for the subject housing accommodation, in addition to the tenant's reasonable moving expenses, the owner may be required to pay the tenant a stipend equal to the difference in rent, at the commencement of the occupancy by the tenant of the new housing accommodation, between the subject housing accommodation and the housing accommodation to which the tenant is relocated, multiplied by 72 months, provided the tenant vacates on or before the vacate date required by the final order; or

(3)      pay the tenant a stipend which shall be the difference between the tenant's current rent and an amount calculated using the demolition stipend chart, at a set sum per room per month multiplied by the actual number of rooms in the tenant's current housing accommodation, but no less than three rooms. This difference is to be multiplied by 72 months.

255.   Finding a comparable unit at the same or lower rental rates in a closely proximate area is often a difficult task. "Suitable housing accommodations" must be of similar size and features, and provide the same required services and equipment. Plus the unit must be "freshly

painted before the tenant takes occupancy." And the tenant is given multiple opportunities to object to the replacement unit, each time requiring a DHCR inspection and determination.

256.    Thus, under the RSL, even the right to dispose of a property through demolition is substantially constrained. The ability to demolish one's own building only after paying for all the tenants to relocate and enjoy below-market rents for six years, is no relief from a forced physical taking. Instead, it is simply a taking in another form, ensuring that property owners will continue to subsidize for years to come the lifestyles of tenants lucky enough to find a rent-stabilized unit.

257.    **Cooperative and Condominium Conversions.** As noted above, the 2019 Amendments have also effectively removed another option for owners to dispose of their property—the ability to convert buildings into cooperatives or condos. The 2019 Amendments eliminate "eviction plans" and require written purchase agreements from 51% of all existing tenants under "non-eviction" plans before a building can be converted to a cooperative or condominium. Chapter 36 of the Laws of 2019, Part N, § 1.

258.    Prior to the 2019 Amendments, owners had been able to convert units to condos upon obtaining written purchase agreements from at least 15% of tenants (or bona fide purchasers who represent that they or one of their family members intend to occupy the unit). Rent stabilized tenants in the building would retain their regulated rights and were not required to purchase their unit. The 2019 Amendments now require purchase agreements from 51% of tenants, and bona fide purchasers no longer count toward that total.

259.    Given that rent-stabilized tenants enjoy below-market rents with virtually no rent increases, there is little incentive for those tenants to purchase their units (assuming they had the resources to do so) and to take on the actual costs of ownership (such as maintenance costs) that are currently funded by owners. Thus, the 2019 Amendments effectively foreclose condo-

conversion as a means for property owners to dispose of their properties. As recently reported, in response to this change in the law, the Chairman of the Council of New York Cooperatives and Condominiums concluded that "Condo conversions are effectively dead."

260.     Thus, under the RSL—particularly after the 2019 Amendments—the goal of "preserving" rent-stabilized units is achieved by denying the property owner any means of disposing of his property that would eliminate stabilized units. In any sale of the property, the buyer would be subject to the same RSL obligations (and thus the sale would result in the substantial diminution of economic value described below). The building may not be leased out for non-housing purposes nor may it be withdrawn from the market unless it is worth less than the cost of fixing it or unless the owner has a side-business that requires multiple stories of office space. Nor can the owner convert the building to cooperatives or condominiums. In fact, the only means for the owner to recover possession his own property is to demolish the rent-stabilized building (which itself is very time-consuming and costs millions). That the owner must demolish his own building to recover his property demonstrates how complete a physical taking is effected by the RSL.

**D.      _The 2019 Amendments Have Eliminated the Few Remaining Options for a Property Owner to Remove a Property from Rent Stabilization._**

261.     As previously explained, the few instances in which a unit in a property might become decontrolled—Luxury Decontrol and High Income Decontrol—were eliminated by the 2019 Amendments. But, even prior to their elimination, those limited options for obtaining decontrol of a unit provided little meaningful relief to property owners from the RSL's physical takings.

262.     **_High Income Decontrol._** Prior to its elimination in 2019, High Income Decontrol granted property owners the right to petition the DHCR to remove a property from rent

stabilization when two conditions were met—the controlled rent met the Luxury Decontrol maximum ($2,744.76) *and* the tenant had an income of over $200,000 for the last two years. *See* N.Y. UNCONSOL. LAW §§ 26-504.1, 26-504.3 (McKinney).

263.    As reported, this generous standard legally permitted Faye Dunaway to rent a rent-stabilized apartment on the Upper East Side for $1,048.72 a month. So long as the unit was under the maximum rent ceiling for rent-stabilized units, her income made no difference in whether or not she could live in a below-market unit.

264.    Given the need to reach the maximum statutory rent *and* have a tenant with income exceeding the statutory maximum, applications for high-income decontrol were relatively rare. Compounding those issues was the slow decision-making of Division of Housing and Community Renewal ("DHCR") (the unit assigned to act on luxury decontrol petitions). It has been reported that during the three-year period from January 1, 2011 through December 31, 2013, 8,185 luxury decontrol petitions were filed with the DHCR, but only 291 were approved.

265.    The benefit of High-Income Decontrol was significantly diminished under the Rent Act of 2015, because the Luxury Decontrol threshold that triggers deregulation was made to increase by the same percentage each year as the RGB determines rents may increase, thereby keeping the threshold constantly beyond reach. In 2016, only 146 units were de-regulated based on High-Income Decontrol.

266.    ***Luxury Decontrol***. Luxury Decontrol had similarly become a narrow exit door for rent-stabilized units even prior to the 2019 Amendments. In 2016, only 4,690 units were deregulated because the unit's rent reached the then-ceiling of $2,700 *and* the apartment became vacant. That represents roughly .005% of the approximately one million rent-stabilized units in the City of New York.

267.    In short, the RSL effects a physical taking of the properties it regulates. It first deprives the property owner of the fundamental right to exclude, by requiring owners to renew leases of existing tenants, their successor tenants and sub-lessees. It deprives the owner of the right to take possession for the owner's personal use of more than a single unit, and even then under circumstances so limited as to not be meaningful. It deprives the owner of the right to dispose of the property through withdrawal from the market, or conversion into condos, and significantly impairs an owner's ability to demolish his own property. Finally, the law has now removed the few options under which a property owner might have ever removed units from the regulatory system.

268.    It is no accident that the law has evolved—with the capstone of the 2019 Amendments—to deprive owners of all the rights of ownership, and to eliminate property owner's right to use their property for anything other than the compelled use of stabilized rental. Obtaining control over the rent-stabilized units has been the declared goal of Defendants for some time.

269.    In 2017, Mayor de Blasio stated that the hardest impediment to achieving his goals was "the way the legal system is structured to favor private property," which interferes with the "socialistic impulse" that he hears in the communities that would "like things to be planned in accordance to their needs." He acknowledged that he, too, would prefer that system, noting that "if I had my druthers, the city government would determine every single plot of land, how development would proceed. And there would be very stringent requirements around income levels and rents. That's a world I'd love to see . . ." He cited "[t]he rent freeze we did [that] reached over 2 million people," and got "affordable housing under our plan for 200,000 apartments."

270.    As Senator Myrie stated during legislative consideration of the 2019 Amendments, the amendments are "the strongest package of tenant protections New York has seen in almost a century. For decades, our communities have lost hundreds of thousands of rent regulated units, but with this legislation, we are putting power back in the hands of tenants."

271.    Senator Addabbo made clear that "ensuring an adequate supply of affordable housing for individuals and families has always been a priority for me." NYC Council Speaker Corey Johnson remarked that "[t]hese transformative rent protections will help us tackle the homelessness crisis we are facing as a city…"

272.    City and State regulators have taken for granted their ability to take the private property rights of New York City landowners to meet the perceived housing needs (and political demands) of their constituency, without the obligation to compensate the owners for any of those benefits. Separately, and combined, these very substantial restrictions on property owners' rights effect an uncompensated physical taking that is a per se violation of the Takings Clause.

## V.    THE RSL EFFECTS UNCOMPENSATED REGULATORY TAKINGS OF PRIVATE PROPERTY

273.    The RSL effects not only a per se unlawful physical taking by depriving owners of their rights to use, possess, dispose of, and exclude others from their property; it also constitutes a regulatory taking of rental properties subject to the law. In an impermissible attempt to fund "a local public assistance benefit" by imposing very substantial burdens on a subset of property owners, these property owners have been subjected to the range of restrictions just discussed and, in addition, required to charge and accept rental rates for RSL units that are on average 40% lower than market-rate rents, and in some units 80% lower.

274.    The RSL's regulatory burdens have dramatically reduced the market value of regulated properties, in some cases by over 50%, as reflected in the city's own data. Even the

City's own tax assessment guidelines concede that unregulated properties are typically worth 20% to 40% more than regulated properties, and in Manhattan regulated properties on average are worth less than half as much as unregulated properties.

275.    And that data does not take account of the effects of the 2019 Amendments, which do not only impose the regulatory restrictions just discussed, but also impose new restrictions on rent levels that will further reduce the value of properties subject to the RSL.

276.    Despite permissible rental increases over the last five-year period of only 0–1.5% on one-year leases, the 2019 Amendments eliminated rental increases designed to help owners modestly alleviate the disparity with market rates, including:

(a)     "statutory vacancy increases," which allowed an owner to increase rent up to 20% upon the vacancy of the apartment. *See* Chapter 36 of the Laws of 2019, Part B, §§ 1-7.

(b)     "longevity increases," which permitted an owner to further increase rents upon the vacancy of a long-term tenant who had resided in the unit for at least eight years. *See* Chapter 36 of the Laws of 2019, Part B, §§ 1-7.

277.    The 2019 Amendments also dramatically limited owners' ability to increase rents to compensate for major capital improvements and individual apartment improvements. The rent increases now permitted under the law are in many instances insufficient to recover even the costs of the improvements.

278.    For units offered at rents below the legally permitted levels (termed "Preferential Rents"), owners had been permitted to increase rents to the legal limits upon lease renewal or vacancy. The 2019 Amendments now prohibit rent increases at lease renewal in an amount greater than those set by the RGB.

279.    Combined with the physical occupation of their property imposed on property owners, and given the lack of both any reciprocity of advantage for property owners and any justification in preventing a noxious use of the property, the adverse economic impact on building values and rent levels demonstrates that the RSL effects in a regulatory taking.

A.    *The Legal Framework for Regulatory Takings*

280.    The "ad hoc, factual inquiries" necessary to determine if government regulation amounts to a taking of private property that requires compensation are guided by "several factors that have particular significance" under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), and other decisions.

281.    Factors relevant to the regulatory takings inquiry include:

(a)    "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with investment-backed expectations" (*Penn Central*, 438 U.S. at 124). Judicial decisions assess the economic impact of regulation on the property owner by looking to the extent in the diminution of value caused by the regulation, including "the change in the fair market value of the subject property" (*Arctic King Fisheries, Inc. v. United States*, 59 Fed. Cl. 360, 374 (Fed. Cl. 2004)); "the value that has been taken" compared "with the value that remains" (*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)); whether the owner can obtain a "'reasonable return' on its investment" (*Penn Central*, 438 U.S. at 136); "the owner's opportunity to recoup its investment or better" (*Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 905 (Fed.Cir.1986)); the decrease in the property's profitability (*Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1188 (Fed. Cir. 2004)); or some combination of these analyses.

(b)      Whether the regulation creates an "'average reciprocity of advantage,'" such that burdens and reciprocal benefits are shared among those affected by the regulation. *Pennsylvania Coal*, 260 U.S. at 415. This factor reflects the core principle of the Takings Clause that the Fifth Amendment bars the "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). See *Penn Central*, 438 U.S. at 147 (Rehnquist, J., dissenting) (regulations may reduce individual property values without effecting a taking provided "the burden is shared relatively evenly and it is reasonable to conclude that on the whole an individual who is harmed by one aspect of the [regulation] will be benefitted by another"); *Pennell v. City of San Jose*, 485 U.S. 1, 22 (Scalia & O'Connor, JJ, concurring in part and dissenting in part) (San Jose's rent regulation ordinance created an "'off budget'" "welfare program privately funded" by landlords and was therefore a taking); *Cienega Gardens v. United States*, 331 F.3d 1319, 1338 (Fed. Cir. 2003) (finding a taking where "Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing)" but "the expense was placed disproportionately on a few private property owners"); *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1132 (en banc) (Bea, J., dissenting) (ordinance worked a regulatory taking where it imposed "a high burden on a few private property owners instead of apportioning the burden more broadly among the tax base").

(c)      "[T]he character of the government action," including that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by the government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good" (*Penn*

*Central*, 438 U.S. at 124) (internal citation omitted))—a test that is satisfied when government intrudes substantially on a property owner's rights to use, possess, dispose, and exclude, *e.g.*, *Kaiser Aetna*, *supra*.

(d)     Whether the regulation prohibits a noxious use of the property, such as a nuisance (*Penn Central*, 438 U.S. at 125–127; *id.* at 144–146 (Rehnquist, J., dissenting); *Keystone Bituminous Coal*, 480 U.S. at 492.

282.     It is no barrier to a regulatory takings claim (or, indeed, to any takings claim) that some owners of New York City rental properties purchased the property or leased units to tenants after the RSL went into effect. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 626–27 (2001) (rejecting proposition that a landowner who "purchased or took title with notice of the limitation" cannot allege that the limitation is a taking, because improper enactments "do not become less so through passage of time," otherwise government "would be allowed, in effect, to put an expiration date on the Takings Clause"); *id.* at 637 (Scalia, J., dissenting) ("the fact that a restriction existed at the time the purchaser took title . . . should have no bearing upon the determination of whether the restriction is so substantial to constitute a taking"); *see also Horne v. Dep't of Ag.*, 135 S.Ct. 2419, 2430 (2015) (rejecting argument that plaintiff forfeited his physical takings claim by participating in challenged government program).

**B.     *Even Before the 2019 Amendments, The RSL Resulted in a Substantial Diminution in Value of Regulated Properties and Deprived Owners of a Reasonable Market Return on Investment***

283.     By requiring rents to remain at below-market averages for an indefinite period, and imposing its other regulatory restrictions, the RSL significantly reduced the value of regulated properties and deprived building owners of a reasonable market return on their investment, even prior to the 2019 Amendments.

284. **Reduced Rents in Rent-Stabilized Units**. Given that the goal of rent stabilization is to reduce the rents paid by tenants (at the expense of property owners), it is not surprising that rents in rent-stabilized units are significantly below the rents for non-regulated units. The Wall Street Journal recently reported that median regulated rents in Manhattan were 53% below the median market rates in the Borough. The New York Department of Finance estimates that in Manhattan, the income from non-regulated units can be as much as 60-90% higher than regulated units for units built before 1973.

285. One member of plaintiff CHIP reports that for certain apartment units, the rental rates he is permitted to charge his rent-stabilized tenants are 70-80% lower than the rates he charges for comparable market-rate apartments in the same building.

286. According to multiple estimates, the median rent for rent-stabilized properties across New York is approximately 25% less than the rent charged for non-regulated units.

287. Over the past six years, the disparity between stabilized rental rates and market rental rates have only increased because the RGB has restricted stabilized units to *de minimis* annual rental increases of 0% to 1.5%. This disparity will only continue to grow because the legislature has removed all options for increasing legal rents other than the RGB-authorized increases.

288. According to the 2017 HVS survey, for the period from 2014 to 2017, the median monthly contract rent for rent stabilized units averaged an annual increase of 0.85% (for a total increase of 2.6% over that three-year period), while rents for market-rate units increased 3.22% (for a total of 10% over that three-year period).

289. The RGB rent increases have not even kept pace with the RGB's own estimate of owners' operating expenses.

290.    The RGB separately estimates the increase of owners' costs through its Price Index of Operating Costs (PIOC). The PIOC consists of seven cost components, including taxes, labor costs, fuel, utilities, maintenance, administrative costs and insurance costs. The RGB has changed the components used over time to reflect changes in owner expenditure patterns.

291.    While the RGB estimates that owner costs have increased 5.4% on average over the last 20 years (thus cumulatively increasing by 169% during that period), the RGB's approved rent guideline increases have increased at only half that rate—2.7% per year over that period, resulting in a cumulative increase of only 66%. That disparity between price and cost increases is reflected on Chart 1.

**CHART 1: RGB-Permitted Rent Cumulatively Increased at
Half the Rate of Owners' Costs**



292.    Using that PIOC data, the RGB also tracks what it terms "the commensurate rent adjustment," which it describes as "a single measure to determine how much rents would have to change for net operating income (NOI) in rent stabilized buildings to remain constant." It also creates an index based on that commensurate adjustment that is adjusted for inflation. That inflation-adjusted index shows that rents should have increased on average 5.6% per year from 1999 through 2018 in order for owner net operating income to remain constant. Instead, RGB has approved rent increases of only 2.7% on average during that period. Thus, RGB's own estimates confirm that owners' net operating income is being reduced each year. In fact, particularly for units with long-term tenants, the cumulative impact of the RGB extremely low increases could eliminate the owner's net operating income entirely.

293.    The RGB's recent rent freezes, and its approval of rent increases that are far below owners' costs, result in a consistent subsidy from owners to tenants. Mayor De Blasio has publicly stated that he instructed the RGB to take that approach. He has been reported as explaining that the two-year rent freeze, unprecedented in four decades of City rent regulation, "happened under this administration because I instructed the Rent Guidelines Board—I name the members—and I instructed them not to follow the biases of the past . . ."

294.    By requiring property owners to forego 25% to 80% of the market-rate rental income, the RSL forces property owners to directly subsidize New York's "public assistance program."

295.    **Reduced Value of Properties.** Not surprisingly, the reduced rental income, combined with the forced physical occupation and deprivation of the ability to use one's own building, results in a dramatic reduction in the value of rent stabilized buildings.

296.     Based on an analysis of data originating from the New York Department of Finance, the value of buildings with predominantly non-stabilized units is approximately double, or more, the value of a buildings with predominantly rent stabilized unit.

297.     For example, using market value data for properties that sold in 2016 shows that properties with 25% or less rent stabilized units sold for twice the square foot price of buildings with 75% or more rent stabilized units. Put differently, properties with predominantly rent stabilized units were worth half as much as properties with predominantly non-regulated units.

298.     In fact, the data demonstrates a linear relationship in the per-square foot value of a building based on the percent of the building units that are rent stabilized, as reflected in Chart 2 below. In other words, the sales price per square foot of a building reduces in direct relationship to the amount of square feet that are regulated by the RSL. As Chart 2 reflects, at the extremes, buildings where rent stabilized units account for almost 100% of the units can expect a price per square foot ($200-300/square foot) of two-thirds less than the price per square foot of buildings where rent stabilized units account for almost 0-20% of the units ($800-900/square foot).

**CHART 2: Sales Price per Square Foot Depending on Percent of Building Stabilized (2016 Sales Data)**



Building Sales Price per Square Foot Based on Percent of Building Units Stabilized

299.     The reduced value of the regulated units is further confirmed by the New York City's Department of Finance assessed values of properties. For example, in 2019, the market value of a building with 25% or fewer regulated units had a per square foot market value ($233/sq. ft.) of more than double the value of buildings in which 75% or more of the units were regulated ($97/sq. ft.). When properties that are eligible for a full tax exemption are removed from the database, the disparity becomes even greater. Then, properties with 25% or fewer stabilized units have a value assessed by the City that is more than 2.5 times greater than the buildings with 75% or more of the units regulated, as reflected on Chart 3.

**Chart 3: Appraised Market Value Per Square Foot
(Exempt Properties Removed)**



300.    The New York City's Department of Finance's 2019 "Assessment Guidelines for Properties Values Based on the Income Approach" is itself an admission by the City that rent stabilized units have a lower value than comparable unregulated units. Those guidelines include a range of values per square foot for various properties including both regulated and unregulated residential properties. Consistently, those valuations confirm that regulated properties have a significantly lower value than non-regulated properties.

301.    For example, for rental properties built post-1973 in Manhattan, the Assessment Guidelines concede that unregulated properties have a value that is 11% to 45% greater than their regulated counterparts. For rental properties in Manhattan built pre-1973, the guidelines admit that the value of regulated properties are half that of their unregulated property peers, as reflected in Chart 4. In other words, by designating a property in Manhattan for rent stabilization, Defendants take at least half the value of that property from its owner.

**Chart 4: Assessment Guidelines for Regulated and Unregulated Properties**



302.     Thus, even prior to the 2019 Amendments, the RSL eliminates half to two-thirds of the value of buildings with a significant percentage of rent stabilized units.

303.     **Interference with Reasonable Investment-Backed Expectations.** Although nominally established as a temporary measure to address an emergency caused by World War II, the New York City Council has (with little basis) determined there to be an emergency every three years for 50 years. Over the past decade, even prior to the 2019 Amendments, modifications made to the law have chipped away at owners' ability to increase rents to pay for needed improvements and have limited owners' ability to remove units from the RSL system.

304.     In the first instance, the perpetual renewal of a nominally temporary remedy itself interferes with the reasonable expectations of owners. Indeed, the ETPA declares that "the ultimate objective of state policy" is "the transition from regulation to a normal market of free bargaining between landlord and tenant." N.Y. UNCONSOL. LAW § 8622 (McKinney). Having defined the RSL to be a temporary measure, Defendants should be estopped from challenging the reasonableness of owners in relying upon those very representations.

305.    Modifications to the RSL in the past ten years have further interfered with the reasonable investment-backed expectations of property owners. For example, the Rent Act of 2011 limited the frequency of vacancy increases to one per calendar year, reduced the amount that could be recovered for IAIs from $1/40^{th}$ of the cost per month (2.5%) to $1/60^{th}$ of the cost (1.6%), raised the threshold for high-rent vacancy decontrol to $2,500 (from $2000), and raised the income level for high-income deregulation to $200,000 (from $175,000). The Rent Act of 2015 further increased the high-rent vacancy deregulation threshold to $2,700 and indexed that level to the one-year guidelines passed by the RGB (thereby keeping the threshold nearly perpetually out of reach), and lengthened the MCI amortization period from 7 years, to 8 years and 9 years respectively for buildings with 35 units or less, and those with more than 35 units.

306.    By limiting permissible rental rate increases to very small amounts each year for the past six years, the Defendants have further prevented owners from achieving the growth in rents that would be reasonably expected by any investor. Over the past six years, the maximum rent increase for one-year leases has varied between 0% and 1.5% per year, as reflected below.

| Year | Maximum Increase for One-Year Lease | Maximum Increase for Two-Year Lease |
|------|------|------|
| 2019 | 1.5% | 2.5% |
| 2018 | 1.5% | 2.5% |
| 2017 | 1.25% | 2% |
| 2016 | 0% | 2% |
| 2015 | 0% | 2% |
| 2014 | 1% | 2.75% |

307.    Thus, even prior to the 2019 Amendments, dramatic limitations on permissible rental increases and the modifications to the RSL have taken, piece-by-piece, various economic rights of property owners, thereby interfering with owners' reasonable investment-backed expectations.

**C.** ***The 2019 Amendments Expanded the Regulatory Taking by Eliminating Rent Increases Beyond the RGB-Permitted Rates, Effectively Preventing the Recovery of Investments for Improvements, and Essentially Eliminating Rent Increases for Units Offering Preferential Rents***

308.    The 2019 Amendments dramatically exacerbate the regulatory takings effected by the RSL. Those Amendments eliminate any avenue for increasing rents beyond those levels set by the RGB, through the elimination of the Statutory Vacancy Increase and the Longevity Increase, and through the limitation on rent increases in units with preferential rents. The Amendments go further and preclude the RGB from making any adjustments for vacancy leases beyond those permitted by the RSL code. They further reduce the market value of stabilized units by removing any potential for decontrol through Luxury Decontrol or High-Income Decontrol, and by effectively eliminating the ability to convert buildings into cooperative or condominium-owned buildings. In addition, by dramatically reducing (if not eliminating) the ability to recover for IAI and MCI investments, the 2019 Amendments further reduce the value of stabilized units and interfere with owner's investment-backed expectations.

309.    **Vacancy and Longevity Increases Eliminated.** By eliminating statutory vacancy increases and longevity increases, the 2019 Amendments eliminated two methods of obtaining any rental increases beyond the annual increases permitted by the RGB. Vacancy increases have been a long-standing component of rent stabilization, permitted by the RGB even before they were required by statute. Those increases served to partially offset the effect of below-market rental rates and below-cost rent increase levels established by the RGB, while minimizing the impact to existing tenants.

310.    Further, given the lengthened duration of tenants under the RSL (as explained above), the longevity rent increase was important to partially offset the compounded effect of below-market rate rent increases over a period of years. Elimination of the vacancy and

longevity increases cannot be justified as a tenant protection measure because the unit is vacant. Rather, the elimination of those increases serves to further subsidize tenants (regardless of their financial need) at the expense of owners (despite the historic recognition that such vacancy and longevity increases were needed to help defray the impact of below-market—and below-cost— rent increases).

311.     Those rate increases also served to partially compensate owners for the costs associated with vacancy turnovers, including the lost rent during the vacancy period, the cost of apartment painting and other costs (which are not recoverable under IAI increases), plus the costs of brokerage and other costs associated with marketing the unit. By eliminating the availability of such rate increases, the 2019 Amendments deny owners any meaningful ability to partially offset the sub-market-rate rents and to recover for those costs of vacancies.

312.     **Preferential Rent Increase Elimination**. In certain circumstances, owners may choose not to charge tenants the maximum amount permitted under the rent regulations (termed "Preferential Rents"). Under the law prior to the 2019 Amendments, owners retained the right to increase preferential rents by more than the RGB-adopted rate, up to the legally permissible rent upon the renewal or vacancy of any tenant lease. *See* Admin. Code of the City of New York § 26-511(c)(14). Preferential rents are estimated to account for almost a third of all rent-stabilized units.

313.     The 2019 Amendments eliminated the right of owners to increase such rents beyond the inadequate RGB-rate upon renewal of the lease. Rather, even for leases where the lease amount is below the legal regulated rent, the amount that may be charged upon renewal of the lease cannot exceed the rent charged prior to renewal, adjusted by the most recent applicable guidelines increase. *See* Chapter 36 of the Laws of 2019, Part E.

314.    That the 2019 Amendments locks in place rents that are below the regulated rental rate demonstrates that the intent of the Amendments is not to preclude price gouging. The preferential rents are *below* the regulated rates, and therefore Defendants cannot assert that those rents are excessive. Rather, by requiring property owners with preferential rents to limit rental increases to the modest 0–1.5% annual rate, Defendants make clear that the purpose of the RSL is simply to subsidize tenants at the expense of owners.

315.    Eliminating owners' ability to increase preferential rents not only deprives owners of the ability to keep up with increases in operating expenses, but also further reduces the value of buildings containing such units.

316.    **Elimination of Luxury Decontrol and High-Income Decontrol.** By eliminating Luxury Decontrol and High-Income Decontrol, the 2019 Amendments further reduced the value of buildings with rent-stabilized units. Even where the rent from a unit may be limited under rent stabilization, if the units were near the decontrol thresholds, the value that purchasers would assign to a building was based on the expectation of returning the units to market-rate. With the elimination of Luxury Decontrol and High-Income Decontrol, any such increased valuation has been eliminated.

317.    **Limit on Rent Increases from IAIs and MCIs.** Even before the adoption of the 2019 Amendments, owners who were making individual apartment improvements (IAIs) were limited in the rent increases they could charge to pay for those improvements. For buildings with 35 or fewer housing accommodations, the owner could only increase monthly rent by one-fortieth (or 2.5%) of the cost of the improvement, and for buildings with more than 35 units, the owner could only increase rent by one-sixtieth (or 1.6%) of the improvement cost. *See* Admin. Code of the City of New York § 26-511(c)(13). Owners who were making major capital

improvements (MCIs) to their building were limited to increasing rates at an amortization period of 8 and 9 years respectively for buildings with 35 or fewer units and for buildings with more than 35 units. *See* Admin. Code of the City of New York § 26-511(c)(6).

318.    Those limits on recovery for MCIs and IAIs, which did not permit recovery for any of the financing costs incurred to fund the improvements, already significantly limited the amount that property owners could recover for improvements made.

319.    *IAIs.* The 2019 Amendments further restrict owners from recovering the costs of, let alone a reasonable return on, most IAIs. The law limits IAIs to the aggregate cost of $15,000 that can be spent on no more than three IAIs over a 15 year period. The law makes no exception to those amounts based on the size of the apartment, the condition of the apartment, or the length of the tenant's occupancy.

320.    To recover those expenses, owners may only make a temporary increase in the regulated rent in the amount of one-one hundred sixty-eighth (0.6%) of the cost of the improvement (excluding finance charges) for buildings with 35 or fewer units, and one-one hundred eightieth (0.55%) for buildings with more than 35 units. Ch. 36 of the Laws of 2019, Park K, § 2. This results in spreading the improvement cost over 14 to 15 years. Any rent increase resulting from such IAI must be removed from the rent within 30 years. *Id.*

321.    Where a unit has been leased to the same tenant for a number of years (as often occurs with stabilized units), substantial work is often required before the unit can be returned to the market. Improvements covered by IAIs may include replacement of lead-paint covered windows, walls, ceilings, doors, door frames and sills. IAIs may also be needed to replace flooring, wiring and plumbing. Units may require kitchen renovations, bathroom revocations or

new appliances. In such cases, the cost of IAIs can significantly exceed $15,000, potentially costing $50,000 to $70,000 or more.

322. With a $15,000 cap on any rent increase from IAIs, owners would be unable to fully recover the costs of those more expensive IAIs. Thus, owners must choose between limiting the IAI to only $15,000—thereby suffering a slow deterioration of the value of the unit—or investing the full cost of the IAI, thereby suffering a more immediate loss (and a literal taking of the owner's property in the form of expenditures that can never be recovered).

323. In fact, based on the permitted rental rate increases under the 2019 Amendments, an owner would likely never fully recover any IAI investment. The net present value of the after tax rent increases will almost always be less than the net present value of the IAI investment. For example, if an owner of a building spent $15,000 replacing cabinets and appliances upon the vacancy of a tenant, the owner could increase its rent at most by $83/month ($15,000/180). Because the value of a $1 rent increase in 30 years is worth less than $1 currently, the cash flows from that rent increase would have to be adjusted to present value. The net present value of the return from the increased rent will typically be less than the amount the owner invested in making the repairs. Once the taxes associated with the additional rent revenue is considered, the investment will almost always result in a loss.

324. As noted previously with respect to Plaintiffs Mycak Associates LLC, Vermyck LLC, and M&G Mycak LLC, owners faced with such repair costs would likely choose to make no such repairs (resulting in gradual deterioration of the building) and potentially leave the unit empty. These Plaintiffs, which own several rent-stabilized units occupied for decades by the same tenants, expect that the units will require costly repairs after the departure of the current tenants. Because the IAI limit will prevent them from ever recouping the money required to

rehabilitate and re-lease these stabilized units, they plan not to rehabilitate the units after the departure of the current tenants. Instead, the owners will leave the units vacant—the only economically rational scenario in this circumstance.

325.    If the owner made the IAI investment (in order to preserve the value of the owner's property), the RSL would result in the owner's compelled loss of money to subsidize the tenant's use of the property.

326.    **MCIs.** For MCIs, the 2019 Amendments made a similar change. The Amendments extended the amortization period for reimbursement of major capital improvements to twelve years for buildings with 35 or fewer units and twelve and one-half years for buildings with more than 35 units. Chap. 36 of the Laws of 2019, Part K, §§ 4, 11. It also capped the period during which such increased rents could be charged to 30 years. And it precludes owners from increasing rents on any existing tenant by more than 2% in any year to recover the MCI, which is one-third of the 6% increase previously permitted.

327.    As with IAI rental increases, the amended amortization schedule when combined with the 30-year period of collectability means that most owners are unlikely to generate positive returns—much less investment-backed expectations—in making such MCI investments. Indeed, for those units where the two-percent cap on rent increases is lower than the permissible rent increase under the amortization method, in most (if not all) cases it will not be possible for owners to fully recover their investment. Few, if any, property owners would expect that they would be unable to recover through rents the costs of all future improvements to their own property.

328.    Following the 2019 Amendments, the impact of the regulatory takings has become far more severe along every relevant metric. Although rent rates were already 25% to

80% lower than market rates and increasing half as fast as operating expenses, the 2019 Amendments eliminate most avenues for rents to increase beyond that permitted by the RGB. Absent any meaningful ability to raise rents beyond the near-static levels permitted by the RGB, owners will face a steady decline of income production from their properties.

329.    While the decreased rent revenues and other RSL obligations had already eliminated up to 50% or more from the value of buildings with a significant number of RSL units, the elimination of any options to decontrol units, and the steady reduction of income, will cut those values significantly further.

330.    Some owners have already experienced that loss. One member of CHIP and RSA had nearly finalized a recapitalization of a portfolio of rent stabilized properties. Prior to the passage of the 2019 Amendments, that portfolio was valued in excess of $300 million. Shortly after the passage of the 2019 Amendments, the institution participating in the recapitalization informed the owner that it would have to re-price the transaction. The re-priced transaction reduced the value of the portfolio by about $50 million, or nearly 15 percent of the value of the buildings.

331.    On information and belief, surveys of other owners of portfolios of stabilized units reflect that such owners are reducing the booked value of those assets by 20-30 percent.

D.    ***The Hardship Exceptions in the RSL Do Not Alleviate any Takings***

332.    The "hardship exception" purports to allow property owners to petition the Division of Housing and Community Renewal (DHCR) to charge a higher rent to tenants than that set by the Board. N.Y. UNCONSOL. LAW § 26-511 (McKinney). However, because the requirements for demonstrating a "hardship" are so onerous (and disconnected from true hardship), and because the DHCR typically takes years to adjudicate hardship applications, most property owners do not use the mechanism.

333.    Data from 2011 through 2015 show that the highest number of property owners filing hardship applications in any given year was *four* (2011), and that no applications were filed in 2015. Yet, during that same period, the RGB reports that 5–6% of rent-stabilized buildings were distressed (meaning that they reported operating and maintenance costs that exceeded their gross revenue). The existence of those distressed buildings confirm that the lack of hardship applications was not due to the lack of hardship suffered by property owners.

334.    One former Director of the RSA confirmed the futility of the hardship exception process. During his career, he had submitted approximately two-dozen hardship applications. All of them were either denied, or never acted upon. Notably, the RSL does not set any timeline for resolution of hardship applications, allowing the DHCR to simply take no action on such applications. Further, limits on the expenses that would be considered under the hardship application would undermine the claim, making proof of hardship practically implausible.

335.    There are two statutory means of receiving a hardship exception, including (1) demonstrating an inability to obtain historic net income; or (2) demonstrating an inability to obtain income greater than the building operating expenses. As discussed below, each of these exceptions are either practically implausible, or by their very construction, provide inadequate compensation to the property owner.

336.    ***Historic Income Test.*** An individual can receive a hardship exemption because "the level of fair rent increase is not sufficient to enable the owner to maintain approximately the same average annual net income (which shall be computed without regard to debt service, financing costs or management fees)" as in the past. The owner must either provide, for comparison (1) for buildings constructed before 1968, records demonstrating annual net income from 1968–1970; (2) for buildings constructed after 1968, records of annual net income from the

first three years of operation; or (3) for buildings that have transferred title, records of annual net income for the first three years of operation under the new owner, *provided* that (a) title was acquired through a bona fide sale of the entire building, (b) the new owner cannot obtain records from 1968–1970 "despite diligent efforts to obtain same from predecessors in title," and (c) the new owner can provide six years of financial data under his or her "continuous and uninterrupted operation of the building." N.Y. UNCONSOL. LAW § 26-511(6) (McKinney).

337.    This historic income hardship application is so impractical that it is rarely used by property owners. *First*, the historic income test evaluates the hardship data over a three-year period, meaning that the owner would have had to suffer the hardship for three years, but still own the building.

338.    *Second*, the historic income test requires a comparison of income from a period that is typically *fifty years earlier*, and requires the submission of detailed records to confirm that income. For most owners, producing records of building income from fifty years earlier is alone too great a hurdle to permit the historic income test to be meaningful.

339.    *Third*, the statute on its face does not permit applicants to include debt service or financing costs. Those building owners that might have experienced diminished income are also likely to have taken on additional debt or financing costs. By excluding those components from the analysis, the historic income test excludes a critical factor giving rise to the hardship.

340.    *Fourth*, the statute does not require the cost comparison to be adjusted for inflation. Given the inflation for the period from 1968 to present, an owner could suffer a hardship and yet still reflect an income that exceeds the 1968 income. An owner generating annual net income of $2,000 in 2019 would be far worse off than an owner with income of $1,000 in 1968, but would still not be entitled to a hardship exemption. In fact, the same owner

would need to earn annual income of well over $10,000 in 2019 dollars to be in the same position as 1968.

341.   *Fifth*, the statute permits a hardship finding only if the operating income in absolute dollars is less than the income from base period (typically 1969). But there is no evaluation of whether the net operating income in the base year was profitable. Indeed, given that many properties in the base year were transitioning from rent control, the assumption that the base period was profitable is ill-founded.

342.   In any event, most investors reasonably expect net operating income to increase year over year, not to stay flat or even decline in real terms (once inflation is included). By relying on an arbitrary benchmark (performance in 1969-1970), failing to account for inflation, and failing to account for financing costs, even if hardship applications were not administratively futile (which they are), the standard set in the RSL for such an award makes them incapable of remedying owners' deprivation of their reasonable investment-backed expectations.

343.   ***Alternative Hardship Exception.*** There is an alternative hardship exception under Section 26-511 (6-a) of the New York City Administrative Code. To receive a hardship exemption under this provision, owners are required to demonstrate that gross rent income does not exceed operating expenses by at least five percent of gross rent:

> [O]wners of buildings acquired by the same owner or a related entity owned by the same principals three years prior to the date of application may apply to the division for increases in excess of the level of applicable guideline increases established under this law based on a finding by the commissioner that such guideline increases are not sufficient to enable the owner to maintain an annual gross rent income for such building which exceeds the annual operating expenses of such building by a sum equal to at least five percent of such gross rent.

N.Y. UNCONSOL. LAW § 26-511(6-a) (McKinney).

344. This alternative hardship exception is just as illusory as the historic income test. *First*, the alternative hardship provision requires the owner to have held the property for three years (likely suffering a hardship during that entire period) before any application can be made.

345. *Second*, the law artificially limits what may be included as "operating expenses" in the hardship application. Only "the actual, reasonable, costs of fuel, labor, utilities, taxes, other than income or corporate franchise taxes, fees, permits, necessary contracted services and non-capital repairs, insurance, parts and supplies, management fees and other administrative costs and mortgage interest" may be counted toward annual operating expenses.

346. This formulation specifically excludes costly capital repairs. N.Y. UNCONSOL. LAW § 26-511 (McKinney). The exclusion of such capital repairs means that properties with a positive operating margin provide insufficient income to reimburse owners for improvements made to the building.

347. *Third*, a 5% margin on gross rents consistent with reasonable industry investment-backed expectations. Industry metrics indicate that property owners would typically expect to generate net operating income substantially greater than 5%, as such income is necessary to finance capital improvements, pay taxes and return reasonable profits. After paying for the capital improvements and any income taxes, the 5% hardship margin leaves little, if any, return on the property owner's investment.

348. What little profit that might exist would be far below the expectations of investors in both real estate and other investments. Indeed, based on income and expense filings from other jurisdictions in New York, it is apparent that owners' average profit margin after interest and depreciation are significantly greater than even the 5% (which, as noted, is before payments of capital improvements).

349.     In short, before an owner could meet the 5% margin required to show a hardship, the owner would have already suffered returns that are insufficient to fund capital improvements, that are well below the industry-expected return on investment, and that would generate a profit (if any) that is significantly below industry expectations.

350.     Further, owners are not able to file a hardship application with respect to a single apartment, or group of apartments, but may only file with respect to the whole building. Thus, while a number of apartments in a building may not even be covering their pro rata share of operating expenses, neither hardship exception would permit an increase to that unit or group of units.

E.     ***The RSL Provides No Average Reciprocity of Advantage to Regulated Property Owners, But Is An Off-budget Welfare Program Funded Solely by Regulated Owners.***

351.     The character of the RSL as a public assistance benefit funded solely by (some) building owners, and the absence of *any* reciprocity of advantage to those owners, further establishes that it is a regulatory taking.

352.     As previously explained, the New York Court of Appeals has conclusively determined that "a tenant's rights under a rent-stabilized lease are a local public assistance benefit." *Santiago-Monteverde*, 24 N.Y.3d at 289. The Court explained that "[r]ent stabilization provides assistance to a specific segment of the population that could not afford to live in New York City without a rent regulatory scheme. And the regulatory framework provides benefits to a targeted group of tenants—it protects them from rent increases, requires owners to offer lease renewals and the right to continued occupancy, imposes strict eviction procedures, and grants succession rights for qualified family members." *Id.* at 290.

353.    The Court observed that this benefit, while *conferred by* the government through regulation, is "not *paid for* by the government," but is instead "applied to private owners of real property." *Id.* at 291.

354.    Accordingly, the RSL violates the basic Takings Clause principle that government may not force some property owners "alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *see, e.g.*, *Pennell*, 485 U.S. at 22 (Scalia & O'Connor, JJ, concurring in part and dissenting in part) (condemning a rent regulation ordinance as an "'off budget'" "welfare program privately funded" by landlords and thus a taking).

355.    Owners of properties subject to RSL regulation do not receive any reciprocal benefits from the RSL program. Unlike zoning ordinances, which benefit all property owners subject to the zoning in an approximately equal way, RSL regulated property owners lose property value and/or profits but receive nothing in return. No benefit is conferred on RSL property owners because some other property also is subject to RSL. The RSL singles out one group of property owners to bear all the economic burdens of the public assistance scheme, and one group of tenants to receive all the benefits, and it provides no countervailing benefits—still less benefits that approximate and compensate for the burdens—to regulated property owners.

356.    Even if there were general societal benefits from having an RSL-regulated property, such as a reduction in homelessness—which Plaintiffs dispute and studies refute—such societal benefits accrue to all residents and visitors to New York City, not just property owners subject to the RSL, and in no way approximate the losses borne solely by regulated owners. *See, e.g., Pennell*, 485 U.S. at 22 (Scalia & O'Connor, JJ, concurring in part and dissenting in part) ("A legislative category of economically needy senior citizens is sound, proper and sustainable

as a rational classification. But compelled subsidization by landlords or by tenants who happen to live in an apartment building with senior citizens is an improper and unconstitutional method of solving the problem.") (*quoting Prop. Owners Ass'n. v. North Bergen,* 74 N.J. 327, 339 (1977)).

F.     **The RSL Does Not Prevent a Nuisance or Noxious Use of the Property**

357.     Unlike laws prohibiting a nuisance, the RSL is not designed to prescribe a noxious use of properties. The rental properties subject to the RSL are put to the same use as those not subject to the RSL.

G.     **The RSL Has the Character of a Physical Invasion of Owners' Private Property of Indefinite Duration**

358.     "[T]he character of the government action" in promulgating and enforcing the RSL involves the sort of "interference with property [that] can be characterized as a physical invasion by the government" for which a taking "may more readily be found." *Penn Central,* 438 U.S. at 124.

359.     As described above, the RSL involves precisely the type of physical invasion that weighs in favor of finding a regulatory taking.

## VI.     AN ORDER ENJOINING THE RSL AS A VIOLATION OF DUE PROCESS AND DECLARING IT TO BE A TAKING OF PRIVATE PROPERTY WOULD IMPROVE, NOT HARM, NEW YORK CITY'S RENTAL HOUSING MARKET

360.     The Court need not fear adverse consequences or market disruption from ending the facially unconstitutional RSL.

361.     The example of Cambridge, Massachusetts is instructive. Cambridge imposed rent control from 1971 to 1994. Following rent de-control, Henry O. Pollakowski, a Housing Economist at the MIT Center for Real Estate, published an economic study of the impact of the

return to market rents.[1] He found that there was a "housing investment boom" after the return to market rate rents, and that "investment in previously rent-controlled buildings…increased by approximately 20 percent over what would have been the case in the absence of decontrol."

362.    Dr. Pollakowski concluded that post-regulation Cambridge experienced "a tremendous boom in housing investment, leading to major gains in housing quality. This research thus provides a concrete example of complete rent deregulation leading to housing investment that would otherwise not have occurred. Given the need for better maintenance and increased renovation of New York's aging housing stock, such an increase represents a considerable potential boon to the city's residents."

363.    In addition, there is ample evidence that removing the system of rent stabilization in New York would have benefits beyond just increased housing investment.

364.    Each year, the impact of pre-2019 Amendment rent stabilization causes the City of New York to lose **$283 million** of property tax revenue. That amount will grow significantly as a result of the 2019 Amendments. This is money that the city could spend targeting housing assistance to individuals who actually need it.

365.    Eliminating rent stabilization does not mean eliminating any housing assistance for individuals who need it. Instead, the elimination of a system that is inefficient, expensive, and untargeted would free up resources and money to provide housing assistance where it is actually needed. As noted above, there are many alternatives that actually target low-income affordable housing and vacancy issues. Those options include direct subsidies (through Section 8 or a

---

[1] Henry O. Pollakowski, Manhattan Institute Center for Civic Innovation, Civic Report No. 36 (May 2003), *Rent Control and Housing Investment: Evidence from Deregulation in Cambridge, Massachusetts*, available at https://www.manhattan-institute.org/pdf/cr_36.pdf.

similar program), indirect subsidies (through programs like SCRIE and DRIE), tax incentives, and increasing the supply of housing.

366. In addition, owners could still choose to voluntarily participate in rent regulation. Currently, new buildings, or buildings that are rehabilitated, can apply for a period of exemption or abatement of real estate taxes in exchange for submitting themselves to rent regulation. After this period of tax benefit is over, owners can return to charging market rents, depending on whether they meet certain requirements. This enables building owners to receive benefits for participating in rent stabilization.

## CLAIMS FOR RELIEF

### Claim I (Against All Defendants):
### Due Process (U.S. Const. Amend. XIV; 42 U.S.C. § 1983)

367. Plaintiffs incorporate by reference the preceding allegations of this complaint.

368. Defendants, acting under color of New York law, have caused, and will continue to cause, Plaintiffs to be deprived of their property without due process of law in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution.

369. The Rent Stabilization Laws are irrational. They fail to serve any of the goals that they purport to seek to achieve. Among other things, the RSL does not target affordable housing to those in need; is not a rational means of ensuring socio-economic or racial diversity; is not a rational means of increasing the vacancy rate; has a deleterious impact on the community at large; and alternatives to the RSL are available that are more narrowly tailored to the goals claimed to underlie the RSL. It serves no legitimate government purpose.

370. Separately, without rational basis or an adequately developed record for determining that a serious public emergency requiring rent regulation in New York City

continues to exist—or even defining what, precisely, the emergency entails—defendant New York City has reflexively renewed the RSL every three years for the last forty-five years.

371.    Defendant New York City is statutorily empowered to make the emergency determination if the vacancy rate is at or below a 5% threshold (which is itself entirely arbitrary and methodologically unsound), taking into account the condition of rental accommodations and the need for regulating and controlling residential rents.

372.    Defendants' rationale for what constitutes the "serious public emergency" has shifted over time. Defendants have variously justified the need for rent regulation by citing the unique problems in a post-war housing market, low vacancy rates, lack of affordable housing options, the need to ensure socio-economic and cultural diversity and to combat homelessness. However, data has shown overwhelmingly that the RSL is not a rational means of addressing any of these ends.

373.    Defendant New York City's continuing declaration of an emergency and renewal of the RSL without a rational basis for doing so deprives Plaintiffs and the organizational Plaintiffs' members of fundamental property rights without the benefit of Due Process required by the Constitution. Defendants' actions are arbitrary and are not rationally related to any legitimate government purpose.

374.    In addition, the Rent Stabilization Laws' destruction of building owners' fundamental property rights warrants strict scrutiny. Defendants cannot demonstrate that a compelling state interest is furthered by the RSL, nor can they demonstrate that the RSL is narrowly tailored to address any compelling state interest.

375.    Absent injunctive and declaratory relief, Plaintiffs will suffer irreparable harm caused by the deprivation of their constitutional rights.

## Claim II (Against All Defendants):
## Physical Taking (U.S. Const. Amends. V and XIV; 42 U.S.C. § 1983)

376. Plaintiffs incorporate by reference the preceding allegations of this complaint.

377. Defendants, acting under color of New York law, have caused, and will continue to cause, Plaintiffs to be deprived of their right to possess, use and dispose of their real property without just compensation in violation of the Takings Clause of the Constitution.

378. Through the Rent Stabilization Laws, including Chapter 36 of the Laws of 2019, and New York City's rote renewal of its emergency declaration which triggers application of the RSL in New York City, Defendants deprive Plaintiffs of fundamental rights among the "bundle" associated with property ownership, including the rights to possess, use and dispose of the property. Specifically, among other things, the RSL deprives owners of rent stabilized buildings in New York City of the actual or practical ability to control who rents and lives in those buildings, to evict tenants outside of certain limited circumstances, or to dispose of or demolish the building.

379. Owing to the mandatory lease renewal provisions of the Rent Stabilization Laws, rent stabilized tenants and their successors are able to occupy Plaintiffs' property for periods of indefinite duration, transferring de facto property rights of possession, use, and disposition from Plaintiffs to tenants without just compensation—thus effecting a per se physical taking.

380. Those same provisions that result in owners losing physical possession and economic control of their property operate as an unconstitutional condition on the use of private property.

381. Absent declaratory or injunctive relief, Plaintiffs will suffer irreparable harm caused by the deprivation of their Constitutional rights.

**Claim III (Against All Defendants):**
**Regulatory Taking (U.S. Const. Amends. V and XIV; 42 U.S.C. § 1983)**

382.     Plaintiffs incorporate by reference the preceding allegations of this complaint.

383.     Defendants, acting under color of New York law, have caused, and will continue to cause, Plaintiffs to be deprived of their real property without just compensation in violation of the Takings Clause of the Constitution.

384.     Through the Rent Stabilization Laws, including Chapter 36 of the Laws of 2019, and New York City's rote renewal of its emergency declaration which triggers application of the RSL in New York City, Defendants effect a regulatory taking of Plaintiffs' property without just compensation. Specifically, the RSL imposes significant regulatory restrictions and in addition requires Plaintiffs to rent their property at rates often far below market-based rates, while placing limits on rent increases and the recovery of investments in improvements.

385.     The Rent Stabilization Laws, among other things, deprive property owners of a reasonable market return on their investment, devalue their properties, and upset their investment-backed expectations. The character of Defendants' actions—providing for a public welfare program at the expense of a subset of private property owners and imposing a physical occupation on rent stabilized units—together with the extensive and negative economic impact of the Rent Stabilization Laws, renders them facially unconstitutional as a regulatory taking.

386.     Absent declaratory or injunctive relief, Plaintiffs will suffer irreparable harm caused by the deprivation of their constitutional rights.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court:

A.     Declare the Rent Stabilization Laws to be an unlawful violation of Due Process;

B.      Enjoin the application and enforcement of the Rent Stabilization Laws as a violation of Due Process;

C.      Declare New York City's 2018 declaration of a housing emergency to be an unlawful violation of Due Process;

D.      Enjoin New York City's 2018 declaration of a housing emergency as an unlawful violation of Due Process;

E.      Declare that the Rent Stabilization Laws effect a physical taking of private property for public use that requires the payment of just compensation;

F.      Enjoin the application and enforcement of the Rent Stabilization Laws as an unlawful physical taking of private property;

G.      Declare that the Rent Stabilization Laws effect a regulatory taking of private property for public use that requires the payment of just compensation;

H.      Enjoin the application and enforcement of the Rent Stabilization Laws as an unlawful regulatory taking of private property;

I.      Award Plaintiffs their reasonable fees, costs, expenses and disbursements, including attorneys' fees, associated with this action; and

J.      Grant Plaintiffs such other relief as may be just and proper.

Dated: July 15, 2019

By: /s/ *Reginald R. Goeke*
Andrew J. Pincus (*pro hac forthcoming*)
Timothy S. Bishop (*pro hac forthcoming*)
Reginald R. Goeke, Bar Number 2700367
Robert W. Hamburg, Bar Number 4889093

MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500

*Attorneys for Plaintiffs*
