

September 6, 2019

Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

     Re: <u>*Community Housing Improvement Program, et al. v. City of New York, et al.,*</u> 19-cv-4087

Dear Judge Brodie:

     We write to request a conference regarding our proposed motion pursuant to F.R.C.P. 24 to intervene on behalf of N.Y. Tenants and Neighbors (T&N), and Community Voices Heard (CVH), whose members include thousands of rent stabilized tenants who stand to lose their homes if Plaintiffs prevail in this action and succeed in nullifying the Rent Stabilization Laws that have protected tenants in New York since 1968. We also request leave to file a motion to dismiss the complaint in the event that intervention is granted. Defendants have informed us that they take no position on our motion.

<u>Intervention</u>

     The proposed intervenors have both representational and organizational standing to intervene in this matter. An organization suing "on behalf of its members" has representational standing if "some particular member of the organization would have had standing to bring the suit individually." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). An association has standing to bring suit on behalf of its members when (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 275 (1986) (citing *Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

     An organization may also "have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin,* 422 U.S. 490, 511 (1975). To have standing, an organization must allege only a "perceptible impairment" of its interests or an expenditure of resources that could be spent on other activities. *Nnebe v. Daus*, 644 F.3d 147, 156-58 (2d Cir. 2011).

     Proposed intervenors T&N and CVH have numerous members who have standing to assert claims and defenses in this action; the interests that they seek to protect through this lawsuit, namely preserving affordable housing and furthering tenants' rights, are germane to their purpose; and the relief requested and the claims asserted do not require participation of their individual members. Furthermore, if Plaintiffs were to prevail in this action, the proposed intervenors to would have to divert all their

resources towards assisting the one million tenant families suddenly bereft of the protections of the Rent Laws and in imminent danger of homelessness.

Even if the Attorney General adequately represents the proposed intervenors' interests, permissive intervention may be granted if they "ha[ve] a claim or defense that shares with the main action a common question of law or fact," F.R.C.P. 24(b), and their intervention will "assist in the just and equitable adjudication of any of the issues between the parties," *Oneida Grp. Inc. v. Steelite International U.S.A. Inc.*, 17 Civ. 0957, 2017 WL 6459464 at *13 (E.D.N.Y. 2017) (citing *Allco Fin. Ltd. v. Etsy*, 300 F.R.D. 83, 88 (D. Conn. 2014)); *New York v. U.S. Dep't of Health and Human Services*, 19 Civ. 4676, 2019 WL 3531960 at *6 (S.D.N.Y. 2019). The proposed intervenors' defenses share a common question of law with the main action—that is, the constitutionality of New York's Rent Stabilization Law (R.S.L.). Their members, as rent-stabilized tenants facing potential loss of their homes, are also uniquely positioned, and motivated, to assist in the just and equitable adjudication of these issues.

Sufficiency of the Pleadings

The complaint should be dismissed pursuant to F.R.C.P. 12(b)(6) because it utterly fails to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 173 (2d Cir. 2012). Plaintiffs assert that the R.S.L. on its face constitutes both a regulatory and a physical taking of property, and violates due process, in violation of the 5th and 14th Amendments to the U.S. Constitution. Notably, Plaintiffs' claims are not confined to the June 2019 amendments to the R.S.L., but rather challenge the very concept of rent regulation that has existed in New York State since World War II. Also notable is the absence from the complaint of any allegation that any Plaintiff, or any particular member of the Plaintiff organizations, has suffered any specific amount of monetary loss due to the application of the R.S.L. The absence of individual "as applied" challenges to the statute by itself mandates dismissal of the complaint. *See West 95 Housing Corp. v. N.Y.C. Dep't of Housing Preservation and Devel.*, 31 F. App'x 19 (2d Cir. 2002); *Rent Stabilization Ass'n of N.Y.C. v. Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993).

Plaintiffs wrongly allege that the R.S.L. effects a "physical taking" of their property because: a) they are deprived of "their right to possess, use and dispose of" their property; b) they are deprived of some elements of their "bundle" of property rights—specifically "the ability to control who rents and lives in buildings," to evict tenants, and to demolish their buildings[1]—and c) that the "indefinite duration" of their tenants' lawful occupancies constitute a "per se physical taking." *See* Complaint ¶¶ 376-81. These contentions contravene decades of precedent in the Supreme Court and Second Circuit. Where "a property owner offers property for rental housing, the Supreme Court has held that governmental regulation of the rental relationship does not constitute a physical taking." *Harmon v. Markus*, 412 F. App'x 420, 422 (2d Cir. 2011) (citing *Fed. Home Loan Mortg. Corp. v. N.Y.S. Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47-48 (2d Cir. 1996)). "That a rent-regulated tenancy might itself be of indefinite duration—as has long been the case under rent control and rent stabilization—does not, without more, render it a permanent physical occupation of property." *Rent Stabilization Ass'n v. Higgins*, 83 N.Y.2d 156, 172 (1993) (approvingly cited in *Harmon*, 412 F. App'x at 422). Moreover, landlords who have acquired property "with full knowledge that it was subject to the RSL ... have acquiesced in its continued use as rental housing." *Fed. Home Loan*, 83 F.3d at 48.

---

[1] Notably, rent stabilized landlords are permitted to evict their tenants for good cause, Rent Stabilization Code (R.S.C.) § 2524.3, and to demolish their buildings, R.S.C. § 2524.5(a)(2). Nothing in the R.S.L. limits landlords' rights to choose among applicants for vacant apartments.

Plaintiffs further claim that that the R.S.L. effects a "regulatory taking" because a) it imposes "significant regulatory restrictions" and requires rental at below market rates; b) it deprives landlords of a "reasonable market return" which "upsets their investment-backed expectations;" c) it provides for a "public welfare program" at the expense of a subset of property owners; d) it causes extensive and negative economic impact; and e) it imposes "a physical occupation on RS units." *See* Complaint ¶¶ 382-86. These contentions also contravene decades of precedent in the Supreme Court and Second Circuit. The Second Circuit, in *Federal Home Loan*, held that a claim of regulatory taking fails where the plaintiff does not allege that it is deprived of all "economically viable use of the property." *Fed. Home Loan*, 83 F.3d at 48 (citing *Keystone Bituminous Coal Assoc. v. DeBenedictis*, 480 U.S. 470, 485 (1987)). The court noted that no taking occurs where, even though a landlord "will not profit as much as it would under a market-based system, it may still rent apartments and collect the regulated rents." *Id.* A mere reduction in property value does not establish a regulatory taking, *id.* (citing *Bowles v. Willingham*, 321 U.S. 503, 517 (1944)), and a landlord owner is not guaranteed a "reasonable return" on investment, *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139-40 (2d Cir.1984).

Finally, Plaintiffs assert a claim for violation of their due process rights on the grounds that the R.S.L. allegedly does not serve the goals it purports to achieve and "serves no legitimate government purpose." Complaint ¶¶ 367-75. Plaintiffs also claim that New York City has no basis to determine that a housing emergency exists.[2] *See Id.* However, the Supreme Court has consistently held that land use restrictions survive a substantive due process challenge so long as they are not "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 541 (2005) (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926)). The court in *Lingle* cautioned that courts should not engage in "heightened means-ends review" of economic regulation which would empower or require them "to substitute their predictive judgments for those of elected legislatures and expert agencies." *Id.* at 545; *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124-25 (1978). Appellate courts, moreover, have held repeatedly that rent regulation *does* serve public purposes of the utmost importance. *See, e.g.*, *Pennell v. City of San Jose*, 485 U.S. 1, 13 (1988); *Bowles v. Willingham*, 321 U.S. 503, 513 n.9 (1944); *Dawson v. Higgins*, 610 N.Y.S.2d 200, 208 (1st Dep't 1994). The R.S.L. is neither arbitrary nor unreasonable under longstanding precedent and does not violate the due process clause.

For the reasons stated above, the proposed intervenor defendants should be granted leave to file a motion to intervene in this action, and a pre-motion conference in anticipation of a motion to dismiss the complaint for failure to state a cause of action should be scheduled.

---

[2] No basis *other than* the 61,129 homeless people in the New York City shelters, including 14,674 homeless families with 21,372 homeless children, comprising 14 percent of the U.S. homeless population (HUD "2018 Annual Homeless Assessment Report (AHAR) to Congress"); the 20 percent increase in real median rents over the past decade, compared to the 5 percent increase in real median income ("State of New York City's Neighborhoods in 2018," Furman Center (2018)); the fact that over three quarters of low income New Yorkers are officially "rent burdened," paying over thirty percent of their income in rent, while almost half pay over 50 percent of their income to their landlords ("State of New York City's Neighborhoods," Furman Center (2013 and 2018)); and the 188,000 New Yorkers who faced eviction proceedings in 2018 because they could not afford their rent (NYC Office of Civil Justice, Annual Report 2018, at 21). Meanwhile, New York City rent stabilized landlords have enjoyed a 229 percent increase in rents since 1990, with an uninterrupted rise in Net Operating Income over the past 13 years. Net Operating Income has reached an all-time high of $6,400 per year per stabilized unit, or $6.4 billion annually for rent stabilized housing as a whole. (NYC Rent Guidelines Board 2019 Income and Expense Study).

Respectfully submitted,

\_\_\_s/_____
Edward Josephson
Director of Litigation
Legal Services NYC
105 Court Street, 4th floor
Brooklyn, NY 11201
(718) 237-5538
ejosephson@lsnyc.org

Judith Goldiner
Attorney in Charge
Civil Law Reform Unit
Ellen Davidson, of counsel
The Legal Aid Society
199 Water St., 3rd Floor
New York, N.Y. 10038
(212) 577-3332
JGoldiner@legal-aid.org


Faith Gay
Caitlin Halligan
Sean Baldwin
Selendy & Gay PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9001
fgay@selendygay.com