## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMUNITY HOUSING IMPROVEMENT PROGRAM, et al.<br><br>Plaintiffs,<br><br>-against-<br><br>CITY OF NEW YORK, et al.,<br><br>Defendants. | Civil Action No.:<br>19-cv-4087(MKB) |

## BRIEF of the REAL ESTATE BOARD OF NEW YORK
## AS *AMICUS CURIAE* IN SUPPORT OF THE RELIEF SOUGHT
## BY PLAINTIFFS

BELKIN BURDEN WENIG & GOLDMAN, LLP
Attorneys for *Amicus Curiae*
270 Madison Avenue
New York, New York 10016
(212) 867-4466
mcruz@bbwg.com

Sherwin Belkin
Magda L. Cruz
 *Of Counsel*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..............................................................................ii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT .............................1

RULE 29(4)(E) STATEMENT .........................................................1

INTEREST OF THE *AMICUS CURIAE* ...........................................2

SUMMARY OF THE ARGUMENT....................................................3

ARGUMENT ...................................................................................4

I. The Rent Stabilization Law was Meant as a Temporary Measure;
Even as a "Housing Emergency" Tool it Fails to Address the Most
Intractable Segment of the Housing Market .......................................4

II. Rent Stabilization Law Restricts Owners' Ability to Recoup Costs
for Regulatory Investments and Continued Maintenance..................8

III. Rent Stabilization is Not an Affordable Housing Program.........................12

CONCLUSION .............................................................................15

CERTIFICATE OF COMPLIANCE .............................................16

# TABLE OF AUTHORITIES

**Cases**

*City of New York v. New York State Division of Housing and Community Renewal,*
97 N.Y.2d 216 (2001) ...................................................................................5

**Statutes**

Emergency Tenant Protection Act of 1974 (ETPA) (L. 1974, ch. 576),
N.Y. Unconsol. Law §§8621, et seq. ............................................... 5,6,7,8

Housing Stability and Tenant Protection Act of 2019 ("HSPTA")................. passim

Legislative declaration, Local Law No. 16 of 1969 ...................................4

Local Emergency Housing Rent Control Act .......................................4,5

Rent Stabilization Law................................................................. passim

Urstadt Law (Law 1971, ch 372, 1012) ...............................................5,6

**Other Authorities**

Barbanel, J., "New York Landlords Slow Apartment Upgrades, Blame
New Rent," Wall Street Journal, Dec. 19, 2019 ...................................9,11

Brown, M., "Slowdown in NYC Multifamily Market Won't Let Up,"
Globest.com, December 17, 2019.........................................................11

Diamond, R., "What Does Economic Evidence Tell Us About the Effects of
Rent Control," Brookings (Oct. 18, 2018).............................................14

Harvard's Joint Center for Housing Studies, 2017 .................................13

Lebovits, G., et al., "New York's Housing Stability and Tenant Protection
Act of 2019: What Lawyers Must Know – Part II"
(NYSBA Journal, Nov. 2019)...............................................................10

"Many Renters Who Face Eviction Owe Less Than $600", <u>NY Times</u>,
Dec. 12, 2019, Upshot sec. ........................................................................13

NYC 2017 Housing and Vacancy Survey ("2017 HVS") ............................... 7,8,12

NYC Rent Guidelines Board 2019 Income and Affordability
Study (4/4/19) ..........................................................................................12

U.S. Dep't of Housing & Community Development ("HUD"):
Basic Laws on Housing and Community Development, Subcommittee on
Housing and Community Development, rev. Dec. 31, 1994, Section 3(a)(12) ......12

## <u>RULE 26.1 CORPORATE DISCLOSURE STATEMENT</u>

*Amicus* Real Estate Board of New York is a trade association, with no parents or subsidiaries.  Its affiliates are:

> REBNY Foundation, Inc.;
>
> Taxpayers for an Affordable New York, Inc.;
>
> Taxpayers for an Affordable New York PAC;
>
> Real Estate Board of New York PAC;
>
> Putting New Yorkers to Work, Inc.; and
>
> Jobs for New York, Inc.

## <u>RULE 29(4)(E) STATEMENT</u>

*Amicus* Real Estate Board of New York affirms that no counsel for a party authored this brief in whole or in part, and that no person, other than *Amicus* made a monetary contribution to its preparation and submission.

## INTEREST OF THE *AMICUS CURIAE*

The Real Estate Board of New York ("REBNY"), founded in 1896, is the first real estate trade association in the State of New York.  REBNY membership is comprised of more than 17,000 commercial, residential, and institutional owners, builders, brokers, managers, banks, insurance companies, pension funds, real estate investment trusts, utilities, attorneys, architects, marketing professionals, and many other individuals and companies involved in the New York real estate industry.

For more than a century, REBNY has been the collective voice of its diverse members in matters of great importance to the New York real estate industry. REBNY works to promote sound public and industry policies in order to improve and expand New York's economy, encourage the development, preservation, and renovation of commercial and residential property, and facilitate effective property management.   To that end, REBNY undertakes a wide variety of activities, including, but not limited to, research projects studying the residential and commercial conditions within New York City.  REBNY frequently speaks before governmental bodies and various industry groups on these issues.  REBNY conducts various professional education programs and seminars to help members improve their professional and business skills.  REBNY also participates in cases of major concern to its members, like the one at bar, to advocate for its members' property interests before state and federal tribunals.

REBNY has a strong interest in the outcome of this action because the constitutional infringements on private property rights caused by the Rent Stabilization Law and its implementing regulations directly impact REBNY members; many of whom own, manage, and/or finance rent regulated multi-family housing.  Rent stabilization has been abused by the Legislature, resulting in a taking without just compensation that has not solved the affordability crisis in New York City.

## SUMMARY OF THE ARGUMENT

This brief will explain how the Rent Stabilization Law was meant as a temporary measure to address post-World War II market conditions that limited housing availability but since then, has been misapplied as a "housing emergency" tool.  As such a tool, rent stabilization does not address availability and only exacerbates competition for below-market housing – the most intractable segment – upon the backs of property owners.

Equally important to housing availability is its quality.  However, the Rent Stabilization Law and the recent passage of the Housing Stability and Tenant Protection Act of 2019 ("HSPTA"), severely restricts an owner's ability to recoup costs for housing investments and government-mandated improvements, without a complementary system in place to offset core expenses such as property taxes.

Moreover, in its fifty years of existence, rent stabilization has failed to target persons most in need of accessing and paying for affordable housing.  Rent stabilization, which is not income-restricted, compels private property owners to provide highly regulated housing at below-market rents for persons who are not rent-burdened (*i.e.* 30% or less of the tenant's income is spent on rent).  This, in turn, incentivizes existing tenants to remain in occupancy indefinitely, regardless of any actual need for below-market housing.  Consequently, opportunities for new entrants to housing at below-market rents are extremely limited.

REBNY urges the Court to sustain the Plaintiffs' complaint and grant the declaratory and injunctive relief sought therein.

## ARGUMENT

**I.     The Rent Stabilization Law was Meant as a Temporary Measure; Even as a "Housing Emergency" Tool it Fails to Address the Most Intractable Segment of the Housing Market**

Pursuant to the Local Emergency Housing Rent Control Act, in 1969, the New York City Council declared a public emergency and enacted the Rent Stabilization Law ("RSL").  New York City Administrative Code §YY51-1.0 et seq. (now, New York City Administrative Code §26-501 et seq.).  The City Council found that there was an "acute shortage of dwellings which creates a special hardship to persons and families occupying rental housing" and "unjust, unreasonable and oppressive rents." RSL §26-501.  *See*, Legislative declaration, Local Law No. 16 of

1969.  New York City buildings with six units or more, constructed after February 1, 1947, and previously decontrolled apartments, were covered by the RSL.

In 1971, the State Legislature passed the Urstadt Law, which amended section 5 of the Local Emergency Housing Rent Control Act, "in relation to limiting the authority of the city having a population of one million or more to subject additional housing to the regulation and control of residential rents and eviction."  L. 1971, ch. 1012, §1; L. 1971, ch. 372.

The Urstadt Law "was part of a series of bills prompted by the State's concern over the abandonment and divestment of controlled housing in New York City attributable in large part to uneconomic rents" and the desire of the State Legislature to prevent New York City from using "its powers to thwart the process of vacancy decontrol."  *City of New York v. New York State Division of Housing and Community Renewal,* 97 N.Y.2d 216, 226 (2001).  Thus, the Urstadt Law "was intended to check the City's attempts, whether by local law or regulation, to expand the set of buildings subject to rent control or stabilization." *Id*. at 227.

However, in 1974, the New York State Legislature re-introduced housing restrictions it had previously deemed to be counterproductive to increasing, preserving, and improving the City's aging rental housing stock.  The State Legislature enacted the Emergency Tenant Protection Act of 1974 (ETPA) (L. 1974, ch. 576), N.Y. Unconsol. Law §8621, et seq., which caused housing that had become

vacancy decontrolled pursuant to the Urstadt Law to now be subject to rent regulation again.

The legislative findings in ETPA Section 2 declared that "a serious public emergency continues to exist in the housing of a considerable number of persons in the state of New York" and while "the transition from regulation to a normal market of free bargaining between landlord and tenant [is] the ultimate objective of state policy, [such transition] must take place with due regard for such emergency." N.Y. Unconsol. Law §8622.

ETPA Section 4(a) stated that "[t]he existence of [a] public emergency requiring the regulation of residential rents" may be declared by the local municipality "if the vacancy rate for the housing accommodations in [the covered] class within such municipality is not in excess of five (5%) percent."  Section 4(b) further specified that "[t]he emergency must be declared at an end once the vacancy rate … exceeds five (5%) percent." N.Y. Unconsol. Law §8623(a).

However, the vacancy rate alone is not determinative of a public emergency warranting rent regulation.  The City must consider other factors.  ETPA Section 4(a) directed that "[a]ny such determination [of a public emergency] shall be made by the local legislative body … on the basis of [1] the supply of housing accommodations …, [2] the condition of such accommodations and [3] the need for

regulating and controlling residential rents with such city, … ." N.Y. Unconsol. Law §8623(a).

Since this enactment over 45 years ago, the City of New York has never reported an overall citywide vacancy rate in excess of 5%, despite ever-increasing expansions to rent stabilization.  Moreover, certain sub-markets (such as higher-rent units not subject to rent stabilization) comprising the overall citywide vacancy rate have experienced vacancy rates in excess of 5% as explained further below.  Also discussed further below is the fact that overall housing stock has improved due, in part, to changes to cost-recovery mechanisms, such as Major Capital Improvements ("MCIs") and Individual Apartment Improvements ("IAIs"), which mechanisms have now been weakened by the HSTPA.  In sum, the City of New York has never demonstrated that it based its determination of a "public emergency" justifying rent regulation upon evidence establishing the three statutory criteria.

According to the NYC 2017 Housing and Vacancy Survey ("2017 HVS"), the citywide rental vacancy rate is 3.63%.  However, a deeper analysis of the data shows that vacancy rates differ greatly based on rent levels and whether the apartments are subject to rent regulation.  The 2017 HVS reported only low vacancy rates for low-rent apartments – which would be the case in almost every market where there are more people wanting to buy a product (apartment, gasoline, smart phone, a gallon of milk) at a low price than there are people willing to sell the product

at that price.  Conversely, the vacancy rates were much higher for higher-rent units due, in part, to increased supply.  The vacancy rate for apartments that rent above $2,500 per month is 7.4%.  However, despite the availability of higher-rent housing, the HSTPA now applies rent stabilization to this segment of the market in perpetuity. *See* Part D, §§ 5, 6 of the HSTPA, repealing high rent and high income deregulation.

In complete disregard of the law's original intent as a transitional housing program that would lead to a market-based real estate economy, the HSTPA has now made rent stabilization permanent.  Part A of the new law did away with periodic legislative review of the stabilization regime to measure whether it was meeting the stated goals of the ETPA.  There is no longer a "sunset provision" for the RSL.  The "temporary emergency" is now permanent.

## II.    Rent Stabilization Law Restricts Owners' Ability to Recoup Costs for Regulatory Investments and Continued Maintenance

Before the passage of the HSTPA, rent stabilization recognized the fundamental precept that capital investment in multi-family buildings, many built prior to 1947, was critical to the preservation and expansion of the supply of housing. According to the 2017 HVS, the citywide dilapidation rate was a historically low 0.2%, despite the advanced age of the majority of rent stabilized buildings.

There is a direct relationship between rental income and housing quality in the New York City regulated housing market.  According to NYC Department of Finance and PLUTO (Primary Land Use Tax Lot Output) data, 71% of the City's

rent-stabilized housing stock was built prior to 1947.  As a result, maintenance costs are significant for the upkeep and preservation of these buildings.  These older buildings inevitably require major system overhauls to operating systems such as gas, electricity, and water, and routine capital improvements such as boiler, elevator, and roof replacements.

Rental revenue pays for expenses like taxes, insurance, heat, utilities, labor, and administrative costs.  What remains is: (1) repayment of mortgage or finance costs; (2) reinvestment in the property; and (3) profit.

But in contradiction of these basic economic concepts, the HSTPA significantly increased the economic burden on regulated properties.  Part K of the HSTPA imposes restrictions on MCIs and IAIs that, by its express terms, prevent owners from recovering anything close to the real cost of those improvements – even improvements required by the City's building and housing codes.

Recovery for IAIs is limited to $15,000 over a 15-year period, even if the owner's actual cost was substantially more than that amount. According to an analysis by the Wall Street Journal of N.Y.C. Department of Buildings records, the median interior renovation project costs $60,000.  Barbanel, J., "New York Landlords Slow Apartment Upgrades, Blame New Rent," Wall Street Journal, Dec. 19, 2019, https://www.wsj.com/articles/new-york-landlords-slow-apartment-upgrades-blame-new-rent-law-11576756800.  Yet, the rent increase for the

incoming tenant under the Part K amendments has been reduced to a miniscule sum that must be removed after 30 years.  Under the HSTPA, the maximum rent increase that an owner can receive for IAIs over a 15-year period is $83.33 for a building of more than 35 apartments.  This sum bears no relationship to the actual cost to upgrade a long-occupied apartment.

Restrictions were also placed on MCIs.  The recoupment period was lengthened to up to 12.5 years from nine years; the increases have a 2% annual cap; and must be removed after 30 years.  The 2% cap was also made effective to MCI orders granted as far back as June 2012. (Sec. 9 of Part K of the HSTPA.)  Thus, capital expenditures made predicated upon the law in effect at that time, with reasonable investment-backed expectations of a certain return, have been significantly impaired.  The schedule of qualified MCI costs is also materially changed.  Moreover, the HSTPA illogically eliminates any MCI for buildings with 35% or fewer rent-regulated tenants, although the impact upon tenants in such buildings is identical to highly stabilized buildings.

The HSTPA changes effectively eviscerated these improvement cost-recovery mechanisms, discouraging owners from making necessary capital infusions into aging buildings by rendering investment economically unsustainable.  Lebovits, G., et al., "New York's Housing Stability and Tenant Protection Act of 2019: What Lawyers Must Know – Part II" (NYSBA Journal, Nov. 2019).  As reported in the

-10-

Wall Street Journal, *supra*, after the passage of the HSTPA, "[l]andlords started 535 fewer renovation projects from July through November [2019] in rent-regulated buildings over the same period in 2018, a decline of 44% [and] [s]pending on renovations fell by $71 million."

The property value of these buildings has been and will continue to decrease.  A study of multi-family investment sales, citywide, comparing the 2018 3rd quarter recordings to the 2019 3rd quarter recordings, show stunning results.  In anticipation of and because of HSTPA's passage, sales of such properties decreased by 59%.  Related City and State tax revenues had similar reductions.  Whereas taxes to the City in 2018-3Q were almost $71million, in 2019-3Q, the City collected $28,875,000 – a 59% reduction in tax revenue for the City.  The State experienced a 34% reduction in tax revenues during this same period.

The decline in the City's multi-family housing market continues. According to new data from @PropertyShark, sales volume is down 60% year-over-year, from $1.4 billion in 2018 to $412 million in 2019.  A significant indicator is the reduction in the number of units sold.  Unit sales dropped from 44,308 between January-November '18 to 20,124 between January-November '19. Brown, M., "Slowdown in NYC Multifamily Market Won't Let Up," Globest.com, December 17, 2019, https://www.globest.com/2019/12/17/slowdown-in-nyc-multifamily-market-wont-let-up/.

These documented effects of rent stabilization on property values and tax revenue are projected to worsen as the extreme restraints on rents and reinvestment take hold.  Models developed by HR&A Advisors, Inc., to analyze the changes caused by the expansion of the Rent Stabilization Law to various building typologies show that within five years, approximately a quarter of the rent-stabilized housing stock could be financially distressed, with owners unable to afford investment beyond basic maintenance, taxes, and utilities.  The analysis also shows reductions in property tax revenue by up to $1 billion per year due to steep drops in real estate values.

### III.    Rent Stabilization is Not an Affordable Housing Program

Housing is generally considered affordable when a household pays no more than 30% of its income in gross rent.  U.S. Dep't of Housing & Urban Development ("HUD") benchmark: Basic Laws on Housing and Community Development, Subcommittee on Housing and Community Development, rev. Dec. 31, 1994, Section 3(a)(12).  Because Rent Stabilization is not tethered to tenant income, it is not an affordability program, but, rather, a tenant protection program.

The 2017 HVS found that while stabilized tenants overall had a median income of $44,560, 22,000 households make $199,000 or more, and 2,300 were occupied by households making more than $500,000 per year.  The NYC Rent Guidelines Board 2019 Income and Affordability Study (4/4/19) of the 2017 HVS

concluded that the estimated gross rent-to-income ratio for rent stabilized tenants in 2017, as a whole, fluctuated on the basis of whether the household was low- or high-income, and on the amount of the apartment's rent.  Overall, 50% of renters in New York (regulated and market tenants combined) are rent burdened and will remain rent burdened as nothing in rent stabilization or in the HSTPA amendments increase rental assistance to tenants in need.

Instead, the legislative approach to the "affordability" problem only exacerbates the problem.  By failing to enact any income criteria, existing tenants in stabilized housing are the beneficiaries of below-market rents and perpetual lease renewals, regardless of their income level.  Such tenants have no incentive to relocate when they enjoy rents below 30% of their household income, even when the apartment is no longer suitable for the household size.  As found in Harvard's Joint Center for Housing Studies, 2017:

> Wages have stagnated for the poor, and the supply of housing affordable to the poorest renters has dwindled. Between 1990 and 2017, the national stock of rental housing grew by 10.9 million units, [but] [o]ver that same time, the number of units renting for less than $600 a month in inflation-adjusted dollars fell by 4 million.  All net growth in rental housing in America, in other words, has been for higher-income tenants.

"Many Renters Who Face Eviction Owe Less Than $600", NY Times, Dec. 12, 2019, Upshot sec.

"Affordability" is, thus, a convenient political catch-phrase used to justify a heavily regulated housing system that has no affordability standard. Studies confirm that rent regulation may foster "affordability" in the short-run for current tenants, "but in the long-run decreases affordability, fuels gentrification, and creates negative externalities on the surrounding neighborhood." Diamond, R., "What Does Economic Evidence Tell Us About the Effects of Rent Control," <u>Brookings</u> (Oct. 18, 2018).

As noted in the Diamond report, *supra*:

These results highlight that forcing landlords to provide insurance to tenants against rent increases can ultimately be counterproductive. If society desires to provide social insurance against rent increases, it may be less distortionary to offer this subsidy in the form of a government subsidy or tax credit.

If affordability is to be tied to limitations on rent, then the regulatory framework must be income-based, with publicly-funded subsidies for both tenants and owners in the form of direct cash grants or tax exemptions, respectively, and as needed, to maintain adequate levels of maintenance and investment. There is ample precedent for these models in the City of New York's Zoning Resolution, and Department of Housing and Preservation Development's housing programs; and State and Federal tax credits tied to the provision of low-income housing.

Finally, the genesis of the Rent Stabilization Law is rooted in post-World War II market conditions.  Generations of innovative thought leadership around affordable housing have been developed and successfully implemented since then.  The continuing solution cannot be solely burdening private owners with ever-increasing infringements on their property rights that bear no rational relationship to the stated goals of the regulatory regime.

## CONCLUSION

**WHEREFORE**, REBNY, as *amicus curiae,* respectfully requests that the Plaintiffs' complaint challenging the constitutionality of the Rent Stabilization Law, including the 2019 amendments by the Housing Stability and Tenant Protection Act of 2019, be sustained, and Defendants' motions to dismiss be denied in their entirety.

Dated:  New York, New York
        December 20, 2019        Respectfully submitted,

                                    BELKIN BURDEN WENIG & GOLDMAN, LLP

                                    BY: __/s/_____
                                        Magda L. Cruz
                                        270 Madison Avenue
                                        New York, NY  10016
                                        (212) 867-4466
                                        mcruz@bbwg.com

                                    Attorneys for *Amicus Curiae*
                                        *Real Estate Board of New York*

Sherwin Belkin
Magda L. Cruz
  *Of Counsel*

## CERTIFICATE OF COMPLIANCE

In accordance with Local Civil Rule 11.1 of the Eastern District of New York, as well as with Individual Practice Rule 3(B) of Judge Margo K Brodie, the undersigned hereby certifies that the foregoing brief was prepared on a computer using the word processing program, Microsoft Word 2016 MSO, and a proportional typeface was used, as follows:

Name of typeface: Times New Roman

Point size:          14 (except footnotes are point size 12)

Line spacing:       Double (except block quotes are single space)

The undersigned further certifies that according to the word count feature of the program, the total number of words in the brief, inclusive of footnotes, but exclusive of pages containing the disclosure statements, the table of contents, table of authorities, proof of service, and this Certificate, is 3,040.

Dated: December 20, 2019

BELKIN BURDEN WENIG &
 GOLDMAN, LLP
Attorneys for proposed *Amicus Curiae*


By: __/s/_____
        Magda L. Cruz, Esq.