1

CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

            Of the

COMMITTEE ON HOUSING AND BUILDINGS

------------------------ X

                    March 19, 2018
                    Start:  1:11 p.m.
                    Recess:  4:02 p.m.


HELD AT:          Council Chambers - City Hall


B E F O R E:      ROBERT E. CORNEGY, JR.
                  Chairperson

                  COREY JOHNSON
                  Speaker


COUNCIL MEMBERS:  Fernando Cabrera
                  Margaret S. Chin
                  Rafael L. Espinal, Jr.
                  Mark Gjonaj
                  Barry S. Grodenchik
                  Keith Powers
                  Carlina Rivera
                  Helen K. Rosenthal
                  Ritchie J. Torres
                  Jumaane D. Williams

2

A P P E A R A N C E S (CONTINUED)

Vaughan Armor
President of Barbara Simmons Tenant
Association and Member of the
Community for Change

Reverend Leslie Foltz Morrison

Basilio Garci
President Tenants' Association from Queens
Member of Whose Side on the Move

Matt Murphy
Deputy Commissioner of Policy and Strategy
New York City Department of Housing,
Preservation and Development

Francesc Marti
Assistant Commissioner for Government
Affairs, New York City Department of
Housing, Preservation and Development

Elizabeth Gummer
Assistant Commissioner for Research and
Evaluation, New York City Department of
Housing, Preservation and Development

Norma Shrier

Member of the Rent Controlled Tenants
Leadership Committee at Tenants and
Neighbors

Cynthia Chafee
Co-Foundress of the Stop Croman Coalition
Member of GOALS

Abigail Martinez
Neighbors Helping Neighbors

Miteriz Marcella (did not speak)

Exona Miranova
Housing Policy Analyst
Community Service Society

Bareka Williams, Deputy Director
Association for Neighborhood and Housing
Development

Leno Diaz, Housing Attorney
Legal Services of New York City
Queens Borough Office

Ellen Davidson, Staff Attorney
The Legal Aid Society

Delcinia Glover
Director of Education and Organizing for
New York State Tenants and Neighbors
Information Service and New York State
Tenants and Neighbors Coalition

Hosea Ruiz Rodriguez
Member of Picture the Homeless

4

Scott Hutchens
Representing Picture the Homeless

Ed Viera, Jr.
Disabled Special Ed Teacher

Susan Steinburg
President of the Stuyvesant Town, Peter
Cooper Village Tenants' Association

Jessica Burk
Red Residents in Distress
Christopher Street Partnership and
The 95 Christopher Street Tenants'
Committee

Julie Hamlin
Dexter House 345 W. 86th Street
Member of the Tenants' Association and
Member of an NGO representing in the
United Nations

Earl Carter (did not speak)

Ava Farkas
Executive Director of the Met Council on
Housing

Horea Rodriguez
Resident from Korona - Queens

1    COMMITTEE ON HOUSING AND BUILDINGS                    5

2              MS. TORRES:  Mike check, mike check.

3    Today's hearing is on the Committee on Housing and

4    Buildings being recorded by Sherese Torres, March 19,

5    2018.

6              CHAIRPERSON CORNEGY:  Good afternoon,

7    everyone.  I'm Council Member Robert Cornegy, Chair

8    of the Committee on Housing and Buildings and I'm

9    joined today by my Speaker, Corey Johnson and Council

10   Member Grodenchik and Powers.  We're here to hold a

11   hearing and a vote on proposed Intro #600-A and

12   Proposed Reso #188-A which adopts the findings of the

13   most recent housing and vacancy survey and extends

14   rent stabilization and rent control in New York City.

15   New York City's housing stock is increasingly

16   becoming unaffordable for those, for the many seniors

17   and families who live here and the housing vacancy

18   survey shows that it is crucial for us to extend rent

19   regulation for the next three years and for our State

20   counterparts to do the same when it expires in 2019.

21   I look forward to working with my fellow Council

22   Members, especially Speaker Johnson and advocates to

23   ensure that that does happen next year.  Thank you

24   Mr. Speaker.  I'd like to remind everyone who would

25   like to testify today to please fill out a card with

1   COMMITTEE ON HOUSING AND BUILDINGS                    6

2   the sergeant and we'll be sticking to a three minute

3   clock for all public testimony except for the

4   Speaker.

5                 SPEAKER JOHNSON:  Thank you, good

6   afternoon everyone and thank you for being here to

7   discuss rent regulation, the most critical tool we

8   have for maintaining affordable housing in New York

9   City.  This year's housing vacancy survey results are

10  staggering and show that it is of course necessary

11  for the City to extend rent regulation.  According to

12  the survey, there is only a 3.63% vacancy in the City

13  and when it comes to rent regulated housing, that

14  vacancy rate drops to 2%.  On top of that, three in

15  ten renter households pay 50% or more of their income

16  towards rent in the City meaning that these renters

17  are rent burdened making it difficult to pay bills or

18  raise a family.  Even worse, the median rent went up

19  by 6% in the three years since the last survey in

20  2014.  When combined with lack of available rent

21  regulated housing, it's apparent from these

22  statistics that this City is becoming increasingly

23  unaffordable.  We have lost hundreds of thousands of

24  rent regulated housing since the mid 1990's and we

25  cannot lose anymore.  We cannot risk more families

1    COMMITTEE ON HOUSING AND BUILDINGS                    7

2    having to choose between paying rent or putting food

3    on the table.  At a time when New York City is

4    committed to expanding opportunities and access to

5    affordable housing and when the City is struggling

6    with a homelessness crisis, the survey shows that we

7    have much more work to do.  Throughout this year and

8    until the State takes up rent regulation in June of

9    2019, we'll be urging the State legislature to repeal

10   laws that are making housing unaffordable such as

11   vacancy decontrol, the preferential rent loophole and

12   vacancy bonuses.  We will continue to work on

13   legislation that protects tenants and we will

14   continue to increase opportunities to access

15   affordable housing.  Today we are taking the first

16   step by renewing the findings that we are still in a

17   housing crisis so if the State can extend rent

18   regulation for another three years.  I want to thank

19   our Chair of this Housing and Buildings Committee, my

20   friend, Council Member Robert Cornegy for having me

21   here today and I want to thank you all the tenants

22   and organizers in this room.  I see so many friends

23   when I walk around, Bill Senia [phonetic] and Michael

24   and so many folks that are here that I've been in the

25   trenches with over the years and I hope to see you

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                8

 2   again in the coming months as we advocate for rent

 3   reform.  I'll end with this.  There was a press

 4   conference this morning with Council Member Torres

 5   related to Jared Kushner illegally trying to drive

 6   people out of rent regulated buildings in his

 7   buildings throughout the City and we have to ensure

 8   that the things that are within our power in the

 9   City, DOB ensuring that landlords are not able to

10   engage in construction which drives people out of

11   their buildings, we are going to continue to play

12   that oversight role.  We want to strengthen the rent

13   laws and continue to work on behalf of tenants here

14   in New York City where it makes sense for them so

15   again I want to thank you Council Member Cornegy and

16   I look forward to hearing from all of you and working

17   with all of you in the months to come.  Thank you

18   very much.

19              CHAIRPERSON CORNEGY:  Thank you

20   Mr. Speaker.  We are going to begin the opening

21   testimony with a panel of tenants and tenant

22   advocates first.  We really believe that it is

23   important sometimes to hear directly from the voices

24   prior to the administration so in this hearing today,

25   prior to the administration giving testimony, we will
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    9

2    be hearing from Reverend Leslie Foltz Morrison,

3    Basilio [phonetic] Garcia, and Vaughan Armor.

4              CHAIRPERSON CORNEGY:  I'd like to affirm

5    your testimony here before City Council oh never

6    mind.  You can begin.  We generally ask ladies first.

7              VAUGHAN ARMOR:  Yeah, but unfortunately I

8    have to run.  I'd ask them.

9              CHAIRPERSON CORNEGY:  Oh, okay.  You

10   worked that out already, okay.

11             VAUGHAN ARMOR:  All right, hi.  My name

12   is Vaughan Armor and I'm the president of Barbara

13   Simmons Tenant Association and a proud member of New

14   York Community for Change.  I want to thank you for

15   the opportunity to testify this afternoon.  I'm here

16   because of two years ago my companion of 17 years

17   passed away.  The very next day the landlord called

18   me and asked me what I'm gonna do about the

19   apartment.  He didn't call to say you have my

20   condolences or to see how I felt.  All he wanted to

21   do is to question us about the stabilization and lie

22   to us about it where he can get the apartment and

23   raise the rent and that's totally disrespectful and

24   this is what is going on in Crown Heights and

25   throughout the City.  560 and 570 was taken over by

1   COMMITTEE ON HOUSING AND BUILDINGS                10

2   Treetop Developers.  They came in, they beautified

3   the outside, they fixed the lobby and they fixed the

4   stairwells and hallways.  They did this for attract

5   newcomers.  In the meanwhile, tenants like me that

6   have been there for 17 and tenants that have been in

7   the building for 20 and 30 years are going through

8   lack of repairs, lack of heat and this is what we're

9   facing right now and also what they want is to push

10   out long-time residents have been in the building

11   where they can put in new tenants and get market

12   value.  I'm here also to ask that we, the Council of

13   the City, declare a housing emergency where we are

14   hoping we can get Governor Cuomo and the State

15   senators, especially the IDC members, to not only

16   strengthen the rent laws but to protect us tenants by

17   getting rid of such as the rent vacancy bonus, the

18   vacancy bonus and preferential rent and this is a

19   must.  This is definitely a must and I'm telling you,

20   I see my long-time neighbors being forced out

21   especially what's going on in buildings where I live

22   at so once again, I want to make it clear that right

23   now where I live at in Crown Heights, we're going

24   through what I call a super gentrification process so

25   I once again say thank you for the opportunity and

1   COMMITTEE ON HOUSING AND BUILDINGS                11

2   please, please help us stay in our community.  Thank

3   you.

4              CHAIRPERSON CORNEGY:  Thank you for your

5   testimony.

6              [Applause]

7              CHAIRPERSON CORNEGY:  While I understand

8   that we are all very passionate about affordability

9   and staying in our communities, I have to ask you not

10  to clap out loud.  Generally, when we want to

11  express, thank you, all you guys already knew.  Thank

12  you.  Next.

13             LESLIE FOLTZ MORRISON:  All right, I hope

14  you can hear me better now.  Greetings Chairperson

15  Cornegy and Council President Mr. Johnson or Council

16  Speaker.  My name is Leslie Foltz Morrison, Reverend

17  Leslie Foltz Morrison.  I live in the Bronx in a rent

18  stabilized building and I am here as a member of the

19  Met Council on Housing in support of Resolution 188-A

20  and Intro 600-A and I am so pleased to hear that you

21  sound sympathetic and supportive of these bills.  I

22  thank you and all the members of the City Council and

23  all your staff members who serve in public service on

24  behalf of all New Yorkers and that you seem to be so

25  concerned about renters that they could stay in their

1   COMMITTEE ON HOUSING AND BUILDINGS                    12

2   apartments and avoid eviction and homelessness.  I'm

3   especially concerned about the need to repeal the

4   statutory vacancy bonus which allows landlords to

5   raise a rent stabilized apartment by 20% when a unit

6   is vacated.  I have seen in my building in

7   Kingsbridge, my landlord has been tempted to take

8   advantage of this loophole these past couple of

9   months after a pipe burst and flooded three

10  apartments.  My neighbors in these units, two of them

11  are families with young children, were moved from

12  their flooded two bedroom apartment into studio

13  apartments in the building but their rent was not

14  reduced and all this time the repairs on their units

15  that they want to move back into, repairs have not

16  even begun and so I can see that with this statutory

17  vacancy loophole that the landlord has a strong

18  incentive to drag out these repairs to the units that

19  the tenants want to move back into and then they will

20  give up and move out and so the landlord can then

21  jack up the rent for the next set of tenants while

22  perhaps not even disclosing that the units had been

23  water damaged so it is no wonder why New York City

24  rents are so high with these loopholes permitted.  In

25  the face of our City's housing crisis, I think it is

1  COMMITTEE ON HOUSING AND BUILDINGS                    13

2  essential that we protect all of the affordable units

3  that we do have and the families who depend on them.

4  It was 30 years ago this month when the U. S.

5  Catholic Bishop's conference issued a moral challenge

6  for us to view adequate housing as a human right and

7  it is now harder, much harder, than it was 30 years

8  ago to advocate for this with the commonly accepted

9  practice of real estate investment trusts where they

10  see every apartment as an opportunity to put profit

11  over people and so you have this important

12  opportunity to act to protect rent stabilize.  Thank

13  you.

14           CHAIRPERSON CORNEGY:  Thank you.

15  Mr. Garcia.

16           BASILIO GARCIA:  Hello, my name is

17  Basilio Garcia.  Good afternoon (Inaudible).  I am a

18  tenant who's president of my tenant's association

19  from Queens and a member of Whose Side on the

20  Move[?].  I am standing here today to call from a

21  stronger rent law.  We cannot receive more increases.

22  What we need desperately is to preserve affordable

23  housing.  I live in a building that every year has

24  been affected by MCI systematically.  The landlord

25  had been applying for MCI to increase the legal rent.

```
1   COMMITTEE ON HOUSING AND BUILDINGS                14

2   This year, for example.  We have MCI approved and

3   there will be increase for $30 per room.  I have

4   three rooms and (Inaudible).  I will be writing a

5   separate check for $90.  This increase is not

6   increased.  It will be an additional.  I live on the

7   district of Tenoro Palata [phonetic] and the

8   community need their lack of (Inaudible) to evocate

9   and represent them.  We working class tenants cannot

10  afford another increase.  It is exhausting that the

11  landlord receive, they get an additional increase to

12  the legal rent.  With the managed stronger protection

13  for tenant or otherwise we'll be killing the

14  affordable housing.  Thank you so much.

15            CHAIRPERSON CORNEGY:  Thank you and thank

16  you so much for all of your testimonies.  Are there

17  any questions?  Thank you.  At this time we'll ask

18  the administration.  Also I want to point out we've

19  been joined by Council Members Chin, Gjonaj,

20  Williams, Rosenthal, Torres and Espinal.  At this

21  point if I can just affirm your testimonies.  If I

22  can have you raise your right hand.  Do you affirm to

23  tell the truth, the whole truth and nothing but the

24  truth in your testimony before this Committee and to

25  respond honestly to Council Member questions?
```

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                    15

 2                  GROUP FROM HPD:  Yes.

 3                  CHAIRPERSON CORNEGY:  I'd like for you to

 4   begin identifying yourselves please.

 5                  My name is Matt Murphy.  I'm Deputy

 6   Commissioner of Policy and Strategy at HPD.

 7                  My name is Francesc Marti.  I'm Assistant

 8   Commissioner for Government Affairs at HPD.

 9                  Elizabeth Gummer, Assistant Commissioner

10   for Research and Evaluation, HPD.

11                  CHAIRPERSON CORNEGY:  Thank you for

12   joining us.  You can begin your testimony.

13                  MATT MURPHY: Thank you.  Good morning,

14   Speaker Johnson, Chair Cornegy and members of the

15   Housing and Buildings Committee.  I am Matt Murphy,

16   Deputy Commissioner of Policy and Strategy at the New

17   York City Department of Housing, Preservation and

18   Development.  I'm joined by my colleagues Elizabeth

19   Gummer, Assistant Commissioner for Research and

20   Evaluation and Francesc Marti, Assistant Commissioner

21   for Government Affairs.  I would like to thank the

22   Committee for welcoming us today to discuss rent

23   regulation a vital topic that fundamentally concerns

24   the future of New York City.  New York City continues

25   to face a housing affordability crisis that causes
```

1    COMMITTEE ON HOUSING AND BUILDINGS                16

2    too many of our residents to pay a larger share of

3    income for housing than they can sustain.  This day-

4    to-day reality forces many to make strategic trade-

5    offs, to delay payment of other critical expenses, go

6    into debt, or fall short on paying the rent which we

7    know places them at a great risk of eviction and in

8    more dire situations, homelessness.  This is a crisis

9    that requires action at every level of government.

10   Despite constant federal budget threats, locally we

11   have made great strides to both address the crisis

12   head on as well as to create and update the tools we

13   need over the long term to confront this issue.  I'd

14   like to take a moment to provide an overview of these

15   tools.  Together with the support of City Council,

16   Mayor de Blasio has committed an unprecedented amount

17   of resources to build and preserve affordable

18   housing.  HPD expanded the commitment to affordable

19   housing, production and preservation with the

20   announcement of HNY 2.0 which laid a roadmap to

21   expanding the HNY plan to create 300,000 units of

22   affordable housing by 2026.  This announcement was

23   coupled with the dedication of $13.5 billion in

24   Mayoral capital to be spent towards affordable

25   housing, production and preservation through 2026.

1    COMMITTEE ON HOUSING AND BUILDINGS                17

2    The administration has financed the construction of

3    28,492 units and the preservation of 59,065 units

4    towards these HNY goals.  Last calendar year, HPD

5    financed more than 24,500 affordable homes.  About

6    50% of that housing serves households with an income

7    of under $43,000 for a family of three.  As well

8    since 2014, the administration has provided funded

9    for legal services and legislation to guarantee legal

10   counsel for 180,000 low income tenants facing

11   eviction.  We have also taken part in a multi-agency

12   anti-harassment taskforce with our State colleagues.

13   We also work to expand the SCRIE and DRIE programs to

14   freeze the rents of more eligible seniors and New

15   Yorkers with disabilities.  We also worked with City

16   Council to pass laws that prohibit harassing tenants

17   with buy-out offers, enhanced enforcement tools to

18   address poor housing conditions, bring cases in

19   housing court against owners who do not comply with

20   outstanding violations and seek findings of contempt

21   and jail against recalcitrant landlords when

22   necessary.  We also worked with the City Council to

23   expand a certification of no harassment policy to

24   prevent displacement in areas most at risk by

25   requiring a review of a building's recent history

1   COMMITTEE ON HOUSING AND BUILDINGS                    18

2   upon application for a material alteration building

3   permit.  We also worked to create a speculation watch

4   list which is a data driven approach to help protect

5   residents from the threat of investments in rent

6   regulated buildings that could be an indicator they

7   will be asked to leave to make way for higher paying

8   residents.  This work compliments what rent

9   regulation laws accomplish which speaks to the

10  importance of a comprehensive approach.  For example,

11  over the past few years, the Rent Guidelines Board

12  issued historically low rent increases for the one

13  million rent stabilized units in our City which

14  protected against rapidly rising rents for those

15  regulated households but the data we are here to

16  discuss today shows that there are significant and

17  continuing challenges we face.  We'll show that there

18  continues to be a mismatch between supply and demand.

19  In fact, the typical New York City renter household

20  is unable to afford an apartment at a median rent.

21  The strong demand for housing combined with the

22  recovered financial health of the multi-family market

23  has led to large scale new construction and

24  development throughout the City.  Given that the

25  demand for housing consistently outpaces available

1  COMMITTEE ON HOUSING AND BUILDINGS                    19

2  supply, it is vital that the available supply of

3  housing grows.  This administration has worked but to

4  ensure that as supply grows, the private market is

5  required to provide affordable housing.  For example,

6  in partnership with Council, we passed mandatory

7  inclusionary housing which is the strongest

8  inclusionary housing program in the nation and

9  ensures that as housing supply grows through a

10 rezoning action, a portion of that housing is

11 permanently affordable.  While vital, the growth and

12 supply is not enough to address the housing shortage.

13 The housing shortage affects all New Yorkers but

14 acutely falls on those households that are able to

15 afford only the lowest cost units.  The pressure of

16 market demand and lack of supply places every day New

17 Yorkers at risk of sharper rent increases, harassment

18 and displacement from their homes and communities.

19 This brings us to the importance of rent

20 stabilization laws.  Rent stabilization laws provide

21 a critical resource for about one million New York

22 City households that must be protected and

23 strengthened in order to provide lower income

24 households the choice to live in our great City

25 amidst our housing crisis.  The law provides the

1   COMMITTEE ON HOUSING AND BUILDINGS                    20

2   largest source of low cost housing in the City and

3   offers critical tenant protections that enable

4   residents to remain in their homes and exercise the

5   choice to stay in their neighborhoods.  Rent

6   stabilization also supports our affordable housing

7   work.  HPD financed units become stabilized in

8   exchanged for our investment which provides an extra

9   layer of protection for those residents.  The rent

10  law reforms of 2011 and 2015 made progress towards

11  our protecting our rent stabilized stock.  By our

12  estimates, these reforms helped to retain 100,000

13  units that otherwise would have exited rent

14  stabilization but given the market pressures facing

15  our City, it is critical we do more.  That's why in

16  the coming 15 months we'll be strongly advocating for

17  additional rent regulation reforms to keep New

18  Yorkers in their homes and curb the predatory

19  landlord practices.  Our rent stabilization agenda in

20  2019 will be built on these principles.  Retaining

21  the rent stabilized stock and the quality of this

22  stock over the long term, preserving affordability of

23  this stock, especially at lower rents, ensuring that

24  current tenants are securing their homes and

25  neighborhoods and protecting the benefits of rent

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                21

 2   stabilization for future tenants.  As we prepare to

 3   enact and advocate for additional reforms in Albany

 4   in 2019, we'll be meeting with stakeholders in order

 5   to create a comprehensive rent regulation reform

 6   agenda.  Your partnership, feedback and advocacy is

 7   essential in this process.  As this process unfolds,

 8   it remains clear that it takes a comprehensive

 9   approach to address our affordable housing shortage.

10   Extending rent stabilization is essential to this

11   overall effort.  Before turning over to Assistant

12   Commissioner Gummer, I'd like to reemphasize what an

13   enormous priority this is for this Mayor and

14   administration.  As we work towards creating and

15   sharpening policies that work to make New York City

16   America's fairest City, rent stabilization laws are

17   the key to remaining an economically diverse City and

18   a thriving cultural metropolis and I know that this

19   is a focus we all share.

20              (Inaudible)

21              SPEAKER JOHNSON:  Everyone's gonna have

22   their chance to speak.  We respect each other here.

23   Chair Cornegy.

24              ELIZABETH GUMMER:  Thank you.  I am

25   Elizabeth Gummer, Assistant Commissioner of Research
```

1   COMMITTEE ON HOUSING AND BUILDINGS                22

2   and Evaluation at HPD.  Thank you for the opportunity

3   to appear before you today to testify in support of

4   Resolution #188-A and Introduction #600-A.  These two

5   important measures represent local confirmation of

6   the continued housing emergency in New York City and

7   are required in order to continue our system of rent

8   control and stabilization.  Simply put, they are what

9   makes the extension of the rent control and rent

10  stabilization law possible.  As you know, the City

11  Council must pass these two pieces of legislation 30

12  days after receipt of the findings of the Housing and

13  Vacancy Survey and the Mayor must sign the

14  legislation before April 1.  HPD has submitted

15  selected initial findings of the 2017 HVS to the

16  Council on February 9, 2018.  Our testimony today

17  will present initial findings of the 2017 New York

18  City Housing and Vacancy Survey.  This survey of the

19  City's housing stock has been carried out every three

20  years since 1965.  It is the longest running housing

21  survey in the country and is of critical importance

22  for understanding how our City is changing and what

23  we can and should do to support improvements in

24  policy and programming.  Its methodology has remained

25  consistent over time with only minor changes to

1    COMMITTEE ON HOUSING AND BUILDINGS                    23

2    improve reliability and validity.  It is conducted by

3    the United States Census Bureau at the request of the

4    City of New York.  Interviews for the current survey

5    were conducted between January and June 2017.  This

6    makes it the most up-to-date representative data on

7    New York City current available.  As required by

8    State and local law, the purpose of the survey is to

9    establish the net rental vacancy rate which is used

10   to determine if New York City is in a state of

11   housing emergency.  Local law also required that a

12   survey be conducted to examine the supply of housing,

13   the condition of housing and the need for continuing

14   regulation and control of residential rents and

15   evictions.  Today we will share key statistics on the

16   current state of housing as well as provide a more

17   detailed portrait of the rent stabilized stock and

18   tenants living in the stabilized units.  As have past

19   waves of the HVS, more detailed analysis will be made

20   available over the coming months and the Census

21   Bureau plans to release the microdata later this

22   summer for analysis by a range of policy makers,

23   policy researchers and academics to utilize the HVS

24   in our everyday work.  The 2017 Housing and Vacancy

25   Survey reports the vacancy rate in rental apartments

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                  24

 2   in New York City to be 3.63%, significantly below the

 3   5% net rental vacancy rate threshold set forth in

 4   State and local laws as the condition determining

 5   that a housing emergency continues to exist.  As the

 6   figure shows, the net rental vacancy rate varies by

 7   rent level.  Among the lowest cost units, those with

 8   asking rents below $800, the vacancy rate is 1.2%.

 9   While among the highest rent levels, it is above the

10   5% threshold.  Units with asking rents of $2,000 to

11   $2,499 have a 5.2% vacancy rate and those with asking

12   rents at or above $2,500 have an 8.7% vacancy rate.

13   New York City continues to see growth in the housing

14   inventory.  In 2017 we estimate that the stock

15   comprises 3.47 million units.  This is the largest

16   housing stock recorded since the HVS began in 1965.

17   As a reminder, this estimate is a snapshot of the

18   current housing stock and the increase of 69,000

19   units since 2014 represents a net change, the results

20   from both loss of stock as well as the creation of

21   new units.  The low vacancy rate despite this record

22   break in housing stock number indicates that although

23   supply has continued to increase, it has failed to

24   keep pace with the continuing demand for housing.  In

25   2017, there were approximately 966,000 rent
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    25

2    stabilized units representing 44% of the overall

3    rental stock.  As with our estimates of the overall

4    housing inventory, this represents a point in time

5    estimate that accounts for both the loss of rent

6    stabilized units as well as newly stabilized units

7    that have come on line.  We continue to improve the

8    data and methodology of the HVS with each successive

9    wave.  In 2017, we again improved the accuracy and

10   validity of our estimates of units subject to rent

11   stabilization.  This estimate of 966,000 units is

12   statistically equivalent to the number of units that

13   were rent stabilized in both 2011 and 2014 if the

14   same methodology were applied.  As this map shows,

15   these units are located throughout the five boroughs

16   but are concentrated in the Bronx and Manhattan as

17   well as parts of Brooklyn and Queens.  The areas

18   where we see the fewest number of rent stabilized

19   units are parts of the City where we know that home

20   ownerships are high.  The HVS measures housing

21   conditions in several ways including through self

22   report of the current occupants regarding maintenance

23   deficiencies.  One important measure of housing

24   quality is the count of items reported by the current

25   occupants with five or more deficiencies representing

1   COMMITTEE ON HOUSING AND BUILDINGS                    26

2   a unit with critical deficits.  In 2017, 3.6% of

3   renter occupied units reported five or more

4   deficiencies.  This is the lowest prevalence on

5   record since 1991 when the HVS began using this

6   measure.  Although not shown here, we found that

7   housing quality is as good or better on nearly every

8   measure included in the HVS.  Since 1991, the HVS has

9   also collected data regarding neighborhood conditions

10  and quality.  In 2017, 76.1% of renter occupied

11  households rated the condition of the residential

12  structures in their neighborhood as either excellent

13  or good and again, this is the highest on record

14  since we began using this measure in 1991.  As you

15  know, for many years rents continued to increase

16  while wages stagnated.  As first seen in other census

17  surveys, that trend has finally reversed.  In 2017,

18  the HVS estimated that household incomes among

19  renters rose by 10.9% in real terms while rents

20  increased by 6.2%.  Incomes grew more than rents in

21  both rent stabilized tenants as well as those living

22  in private non-regulated rental units.  Despite the

23  increase in median income, we continue to face a

24  severe affordability challenge.  According to the

25  2017 HVS, the median household income for renters was

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                    27
 2   $47,200.  That's equivalent to a monthly income of
 3   $3,933 before any taxes.  Using standard federal
 4   guidelines that suggest a household should pay no
 5   more than 30% of gross income on housing costs, the
 6   typical renter household could afford to pay as much
 7   as $1,180 in rent and utilities but the median
 8   contract rent in 2017 was $1,337 and it was $1,450
 9   when we factor in the cost of utilities which are
10   also high.  Moreover, the median asking rent of units
11   available right now in the market is $1,875 well
12   above the $1,180 the typical household could afford
13   to pay.  What results is a high prevalence of rent
14   burden across nearly every income level.  In 2017 we
15   found that 56% of renter households were rent
16   burdened or paying more than 30% of income for
17   housing each month, 32% were severely burdened or
18   paying more than 50% of income for housing.  This
19   graph shows the prevalence of rent burden by HUD
20   income limits or AMI which is a relative measure of
21   income that factors in differences in household of
22   five and local market conditions.  When we roll this
23   up by income group, we see different facets of our
24   affordability crisis.  In the first bar which
25   includes households that are extremely low income,
```

```
 1    COMMITTEE ON HOUSING AND BUILDINGS                28

 2    typically at or near the federal poverty line, we see

 3    that about half of households or just over 360,000

 4    are rent burdened.  Of those who are rent burdened in

 5    this income stratum, almost all are severely

 6    burdened.  The remaining 50%, those in the gray

 7    portion of the stacked bar, are largely served by

 8    subsidized housing or otherwise receiving some form

 9    of rental assistance but the second bar, these are

10    households designated as very low income or low

11    income.  A larger share are rent burdened.  Here

12    about 60% are paying more than 30% of income toward

13    housing costs each month and that's equivalent to

14    about 425,000 rent burdened households who are very

15    low or low income.  Of those, 165,000 are severely

16    burdened or paying more than half of income toward

17    housing costs.  Again, the remainder is either

18    receiving some form of assistance with housing costs

19    or living in a private market in lower cost units.

20    The HVS helps to identify the components of this

21    affordability challenge.  One side is rent burdened

22    based on the intersection of housing costs and

23    incomes but another critical component is the overall

24    composition of our rental inventory.  Between 2014

25    and 2017, we saw a large net loss of the lowest cost
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    29

2    units as rents shifted upwards.  This graph shows the

3    number of rental units by rent level as measured by

4    the 2014 and 2017 HVS's.  The bars on the left show

5    the number of units renting for less than $1,500 in

6    both 2014 and 2017.  The bars on the right show the

7    number of units renting for $1,500 or more again in

8    both '14 and '17 HVS's.  As you can see, over this

9    time period, there was a net decrease of low cost

10   units and a corresponding increase of higher cost

11   units.  While we saw an overall increase of 6.2% in

12   median gross rent, there is substantial variation by

13   neighborhood.  In particular, parts of Brooklyn and

14   Queens have seen substantial increases in median

15   rental costs.  This map shows the changes in median

16   gross rent among only the substantive units that are

17   rent stabilized by neighborhood.  As you can see,

18   many neighborhoods experienced little or no change in

19   rent.  That's indicated in the gray.  Many

20   neighborhoods that saw large increases in overall

21   rental costs saw lower increases for stabilized

22   units.  This is particularly true for parts of

23   Brooklyn, Ft. Greene, Bedsty, Park Slope and Queens,

24   particularly Ridgewood and in Manhattan including

25   East Harlem, Washington Heights, Inwood and the Upper

1  COMMITTEE ON HOUSING AND BUILDINGS                    30

2  West Side.  In evaluating the continued need for rent

3  stabilization, it is important to examine the

4  demographics of who is served.  Here we see the

5  income distribution of rent stabilized tenants – 64%

6  are low income that is earning up to 80% of HUD

7  income limits or AMI.  That's equivalent to about

8  610,000 households and an additional 23% are either

9  moderate or middle income.  In summary, New York City

10 continues to face a housing emergency with a net

11 rental vacancy rate of 3.63%.  While we have added to

12 the overall stock of housing, it is insufficient to

13 keep pace with demand.  We continue to have about

14 966,000 rent stabilized units in our City located

15 throughout the five boroughs.  Both housing and

16 neighborhood conditions are good and many dimensions

17 have improved since 2014.  There is a clear and

18 continuing need for rent regulation in New York City.

19 The 2017 HVS shows that while renter incomes have

20 increased more than rents, there continues to be an

21 affordability crisis.  Half of renter households are

22 rent burdened.  One-third are severely burdened.

23 Median rents are not affordable to the typical New

24 York household.  Rent stabilized rents rose less

25 sharply and represent a large and generally lower

```
 1    COMMITTEE ON HOUSING AND BUILDINGS                 31

 2    cost portion of the stock and moreover, the majority

 3    of rent stabilized tenants are low income.  Taking

 4    all of these first findings into consideration, we

 5    find that New York City continues its state of

 6    housing emergency.  The shortage is particularly

 7    acute for lower income households who face the lowest

 8    vacancy rates and a shrinking stock of lower cost

 9    units.  It is clear from the 2017 HVS that we must

10    not only continue to add to the overall stock to

11    address the emergency, but specifically add lower

12    cost units and work to retain existing units with

13    lower rents in order to support everyday New Yorkers

14    who face continued affordability challenges.  Thank

15    you for the opportunity to testify.  We're happy to

16    answer any questions.

17               CHAIRPERSON CORNEGY:  Thank you for your

18    testimony.  At this time, we'll have questions from

19    Mr. Speaker.

20               SPEAKER JOHNSON:  I thank you for your

21    detailed testimony.  It's great to actually dig down

22    into the numbers and to understand the composition of

23    our rental inventory, the wage gaps that exist and

24    understanding what the needs really are so it was

25    very, very helpful to understand the details of the
```

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                32

 2   housing vacancy survey.  Could you speak a little bit

 3   and I know we have folks here today who are in rent

 4   controlled apartments, can you talk a little bit

 5   about, I know we're talking about two different

 6   things on how they're categorized and the rent

 7   control stock has dwindled quite a bit.  If you could

 8   speak a little bit to not just the rent stabilized

 9   units but also the rent controlled units.

10             ELIZABETH GUMMER:  Certainly, so as you

11   know and for the benefit of those who are not as

12   familiar with the details of the policy

13             (Inaudible)

14             ELIZABETH GUMMER:  I'm sorry?

15             SPEAKER JOHNSON:  Could you speak a

16   little louder for the gentleman.

17             ELIZABETH GUMMER:  Is that better?  Can

18   you hear me?

19             SPEAKER JOHNSON:  Sir, if you want to

20   come sit up front here, you can, if it's gonna be

21   easier for you to hear.  Go ahead.

22             ELIZABETH GUMMER:  Thank you, so for

23   those of you who are not as familiar, rent control is

24   of course an important part of our stock of the rent

25   regulated stock and is the original rent regulation
```

1  COMMITTEE ON HOUSING AND BUILDINGS                    33

2  policies that are for units where the current

3  occupants or the original occupant successors have

4  been in continuous residence since July 1 of 1971.

5  As those original occupants or their successors leave

6  those units, they transition to being rent stabilized

7  so HVS has tracked rent controlled as well as rent

8  stabilized and other types of housing over many

9  decades.  In 2017, there were about 22,000 remaining

10 rent controlled units and of course that's a very

11 small share but the occupants of those units are

12 particularly vulnerable and largely comprised of

13 seniors and those who have aged in place.

14           (Inaudible)

15           SPEAKER JOHNSON:  Sir, sir you're gonna

16 have the opportunity to testify.  We asked, yes you

17 will if you sign up.

18           CHAIRPERSON CORNEGY:  Did you sign up?

19           SPEAKER JOHNSON:  Sir, sir, please be

20 respectful.  Everyone else is.  Thank you for

21 answering the question.  We really appreciate it.  So

22 you talked a little bit about the methodology in the

23 survey and how you analyzed the data.  What did HPD

24 and the U. S. Census Bureau change in the methodology

25 from three years a go up until now?

1    COMMITTEE ON HOUSING AND BUILDINGS                    34

2              ELIZABETH GUMMER:  So as I mentioned in

3    my testimony, with each wave of the HVS, we seek to

4    make very surgical improvements that increase our

5    overall validity and the accuracy of our estimates.

6    For 2017, we incorporated additional administrative

7    data on the rent stabilized stock that we had not

8    previously incorporated.  This was information about

9    units that had exited rent stabilization in the past

10   so for example, through vacancy decontrol or through

11   expiring tax benefits and the information we

12   incorporated newly into 2017 was on about 62,000

13   units that had been decontrolled at some time before

14   our survey.  The vast majority of those, about 47,000

15   had decontrolled at some point between 1993 and 2010

16   so those are older units that had previously exited

17   that had not been factored in until 2017.

18             SPEAKER JOHNSON:  So what do you think

19   was wrong with the previous methodology that it

20   wasn't doing the things that you just said.  Are

21   there other additional things that we could be doing

22   to make sure that we have the most accurate data we

23   need to make these decisions?

24             ELIZABETH GUMMER:  Sure, so as I said, we

25   always are striving and open to any and all thoughts

```
1    COMMITTEE ON HOUSING AND BUILDINGS                 35
2    on how we can improve what we do and that's of course
3    balancing with consistency while as you said making
4    sure that our data are the most accurate and complete
5    as possible.  Previous methodology used a combination
6    of source of information which we continued to use
7    even in 2017, information from Department of Homes
8    and Community Renewal, the DHCR, from the Department
9    of Finance, of course from HPD and from the
10   information we gathered directly from occupants such
11   as the year that they moved in, their rent levels,
12   etc.  By incorporating this additional information on
13   units that are permanently exempt and registered as
14   such with DHCR, we're able to incorporate yet one
15   more piece of critical information to make sure that
16   our current estimate of 966,000 units represents the
17   full universe of units subject to rent stabilization.
18            SPEAKER JOHNSON:  Does the administration
19   support the repeal of vacancy decontrol?
20            FRANCESC MARTI:  Hello, my name is
21    Francesc Marti, Assistant Commissioner for
22    Government Affairs.  It's still early on in process
23    and we are finalizing our agenda for rent renewal
24    next year.  This item is definitely something that
25    we are looking at.  We know from past reforms that
```

1   COMMITTEE ON HOUSING AND BUILDINGS                    36

2   we should not focus exclusively on one item, that it

3   is important to

4                    SPEAKER JOHNSON:  No, no, no, this is a

5   yes or no question.  Is the administration's

6   position that you support the repeal of vacancy

7   decontrol or not?

8                    FRANCESC MARTI:  Sure, you know, we share

9   the same view as the Council that this is an unfair

10  policy and that it needs to be addressed, I, I,

11                   SPEAKER JOHNSON:  Do you support

12                   FRANCESC MARTI:  I don't have anything

13  further to add because we are still formulating the

14  agenda but I think I take your position and I will

15  take it back to my colleagues in the HPD and in the

16  administration.

17                   SPEAKER JOHNSON:  I am flabbergasted by

18  that answer and I think you're gonna hear from

19  tenants today on why they're likely flabbergasted as

20  well by that answer from this administration that has

21  made affordable housing and the preservation of

22  affordable housing a cornerstone item the last four

23  years.  We know the best way to preserve affordable

24  housing is through repealing vacancy decontrol which

25

1  COMMITTEE ON HOUSING AND BUILDINGS                37

2  is how we've lost the most number of units since it

3  was repealed.

4           FRANCESC MARTI:  No, I, I mean I do want

5  to clarify, we do share your view that this is an

6  unfair policy that leads to the loss of rent

7  stabilized units and we are going to be working with

8  you on addressing this in the rent reforms next year.

9  We want to keep an open mind as we formulate our rent

10 reform agenda.  You know, we are further analyzing

11 the data and we have to engage stakeholders in

12 discussions and as I said before, there are different

13 levers that need to be pulled in concert[?] in order

14 to maximize the amount of units we want to preserve.

15          SPEAKER JOHNSON:  Well, when the Mayor

16 ran for Mayor, he supported the repeal of vacancy

17 decontrol.

18          FRANCESC MARTI:  When we stand by

19 (Inaudible).

20          SPEAKER JOHNSON:  And when the rent laws

21 expired in 2015, I believe or were up for rental in

22 2015, the Mayor supported the repeal of vacancy

23 decontrol and what we know as a Council and as tenant

24 activists who are here is that it's not helpful to

25 weigh in next year.  It's helpful to weigh in now.

```
 1  COMMITTEE ON HOUSING AND BUILDINGS                38
 2  That, I think is the most important thing so I really
 3  hope that you all will take a leadership role in this
 4  in a meaningful way.  I'm gonna, there are plenty of
 5  colleagues here that have questions so I'm not gonna
 6  ask you a preferential rent which they will ask
 7  about.  I'm not gonna to ask about the vacancy bonus
 8  which they will ask about.  I'm not gonna to ask
 9  about MCI changes which they will ask about but these
10  are all things that I think are pretty important as
11  we talk about the future of renewal and strengthening
12  of rent regulation and rent control.  I will say this
13  though, Council Member Torres is not here but he had
14  a press conference this morning working with the
15  housing rights initiative to look at some buildings
16  owned by Jared Kushner on the falsification of
17  Department of Building forms where construction was
18  being done in buildings and Jared Kushner and his
19  company did not, did not check off the forms that
20  they were rent regulated tenants in those buildings
21  and we want to make sure that HPD is coordinating
22  with the Department of Buildings to not allow this to
23  happen in the future so if you could talk a bit about
24  what HPD is doing to ensure the Department of
25
```

1    COMMITTEE ON HOUSING AND BUILDINGS                39

2    Buildings is working in coordination with you all to

3    protect rent regulated, rent controlled tenants.

4              MATT MURPHY:  Yes, we saw that news and

5    it's extremely disappointing.  I can say this

6    administration is laser focused on preventing tenant

7    harassment.  It's our understanding that DOB did go

8    to that site for tenant's safety inspections.  DOB

9    will have more information about those particular

10   sites and buildings but I, but I can say that we do

11   coordinate with the Department of Buildings on anti-

12   harassment taskforce, two anti-harassment taskforces.

13   I can also say in situations like these, the, we have

14   worked with City Council to create some more

15   proactive tools so, for example, something like the

16   acquisition of rent regulated buildings which is what

17   took place, from my understanding in this case.  We

18   worked with Councilman Torres to create a speculation

19   watch list which will be coming out this year.  The

20   speculation watch list takes a look at rent regulated

21   buildings that transact and looks at a ratio between

22   their rent role and the acquisition price for a very

23   low amount so meaning that a building might have been

24   purchased for more amount than even the market would

25   say can support that rent role.  We expect that going

1    COMMITTEE ON HOUSING AND BUILDINGS                    40

2    forward, in tools like this speculation watch list,

3    would catch transactions like that so we can be, it's

4    more on HPD's radar that there might be an indication

5    that a building is at risk of tenant harassment or

6    tenants being offered buyouts.  As well, we work to

7    expand the certification of no harassment policy.

8    Certification of no harassment requires that a owner

9    seek out certification from HPD upon applying for a

10   permit from the Department of Buildings for buildings

11   that indicate something about their residents or

12   their transaction or their financial or physical

13   distress that says this warrants a deeper look so

14   when that takes place, the City is in a position of

15   doing an investigation.

16            FRANCESC MARTI:  Sorry, I'd like to

17   clarify my earlier statement.  I'd just like to say

18   that we do support the repeal of vacancy decontrol so

19   I'd just like to state that for the record.

20            SPEAKER JOHNSON:  Thank you.

21            CHAIRPERSON CORNEGY:  Thank you.

22            SPEAKER JOHNSON:  Chair Cornegy.

23            CHAIRPERSON CORNEGY:  Thank you,

24   Mr. Speaker and thank you for clearing that up

25   administration.  The median asking rent increased

1    COMMITTEE ON HOUSING AND BUILDINGS                    41

2    33.9% from 2014 to 2017.  Have you done any analysis

3    to see if there is a correlation between displacement

4    and the increase of rent in certain neighborhoods?

5               ELIZABETH GUMMER:  Thank you for your

6    question.  We only received the 2017 data about two

7    weeks ago so this is very early in our cycle that

8    goes up to three years.  We have not yet begun doing

9    analysis like your question on the increase in rents

10   and other factors such as displacement but we're very

11   anxious to speak with any member of the City Council

12   about priority analytic issues so that we can

13   prioritize those as we begin our research agenda

14   based on the 2017 HVS.

15              CHAIRPERSON CORNEGY:  Well, so I will

16   just rephrase my question.  Will you be doing a

17              ELIZABETH GUMMER:  We will certainly

18   consider how we can use our data to be able to

19   estimate that phenomenon which we know is a critical

20   problem but we have to be able to work out the

21   statistical methodology to do so.  I'm committed to

22   sitting down and seeing if that is something that we

23   can do with the data we currently collect.

24              CHAIRPERSON CORNEGY:  I think that the

25   data derived from a close look could be very helpful

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                    42

 2   in this City going forward.  I don't know if you

 3   know, I happen to represent what I believe to be the

 4   epicenter gentrification which is Bedsty and Northern

 5   Crown Heights and it's incredibly important for not

 6   only my constituency but for the City to have good

 7   solid understanding of the correlation between the

 8   two anecdotally.

 9            ELIZABETH GUMMER:  Um-huh.

10            CHAIRPERSON CORNEGY:  I think everybody

11   in this room would believe that there is a

12   correlation and so I think it would be probably

13   paramount to do this sooner than later so I will

14   certainly personally be reaching out to your office

15   to follow through.

16            ELIZABETH GUMMER:  Sure, and we look

17   forward to working with you on that.

18            CHAIRPERSON CORNEGY:  Thank you, I also

19   want to let, acknowledge that we've been joined by

20   Council Member Rivera.  We can go to Council Member

21   questions now.  Keith Powers.

22            COUNCIL MEMBER POWERS:  Thank you and

23   thank you for having this hearing and I first want to

24   welcome my leader of my tenant's association, Susan

25   Steinburg from Stuyvesant Town who has been leading I
```

```
1    COMMITTEE ON HOUSING AND BUILDINGS                    43

2    think the charge along with many others in this room

3    in the City for preserving and protecting tenants in

4    rent regulated apartments and I had the benefit of

5    growing up in a rent stabilized apartment and I care,

6    I care deeply about continuing the future for many

7    more and I thank HPD for your work in that area and

8    I'm glad you do support vacancy decontrol.  I do too

9    but much more and I hope we're not waiting until next

10   year to be fighting the fight in Albany.  Every

11   single year MCI reform, preferential rent reform,

12   vacancy bonuses, vacancy decontrol, you name it, you

13   have our support and my support and, and I want to

14   ask a few questions.  So much of this goes to Albany

15   but today and I think Council Member Torres' report

16   and oversight around Department of Building permits

17   and other processes here at the City level does

18   highlight the fact that the City plays a role in

19   preserving rent stabilization and rent control units.

20   Can you give us more information, or maybe advise us

21   more details of the existing legislation that you

22   have or you're looking at or other tools that might

23   be available to the Council so we don't have to go to

24   and I do note that tenants are going up to Albany

25   next week to continue this fight but that we don't
```

1   COMMITTEE ON HOUSING AND BUILDINGS                    44

2   have to go to Albany.  What is available to us?  What

3   should we be looking at or what is HPD looking at in

4   terms of preserving rent stabilized units or ensuring

5   that they don't go out of the rent regulation, rent

6   stabilization program?

7              MATT MURPHY:  Give me one second so in

8   addition to some of the tools I mentioned in terms of

9   the certification and no harassment and which builds

10  into the process an opportunity for community boards

11  and for tenant groups to weight in when there's a

12  application and the predatory equity watch list,

13  there are some key things that we've done at the

14  local level and we want to use these and also build

15  on these so HRA has provided free legal services for

16  180,000 New Yorkers since 2014 and evictions total

17  are down by 27%.  Supporting this tool going forward

18  and making sure that people are aware that this is a

19  resource available to them is critical.  Enforcing

20  the housing maintenance code in general is an anti-

21  harassment effort.  This includes calling 311 when

22  there are heat outages or any other complaint.  HPD

23  inspectors respond to those complaints and we have

24  done about, we've attempted nearly 873,000

25

1    COMMITTEE ON HOUSING AND BUILDINGS                    45

2    inspections just in FY17 and we issued 481,000

3    violations.

4                COUNCIL MEMBER POWERS:  Thank you and I

5    know, I'm over my time but I'm just gonna ask maybe

6    one or two follow-up questions.  In terms of today's,

7    I know it's an investigation into whether something

8    happened or not so we're far away from actually

9    making a determination but beyond just the legal

10   services which are very important, my concern is

11   always when you have agencies that aren't talking to

12   each other.  In this case, I think Department of

13   Finance was receiving one piece of information.  HPD

14   or DOB rather was receiving another piece of

15   information so it seems like in some cases we as a

16   City, and I'm taking blame for this too, are not

17   doing enough to ensure that our own processes are

18   talking to each other and ensuring that we're not

19   putting people displaced so I'd like to follow up if

20   we can on that topic about ways we can improve

21   internal agency conversations, communications.  I

22   just want to ask one more question and before I do

23   that, I want to just say one thank you to the

24   Chairman for putting tenants first because I think

25   their voice is important and we've done that with the

1    COMMITTEE ON HOUSING AND BUILDINGS                    46

2    NYCHA tenants and now rent stabilization as well and

3    rent regulations to let tenants speak about their

4    issues and we have an opportunity to talk to the

5    agencies as well so I want to thank him for that.  On

6    terms of rent burden particularly, we have programs

7    like SCRIE which I think are wonderful and we've

8    expanded SCRIE in the last few years to reduce rent

9    burden.  Are there other ways either an HPD funded

10   projects or deals or other things you're looking at

11   to not just obviously expand rent protection where

12   they exist already but to look at tenants that are

13   being rent burdened and might be at risk of losing

14   their apartment which is a good rent regulated

15   apartment.  Any tools that you're using or looking at

16   to address the rent burden in addition to the

17   expansion of available units?

18             MATT MURPHY:  A lot of the issue around

19   rent burden, the tools that we use are related to our

20   preservation work.  This includes tax incentives,

21   loan programs that work together to bring financing

22   to buildings to help improve those conditions.  Along

23   with that includes a rent setting that is at 30% of

24   tenant income so by supporting a lot of our

25   preservation work and by getting those tool out, one

1  COMMITTEE ON HOUSING AND BUILDINGS                    47

2  of the things I'd like to mention is we are working

3  on coming out with a new program, the neighborhood

4  pillars program which is targeted to spend more and

5  use more sources of financing in order to work to

6  acquire rent stabilized buildings so this is an

7  exciting program for us because we're working to

8  actually compete with the market and become more

9  targeted with our acquisitions but ultimately the

10  goal of all of our preservation work is to get

11  tenants in a place of a habitable home, quality and

12  spending no more than 30% of their income on their

13  rent.

14           COUNCIL MEMBER POWERS:  Thank you.

15           CHAIRPERSON CORNEGY:  Council Member

16  Chin.

17           COUNCIL MEMBER CHIN:  Thank you Chair and

18  thank you to all the tenants and advocates for being

19  here today.  From your testimony, we all know that we

20  need to continue rent regulation and all the reason

21  that you laid out in testimony, I think residents

22  know and advocates know and we've been saying that

23  all along.  When you look at in your testimony that

24  the least vacancy units are the lower rent ones,

25  everybody knows that because what's happening right

1  COMMITTEE ON HOUSING AND BUILDINGS                48

2  now is that so many market rate units are coming on-

3  line and even some of them, they get the 421A tax

4  incentive.  They only give back 20% so there is a big

5  discrepancy, a big gap and I remember just this past

6  Sunday reading the *New York Times.*  You look at, you

7  know, there are all these competition going on in

8  Brooklyn because all these market rate housings is

9  going up and the next one is gonna be taller, they're

10  gonna offer more amenities because they want to

11  attract the tenants so people who can afford it,

12  they're picking and choosing but the people who

13  cannot afford it, they're stuck and I think in your

14  vacancy surveys do you take a look at overcrowding

15  cause what we see in our neighborhood is that people

16  are doubling up, tripling up.  There's no more one

17  family living in an apartment.  Often time they have

18  to share apartment with another family just to pay

19  they rent so that's one question.  The other question

20  is that I know that you're talking about the program

21  to help non-profit group acquire rent regulated

22  building or non-rent regulated building.  That's

23  great.  I was very excited about that in the last

24  hearing.  One of the things I also want to raise is

25  that HPD looking into, first of all, doing some

1   COMMITTEE ON HOUSING AND BUILDINGS                    49

2   project based subsidy program where new development

3   that developer can use that to lower the income

4   requirement?  In that way they will lower the rent.

5   That's one thing and the other thing is to look at a

6   subsidy that the City can do to help families who are

7   rent burdened similar to what we have in SCRIE and

8   DRIE but for low income family so that they can be

9   able to meet the rent and be able to stay in their

10  rent regulated apartment.

11              ELIZABETH GUMMER:  Thank you very much so

12  let me maybe take the first question.  I'll defer to

13  my colleagues on the follow-up question so the HVS

14  does measure, does collect a lot of data that can

15  help us examine different facets of crowding or

16  doubling up.  In our selected initial findings they

17  didn't present obviously all of our wonderful numbers

18  today but you can see the overcrowding rate from a

19  single dimension in Table 19 of what had been

20  previously distributed to you.  For 2017 across all

21  types of rental housing the crowing rate was 11.5% in

22  2017 and severely crowded, that's where there's more

23  than one and a half persons per room was a rate of

24  4.5%.  That's statistically pretty similar to what we

25  had measured it as in 2014.

```
 1  COMMITTEE ON HOUSING AND BUILDINGS                50

 2            COUNCIL MEMBER CHIN:  Do you break that

 3  down by the rent?

 4            ELIZABETH GUMMER:  We certainly can do

 5  that.  I'm happy to do that as a follow-up.  In our

 6  selected findings, we only show a very small number

 7  of metrics but we can do that by rent level and we're

 8  happy to do that as a follow up for you.

 9            COUNCIL MEMBER CHIN:  Thank you.  The

10  other question about subsidy?

11            FRANCESC MARTI:  Sure, sure, so we're

12  rolling out a New York City 15/15 rental assistance

13  program for supportive housing.  We'll have six new

14  staff and $250,000 in FY18 for this program.  We can

15  arrange a brief

16            COUNCIL MEMBER CHIN:  Well, I know about

17  the supportive housing.  I'm talking about the

18  general population about the low income families who

19  are struggling so that they should have some kind of,

20  before they get to the homeless shelter.  If we can

21  prevent them from, you know, becoming homeless and be

22  able to stay in their homes.  Yes, we have to look

23  towards the State to help but if the City can do

24  something on our own to really help these family,

25  that's one thing and the other one is that in
```

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                51
 2   developing more affordable unit that is for the lower
 3   income level, the City can take a look at creating a
 4   project base subsidy program that allows developers
 5   to do that.
 6            FRANCESC MARTI:  I think it's, I think
 7   it's a fair idea and we're happy to discuss it with
 8   you further.  I think we should also be mindful right
 9   now defending Section 8 at the federal level is very
10   important and we appreciate all your partnership and
11   support.  All these federal programs are under threat
12   so I just say like we are focused on defending
13   Section 8 at the federal level but we are more than
14   happy to sit down with you and discuss I think the
15   idea that you are putting forward right now.
16            COUNCIL MEMBER CHIN:  Yeah, I mean I know
17   that we have to defend Section 8 but while we
18   defending that, let's also be creative
19            FRANCESC MARTI:  Sure.
20            COUNCIL MEMBER CHIN:  And find new ways
21   to help the tenants who are suffering, who needs our
22   support so, so that we just always be on the
23   defensive.  Let's be on the offensive too, okay.
24            FRANCESC MARTI:  Yep, we're happy to talk
25   about that, yep.
```

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                52

 2              COUNCIL MEMBER CHIN:  Thank you.  Thank

 3   you Chair.

 4              CHAIRPERSON CORNEGY:  Council Member

 5   Williams.

 6              COUNCIL MEMBER WILLIAMS:  Thank you

 7   Mr. Chair.  Thank you for your testimony.  I just had

 8   a few things to say but you kinda surprised me on the

 9   preferential rent thing so I know you cleaned it up

10   but I just want to make sure I'm also clear that

11   you're supporting the changing of MCI's and IAI's and

12   preferential rent, all of those things that the

13   movement is usually pushing.  I just want to make

14   sure that the administration supports dealing with

15   those or getting rid of those.

16              FRANCESC MARTI:  So again, I think those

17   are definitely issues we're gonna be looking at.

18              COUNCIL MEMBER WILLIAMS:  Well not just

19   looking at it, support changing MCI's, IAI's,

20   changing preferential rent and high rent decontrol.

21              ELIZABETH GUMMER:  So as, I can just add

22   here as somebody who has worked for HPD and worked on

23   these issues now for several rounds of, of Albany

24   reforms and you're looking at one of the criticals of

25   the team members who will be doing this for, in the
```

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                   53
 2   next 15 months, that my, my component of that is
 3   doing really detailed data analysis from the HVS and
 4   from other sources to be able to help guide not just
 5   internal with the administration but also to help
 6   support just a data driven
 7             COUNCIL MEMBER WILLIAMS:  So I'm sorry, I
 8   have a minute and thirty seconds left.  I didn't
 9   expect this to be a question because I thought it was
10   a yes so I just want to know if those things were in
11   concert in terms of getting rid of or fixing.  That's
12   my question.
13             FRANCESC MARTI:  The answer is yes.
14   We're gonna be looking at it.  We're gonna be looking
15   into both of those things, yep.
16             COUNCIL MEMBER WILLIAMS:  Okay, okay, I
17   just want to make sure we have that on the record
18   because I was a little concerned.
19             FRANCESC MARTI:  Yep, yep.
20             COUNCIL MEMBER WILLIAMS:  So this issue
21   in particular, you know, I wouldn't be a Council
22   Member if it wasn't for my tenant organizing days.
23   Before Barack Obama, no one knew what it was so
24   people would ask me if I was giving tennis lessons
25   and I'd have to tell them no, it was actually tenant
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    54

2    organizing I was doing so I've been doing this for

3    way back.  It's very, very important to me.  I do

4    want to make sure I get to ask some of the advocates

5    at some point.  I was concerned, I guess, by the

6    redoing of the HVS, it looks like we didn't actually

7    lose units which I just want to make sure we're

8    checking the validity of that cause our usual belief

9    is that we're losing a lot of units and perhaps we're

10   just building more luxury units and why it's

11   compensating for what we're actually losing so I just

12   want to get into that but I can't get into it here.

13   Also, yes it looked like there was some good news

14   about income raising I guess versus rent but we still

15   have a big crunch at the bottom and I will say for

16   the most part I think the City's doing decent as

17   there's bones I have to pick.  We did lose from your

18   chart, particularly in the lower income in years of

19   '14 to '17 which is one of the reasons I voted

20   against MIH and I think this body and the Mayor

21   failed by not making it a deeper appointment of

22   affordability.  We're finally cleaning that up now

23   but we did lose some critical years.  I'm happy the

24   421A recapture is happening.  I do want to see more

25   happen with rent regulation so hopefully the City

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                55

 2   will but I just want to put on the record and I

 3   sometimes try to use qualifying statements but I'm

 4   not here.  Governor Cuomo has been a utter failure

 5   when it comes to rent regulation both on rent

 6   control, rent stabilization.  This is primarily, not

 7   only, but primarily a State issue and he's thoroughly

 8   failed.  There's some breaking news happening now

 9   that I hope will pressure him a little bit more but I

10   hope he's listening because there's one thing I think

11   he's done well is probably tenant protection unit.  I

12   will say that has done some good things.  We wouldn't

13   need it if he would do his job.  The fact that he

14   first of all failed on the 421A negotiations and took

15   it out of the negotiations that we used to have with

16   rent regulations is another failure.  I'm just so

17   dismayed by what I see coming out of there and I

18   think it's deeply connected to the amounts of money

19   that he receives from developers and landlords and I

20   won't speak into detail but I've had reason to be

21   traveling across the State and I've been shocked and

22   surprised of how much the housing issue and the

23   homeless issue in New York City is connected across

24   the City and I want to shout out housing justice for

25   whose trying to bridge some of those divides because
```

1    COMMITTEE ON HOUSING AND BUILDINGS                56

2    it all goes back to the State, particularly the

3    gubernatorial mansion so I'm gonna continue to push

4    the City where I can but I want to make sure we're

5    clear on where the buck stops with this one.  Thank

6    you.

7              CHAIRPERSON CORNEGY:  Thank you Council

8    Member Williams.  I just want to shift to have a

9    brief conversation about something that's not talked

10   about much but that is quintessential to life and

11   vibrancy in New York City and that is City wide home

12   ownership.  The City wide home ownership rate was

13   32.4% in 2017, statistically the same as 2014.  How

14   did the City plan to preserve or create more

15   affordable home ownership opportunities?

16             MATT MURPHY:  Thank you for the question

17   and as most know, New York City is the inverses of

18   the rest of the country in terms of its relationship

19   between renters and homeowners which makes us in a

20   unique position to create home ownership policy so as

21   an administration we do look at home ownership as

22   both stabilizing distressed neighborhoods, a tool for

23   that, as well as serving as a wealth building tool.

24   It's critical.  Since the start of HNY, we have

25   financed nearly 13,000 home ownership starts.  A

1    COMMITTEE ON HOUSING AND BUILDINGS                    57

2    portion of those are through NYHOP and our HomeFirst

3    program and it's our expectation by 2026 the City

4    will produce another 10,000 home ownership units so

5    in HNY2.0 we actually announced two new programs to

6    confront this issue.  We are excited to launch a

7    program called Open Door which is a unique new

8    program where we are building co-op units,

9    affordable, two people, in the 80 to 100% AMI bracket

10   which is about $70,000 to $112,000 for a family of

11   three and that's just on the new construction side.

12   We're also working to create the Home Fix program

13   which is about helping mostly lower income homeowners

14   do repairs on their homes so that they can either

15   bring them up to a more habitable status or just work

16   to maximize the quality of their home and maximize

17   their asset so we are, we are working on creating

18   this.  We recognize that we're a City of renters but

19   even still we have pockets of homeowners and we need

20   to have tools that address their needs as well.

21             CHAIRPERSON CORNEGY:  So the overall

22   number that you mentioned which I believe I heard you

23   say 10,000

24             MATT MURPHY:  That's the additional

25   units, yeah.

```
1    COMMITTEE ON HOUSING AND BUILDINGS                58

2              CHAIRPERSON CORNEGY:  Right, so how much

3    of that is new homeowners and how much of it is the

4    Fix program that you mentioned or is there a

5    differentiation somewhere in there?

6              MATT MURPHY:  I don't have a breakdown of

7    where the 10,000 additional would come from.  I can

8    say that in some cases we preserve mitchalama

9    [phonetic]co-ops and the preservation of mitchalama

10   [phonetic] co-ops are home ownership units.

11             CHAIRPERSON CORNEGY:  So for the new

12   potential new homeowners in a very tough market, what

13   is your strategy for getting the word out about new

14   programs, about pathways to home ownership, what's

15   the strategy for getting people enrolled in the

16   program and helping them build wealth and capacity

17   and all of those kinds of things.

18             MATT MURPHY:  Sure, yeah, it's a great

19   question.  Part of it is building awareness.  We need

20   everybody to support that.  Following affordable

21   housing lotteries and being able to know that even if

22   you're in the market to purchase a home, affordable

23   housing lotteries can be for you so I encourage

24   everybody to go visit our website and to look for our

25   resources related to home ownership.  There's also a
```

```
 1    COMMITTEE ON HOUSING AND BUILDINGS                   59

 2    number of non-profits that focus on the home

 3    ownership.  I will give a shout out to the Center for

 4    New York City neighborhoods.  A lot of home ownership

 5    programs are focused on preventing foreclosure but as

 6    the market has recovered and strengthened, there are

 7    more conversations about introducing new home

 8    ownership opportunities so talking to non-profits,

 9    local community organization, talking to housing

10    counseling agencies, coming to our website and

11    looking on the home ownership link and following

12    affordable housing lotteries are just some of the

13    ways but I'd like to talk to you more about what more

14    we could do.

15                CHAIRPERSON CORNEGY:  Yeah, so one of the

16    things that I'm curious about is your relationship,

17    or the administrations relationship to the use of CRA

18    or the Community Reinvestment Act in minority

19    communities like the one that I represent.  There's a

20    great opportunity there to get the CRA numbers up

21    with banks in my district.  We're actually doing an

22    assessment of the banks in my district for their

23    lending practices, both commercial and residential.

24    I'm wondering is the City, counting that as a tool

25
```

1    COMMITTEE ON HOUSING AND BUILDINGS              60

2    for increasing home ownership or are these programs

3    operating mutually exclusive of each other?

4               MATT MURPHY:  That's a great question.

5    At the moment, you know, we don't count what banks

6    count towards CRA unless mostly if it's the financing

7    of multi-family housing and investments in the tax

8    write off program but it's a great opportunity.  I do

9    want to highlight a couple of things.  Usually the

10   news in regards to housing on the federal level is

11   bad these days and I just want to point out that not

12   a lot of people are familiar that there is a proposal

13   to eliminate reporting by banks on just the thing you

14   mentioned.  Banks are required right now to report on

15   the rates in the City of people that receive home

16   mortgage loans as a way to confront past mortgage

17   discrimination and there is a proposal to, this is

18   called the home mortgage disclosure act, and we use

19   this data, hone the data and I would like to talk to

20   you more about how we can use that data more

21   effectively.  However, it's just another example of

22   something that's at risk at the federal level and we

23   are working to fight it because we do use this data

24   but there's conversations about reforming the

25   community reinvestment act, there are conversations

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                61

 2   about taking away this data and, you know, we need

 3   all the support we can to continue those tools cause

 4   the Housing and Vacancy Survey shows us just how

 5   critical you need data to have these conversations.

 6   Otherwise the anecdotal evidence in regards to these

 7   issues is simply not always enough so we should talk

 8   more because there is an opportunity to work more

 9   closely with banks.  We talk with banks a lot about

10   what further investments could be made and they want

11   to do increasing amounts of home ownership so I'd

12   like to follow up with you about that.

13              CHAIRPERSON CORNEGY:  Yes, it's

14   obviously, not obviously, but it's something that

15   we're doing in my district as a combat to the

16   negative sides or the down sides of gentrification

17   and it seems to be a pathway in my district.  I can

18   imagine if the weight of the entire City was brought

19   to bear as it relates to the CRA, the difference we

20   could possibly make so I look forward to not just on

21   the record having this conversation but having a

22   longer extended conversation and not just with myself

23   but the Committee on what we can do working with our

24   federal partners and with the Act so thank you.

25              MATT MURPHŸ:  Great, thanks.
```

1   COMMITTEE ON HOUSING AND BUILDINGS                    62

2                   CHAIRPERSON CORNEGY:   Council Member

3   Gjonaj.

4                   COUNCIL MEMBER GJONAJ:   Chair, I just

5   want to thank you for this very important hearing and

6   my colleagues for bringing up some very important

7   issues and topics.   You mentioned your testimony of

8   SCRIE and DRIE.   Can you please tell me your feelings

9   or your thoughts on the success of those two

10  programs?

11                  FRANCESC MARTI:   So we're actually very

12  proud of the recent expansion in SCRIE.   The State

13  legislature passed an expansion to $50,000 and we

14  implemented it locally and, you know, this is a, this

15  is a success in making sure that more seniors can

16  stay in their homes.   In regards to the SCRIE

17  program, DOF administers the SCRIE program for rent

18  regulated units.   We do it for (Inaudible) and

19  ACFC's.   We'd be happy to like sit down with you and

20  go over more detail about that.

21                  COUNCIL MEMBER GJONAJ:   But overall these

22  are very successful and important programs to make

23  sure that our seniors and disability, those suffering

24  from various disabilities remain in their homes and

25  not allowing their rent to increase is significant.

```
 1  COMMITTEE ON HOUSING AND BUILDINGS                 63

 2              FRANCESC MARTI:  Absolutely, yeah.

 3              COUNCIL MEMBER GJONAJ:  Okay.

 4              ELIZABETH GUMMER:  So I can also add that

 5  HES collects data on the population receiving SCRIE.

 6  We have not incorporated questions on DRIE but one of

 7  the things that we'd be happy to follow up on is as

 8  we get to the point where we're evaluating and

 9  analyzing the impact of SCRIE over time of sharing

10  any findings we have with you on that program.

11              COUNCIL MEMBER GJONAJ:  Because I feel

12  the same way, making sure that those two programs

13  remain viable are important to the wellbeing of this

14  City.  Would your department be open to discuss

15  extending those programs or those protections to

16  every day New Yorkers where we would cut rents and

17  it's known as the TRUE Bill, Tenant Red Ink Exemption

18  Program where if more than half of their rent is

19  going toward rent, and here it's a third, that we

20  would cap those rents and not let things get

21  progressively worse for those very vulnerable

22  families.

23              FRANCESC MARTI:  So we are always happy

24  to review any legislative proposal.  I just want to

25  be clear that we are laser focused on strengthening
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    64

2    the rent laws in Albany next year.  That is our focus

3    and we don't think there's any substitute for that so

4    we just want to be clear about that.  We are familiar

5    with the proposal you are discussing TRUE.  You know,

6    I, the proposal would be administered by DOF so they

7    could speak better about it.  However, we are

8    familiar with certain fiscal concerns, significant

9    fiscal concerns with it.

10           COUNCIL MEMBER GJONAJ:  Fiscal concerns,

11   we're talking about the wellbeing of keeping New

12   Yorkers in their home and making sure that they don't

13   become displaced and homeless, isn't that the intent

14   here?

15           FRANCESC MARTI:  We believe that the best

16   way of achieving that is strengthening the rent laws

17   in Albany next year.

18           COUNCIL MEMBER GJONAJ:  So, if you're one

19   of the fortunate families that has a rent stabilized

20   apartment, you're protected and the other New York

21   City residents, we turn around and say sorry, you

22   didn't draw the luck and we can't help you.  Is that

23   the intent?

24

25

1  COMMITTEE ON HOUSING AND BUILDINGS                    65

2        FRANCESC MARTI:  Well, we, we can

3  certainly discuss proposal with you and we're more

4  than happy to do that.

5        COUNCIL MEMBER GJONAJ:  So let's clarify

6  the position.  It's more than making sure that the

7  rent protections remain in place but making sure that

8  all New Yorkers can afford to live in this great City

9  and not be forced into the streets.

10        FRANCESC MARTI:  I mean, again, I would

11        COUNCIL MEMBER GJONAJ:  And that should

12  be the primary objective I would imagine.

13        FRANCESC MARTI:  Yes, again we believe

14  that strengthening the rent laws is the best way of

15  achieving that but we are more than happy to discuss

16  the specifics or the TRUE proposal with you.

17        COUNCIL MEMBER GJONAJ:  Let me reiterate

18  one more time, we have many more apartments that are

19  not subject to rent stabilization and those families

20  are in current need of assistance and helping secure

21  a roof over their heads should be the primary goal,

22  not just there for the rent stabilize, rent control

23  tenants.  There has to be a much broader approach but

24  I'll take that up with you at a later time.  One of

25  the other issues that I do want to bring up is the

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                66

 2   same group of people that we're looking to help

 3   through rent protections and making sure that RGB

 4   increases don't force these vulnerable families out

 5   of their homes, one of the issues that I see works

 6   counter to that is the water and sewer and real

 7   estate tax increases that are passed on to property

 8   owners and therefore passed on to tenants so on one

 9   hand we say we need to strengthen rent protections,

10   make sure rents remain affordable and that they don't

11   increase out of control forcing families to relocate,

12   on the other end we raise the operating cost of

13   buildings to make sure that we hurt those very

14   existing tenants that we're looking to help.  Water

15   and sewer rates are over $1,000 an apartment

16   annually.  That is more than fuel.  Your real estate

17   taxes imposed on the same rent stabilized tenant that

18   you're looking to protect are about $3,000 annually.

19   These are double digit increases across the board so

20   when are we gonna start addressing the underlying

21   issues.  Are we here to help these tenants or hurt

22   them and under the guise of RGB saying we did our

23   part but those lambs[phonetic] are gonna pass on

24   those increases and make sure that those tenants and

25   families pay for these increases.
```

1   COMMITTEE ON HOUSING AND BUILDINGS                    67

2           MATT MURPHY:  So the issue around

3   operating expense increases, RGB, from my

4   understanding looks at annually when setting the

5   increase in the one year or two year leases.  There's

6   a report that's done on operating expenses and how

7   they are going up and down.  In terms of affordable

8   housing, real estate tax exemptions are used in order

9   to keep costs down so in order to house the lower

10  income tenants we're talking about, the City does

11  provide an operating subsidy by exempting property

12  taxes.  It's an incentive for people to participate

13          COUNCIL MEMBER GJONAJ:  By unstabilized

14  apartments, the one million apartments that we want

15  to protect.  Those same one million apartments are

16  subject to increases on water and sewer rates by New

17  York City on real estate taxes by New York City.

18  They are passed along and I'll paint the picture for

19  you.  City charges landlord, landlord charges tenant,

20  tenant pay landlord, landlord pays City.  Who's the

21  culprit?  It's not the landlord.  He's the middle man

22  and these increases are a direct correlation to the

23  rent increases that those rent stabilized tenants

24  that you're trying to protect, will ultimately pay

25  for.  I also believe rent stabilization in the one

```
1    COMMITTEE ON HOUSING AND BUILDINGS                    68
2    million apartments that are available are not enough
3    and I agree that this is a battle of supply versus
4    demand and New York City's not gonna build its way
5    out of this on its own that there has to be a more
6    willing partnership with a private industry creating
7    the incentive for them to build more apartments which
8    eventually to stabilizing of rents and eventually
9    making sure that all New Yorkers can afford to live
10   here should also have some type of needs testing to
11   make sure that those that should be getting the
12   protections do have the protections and ensuring
13   future generations can thrive here so I want to thank
14   you both for your time.  Thank you.
15                   CHAIRPERSON CORNEGY:  Council Member
16   Rivera.
17                   COUNCIL MEMBER RIVERA:  Thank you and
18   that you Chair for asking about home ownership.  I
19   know those opportunities in moderate income
20   communities are far and few in between so I wanted to
21   ask about the survey.  So compared to previous
22   surveys, the number of rent controlled units was
23   actually less and I'd like to know why does there
24   continue to be a loss of these units and whether HVS
25   has data on the causes?
```

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                69

 2              ELIZABETH GUMMER:  Sure, so in my

 3   previous answer about rent control I explained that

 4   this is the first generation of rent regulated units

 5   where the current occupants had, in fact have to be

 6   by definition, the first occupants or the first

 7   occupant successors and have lived continuously in

 8   that unit since July 1, 1971.  That means that when

 9   those units, when those first occupants exit those

10   units they transition to being rent stabilized so the

11   number of rent controlled units naturally declines

12   over time as those initial occupants who have been

13   living there for several decades give up those

14   apartments but the overall supply of rent regulated

15   units which comprises both rent control and rent

16   stabilized remains intact according to our data.

17              COUNCIL MEMBER RIVERA:  Well based on my

18   very humble experience housing organizing and I see

19   some of my friends here and we've done a lot of work

20   around this, I think some of the causes are the same

21   for rent stabilization as they are even for rent

22   control and that's, that's deprivation of services,

23   that's frivolous litigations, that's harassment.  I

24   want to ask about repairs.  You said that the agency

25   issued 5,000 violations.
```

1   COMMITTEE ON HOUSING AND BUILDINGS                70

2              MATT MURPHY:  I believe it was 473,000.

3              COUNCIL MEMBER RIVERA:  473,000

4   violations in how long?

5              MATT MURPHY:  Think that was fiscal year

6   '17 but if you give me a moment, I'll give you the

7   exact number.

8              FRANCESC MARTI:  We can also confirm that

9   for you after that.

10             COUNCIL MEMBER RIVERA:  He's going to

11  confirm it for me right now.

12             MATT MURPHY:  In fiscal year '17, we

13  issued more than 481,000 violations.

14             COUNCIL MEMBER RIVERA:  Okay, that sounds

15  right, so these violations do you know how many of

16  them were gathered because of an HP action?

17             MATT MURPHY:  I don't have that

18  information in front of me but I can say that we have

19  brought 6,371 cases to housing court.  A portion of

20  those cases I believe are going to be an HP action

21  but this is data we can follow up with you with.

22             COUNCIL MEMBER RIVERA:  That would be

23  great.  I know that when people are taking their

24  landlord to court, sometimes all the time and the

25  energy that they spend in court and the vindication

1   COMMITTEE ON HOUSING AND BUILDINGS                    71

2   that they get is still almost worthless because the

3   repairs don't come and they have to go back to court

4   and then go back to court and that's a loss of wages,

5   that's a loss of time and the stress on these tenants

6   is unbelievable so I see here that it says since 2014

7   the administration funded legal services for 180,000

8   low income tenants facing eviction.  That seems a

9   little bit low.  I'd love to see that broken down and

10  I'd love to see how many people are actually in court

11  who are I guess categorized as low income and how

12  many actually receive legal services.  I know there's

13  criteria and there's eligibility around it but I know

14  how many families are in court and that just seems

15  like, I know we have to do our part but if you can

16  give me a breakdown of who is receiving those

17  services according to income and according to

18  borough, I would really appreciate that.

19              MATT MURPHY:  Okay, our partners at HRA

20  run the programs so let us communicate with them and

21  let you know of your request and we'll get back to

22  you.

23              COUNCIL MEMBER RIVERA:  And then the last

24  thing I'll just say is I want to echo some of my

25  colleagues here who talked about the joint effort so

```
1   COMMITTEE ON HOUSING AND BUILDINGS                72

2   whether it's with HRA or HCR or DOB, this is really a

3   time where I feel like our tenants are constantly

4   under attack and finally for, I guess for example,

5   Kushner to get some press around the false

6   certification you said it was disappointing and I

7   think it's more than disappointing.  It's criminal so

8   for the people here who have been fighting

9   Westminster for years, I have to say, you know, time

10  is up for a lot of these guys and we're gonna need

11  your help so thank you so much for your time.

12           MATT MURPHY:  Thank you and I absolutely

13  agree and this is why the harassment taskforces exist

14  is to actually look into potentially criminal

15  behavioral as well.

16           CHAIRPERSON CORNEGY:  Thank you, Council

17  Member Rosenthal.

18           COUNCIL MEMBER ROSENTHAL:  Thank you very

19  much.  Thank you Chair Cornegy for chairing this

20  hearing.  It's incredibly important and I so

21  appreciate Speaker Johnson and of course the

22  administration moving forward on his two resolutions

23  bills.  I want to follow up on Council Member

24  Rivera's question.  When you saw a decrease in rent

25  controlled apartments, did you see a corresponding
```

```
1   COMMITTEE ON HOUSING AND BUILDINGS                73
2   increase in rent stabilized apartments or can you
3   track to see whether or not that actually happened?
4                ELIZABETH GUMMER:  So the data that we
5   currently are analyzing and that we've shared today
6   are first findings is cross sectional so it's only
7   point in time.  It does not enable us to say where
8   those units had come from or what is happening to
9   them.  However, the HVS also is in its design a
10  longitude mill data set and so with 2017, we will be
11  able to analyze some of these trends and transitions
12  over time between 2011, 14 and 17.  Unfortunately, we
13  don't have those data yet and we'll get them later
14  this summer after the 2017 data themselves are
15  released by the Census Bureau but we'd be more than
16  happy to follow up and look at what has happened to
17  the units that had been rent controlled in earlier
18  waves and what happened to them after they
19  transitioned.
20               COUNCIL MEMBER ROSENTHAL:  That'd be
21  great.  Hypothetically, do you have a data field that
22  captures brand new rent stabilized apartments?
23               ELIZABETH GUMMER:  I'm not quite sure
24  that I understand your question but let me do my best
25  to answer it so we certainly just as we discuss rent
```

1  COMMITTEE ON HOUSING AND BUILDINGS                    74

2  control, we can look at over time what, how units

3  transition from one category to another with that

4  special longitudinal file.

5            COUNCIL MEMBER ROSENTHAL:  Okay.

6            ELIZABETH GUMMER:  The 2017 data

7  themselves don't allow us to look at that change.

8            COUNCIL MEMBER ROSENTHAL:  Got you and

9  when do you expect the full data to be available to

10 the public?

11           ELIZABETH GUMMER:  So the 2017 data will

12 likely be released in June which is similar to what

13 our standard cycle is for an HVS wave.  The

14 longitudinal data will be prepared sometime after

15 that, probably late in the summer, is when we expect

16 to get a first copy of those data back at HPD.

17           COUNCIL MEMBER ROSENTHAL:  Okay, one of

18 my concerns and the reason Council Member Rivera's

19 point really struck me is because I have a building

20 in my district where the landlord is trying very

21 hard, new landlord, new building owner came in and is

22 trying very hard to pressure the tenants who are rent

23 controlled to sign rent stabilization leases with the

24 intent of demolishing the building, you know, then

25 moving to the phase of saying well, we're gonna

1    COMMITTEE ON HOUSING AND BUILDINGS                    75

2    rebuild this and now everyone's out so is that, can

3    that type of situation be captured by your office in

4    a different way or how do you keep track of those

5    situations?

6                ELIZABETH GUMMER:  So the HVS itself is

7    really, it is designed to do many things but it

8    really focuses on City wide borough trends of these

9    major conditions and the things that are defined by

10   both local and State law.  It, of course, goes above

11   and beyond that but it can't do everything and so we

12   are not able to look at the intersection of those

13   particular issues in that survey.  I will say that my

14   division separately does a lot of analysis of

15   different data.  We haven't specifically looked at

16   this idea of decontrol and demolition in the

17   intersection of those particular things in the way

18   you're describing but we're always trying to

19   understand what are the critical issues that everyone

20   is seeing so that we can identify the best data and

21   methodology and we're certainly happy to think about

22   that with you and

23                COUNCIL MEMBER ROSENTHAL:  Yeah, I'd love

24   to add that one to your list and wouldn't it be true

25   that you'd have to work with the DOB data, right,

1    COMMITTEE ON HOUSING AND BUILDINGS                    76

2    because they'll have the permits for demolition or,

3    you know.

4              ELIZABETH GUMMER:  Yeah, it very much

5    like our program areas have to work together with

6    agencies of data and research people also have to

7    collaborate to make, get the right data.

8              COUNCIL MEMBER ROSENTHAL:  Do your data,

9    do your package, software package, do your data

10   packages speak to each other?  Can you use DOB data

11   in your analysis?

12             ELIZABETH GUMMER:  Certainly my division

13   works with all kinds of data from all different

14   agencies.

15             COUNCIL MEMBER ROSENTHAL:  But they just,

16   I'm just curious, they just updated to DOB Now or

17   whatever.  Is that in your

18             ELIZABETH GUMMER:  People, people in my

19   division access back end so those kinds of changes

20   don't alter our ability to be able to talk together

21   in this data.

22             COUNCIL MEMBER ROSENTHAL:  So

23   specifically, so HPD and DOB address by address

24   information could hypothetically speak to each other

25   and

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                77

 2              ELIZABETH GUMMER:  Sure, the researchers

 3   who work on my team use all kinds of data all the

 4   time and we also share with other researchers at

 5   other agencies and outside of the City and all of

 6   those things can work together.

 7              COUNCIL MEMBER ROSENTHAL:  Great, thank

 8   you so much for your time and your efforts.  Thank

 9   you, Chair.

10              CHAIRPERSON CORNEGY:  We're gonna go to a

11   second round.  Council Member Williams has a second

12   round of questions.

13              COUNCIL MEMBER WILLIAMS:  Thank you,

14   kinda I wasn't expecting to come up right now.  I did

15   just want to make sure I put on the record also,

16   sometime we're talking about rent stabilization, rent

17   control, just rent regulation in general, we are

18   talking about the price point and I was make sure I

19   put on the record that it's also the protections that

20   come with it and that people forget to discuss and

21   it's important because when I was an organizer and

22   people would come for assistance I would have to say,

23   are you rent regulated or you're not, because if you

24   aren't I can help you get through the peer, but the

25   landlord may not give you a release renewal and we
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    78

2    may or may not be able to prove that it's connected

3    and so I always want to make sure when we're

4    discussing and having these talking points that the

5    protections that are afforded to tenants in rent

6    regulation are very important to that community and

7    shouldn't just be connected to a price point.  I

8    think I had another question but it's been jogged out

9    of my head but I wanted to make sure that was there.

10   Also, just to recorrect some of my earlier statement

11   just for my clarification, I think the Governor has

12   utterly failed tenants in the City and across the

13   State, not just rent regulated.  Thank you.

14           CHAIRPERSON CORNEGY:  I think you made

15   that abundantly clear, Council Member.

16           COUNCIL MEMBER WILLIAMS:  I think I said

17   rent regulated.  I just wanted to make sure I

18   captured the whole thing.

19           CHAIRPERSON CORNEGY:  Thank you.  If

20   there are no more questions, thank you so much for

21   your testimony.

22           MATT MURPHY:  Thank you.

23           FRANCESC MARTI:  Thank you.

24           ELIZABETH GUMMER:  Thank you.

25

```
1   COMMITTEE ON HOUSING AND BUILDINGS                79

2              CHAIRPERSON CORNEGY:  Look forward to

3   working with you and I'll follow up especially on the

4   home ownership piece.

5              MATT MURPHY:  Thank you Chair, thanks.

6              CHAIRPERSON CORNEGY:  I'm gonna call the

7   next panel.  Norma Shrier [phonetic], Cynthia Chafee,

8   Abigail Martinez and Marcella I'm sorry I can't

9   pronounce your last name.  Miteriz [phonetic]

10  Marcella, I'm sorry.  Thank you.

11             NORMA SHRIER:  Good afternoon

12             CHAIRPERSON CORNEGY:  You have to press

13  the button in and I'm glad you started cause we

14  actually intended to go from that side to that side

15  so.

16             NORMA SHRIER:  Good afternoon.  Thank you

17  Speaker Johnson and Chair Cornegy for your continued

18  support for stronger rent laws and the opportunity

19             CHAIRPERSON CORNEGY:  I'm sorry, hold one

20  second please.  If you can, take the conversation

21  outside please.  We are still in session.  Thank you.

22             NORMA SHRIER:  And the opportunity to

23  speak to the Committee today.  My name is Norma

24  Shrier and I am a member of the Rent Controlled

25  Tenants Leadership Committee at Tenants and
```

```
1   COMMITTEE ON HOUSING AND BUILDINGS                80

2   Neighbors.  I am here to speak in support of

3   Resolution 188-A and Intro #600-A.  I am a rent

4   controlled tenant living on the Upper West side in

5   the same apartment I moved into with my now deceased

6   husband 50 years ago, now living with my disabled

7   daughter and I'm here today to testify on behalf of

8   the approximately 50,000 rent controlled tenants

9   remaining in 22,000 units in New York, down 4,000

10  since the previous HVS.  We call ourselves the

11  forgotten rent regulated tenants but perhaps now we

12  won't be forgotten because there are about one

13  million rent stabilized apartments left in New York

14  so we do not get much attention.  This year rent

15  controlled tenants lobbied Governor Cuomo for a rent

16  freeze, even stopped traffic in front of his office.

17  A bunch of septuagenarians and octogenarians and

18  spent the day in jail because we are so desperate to

19  bring attention to the rent control issue.  We

20  believe that the MBR system that controls rent

21  adjustments for rent controlled tenants is outdated,

22  unsustainable and inhumane.  Think about this, in the

23  eight years of Governor Cuomo's administration, my

24  rent has increased a whopping 44%, I repeat 44%.  In

25  the same time rent stabilized tenants rent has
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    81

2    increased only 12%.  The same economic conditions

3    that exist in the City for rent stabilized tenants

4    and their landlords exist also for rent controlled

5    tenants.  Why the discrepancy?  Here's another

6    thought.  In 1975 there were 642,000 rent controlled

7    apartments in the City compared to 22,000 currently.

8    Some are folded into rent stabilization but others

9    due to the MBR system that controls this form of rent

10   regulation and if the landlord is not too lazy to

11   file the papers each year, most of our rents are more

12   than that deregulation threshold for rent regulation

13   which is $2,700 per month.  The biennial MBR factor

14   at 7.4% for which we just received an announcement

15   from the DACR is much too high for rent controlled

16   tenants in my tenants and neighbors group and the

17   broader rent controlled community with this increase,

18   tenants will continue to pay annual rent increases

19   with no end in sight and the MBR which is a promise

20   of greater economic security will continue to remain

21   elusive.  I leave you with this, the majority of rent

22   controlled tenants are senior citizens living on a

23   fixed income and their median income is $28,000 per

24   year.  They have experienced the burden of up to 7.5%

25   rent increases each year along with fuel pass-alongs

1   COMMITTEE ON HOUSING AND BUILDINGS                    82

2   and the unjust burden of higher MCI percentages at

3   15% for major capital improving increases.  Though

4   the discrete threshold has been lifted which helped

5   some of us, unfortunately by the time that happened,

6   most of us had already lost our quality of life.

7   Thank you.

8              ABIGAIL MARTINEZ:  Buenas tardes,

9   [speaking in Spanish] Gracias.

10             TRANSLATOR:  I'm going to be translating

11  the testimonial.  My name is Abigail Martinez and I

12  am with Neighbors Helping Neighbors.  I moved into

13  680 53rd Street in Sunset Park in 2014 with my

14  husband and my four children between the ages of 2

15  and 11 years old.  My rent was $2,200 when I first

16  moved in.  I had help with a roommate who paid $1,100

17  toward rent.  When my roommate left, I lost my

18  supplemental rent and I looked for help.  With

19  Neighbors Helping Neighbors, I learned that my

20  apartment was rent stabilized and that I have rights.

21  When I reviewed my rent history, I discovered the

22  landlord was reporting my rent as $643.50 and the

23  prior tenant was only paying $588.89 for rent.  I

24  learned I could file a complaint with the State to

25  determine the legal rent amount and in October of

1    COMMITTEE ON HOUSING AND BUILDINGS                    83

2    2017, the State determined that the landlord had

3    overcharged me in the amount of $54,000 and ordered

4    my legal rent rolled back from $2,200 to $588.89.

5    Landlords are taking advantage of tenants who are

6    unaware of their rights.  If I were not in a rent

7    stabilized apartment, I would not have had the

8    opportunity to challenge the legal rent amount.  To

9    truly make a difference, we must repeal vacancy

10   destabilization which acts as an incentive to

11   landlords like mine to illegally raise rents past the

12   threshold to convert affordable units to market rate.

13   I support Resolution 188-A and Intro 600-A.  I want

14   to thank the Speaker Corey Johnson for helping the

15   tenant movement apply pressure to Albany to try and

16   close some of these loopholes in the State and City

17   laws and for understanding that merely renewing the

18   City rent laws in their weakened state is not an

19   adequate response to the affordability crisis we are

20   now experiencing throughout the five boroughs and I

21   want to thank my Councilman Carlos Menchaca for his

22   support of the tenants in Sunset Park.

23            CYNTHIA CHAFFEY:  Hello, okay, sorry

24   thank you.  My name is Cynthia Chaffey and I am the

25   co-foundress of the Stop Croman Coalition and also a

1    COMMITTEE ON HOUSING AND BUILDINGS                    84

2    member of GOALS[phonetic] and we fully support

3    Resolution 188-A and Intro 600-A.  On behalf of the

4    Stop Croman Coalition, I am happy to be able to

5    present testimony to the City Council and we are

6    especially thankful to Corey Johnson, the Speaker,

7    for his efforts in leadership to facilitate a

8    campaign to put pressure on Albany to close the

9    loopholes and weaknesses in the State and City rent

10   laws that allow landlords to remove apartments from

11   rent regulations and charge exorbitant rents that the

12   working people of New York City cannot afford to live

13   in.  I believe that Corey Johnson fully understands

14   that without the strengthening of the rent laws, we

15   will continue to lose rent stabilized units to the

16   point of extinction.  Our landlord, Steve Croman, is

17   a convicted felon and is currently serving one year

18   in jail due to mortgage fraud.  Also a civil suit

19   brought by the Attorney General's office on behalf of

20   tenants who suffered extreme harassment was brought

21   by the Attorney General's office and was recently

22   settled.  Under the terms of this settlement, he will

23   have to relinquish the management of 106 of his

24   properties to a new management company selected by

25   the Attorney General.  Steve Croman has an empire of

1   COMMITTEE ON HOUSING AND BUILDINGS                    85

2   close to 200 buildings in Manhattan.  His motive of

3   sopharenda [phonetic] has been to acquire buildings

4   and then begin to start the harassment of rent

5   stabilized tenants to get them out, raise rents and

6   deregulate apartments under the vacancy decontrol

7   laws.  He has been able to empty out most of the rent

8   regulated tenants out of all his buildings.  Vacancy

9   decontrol gives him an incentive to get tenants out

10  using harassment techniques, tactics excuse me,

11  which, I'm sorry, I have my asthma today, which

12  included frivolous litigation, depravation of

13  services, use of private agents known as tenant

14  relocation specialists to aggressively pursue buyout

15  offers even when the agents were told by the tenants

16  that they were not interested.  One example is

17  Raymond Miskell.  He's an 85 year old tenant and had

18  lived in his rent controlled apartment for 68 years.

19  Croman bought the building and defrauded him of his

20  succession rights and thus his apartment was stolen

21  from him.  He's now living out his remaining years in

22  a Salvation Army residence which is also closing and

23  he will be uprooted again.  Croman's victims are too

24  numerous to mention.  You may read more examples on

25  our website www.stopcromancoalition.org.  Go to the

1   COMMITTEE ON HOUSING AND BUILDINGS                    86

2   section called vulnerable.  Vacancy decontrol has

3   been the engine of displacement and gentrification in

4   our neighborhoods.  This incentive has to be

5   eliminated together with the preferential rent

6   loopholes and the statutory vacancy bonus which gives

7   the landlords 20% automatic rent increases upon a

8   vacancy.  The Stop Croman Coalition and I thank Corey

9   Johnson for his leadership and we call upon Mayor de

10  Blasio to help mobilize the City to put pressure on

11  Governor Cuomo to make this fight a priority.  Thank

12  you.

13          CHAIRPERSON CORNEGY:  Thank you so much

14  for your testimony.

15          CYNTHIA CHAFFEY:  Thank you.

16          CHAIRPERSON CORNEGY:  I'm gonna call the

17  next panel – Bareka [phonetic] Williams, Leno Diaz,

18  Ellen Davidson, Exona Miranova [phonetic].

19          [pause]

20          CHAIRPERSON CORNEGY:  Thank you all for

21  joining us today.  You can begin your testimonies

22  when, when you're ready.

23          Thank you for this opportunity to comment

24  on the vital importance of rent control and rent

25  stabilization laws for New York City's tenants.  My

1   COMMITTEE ON HOUSING AND BUILDINGS                    87

2   name is Exona Miranova and I'm a housing policy

3   analyst at the Community Service Society an

4   independent non-profit organization that addresses

5   some of the most urgent problems facing low income

6   New Yorkers in our communities including the effect

7   of the City's chronic housing shortage.  Rent control

8   and rent stabilization are fundamentally a response

9   to this chronic shortage which creates a severe power

10  and balance between tenants and landlords.  The

11  primary purpose of the law is to prevent landlords

12  from exploiting this imbalance to impose large rate

13  increases and arbitrary evictions.  This is a matter

14  of simple justice, even before we considered the

15  effects of rent regulation on affordability.  This

16  alone should be a sufficient reason for this

17  Committee, the City Council, and the Mayor to extend

18  the laws as they are authorized to do under State

19  law.  Unfortunately, the affordability the rent laws

20  provide falls short of what the City needs partially

21  as a result of specific loopholes within the law,

22  vacancy deregulation, the vacancy bonus and

23  preferential rents.  Beyond extending the laws, I

24  hope that you will join tenants and advocates who

25  will be speaking to strengthen the rent laws on the

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                88
 2   State level this year.  While the rent laws are not
 3   an affordable housing program per se, they do help
 4   stabilize rental costs which makes them more
 5   accessible to low income people.  The median
 6   household income in rent stabilized apartment was
 7   about $44,000 in 2016 as compared to $67,000 in
 8   unregulated units, a 40% difference.  Importantly the
 9   rent laws create a mechanism to mitigate the immense
10   pressure of the rental market on tenants.  They allow
11   the Rent Guidelines Board to take into account the
12   economic situation when they set rent adjustments.
13   The skyrocketing rental market in 2015 and 2016, the
14   RGB enacted two rent freezes.  This had an impact.
15   The median rent for rent stabilized apartments rose
16   from $1,237 in 2014 to $1,269 an increase of just
17   2.6% above inflation.  In comparison, median rents in
18   unregulated apartments rose from $1,546 to $1,700 or
19   10% above inflation.  The two rent freezes have had
20   immeasurable impact on low income New Yorkers.  In
21   2017, as part of CSS's annual unheard third survey,
22   we asked low income renters to rank how much of a
23   problem affordable rent was to them.  This year of
24   the rent regulated renters reporting a very serious
25   or somewhat serious problem with affordability
```

1   COMMITTEE ON HOUSING AND BUILDINGS                    89

2   decreased by 13% from 2015 to 2017.  In comparison,

3   the share of unregulated renters reporting a very to

4   somewhat serious problem declined by only 2%.  As a

5   broad based program focusing on fairness rather than

6   subsidy, rent regulation has an important place in

7   our City's housing policy system.  I urge you to pass

8   the Introduction and Resolution in front of you

9   today.

10              Good afternoon, my name is Ellen

11  Davidson.  I'm a staff attorney at the Legal Aid

12  Society and I want to thank the Housing and Buildings

13  Committee, the Speaker Johnson, and particularly

14  Chair Cornegy who has lead this Committee and remains

15  here today with us.  Look, I mean the real question

16  for this Committee is, is the vacancy rate under 5%.

17  If so, as the law requires, you must declare a

18  housing emergency.  I think the HVS has answered that

19  question.  It's 3.63% and so I have written testimony

20  which goes on for ten pages which I'm not going to go

21  through.  There are a couple of things I want to put

22  on the record.  Last week the Coalition for the

23  Homeless put out a report on the state of

24  homelessness and one of the things they looked at was

25  the most recent HVS and they had this statistic which

1    COMMITTEE ON HOUSING AND BUILDINGS                    90

2    I found unbearable sad.  In 1999, there were 1.1 low

3    income households that needed affordable apartments

4    renting for under $800.  At the time, there were 1.35

5    million apartments which rented for under $800 a

6    month.  Today, there are 867,000 households who need

7    apartments that are renting for under $800 a month

8    and according to the recently released HVS, there are

9    now 350,000 apartments renting for under $800.  That

10   is in less than 20 years, we have lost a million

11   apartments affordable to low income New Yorkers.  You

12   know, the law says that we need to have the rent laws

13   to prevent exactions of unjust, unreasonable and

14   oppressive rents in rental agreements and to force

15   stall profiteering speculation and other disruptive

16   practices tending to produce threats to public health

17   safety, general welfare, and that in order to prevent

18   uncertainty, hardship and dislocation, the provisions

19   of this act are necessary.  Those words are as true

20   today as they were in 1974 and we ask this Council,

21   this Committee and this Council to enact and extend

22   the rent laws.  Thank you.

23             Good afternoon.  My name is Bareka

24   Williams.  I'm the Deputy Director at the Association

25   for Neighborhood and Housing Development and ANHD's

1    COMMITTEE ON HOUSING AND BUILDINGS                91

2    mission is to advance equitable flourishing

3    neighborhoods for all New Yorkers.  I want to say

4    thank you first to you Chair Corney, to the Speaker

5    and to the Committee for having us here to testify on

6    this issue.  ANHD as has been said by so many others

7    supports the Resolution and the law before you and

8    urges the Council to pass the local law and the

9    Resolution.  I don't want to repeat what other folks

10   have said so I just want to hone in on a couple of

11   things.  It has been suggested by some in the press

12   that the dire affordability crisis in New York City

13   is in some way lessening and while the housing

14   vacancy rate has slightly increased, interpreting

15   that as affordability increasing across New York City

16   would be a misreading of what the Housing Vacancy

17   Survey shows.  What we see is a continued tale of two

18   cities.  There's a surplus of luxury high cost

19   housing that is largely unregulated and where rent

20   burden is declining but for the average New York City

21   resident, the vast majority of our households in the

22   City, there's a shrinking number of low cost units,

23   new market rate construction is out of reach and the

24   rent burden is worsening.  Specifically, the vacancy

25   rate in every single housing category except for

1   COMMITTEE ON HOUSING AND BUILDINGS                    92

2   private unregulated stock has been worsening so all

3   of the change that we see in the vacancy rate is

4   attributed to the increase of private unregulated

5   stock.  In addition, what we do see also is that the

6   average New York City renter can only afford the

7   averaged stabilized rent.  They cannot afford the

8   average private unregulated units rent so the median

9   income of a New York City resident is about $1,269,

10  $1,300 that translates into, sorry, is $47,000 in

11  income that translates into $1,200 in rent and there

12  is a big gap between that and about the $1,700 that

13  we see in the private market so again, I'd like to

14  just say ANHD urges the Council to pass the two bills

15  before you and thank you for the opportunity to

16  speak.

17              LEON DIAZ:  Good afternoon.  My name is

18  Leno Diaz.  I'm a housing attorney at Legal Services

19  New York City in the Queens Borough Office.  Thank

20  you very much for the opportunity to speak today.

21  Rent regulation provides one of the few protections

22  for New Yorkers in retaining and maintaining

23  affordable housing.  While the median asking rent for

24  an apartment jumped 33.9% between 2014 and 2017, the

25  only jumped by 2.6% in rent regulated units.  For

1    COMMITTEE ON HOUSING AND BUILDINGS                    93

2    families with fixed incomes or dollars that fluctuate

3    seasonally, the security is a key component to having

4    a stable home and a stable home provides everyone in

5    the household with a number of intangible benefits.

6    The ability for children to remain in their current

7    school district without having to uproot, the ability

8    for people of all ages to form community ties and

9    take part in their neighborhoods and most

10   importantly, the ability to feel safe and secure

11   without market forces leaving people uncertain about

12   where they'll lay their heads at night.  Without an

13   extension of rent stabilization protections,

14   thousands of low income and working families would

15   almost immediately be forced into the City shelter

16   system.  I work in Queens, a borough where there is a

17   large percentage of unregulated housing and as a

18   results, a large number of evictions based solely on

19   the whims of the landlords.  Rent regulation ensures

20   that tenants are able to remain in their homes as

21   evictions are restricted to causes specified by law.

22   Rent stabilized tenants also have the right to lease

23   renews and succession rights for remaining family

24   members, rights that ensure that affordable housing

25   doesn't simply disappear as a result of market

```
 1    COMMITTEE ON HOUSING AND BUILDINGS                    94

 2    forces.  These protections aren't hypothetical.  I

 3    fought those battles and ensured that children retain

 4    the home that they've lived in all their lives and

 5    succeed in tenancies where their families have

 6    resided for multiple generations, have argued against

 7    frivolous proceedings and ensured that people aren't

 8    evicted simply because the landlord is litigious.

 9    These protections are real, important and necessary.

10    I personally ensured that a senior citizen remained

11    in her home where a landlord tried to evict her for

12    allegedly always paying her rent late, retaining her

13    housing and fighting off the unfair proceeding

14    brought against her.  By the same token, I've seen

15    families enter the shelter system when evicted

16    without cause from the unregulated housing because

17    they've had no rent regulation protections.  I've had

18    to represent people with newborns as well as parents

19    of children with severe mental disabilities who were

20    all evicted.  I had the unfortunate luck of just

21    litigating a case where a woman who has limited

22    functionality of her hands and her severely mentally

23    incapacitated son was evicted by her landlord for no

24    reason.  The premises were not rent stabilized and

25    her protections were non-existent.  Now I have a bit
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    95

2    more but it's in the written statement and for the

3    time being I'd just like to say that without the

4    continued protection of rent stabilization, the

5    situation would be far, far worse.  We therefore

6    thank the City Council for addressing this important

7    issue and look forward to continuing our work helping

8    the residents of New York City.

9              CHAIRPERSON CORNEGY:  Thank you for your

10   testimony and more importantly thank you for the hard

11   work that you do on behalf of all of the tenants who

12   need advocacy and the hard work that you put in.

13   Want to call the next panel, Delcinia [phonetic]

14   Glover, Hosea Ruiz Rodriguez, Scott Hutchens, Ed

15   Viera, [phonetic] Jr. and Susan Steinburg.

16             DELCINIA GLOVER:  Excuse me?

17             CHAIRPERSON CORNEGY:  Thank you to those

18   who stayed to testify.  I know it's been a long day

19   but it's important to have your testimony.  Although

20   other members have other hearings that they've had to

21   attend, you testimony will be registered on the

22   record in, you know, in perpetuity so thank you so

23   much for staying no matter what the volume of Council

24   Members is.

25

1    COMMITTEE ON HOUSING AND BUILDINGS                    96

2              DELCINIA GLOVER:  Okay, can I start,

3    should I start?

4              CHAIRPERSON CORNEGY:  Absolutely.

5              DELCINIA GLOVER:  Thank you.  Good

6    afternoon, thank you for the opportunity to submit

7    testimony today.  My name is Delcinia Glover and I am

8    the Director of Education and Organizing for New York

9    State Tenants and Neighbors Information Service and

10   New York State Tenants and Neighbors Coalition which

11   are two affiliate organizations that share a common

12   mission which is to build a powerful unified State

13   wide organization that empowers and educates tenants.

14   Tenants and Neighbors is testifying today in support

15   of Resolution #188-A and Intro #600-A for the renewal

16   of the rent stabilization rent control laws and I am

17   here also to advocate along with the Broad Tenant and

18   Affordable Housing Movement for the strengthening of

19   the rent laws.  I would like to thank Speaker Corey

20   Johnson for advocating for the strengthening of the

21   rent laws and the Chair of the Housing and Buildings

22   Committee, Robert Cornegy and all of the members of

23   the Housing and Buildings Committee for agreeing to

24   be allied in this essential fight for the soul and

25   future of New York.  The data that has been released

1   COMMITTEE ON HOUSING AND BUILDINGS                97

2   in the Housing and Vacancy Survey outlines the severe

3   housing crisis that low and moderate income tenants

4   are facing in New York.  In the past three years, the

5   asking rent has risen by 30%.  Rent burdens have

6   grown and the number of apartments renting for below

7   $1,000 decreased by 87,720 units.  This is the

8   experience of our members and tenants across the City

9   suffering because of a crisis of loss of

10  affordability and weak rent laws.  We are here today

11  to also call on Albany to not just renew the rent

12  laws but strengthen them as well as fix a broken

13  system.  We are calling for the elimination of the

14  vacancy bonus.  We called it the eviction bonus,

15  reform preferential rents and major capital

16  improvements and ensure that the rent laws serve the

17  protection and stability of neighborhoods rather than

18  promoting a fertile ground for speculative investment

19  and tenant displacement and in support of Norma

20  Shrier, one of our tenant members who spoke earlier,

21  the rent control tenants residing in the remaining

22  22,000 should be given at least a two year rent

23  freeze and get rid of the horrendous MBR system and

24  that is a message for Governor Cuomo.  Thank you very

25  much for the opportunity to testify today.

1    COMMITTEE ON HOUSING AND BUILDINGS                98

2              HOSEA RODRIGUEZ:  Good afternoon, my name

3    is Hosea Rodriguez, a member of Picture the Homeless.

4    I would like to thank the Speaker Corey Johnson and

5    the City Council for strengthening the rent laws.

6    The Housing and Vacancy Survey has many New Yorkers

7    concerned by the findings.  Sixty-five additional

8    units are not available to rent.  Medium axiom rents

9    increased 30% since 2014.  Picture the Homeless is

10   asking the City Council to pass Intro 226 which

11   requires landlords to register their properties with

12   the City.  How can we address this homeless crisis

13   without knowing available stock, empty buildings and

14   lots.  This bill will assist in housing many New

15   Yorkers.  Picture the Homeless is asking the City

16   Council to support repealing the vacancy bonus and

17   stop landlords from charging preferential rents.

18   Since 1994 over 250,000 rent stabilized units have

19   been lost through these practices.  Repealing the

20   bonus will help many New Yorkers stay out of

21   shelters.  Thank you.

22             SCOTT HUTCHENS:  I would like to thank

23   the Speaker for inviting us to testify at this

24   hearing and for the Speaker's and Councils' support

25   for renewing and strengthening the rent laws

```
1    COMMITTEE ON HOUSING AND BUILDINGS                99

2    protecting New York City tenants.  My name is Scott

3    Andrew Hutchens and I'm here to represent Picture the

4    Homeless.  In two months I will be a six year

5    resident of the New York City shelter system which

6    pays $1,306.91 more to shelters than the rent of my

7    previous apartment to house me alone.  At Picture the

8    Homeless, we find the results of the survey appalling

9    but not surprising.  It reiterates our demand for a

10   registry of all vacant property in the City as called

11   for by Intro 226.  The crux of our argument for this

12   necessity is found in the following statistic from

13   the reports.  Although the City increased its overall

14   housing stock by 69,000 units this year,

15   approximately 65,400 additional units are considered

16   vacant but unavailable for sale or rent than in 2014.

17   This means that net available housing stock for all

18   practical purposes went up by only 3,600 units, far

19   lower than the number of people who enter the shelter

20   each year.  While developers get tax breaks for

21   creating new "scare"[?] affordable housing stock, the

22   vast majority is well beyond the means of low and

23   extremely low income people.  The net vacancy rate

24   for extremely low income housing is 1.15% while the

25   net vacancy rate for extremely high income units is
```

```
1    COMMITTEE ON HOUSING AND BUILDINGS                100

2    8.74% and this is an upward trend.  Whereas extremely

3    low housing is on the decline and extremely low

4    income housing is on the decline from the 2014

5    survey, with the median household income at $57,500,

6    why are we giving tax breaks for housing for people

7    who make over $100,000 per year when so many of these

8    units are vacant.  Instead, we should be doing the

9    reverse.  In addition to the fees and fines imposed

10   by a vacant property registry, we support the

11   introduction of a peata [phonetic] tare tax for units

12   that remain vacant for too much of the year.  If the

13   City is really committed to ending homelessness, it

14   cannot be rewarding developers who add to the

15   problem.

16             SUSAN STEINBURG:  Housing Committee Chair

17   Cornegy, I want to thank you and the members of the

18   Housing Committee for supporting the renewal of City

19   rent laws and the strengthening of State and City

20   laws by closing loopholes.  I'm Susan Steinburg.  I'm

21   president of the Stuyvesant Town, Peter Cooper

22   Village Tenant's Association and we support

23   Resolution 188-A and Intro 600-A.  My community

24   contains approximately 11,230 units and 28,000

25   residents.  In 1947 it was built as a community for
```

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                101

 2   people of moderate means.  In 1980, my one bedroom

 3   apartment cost $250 a month.  In 2018, that same one

 4   bedroom apartment starts at $3,156.  Figuring 30% of

 5   one's income for rent, one must earn $126,240 to

 6   afford that one bedroom.  That's not moderate.  New

 7   York City's average annual salary is $68,883 and our

 8   cost of living is 129% higher than the national

 9   average so how did a rent regulated community get

10   from moderate to market?  Through vacancy

11   deregulation, the weakening of rent laws every time

12   they come up for renewal in Albany, for vacancy

13   bonuses, preferential rents and lots of major capital

14   improvements that we pay for in perpetuity, loopholes

15   that are bleeding our community, the City and the

16   State of regulated renters.  To afford the rent in

17   Stuyvesant Town today, tenants double or triple up

18   and then they leave at renewal as rents rise.  Two

19   thousand units turn over every year providing a

20   really big opportunity for a 20% vacancy bonus.  That

21   plus multiple MCI's that we pay until death push

22   rents to exceed the $2,700 per month deregulation

23   benchmark.  To ease the turnover burden and sting of

24   market rates, management offer preferential rents.

25   Forty percent of our renters are preferential and the
```

1  COMMITTEE ON HOUSING AND BUILDINGS                    102

2  difference between preferential and legal rents can

3  be hundreds or thousands of dollars.  Most renters

4  don't understand that the landlord is allowed to

5  raise the rent all the way up to the legal rent on

6  renewal and the tenant's association gets the calls

7  from tenants suffering from sticker shock when their

8  monthly rent increases by say $500.  Renters are at a

9  disadvantage.  Owners don't worry every three years

10 about whether they'll have a roof over their heads.

11 Resolution 188-A and Intro 600-A must be passed and

12 rent law strengthened to ensure that housing for

13 hundreds of thousands of tenants is a right, not a

14 luxury.  Thank you.

15         Good afternoon, I don't want to beat a

16 dead horse but I will.  My name is Ed Viera.  I'm a

17 disabled special ed teacher and a person living with

18 AIDS for the past 30 years.  I also support

19 Resolution 188-A as well as Introduction 600-A.  I

20 like everyone else I want to thank Speaker Corey

21 Johnson and all the Council Members present.  The

22 fact is that the current City and State rent laws are

23 weak.  Embedded within are loopholes that promote

24 homelessness and can make misery among the disabled,

25 the elderly, fixed and low income people.  Merely

1   COMMITTEE ON HOUSING AND BUILDINGS                    103

2   renewing these laws every few years perpetuates this

3   crisis because the landlords are the ones who benefit

4   the most from them so we should 1) repeal the vacancy

5   deregulation and reregulate units lost to the control

6   example.  One of the tenants in my building passed

7   away two years ago.  The landlords quickly moved to

8   deregulate the apartment.  The new tenant is now

9   having to find somewhere else to live because she

10  cannot afford the market rate.  2) Repeal the

11  preferential rent loophole that allows landlords to

12  slam the rent stabilized tenants with huge rent

13  increases when leases are renewed.  This is where I

14  come in.  When my lease was renewed in 2016, my rent

15  was increased from $1,100 to $1,250.  When the

16  landlord, when I challenged the landlord he told me

17  that's what HASA agreed to pay.  That was a lie.

18  That was a flat out lie so last year I went to

19  housing court to fight the rent overcharge.  It turns

20  out that housing court doesn't really handle that.

21  They refer you to VACR so I filed with them last

22  year.  Haven't heard anything from them.  To speed up

23  the process I began withholding my 30% share of the

24  rent in the hopes that landlord files in housing

25  court and then I can counter sue for the rent

```
1   COMMITTEE ON HOUSING AND BUILDINGS                104

2   overcharge, a fraudulent department registration

3   designed to increase the market value and harassment.

4   As soon as the landlord continues to hide behind the

5   preferential rent loophole, my chances are dim but

6   I'm looking forward to the fight.  Last thing, repeal

7   the statutory vacancy bonus.  This means less housing

8   for all of us and faster gentrification so this is

9   not just about me.  This is about all of you because

10  I assume all of you are renting too so it affects us

11  all.  Thanks.

12          CHAIRPERSON CORNEGY:  Thank you.  Just

13  for the record, we don't advocate the beating or

14  harming of any horses or any other animals.

15          [Laughter]

16          CHAIRPERSON CORNEGY:  I want to call the

17  last panel.  Mr. Earl Carter, Ava Farkas, Hosea

18  Rodriguez, Jessica Burk, Julie Hamlin.

19          JESSICA BURK:  Which side starts first?

20          SPEAKER JOHNSON:  You may begin.  Thank

21  you.  If you could turn your microphone on and

22  identify yourselves.  Thank you so much.

23          JESSICA BURK:  Thank you.  Certainly last

24  but not least we hope.  I appreciate the chance to be

25  here.  I'm Jessica Burk from Red Residents in
```

1   COMMITTEE ON HOUSING AND BUILDINGS                    105

2   Distress, the Christopher Street Partnership and the

3   95 Christopher Street Tenants' Committee.  That being

4   said, I support these two bills and resolutions.  I

5   was asked to come here and I wanted to state on the

6   record as soon as I'm done here, I'm going across the

7   street and I'm gonna file a federal lawsuit against

8   my landlord, BLDG Management, that would be Lloyd

9   Goldman from Goldman, Goldman, DeLorenzo.  DeLorenzo

10  was involved in racketeering and nothing much has

11  changed in a number of years.  Some of you might have

12  read about my mom who at nearly 90 was dragged out of

13  my apartment, my two bedroom rent controller

14  penthouse apartment at gun point, placed in a nursing

15  home under a whole variety of lies and they had

16  thought they had taken the apartment away from us.

17  I, of course, maintained the apartment and I'd like

18  to thank Arthur Schwartz, our district leader, who

19  some of you may have read went to jail for removing

20  illegal surveillance cameras and we've been in the

21  news quite a lot lately.  The landlord was forced by

22  the Judge to give us half a million dollars to vacate

23  the apartment which I had a great deal of trouble

24  accepting, accepting money from a crook but I felt

25  that the time to maintain residency in this rent

1    COMMITTEE ON HOUSING AND BUILDINGS                    106

2    controlled apartment was over because every day was a

3    nightmare.  I was constantly taken to the police

4    precinct, falsely arrested and the criminal acts

5    perpetrated on myself and my mother for the last 40

6    years, I'm amazed I'm still alive.  Mom is in a rehab

7    center.  She's 94, Ruth Burk.  She's doing very well

8    but for the record I'd like to know why my landlord

9    is not in jail.  Steve Croman is not the only dirty

10   landlord in this City.  My landlord needs to go to

11   jail.  There's no accountability.  Adult Protective

12   Services, HPD, the Sixth Precinct, everybody accepts

13   bribes and money from my landlord BLDG Management and

14   they drag out rent controlled tenants, rent

15   stabilized tenants, numerous elderly tenants who

16   don't have any family or friends have been removed

17   from my apartment.  Some are homeless, they've been

18   placed in shelters and nothing's being done.  There's

19   no accountability and for the record, anybody

20   interested in started a class action suit, well you

21   can read about it in the paper.  As I said, I'm going

22   to pursue litigation but I want to thank Speaker

23   Johnson for always being helpful as an advocate.  My

24   advocacy began with Tom Dwayne on the day he got

25   elected so I'm very happy that you're all still

```
1   COMMITTEE ON HOUSING AND BUILDINGS              107

2   continuing the good work.  Thank you for allowing me

3   to testify.

4              SPEAKER JOHNSON:  Go ahead, yes.

5              JULIE HAMLIN:  Thank you.  My name is

6   Julie Hamlin of the Dexter House 345 W. 86ᵗʰ Street.

7   I'm a member of the Tenants' Association.  I'm also a

8   member of an NGO representing in the United Nations

9   that work towards sustainable development goals for a

10  law that was ratified recently in 2015 for 2030 part

11  of which includes ending conditions of chronic

12  poverty so one thing I want to start saying is that

13  landlord bank on our ignorance, our poverty or worse,

14  our vulnerabilities in how they abuse these

15  regulatory laws.  That is why I support the

16  Resolution 188-A and Intro 600-A so I want to thank

17  Speaker Corey Johnson and Honorable Chairman of this

18  Council and the members of this Council for this

19  privilege to speak to you about really something

20  going on that is criminal through misuse of these

21  loopholes in law.  I also want to thank Honorable

22  Council Member Helen Rosenthal who I guess she had to

23  leave but her advocacy in restoring affordable

24  housing is tireless and the people in her office, her

25  staff are impeccable in guiding tenants like me to
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    108

2    resolution and to keep the fight alive.  I'm only

3    four years into a battle so the loopholes in

4    regulation for what I live in, I live in an SRO

5    landmark building, built in 1924, so here are tenants

6    that have very limited privileges.  Federal laws

7    prevent even private mail that lead to all kinds of

8    problems but let me focus on how the criminal

9    harassment employed to force these people out of

10   these meager little impoverished single rooms take

11   place.  So for four years they've been being poisoned

12   slowly through chemical dispersions in the air, not

13   limited to pesticide poisons mixed through somebody

14   brought up earlier, relocator, aggressor, people that

15   managers hire.  Our manager, Roberto Gogichio

16   [phonetic] we suspect is one of these people hiring

17   people like that.  He was found guilty by New York

18   State DEC and Department of Environmental Protection

19   and Department of Health for massive amounts of

20   illegal ban pesticide poisons, illegal dispersions

21   with illegally unlicensed people.  I can't even get

22   into the depth of fire potential risk.  The heinous

23   abuse it is to breathe air that you can't escape

24   because it's there 24 hours a day in your home so

25   what I've done is I've put together the article that

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                    109

 2   the New York Post their investigative article, I

 3   stapled it with my letter to this Council so the

 4   history of using these laws to deregulate rooms like

 5   ours that is led by greed and cruelty is actually

 6   targeting the aging demographic of senior, disabled,

 7   elderly mostly women and that really disturbs me that

 8   it's mostly women because they are too weak to fight.

 9   I know five tenants that were females that died of

10   cancer who all complained our fumes so strong that

11   they feared for their life.  Try proving a fume in

12   housing court.  It took me four years but I did.

13   Thank God for the HPD lawyers that stood up for me

14   and the lawyers, the inspector involved.  You know,

15   we're limited by agency hours 9 to 5.  We can't

16   really get people in at night so what we're left with

17   as impoverished tenants in this demographic is, you

18   know, these kinds of loopholes being prevented and

19   laws should reflect penalties for landlords abusing

20   tenants like this and they should be forbidden to

21   deregulate rooms.  Whoever can write that law, please

22   do.  When they are found guilty of harassment, my

23   landlord's been proven and admitted their guilt in

24   dispersing these chemicals and you think it would

25   stop there but it hasn't.  We're still breathing
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    110

2    poisonous fumes, up to 24 hours a day in our rooms

3    and what it looks like for the SOO tenants on the

4    ground is that we live in fear of speaking out,

5    serving our rights.  I've got a death threat.  I know

6    three other women that have a death threat.  No

7    protection because law enforcement can't get involved

8    regulating this to a housing issue.  This is reduced

9    to a housing issue, criminal harassment so there's

10   predatory landlords like ours who use criminal

11   harassment in these loopholes that have 0 regard for

12   the rent stabilized tenants and they use every means

13   to extract us out of our right to leave peacefully

14   and with security so without these laws appealed we

15   are at war just to keep in our home so, you know, I'm

16   a witness to tenants that they let rent for 29 days.

17   On the 30th day as an example of a loophole abuse by

18   our building, they come for 29 days and then boom.

19   They made an agreement to leave by the 30th day.  The

20   rent goes up again.

21            [crosstalk]

22            CHAIRPERSON CORNEGY:  Can you please

23   bring your testimony to a close for us?

24            JULIE HAMLIN:  Pardon?

25

1    COMMITTEE ON HOUSING AND BUILDINGS                    111

2              CHAIRPERSON CORNEGY:  Can you just bring

3    your testimony to a close please.

4              JULIE HAMLIN:  Yes, Chairman.  Thank you,

5    sorry.  It's a complicated issue that these loopholes

6    enable, predatory landlords using criminal harassment

7    against elderly, aging people and I believe that

8    repealing these laws and the vacancy loophole will

9    protect further our right to prosecute because I have

10   to prosecute now.  I mean, it's become very serious.

11   We're gonna die if we don't stop the fumes and his

12   Honor Judge Went [phonetic] just restored my case for

13   chemical abuse so.  Thank you.

14             CHAIRPERSON CORNEGY:  Thank you for your

15   testimony.

16             Hi, good afternoon.  Thank you Chair

17   Cornegy, thank you to all the Council Members who are

18   still in the room.  We really appreciate having this

19   issue be paid close attention to and given

20   importance.  My name is Ava Farkas.  I'm the

21   executive director of the Met Council on Housing.

22   We're the City's oldest tenant union.  We represent

23   rent stabilized and rent controlled tenants across

24   the City and we offer anti-eviction services through

25   our hotline and our clinics and I worked briefly in

1   COMMITTEE ON HOUSING AND BUILDINGS                    112

2   the City Council before my current position so I

3   understand and know how much you hear about housing

4   from your constituents and what a daily issue and a

5   urgent issue it is and I just want to emphasize the

6   importance of the bully pulpit you all have to help

7   push the issues of closing the loopholes,

8   strengthening the rent laws in Albany.  We've worked

9   together in the past in 2015 during the rent law

10  expiration.  Many Council Members went up to Albany

11  and got arrested and did direct action with us with

12  the tenant movement and we really appreciate that and

13  we look forward to being in the struggle together.  I

14  wanted to just use the opportunity today to just talk

15  not just about passing the resolutions but to also

16  talk about taking action on a housing that you have

17  direct control over which is the City's rezonings.

18  Today on the cover of *AM New York* is an article about

19  the Inwood rezoning.  It's something that Met Council

20  and Housing has been working on very closely and as

21  we heard here today and we heard from many of the

22  testimonies, the greatest need is in the lowest

23  income bans.  That's where there's the lowest vacancy

24  whereas higher rent apartments have a higher vacancy

25  rate and yet the City's solution to the affordability

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                113

 2   crisis is the mandatory inclusionary housing program

 3   and the rezonings which are going to create buildings

 4   that are majority market rate and are not meeting the

 5   need that we just heard expressed over and over in

 6   this hearing today and what's more, there's really no

 7   analysis of the impact on rent regulated units in the

 8   surrounding area and it's really dangerous I think

 9   for the City to pursue housing development without

10   taking into account the impact it will have on our

11   current stock of affordable housing and rent

12   regulation so they only study in the environmental

13   review non-regulated units as being potentially

14   housing that could be displaced but there's no study

15   in the environmental reviews for rent regulated

16   housing and in Inwood there are over 6,000 households

17   with preferential rent and that means that those

18   rents could skyrocket as soon as the rezoning goes

19   through and as soon as speculation heats up in the

20   neighborhood and that jump can be hundreds of dollars

21   so we are really sitting like on a potential crisis

22   and the fact that there's no information, the City

23   doesn't have to study this or look into displacement

24   is really troubling and so I really urge you not just

25   to pass the bills today but to also hold the City to
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    114

2    a higher standard when it comes to the creation of

3    new housing and really, really fight for that new

4    housing to be deeply, deeply affordable.  Thank you.

5              HOREA RODRIGUEZ:  Good afternoon.  My

6    name is Horea Rodriguez.  I live in Korona, Queens,

7    New York in City Council district 21 in New York

8    State senate district 13.  Right now I'm in

9    discussion with a neighbor who is presently thinking

10   of moving due to preferential rent.  He is

11   considering moving to another state.  This tenant

12   rented an apartment in 2015.  After his first two

13   year lease, his rent increased by $129.  After a

14   year, his second lease had been increased by $109.

15   His monthly rent is continued to be increased due to

16   the many MCI's.  His initial rent of $1,250 is now

17   over $1,500.  He cannot afford another increase.  He

18   applied for disability rent increase exemption known

19   as DRIE and was denied because his permanent legal

20   regulated rent is $2,337 so he can't get it.  If this

21   tenant moves out, the landlord can then apply the

22   vacancy bonus of 20% and the next tenant will be

23   paying more.  Once the rent reaches $2,700 as you all

24   know, it will no longer be protected by the rent

25   stabilized and Rent Guidelines Board rules.

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                115
 2   Eventually, these apartments will no longer be
 3   affordable to many New Yorkers.  Other tenants I have
 4   seen moving out from the complex have complained
 5   about preferential rent.  It appears it is not
 6   explained when a lease is initially signed.  Most did
 7   not know that their rent would increase drastically
 8   year to year.  They only get one year lease.  They
 9   were under the impression that the increase would be
10   those determined by the RGB.  They also had no idea
11   that they would be responsible for MCI's.  As an
12   example in the past year my rent has increased by
13   $99.83 due to MCI's.  Luckily I have SCRIE.  The
14   amount would be higher had I not convinced the
15   Division of Housing and Community Renewal, the HCR
16   that my apartment is really three rooms, not four.
17   For all these years in my apartment, I've been paying
18   MCI's based on four rooms, not three and I won't get
19   that money back by the way.  Okay, the income
20   increase allowed by SCRIE and DRIE, great programs.
21   Legal representation in housing for individuals being
22   evicted is welcome but the only way we can keep rent
23   affordable is we have to change the MCI, the
24   preferential rent, the vacancy bonus and the vacancy
25   decontrol laws.  I am hoping you all can help us.
```

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                116

 2   While MCI's are added to our rent, tenants continue

 3   to complain in the complex where I live, by the way,

 4   it's Leprox [phonetic] City, a lack of heat,

 5   services, etc.  In a recent canvassing I did in a

 6   building to get people more involved with all these

 7   changes in the laws, most of them said they could not

 8   get involved.  When I asked them why is they felt

 9   that the information I was compiling would then be

10   turned over to the landlord and be used again them so

11   though they spoke to me and they complained about

12   everything going on in the complex, they did not want

13   to get involved.  Okay, so again, we need to do

14   something about these laws and I'm hoping that City

15   Council can help us so thanks for letting me speak.

16                CHAIRPERSON CORNEGY:  Thank you so much

17   for your testimonies, all of you.  Thank you.  For

18   the record, we have testimonies submitted by RSA, by

19   Chip and by the Public Advocates office.  Now we'll

20   proceed to a vote.  We ask Billy Martin to call the

21   roll.

22                BILLY MARTIN:  William Martin, committee

23   clerk, roll call vote, Committee on Housing and

24   Buildings, Introduction 600-A and Resolution 188-A.

25   Chair Cornegy.
```

```
 1   COMMITTEE ON HOUSING AND BUILDINGS                 117

 2             CHAIRPERSON CORNEGY:  I vote aye.

 3             COUNCIL MEMBER CABRERA:  Aye.

 4             BILLY MARTIN:  Chin.

 5             COUNCIL MEMBER CHIN:  Aye.

 6             BILLY MARTIN:  Grodenchik.

 7             COUNCIL MEMBER GRODENCHIK:  Aye.

 8             BILLY MARTIN:  Gjonai.

 9             COUNCIL MEMBER GJONAI:  Aye.

10             BILLY MARTIN:  Rivera.

11             COUNCIL MEMBER RIVERA:  Aye.

12             BILLY MARTIN:  By a vote of 6 in the

13   affirmative, 0 in the negative, and no abstentions,

14   both items have been adopted by the Committee.

15             CHAIRPERSON CORNEGY:  We'll keep the roll

16   open for 15 minutes.

17             BILLY MARTIN:  Continuation rollcall

18   Committee on Housing and Buildings, Council Member

19   Rosenthal.

20             COUNCIL MEMBER ROSENTHAL:  I vote aye.

21   Thank you.

22             BILLY MARTIN:  Continuation roll call

23   Committee on Housing and Buildings, Council Member

24   Williams.

25             COUNCIL MEMBER WILLIAMS:  I vote aye.
```

1    COMMITTEE ON HOUSING AND BUILDINGS                    118

2              BILLY MARTIN:  Council Member Williams.

3              COUNCIL MEMBER WILLIAMS:  I vote aye and

4    again this gavel feels familiar.

5              BILLY MARTIN:  Final vote Committee on

6    Housing and Buildings, Introduction 600-A and

7    Resolution 188-A have been adopted by a vote of 8 in

8    the affirmative, 0 in the negative, and no

9    abstentions.

10             COUNCIL MEMBER WILLIAMS:  Like old time

11   sake, this hearing is now closed [gavel].

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

World Wide Dictation certifies that the

foregoing transcript is a true and accurate

record of the proceedings. We further certify that

there is no relation to any of the parties to

this action by blood or marriage, and that there

is interest in the outcome of this matter.



Date     April 19, 2018



RENT STABILIZATION ASSOCIATION • 123 William Street • New York, NY 10038

## City Council Hearing on the Extension of Rent Regulations – Intro. 600 – Res. 188

The 2017 triennial Housing and Vacancy Survey (HVS), intended to establish a housing emergency in order to continue rent regulations, instead demonstrates that the New York City's rental market has evolved into an increasingly deregulated market and should continue to be steered in that direction.

The overall rental vacancy rate of 3.63 in 2017 has steadily been increasing since 2011. But even the increased vacancy rate is suspect. There was an enormous increase in the number of vacant apartments, unavailable for rent to 245,425 of which 78,630 were awaiting or undergoing renovation. If these apartments were added to the 79,190 vacant apartments available for rent, there would not be a technical housing emergency.

In addition, there are clear segments of the market, both geographic and in terms of rent level, where no housing emergency exists. In terms of rent level, the Initial Findings show that the vacancy rate for apartments renting for $2,000 or more per month is 7.42%. Once the granular HVS data has been released, it will be possible to determine that the 5% vacancy threshold is breached at rent level even lower than $2,000.

Geographically, the Initial Findings reveal that the borough of Manhattan has a vacancy rate of 4.73%. However, given the margin of error of this survey, the Manhattan vacancy could well be anywhere in the range of 4.3% to 5.16%. Again, when the actual HVS data are released, it is likely that the area of core Manhattan will have vacancy clearly in excess of 5%.

Since the City council has the authority to extend rent regulations for all housing or for certain classes of housing, based on these findings, there is ample justification to not extend rent regulations for the class of housing renting for $2,000 or more per month and for all rental housing located in the Manhattan core.

The non-vacancy findings of the 2017 HVS all paint a very rosy picture of housing conditions and the position of renters in today's rental market – a picture that is contrary to the image of a housing emergency:

- Incomes are finally rising faster than rents (10.9% versus 8.1% over the last 3-year period)
- Housing and neighborhood conditions are better than ever and even overcrowding has been reduced, an indicator that more households are able to achieve independent living.

- Housing affordability, as measured by the percentage of income spent on rent, has stayed static of the last 9 years leading to the prospect that continued income gains will actually increase affordability going forward.
- Finally, there was a gain of 69,000 housing units over the last three years, leading to largest housing stock on record.

In addition to these findings, it must be noted that rent levels as recorded by the HVS are not at all in line with typical media reports claiming that the average rents in NYC are above $3,000 per month. In fact, the median contract rent for all renters is only $1,337 while rent stabilized apartments are even cheaper at $1,269 per month. Even median asking rents for vacant apartments are only $1,875 per month, dispelling the notion that NYC is high-rent town.

Also notable is the fact that NYC now has almost as many non-regulated apartments as regulated apartments. The non-regulated universe has a vacancy rate of 6.07% while the median contract rent in that sector is only $1,700, indicating that non-regulated housing is doing a better job of meeting renters' needs than regulated tenants.

There is one sour note in the Initial Findings: the median contract rent for all rent stabilized apartments increased by only 2.6% from 2014 to 2016 coinciding with the zero increases imposed by the current Administration. This may be a further boon to tenants but is a growing disaster for the owners of stabilized properties who experienced an increase in operating cost over the same period of more than 5%.

In light of the preliminary findings of the 2017 HVS, the RSA urges the City Council not to extend rent regulations for apartment renting for more than $2,000 per month and not to extend rent regulations for apartments in the Manhattan core.

In addition, we remind the Council that Section 3 of the ETPA specifically allows for the termination of rent regulation when "the regulation of rents pursuant to this act does not serve to abate such emergency…". We submit that after, after 75 years of uninterrupted rent regulation, rent regulation has not served to abate the World War II emergency for which it was introduced as a "temporary" measure.

We submit to the City Council that it is high time to phase out rent regulations, which have failed miserably to abate the housing emergency, and to substitute a program of targeted financial assistance for income-eligible households which would, once and for all, provide benefits only to those truly in need.



**Association** for
**Neighborhood**
**& Housing**
**Development**

ANHD
50 Broad Street, Suite 1402
New York, NY 10004
Tel: (212) 747-1117

TESTIMONY OF BARIKA WILLIAMS BEFORE
THE NEW YORK CITY COUNCIL COMMITTEE ON HOUSING AND BUILDINGS CONCERNING
EXTENDING THE RENT STABILIZATION LAWS.

March 19, 2018

Good Afternoon. Thank you Speaker Johnson, Chair Cornegy and the members of the Committee on Housing and Buildings for the opportunity to testify on Extending the Rent Stabilization Laws.

My name is Barika Williams and I am the Deputy Director of the Association for Neighborhood and Housing Development (ANHD). ANHD's mission is to advance equitable, flourishing neighborhoods for all New Yorkers. A coalition of over 100 community-based affordable housing and equitable economic development organizations in all five boroughs of New York City, ANHD works at the intersection of community organizing, policy, advocacy, and capacity-building. Our members have developed over 100,000 units of affordable housing in the past 25 years alone and directly operate over 30,000 affordable units.

Earlier this month, the City released its initial summary findings of the 2017 Housing Vacancy Survey (HVS), which is conducted every three years to comply with rent regulation laws. ANHD supports the continued funding and employment of the HVS. It is a rich data and research resource that's gives us the only comprehensive look at New York City's housing market and building conditions. Furthermore, we encourage the NYC Council to explore expanding the HVS from its current 20,000 subject sampling size to a 40,000 subject sampling size, which would allow the housing community to further investigate affordability, market trends, and building conditions in more depth for example by geography, race, class, etc.

**The 2017 HVS findings clearly show that New York City is – without question – in the midst of a housing emergency. This is not up for debate.** At 3.63, New York City's housing vacancy rate clearly corroborates that New York City's Rent Laws are absolutely still required and that rent regulation must remain in place.

There have been some suggestions that New York City's dire affordability crisis is lessening. This however is a misrepresentation of the full findings of the 2017 HVS data. The overall vacancy rate in NYC has increased from 3.12% in 2011 to 3.63% in 2017. However this singular metric masks what a more thorough examination of what the 2017 HVS data shows: **a continued tale of two New York Cities. For the wealthy, there is a surplus of luxury high-cost housing units, and increasing number of new construction units, and the rent to income ratio (or rent burden) is declining. For the average NYC resident – the vast majority of our households - there are a shrinking number of low-cost units, new market-rate construction units are out of reach, and the rent burden is worsening.** When we examine the 2017 HVS more closely it raises serious new concerns about the direction and stability of our City's housing affordability and specifically our rent regulated housing stock.

The increase in the overall vacancy rate is driven by the unregulated, high-cost top of New York City's rental market. Manhattan's vacancy rate is the highest in the City by an entire point, 4.73%. Manhattan is also the city's highest cost market with a median rent of $2,000 a month, nearly $500 or 25% more than the rest of NYC's boroughs. In contrast, the Bronx's vacancy rate is just 2.71%, 2 points lower than Manhattan. And comparably, the Bronx's median rent is just $1228, nearly $800 lower than Manhattan's.

We see a similar trend when looking at regulated versus unregulated units. **The vacancy rate has declined in every housing category except private non-regulated units. The entire increase in the City's vacancy rate is accounted for within the private unregulated market,** which jumped from 4.61% in 2011 to 6.07% in 2017. There are more

1



**Association for Neighborhood & Housing Development**

ANHD
50 Broad Street, Suite 1402
New York, NY 10004
Tel: (212) 747-1117

than 56,000 private unregulated units that are vacant and available for rent. That's nearly enough units to house every homeless household in New York City.

Combined, these paint a clear picture – **the high-cost unregulated housing stock is driving up the City's overall vacancy rate while diminishing low-cost unregulated units have seen a decrease in the vacancy rate, as more and more New Yorkers compete for fewer and fewer of these units.**

Rent Stabilization has been and continues to be a necessity to maintain NYC housing affordability. The median monthly rent in rent stabilized units is $1,269. This very closely aligns with the median household income for New York City rental households, whose 2016 median income was $47,200 putting the affordability mark at approximately $1,200 a month rent. As the 2017 HVS makes clear, **the average New York City renter can afford average stabilized unit's rent; they cannot afford the average private unregulated unit's rent.**

Since 2011, the number of rent stabilized units has fallen from 1,020,700 down to just 966,400 by 2017. This is a 5% decline in our rent stabilized stock over six years, even accounting for new rent stabilized units from programs like 421a. Even more alarming is that **our pre-1947 stabilized housing stock has fallen by 10% over just six years, from 767,500 to just 692,700.** If we continue to allow the erosion of our rent-regulated units, we will be left with a private unregulated housing stock that does not serve and is not affordable to the average New Yorker. This illustrates how the continued loss of rent stabilized units due to loopholes in the rent laws is all the more problematic.

At present, landlords are free to raise rents during vacancy through the statutory vacancy bonus. This "vacancy" or "eviction" bonus allows huge 20 percent increases in the legal rent stabilized apartments' rent upon vacancy. The structure creates a clear incentive for landlords to harass tenants out in order to create vacancies, raise rents, and eventually deregulate apartments. **ANHD fully supports NY State Senate bill #S1593 (Serrano) and Assembly bill #A954 (Kavanagh) to close this destructive loophole.**

The preferential rent scheme has been a unique tool to allow landlords to raise rents by huge percentages during a tenancy – thus undermining the very stability rent regulation is intended to provide. While preferential rents seem like a good thing for tenants, they easily hide fraudulent legal rents and even when legitimate, weaken tenants' right to renewal leases at increases approved by the Rent Guidelines Board. **ANHD fully supports NY State Senate bill #S6527 (Krueger) and Assembly bill #A6285 (Cymbrowitz) to eliminate the preferential rent loophole.**

Unfortunately, as you the City Council, know, the current New York State Rent Regulation law precludes the City making the necessary changes to address these flaws that comprise the integrity of the law.

ANHD urges the New York City Council to pass the resolution on today's agenda and to pass the Local Law which reaffirms and re-promulgates the findings that a "serious public emergency continues to exist in the housing of a considerable number of persons within the City of New York." Rent Stabilization and rent control are more than a critical tool of the city's housing affordability infrastructure. **The Rent Laws address the fundamental severe power imbalance between tenants and landlords, which is further exacerbated by our City's chronic housing shortage. They are a matter of justice for New York City tenants exercising their right to housing.**

ANHD and our member groups I hope that all of you will join the tenants, neighborhood activists, community-based organizations, CDCs, advocates, and housing experts who will be working to address these problems at the state level. We look forward to working with members of the City Council over the next year to ensure that we protect and strengthen our rent regulation laws.

Thank you again for your time and the opportunity to testify.

2



**Testimony of the New York City Department of Housing Preservation and Development to the New York City Council Committee on Housing and Buildings**

**2017 Housing and Vacancy Survey (HVS) and the Continuation of Rent Control and Rent Stabilization in New York City**

**Monday, March 19, 2018**

Good morning, Speaker Johnson, Chair Cornegy, and members of the Housing and Buildings Committee. I am Matt Murphy, Deputy Commissioner of Policy and Strategy at the New York City Department of Housing Preservation and Development.

I am joined by my colleagues, Elyzabeth Gaumer, Assistant Commissioner of Research and Evaluation, and Francesc Marti, Assistant Commissioner of Government Affairs.

I would like to thank the Committee for welcoming us today to discuss rent regulation, a vital topic that fundamentally concerns the future of New York City.

New York City continues to face a housing affordability crisis that causes too many of our residents to pay a larger share of income for housing than they can sustain. This day-to-day reality forces many to make strategic trade-offs—to delay payment of other critical expenses, go into debt, or fall short on paying the rent, which we know places them at greater risk of eviction and, in more dire situations, homelessness. This is a crisis that requires action at every level of government.

Despite constant federal budget threats, locally we have made great strides to both address the crisis head on, as well as to create and update the tools we need over the long-term to confront this issue:

I'd like to take a moment to provide an overview of these tools. Together with the support of the City Council, Mayor de Blasio has committed an unprecedented amount of resources to build and preserve affordable housing. HPD expanded the commitment to affordable housing production and preservation with the announcement of HNY 2.0, which laid a road map to expanding the HNY plan to create 300,000 units by 2026. This announcement was coupled with

1

the dedication of $13.5 billion in Mayoral capital to be spent towards affordable housing production and preservation through 2026. The Administration has financed the construction of 28,492 units, and the preservation of 59,065 units towards our HNY goals. Last calendar year, HPD financed more than 24,500 affordable homes. About fifty percent of that housing serves households that earn under $43,000 for a family of three.

Since 2014, the administration has provided funding for legal services and legislation to guarantee legal counsel for 180,000 low-income tenants facing eviction. We have also taken part in a multi-agency anti-harassment task force with our State colleagues. We have worked to expand the SCRIE and DRIE programs to freeze the rents of more eligible seniors and New Yorkers with disabilities. We have also worked with the City Council to pass laws that prohibit harassing tenants with buy-out offers, enhanced enforcement tools to address poor housing conditions, bring cases in Housing Court against owners who do not comply with outstanding violations, and seek findings of contempt and jail against recalcitrant landlords when necessary. We also worked with the City Council to expand a Certification of No Harassment policy to prevent displacement in areas most at risk by requiring a review of a building's recent history upon application for a material alteration, and a new Speculation Watch List, which is a data-driven approach to help protect residents from the threat of investments in rent regulated buildings that could be an indicator they will be asked to leave to make way for higher paying renters.

This work complements what Rent Regulation laws accomplish, which speaks to the importance of a comprehensive approach. For example, over the past few years, the Rent Guidelines Board issued historically low rent increases for the 1 million rent stabilized units in our city, which protected against rapidly rising rents for those regulated households.

But the data we are here to discuss today shows that there are significant and continuing challenges we face:

The data we will show today indicates a mismatch between supply and demand – in fact, the typical New York City renter household is unable to afford an apartment at the median rent. The strong demand for housing combined with the recovered financial health of the multifamily market has led to large scale new construction and development throughout the city. Given that the demand for housing consistently outpaces available supply, it is vital that the supply of available housing grows. This administration has worked to ensure that as supply grows, the private market is required to provide affordable housing. For example, the passage of the Mandatory Inclusionary Housing program, the strongest inclusionary housing program in the nation, ensures that as the supply of housing grows through a rezoning action, a portion of that housing is permanently affordable.

While vital, the growth in supply alone is not enough to address the housing shortage, which affects all New Yorkers, but acutely falls on those households that are able to afford only the lowest cost units. The pressure of market demand and lack of supply places everyday New Yorkers at risk of sharp rent increases, harassment, and displacement from their homes and communities.

This brings us to the importance of Rent Stabilization laws. Rent Stabilization laws provide a critical resource for about 1 million New York City households that must be protected and strengthened in order to provide lower income households the choice to live in our great city amidst our housing crisis. The law provides the largest source of low-cost housing in the city, and offers critical tenant protections that enable residents to remain in their homes and exercise the choice to stay in their neighborhoods. Rent stabilization also supports our affordable housing work. HPD-financed units become stabilized in exchange for our investments, which provides an extra layer of protection for those renters.

The rent law reforms of 2011 and 2015 made progress toward protecting our rent stabilized stock. By our estimates, these reforms helped to retain 100,000 units that otherwise would have exited rent stabilization.

But given the market pressures facing our City, it is critical we do more. That's why in the coming 15 months we will be strongly advocating for additional rent regulation reforms to keep New Yorkers in their homes and curb predatory landlord practices. Our rent stabilization agenda in 2019 will be built on these principles:

1. Retaining the rent stabilized stock and the quality of this stock over the long-term
2. Preserving affordability of this stock, especially at lower rents
3. Ensuring current tenants are secure in their homes and neighborhoods; and
4. Protecting the benefits of rent stabilization for future tenants

As we prepare to enact and advocate for additional reforms in Albany in 2019, we will be meeting with stakeholders in order to create a comprehensive rent regulation reform agenda. Your partnership, feedback, and advocacy is essential in this process. As this process unfolds it remains clear that it takes a comprehensive approach to address our affordable housing shortage; extending Rent Stabilization is essential to this overall effort.

Before turning to Assistant Commissioner Gaumer, I'd like to reemphasize what an enormous priority this is for the Mayor and administration as we work towards creating and sharpening policies that work to make New York City America's fairest city. Rent stabilization laws are the key to remaining an economically diverse city and a thriving cultural metropolis, and I know this is a focus we all share.

I am Elyzabeth Gaumer, Assistant Commissioner of Research and Evaluation at HPD. Thank you for the opportunity to appear before you today to testify in support of Resolution Number 188-A and Introduction Number 600-A. These two important measures represent local confirmation of the continued housing emergency in New York City, and are required in order to continue our system of Rent control and Stabilization. Simply put, they are what makes the extension of the Rent Control and Rent Stabilization Laws possible.

As you know, the City Council must pass these two pieces of legislation 30 days after receipt of findings of the Housing and Vacancy Survey, and the Mayor must sign the legislation before April 1st. HPD submitted selected initial findings of the 2017 HVS to the Council on February 9th, 2018. Our testimony today will present initial findings of the 2017 New York City Housing and Vacancy Survey.

This survey of the City's housing stock has been carried out every three years since 1965. It is the longest running housing survey in the country and is of critical importance for understanding how our City is changing and what we can and should do to support improvements in policy and programming. Its methodology has remained consistent over time, with only minor changes to improve reliability and validity. It is conducted by the United States Census Bureau at the request of the City of New York. Interviews for the current survey were conducted between January and June 2017, making it the most up-to-date representative data on New York City currently available.

As required by State and Local law, the purpose of the survey is to establish the net rental vacancy rate, which is used to determine if New York City is in a state of housing emergency. Local law also requires that a survey be conducted to examine the supply of housing, the condition of housing, and the need for continuing regulation and control of residential rents and evictions.

Today, we will share key statistics on the current state of housing as well as provide a more detailed portrait of the rent stabilized stock and tenants living in stabilized units. As with past waves of the HVS, more detailed analysis will be made available over the coming months and the Census Bureau plans to release the microdata later this summer for analysis by the range of policymakers, policy researchers, and academics who utilize the HVS in their work.

The 2017 Housing and Vacancy Survey reports the vacancy rate in rental apartments in New York City to be 3.63 percent, significantly below the 5 percent net rental vacancy rate threshold set forth in State and Local Laws as the condition determining that a housing emergency continues to exist.

As the figure shows, the net rental vacancy rate varies by rent level. Among the lowest cost units—those with asking rents below $800—the vacancy rate is 1.2 percent while among the highest rent levels it is above the 5 percent threshold. Units with asking rents of $2,000 to $2,499 have a 5.2 percent vacancy rate and those with asking rents at or above $2,500 have a 8.7 percent vacancy rate.

New York City continues to see growth in the housing inventory. In 2017, we estimate that the stock comprises 3.47 million units. This is the largest stock recorded since the HVS began in 1965. As a reminder, this estimate is a snapshot of the current housing stock and the increase of 69,000 units since 2014 represents a net change that results from both loss of stock and new units created.

The low vacancy rate, despite this record-breaking housing stock number, indicates that although supply has continued to increase, it has failed to keep pace with the continuing demand for housing.

In 2017, there were 966,000 rent stabilized units, representing 44 percent of the overall rental stock. As with our estimates of the overall housing inventory, this represents a point-in-time estimate that accounts for both the loss of rent stabilized units as well as newly stabilized units that have come online.

We continue to improve the data and methodology of the HVS. For 2017, we again improved the accuracy and validity of our rent stabilized estimates. This estimate of 966,000 units is statistically equivalent to the number of units that were rent stabilized in 2011 and 2014 if the same methodology were applied.

As the map shows, these units are located through the five boroughs but are concentrated in the Bronx and Manhattan as well as parts of Brooklyn and Queens. The areas where we see the fewest number of rent stabilized units are parts of the City where we know that homeownership rates are high.

The HVS measured housing conditions in several ways, including through self-report of the current occupants regarding maintenance deficiencies. One important measure of housing quality is the count of items reported, with five or more deficiencies representing a unit with critical deficits. In 2017, 3.6 percent of renter-occupied units reported five or more deficiencies. This is the lowest prevalence on record since 1991 when the HVS began using this measure. Although not shown here, we find that housing quality is as good or better on every measure included in the HVS.

Since 1991, the HVS has also collected data regarding neighborhood conditions and quality. In 2017, 76.1 percent of renter-occupied households rated the condition of the residential structures in their neighborhood as "Excellent" or "Good."

As you know, for many years rents continued to increase while wages stagnated. As first seen in other Census surveys, that trend has finally reversed. In 2017, the HVS estimated that household incomes among renters rose by 10.9 percent in real terms while rents increased 6.2 percent. Incomes grew more than rents for both rent stabilized tenants as well as those living in private, non-regulated rental units.

Despite the increase in median income, we continue to face a severe affordability challenge. According to the 2017 HVS, the median household income for renters was $47,200. That's equivalent to a monthly income of $3,933 before taxes.

Using standard federal guidelines that suggest a household should pay no more than 30 percent of gross income on housing costs, the typical renter household could afford to pay $1,180 in rent and utilities.

But the median contract rent in 2017 was $1,337. And it was $1,450 when we factor in the cost of utilities, which are also high. Moreover, the median asking rent of units available right now in the market is $1,875—well above the $1,180 the typical household could afford to pay.

What results is a high prevalence of rent burden across nearly every income level. In 2017, we found that 56 percent of renter households were rent burdened, or paying more than 30 percent of income for housing each month. 32 percent were severely burdened or paying more than 50 percent of income for housing. This graph shows the prevalence of rent burden by HUD Income Limits, or AMI, which is a relative measure of income that factors in differences in household size and local market conditions.

When we roll this up by income group, we see different facets of our affordability crisis. In the first bar, which includes households that are Extremely Low Income (typically at or near the federal poverty line), we see that about half of households or just over 360,000 are rent burdened. Of those who are rent burdened in this income stratum, almost all are severely burdened. The remaining 50 percent—those in the grey part of the stacked bar—are largely served by subsidized housing or otherwise receiving some form of rental assistance.

But in the second bar—these are households designated as Very Low or Low Income—a larger share are rent burdened. Here, about 60 percent are paying more than 30 percent of income toward housing costs each month and that is equivalent to about 425,000 households. Of those, 165,000 are severely burdened. Again, the remainder is either receiving some form of assistance with housing costs or are living in lower cost units in the private market.

The HVS helps us to identify the components of this challenge. One side is rent burden based on the intersection of housing costs and incomes. But another critical component is the overall composition of our rental inventory. Between 2014 and 2017, we saw a large net loss of the lowest cost units as rents shifted upward. The graph shows the number of rental units by rent level as measured by the 2014 and 2017 HVSs. The bars on the left show the number of units renting for less than $1500 in 2014 and 2017; the bars on the right show the number of units renting for $1500 or more in 2014 and 2017. As you can see, over this time period, there was a net decrease of low cost units and a corresponding increase of high cost units.

While we saw an overall increase of 6.2 percent in median gross rent, there is substantial variation by neighborhood. In particular, parts of Brooklyn and Queens have seen substantial increases in median rental costs.
This map shows the changes in median gross rent among rent stabilized units, by neighborhood. As you can see many neighborhoods experienced little or no change in rent. Many of the neighborhoods that saw large increases in rental costs overall, saw lower increases for stabilized units. This is particularly true for parts of Brooklyn (Fort Greene, Bed Stuy, Park Slope), Queens (Ridgewood), and Manhattan (East Harlem, Washington Heights/Inwood, Upper West Side).

In evaluating the continued need for rent stabilization, it is important to examine the demographics of who is served. Here, we see the income distribution of rent stabilized tenants. 64 percent are low income—that is, earn up to 80 percent of HUD Income Limits. That's equivalent to 615,000 households. An additional 23 percent are moderate or middle income.

In summary, New York City continues to face a housing emergency with a net rental vacancy rate of 3.63 percent.

While we have added to the overall stock of housing, it is insufficient to keep pace with demand. We continue to have about 966,000 rent stabilized units in our City, located throughout the five boroughs.

Both housing and neighborhood conditions are good and many dimensions have improved since 2014.

There is a clear continuing need for rent regulation in New York City.

The 2017 HVS shows that while renter incomes have increased more than rents, there continues to be an affordability crisis. Half of renter households are rent burdened; one third are severely burdened. Median rents are not affordable to the typical New York household. Rent stabilized rents rose less sharply and represent a large and generally lower-cost portion of our stock. Moreover, the majority of rent stabilized tenants are low-income.

Taking all of these first findings into consideration, we find that New York City continues its state of housing emergency. The shortage is particularly acute for lower income households who face the lowest vacancy rates and a shrinking stock of lower cost units. It is clear from the 2017 HVS that we must not only continue to add to the overall stock to address our emergency, but specifically add lower cost units and work to retain existing units with lower rents in order to support everyday New Yorkers who face continued affordability challenges.

Thank you for the opportunity to testify.  We are happy to answer any questions.



Queens
Legal
Services

Legal
Services NYC

## TESTIMONY OF LEGAL SERVICES NYC ON PROPOSED INT. NO. 600-A AND PROPOSED RES. NO. 188-A

Legal Services NYC welcomes the opportunity to give testimony before the New York City Council on the critical topic of affordable housing.  Legal Services NYC is one of the largest law firms for low income people in New York City.  With five borough offices and numerous outreach sites, Legal Services NYC's mission is to provide expert legal assistance that improves the lives and communities of low income New Yorkers.  Legal Services NYC annually provides legal assistance to thousands of low income clients throughout New York City.  Historically, Legal Services NYC's priority areas have included housing, government benefits and family law; in recent years, Legal Services NYC has vastly expanded services in areas of need critical to our client base, including consumer issues and foreclosure prevention, unemployment, language access, disability, education, immigration, and bankruptcy.

## RENT REGULATION PROTECTIONS

Rent regulation provides one of the few protections for New Yorkers in retaining and maintaining affordable housing.  While the median asking rent for an apartment jumped 33.9% between 2014 and 2017, it only jumped by 2.6% in rent regulated units.  For families with fixed incomes, or jobs that fluctuate seasonally, this security is a key component to having a stable home.  And a stable home provides everyone in the household with a number of intangible benefits – the ability for children to remain in their current school district, without having to uproot; the ability for people of all ages to form community ties and take pride in their neighborhoods; and most importantly, the ability to feel safe and secure without market forces leaving people uncertain about where they'll lay their heads that night.

Without an extension of Rent Stabilization protections, thousands of low income and working families would almost immediately be forced into the City's shelter system.

I work in Queens, a borough where a there is a large percentage of unregulated housing and, as a result, a large number of evictions based solely on the whims of landlords.  Rent Regulation ensures that tenants are able to remain in their homes, as evictions are restricted to causes specified by law.  Rent Stabilized Tenants also have the right to lease renewals and succession rights for remaining family members, rights that ensure that affordable housing doesn't simply disappear as a result of market forces.

These protections aren't hypothetical: I've fought those battles, and ensured that children retain



the home they've lived in all their lives, and succeed in tenancies where their families have resided for multiple generations; I've argued against frivolous proceedings and ensured that people aren't evicted simply because a landlord is litigious. These protections are real, important, and necessary. I've personally ensured that a senior citizen remained in her home when a landlord tried to evict her for allegedly always paying her rent late, retaining her housing and fighting off the unfair proceeding brought against her.

By the same token, I've seen families enter the shelter system when evicted, without cause, from their unregulated housing. Because they've had no rent regulation protections, I've had to represent people with newborns, as well as parents of children with severe mental disabilities, who were all evicted. I had the unfortunate luck of just litigating a case where a woman, who had limited functionality of her hands, and a severely mentally incapacitated son, was evicted by her landlord for no reason. The premises were not rent stabilized, and her protections were non-existent.

## SHORTAGE OF AFFORDABLE HOUSING

Although rent regulation is an indispensable lifeline for working families, the Council is aware that the system has numerous loopholes that are readily exploited by landlords, and that exacerbate the shortage of affordable housing. Vacancy decontrol provides an irresistible incentive to landlords to deregulate apartments by performing cosmetic improvements upon each vacancy and raising the rents above the decontrol threshold. In addition, preferential rents result in increases far beyond those allowed under the rent stabilization code, and thus in eviction. Landlords also use Major Capital Improvement increases, which stem from work done to rent-stabilized building systems, often while leaving individual apartments in disrepair, to push apartments out of rent regulation.

In addition, severe overcrowding increased 18% city-wide in the past year, an increase that results from families and young adults living together in order to afford increasingly unaffordable rents. Traditionally, increases in overcrowding are a precursor to waves of shelter applications. The situation has been compounded by the shrinking stock or affordable housing in the city. This fact is best demonstrated by the following: in 2017, the number of units renting for over $2,000 increased by nearly 100,000 units, while the number of units with a rent below $1,500 fell by over 165,000 units, all while 1.5 million New York City households can't afford to pay more than $1,500 in rent.

Without the continued protections of Rent Stabilization, the situation would be far, far worse. We therefore thank the City Council for addressing this important issue, and look forward to continuing our work helping the residents of New York City.

*March 19, 2018*
*Testimony of Oksana Mironova, Housing Policy Analyst, Community Service Society*
*New York City Council Committee on Housing and Buildings – Public Hearing on the Extension of the Rent Laws*

Thank you for this opportunity to comment on the vital importance of rent control and rent stabilization laws for New York City's tenants. My name is Oksana Mironova and I am a Housing Policy Analyst at The Community Service Society (CSS), an independent nonprofit organization that addresses some of the most urgent problems facing low-income New Yorkers and their communities, including the effects of the city's chronic housing shortage.

Rent control and rent stabilization are fundamentally a response to this chronic shortage, which creates a severe power imbalance between tenants and landlords. The primary purpose of the laws is to prevent landlords from exploiting this imbalance to impose large rent increases and arbitrary evictions. This is a matter of simple justice, even before we consider the effects of rent regulation on affordability. This alone should be a sufficient reason for this committee, the City Council, and the mayor to extend the laws as they are authorized to do under state law.

Unfortunately, the affordability the rent laws provide falls short of what the city needs, partially as a result of specific loopholes within the law: vacancy deregulation, the vacancy bonus, and preferential rents. Beyond extending the laws, I hope that you will join tenants and advocates who will be seeking to strengthen the rent laws on the state level this year.

**Rent Regulation within the Context of a Growing Economy**

The rent laws are also an important complement to the city's economic development activities. When public resources are used to promote economic development, all New Yorkers should benefit. But too often, economic development leads to rent increases, and only those who can pay the increased rent can share in the benefits. Those who cannot pay are either displaced or subject to severe rent burdens. Rent control and rent stabilization are important tools for alleviating the negative side effects of economic development policy. They ease displacement pressures. This is also an important reason for the city to extend the rent laws.

Data included in the *Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey* (presented by the New York City Department of Housing Preservation and Development to the City Council in February 2018) points to rapidly increasing market rents, likely spurred by both the broader economic recovery and public economic development

efforts. The median asking rent increased from $1,443 (April 2017 dollars) in 2014 to $1,875 in 2017, 29.9 percent above inflation. For comparison, asking rents between 2011 and 2014 went up by 2.1 percent above inflation, from $1,371 to $1,400 (See: http://www.cssny.org/news/entry/demystifying-housing-data). Given a rising rental market, rent protections afforded by rent stabilization and rent control are paramount.

The rental market in New York City is rising within the context of a growing economy, as measured by multiple indicators, including declining unemployment. However, low-income New Yorkers, defined as those with incomes below 200 percent of the federal poverty line, have not reaped the same post-recession benefits as higher income households (incomes above 400 percent of the federal poverty line). According to analysis of American Community Survey data conducted by CSS Policy Analyst Irene Lew, "the real median income of employed, working-age (18-64) households in New York City increased by 8 percent since the end of the Recession, from $71,544 in 2010 to $77,000 in 2016... However, the growing ranks of higher-income households are driving up overall median incomes—the number of working higher-income households rose by 12 percent since the end of the Recession. Meanwhile, despite higher employment, increases in the minimum wage and other new worker protections, the number of working poor and near-poor households have barely budged."

**Rent Regulation and Low-Income Tenants**

With increasing market pressure and stagnating wages, New York City's rent control and rent stabilization laws protect about one million households, including over 400,000 low-income households. It is important to note that the rent laws are not a housing affordability program like public housing or Section 8 vouchers. Many rent regulated tenants are rent burdened, paying more than 30 percent of household income. This is confirmed in the *Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey*, which shows a median rent burden of 33.3 percent for rent-stabilized tenants and 40.2 percent for rent-controlled tenants.

Despite this, rent regulated housing is an essential resource for low-income households. According to the *Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey*, median contract rents in rent stabilized apartments in 2017 were $1,269; in non-

2

*March 19, 2018*
*Testimony of Oksana Mironova, Housing Policy Analyst, Community Service Society*
*New York City Council Committee on Housing and Buildings – Public Hearing on the Extension of the Rent Laws*

regulated units they were $1,700, a 29 percent difference. Accordingly, the rent stabilized vacancy rate was also much lower, 2.06 percent, as compared to 6.07 percent in the non-regulated units. While the rent laws are not an affordable housing program, they do help stabilize rental costs, which makes them more accessible to low-income people. The median household income in rent stabilized apartments was $44,650, as compared to $67,000 in unregulated units, a 40 percent difference.

As we wrote in *Making the Rent: Tenant Conditions in New York City's Changing Neighborhoods* (See: http://www.cssny.org/publications/entry/making-the-rent-2016), in 2014 the median rent burden for low-income rent regulated tenants was 48 percent, compared to 50 percent for unregulated tenants (2017 HVS data for low income households is not yet available). While seemingly small, the significance of 2 percent of income should not be underestimated. For a family earning $20,000 a year, it is the difference between after-rent income of $10,000 in an unregulated apartment and $10,400 in a regulated one. For a family on a tight budget, that $400 can make a real difference.

Importantly, the rent laws create a mechanism to mitigate the immense pressure of the rental market on tenants. They allow the Rent Guidelines Board to take the economic situation into account when setting rent adjustments. With the skyrocketing rental market in 2015 and 2016, the Rent Guidelines Board enacted two rent freezes. This had an impact: the median rent for rent stabilized apartments rose from $1,237 in 2014 (April 2017 dollars) to $1,269 in 2017, an increase in 2.6 percent above inflation. In comparison, median rents in unregulated apartments rose from $1,546 (April 2017 dollars) to $1,700, or 10 percent above inflation.

The two rent freezes have had a measurable impact on low-income New Yorkers. In 2017, as part of Community Service Society's annual Unheard Third survey, we asked low-income renters to rank how much of a problem affording the rent was for their household. The share of rent regulated renters reporting a very serious or somewhat serious problem with affordability decreased by 13 percent from 2015 to 2017 to 37 percent. In comparison, the share of unregulated renters reporting a very to somewhat serious problem declined by only two percent, to 48 percent (within the survey's margin of error).

*March 19, 2018*
*Testimony of Oksana Mironova, Housing Policy Analyst, Community Service Society*
*New York City Council Committee on Housing and Buildings – Public Hearing on the Extension of the Rent Laws*

Beyond affordability, the rent laws provide a foundation for a number of other programs that extend support to vulnerable New Yorkers, including the Senior Citizen Rent Increase Exemption (SCRIE), Disability Rent Increase Exemption (DRIE), and the city's groundbreaking Right to Counsel program, which will provide all low-income tenants with access to an attorney when facing an eviction in Housing Court.

**The Need for Stronger Rent Laws**

Rent regulation is an important piece of the city's housing affordability landscape. However, as illustrated by the relatively high median rent burdens among low-income rent regulated tenants, the affordability it provides still falls short of what the city needs. This is only partly because rent regulation is a system of rent and eviction protections, conceptually distinct from a true affordability program. The problem is also caused by specific weaknesses in the laws, which often stem from pro-landlord amendments that have been made to the laws as they have been renewed over the years.

Vacancy deregulation, the vacancy bonus, and preferential rents undermine the affordability of rent regulated apartments. For example, as described in Community Service Society's *Making the Rent*, the largest contributor to rent increases in rent stabilized apartments is the vacancy bonus, which allows an automatic increase of about 20 percent when an apartment becomes vacant and turns over to a new tenant. This mechanism explains 49 percent of the citywide total increase in stabilized rents above inflation between 2011 and 2014.

Unfortunately, as you know, state law precludes the city from making changes to address these defects. But I hope that many of you will join the tenants, neighborhood activists, and advocates who will be seeking solutions to these problems at the state level this year. We must not allow rent regulation to erode until it becomes a socially stigmatized residual program for a handful of people. As a broad-based program focusing on fairness rather than subsidy, rent regulation has an important place in our city's housing policy system. I urge you to pass introduction and resolution in front of you today.



**THE LEGAL AID SOCIETY**

Civil Practice Law Reform Unit
199 Water Street
New York, NY 10038
T (212) 577-3300
www.legal-aid.org

Direct Dial:  (212) 577-3339
Direct Fax:  (646) 616-4339
E-mail:  EBDavidson@legal-aid.org

Blaine (Fin) V. Fogg
*President*

Seymour W. James, Jr.
*Attorney-in-Chief*

Adriene L. Holder
*Attorney-in-Charge*
Civil Practice

Judith Goldiner
*Attorney-in-Charge*
Law Reform Unit

## TESTIMONY OF THE LEGAL AID SOCIETY

IN SUPPORT OF INT. 0600-18, A LOCAL LAW TO AMEND THE ADMINISTRATIVE
CODE OF NEW YORK, IN RELATION TO THE CONTINUATION OF THE PUBLIC
EMERGENCY REQUIRING THE REGULATION OF RESIDENTIAL RENTS AND
RES. 0188-2018 RESOLUTION DETERMINING THAT A PUBLIC EMERGENCY
REQUIRING RENT CONTROL IN THE CITY OF NEW YORK CONTINUES TO
EXIST AND WILL CONTINUE TO EXIST ON AND AFTER APRIL 1, 2018.

New York City Council Committee on Housing and Buildings

March 19, 2018

Thank you to Speaker Johnson, Chair Cornegy, and the New York City Council

Committee on Housing and Buildings for the opportunity to speak at this very important

hearing.

**The Legal Aid Society**

This testimony is submitted on behalf of the Legal Aid Society.  The Society is the

oldest and largest program in the nation providing direct legal services to low-income

families and individuals.  The mission of the Society's Civil Practice is to improve the lives

of low-income New Yorkers by providing legal representation to vulnerable families and

March 19, 2019

Page 2

individuals to assist them in obtaining and maintaining the basic necessities of life —

housing, health care, food and subsistence-level income or self-sufficiency. The Society's

legal assistance focuses on enhancing individual, family and community stability by

resolving a full range of legal problems in the areas of housing and public benefits,

foreclosure prevention, immigration, domestic violence and family law, employment, elder

law, tax law, community economic development, health law and consumer law

The Legal Aid Society welcomes this opportunity to testify before the New York

City Council Committee on Housing and Buildings concerning the continuing housing

emergency and the importance of extending the rent laws.

**Introduction**

The primary purpose of rent regulation in New York City has been to eliminate

abnormal rents in an overheated market. Indeed, the Rent Stabilization Law's stated goal is

to protect "public health, safety, and welfare…and to prevent exactions of unjust,

unreasonable, and oppressive rents and rental agreements." Rent Stabilization can only

exist during a housing emergency which is defined by law as a market where the vacancy

rate has fallen below 5 percent. New York City first declared an emergency in 1974. This

emergency has endured throughout the years but the crisis which had been chronic has

become acute. Because the vacancy rate is so low, tenants cannot move and exercise

market power. The Rent Stabilization Law was meant to – and has acted to – approximate

the workings of a market where both parties have the power to negotiate contracts.

This purpose of this committee hearing is to consider whether that housing

emergency continues to exist and thus whether Rent Stabilization and Rent Control should

be extended. Our answer to these questions is yes. The Selected Findings of the Housing

Vacancy Survey (HVS) demonstrates that for renters in New York City the vacancy rate is

March 19, 2019

Page 3

3.63 percent - well under the 5 percent threshold. Thus, the emergency continues to exist and these essential laws must be extended. If the City does not act, millions of New Yorkers will be at risk of "unjust, unreasonable and oppressive rents" and will face "uncertainty, hardship and dislocation." Without rent regulation, programs that have been created to protect our elderly residents and residents with disabilities, such as SCRIE (the rent increase exemption law for senior citizens) and DRIE (the rent increase exemption law for persons with disabilities), will become meaningless, and elderly New Yorkers and New Yorkers with disabilities will be threatened with eviction and homelessness.

While the City Council has an immensely important task in declaring a housing emergency and extending the rent laws, unfortunately this body cannot address the severe problems facing rent stabilized and rent control tenants. Because the New York State Legislature amended the laws to include loopholes that allow landlords to charge oppressive rents and offer oppressive rent agreements, many rent stabilized households are living in fear of losing their homes and communities. These loopholes have incentivized landlords to harass tenants out of their homes and their communities. Until Albany fixes the rent laws by ending the eviction bonus and the preferential rent loophole, tenants will remain insecure in their housing. One of the most astounding findings in the 2017 HVS is that the median asked for rent – the rent for people who are looking for housing – increased, in three years, almost 30 percent to $1875. The Legal Aid Society's clients cannot afford apartments renting for $1875.

We appreciate the work that this committee and the entire City Council has done to address tenant harassment and tenant displacement but I would be remiss if I did not point out that our State Legislature and Governor must act soon to address this crisis.

Page 4

**Who Lives in Rent Regulated Housing?**

Rent stabilization primarily serves low-income people, people of color, and immigrants.[1]  The median household income for rent-stabilized households is $44,560 a year and the median income for rent controlled households is $28,250.  The median income of households in private non-regulated rent units is $67,000.  The median income for homeowners is $87,000.[2] 44.3 percent of renter households live in rent-stabilized units.[3] Overall, over 400,000 low-income families live in rent-regulated housing.[4]  41 percent rent-stabilized tenants are low income(with incomes up to 200 percent of the federal poverty line).

**Declining Affordability of Housing**

Many New York City renters are facing dire circumstances.  In the face of fewer rental opportunities and higher prices, renters are suffering from a growing disparity between what they can afford and their actual rent.  According to the Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey, the median rent for rent-stabilized apartments rose from $1,237 in 2014 to $1,269 in 2017; an increase of 2.6 percent above inflation[5].  While rents in rent-controlled apartment decreased from $928 to $915, median rent burdens for rent-controlled households increased dramatically 30 percent

---

[1] Email from Tom Waters, Community Service Society to Ellen Davidson.
[2] Gaumer, E. Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey. New York, NY: New York City Department of Housing Preservation and Development., available at http://www1.nyc.gov/assets/hpd/downloads/pdf/about/2017-hvs-initial-findings.pdf Accessed March 15, 2018.
[3] Id.
[4] Victor Bach & Tom Waters, Community Service Society. *Making the Rent. Before and After the Recession*, May 2016 at 24.
[5] Gaumer, E. Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey. New York, NY: New York City Department of Housing Preservation and Development., available at http://www1.nyc.gov/assets/hpd/downloads/pdf/about/2017-hvs-initial-findings.pdf Accessed March 15, 2018.

March 19, 2019

Page 5

in 2014 to 40 percent in 2017[6]. While households incomes have begun to recover from the

Great Recession, median rent burdens for rent stabilized households remain high at 33.3

percent in 2017[7].

Tenants continue struggle to pay rent and obtain the necessities of life. Median gross

rents increased 3.1 percent between 2015 and 2016.[8] The poverty rate in New York City

was 20.3 percent in 2016, compared to a nation-wide poverty rate of 14.7 percent.[9] The

average number of cash assistance cases in New York City increased for the seventh time in

the past eight years by 2.4 percent in 2016, following an increase of 5.7 percent in 2015.[10]

And, despite the decrease in the number of food stamps recipients between 2014 and 2015

to 1.7 million, this number is still more than double what it was in the early 2000s.[11] There

are increasing numbers of tenants facing the potential loss of their homes. Landlords are

suing tenants more often for money that they do not have; increasing rents will only lead to

more evictions and homelessness. An individual would have to work an astonishing 114-

120 hours per week at minimum wage, 52 weeks a year, in order to afford an average two-

bedroom apartment in New York City.[12] Alternatively, the individual would need a wage

increase to at least $31.48 per hour, or $65,480 a year, in order to afford the same

apartment.[13]

---

[6] Id.
[7] Id.
[8] NYC Rent Guidelines Board, *2018 Income and Affordability Study*. 11.
[9] *2012-2016 American Community Survey 5-year estimate, US Census*.
https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk
[10] NYC Rent Guidelines Board, *2017 Income and Affordability Study*. 14.
[11] NYC Rent Guidelines Board, *2017 Income and Affordability Study*. 15.
[12] NYC Rent Guidelines Board, *2017 Income and Affordability Study*. 12.
[13] NYC Rent Guidelines Board, *2017 Income and Affordability Study*. 12.

**Declining Availability of Housing**

Unfortunately for New York renters, declining affordability is coupled with declining availability. The net vacancy rate of rent-stabilized units was 2.06 percent in 2017 compared to a City-wide vacancy rate of 3.63 percent, significantly below the 5.0 percent threshold that legally defines a housing emergency.[14] The number of vacant units affordable to low-income New Yorkers is even more meager. In 2017, the vacancy rate for all units with rents less than $800 was only 1.15 percent.[15] The 2017 vacancy rate for units under $1000 was only 2.09 percent.[16]

The decrease in availability of affordable vacant units is exacerbated by the loss of at least 151,222 rent-stabilized housing units in the last 22 years, primarily due to high-rent vacancy deregulation.[17] Units that remain available are increasingly out of the range of low-income New Yorkers. Between 2000 and 2012, the number of units in New York City renting for less than $1000 declined by over 400,000.[18] According to the recently released HVS, between 2014 and 2017, the number of units renting at under $1500 decreased by 166,000 or 12.4 percent.[19] During the same time period, the number of units renting at over

---

[14]. Gaumer, E. Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey. New York, NY: New York City Department of Housing Preservation and Development;, available at http://www1.nyc.gov/assets/hpd/downloads/pdf/about/2017-hvs-initial-findings.pdf Accessed March 15, 2018.

[15] Id.

[16] Id.

[17] NYC Rent Guidelines Board, *Changes to the Rent Stabilized Housing Stock in New York City in 2015*, 9, 13. (As noted in the report, these numbers are a floor or a minimum count of units loss as registration of deregulated units with DHCR is voluntary).

[18] Scott M. Stringer, New York City Comptroller, *The Growing Gap: New York City's Housing Affordability Challenge*, 2014, 6.

[19] Gaumer, E. Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey. New York, NY: New York City Department of Housing Preservation and Development;, available at http://www1.nyc.gov/assets/hpd/downloads/pdf/about/2017-hvs-initial-findings.pdf Accessed March 15, 2018.

March 19, 2019

Page 7

$1500 increased by 149,000 or 21 percent.[20]  And in the last three years, apartments renting for over $2000 increased by 99,594 units.[21]

A recent report from the Coalition for the Homeless analyzed the historical context of the mismatch between low-income New Yorkers need for affordable housing and the numbers of affordable units.  The findings are extremely concerning.  In 1999, there were 1,178,994 low income households needing affordable apartments renting for under $800.[22]  At the time, there were 1,351,367 apartments renting for under $800[23].  Today, there are 867,811 households needing apartments renting under $800 in order to access affordable rents[24].  According to the recently released HVS, there are now 349,862 apartments available to these low income New Yorkers[25].  Nearly one-third of New York City renters are severely rent burdened, paying more than 50 percent of their income toward their rent.

The scarcity of available rent-stabilized housing is a part of an overall decline in the availability of affordable housing.  There remain only 77,000 units covered by either the Mitchell-Lama program or the federally subsidized Project Based Section 8 program.  This is a loss of 35 percent since 1990.[26]

---

[20] Id.
[21] Id.
[22] Giselle Routhier, *State of the Homeless 2018: Fate of a Generation*, Coalition for the Homeless, March 2018
[23] Id.
[24] Id.
[25] Id.
[26] Oksana Miranova, *Closing the Door: Subsidized Housing at a Time of Federal Instability*, Community Service Society, March 2018.
http://lghttp.58547.nexcesscdn.net/803F44A/images/nycss/images/uploads/pubs/Closing_the_Door_FINAL._WEB.pdf

March 19, 2019

Page 8

Applicants for public housing face similar shortages: 257,143 families are on the waitlist for NYCHA public housing, with 146,808 applicants on the waiting list for Section 8 housing vouchers in New York City.[27]

This combination of market forces and governmental decisions has worked together to have a devastating effect on low and moderate income New Yorkers. The declining number of vacant units available for rent, the fact that housing expansion has not kept pace with population growth, and the ongoing public housing crisis have all contributed to the scarcity of available affordable housing.

**Growing Problem of Homeless Families**

The scarcity of affordable housing, rising rents, and the increasing cost of living have contributed to record use of the City's shelters in 2018. In the last decade, the number of homeless New Yorkers sleeping in municipal shelters has risen an astonishing 82 percent.[28] The period for which those families remain in temporary housing remains an average of 400 days, the longest average recorded.[29] At the end of 2017, an average of 63,495 men, women and children slept in New York City's homeless shelters.[30] Three-fourths of New Yorkers sleeping in shelters are members of homeless families, including 23,600 children[31].

**Close the loopholes in the Rent Stabilization and Rent Control Systems**

Unfortunately, while renewal of the rent laws is essential, renewing the rent laws alone does not address the instability and affordability crisis faced by rent regulated tenants. Albany must move this year to end the preferential rent loophole. The preferential rent

---

[27] New York City Housing Authority, "Facts about NYCHA," available at https://www1.nyc.gov/assets/nycha/downloads/pdf/factsheet.pdf. Data accessed May 9, 2017.
[28] Giselle Routhier, *State of the Homeless 2018: Fate of a Generation*, Coalition for the Homeless, March 2018.
[29] Id.
[30] Id.
[31] Id.

March 19, 2019

Page 9

scheme has been a unique tool to assist landlords in raising rents by huge percentages during a tenancy. While preferential rents seem to be a good thing for tenants, preferential rents easily hide fraudulent legal rents and even when legitimate, weaken tenants' right to renewal leases at increases approved by the Rent Guidelines Board. At this moment, over 30 percent of all regulated rents are preferential. Increasingly, attorneys from the Legal Aid Society have clients that are too afraid to complain about dangerous conditions in their homes. Tenants with preferential rents fear requesting repairs because they know that at the end of each lease term, they risk losing their homes and facing homelessness. Additionally, rewarding landlords with 20 percent increases for pushing tenants out of their homes is unacceptable in a City where we have lost one million apartments affordable to low income New Yorkers in the past 20 years. The Community Service Society's Making the Rent 2016 analyzed rent increases between 2011 and 2014 and found that 48 percent of the rent increases in rent stabilized apartments could be attributed to the eviction bonus. It is long past time to close these loopholes.

**Extend the Rent Stabilization and Rent Control laws.**

In light of the continuing housing emergency, the City must extend the Rent Stabilization and Rent Control laws. In Section 2 of the Emergency Tenant Protection Act, the Legislature found that

> a serious public emergency continues to exist in the housing of a considerable number of persons in State of New York . . . there continues to exist in many areas of the state an acute shortage of housing accommodations caused by high demand, attributable in part to new household formations and decreased supply, in large measure attributable to reduced availability of federal subsidies and increased costs of construction and other inflationary factors.

The Legislature further found

> preventive action by the legislature continues to be imperative
> in order to prevent exaction of unjust, unreasonable and
> oppressive rents and rental agreements and to forestall
> profiteering, speculation and other disruptive practices
> tending to produce threats to public health, safety and general
> welfare; that in order to prevent uncertainty, hardship and
> dislocation, the provisions of this act are necessary. . . .

These words are as true today as they were in 1974 when the ETPA was enacted.   For all

these reasons, we urge this Committee to extend the Rent Stabilization and Rent Control

Laws.

**Conclusion**

Thank you for the opportunity to testify before the New York City Council

Committee on Housing and Buildings today.  We hope that the City will extend the rent

laws and protect the housing of over one million families.

Respectfully Submitted:


Adriene Holder
Judith Goldiner
Ellen Davidson
The Legal Aid Society
199 Water Street, 6th Floor
New York, NY 10038
212-577-3339



# MEMORANDUM IN SUPPORT

## MARCH 22, 2018

## THREE IMPORTANT PRO-TENANT BILLS

There are dozens of bills necessary to strengthen rent and eviction protections and to reverse the phaseout of affordable rental housing in New York City and suburban counties. Numerous deregulation amendments have been inserted into the rent laws in the last 25 years, with predictable results: the supply of affordable housing has shrunk dramatically, both regulated and market rents have soared, homelessness is at record levels, and the remaining rent-protected tenants have targets on their backs.

The Real Rent Reform Campaign, a coalition of more than 40 grassroots housing and tenant organizations, has identified the following three bills as priorities for the current legislative session. Enactment of these three bills is essential, before legislators leave Albany in June.

### S3482/A433

This bill repeals Vacancy Deregulation, which allows landlords to take apartments out of rent regulation whenever they turn over and also restores rent stabilization protections to 98 percent of the units that have been lost to Vacancy Deregulation. This is the single most meaningful step the Legislature can take to reverse the loss of our dwindling affordable rental housing stock.

Vacancy Deregulation, first inserted into state law in 1993, is an ill-conceived measure which has caused the loss of between 300,000 and 450,000 affordable apartments in New York City and the suburban counties of Nassau, Rockland and Westchester. If it is not repealed, the entire rent and eviction protection system will be phased out over time.

Vacancy destabilization has created a perverse incentive for landlords to do everything they can to drive tenants out of their homes. The uptick in harassment, both overt and subtle; the speculative purchase and flipping of rent-stabilized and Mitchell-Lama properties at prices that vastly exceed reasonable commercial standards; increased evictions and aggressive attempts at eviction by means such as owner use, non-primary residence, and similar tactics – the motivation for all of this destructive behavior is the chance landlords see to remove units from rent and eviction protections, and thereby increase profits for already profitable properties.

Raising the threshold for deregulation, from $2,000 to $2,500 monthly rent in 2011, and to $2,700 in 2015, were ineffective half-measures, which some tried to claim as great tenant victories. For the big landlords, their rents are already above the threshold, or if not, they will spend the necessary funds on Individual Apartment Improvements to bring the rent up to the threshold. Dishonest landlords, however, don't spend funds on improvements; they simply stop registering the apartment annually with the state housing agency and hope the tenant does not file a complaint. If four years pass without complaint, the landlord gets away with this illegal deregulation.

There is no substitute for outright repeal of Vacancy Deregulation. Attempts to beef up enforcement against bad landlords by state and local governments have been useful, but not as useful as repeal of the incentive for all this destructive behavior. Not to mention the public benefit of restoring and preserving our scarce affordable rental housing stock.

S3482 Sponsors: Stewart-Cousins, Addabbo, Alcantara, Avella, Benjamin, Dilan, Gianaris, Hamilton, Hoylman, Krueger, Montgomery, Parker, Peralta, Persaud, Rivera, Sanders, Stavisky

**...OVER...**

A433 Sponsors: Rosenthal L, Lentol, Dinowitz, Gottfried, Colton, Titus, Ortiz, Benedetto, Hooper, Glick, Mosley, Zebrowski, Weprin, Davila, Pichardo, Bichotte, Mayer, Abinanti, Simon, Joyner, Quart, Rozic, Blake, Seawright, Walker, Richardson, De La Rosa, Barron; M-S Cook, Cymbrowitz, Jaffee, Peoples, Stokes, Perry, Pretlow, Rivera, Sepulveda

### S6527/A6285

This bill closes the preferential rent loophole. A preferential rent is a discounted rent when the registered rent (which, in many cases, incorporates illegal rent hikes) exceeds the actual market value of the apartment. Landlords can revert to the higher rent when tenants renew their leases, leading to sudden, massive rent hikes, often hundreds of dollars, which accelerate gentrification by forcing tenants to give up their homes and move. Some 266,000 families in New York City have preferential rents, and thousands more in the three suburban counties, meaning they are one lease renewal away from eviction. This bill mandates that landlords renew rent-stabilized leases at the preferential rent level until the tenant voluntarily vacates, which was the law until 2003.

S6527 Sponsors: Krueger, Addabbo, Alcantara, Avella, Bailey, Benjamin, Comrie, Dilan, Gianaris, Hamilton, Hoylman, Kavanagh, Montgomery, Peralta, Persaud, Rivera, Sanders, Savino, Serrano, Stavisky

A6285 Sponsors: Cymbrowitz, De La Rosa, Walker, Rosenthal L, Barron, Dinowitz, Ortiz, Carroll, Sepulveda

### S1593/A9815

This bill repeals the "statutory vacancy bonus," a 20 percent rent increase enacted in 1997 that landlords get every time an apartment turns over. This is, in effect, an eviction bonus, as it gives bad landlords an irresistible incentive to harass and evict long-term tenants.

There is a connection between the preferential rent loophole and the statutory vacancy bonus. With these two enactments, the legislature created an outright scam that is victimizing tenants and destroying housing affordability, especially in low-income communities of color.

Here's how it works: the landlord rents a rent-stabilized apartment to a new tenant at a preferential rent (let's say at $1,100 per month), when the registered rent is $1,800. A year later, the landlord sends a lease renewal notice to the tenant, offering to renew for $1,800 plus the rent adjustments authorized by the city or county Rent Guidelines Boards. Unable to afford a $700+ per month rent increase, the tenant vacates, whereupon the landlord re-rents to another unsuspecting tenant, again with a preferential rent. Before doing so, however, the landlord is allowed to add a statutory vacancy bonus of 18-20 percent (in this example, $360) to the registered rent, moving it closer to the deregulation threshold. Another year goes by and the scam is repeated once more.

According to the NYS Division of Housing and Community Renewal, at least 55 percent of apartments with preferential rents have registered rents that are likely illegal. Our weak rent laws promote churning of apartments, displacement, illegal rent overcharging – and illegal deregulation.

S1593 Sponsors: Serrano, Addabbo, Alcantara, Avella, Benjamin, Dilan, Gianaris, Hamilton, Hoylman, Krueger, Parker, Peralta, Persaud, Sanders, Savino

A9815 Sponsors: Pichardo, Cymbrowitz, Rosenthal L, Carroll, Sepulveda, De La Rosa, Dinowitz, Bichotte, Taylor, Barnwell, Ortiz, Mosley

The Real Rent Reform Campaign urges enactment of these three bills – this year. Elected officials who genuinely care about protecting tenants and preserving affordable housing must act now, rather than waiting until next year, when the sunset of the rent and co-op laws has been deliberately set for eight months after the November 6 statewide election.

realrentreform.org | 212-979-6238



FOR THE RECORD

**Testimony of Elizabeth Ginsburg**
**Senior Program Officer**
**Enterprise Community Partners, Inc.**

**To the New York City Council Committee on Housing and Buildings**
**Proposed Res. No. 188-A**

**March 19, 2018**

On behalf of Enterprise Community Partners, I would like to thank Chair Cornegy and the City Council Committee on Housing and Buildings for convening today's hearing on extending the rent stabilization laws. This hearing is an opportunity to discuss a critical tool at the city's disposal to help stabilize communities and prevent displacement.

Enterprise is a national nonprofit organization that provides capital for affordable housing and community development, advocates for policies that advance these goals, and supports local groups working on these issues. Since our New York office opened in 1987, we have committed nearly $3.4 billion in equity, loans, and grants to help create or preserve over 60,000 affordable homes for nearly 160,000 residents in the region.

The 2017 New York City Housing and Vacancy Survey released last week found that the citywide net rental vacancy rate was 3.63%, which triggers the declaration of a "housing emergency." Additionally, the vacancy rate in 2017 for rent-stabilized units overall was 2.06% and, on the whole, vacancy rates decrease as the more affordable a unit is. The vacancy rate for apartments with rents under $800 per month is a mere 1.15%, highlighting the extreme shortage of housing affordable to households with the lowest incomes. The HVS underscores the need for rent regulations to protect the city's lowest income households, and we fully support the Council voting to extend the rent stabilization laws.

As the Council and the city well know, building affordable housing in New York is incredibly costly, and the city is investing record amounts of money to help meet the extreme demand. We must ensure that as we build new housing, that existing housing remains affordable. Rent regulations have been part of the fabric of New York City for nearly a century. While the declared housing emergency affirms the need for the renewal of the rent laws, additional data on



regulated units show that the New York State Legislature must go even further and strengthen outdated rent laws when they come up for renewal in 2019 in order to maintain this critical stock of affordable housing.

Specifically, we are urging the New York State Legislature to reform these elements of the rent stabilization system:

- **Vacancy allowance** – One element that is ripe for reform is the vacancy allowance. Each time a rent-stabilized tenant moves out or is evicted, the landlord is entitled to a 20% rent increase. This high allowance contributes to the loss of rent-stabilized units by speeding the process by which a unit reaches $2,700 decontrol level. If a unit experiences a high turnover in a short period of time, the vacancy allowance will quickly get it to the deregulation threshold. While this frequently happens organically, some bad acting landlords will employ harassment mechanisms so that rent-stabilized tenants will leave and they can quickly bring the unit out of regulation.

- **Preferential rent –** Another component of the rent laws that increasingly poses a problem is the use of preferential rents, which allows landlords to rent apartments for less than the registered maximum amount, with the option of bringing rents back to their higher registered rents at lease renewal. One negative result of this practice is that buildings, particularly in gentrifying areas, are being marketed to buyers as having preferential rents and in some cases indicating just how much the rents could be raised. The sorts of buyers that these ads are directed at would be eager not only to raise preferential rents to the maximum rents, but also get current tenants out so they could drive rents up further, leading to displacement and speeding the pace at which these neighborhoods gentrify.

- **Major Capital Improvement and Individual Apartment Improvement increase** - Landlords can also raise rents when they make capital improvements to their buildings. We fully support there being an incentive for landlords to make vital repairs and invest in their buildings. But safeguards must be put in place to ensure that landlords are not abusing it to make expensive, merely cosmetic upgrades, or claiming an increase simply

ENTERPRISE COMMUNITY PARTNERS, INC.
One Whitehall Street ■ 11ᵗʰ Floor ■ New York, NY 10004 ■ 212.262.9575 ■ www.EnterpriseCommunity.org

March 19, 2018

Julie Hanlon of Dexter House 345 W. 86th St Tenants Association  347 757
9251

Landlords bank on our ignorance or poverty or worse our vulnerabilities.
That is why I support Resolution 188-A & Intro 600-A.

Many thanks to Speaker Corey Johnson for putting pressure on Albany,
Hon Councilmember Helen Rosenthal for her advocacy in restoring
affordable housing for all, and Anna Gago for guiding tenants to acting on
their rights under law.

Loopholes in regulation for, an SRO landmark 1924 building means tenants
who live here long term face constant and even criminal harassment to
force us out of our right to live in permanent rent stabilised homes. It took
me four years to prove we have been being slowly poisoned by air laden
with chemicals not limited to pesticide poisons where our Manager was
found guilty and held accountable while staff and tenants they assigned
dispersed illegal banned pesticide poisons mixed with other chemicals up
to 24 hours a day in our air.  He later admitted guilt (avoided a trial I had
ongoing in Housing while they denied all existence of fumes) to paying
fines issued. (Now in Motion to restore by Hon Judge Wendt 001340(16)

A history using these laws to deregulate rooms  led by greed, and cruelty to
mostly ageing Senior, Disabled, and Elderly female tenants— woven neatly
around every loop hole these laws created.  With such a need for
affordable housing, it is unrealistic to allow regulations to continue.  Laws
should reflect penalties for landlords abusing tenants and they should be
forbidden deregulation where found guilty of harassment or that which
dishonestly was reported.

Our Certificate of Occupany says 150 rooms, but we know there are more.
but because of these loopholes and fancy lawyers hired by wealthy
Landlords they can work out  aspects with like rooms declared empty to
DHCR to not really be empty.  What that looks like for SRO tenants on the
ground is the landlord hires Managers who migrate or place "aggressor
harassment occupants" for short term abuse of the elderly. Moving them

from room to room to abuse the real SRO Tenants or floor to floor so they can put in illegal higher priced rentals. I know a man that left for 3,000 after his cat was found buried in the wall when he returned from a day trip. Predatorial landlords with little regard for law have no regard for Rent Stabilised tenants using any means to harass or extract them out of their right to live peacefully with security.

Without these laws repealed we are at war to keep our homes, and protect our rights.   They constantly raise the rents of single rooms by  renting to tourists for 29 days must leave before they would stay the 30th day.

Tenants paying illegally higher rents are another benefit of these loopholes. There is a work stop order in my building.  Yet, no regard for law means illegal construction happens while they build luxury standards that tax the rest of the building's plumbing and wiring using non licensed workers?! (no SRO room has a kitchen or private bath but the new higher rent occupants have it built)This  means harassment on real tenants because noise and in our case Violations for lead paint dust in the air duration of work largely done after hours so Inspectors never find out.  Same with chemicals. I remember telling my Manager for two years I was being electrocuted to a degree when showering, a jolt.  His reaction was to laugh not correct.

People disobeying any City Ordinance certainly prove their gain of how to manipulate a system built to protect their gain.  This must be stopped.

There is a well orchestrated system enabling harassment to constructively evict long term residents like ~~███████~~ US,

Repeal Vacancy DeRegulation to stop a system of chronic abuse by predatorial SRO Landlords using these laws to gain in hidden ways.

https://nypost.com/2017/03/12/rent-controlled-tenants-say-landlord-tries-to-oust-them-with-pesticides/



# Rent-controlled tenants say landlord tries to oust them with pesticides

By Bill Sanderson

March 12, 2017 | 6:45am | Updated



345 West 86th St. J.C. Rice

Residents of an Upper West Side building say their landlords treat them like roaches and rats by trying to chase them from their apartments with pesticide.

Modal Trigger                                     Jay Wartski.

Late at night, employees at Dexter House — a single-room-occupancy building at 345 W. 86th St. just off Riverside Drive — allegedly walk the building's winding hallways spreading a poisonous mix of pesticide and deodorizer near the apartments of longtime rent-controlled tenants.

"I believe they want to kill me. I have a bad breathing problem," nonagenarian Helen Ball complained last year to the state division of Homes and Community Renewal.

"I strangle if I lie on my back," said Ball's handwritten complaint. "It's difficult to eat or drink . . . I always liked the management . . . I don't know why they now want to kill me."

Ball eventually moved.

Another tenant, speaking on condition of anonymity, told The Post she caught a man spraying under her door at 2 a.m. and suffered rashes and breathing problems presumably from the mystery chemicals.

"I started to get weird odors," she said. "I started to get severe headaches. I started to get nauseous."

After seeing several doctors, she found an ear, nose and throat specialist.

"He said it was something I was inhaling," the woman said.

The tenants' claims gained credence when a state Department of Environmental Conservation inspector found pesticides stored in the building during visits in September and November.

The inspector says Dexter House employees are not certified to use the chemicals and did not keep daily records of their use — in violation of state law.

Legal Aid Society lawyers, who have seen landlords use all kinds of underhanded strategies to rid their buildings of tenants they dislike, are astonished by the allegations. Adan Soltren, who is trying to organize Dexter House tenants for a lawsuit, said if building residents' claims are true, they are among "the more sinister kinds of tactics I've heard of."

Modal Trigger                          Julie Hanlon J.C. Rice
For years Dexter House residents have accused lead landlord Jay Wartski of seeking to get rid of them so their rooms can be put to more lucrative use.

They live cheaply in one of the city's most desirable neighborhoods, on the Upper West Side near Riverside Park. A five-story single-family town house next door to Dexter House was put on the market in 2013 with an asking price of $50 million.

Julie Hanlon, a Dexter House tenant for 25 years who brought the pesticide allegations to officials, pays $308 per month in rent.

Wartski has a long history as a landlord feared by the city's poor. In the mid-1980s he reportedly spent 30 days at Rikers Island for refusing to repair hazardous conditions at an SRO he owned on Chambers Street in Tribeca.

Wartski, his brother, Allen, and his father, Jerry, were labeled by the Village Voice in 1984 as the city's "most heartless" SRO landlords. Tenant organizers accused Wartski of moving drug dealers and "goons" into one of the family's buildings, which included 25 rooms used by prostitutes.

Dexter House's manager, Robert Goicochea, said the pesticides found by the state inspector were used to provide good service to tenants.

"Whenever a tenant would ask to have his room sprayed, my super would go upstairs and spray in the room with any product he got in the hardware store," Goicochea said.

The state inspector found a spray can of Gentrol, a pesticide used to combat bedbugs and cockroaches, which under state law building workers may not use or possess. Gentrol's active ingredient is a chemical called hydroprene. According to the National Pesticide Information Center, little is known about its effect on humans.

The inspector also found three other containers of pesticides advertised as capable of killing bedbugs. They were legal for the building to possess, but not legal for employees to use, a state official said.

Goicochea acknowledged the issues raised by the state inspector: "He notified us we shouldn't be spraying. He said, 'OK, you guys have to go and get certified.'"

Wartski's lawyer, Jeffrey Seiden, said there is "no validity" to claims that building workers are trying to chase people from the building with pesticides.

"There has been no attempt to evict anybody through the use of illegal chemicals," Seiden said.

But Hanlon says some tenants of the 16-story, 270-unit building stuff paper under their doors nightly to keep fumes from seeping in.

"What they did to us is a horror show," she said.



for bringing a building back into compliance after years of neglect. Without sufficient oversight, it can be easily abused.

With more than 60,000 people in homeless shelters every night and nearly a quarter of households paying more than half their income in rent each month, New York simply cannot build its way out of this. Low-income families occupy more than two-thirds of the city's rent-stabilized units. The state must take this opportunity to strengthen the rent regulation system and enforce it in order to sustain the city's regulated stock and promote stability in communities.

Thank you for your time and we look forward to working with the City Council and HPD to ensure that all New Yorkers have the safety and security that an affordable home provides.



**TENANTS &**
**NEIGHBORS**
*THE STATEWIDE CENTER OF POWER FOR TENANTS*

Delsenia Glover, Director, Education and Organizing

**New York State Tenants & Neighbors**

*Testimony as Prepared*

March 19, 2018

**New York City Council Committee on Housing and Buildings**

**Resolution No. 188-A Intro No. 600-A**

Good afternoon. Thank you for the opportunity to submit testimony today.

My name is Delsenia Glover and I am the Director of Education and Organizing for New York State Tenants & Neighbors Information Service and New York State Tenants & Neighbors Coalition, two affiliate organizations that share a common mission: to build a powerful and unified statewide organization that empowers and educates tenants; preserves affordable housing, livable neighborhoods, and diverse communities; and strengthen tenant protections. The Information Service organizes tenants in at-risk rent regulated and subsidized buildings, to help tenants be active in preserving their homes as affordable housing, and organizes administrative reform campaigns. The Coalition is a 501c4 membership organization that does legislative organizing to address the underlying causes of loss of affordability. Our membership organization has over 3,000 dues-paying members.

Tenants & Neighbors organizes in rent-regulated, Mitchell-Lama, and project-based Section 8 developments citywide. In the buildings where we organize, the story is the same.  Low and moderate income tenants in New York City are regularly experiencing the pressures of displacement.  Rents are climbing and tenants are concerned that they will not be able to afford to stay in their homes and communities.  A major cause of the massive affordability and housing crisis is the power of the real estate industry to shape pro-landlord policies and laws.

Tenants & Neighbors is testifying today in support of Resolution no. 188-A and Intro no. 600-A. for the renewal of the rent stabilization and rent control laws, and am here

also to advocate along with the broad tenant and affordable housing movement for the strengthening of the rent laws.

I would like to thank Speaker Corey Johnson for advocating for the strengthening of the rent laws, and the Chair of the Housing and Building Committee, Robert Cornegy, and all of the members of the Housing and Buildings Committee for agreeing to be allies in this essential fight for the soul and future of New York.

The data that has been released in the Housing and Vacancy Survey outlines the severe housing crisis that low-and moderate income tenants are facing in New York. In the past three years, the asking rent has risen by 30%, rent burdens have grown, and the number of apartments renting for below $1,000 decreased by 87,720 units. This is the experience of our members and tenants across the city suffering because of a crisis of loss of affordable housing and weak rent laws. We are here today to also call on Albany to not just renew the rent laws, but strengthen them as well to fix a broken system. We are calling for the elimination of the vacancy allowance, reform preferential rents, and Major Capital Improvements, and ensure that the rent laws serve the protection and stability of neighborhoods, rather than promoting a fertile ground for speculative investment and tenant displacement.

Thank you very much for the opportunity to testify today. We so appreciate your advocacy to renew and strengthen the rent laws, and partner with us on this key preservation campaign for 2.5 million New Yorkers.



**COMMUNITY HOUSING IMPROVEMENT PROGRAM, INC.**

Community Housing Improvement Program (CHIP) is a trade association representing more than 3,500 residential building owners in New York City. CHIP has been an active player in city and state housing policy for 52 years, almost as long as this so-called emergency has existed.  We thank the City Council for its time and consideration in giving CHIP the opportunity to testify concerning the bill and resolution that would extend rent control and rent stabilization in New York City for another three years.

Testimony of Community Housing Improvement Program In Opposition to Res. 0188A-2018 (determining that a public emergency continues to exist, requiring the extension of rent control) & Int. 0600A-2018 (extending rent stabilization)

Some might say this is like déjà vu all over again. Another NYC Housing Vacancy Survey, another vacancy rate below 5%. Another declaration of emergency by this City Council so that the ineffective policies of Rent Stabilization and Rent Control (collectively "rent regulation") can continue. Since 1965, this declaration of emergency has occurred every three years without interruption. After 17 declarations of emergency and more than 50 years of rent regulation, isn't there enough historical evidence of rent regulation's failure to condemn it as poor housing policy?  And if first-hand experience is not enough, there is a significant majority of accredited economists and accredited economic research illustrating that rent regulation doesn't work in the long run. Applying the principal of trial and error, it has become clear that rent regulation is not a solution to the problem the Council is trying to solve.  And while rent regulation may arguably provide some benefit to individuals lucky enough to find such an apartment, it punishes everyone else (see the most recent study by the National Bureau of Economics at http://www.nber.org/papers/w24181). The Council should be exploring other policy avenues that will rationally address the problem, giving the tenants of this city an adequate supply of decent and affordable housing.  Reliance on rent regulation, although a politically popular position, will only result in more of the same.

If the Council is serious about making housing more affordable to all, it will resist the urge to do what is easy politically (but ineffective), and find the courage to do what is politically hard (but effective).  Rental housing will become more affordable if more rental housing is constructed.  The Council must encourage more rental

housing to be constructed by making it cheaper to build, streamlining the approval process, and setting expectations up front rather than through an ad-hoc process.  Something is wrong when the only way rental housing can be built is with the use of tax subsidies.  In addition, the Council must also look to subsidy programs as the proper mechanism to bring affordability to very low income households – akin to the Federal Section 8 program.  Housing subsidies such as the Section 8 Housing Choice Voucher Program have been found to be the best mechanism to target affordable housing subsidies to those in need.

Rent regulation in NYC was implemented to alleviate certain price pressures on renters by preventing rent-gouging, profiteering, and taking advantage of a tight housing market that was overburdened as American soldiers returned home from World War II.  However, these wartime and post-war conditions have long since receded, so why does rent regulation still exist?  According to the law itself, to alleviate the same price gouging concerns due to a tight housing market, but there is no longer anything in the statute that points to the cause of the tight housing market.  So the original cause of the housing emergency has ended, but the housing emergency, and the accompanying rent regulations, still exist.  From a logical perspective, it would appear that the continuation of the rent regulations have played a role in maintain the housing shortage. Despite the law's stated purpose to transition from a regulated market to a normal market of free bargaining, it has not yet happened because rent regulation is a self-fulfilling prophecy.

One of the destructive side effects of rent regulation is the deterrence of new housing construction.  Not because a new multifamily building would be subject to rent regulation per se (although it could have some aspect of rent regulation if built with certain tax benefits or was subject to a regulatory agreement as part of a zoning change), but because it is almost impossible, and extremely expensive, to build a new building if the old one that needs to be torn down is occupied by rent regulated tenants.  First, it is usually impossible to transfer a long-time tenant to another apartment in a neighborhood because a long-term tenant is likely to have a rent below the market rate, and under the rent laws the new apartment would have to be at the same rent.  Even where an owner agrees to keep rent levels at the new apartment equivalent to the old apartment and follow the RGB rates for renewal leases, the courts have held, with the City's blessing, that this would not comply with the rent laws. So the only option is to pay the tenants to leave – an extremely expensive and time consuming endeavor, with no guarantee

of success.  This expense and uncertainty prevents underdeveloped buildings from being redeveloped to current zoning allowances.  In this fashion, the New York City rent laws prevent the efficient utilization of parcels of land suitable for new affordable housing—and this in a city that, according to current and past generations of status quo defenders, is perennially short of affordable housing.

In essence, it defeats the goal of building more housing (and thus making housing more affordable) by deflecting investment from multi-family housing to other sectors of the economy not burdened by the minefield of risks, liabilities, and price controls that fetter multi-family housing in a rent-regulated environment. In other words, investors seeking a competitive rate of return will put their dollars anywhere but multi-family housing— at least multi-family housing in the rent-regulated City of New York.

One can take slender comfort in the mayor's claim, in a January 20, 2018, press release, that "The City has financed [not created] 87,557 affordable apartments since 2014." Whence will come the other roughly 500,000 units needed to address the housing shortage? From the adoption by this Council of practical and proven policy measures to create new housing and to make our existing housing stock more affordable. For example:

1. The City of New York could immediately make available for residential development the "more than 1,000 city-owned properties" currently lying fallow, according to a report released by the Office of the City Comptroller on February 12, 2018. If optimally developed, these vacant lots could support **50,000 to 100,000 new units of affordable housing**. The City Council must amend our antiquated, unduly rigid, and numbingly complicated zoning rules in order to permit such development to occur.

2. The Senior Citizen Rent Increase Exemption (SCRIE) and the Disability Rent Increase Exemption (DRIE) exemplify public policies that work directly to increase the affordability of rental housing, by properly shifting the burden from those who cannot afford to pay their rent to the government, rather than to taxpaying property owners. The federal Section 8 Housing Choice Voucher program is an even better example. These programs could be reformed, expanded, and perpetuated. Likewise, state and local rental subsidies could be increased to compensate for the anticipated federal cuts to Section 8—another example of an effective, targeted policy measure that actually makes housing affordable for persons who need the help, not at the expense of only one class of private citizens, but at the expense of society as a whole.

4

We note that HPD's "Selected Initial Findings of the 2017 Housing and Vacancy Survey" reports a 3.63% Rental Vacancy Rate. But Table 8 thereof discloses that **245,425** vacant rental units were excluded from the calculation of the Rental Vacancy Rate. We recognize that a certain proportion of these are genuinely unavailable, but the magnitude of this figure should give every member of this Committee pause, in evaluating the need for a renewed "housing emergency" declaration.

Data from the 2017 Housing and Vacancy survey also illustrate that the housing market can work in NYC if allowed to function. According to Table 6 of the 2017 HVS Initial Findings, the vacancy rate for unregulated units was 6.07%. The vacancy rate for all rental units renting between $2,000 and $2,499 per month was 5.2%. Even according to the arbitrary definition of an emergency used by this Council, no emergency exists for rentals at that price point. The Council should declare that no emergency exists for the class of units renting above $2,000.

The media has also picked up on these trends. According to several news reports, rents are declining and new housing supply is making NYC more affordable (see the Wall Street Journal, "New York Housing is Getting (Gasp!) More Affordable," https://www.wsj.com/articles/new-york-housing-is-getting-gasp-more-affordable-1520449102; Bloomberg News, "Manhattan landlords race to fill apartments in declining market," http://www.crainsnewyork.com/article/20180315/REAL_ESTATE/180319947/manhattan-landlords-race-to-fill-apartments-in-declining-market; and The New York Times, "As Brooklyn Towers Soar, a Sinking Feeling for Developers," https://www.nytimes.com/2018/03/16/realestate/brooklyn-development.html). We urge the Council to eliminate rent stabilization in NYC and allow the housing market to function in its purest form, with government subsidies rather than rent freezes to address issues of affordability.

For all the above reasons, we at CHIP urge the City Council to reject both Res. 0188-2018 and Int. 0600-2018.

Thank you again for your time and consideration.

*For The Record* (RP)

**April Sandmeyer- Tudor City Rent Stabilized Tenant- Testimony at City Council Hearing-3/19/18  In SUPPORT of Renewal of city rent control and stabilization laws, Resolution 188A and Intro 166**

Thank you Speaker Johnson, Housing Committee Chair Robert Cornegy, and others for your support of stronger rent laws, for helping tenants pressure Albany to close loopholes, and for understanding that merely renewing the city rent laws, in their weakened state, is not an adequate response to our city's housing affordability crisis  and homelessness.

The majority of rent regulated tenants are seniors and the disabled, whose low incomes kept them from being able to afford to move. When they lose their apartments, they end up in nursing homes, costing taxpayers millions of dollars, compared to the cost of tax abatements that landlords have now. I witnessed this first hand, as a volunteer, accompanying tenants from my Tudor City neighborhood to Housing Court and otherwise helping them fight evictions, after the bldgs. went co-op and landlords aggressively attempted to repossess their apts. Only one of them is still in her apt. The rest ended up in nursing homes with Medicaid footing their bills. By renewing and strengthening rent regulation laws, YOU WILL SAVE OUR GOVERNMENT MILLIONS OF DOLLARS.

Landlords have an advantage over tenants. They've found more creative, complex, and strategic ways, including, using construction, demolition, and repairs, to get tenants out. In order to defend themselves tenants have to be able to come up with thousands of dollars in advance to get a lawyer capable of tackling landlord's legal experts experienced in how to remove rent regulated tenants. Legal fees are tax deductible to the landlords, but not to tenants. There is misleading hype about protections and free legal services available for tenants. Most legal assistance agencies only have grants to help tenants once they are in Housing Court, and only under very specific simple circumstances, such as non payment.

A 90 yr old I know was "forced" to "temporarily vacate his apt. for repairs to the roof, only to be kept out for more than 5 years. He won't get back in. I am in a similar situation, trying to keep from being forced to vacate my apt., under questionable circumstances, using construction and demolition and have endured harassment for decades.

I was told that no tenant has ever succeeded in a harassment case against their landlord because they are impossible to prove. This needs to be made easier and legal services should help tenants do this. Penalties for landlords' abuses are a slap on the wrist, and inexpensive, compared to the profits they stand to gain by getting rent regulated tenants out.

Recently, I tried to help a retired teacher neighbor that felt she was being harassed by her landlord, find another apt. No one was willing to give her an application unless she earned 45 -65x the monthly rent. We only found one bldg willing to accept her if she paid the year in advance. When her lease is up she has to pay another year up front, but can't afford to keep doing it.

I have spent more than half my life: time, energy, and income, fighting to remain in my home, when I am an ideal tenant and have done nothing wrong. I am tired, but still thankful because I am so much more fortunate than others who do not have as good a command of English, understanding of the legal papers they get or never see, or ability to defend themselves. Thank you.

CONTACT INFO: 917-806-4253
ASANDMEYER@AOL.com

MARCH 19TH,2018


TESTIMONY OF THE STOP CROMAN COALITION FOR NEW YORK CITY COUNCIL

IN SUPPORT OF RESOLUTION NO. 188-AND INTRO NO. 600-A


BY CYNTHIA CHAFFEE

CO-FOUNDRESS STOP CROMAN COALITION



**NEW YORK CITY COUNCIL
COMMITTEE ON HOUSING AND BUILDINGS
PUBLIC HEARING, MONDAY MARCH 19TH, 2018, 1;00 PM**

**Subject of Hearing: Resolution No. 188-A
Intro No. 600-A**

**Cynthia Chaffee
The Stop Croman Coalition**

My name is Cynthia Chaffee and I'm the co-foundress of the STOP CROMAN COALITION, and we fully support Resolution 188-A and Intro 600-A.

On behalf of the Stop Croman Coalition, I am happy to be able to present testimony to the city council and we are especially thankful to Corey Johnson, the speaker, for his efforts and leadership to facilitate a campaign to put pressure on Albany to close the loopholes and weaknesses in the state and city rent laws that allow landlords to remove apartments from rent regulations and charge exorbitant rents that the working people of New York City cannot afford to live in. I believe Corey Johnson fully understands that without the strengthening of the rent laws, we will continue to lose rent stabilized units to the point of extinction.

Our landlord Steven Croman is a convicted felon and is currently serving one year in jail due to mortgage fraud. Also, a civil suit brought by the attorney general's office on behalf of tenants who suffered extreme harassment was brought by the Attorney General's office and was recently settled. Under the terms of this settlement he will have to relinquish the management of 106 of his properties to a new management company selected by the attorney general.

Croman has an empire of close to 200 buildings in Manhattan. His "modus operandi" has been to acquire buildings and then begin to start the harassment of rent stabilized tenants to get them out, raise rents and deregulate apartments under the vacancy decontrol laws. He has been able to empty out most of the rent regulated tenants out of his buildings. Vacancy decontrol gives him an incentive to get tenants out using harassment tactics which included frivolous litigation, deprivation of services, use of private agents known as tenant relocation specialists to aggressively pursue buy-out offers even when the agents were told by the tenants that they were not interested.

Helen Rajewsky, a 92 years old woman was forcibly removed by the police at the request of Croman's property managers and taken to Bellevue hospital for "observation" all because she knew her rights and didn't have to open her door to them without 24 hour notice. The property managers called the police and they restrained her, threw her on a gurney and took her to Bellevue. She was released several hours later into a rainy, windy, bitter cold night walking home from the bus stop in her house slippers, that rubbed against the skin of her foot creating an open sore. Ms. Rajewsky is diabetic, the wound didn't heal, and the result was part of her foot was amputated. This is the greed of Steve Croman. Helen has a rent control apartment and he wants it.

Raymond Miskell, is 85 years old and had lived in his RC apt. for 68 years. Croman bought the building and defrauded him of his succession rights, and thus his apartment was stolen from him. He is now living out his remaining years in a Salvation Army Residence, which is also closing, and he will be uprooted again.

Croman's victims are too numerous to mention. You may read more examples in our website: **www.stopcromancoalition.org**. Go to the section The Vulnerable."

Vacancy decontrol has been the engine of displacement and gentrification in our neighborhoods. This incentive has to be eliminated together with the preferential rent loopholes and the statutory vacancy bonus which gives the landlords 20% automatic rent increases upon a vacancy.

The Stop Croman Coalition and I thank Corey Johnson for his leadership and we call upon Mayor De Blasio to help mobilize the city to put pressure on Governor Cuomo to make this fight a priority!

Ms. Norma Schreier, Member

Tenants & Neighbors
*Testimony*
March 19, 2017
The New York City Council
Hearing
Resolution no. 188-A and Intro no. 600-A

Good morning. Thank you Speaker Johnson and Chair Cornegy, for your continued support of stronger rent laws and the opportunity to speak to the committee today. My name is Norma Schreier and I am a member of the Rent Controlled Tenants Leadership Committee at Tenants & Neighbors. I am here to speak in support of Resolution no. 188-A and Intro no. 600-A. I am rent controlled tenant living on the Upper West Side, in the same apartment I moved into with my now deceased husband 50 years ago, now living with my disabled daughter, and I am here today to testify on behalf of the approximately 50,000 rent controlled tenants remaining in 22,000 units in New York, down 4,000 units since the previous HVS.

We call ourselves the forgotten rent regulated tenants, because there are about 1,000,000 rent stabilized apartments left in New York, so we do not get much attention. This year, rent controlled tenants lobbied Governor Cuomo for a rent freeze, even stopped traffic in front of his office – a bunch of septuagenarians and octogenarians – and spent the day in jail because we are so desperate to bring attention to the rent control issue.

We believe that the MBR system that controls rent adjustments for rent controlled tenants is outdated, unsustainable, and inhumane.

Think about this: In the 8 years of Governor Cuomo's administration, my rent has increased a whopping 44 percent. I repeat, 44 percent. In the same time, rent stabilized tenants rent has increased only 12%. The same economic conditions that exist in this city for rent stabilized tenants, and their landlords, exists also for rent controlled tenants. Why the discrepancy?

Here's another thought: In 1975, there were 642,000 rent controlled apartments in this city compared to 22,000 currently. Some were folded into rent stabilization, but others, due to the MBR system that controls this form of rent regulation, and if the landlord is not too lazy to file the papers each year, most of

our rents are more that the deregulation threshold for rent regulation, which is $2700 per month.

According to the initial findings from the 2017 Housing Vacancy Survey:

- Between 2014 and 2017 median asking rents in all renter units increased from $1,443 (in 2017 dollars) to $1,875, **by 30%!**
- Since 2014, median contract rents in regulated units increases by 2.6 percent compared to 10 percent in unregulated units.  The freeze mitigated the negative impact of the skyrocketing rental market on regulated tenants."

The biennial MBR factor at 7.4% for which we just received an announcement from DHCR, is much too high for rent controlled tenants in my Tenants & Neighbors group and the broader rent control community. With this increase, tenants will continue to pay annual rent increases with no end in sight, and the MBR, which is a promise of greater economic security, will continue to remain elusive.

I will leave you with this:  The majority of rent control tenants are senior citizens, living on a fixed income, and their mean income is $28,000 per year. They have experienced the burden of up to 7.5% rent increases each year, along with the fuel pass-alongs, and the unjust burden of higher MCI percentages at 15% for Major Capital Improvement Increases. Though the SCRIE threshold has been lifted which helps some of us, unfortunately, by the time that happened, most of us had already lost our quality of life.

Thank you.

**Testimony Of Susan Steinberg**
**President, Stuyvesant Town—Peter Cooper Village Tenants Association**
**Before The New York City Council Housing Committee – March 19, 2018**

Speaker Johnson, Housing Committee Chair Cornegy, members of the Housing Committee, thank you for supporting the renewal of city rent laws and the strengthening of state and city rent laws by closing loopholes. I am Susan Steinberg, President of the Stuyvesant Town-Peter Cooper Village Tenants Association, and we support Resolution 188-A and Intro 600-A.

STPCV contains approximately 11,230 units and 28,000 residents. In 1947, it was built as a community for people of *moderate* means. In 1980 my one bedroom cost $250 per month. In 2018, despite rent regulations, a one bedroom *starts* at $3156. Figuring 30% of one's income for rent, one must earn $126,240 to afford that one bedroom. That's not moderate. New York City's average annual salary is $68,883. Our cost of living is 129% higher than national average.

So how did a rent regulated community get from moderate to market? Through vacancy deregulation, through weakening of rent laws every time they come up for renewal in Albany, and through loopholes -- vacancy bonuses, preferential rents, and *lots* of major capital improvements that we pay for in perpetuity – loopholes that are bleeding our community, the city and the state of regulated renters.

To afford the rent in Stuytown today, tenants double or triple up and leave at renewal as rents rise. Two thousand units turn over every year, providing a big opportunity for a 20% vacancy bonus. That, plus multiple MCIs we pay for til death push rents to exceed the $2,700/month deregulation benchmark.

To ease the turn-over burden and sting of market rates, management offers preferential rents. Forty percent of our renters are preferential. The difference between the preferential and legal rents can be hundreds or thousands of dollars. Most renters don't understand that the landlord is allowed to raise the rent all the way up to the legal rent on renewal. The Tenants Association gets the calls from tenants suffering from sticker shock when their monthly rent increases by, say, $500.

Renters are at a disadvantage. Owners don't worry every three years about whether they will have a roof over their heads. Resolution 188-A and Intro 600-A must be passed and rent laws strengthened to ensure that housing for hundreds of thousands of tenants is a right, not a luxury.

Thank you council members for the opportunity to testify.

# Ed Viera, Jr.

> **MPA, MS Ed.**

> **Disabled PLWA**

**NYC Council Committee on Housing and Buildings**
**Public Hearing**
**March 19th, 2018**

Dear Councilmembers:

My name is Ed Viera, Jr. I'm a disabled Special Ed teacher and a person living with AIDS.

I support Resolution 188-A and Intro 600-A.

I also want to thank Speaker Corey Johnson for helping the tenant movement, and for reminding everyone of the affordability crisis we're all facing.

The fact is that the current city rent laws are too weak. Embedded within are loopholes that promote homelessness and economic misery among the disabled, the elderly, fixed- and low-income people.

Merely renewing these laws every few years perpetuates this crisis because the landlords are the ones who benefit the most from them.

We should:

- **Repeal vacancy deregulation and re-regulate units lost to decontrol**

  (Leland Davidson died 2 years ago, his rent-stabilized apartment was deregulated. The new tenant, unable to afford the market rate, is seeking housing elsewhere.)

1314 Grand Concourse, #1-C
Bronx, NY    10456

917-500-6969
edvierajr@gmail.com

- **Repeal the preferential rent loophole that allows landlords to slam rent-stabilized tenants with huge rent increases when leases are renewed**

  (When I renewed my lease in 2016, the rent jumped from $1,100 to $1,250. The landlord told me that that's what HASA agreed to pay. That was a lie.

  Last year I went to Housing Court to fight the rent overcharge. They referred me to DHCR. I filed the Rent Overcharge Application, but haven't heard anything yet.

  To expedite the process, I began withholding my 30% of the rent last February in the hopes the landlord files in Housing Court and I can countersue for the overcharge, a fraudulent apartment registration designed to increase the apartment's market value, and harassment.

  But as long as the landlord can continue to hide behind the preferential rent loophole, my chances are slim.)

- **Repeal the statutory vacancy bonus (eviction bonus) that allows landlords to tack on a 20% rent hike whenever an apartment turns over**

  This means less housing for all of us; and faster gentrification.

I beseech this committee, and the Council as a whole, to fight for social justice and help us amend these laws. This isn't just about me, it's about all of you as well.

Thank you so much.



PICTURE THE HOMELESS

### Testimony of Scott Andrew Hutchins
### 2017 Housing and Vacancy Survey

**March 19, 2018**

I would like to thank the speaker for inviting us to testify at this hearing, and for the speakers' and council's support for renewing and strengthening the rent laws protecting New York City tenants. My name is Scott Andrew Hutchins, and I am here to represent Picture the Homeless. In two months, I will be a six-year resident of the New York City shelter system, which pays $1,306.91 per month MORE to shelters than the rent of my previous apartment to house me alone.

At Picture the Homeless, we find the results of the survey appalling but not surprising. It reiterates our demand for a registry of all vacant property in the city as called for by Intro 226. The crux of our argument for this necessity is found in the following statistic from the report: Although the city increased its overall housing stock by 69,000 units this year, approximately 65,400 additional units are considered "vacant, but unavailable for sale or rent" than in 2014" This means that net available housing stock, for all practical purposes, went up by only 3,600 units, far lower than the number of people who enter shelter each year.

While developers get tax breaks for creating new "affordable" housing stock, the vast majority is well beyond the means of low and extremely low income people. The net vacancy rate for extremely low income housing is 1.15%, while the net vacancy rate for extremely high income units is 8.74%, and this is an upward trend, whereas extremely low income housing is on the decline from the 2014 survey. With median household income at $57,500, why are we giving tax breaks for housing for people who make over $100,000 per year when so many of these units are vacant? Instead, we should be doing the reverse: in addition to the fees and fines imposed by a vacant property registry, we support the introduction of a pied à terre tax for units that remain vacant for too much of the year.

If the city is really committed to ending homelessness, it cannot be rewarding developers who add to the problem.

Greetings to you Chairperson Cornegy and Speaker Johnson.
My name is Leslie Foltz-Morrison and I live in the Bronx in a rent stabilized
apartment. I am here as a member of Met Council on Housing in support of
Resolution 188-A and Intro 600-A.

I thank you and all the members and staff of the Housing Committee for your
public service on behalf of New Yorkers and concern that renters throughout the
city can stay in their apartments and avoid eviction and homelessness.
I am especially concerned about the need to repeal the statutory vacancy bonus
which allows landlords to raise a rent stabilized apartment by 20% when a unit is
vacated. I have seen in my building in Kingsbridge my landlord has been tempted
to take advantage of this loophole these past couple of months after a pipe burst
and flooded 3 apartments. My neighbors in these units, 2 of them families with
young children, were moved from their flooded 2 bedroom units into vacant studio
units in the building, but their rents were not reduced. And the promised repairs on
their units still have not begun all this time. With the statutory vacancy bonus
loophole, I can see the landlord has a strong incentive to keep dragging out repairs
to the units they want to move back into, until they give up and move out. The
landlord will then be able to jack up the rent for new tenants, perhaps while not
disclosing to new tenants that there has been water damage in these units. It is no
wonder why NYC rents are so high with this loophole. In the face of our city's
housing crisis, it is essential we protect affordable units and the families who
depend on them.

30 years ago this month, the US Catholic Bishops issued a moral challenge for us
to view adequate housing as a human right, and it is now harder than ever to
advocate for this with the rise of Real Estate Investment Trusts seeing every
apartment as an opportunity to put profit over people. You have this important
opportunity to thwart this trend and protect millions of New Yorkers to retain
adequate housing by voting in favor of this legislation. And I thank you for all
your efforts to promote housing for people.

Thank you for the opportunity to testify on these items. For the record, ABO opposes Resolution 188-A and Intro. 600-A.

The definition of insanity is doing the same thing over and over and expecting a different result. Rent regulations have not solved New York City's housing shortage after 75 years. All the economic research indicates it is part of the problem. I am attaching a recent study of the effects of rent regulation in San Francisco as an example. It demonstrates clearly what "Economics 101" predicts: rent regulation actually results in fewer rental apartments, higher rents for free-market units, and less tenant diversity.

It is also worth mentioning that there is no reason to believe, other than a statutory definition, that a less than 5% vacancy rate means an emergency exists. There is no standard for measuring a vacancy rate or a housing emergency. The Housing Vacancy Survey chooses to define about 78,000 units undergoing or awaiting renovation as "unavailable to rent," yet there is no reason to believe that many such units identified at the beginning of the survey period are still unavailable by the end of the survey period, or at least soon after. Also, the HVS shows a vacancy rate well over 5% for apartments renting for more than $2,000 a month. Logically, the Council should at least consider declaring the emergency over for those units.

Dan Margulies

Associated Builders and Owners of Greater New York

Community Housing Improvement Program, Inc.

5 Hanover Square, Suite 1605

New York, NY  10004

o. 212 385-4949

c. 914 834-1897

dan@abogny.com

# The Effects of Rent Control Expansion on Tenants, Landlords, and Inequality: Evidence from San Francisco [*]

Rebecca Diamond[†], Tim McQuade[‡], & Franklin Qian[§]

October 11, 2017

## Abstract

In this paper, we exploit quasi-experimental variation in the assignment of rent control in San Francisco to study its impacts on tenants, landlords, and the rental market as a whole. Leveraging new micro data which tracks an individual's migration over time, we find that rent control increased the probability a renter stayed at their address by close to 20 percent. At the same time, we find that landlords whose properties were exogenously covered by rent control reduced their supply of available rental housing by 15%, by either converting to condos/TICs, selling to owner occupied, or redeveloping buildings. This led to a city-wide rent increase of 7% and caused $5 billion of welfare losses to all renters. We develop a dynamic, structural model of neighborhood choice to evaluate the welfare impacts of our reduced form effects. We find that rent control offered large benefits to impacted tenants during the 1995-2012 period, averaging between $2300 and $6600 per person each year, with aggregate benefits totaling over $390 million annually. The substantial welfare losses due to decreased housing supply could be mitigated if insurance against large rent increases was provided as a form of government social insurance, instead of a regulated mandate on landlords.

---

[*]We are grateful for comments from Ed Glaser, Christopher Palmer, Paul Scott, and seminar participants at the NBER Real Estate Summer Institute, The Conference on Urban and Regional Economics, and the Stanford Finance Faculty Lunch.

[†]Stanford University & NBER. Email: diamondr@stanford.edu.

[‡]Stanford University. Email: tmcquade@stanford.edu .

[§]Stanford University. Email: zqian1@stanford.edu .

# 1   Introduction

Steadily rising housing rents in many of the US's large, productive cities has brought the issue of affordable housing to the forefront of the policy debate and reignited the discussion over expanding or enacting rent control provisions. State lawmakers in Illinois, Oregon, and California are considering repealing laws that limit cities' ability to pass or expand rent control. Already extremely popular around the San Francisco Bay Area, with seven cities having imposed rent control regulations, five additional Bay Area cities placed rent control measures on the November 2016 ballot, with two passing. Rent control in the Bay Area consists of regulated price increases within the duration of a tenancy, but no price restrictions between tenants. Rent control also places restrictions on evictions.

A substantial body of economic research has warned about potential negative efficiency consequences to limiting rent increases below market rates, including over-consumption of housing by tenants of rent controlled apartments (Olsen (1972), Gyourko and Linneman (1989)), mis-allocation of heterogeneous housing to heterogeneous tenants (Glaeser and Luttmer (2003), Sims (2011)), negative spillovers onto neighboring housing (Sims (2007), Autor et al. (2014)) and, in particular, under-investment and neglect of required maintenance (Downs (1988)). Yet, due to incomplete markets, in the absence of rent control many tenants are unable to insure themselves against rent increases. A variety of affordable housing advocates have argued that tenants greatly value these insurance benefits, allowing them to stay in neighborhoods in which they have spent many years and feel invested in.

Due to a lack of detailed data and natural experiments, we have little well-identified empirical evidence evaluating the relative importance of these competing effects.[1] In this paper, we bring to bear new micro data, exploit quasi-experimental variation in the assignment of rent control provided by unique 1994 local San Francisco ballot initiative, and employ structural modeling to fill this gap. We find tenants covered by rent control do place a substantial

---

[1]A notable exception to this is Sims (2007) and Autor et al. (2014) which use the repeal of rent control in Cambridge, MA to study it's spillover effects onto nearby property values and building maintenance.

value on the benefit, as revealed by their migration patterns. However, landlords of properties impacted by the law change respond over the long term by substituting to other types of real estate, in particular by converting to condos and redeveloping buildings so as to exempt them from rent control. This substitution toward owner occupied and high-end new construction rental housing likely fueled the gentrification of San Francisco, as these types of properties cater to higher income individuals.

The 1994 San Francisco ballot initiative created rent control protections for small multifamily housing built prior to 1980. This led to quasi-experimental rent control expansion in 1994 based on whether the multifamily housing was built prior to or post 1980. To examine rent control's effects on tenant migration and neighborhood choices, we make use of new panel data sources which provide the address-level migration decisions and housing characteristics for close to the universe of adults living in San Francisco in the early 1990s. This allows us to define our treatment group as renters who lived in small apartment buildings built prior to 1980 and our control group as renters living in small multifamily housing built between 1980 and 1990. Using our data, we can follow each of these groups over time up until the present, regardless of where they migrate to.

On average, we find that in the medium to long term, the beneficiaries of rent control are between 10 and 20 percent more likely to remain at their 1994 address relative to the control group. These effects are significantly stronger among older households and among households that have already spent a number of years at their treated address. This is consistent with the fact both of these populations are less mobile in general, allowing them to accrue greater insurance benefits.

On the other hand, for households with only a few years at their treated address, the impact of rent control can be negative. Perhaps even more surprisingly, the impact is only negative in census tracts which had the *highest* rate of ex-poste rent appreciation. This evidence suggests that landlords actively try to remove their tenants in those areas where the reward for resetting to market rents is greatest. In practice, landlords have a few possible

3

ways of removing tenants. First, landlords could move into the property themselves, known as move-in eviction. The Ellis Act also allow landlords to evict tenants if they intend to remove the property from the rental market - for instance, in order to convert the units to condos. Finally, landlords are legally allowed to offer their tenants monetary compensation for leaving. In practice, these transfer payments from landlords are quite common and can be quite large. Moreover, consistent with the empirical evidence, it seems likely that landlords would be most successful at removing tenants with the least built-up neighborhood capital, i.e. those tenants who have not lived in the neighborhood for long.

To understand the reduced form impact of rent control on rental supply, we merge in historical parcel history data from the SF Assessor's Office, which allows us to observe parcel splits and condo conversions. We find that the owners of exogenously rent controlled properties substitute toward other types of real estate that are not regulated by rent control. In particular, we find that rent-controlled buildings were almost 10 percent more likely to convert to a condo or a Tenancy in Common (TIC) than buildings in the control group, representing a substantial reduction in the supply of rental housing. Consistent with these findings, we moreover find that, compared to the control group, there is a 15 percent decline in the number of renters living in these buildings and a 25 percent reduction in the number of renters living in rent-controlled units, relative to 1994 levels.

In order to evaluate the welfare impacts of these reduced form effects, we construct and estimate a dynamic discrete choice model of neighborhood choice. Motivated by our reduced form evidence, we allow for household preferences to depend on neighborhood tenure and age, and allow for monetary "buyouts" where landlords of rent-controlled properties can pay their tenants to move out. The model features fixed moving costs and moving costs variable with distance. A key contribution of the paper, relative to the existing dynamic discrete choice literature, is to show how such models can be identified in a GMM framework using quasi-experimental evidence.

We find that rent control offered large benefits to impacted tenants during the 1995-2012

period, averaging between $2300 and $6600 per person each year, with aggregate benefits totaling over $393 million annually. These effects are counterbalanced by landlords reducing supply in response to the introduction of the law. We conclude that this led to a city-wide rent increase of 7% and caused $5 billion of welfare losses to all renters. We discuss how the substantial welfare losses due to decreased housing supply could be mitigated if insurance against large rent increases was provided as a form of government social insurance, instead of a regulated mandate on landlords.

Our paper is most related to the literature on rent control. Recent work by Autor et al. (2014) and Sims (2007) leverages policy variation in rent control laws in Cambridge, Massachusetts to study the property and neighborhood effects of removing rent control regulations. Our paper studies the effects of enacting rent control laws, which could have very different effects than decontrol. De-control studies the effects of removing rent control on buildings which remain covered. Indeed, we find a large share of landlords substitute away from supply of rent controlled housing, making those properties which remain subject to rent-control a selected set. Further, we are able to quantify how tenants use and benefit from rent control, a previously unstudied topic due to the lack of the combination of appropriate data, natural experiments and estimation methods.

There also exists an older literature on rent control combining applied theory with cross-sectional empirical methods. These papers test whether the data are consistent with the theory being studied, but usually cannot quantify causal effects of rent control. (Early (2000), Glaeser and Luttmer (2003), Gyourko and Linneman (1989), Gyourko and Linneman (1990), Moon and Stotsky (1993) Olsen (1972)).

Our estimation methods build on the dynamic discrete choice literature. Previous work using dynamic demand for housing and neighborhoods has required strong assumptions about how agents form expectations and how all neighborhood characteristics evolve over time (Bishop and Murphy (2011), Kennan and Walker (2011), Bayer et al. (2016), Davis et al. (2017), Murphy (2017)). We relax these assumptions by building on Scott (2013). His

5

key insight is to use realized values of agents' future expected utility as a noisy measure of agents' expectations. This method allows us to avoid needing to make explicit assumptions about how agents form expectations. Further, we do not need to assume how all state variables transition over time. Both of these assumptions are typically needed to estimate dynamic discrete choice models. Scott leverages "renewal" actions in tenants' choice sets which allows estimation to focus on specific actions in agents' choice sets which exhibit finite dynamic dependence, greatly simplifying the dynamic problem (Arcidiacono and Miller (2011), Arcidiacono and Ellickson (2011)). Our contribution is to show how Scott's method can be generalized to a set of difference-in-difference style linear and instrumental variable regressions that can be used in combination with a natural experiment to identify the model parameters.

Finally, our paper is related to a separate strand of literature on community attachment in sociology. Kasarda and Janowitz (1974) provide survey evidence that length of residence is correlated with various self-reported indicators of neighborhood attachment. We estimate households' attachments to their neighborhoods, as revealed by their migration decisions. Consistent with survey evidence, we find community attachment grows with years living in one's neighborhood, but it accumulates quite slowly over time. One additional year of residence increases one's community attachment by the equivalent of $300.

The remainder of the paper proceeds as follows. Section 2 discusses the history of rent control in San Francisco. Section 3 discusses the data used for the analysis. Section 4 presents our reduced form results. Section 5 develops and estimates a dynamic discrete choice structural model. Section 6 discusses the welfare impacts of rent control. Section 7 concludes.

# 2   A History of Rent Control in San Francisco

Rent Control in San Francisco began in 1979, when acting Mayor Dianne Feinstein signed San Francisco's first rent-control law. Pressure to pass rent control measures was mounting due to high inflation rates nationwide, strong housing demand in San Francisco, and recently passed Proposition 13.[2] This law capped annual nominal rent increases to 7% and covered all rental units built before June 13th, 1979 with one key exemption: owner occupied buildings containing 4 units or less.[3] These "mom and pop" landlords were cast as less profit driven than the large scale, corporate landlords, and more similar to the tenants who were the ones being protected. These small multi-family structures made up about 30% of the rental housing stock in 1990, making this a large exemption to the rent control law.

While this exemption was intended to target "mom and pop" landlords, small multi-families were increasingly purchased by larger businesses who would sell a small share of the building to a live-in owner, to satisfy the rent control law exemption. This became fuel for a new ballot initiative in 1994 to remove the small multi-family rent control exemption. This ballot initiative barely passed in November 1994. Beginning in 1995, all multi-family structures with four units or less built in 1979 or earlier were now subject to rent control. These small multi-family structures built prior to 1980 remain rent controlled today, while all of those built from 1980 or later are still not subject to rent control.

# 3   Data

We bring together data from multiple sources to enable us to observe property characteristics, determine treatment and control groups, track migration decisions of tenants, and observe the property decisions of landlords. Our first dataset is from Infutor, which provides the

---

[2]Proposition 13, passed in 1978, limited annual property tax increases for owners. Tenants felt they were entitled to similar benefits by limiting their annual rent increases.

[3]Annual allowable rent increase was cut to 4% in 1944 and later to 60% of the CPI in 1992, where is remains today.

entire address history of individuals who resided in San Francisco at some point between the years of 1980 and 2016.[4]  The data include not only individuals' San Francisco addresses, but any other address within the United States at which that individual lived during the period of 1980-2016.  The dataset provides the exact street address, the month and year at which the individual lived at that particular location, the name of the individual, and some demographic information including age and gender.

To examine the representativeness of the Infutor data, we link all individuals reported as living in San Francisco in 1990 to their census tract, to create census tract population counts as measured in Infutor.  We make similar census tract population counts for the year 2000 and compare these San Francisco census tract population counts to those reported in the 1990 and 2000 population counts for adults 18 years old and old.  A regression of the Infutor populations on census population are shown in Figures A.1 and A.2[5] Figure A.1 shows that for each additional person recorded in the 1990 Census, Infutor contains an additional 0.45 people, suggesting we have a 45% sample of the population.  While we do not observe the universe of San Francisco residents in 1990, the data appear quite representative, as the census tract population in the 1990 Census can explain 70% of the census tract variation in population measured from Infutor.  Our data is even better in the year 2000.  Figure A.2 shows that we appear to have 1.2 people in Infutor for each person observed in the 2000 US census.  We likely over count the number of people in each tract in Infutor since we are not conditioning on year of death in the Infutor data, leading to over counting of alive people. However, the Infutor data still track population well, as the census tract population in the 2000 Census can explain 90% of the census tract variation in population measured from Infutor.  Now, Infutor matches well the level of the San Francisco population and generates an even higher $R^2$ of 89.9%.

We merge these data with public records information provided by DataQuick about the

---

[4]Infutor is a data aggregator of address data using many sources including sources such as phonebooks, magazine subscriptions, and credit header files.

[5]We only can do data validation relative to the US Censuses for census tracts in San Francisco because we only have address histories for people that lived in San Francisco at some point in their life.

particular property located at a given address. These data provide us with a variety of property characteristics, such as the use-code (single-family, multi-family, commercial, etc.), the year the building was built, and the number of units in the structure. For each property, the data also details its transaction history since 1988, including transaction prices, as well as the buyer and seller names. Again, we assess the quality of the matching procedure by comparing the distribution of the year buildings were built across census tracts among addresses listed as occupied in Infutor versus the 1990 and 2000 censuses. Figures A.3 and A.4 show the age distribution of the occupied stock by census tract. In both of the years 1990 and 2000, our R-squareds are high and we often cannot reject a slope of one. [6] This highlights the extremely high quality of the linked Infutor-DataQuick data, as the addresses are clean enough to merge the outside data source DataQuick and still manage to recover the same distribution of building ages as reported in both 1990 and 2000 Censuses.

To measure whether Infutor residents were owners or renters of their properties, we compare the last names of the property owners list in DataQuick to the last names of the residents listed in Infutor. Since property can be owned in trusts, under a business name, or by a partner or spouse with a different last name, we expect to under-classify residents as owners. Figures A.5 and A.6 plot the Infutor measure of ownership rates by census tract in 1990 and 2000, respectively, against measures constructed using the 1990 and 2000 censuses. In 1990 (2000), a one percentage point increase in the owner-occupied rate is leads to a 0.43 (0.56) percentage point increase in the ownership rate measured in Infutor. Despite the under counting, our cross-sectional variation across census tract matches the 1990 and 2000 censuses extremely well, with R-squareds over 90% in both decades. This further highlights the quality of the Infutor data.

Next we match each address to its official parcel number from the San Francisco Assessor's office. Using the parcel ID number from the Secured Roll data, we also merge with any

---

[6]Since year built comes from the Census long form, these data are based only on a 20% sample of the true distribution of building ages in each tract, creating measurement error that is likely worse in the census than in the merged Infutor-DataQuick data.

building permits that have been associated with that property since 1980. These data come from the San Francisco Planning Office. This allows us to track large investments into renovations and changes in building use type over time based on the quantity and type of permit issued to each building over time.

The parcel number also allows us to link to the parcel history file from the Assessor's office. This allows us to observe changes in the parcel structure over time. In particular, this allows us to determine whether parcels were split off over time, a common occurrence when a multi-family apartment building (one parcel) splits into separate parcels for each apartment during a condo conversion.

Historical data on annual San Francisco wide market rents are from a dataset produced by Eric Fisher, who collected historical apartment advertisements dating back to the 1950s. See https://experimental-geography.blogspot.ca/2016/05/employment-construction-and-cost-of-san.html for further details on the construction. Figure 1 shows the time series of SF rental rates generated by this data. We use an imputation procedure to construct annual rents at the zipcode level. Specifically, using census data we construct a relationship between zipcode house price deviations from the SF mean and zipcode rent deviations from the SF mean. We then use this relationship to construct zipcode level rent measures in the years we don't have census data.[7]

Summary statistics are provided in Table 1 and Table 2.

# 4   Reduced Form Effects

Studying the effects of rent control is challenged by the usual endogeneity issues. The tenants who choose to live in rent-controlled housing, for example, are likely a selected sample. To overcome these issues, we exploit the particular institutional history of the expansion of rent control in San Francisco. Specifically, we exploit the successful 1994 ballot initiative which

---

[7]Census data reports rents paid by tenants, not asking rents. We therefore use a level adjustment to ensure that the average imputed market SF rent is equal to that reported by Eric Fisher. See the appendix for the exact details of the imputation procedure.

removed the original 1979 exemption for small multifamily housing of four units or less, as discussed in Section 2.

In 1994, as a result of the ballot initiative, tenants who happened to live in small multifamily housing built prior to 1980 were, all of a sudden, protected by statute against rent increases. Tenants who lived in small multifamily housing built 1980 and later continued to not receive rent control protections. We therefore use as our treatment group those renters who, as of December 31 1993, lived in multifamily buildings of less than or equal to 4 units, built between years 1900 and 1979. We use as our control group those renters who, as of December 31, 1993, lived in multifamily buildings of less than or equal to 4 units, built between the years of 1980 and 1990. We exclude those renters who lived in small multifamily buildings constructed post 1990 since individuals who choose to live in new construction may constitute a selected sample and exhibit differential trends. We also exclude tenants who moved into their property prior to 1980, as the none of the control group buildings would have been constructed at the time.

When examining the impact of rent control on the parcels themselves, we use small multifamily buildings built between the years of 1900 and 1979 as our treatment group and buildings built between the years of 1980 and 1990 as our control group. We once again exclude buildings constructed in the early 1990s to remove any differential effects of new construction. Figure 2 shows the geographic distribution of treated buildings and control buildings in San Francisco.

## 4.1  Tenant Effects

We begin our analysis by studying the impact of rent control provisions on its tenant beneficiaries. We use a differences-in-differences design described above, with the following exact specification:

$$Y_{it} = \delta_{xt} + \alpha_i + \beta_t * T_i + \gamma_{st} + \epsilon_{it}. \tag{1}$$

11

Here, $Y_{it}$ are outcome variables equal to one if, in year $t$, the tenant $i$ is still living at either the same address, in the same zipcode $z$, or in San Francisco as they were at the end of 1993. The variables $\delta_{zt}$ and $\alpha_i$ denote zipcode by year fixed effects and individual tenant fixed effects, respectively. The variable $T_i$ denotes treatment, equal to one if, on December 31, 1993, the tenant is living in a multifamily building with less than or equal to four units built between the years 1900 and 1979.

We include fixed effects $\gamma_{st}$ denoting the interaction of dummies for the year the tenant moved into the apartment $s$ with calendar year $t$ time dummies. These additional controls are needed since older buildings are mechanically more likely to have long-term, low turnover tenants; not all of the control group buildings were built when some tenants in older buildings moved in. Finally, note we have included a full set of zipcode by year fixed effects. In this way, we control for any differences in the geographic distribution of treated buildings vs. control buildings, ensuring that our identification is based off of individuals who live in the same neighborhood, as measured by zipcode.[8,9] Our coefficient of interest, quantifying the effect of rent control on future residency, is denoted by $\beta_t$.

Our estimated effects are shown in Figure 3, along with 90% confidence intervals. We can see that tenants who receive rent control protections are persistently more likely to remain at their 1993 address relative to the control group. Not only that, but they are also more likely to be living in San Francisco. This result indicates that the assignment of rent control not only impacts the type of property a tenant chooses to live in, but also their choice of location and neighborhood type.

These figures also illustrate how the time pattern of our effects correlates with rental

---

[8]We have also ran our regressions with census tract by year fixed effects and our results are robust to this even finer neighborhood classification. Further, dropping the zip-year fixed effects also produces similar results.

[9]While there may be some sorting into older buildings based on personal characteristics, it seems likely that once neighborhood characteristics have been controlled for, as well as the number of years lived in the apartment as of December 31, 1993, these characteristics would not lead to differential trends in migration decisions which could contaminate our estimates. As a robustness test, we have restricted our treatment group to individuals who lived in structures built between 1960 and 1979, thereby comparing tenants in buildings built slightly before 1979 to tenants in buildings built slightly after 1979. We find very similar results.

rates in San Francisco. We would expect that our results would be particularly strong in those years when the outside option is worse due to quickly rising rents. Along with our yearly estimated effect of rent control, we plot the yearly deviation from the log trend in rental rates against our estimated effect of rent control in that given year. We indeed see that our effects grew quite strongly in the mid to late 1990s in conjunction with quickly rising rents, relative to trend. Our effects then stabilize and slightly decline in the early 2000s in the wake of the Dot-com bubble crash, which led to falling rental rates relative to trend. Overall, we measure a correlation of 49.4% between our estimated same address effects and median rents, and a correlation of 78.4% between out estimated SF effects and median rents.

In Table 3, we collapse our estimated effects into a short-term 1994-1999 effect, a medium-term 2000-2004 effect, and a long-term post-2005 effect. We find that in the short-run, tenants in rent-controlled housing are 2.18 percentage points more likely to remain at the same address. This estimate reflects a 4.03 percent increase relative to the 1994-1999 control group mean of 54.10 percent. In the medium term, rent-controlled tenants are 3.54 percentage points more likely to remain at the same address, reflecting a 19.38 percent increase over the 2000-2004 control group mean of 18.27 percent. Finally, in the long-term, rent-controlled tenants are 1.47 percentage points more likely to remain at the same address. This is a 12.95 percent increase over the control group mean of 11.35 percent. These effects are intuitive since we expect the utility benefits of staying in a rent controlled apartment to grow over time as the wedge between controlled and market rents widen.

Tenants who benefit from rent control are 2.00 percentage points more likely to remain in San Francisco in the short-term, 4.51 percentage points more likely in the medium-term, and 3.66 percentage points more likely in the long-term. Relative to the control group means, these estimates reflect increases of 2.62 percent, 8.78 percent, and 8.42 percent respectively. Since these numbers are of the same magnitude as the treatment effects of stay at one's exact 1994 apartment, we find that absent rent control essentially all of those incentivized to stay in their apartments would have otherwise moved out of San Francisco.

These estimated overall effects mask interesting heterogeneity. We begin by cutting the data on two dimensions. First, we cut the data by age, sorting individuals into two groups, a young group who were aged 20-39 in 1993 and an old group who were aged 40-65 in 1993. We also sort the data based on the number of years the individual has been living at their 1993 address. We create a "low turnover" group of individuals who had been living at their address for greater than or equal to four years and a "high turnover" group of individuals who had been living at their address for between four and fourteen years. Finally, we form four subsamples by taking the $2 \times 2$ cross across each of these two dimensions and re-estimate our effects for each subsample.

The results are reported in Figure 4. We summarize the key implications. First, we find that the effects are weaker for younger individuals. We believe this is intuitive. Younger households are more likely to face larger idiosyncratic shocks to their neighborhood and housing preferences (such as changes in family structure and employment opportunities) which make staying in their current location particularly costly, relative to the types of shocks older households receive. Thus, younger households may feel more inclined to give up the benefits afforded by rent control to secure housing more appropriate for their circumstances.

Moreover, among older individuals, there is a large gap between the estimated effects based on turnover. Older, low turnover households have a strong, positive response to rent control. That is, they are more likely to remain at their 1993 address relative to the control group. In contrast, older, high turnover individuals are estimated to have a *negative* response to rent control. They are less likely to remain at their 1993 address relative to the control group.

To further explore the mechanism behind this result, we do another cut of the data, sorting individuals based on the 1990-2000 rent appreciation of their 1993 zipcode. Individuals are then sorted into two groups based on whether their zipcode experienced above or below median rent appreciation. We now estimate our effects by age, turnover, and zipcode rent appreciation. The results are in Figure 5 and Figure 6. Among older, lower turnover

individuals, we find that the effects are always positive and strongest in those areas which experienced the most rent appreciation between 1990 and 2000, as one might expect. For older, high turnover households, however, the results are quite different. For this subgroup, the effects are actually *negative* in the areas which experienced the *highest* rent appreciation. They are positive in the areas which experienced below median rent appreciation.[10]

This result suggests that landlords are likely actively trying to remove tenants in those areas where rent control is affording the most benefits, i.e. high rent appreciation areas. There are a few ways a landlord could accomplish this. First, landlords could try to legally evict their tenants by, for example, moving into the properties themselves, known as owner move-in eviction. Alternatively, landlords could evict tenants according to the provisions of the Ellis Act, which allows evictions when an owner wants to remove units from the rental market - for instance, in order to convert the units into condos or a tenancy in common. Finally, landlords are legally allowed to negotiate with tenants over a monetary transfer convincing them to leave. Such transfers are, in fact, quite prevalent in San Francisco. Moreover, it is likely that those individuals who have not lived in the neighborhood long, and thus not developed an attachment to the area, could be more readily convinced to accept such payments or are worse at fighting eviction. Indeed, since landlord can evict or pay tenants to move out, rent control need not inefficiently distort renters' decisions to remain in their rent controlled apartments. Tenants may "bring their rent control with them" in the form of a lump sum tenant buyout. Of course, if landlords predominantly use evictions, tenants are not compensated for their loss of rent protection, weakening the insurance value of rent control.

These considerations help to rationalize some additional, final findings. In Figure 7 and Figure 8, we examine the impact that rent control has on the types of neighborhoods tenants live in in a given year. We find that treated individuals, i.e. those who received rent control, ultimately live in census tracts with lower house prices, lower median incomes, and lower

---

[10]A similar pattern holds for younger individuals as well, although the results are weaker.

college shares than the control group. As Figure 9 and Figure 10 show, this is not a function of the areas in which treated individuals lived in 1993. In this figure, we fix the location of those treated by rent control at their 1993 locations, but allow the control group to migrate as seen in the data. If rent-controlled renters were equally likely to remain in their 1993 apartments across all locations in San Francisco, we would see the sign of the treatment effects on each neighborhood characteristic to be the same as in the previous regression. Instead, we find strong evidence that the out-migration of rent-controlled tenants came from very selected neighborhoods. Had treated individuals remained in the 1993 addresses, they would have lived in census tracts which had significantly higher college shares and higher house prices than the control group. This evidence is consistent with the idea that landlords undertake efforts to remove their tenants or convince them to leave in improving, gentrifying areas.

## 4.2   Parcel and Landlord Effects

We continue our analysis by studying the impact of rent control on the structures themselves. In particular, we examine how rent control impacts the nature of the tenants who live in the buildings, as well as its impact on investments that landlords choose to make in the properties. We run a similar specification to that above:

$$Y_{kt} = \delta_{zt} + \lambda_k + \beta_t * T_k + \epsilon_{kt}, \qquad (2)$$

where $k$ now denotes the individual parcel and $\lambda_k$ represent parcel fixed effects. The variable $T_k$ denotes treatment, equal to one if, on December 31, 1993, the parcel is a multifamily building with less than or equal to four units built between the years 1900 and 1979. The $\delta_{zt}$ variables once again reflect zipcode by year fixed effects. Our outcome variables $Y_{kt}$ now include the number of renters and owners living in the building, whether the building sits vacant, the number of renovation permits associated with the building, and whether the

16

building is ever converted to a condo. The permits we look at specifically are addition/alteration permits, taken out when major work is done to a property.

We begin by plotting in Figure 11a the effects of rent control on the number of individuals living at a given parcel, calculated as percentage of the average number of individuals living at that parcel between the years 1990-1994. We estimate a decline of approximately 10 percent over the long-run, although this effect is not statistically significant.

We next decompose this effect into the impact on the number of renters and the number of owners living at the treated buildings. As shown in Figure 11b, we find that there is a significant decline in the number of renters living at a parcel, approximately equal to 20 percent in the late 2000s, relative to the 1990-1994 level. Figure 11c shows that the decline in renters was counterbalanced by an increase of approximately 10 percent in the number of owners in the late 2000s. This is our first evidence suggestive of the idea that landlords redeveloped or converted their properties so as to exempt them from the new rent control regulations.

We now look more closely at the decline in renters. In Figure 12b, we see that there is an eventual decline of almost 30 percent in the number of renters living in rent-controlled apartments, relative to the 1990-1994 average.[11] This decline is significantly larger than the overall decline in renters. This is because a number of buildings which were subject to rent control status in 1994 were redeveloped in such way so as to no longer be subject to it. These redevelopment activities include tearing down the existing structure and putting up new single family, condominium, or multifamily housing or simply converting the existing structure to condos. These redeveloped buildings replaced about 10 percent of the initial rental housing stock treated by rent control, as shown in Figure 12a.

A natural question is whether this redevelopment activity was a response of landlords to the imposition of rent control or, instead, if such activity was also taking place within the control group and thus reflected other trends. Since we have the entire parcel history

---

[11]Note here that we mean relative to the number of individuals who lived at parcels which received rent control status due to the 1994 law change.

for a property, we can check directly whether a multifamily property which fell under the rent control regulations in 1994 is more likely to have converted to condominium housing or a tenancy in common, relative to a multifamily property which did become subject to rent control. In Figure 12c, we show that treated buildings are 8 percentage points likely to convert to condo or TIC in response to the rent control law. This represents a significant loss in the supply of rent controlled housing.

As a final test of whether landlords actively respond to the imposition of rent control, we examine whether the landlords of rent-controlled properties disproportionately take out addition/alteration (i.e. renovation) permits. We find this to strongly be the case, as shown in Figure 12d. Of course, conversions of multifamily housing to condos undoubtedly require significant alteration to the structural properties of the building and thus would require such a permit to be taken out. These results are thus consistent with our results regarding condo conversion.

Moreover, under the San Francisco rent control regulations, capital improvements can be passed onto tenants in the form of higher rents. If the existing tenants are unable to afford the higher rents, capital improvements could be one way to get new tenants in the property and reset to market rents. It is important to note that this evidence contradicts the traditional view of rent control, that landlords will be disincentivized from investing in the property. On the contrary, we find that landlords appear to make significant investments in their properties.

Taken together, we see rent controlled increased property investment, demolition and reconstruction of new buildings, conversion to owner occupied housing and a decline of the number of renters per building. All of these responses lead to a housing stock which caters to higher income individuals. Rent control has actually fueled the gentrification of San Francisco, the exact opposite of the policy's intended goal.

# 5   A Structural Spatial Equilibrium Model

The reduced form shows that rent control can either increase or decreases tenancy durations depending on whether the tenant receives a buyout or eviction or instead remains at their residence at below market rents. To quantify how tenants trade off these decisions and to quantify the welfare impact of rent control to covered tenants, we estimate a dynamic discrete choice model of neighborhood choice.

## 5.1   Model Setup

Each year $t$, a household decides whether to remain in its current home, a choice which we denote as $\mathcal{S}$, or to move, in which case the households chooses a neighborhood $j \in \mathcal{J}$ to live in. We denote the household's choice as $x \in \{\mathcal{S}\} \cup \mathcal{J}$. The relevant state variables for the household's decision problem are the current neighborhood $j_{t-1} \in \mathcal{J}$, the number of years lived in the current neighborhood $\tau_{n,t-1} \in \mathbb{N} \cup \{0\}$, the number of years lived in the current house $\tau_{h,t-1} \in \mathbb{N} \cup \{0\}$, and whether the residence is rent-controlled $d_{t-1} \in \{0,1\}$. We also have a state variable $a_{t-1} \in \{Y, M\}$ denoting whether the household is in a young $(Y)$ or mature $(M)$ state of life. We let $\theta_{t-1} = (j_{t-1}, \tau_{n,t-1}, \tau_{h,t-1}, d_{t-1}, a_{t-1})$ denote the household's current state variable. The transition dynamics of the state variable are straightforward. We have $j_t = j(x_t)$, where:

$$
\begin{aligned}
j(x_t) &= j_{t-1} \text{ if } x_t = \mathcal{S} \\
j(x_t) &= x_t \text{ otherwise.}
\end{aligned}
$$

This equation simply says that the neighborhood remains the same if the household decides to remain in its current home. Otherwise, the new neighborhood is given by the household's choice. The implications for years in the current neighborhood and years in the current

house are clearly similar, with:

$$\tau_n(x_t) = \tau_{n,t-1} + 1 \text{ if } x_t \in \{\mathcal{S}, j_{t-1}\}$$
$$\tau_n(x_t) = 0 \text{ otherwise.}$$

and

$$\tau_h(x_t) = \tau_{h,t-1} + 1 \text{ if } x_t = \mathcal{S}$$
$$\tau_n(x_t) = 0 \text{ otherwise.}$$

Finally, we assume that each period young households transition to mature households with exogenous probability $\xi$. This is clearly a simplification, made due to limitations of the data, but captures the idea that households experience certain life events such as marriage and having children at different ages.[12] Mature households do not transition back into young households. We denote the (probabilistic) transition function as $\theta_t = \Theta(x_t, \theta_{t-1})$. We identify the set of neighborhood locations $\mathcal{J}$ as the San Francisco zipcodes, the counties (other than San Francisco County) in the Bay Area, and an outside option denoting any location outside of the Bay Area.

We assume that a household $i$ has the following per-period utility from their housing decision:

$$u(x, \omega_t, \varepsilon_{it}, \theta_{t-1}) = \gamma_a \exp R_t(j, d, \tau_h) + \alpha_a \tau_n + \varphi_a(x, j_{t-1}, \tau_{n,t-1}) \qquad (3)$$
$$+ \Lambda(x, d_{t-1}) + \omega_{jt} + \varepsilon_{ixt},$$

where $R_t(j, d, \tau_h)$ denotes the rent paid at the chosen location, $\varphi_a(x, j_{t-1}, \tau_{n,t-1})$ are moving costs, $\Delta_t(x, d_{t-1})$ are possible monetary transfers from landlords to tenants, $\omega_{jt}$ is an unobservable neighborhood taste shock, and $\varepsilon_{ixt}$ is an idiosyncratic logit error taste shock

---

[12]In principle, we could tract the exact age as a stage variable, but this makes the state space very large.

over the possible choices which is specific to household $i$.[13] Note that we are suppressing the dependence of $(j, \tau, d)$ on $x$. If a tenant does not live in a rent-controlled property, she pays market rents, given by $R_t(j, 0)$. Thus, there is no dependence on $\tau_h$. In contrast, the rent paid by tenants in rent-controlled properties $R_t(j, 1, \tau_h)$ is a function of the number of years lived in the property. Crucially, note that the household has utility over *exponential* rents, with coefficient $\gamma_a$. We, of course, expect this coefficient to be negative. This assumption ensures, due to the effects of Jensen's inequality, that rent control offers real insurance value to tenants. We moreover allow for utility to depend on how long a household has lived in the current neighborhood, as measured by parameter $\alpha_a$. Intuitively, households may build up neighborhood capital over time which makes that location more attractive. For instance, over time people form meaningful friendships with their neighbors and acquire valuable local knowledge, such as that regarding local amenities. We allow both the rent utility parameter and neighborhood capital parameter to depend on whether the household is in the young or mature stage of life.

Households incur moving costs when they switch homes. We assume that there is a fixed moving cost $\varphi_{0,a} > 0$, as well as a cost $\varphi_{d,a} > 0$ that is variable with distance. We allow the variable moving cost parameter to depend on current neighborhood capital $\tau_{n,t-1}$, with the interaction effect measured by $\varphi_{\tau,a}$. This allows for the possibility that the desirability of nearby neighborhoods changes as one accrues neighborhood capital. In particular,

$$
\begin{aligned}
\varphi_a(x, j_{t-1}) &= 0 \text{ if } x_t = \mathcal{S} \\
\varphi_a(x, j_{t-1}) &= \varphi_{0,a} + \varphi_{d,a} d(j_t, j_{t-1}) + \varphi_{\tau,a}(d(j_t, j_{t-1}) \times \tau_{n,t-1}) \text{ otherwise,}
\end{aligned}
$$

where $d(j_t, j_{t-1})$ denotes the distance between the old and new neighborhoods. We allow the moving costs to vary with age. For example, it seems likely that households with children will find moving more costly than households without children, since changing schools could

---

[13] We measure rents as monthly rents divided by 3000, measured in 2010 dollars. We divide by 3000 for computational convenience.

prove disruptive.

We also allow for possible monetary transfers from landlords of rent-controlled properties to tenants incentivizing them to move. These may represent true tenant buyouts or the amount of buyout that would have been required to rationalize the tenant out-migration, even if in reality the migration was due to eviction. In practice, the city of San Francisco allows for such negotiations and these payments are, in practice, quite prevalent. We do not explicitly model the bargaining game between landlords and tenants. Instead, we proceed in more reduced form fashion and parameterize the transfers as:

$$\Lambda_t \left( x, d_{t-1}, a_{t-1} \right) = 0 \text{ if } x_t = \mathcal{S} \text{ or } d_{t-1} = 0$$
$$\Lambda_t \left( x, d_{t-1}, a_{t-1} \right) = \lambda_1 \left[ R_t \left( j, 0 \right) - R_t \left( j, 1, \tau_h \right) \right] + \lambda_2 \tau_n + \lambda_Y 1 \left[ a_{t-1} = Y \right] \text{ otherwise.}$$

The first equation simply says that, if the tenant does not move or does not live in rent-controlled housing, he receives no transfers. The first term in the second equation denotes the difference between market rents and rent-controlled rents. We would expect the coefficient on this term, $\lambda_1$, to be weakly positive. Intuitively, the greater the current difference between market rents and rent-controlled rents, the greater the incentive for landlords to remove tenants and thus the more landlords should be willing to pay to convince tenants to leave. We also allow for the outcome of the bargaining to depend on neighborhood tenure $\tau_n$, with the impact measured by the coefficient $\lambda_2$. This allows for more invested tenants to receive a larger payment, since their outside option, i.e. choosing to stay, is likely better than that of a short term tenant who has not built up a large stock of neighborhood capital. Finally, we allow the level difference in transfers to differ between young and mature households, measured by $\lambda_Y$.

We decompose the unobservable neighborhood amenity value $\omega_{jt}$ into

$$\omega_{jt} = \omega_j + \tilde{\omega}_{jt},$$

22

where $\omega_j$ is a time-invariant fixed effect and $\tilde{\omega}_{jt}$ is a per-period neighborhood specific shock. We impose no structure on the distribution of $\tilde{\omega}_{jt}$ beyond requiring that $F(\tilde{\omega}_{j,t+1}|\tilde{\omega}_{jt}, x_{it}) = F(\tilde{\omega}_{j,t+1}|\tilde{\omega}_{jt})$. That is, the decision of any individual agent has no impact on the distribution of the neighborhood amenity value next period.

Letting $\beta$ denote the common discount factor, the household's dynamic optimization problem at time $t$ is given by:

$$V\left(\theta_{i,t-1}, \omega_t, \varepsilon_{it}\right) = \max_{x^*} E\left(\sum_{s \geq t}^{\infty} \beta^{s-t} u\left(x^*, \omega_t, \varepsilon_{it}, \theta_{i,t-1}\right) | \theta_{i,t-1}, \omega_t, \varepsilon_{it}\right).$$

We next define the ex-ante value function $\overline{V}\left(\theta_{it}, \omega_t\right)$ by integrating over the idiosyncratic errors:

$$\overline{V}_t\left(\theta_{t-1}\right) = \int \cdots \int V\left(\theta_{t-1}, \omega_t, \left(\varepsilon_1, ..., \varepsilon_{J+1}\right)\right) dF\left(\varepsilon_1\right) ... dF\left(\varepsilon_{J+1}\right),$$

where $J$ is the number of neighborhoods and $\varepsilon_{J+1}$ it the logit error associated with staying in the current home. From this we can define the value function conditional on actions:

$$v_t\left(x, \theta_{t-1}\right) = \overline{u}_t\left(x, \theta_{t-1}\right) + \beta E_t\left[\overline{V}_{t+1}\left(\Theta\left(x, \theta_{t-1}\right)\right)\right],$$

where $\overline{u}_t\left(x, \theta_{t-1}\right) = u\left(x, \omega_t, 0, \theta_{t-1}\right)$, $\Theta\left(x, \theta_{t-1}\right)$ denotes the state transition function, and $E_t\left[\cdot\right]$ denotes expectations conditional on time $t$ information.

Since the idiosyncratic taste shocks follow a logit specification, we get the standard results (see e.g. Hotz and Miller (1993)) relating conditional value functions to conditional choice probabilities $p_t\left(x|\theta_{t-1}\right)$:

$$p_t\left(x|\theta_{t-1}\right) = \frac{\exp\left(v_t\left(x, \theta_{t-1}\right)\right)}{\sum_{x'} \exp\left(v_t\left(x', \theta_{t-1}\right)\right)}. \tag{4}$$

In what follows, we denote the log of the denominator of this expression as:

$$I_t\left(\theta_{t-1}\right) = \ln\left(\sum_{x'} \exp\left(v_t\left(x', \theta_{t-1}\right)\right)\right)$$

23

We also have that the ex-ante value function is given by:

$$\overline{V}_t\left(\theta_{t-1}, \omega_t\right) = I_t\left(\theta_{t-1}\right) + \Gamma, \tag{5}$$

where $\Gamma$ is Euler's gamma.

## 5.2   Renewal Actions

The key challenge in identifying dynamic discrete choice models is dealing with the expected continuation values in the Bellman equation. To be able to calculate the expected continuation values, one generally must make assumptions about exactly how agents form expectations, including exactly what information is known to the agent and how they expect market-level state variables to evolve. This normally requires assuming all market state variables (e.g. rents and amenities) are observed and follow assumed transition dynamics. We build on Scott (2013) and make no assumptions about how amenities evolve. We also do not assume how agents form expectations about future market states, other than that they are on average rational. Following work by Arcidiacono and Ellickson (2011) and Arcidiacono and Miller (2011), we make extensive use of renewal actions, or action(s) which, given current states $\theta_{t-1}$ and $\theta'_{t-1}$, lead to the same state in the next period. This will allow us to difference out much of the long-term continuation values in the Bellman equation, which are impossible to estimate without strong assumptions.

### 5.2.1   Immediate Renewals

Suppose we have two households in states $\theta_{t-1}$ and $\theta'_{t-1}$. In period $t$, these two households take the actions $x$ and $x'$ respectively. Using equation (4) and differencing we find that:

$$v_t\left(x, \theta_{t-1}\right) - v_t\left(x', \theta'_{t-1}\right) = \ln\left(\frac{p_t\left(x|\theta_{t-1}\right)}{p_t\left(x'|\theta'_{t-1}\right)}\right) + I_t\left(\theta_{t-1}\right) - I_t\left(\theta'_{t-1}\right)$$

24

Substituting in for the conditional value functions, we get:

$$\overline{u}_t\left(x, \theta_{t-1}\right) - \overline{u}_t\left(x', \theta'_{t-1}\right) + \beta E_t\left[\overline{V}_{t+1}\left(\Theta\left(x, \theta_{t-1}\right)\right)\right] - \beta E_t\left[\overline{V}_{t+1}\left(\Theta\left(x', \theta'_{t-1}\right)\right)\right] \quad (6)$$
$$= \ln\left(\frac{p_t\left(x|\theta_{t-1}\right)}{p_t\left(x'|\theta'_{t-1}\right)}\right) + I_t\left(\theta_{t-1}\right) - I_t\left(\theta'_{t-1}\right).$$

Now assume $x$ and $x'$ are renewal actions in the sense that $\Theta\left(x, \theta_{t-1}\right) = \Theta\left(x', \theta'_{t-1}\right)$. Note that we do not require $x = x'$, although this will often be the case. For example, if two households in non-rent controlled housing are living in the same neighborhood $j$ and have the same level of neighborhood tenure, then $x = \mathcal{S}$ and $x' = j$, i.e. one household choosing to stay in the current home and the other moving to another house in the same neighborhood, constitute renewal actions. The key implication is that the future continuation values difference out, leaving:

$$\overline{u}_t\left(x, \theta_{t-1}\right) - \overline{u}_t\left(x', \theta'_{t-1}\right) = \ln\left(\frac{p_t\left(x|\theta_{t-1}\right)}{p_t\left(x'|\theta'_{t-1}\right)}\right) + I_t\left(\theta_{t-1}\right) - I_t\left(\theta'_{t-1}\right). \quad (7)$$

If $\theta_{t-1} \neq \theta'_{t-1}$, we also need to remove the difference of log sums, which implicitly involves future continuation values as well.

To do so, suppose the households *move* to some neighborhood $j^* \in \mathcal{J}$, with $j^* \neq x$ and $j^* \neq x'$. This always constitutes a renewal action, so we get equation (7) again with $x$ and $x'$ replaced with $j^*$:

$$\overline{u}_t\left(j^*, \theta_{t-1}\right) - \overline{u}_t\left(j^*, \theta'_{t-1}\right) = \ln\left(\frac{p_t\left(j^*|\theta_{t-1}\right)}{p_t\left(j^*|\theta'_{t-1}\right)}\right) + I_t\left(\theta_{t-1}\right) - I_t\left(\theta'_{t-1}\right). \quad (8)$$

Differencing equations (7) and (8) yields:

$$\ln\left(\frac{p_t\left(x|\theta_{t-1}\right)}{p_t\left(x'|\theta'_{t-1}\right)}\right) - \ln\left(\frac{p_t\left(j^*|\theta_{t-1}\right)}{p_t\left(j^*|\theta'_{t-1}\right)}\right) = \begin{array}{l}\left[\overline{u}_t\left(x, \theta_{t-1}\right) - \overline{u}_t\left(x', \theta'_{t-1}\right)\right] \\ \qquad - \left[\overline{u}_t\left(j^*, \theta_{t-1}\right) - \overline{u}_t\left(j^*, \theta'_{t-1}\right)\right],\end{array} \quad (9)$$

which removes the log sums. Intuitively, equation (9) compares the difference in utility between two different actions a household in state $\theta_{t-1}$ could take versus a household in state $\theta'_{t-1}$. This "differences-in-differences" approach removes all long-term utility differences since actions are selected to create renewals.

### 5.2.2   One Period Ahead Renewals

Now suppose that $x$ and $x'$ are not renewal actions in period $t$. Following Scott (2013), we substitute the expected difference in continuation values in equation (6) with its realization and expectational errors:

$$\overline{u}_t\left(x, \theta_{t-1}\right) - \overline{u}_t\left(x', \theta'_{t-1}\right) - \ln\left(\frac{p_t\left(j|\theta_{t-1}\right)}{p_t\left(j'|\theta'_{t-1}\right)}\right) - \left[I_t\left(\theta_{t-1}\right) - I_t\left(\theta'_{t-1}\right)\right]$$
$$= \beta\left(\overline{V}_{t+1}\left(\Theta\left(x', \theta'_{t-1}\right)\right) - \overline{V}_{t+1}\left(\Theta\left(x, \theta_{t-1}\right)\right)\right) + \xi_t^V\left(x', \theta'_{t-1}\right) - \xi_t^V\left(x, \theta_{t-1}\right)$$

where

$$\xi_t^V\left(x, \theta_{t-1}\right) = \beta\left(E_t\left[\overline{V}_{t+1}\left(\Theta\left(x, \theta_{t-1}\right)\right)\right] - \overline{V}_{t+1}\left(\Theta\left(x, \theta_{t-1}\right)\right)\right)$$

is the expectational error.

We now again make use of renewals. Suppose that at time $t+1$, both households move to the same neighborhood, that is $x_{t+1} = x'_{t+1} = j^* \in \mathcal{J}$. To see the effects of this, first substitute out the realized ex-ante value functions using equations (4) and (5). We have:

$$\overline{u}_t\left(x, \theta_{t-1}\right) - \overline{u}_t\left(x', \theta'_{t-1}\right) - \ln\left(\frac{p_t\left(j|\theta_{t-1}\right)}{p_t\left(j'|\theta'_{t-1}\right)}\right) - \left[I_t\left(\theta_{t-1}\right) - I_t\left(\theta'_{t-1}\right)\right]$$
$$= \beta\left(v_{t+1}\left(j^*, \Theta\left(x', \theta'_{t-1}\right)\right) - v_{t+1}\left(j^*, \Theta\left(x, \theta_{t-1}\right)\right)\right)$$
$$- \beta\ln\left(\frac{p_{t+1}\left(j^*, \Theta\left(x'|\theta'_{t-1}\right)\right)}{p_{t+1}\left(j^*, \Theta\left(x|\theta_{t-1}\right)\right)}\right) + \xi_t^V\left(x', \theta'_{t-1}\right) - \xi_t^V\left(x, \theta_{t-1}\right).$$

Since $j^*$ is a renewal action, the time $t+2$ expected value functions difference out and this

equation becomes:

$$\overline{u}_t \left(x, \theta_{t-1}\right) - \overline{u}_t \left(x', \theta'_{t-1}\right) - \ln \left( \frac{p_t \left(j | \theta_{t-1}\right)}{p_t \left(j' | \theta'_{t-1}\right)} \right) - \left[I_t \left(\theta_{t-1}\right) - I_t \left(\theta'_{t-1}\right)\right] \tag{10}$$

$$= \ \beta \left( \overline{u}_{t+1} \left(j^*, \Theta \left(x', \theta'_{t-1}\right)\right) - \overline{u}_{t+1} \left(j^*, \Theta \left(x, \theta_{t-1}\right)\right) \right)$$

$$- \beta \ln \left( \frac{p_{t+1} \left(j^*, \Theta \left(x' | \theta'_{t-1}\right)\right)}{p_{t+1} \left(j^*, \Theta \left(x | \theta_{t-1}\right)\right)} \right) + \xi_t^V \left(x', \theta'_{t-1}\right) - \xi_t^V \left(x, \theta_{t-1}\right).$$

To fully remove the conditional value functions, we once again must remove the difference in log sums $I_t \left(\theta_{t-1}\right) - I_t \left(\theta'_{t-1}\right)$.

We follow the same procedure as previously, subtracting equation (8) from equation (10):

$$\ln \left( \frac{p_t \left(j | \theta_{t-1}\right)}{p_t \left(j' | \theta'_{t-1}\right)} \right) - \ln \left( \frac{p_t \left(j^* | \theta_{t-1}\right)}{p_t \left(j^* | \theta'_{t-1}\right)} \right) + \beta \ln \left( \frac{p_{t+1} \left(j^*, \Theta \left(x | \theta_{t-1}\right)\right)}{p_{t+1} \left(j^*, \Theta \left(x' | \theta'_{t-1}\right)\right)} \right) \tag{11}$$

$$= \ \left[ \overline{u}_t \left(x, \theta_{t-1}\right) - \overline{u}_t \left(x', \theta'_{t-1}\right) \right] - \left[ \overline{u}_t \left(j^*, \theta_{t-1}\right) - \overline{u}_t \left(j^*, \theta'_{t-1}\right) \right]$$

$$+ \beta \left( \overline{u}_{t+1} \left(j^*, \Theta \left(x, \theta_{t-1}\right)\right) - \overline{u}_{t+1} \left(j^*, \Theta \left(x, \theta_{t-1}\right)\right) \right)$$

$$+ \xi_t^V \left(x', \theta'_{t-1}\right) - \xi_t^V \left(x, \theta_{t-1}\right).$$

Equations (9) and (11) provide a linear regression framework which we can use to fully identify and estimate the parameters of the model.

## 5.3   Empirical Framework

We now discuss how to empirically operationalize the preceding considerations.

### 5.3.1   Constructing Conditional Choice Probabilities

We first need to construct empirical estimates of the conditional choice probabilities, $p_t \left(x | \theta_{t-1}\right)$. In a given year $t$, we focus on those households who were part of the 1994 treatment and control groups described in the previous section and who have not moved away from their 1994 residence. Given the latter restriction, we do not need to keep track of $\tau_h$ and we therefore suppress the dependence of $\theta_{t-1}$ on this state variable in what follows.

With a large enough dataset, we could simply compute empirical frequencies for all conditional choice probabilities. However, since there are many states, not all CCPs in our data are measured precisely. We therefore use kernel smoothing on the empirical frequencies to improve the prediction error. We smooth over distance, neighborhood tenure, and age. We use a Gaussian kernel. Distance is measured between the midpoints of zipcodes. Neighborhood tenure equals the number of years the renter has lived in that zipcode. Young renters are those under the age of 40, while mature/old renters are those 40 and older. We use $k$-fold cross validation to set the optimal bandwidths with $k$=5.

### 5.3.2   Identifying the Parameters of the Model

We set $\beta = .85$.[14] We estimate the various parameters of the model by estimating equation (9) and (11) for appropriately chosen values of $\left(\theta_{t-1}, \theta'_{t-1}\right)$ and $(x, x')$. Intuitively, by examining the differential behavior of individuals in certain states of the world and following certain types of deviations, we can isolate the impact of the different parameters of the model. We begin by constructing a regression equation for $\gamma_M, \lambda_1$, and $\lambda_2$. These are the (mature) rent utility parameter and the parameters of the transfer function. Normally, we would be confronted with a significant endogeneity problem in estimating these parameters since market rents $R_t(j, 0)$ in neighborhood $j$ are likely correlated with the amenity value $\omega_{jt}$ unobservable to the econometrician.

We overcome this essential endogeneity problem by exploiting the quasi-experimental nature of the 1994 San Francisco rent control ballot measure. This law change quasi-randomly assigned renters *within* a given neighborhood $j$ to rent control status. As mentioned, we focus exclusively on this population for our regressions.

Now let $\theta_{t-1} = (j, \tau_n, 1, M)$ and $\theta'_{t-1} = (j, \tau_n, 0, M)$ for some $j \in \mathcal{J}$. We furthermore set $x = x' = \mathcal{S}$ and let $j^*$ be any element of $\mathcal{J}$. In words, we consider two mature households who both lived in neighborhood $j$ in 1994 and have not moved as of year $t$. The two households

---

[14]This choice is consistent with the evidence provided in De Groote and Verboven (2016), who estimate a household discount factor of .87.

are of equal tenure $\tau_n$. One was assigned to rent control status in 1994 and the other was not. We examine the relative probabilities of these individuals staying in neighborhood $j$ in year $t$, using neighborhood $j^*$ as the renewal choice in the manner described in the previous section. Under these assumptions, equation (11) gives the regression:

$$
\begin{aligned}
Y_{j,j^*}^t &= \gamma_M \left[\exp R_t\left(j,1\right) - \exp R_t\left(j,0\right)\right] + \\
&\quad + \lambda_1 \left[\left(\beta \ln R_{t+1}\left(j,0\right) - \ln R_t\left(j,0\right)\right) - \left(\beta \ln R_{t+1}\left(j,1\right) - \ln R_t\left(j,1\right)\right)\right] \\
&\quad + \lambda_2 \left[\beta\left(t + \tau_n + 1\right) - \left(t + \tau_n\right)\right] \\
&\quad + \xi_t^V\left(x',\theta_{t-1}'\right) - \xi_t^V\left(x,\theta_{t-1}\right) + \chi_{j,j^*}^t \\
Y_{j,j^*}^t &= \ln\left(\frac{p_t\left(\mathcal{S}|j,1,\tau_n\right)}{p_t\left(\mathcal{S}|j,0,\tau_n\right)}\right) - \ln\left(\frac{p_t\left(j^*|j,1,\tau_n\right)}{p_t\left(j^*|j,0,\tau_n\right)}\right) + \beta \ln\left(\frac{p_{t+1}\left(j^*|j,1,\tau_n\right)}{p_{t+1}\left(j^*|j,0,\tau_n\right)}\right)
\end{aligned}
$$

Intuitively, this regression compares the probability of staying in the neighborhood for one more year and then moving to $j^*$ versus moving to $j^*$ this year. This difference in probabilities is then differenced between treatment and control, which differences out all the utility impacts of living in $j$ vs $j^*$ other than those which are impacted by rent control.

Note that we have included an additional error term $\chi_{j,j^*}^t$, reflecting measurement error in our constructed conditional choice probabilities.The key for identification is that the unobserved amenity value $\omega_{jt}$ differences out. We furthermore know that:

$$
E_t\left[\left(R_t\left(j,1\right) - R_t\left(j,0\right)\right)\left(\xi_t^V\left(x',\theta_{t-1}'\right) - \xi_t^V\left(x,\theta_{t-1}\right)\right)\right] = 0
$$

due to rational expectations. That is, the expectational error is uncorrelated with any time $t$ information. In general, however, we do *not* have:

$$
E_t\left[\left(R_{t+1}\left(j,1\right) - R_{t+1}\left(j,0\right)\right)\left(\xi_t^V\left(x',\theta_{t-1}'\right) - \xi_t^V\left(x,\theta_{t-1}\right)\right)\right] = 0.
$$

The time $t+1$ rent difference may be correlated with the expectational error. This is intuitive. For instance, neighborhood $j$ may be better at date $t + 1$ than was expected since market

rents are lower than anticipated. We, therefore, instrument for the time $t+1$ rent difference $R_{t+1}(j,1) - R_{t+1}(j,0)$ with $Z_t$, equal to the one-period lagged value $R_t(j,1) - R_{t-1}(j,0)$. Since $Z_t$ is in the time $t$ information set, we have:

$$E_t\left[Z_t\left(\xi_t^V\left(x',\theta_{t-1}'\right) - \xi_t^V\left(x,\theta_{t-1}\right)\right)\right] = 0.$$

Thus, our exclusion restrictions are satisfied and the parameters are identified.

To identify the impact of tenure on utility $\alpha_M$, consider two mature households living in non-rent controlled housing in neighborhood $j$, with different levels of initial tenure, $\tau_n$ and $\tau_n'$. Suppose both households move to $j^*$ after one year. We thus have $\theta_{t-1} = (j, \tau_n, 0, M)$ and $\theta_{t-1}' = (j, \tau_n', 0, M)$ for some $j \in \mathcal{J}$ and $x = x' = \mathcal{S}$. Then equation (11) becomes:

$$
\begin{aligned}
Y_{j,j^*}^t &= \alpha_M\left(\tau_n - \tau_n'\right) + \xi_t^V\left(x',\theta_{t-1}'\right) - \xi_t^V\left(x,\theta_{t-1}\right) + \chi_{j,j^*}^t \\
Y_{j,j^*}^t &= \ln\left(\frac{p_t\left(\mathcal{S}|j,0,\tau_n\right)}{p_t\left(\mathcal{S}|j,0,\tau_n'\right)}\right) - \ln\left(\frac{p_t\left(j^*|j,0,\tau_n\right)}{p_t\left(j^*|j,0,\tau_n'\right)}\right) + \beta\ln\left(\frac{p_{t+1}\left(j^*|j,0,\tau_n\right)}{p_{t+1}\left(j^*|j,0,\tau_n'\right)}\right)
\end{aligned}
$$

Since both households live in non-rent controlled housing in the same neighborhood, they pay the same rents and receive the same unobserved amenity value. Indeed, the only payoff-relevant difference between the two populations is the number of years they have lived in the neighborhood. Thus, appropriately examining the relative probabilities of staying in the neighborhood is informative of the importance of tenure on utility or, in other words, of the magnitude of $\alpha_M$. Intuitively, as one builds up more neighborhood capital, the benefits of staying in the neighborhood an additional year. Thus, the relative probability of staying one more year versus moving away should grow if neighborhood capital is accruing.

To estimate moving costs, we consider two mature households of equal tenure $\tau_n$ living in non-rent controlled housing in neighborhood $j$. Suppose that one household immediately moves to another house in the same zipcode and one household stays in the same home. Formally, $\theta_{t-1} = \theta_{t-1}' = (j, \tau_n, 0, M)$, $x = \mathcal{S}$, and $x' = j$. As was discussed in Section 5.2.1, this constitutes an immediate renewal since rents do not change and neighborhood tenure

does not change. Since one is only changing the house they live in due to the logit error and the moving costs, we can identify the fixed cost of moving. If people move houses a lot within a zipcode, moving costs must be low. If they do it rarely, moving costs must be high. Equation (9) gives the regression:

$$
\begin{aligned}
Y_j^t &= -\varphi_{0,M} + \chi_j^t \\
Y_j^t &= \ln\left(\frac{p_t\left(\mathcal{S}|j,0,\tau_n\right)}{p_t\left(j|j,0,\tau_n\right)}\right),
\end{aligned}
$$

which identifies the fixed moving cost parameter $\varphi_{0,M}$. Note that there is only one log difference instead of two since the households begin in the same state.

We also need the variable moving cost parameter, $\varphi_{d,M}$. Consider two mature households of equal tenure $\tau_n$, both living in non-rent controlled housing, one living in neighborhood $j$ and the other in neighborhood $j'$. Suppose they immediately move to either neighborhood $j^*$ or $j^{**}$. Both of these are choices constitute immediate renewals. Therefore, Equation (9) gives the specification:

$$
\begin{aligned}
Y_{j,j',j^*,j^{**}}^t &= \varphi_{d,M}\left(d_{j,j^*} - d_{j',j^*}\right) - \varphi_{d,M}\left(d_{j,j^{**}} - d_{j',j^{**}}\right) + \chi_{j,j',j^*,j^{**}}^t \\
Y_{j,j',j^*,j^{**}}^t &= \ln\left(\frac{p_t\left(j^*|j,0,\tau_n\right)}{p_t\left(j^*|j',0,\tau_n\right)}\right) - \ln\left(\frac{p_t\left(j^{**}|j,0,\tau_n\right)}{p_t\left(j^{**}|j',0,\tau_n\right)}\right).
\end{aligned}
$$

Intuitively, this compares the relative probabilities of moving to $j^*$ vs $j^{**}$ depending on whether one starts in $j$ or $j'$. If $j$ is very close to $j^*$, but far from $j^{**}$, then the difference in moving costs between the moves in large. However, if $j'$ is equidistant between the two, the moving costs between the two locations are the same. The relationship between these differences in distances and differences in migration probabilities identifies the marginal cost of moving with respect to distance. Using similar considerations, one can estimate the interaction term parameter $\varphi_{\tau,M}$. The equation is detailed in the appendix.

As one would expect, the equations for young households are very similar to the ones described above, but the probability of transitioning to a mature household must be taken

into account. Furthermore, one can use the treatment group as well as the control group to estimate the neighborhood tenure parameters and the variable moving cost parameters. All of these additional equations are detailed in the appendix. The model is then estimated via GMM.

Finally, it remains to estimate the permanent component of amenities $\omega_j$.[15] We do so after estimating the full GMM system detailed above. We once again consider two mature households of equal tenure $\tau_n$, living in neighborhoods $j$ and $j'$ respectively and suppose that both households move to some neighborhood $j^*$ after one year. We thus have, $\theta_{t-1} = (j, \tau_n, 0, M)$, $\theta'_{t-1} = (j', \tau_n, 0, M)$, and $x = x' = \mathcal{S}$. These choices yield the equation:

$$
\begin{aligned}
Y^t_{j,j',j^*} &= \omega_j - \omega_{j'} + \tilde{\omega}_{jt} - \tilde{\omega}_{j't} + \xi^V_t\left(x', \theta'_{t-1}\right) - \xi^V_t\left(x, \theta_{t-1}\right) + \chi^t_{j,j',j^*} \\
Y^t_{j,j',j^*} &= \ln\left(\frac{p_t\left(\mathcal{S}|j, 0, \tau_n\right)}{p_t\left(\mathcal{S}|j', 0, \tau_n\right)}\right) - \ln\left(\frac{p_t\left(j^*|j, 0, \tau_n\right)}{p_t\left(j^*|j', 0, \tau_n\right)}\right) + \beta\ln\left(\frac{p_{t+1}\left(j^*|j, 0, \tau_n\right)}{p_{t+1}\left(j^*|j', 0, \tau_n\right)}\right) \\
&\quad - (\beta - 1)\,\varphi_{d,M}\left(d_{j,j^*} - d_{j',j^*}\right) - \gamma_M\left[R_t\left(j, 0\right) - R_t\left(j', 0\right)\right]
\end{aligned}
$$

Identification comes from the fact that, averaging over time, we average out the per-period neighborhood amenity shocks and expectational error shocks. Moreover, note that we do not have an endogeneity problem since we have already estimated $\gamma_M$ and can therefore move the utility impact of the rent difference to the left hand side of the equation. We also account for the differential moving costs related to distance on the left hand side of the equation. Finally, note that we can only identify fixed amenity value differences between neighborhoods. We therefore choose a normalization, letting zipcode 94110, representing the Mission District and Bernal Heights, be our baseline zipcode. We set its amenity value fixed effect to zero.

---

[15]We cannot identify amenities of the outside options, i.e. the rest of the Bay Area and the rest of the country, as no one in our 1994 cohorts started off living in those locations.

## 5.4   Model Estimates

Table 4 shows the parameter estimates of the model. Panel A reports the parameters measured in rent equivalent dollar units, with the exception of the transfer payments, which are measured in actual dollar amounts.[16] Panel B reports the estimates in units of migration elasticities. We will focus on the estimates in Panel A. Normalizing the coefficient on exponential rents to 1, we identify the standard deviation of tenants' idiosyncratic shocks to their location preferences. We find that young renters have annual location taste shocks with a standard deviation equivalent to $7,411. Mature renters face location shocks with a 12.7% lower standard deviation. These estimates are consistent with our previously discussed hypothesis that young renters' migration decisions are more driven by idiosyncratic shocks than older households.

Turning to the magnitudes of the tenant buyouts, we find young renters receive $1.631 more dollars from their landlords for each additional $1 below market their rent is. Mature renters face similar impact of $1.404. We also find buyout offers are larger as tenants live in their zipcodes longer. For each additional year a young (mature) tenant lives in their zipcode, they receive $164 ($141) additional dollars in the buyout offer from their landlord. Finally, we find mature tenants receive larger buyout offers overall by $70,702. This may reflect that landlords expect older tenants to remain in their apartments for the very long term. Along the same lines, to the extent that these transfers reflect evictions, landlords would be more incentivized to evict older renters. To get a better sense of the magnitudes of these buyout payments, Figure 14 plots the average buyout to young tenants offered in each year in the data, across all tenants and neighborhoods. By 2010, the average offer to tenants who still remain at their 1994 address is just over $30,000. Figure 15 plots the heterogeneity across zipcodes in mean buyout offers, highlighting that some zipcodes experience much large rent increases than others over this time period. In the most expensive zipcode, the average buyout in 2010 is just about $40,000, while in the cheapest zipcode the mean buyout offer is

---

[16]These are measured at the mean rent paid by rent-controlled households, $2350.

around $25,000. These numbers seem very much in line with popular press anecdotes about tenant buyouts in San Francisco.

Moving along to our estimates of moving costs, we find the fixed cost of moving is equivalent, in rent-equivalent dollars, to $42,626 for young renters and $38,988 for old renters. These estimates seem quite reasonable and actually quite below what is typically found in the literature. A main driver of the magnitude of this estimate are the short-run migration elasticities with respect to a one-year temporary change. It is often quite hard to find a high quality instrument for rents that does not effect other omitted variables such as amenities. Likely, many instruments for rent also impact the supply and quality of amenities, leading to rent elasticities being biased towards 0. Our rent control policy experiment only affects rents and cannot effect amenities in our regressions, as we are comparing migration decisions between market rent and rent controlled households in the same neighborhood consuming the same amenities.

In addition to the fixed costs of moving, we find that the moving costs increase with the distance of the move. A 1 percent increase in move distance is equivalent to $114 for the young and $101 for the old. Finally, we also consider whether these variable moving costs change as households live in their zipcodes longer. One might think that the longer a household has lived in the area the more familiar they are with further and further away neighborhoods, lowering those marginal moving costs. Indeed, we find this is the case, with each additional year a tenant has lived in their zipcode lowering the moving cost by $415 for the young and $357 for the old.

Lastly, we turn to our neighborhood capital estimates. Proponents of rent control often argue that long-term residents are the ones in the most need of rent control as migrating away from their community forces them to lose many of the connections and investments they have been in the neighborhoods over time. We do find very statistically significant effects of neighborhood capital accumulation. However, the economic magnitude is small. Young (mature) households increasingly value living in their zipcode by $266 ($292) in dollar

rent equivalent terms. However, these effects can add up to a sizable effect over a lifetime.

# 6    Welfare Effects of Rent Control

## 6.1    Welfare Decomposition: 1994-2012

We begin our investigation of the welfare effects of rent control by decomposing the impacts of the 1994 ballot initiative on its beneficiaries, relative to the control group. We discuss here mature households. The expressions for young households are exactly analogous.

### 6.1.1    Derivations

In any given year $t$ between the years of 1994 and 2012, the average utility difference between the treatment group and the control group is given by:

$$
\begin{aligned}
\Delta U_t^M &= \sum_{\theta_{t-1}} \sum_x \left( \overline{u}_t \left( x, \theta_{t-1} \right) + E_t \left[ \varepsilon_{ixt} | x, \theta_{t-1} \right] \right) p_t \left( x | \theta_{t-1} \right) \left( p_t^T \left( \theta_{t-1} \right) - p_t^C \left( \theta_{t-1} \right) \right) \quad (12) \\
&= \sum_{\theta_{t-1}} \sum_x \left( \overline{u}_t \left( x, \theta_{t-1} \right) + E_t \left[ \varepsilon_{ixt} | x, \theta_{t-1} \right] \right) \left( p_t^T \left( x, \theta_{t-1} \right) - p_t^C \left( x, \theta_{t-1} \right) \right)
\end{aligned}
$$

where recall $\overline{u}_t \left( x, \theta_{t-1} \right) = u \left( x, \omega_t, 0, \theta_{t-1} \right)$ and the utility function is defined in equation (3). The expression $p_t \left( x | \theta_{t-1} \right)$ again denotes the conditional probability of choosing $x \in \{ \mathcal{S} \} \cup \mathcal{J}$, given that the current state is $\theta_{t-1}$, $p_t^T \left( \theta_{t-1} \right), p_t^C \left( \theta_{t-1} \right)$ denote the probabilities of being in state $\theta_{t-1}$ for the treatment group and control group respectively, and $p_t^T \left( x, \theta_{t-1} \right), p_t^C \left( x, \theta_{t-1} \right)$ denote the joint probabilities. The conditional expectation $E_t \left[ \varepsilon_{it} | x, \theta_{t-1} \right]$ denotes the expected logit error conditional on choosing $x$ from state $\theta_{t-1}$. Of course, equation (12) simply says that the average utility difference is the weighted average utility received by the treatment group minus the weighted average utility received by the control group.

We can decompose this average utility difference by substituting in for the utility function

from equation (3). We find that:

$$
\begin{aligned}
\Delta U_t^M =\ & \Delta U_t^{M,\text{Rent}} + \Delta U_t^{M,Payoff} + \Delta U_t^{M,NC} \\
& + \Delta U_t^{M,MC} + \Delta U_t^{M,Miles} + \Delta U_t^{M,Amenity} + \Delta U_t^{M,Logit}.
\end{aligned}
\tag{13}
$$

That is, the average utility difference between the treatment group and the control arises from differences in average rent paid $\Delta U_t^{M,\text{Rent}}$, in transfers received from landlords $\Delta U_t^{M,Payoff}$, in accumulated neighborhood capital $\Delta U_t^{M,NC}$, in fixed costs $\Delta U_t^{M,MC}$, in variable moving costs $\Delta U_t^{M,Miles}$, in neighborhood amenity values $\Delta U_t^{M,Amenity}$, and in idiosyncratic valuations $\Delta U_t^{M,Logit}$. Suppressing the dependence of $j$ and $\tau$ on $x$, we can formally write these terms as:

$$
\begin{aligned}
\Delta U_t^{\text{Rent}} &= \sum_{\theta_{t-1}} \sum_x \gamma_M \exp\left(R_t\left(j, d, \tau_h\right)\right)\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right) \\
\Delta U_t^{Payoff} &= \sum_{\theta_{t-1}} \sum_x \Lambda_t\left(x, d_{t-1}, M\right)\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right) \\
\Delta U_t^{M,NC} &= \sum_{\theta_{t-1}} \sum_x \alpha_M \tau_n\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right) \\
\Delta U_t^{M,MC} &= \sum_{\theta_{t-1}} \sum_x \varphi_{0,M} 1\left[x \neq \mathcal{S}\right]\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right) \\
\Delta U_t^{M,Miles} &= \sum_{\theta_{t-1}} \sum_x \varphi_{d,M} d_{j,j_{t-1}} 1\left[x \neq \mathcal{S}\right]\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right) \\
\Delta U_t^{M,Amenity} &= \sum_{\theta_{t-1}} \sum_x \omega_{jt}\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right).
\end{aligned}
$$

We can measure each of these terms.[17] We recover estimates of $\gamma_M, \Lambda_M, \alpha_M, \varphi_{0,M}, \varphi_{d,M}$, and $\omega_{jt}$ from our structural model. We can then recover the other needed quantities from standard reduced form differences-in-differences analysis. For example, $\sum_{\theta_{t-1}} \sum_x \exp\left(R_t\left(j, d, \tau_h\right)\right)\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right)$ is simply the average difference in rents paid between treatment and control in year $t$, $\sum_{\theta_{t-1}} \sum_x \tau_n\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right)$

---

[17]Since we measure rents as monthly rents/3000, we multiply by 36,000 to convert to an annual rent number.

36

is the average difference in accumulated neighborhood capital between treatment and control, $\sum_{\theta_{t-1}} \sum_x 1\,[x \neq \mathcal{S}]\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right)$ is the average difference in number of moves between treatment and control, and

$\sum_{\theta_{t-1}} \sum_x d_{j,j_{t-1}} 1\,[x \neq \mathcal{S}]\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right)$ is the average difference in distance moved between treatment and control. Each of these can be readily calculated using the reduced form methodology described in Section 4. The average utility difference due to transfers and the average utility difference due to amenities can be similarly calculated by combining our structural estimates with reduced form differences-in-differences analysis.

Deriving an expression for the utility difference due to idiosyncratic valuations $\Delta U_t^{M,Logit}$ is a bit more complicated. We have that:

$$\Delta U_t^{M,Logit} = \sum_{\theta_{t-1}} \sum_x E_t\left[\varepsilon_{it} | x, \theta_{t-1}\right]\left(p_t^T\left(x, \theta_{t-1}\right) - p_t^C\left(x, \theta_{t-1}\right)\right). \tag{14}$$

We therefore need an expression for the conditional expectation $E_t\left[\varepsilon_{ixt} | x, \theta_{t-1}\right]$. Using Bayes' rule, we get:

$$
\begin{aligned}
E_t\left[\varepsilon_{ixt} | x, \theta_{t-1}\right] &= \frac{\int \varepsilon_{ixt} \left(\prod_{x' \neq x} e^{-e^{-(\varepsilon_{ixt} + v_t(x, \theta_{t-1}) - v_t(x', \theta_{t-1}))}}\right) e^{-\varepsilon_{ixt}} e^{-e^{-\varepsilon_{ixt}}} d\varepsilon_{ixt}}{p_t\left(x | \theta_{t-1}\right)} \\
&= \frac{\int \varepsilon_{ixt} \left(\prod_{x' \neq x} e^{-e^{-(\varepsilon_{ixt} + \ln p_t(x | \theta_{t-1}) - \ln p_t(x' | \theta_{t-1}))}}\right) e^{-\varepsilon_{ixt}} e^{-e^{-\varepsilon_{ixt}}} d\varepsilon_{ixt}}{p_t\left(x | \theta_{t-1}\right)},
\end{aligned}
$$

where in the second equality we used the Hotz and Miller (1993) inversion $v_t\left(x, \theta_{t-1}\right) - v_t\left(x', \theta_{t-1}\right) = \ln p_t\left(x | \theta_{t-1}\right) - \ln p_t\left(x' | \theta_{t-1}\right)$. Substituting into equation (14), we derive:

$$
\begin{aligned}
\Delta U_t^{M,Logit} = \sum_{\theta_{t-1}} \sum_x \Bigg\{ &\int \varepsilon_{ixt} \left(\prod_{x' \neq x} e^{-e^{-(\varepsilon_{ixt} + \ln p_t(x | \theta_{t-1}) - \ln p_t(x' | \theta_{t-1}))}}\right) e^{-\varepsilon_{ixt}} e^{-e^{-\varepsilon_{ixt}}} d\varepsilon_{ixt} \Bigg\} \times \\
&\left(p_t^T\left(\theta_{t-1}\right) - p_t^C\left(\theta_{t-1}\right)\right).
\end{aligned}
$$
$$\tag{15}$$

Since we have empirical estimates of each of the probabilities, we can estimate this utility

difference.

We finally convert our estimated utility differences into rent equivalent dollar amounts. Consider an individual in the control group who pays the average San Francisco rent in year $t$, which we denote as $\overline{R}_t$. We now proceed iteratively. The dollar rent equivalent $\Delta W_t^{\mathrm{Rent}}$ of the utility difference $\Delta U_t^{\mathrm{Rent}}$ in year $t$ due to rent differences can be calculated as the solution to :

$$\gamma_M \exp\left(\overline{R}_t + \Delta W_t^{\mathrm{Rent}}\right) - \gamma_M \exp\left(\overline{R}_t\right) = \Delta U_t^{\mathrm{Rent}},$$

which gives:

$$\Delta W_t^{\mathrm{Rent}} = \ln\left(\frac{\Delta U_t^{\mathrm{Rent}}}{\gamma_M} + \exp\left(\overline{R}_t\right)\right) - \overline{R}_t.$$

The dollar rent equivalent incremental impact of transfers can then be calculated as:

$$\Delta W_t^{Payoff} = \ln\left(\frac{\Delta U_t^{Payoff}}{\gamma_M} + \exp\left(\overline{R}_t + \Delta W_t^{\mathrm{Rent}}\right)\right) - \left(\overline{R}_t + \Delta W_t^{\mathrm{Rent}}\right).$$

Now let $\Delta U_t^{M,\iota}$ denote the utility differences, with $\iota \in \{1, ..., 7\}$ corresponding to the ordering in equation (13). Iterating on our procedure gives the dollar rent equivalent incremental impacts of each element of the decomposition:

$$\Delta W_t^{\iota} = \ln\left(\frac{\Delta U_t^{Payoff}}{\gamma_M} + \exp\left(\overline{R}_t + \sum_{\iota' < \iota} \Delta W_t^{\iota'}\right)\right) - \left(\overline{R}_t + \sum_{\iota' < \iota} \Delta W_t^{\iota'}\right).$$

### 6.1.2   Results

The results of this decomposition are reported in Table 5. We find that the beneficiaries of the 1994 rent control law received large welfare benefits between the 1994-2012 period. Older households received a total rent-equivalent dollar benefit of \$119,625, reflecting an annual benefit of \$6,646. These benefits were front loaded, with households earning a cumulative benefit of \$74.514 and average annual benefit of \$8,279 during the 1995-2003 period Cumulative benefits equaled \$45,111 during the 2004-2012 period, reflecting an annual average of

$5,012.

In terms of decomposition, most of the benefits from the rent control law came from protection against rent increases and transfers.[18] Respectively, protection against rent increases constituted 44.2% of the total benefit and transfers constituted 30.2% of the total. Lower moving costs, both fixed and variable, were 13.5% of the total. Increased neighborhood capital constituted only small fraction of the total benefit at 1.2%. The welfare benefits from increased amenity values were negligible. Interestinly, we find increased utility from the utility value of one's idosyncratic preference equal to 11.2% of the welfare gain. This likely due to the fact that we found some low neighborhood capital househlds were more likley to move due to rent control, allowing them to over come moving costs and live in a location that best suites their idiosyncratic preference.

The benefits of the rent control expansion were smaller for younger households, although still large. That they are smaller is consistent with our estimate that younger households receive larger idiosyncratic shocks, which leads to more frequent moving and thus smaller benefits from rent control protections. Younger households are also estimated to receive smaller transfers. Cumulative welfare benefits for these households totaled $41,121, reflecting an annual average of $2,285. Similar to older households, the benefits were front loaded. Younger households received cumulative benefits of $32,960 during the 1995-2003 period and cumulative benefits of $8,162 during the 2004-2012 period. Annual averages were $3,662 and $907 respectively.

Also similar to older households, most of the benefits came from protection against rent increases and transfers, constituting 79.6% and 45.4% respectively over the total period. The fraction due to moving costs is much smaller for younger households, at only 8%. Note this reinforces the idea that, due to a higher variance if idiosyncratic shocks, younger

---

[18]The model assumes that all observed moves are rational choices. The transfers we estimate are those which rationalize the observed empirical frequencies. It is possible that some of the moves we see in the data are forced evictions, rather than the result of negotiations between landlords and tenants over monetary compensation. To the extent that this is the case, our welfare benefits from transfer payments over overstated. However, even in the extreme case where the welfare benefits from transfers are zero, the benefits from protection against rent increases would still be large.

households optimally choose to move more often. The fraction due to neighborhood capital is once again small, constituting just 2.6% for the average. Welfare benefits due to increased amenity values now reflect a small, but non-negligible, fraction of the total benefit at 2.6%. Finally, the young face a substantial welfare loss due to living in places that are worse matches to their idiosyncratic preference under rent control, equal to -37.2%. This reflects that to stay in one's apartment to benefit from below market rents, one must give up living in the best apartment and location that suites one's preferences. Our estiamtes shows that idosyncratice preference variaince is higher for the young, making giving up the match value a larger sacrifice.

We aggregate these numbers over the entire population of renters impacted by the rent control law. The aggregate welfare benefits are very large. Older households received a cumulative benefit of $4.440 billion dollars over the entire period, while younger households received a cumulative benefit of $2.64 billion dollars. Across the entire population, the aggregate benefit was $7.085 billion dollars, reflecting an annual average of $394 million dollars. Note also that these welfare numbers are only for the 1994 population impacted by the rent control expansion. It does not take into account the welfare benefits for renters who moved into the impacted properties in later years, which presumably were also quite large.

## 6.2   General Equilibrium Welfare Impact of Reduced Supply

We finally turn to evaluating the GE welfare impact of the landlord supply response. Intuitively, since landlords reduced supply in response to the 1994 law, as was shown in Section 4.2, average San Francisco rents were higher than they otherwise would have been. Using our structural framework, we quantify the magnitude of this cost.

### 6.2.1   Derivations

We evaluate the welfare impact relative to the 1993 steady state, prior to the introduction of the law change. Aggregate welfare in this steady state is given by:

$$\sum_j N_j \ln \left( \sum_{x \in \{\mathcal{S}\} \cup \mathcal{J}} \exp \left( v \left( x, j \right) \right) \right),$$

where $N_j$ is the number of people living in neighborhood $j$. Note that the state variable now does not include rent control status since we are consider the pre-law steady state. Suppose that the law raises rents in zipcode $j$ by San Francisco by a proportional amount equal to $d \ln R_j$. Using standard calculations, we find that the local welfare impact of a change in rents is given by:

$$\sum_j N_j \sum_x p \left( x | j \right) \sum_k \frac{\partial v \left( x, j \right)}{\partial \ln R_k} d \ln R_k, \tag{16}$$

where $p \left( x | j \right)$ are the pre-law conditional choice probabilities To compute this quantity we thus need to calculate $\partial v \left( x, j \right) / d \ln R_k$ for all $j$, $x$, and $k \in \mathcal{J}$ and we need to determine the zipcode level rent response to the measured reduced form supply reduction.

Steady-state in the model is characterized by the equation:

$$\forall j : N_j \left( 1 - p \left( \mathcal{S} | j \right) - p \left( j | j \right) \right) = \sum_{j' \neq j} N_{j'} p \left( j | j' \right). \tag{17}$$

This simply says that, in steady state, the number of renters flowing out of neighborhood $j$ must be equal to the number of renters flowing into neighborhood $j$. We now assume that the supply decrease is the same proportionally in each zipcode. Since small multifamily housing constituted 44% of 1994 non rent-controlled housing stock, our reduced form results indicate that rental supply in San Francisco decreased by 6 percent. Letting $d \ln N_j / d\Phi$ denote the supply response, where $\Phi$ is simply a convenient notation indicating the impact of the law, we have

$$\frac{d \ln N_j}{d\Phi} = \frac{d \ln N_{SF}}{d\Phi} = -.06 \text{ for all } j \text{ in SF}$$

We determine how much rents have to change by in the new long-run steady state given this

41

supply response. Taking a derivative of equation (17) with respect to $\Phi$ gives:

$$\frac{d\ln N_j}{d\Phi}N_j\left(1-\sum_{x\in\{\mathcal{S},j\}}p\left(x|j\right)\right)-N_j\sum_{x\in\{\mathcal{S},j\}}\frac{dp\left(x|j\right)}{d\Phi}=\sum_{j'\neq j'}\left[\frac{d\ln N_{j'}}{d\Phi}N_{j'}p\left(j|j'\right)+N_{j'}\frac{dp\left(j|j'\right)}{d\Phi}\right],$$
$$(18)$$

for all $j$.

Now, in steady state, the conditional probabilities are given by:

$$p\left(x|j\right)=\frac{\exp\left(v\left(x,j\right)\right)}{\sum_{x'}\exp\left(v\left(x',j\right)\right)}.$$

So:

$$\begin{aligned}\frac{dp\left(x|j\right)}{d\Phi} &= \sum_k\frac{\partial p\left(x|j\right)}{\partial\ln R_k}\frac{d\ln R_k}{d\Phi} \\ &= \sum_k p\left(x|j\right)\left(\frac{\partial v\left(x,j\right)}{\partial\ln R_k}-\sum_{x'}p\left(x'|j\right)\frac{\partial v\left(x',j\right)}{\partial\ln R_k}\right)\frac{d\ln R_k}{d\Phi}.\end{aligned}$$
$$(19)$$

To finish the calculation, we therefore need to determine $\partial v\left(x,j\right)/\partial\ln R_k$. With these in place, we can plug equation (19) into equation (18) and solve the resulting system of equations for the rent responses $d\ln R_k/d\Phi$.

We note that in steady-state:

$$v\left(x,j\right)=\overline{u}\left(x,j\right)+\beta\ln\left(\sum_{x'}\exp\left(v\left(x',j\left(x\right)\right)\right)\right)$$

Taking derivatives with respect to log rents, we get:

$$\frac{\partial v\left(x,j\right)}{\partial\ln R_k}=\gamma\exp\left(R_j\right)R_j1\left[j\left(x\right)=k\right]+\beta\sum_{x'}p\left(x'|j\left(x\right)\right)\frac{\partial v\left(x',j\left(x\right)\right)}{\partial\ln R_k}.$$

This is a system of equations which can be numerically solved for the partial derivatives. The system for young renters is similar, but takes into account the possibility of transitioning to a mature renter.

### 6.2.2   Results

We find that 6% decrease in housing supply led to 7% increase in rental prices. These caused an aggregate welfare loss to renters of $5 Billion. This is almost as large as the benefits accrued by the lucky beneficiaries of rent control. These GE welfare losses only account for the increased rents due to the decreased supply of housing. We also found that rent control incentivized landlords to invest in their properties by renovating and building new housing, as well as converting to owner occupancy. These effects likely attached higher income tenants to San Francisco and further raised rents. It appears that the GE losses from the landlords' response to rent control essentially completely undoes the gains accrued to the households that were lucky enough to receive rent control in 1994.

## 7   Conclusion

In this paper, we study the welfare impacts of rent control on its tenant beneficiaries as well as the welfare impacts of landlords' responses. To answer this question, we exploit a unique rent control expansion in San Francisco in 1994 that suddenly provided rent control protections for small multifamily housing built prior to 1980. By combining new panel micro data on individual migration decisions with detailed assessor data on individual SF parcels we get quasi-experimental variation in the assignment of rent control at both the individual tenant level and at the parcel level.

We find that, on average, in the medium to long term the beneficiaries of rent control are between 10 and 20 percent more likely to remain at their 1994 address relative to the control group. These effects are significantly stronger among older households and among households that have already spent a number of years at their current address. On the other hand, individuals in areas with quickly rising rents and with few years at their 1994 address are less likely to remain at their current address, consistent with the idea that landlords try to remove tenants when the reward is high, through either eviction or negotiated payments.

We find that landlords actively respond to the imposition of rent control by converting their properties to condos and TICs or by redeveloping the building in such as a way as to exempt it from the regulations. In sum, we find that impacted landlords reduced the supply the available rental housing by 15 percent. Consistent with this evidence, we find that there was a 20 percent decline in the number of renters living in impacted buildings, relative to 1990-1994 levels, and a 30 percent decline in the number of renters living in units protected by rent control.

We develop a dynamic, structural model of neighborhood choice to translate our reduced form impacts into welfare impacts. A key contribution of the paper is to show how quasi-experimental evidence can be leveraged to estimate to dynamic discrete choice model. We find that rent control offered large benefits to impacted tenants during the 1995-2012 period, averaging between $2200 and $6600 per person each year, with aggregate benefits totaling over $393 million annually. Over the entire period, tenants received cumulative benefits of around $7.1 billion. We find that most of these benefits came from protection against rent increases and transfer payments from landlords. However, we find losses to all renters of $5 billion due to rent control's effect on decreasing the rental housing and raising market rents.

These results highlight that forcing landlords to provided insurance against rent increases leads to large losses to tenants. If society desires to provide social insurance against rent increases, it would be more desirable to offer this subsidy in the form of a government subsidy or tax credit. This would remove landlords' incentives to decrease the housing supply and could provide household with the insurance they desire. A point of future research would be to design an optimal social insurance program to insure renters against large rent increases.

# References

**Arcidiacono, Peter and Paul B. Ellickson**, "Practical Methods for Estimation of Dynamic Discrete Choice Models," *Annual Review of Economics*, 2011, *3* (1), 363–394.

_ **and Robert A. Miller**, "Conditional Choice Probability Estimation of Dynamic Discrete Choice Models With Unobserved Heterogeneity," *Econometrica*, November 2011, *79* (6), 1823–1867.

**Autor, David H, Christopher J Palmer, and Parag A Pathak**, "Housing Market Spillovers: Evidence from the End of Rent Control in Cambridge, Massachusetts," *Journal of Political Economy*, 2014, *122* (3), 661–717.

**Bayer, Patrick, Robert McMillan, Alvin Murphy, and Christopher Timmins**, "A Dynamic Model of Demand for Houses and Neighborhoods," *Econometrica*, May 2016, *84* (3), 893–942.

**Bishop, Kelly C. and Alvin D. Murphy**, "Estimating the Willingness to Pay to Avoid Violent Crime: A Dynamic Approach," *American Economic Review*, May 2011, *101* (3), 625–629.

**Davis, Morris A., Jess Gregory, Daniel A. Hartley, and Kegon Teng Kok Tan**, "Neighborhood Choices, Neighborhood Effects and Housing Vouchers," 2017.

**Downs, Anthony**, "Residential Rent Controls," *Washington, DC: Urban Land Institute*, 1988.

**Early, Dirk W.**, "Rent Control, Rental Housing Supply, and the Distribution of Tenant Benefits," *Journal of Urban Economics*, September 2000, *48* (2), 185–204.

**Glaeser, Edward L and Erzo FP Luttmer**, "The Misallocation of Housing under Rent Control," *The American Economic Review*, 2003, *93* (4), 1027–1046.

**Gyourko, Joseph and Peter Linneman**, "Equity and Efficiency Aspects of Rent Control: An Empirical Study of New York City," *Journal of urban Economics*, 1989, *26* (1), 54–74.

_ **and** _ , "Rent Controls and Rental Housing Quality: A Note on the Effects of New York City's Old Controls," *Journal of Urban Economics*, May 1990, *27* (3), 398–409.

**Hotz, V. Joseph and Robert A. Miller**, "Conditional Choice Probabilities and the Estimation of Dynamic Models," *The Review of Economic Studies*, 1993, *60* (3), 497–529.

**Kasarda, John D. and Morris Janowitz**, "Community Attachment in Mass Society," *American Sociological Review*, 1974, *39* (3), 328–339.

**Kennan, John and James R. Walker**, "The Effect of Expected Income on Individual Migration Decisions," *Econometrica*, January 2011, *79* (1), 211–251.

**Moon, Choon-Geol and Janet G. Stotsky**, "The Effect of Rent Control on Housing Quality Change: A Longitudinal Analysis," *Journal of Political Economy*, December 1993, *101* (6), 1114–1148.

**Murphy, Alvin**, "A Dynamic Model of Housing Supply," SSRN Scholarly Paper ID 2200459, Social Science Research Network, Rochester, NY February 2017.

**Olsen, Edgar O**, "An Econometric Analysis of Rent Control," *Journal of Political Economy*, 1972, *80* (6), 1081–1100.

**Scott, Paul T.**, "Dynamic Discrete Choice Estimation of Agricultural Land Use," *Toulouse School of Economics Working Paper*, 2013, *526*.

**Sims, David P**, "Out of Control: What Can We Learn from the End of Massachusetts Rent Control?," *Journal of Urban Economics*, 2007, *61* (1), 129–151.

\_ , "Rent Control Rationing and Community Composition: Evidence from Massachusetts," *The BE Journal of Economic Analysis & Policy*, 2011, *11* (1).

Table 1: Sample Characteristics for Individual Regressions for Multi-Family Residence (2-4 Units)

|  | Mean | S.D |
|---|---|---|
| *Demographics* | | |
| Age in 1993 | 38.584 | 10.707 |
| Male | 0.504 | 0.500 |
| Is Landlord | 0.144 | 0.352 |
| *Residency* | | |
| Living in SF | 0.643 | 0.479 |
| Living in Zipcode of Treated Address | 0.443 | 0.497 |
| Living in Treated Address | 0.375 | 0.484 |
| Years at 1993 Address | 6.761 | 4.911 |
| Years at Current Address | 1.659 | 0.597 |
| Observations | 1508247 | |

*Notes*: Sample consists of all tenants and landlords between 20 and 65 years old living in SF in 1993 and small multi-family residences that were built during $1900 - 1990$. If a building is constructed post 1993 and we observe a landlord living there in 1993, we include it into the treatment group for rent control. Table reports the mean, standard deviation and median of demographic characteristics and various dependent variables during $1990 - 2016$.

Table 2: Sample Characteristics for Multi-Family Properties (2-4 Units)

|  | Mean | S.D |
|---|---|---|
| *Residency* | | |
| Is Vacant | 0.103 | 0.304 |
| *Population* | | |
| Population/Avg Pop 90-94 | 2.076 | 3.728 |
| Renters/Avg Pop 90-94 | 1.541 | 3.276 |
| Renters in Covered by Rent-Control/Avg Pop 90-94 | 1.311 | 1.808 |
| Renters in Redeveloped Buildings/Avg Pop 90-94 | 0.108 | 0.679 |
| Owners/Avg Pop 90-94 | 0.535 | 1.467 |
| *Permits* | | |
| Cumulative Add/Alter/Repair per Unit | 0.256 | 0.487 |
| Ever Received Add/Alter/Repair | 0.336 | 0.472 |
| Observations | 724037 | |

*Notes*: Sample consists of all parcels that are multi-family residence with fewer than four units in SF that were built during $1900 - 1990$. If a building associated with a parcel is constructed post 1993 and we observe someone living there before 1993, we include it into the treatment group for rent control. Table reports the mean, standard deviation and median of various dependent variables during $1990 - 2016$.

Table 3: Treatment Effect for Tenants of Multi-Family Residence (2-4 Units)

|  | (1)<br>In SF | (2)<br>Same Zip | (3)<br>Same Address |
|---|---|---|---|
| *Treat×Period* |  |  |  |
| 1994-1999 | 0.0200** | 0.0226*** | 0.0218*** |
|  | (0.0081) | (0.0087) | (0.0083) |
| 2000-2004 | 0.0451*** | 0.0355*** | 0.0354*** |
|  | (0.0115) | (0.0104) | (0.0088) |
| Post 2005 | 0.0366*** | 0.0302*** | 0.0147** |
|  | (0.0109) | (0.0084) | (0.0063) |
| Control Mean $1994-1999$ | 0.7641 | 0.5971 | 0.5410 |
| Control Mean $2000-2004$ | 0.5138 | 0.2672 | 0.1827 |
| Control Mean Post 2005 | 0.4346 | 0.1801 | 0.1135 |
| Adjusted $R^2$ | 0.600 | 0.630 | 0.655 |
| Observations | 1251747 | 1251747 | 1251747 |

*Notes*: Sample consists of all tenants between 20 and 65 years old living in SF in 1993 and in small multi-family residences that were built during $1900-1990$. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. Table reports the mean of dependent variables for the control group during $1990-1994$, $2000-2004$ and post-2005. Standard errors are clustered at the person level. Significance levels: * 10%, ** 5%, *** 1%.

49

Table 4: Model Estimates

A. Parameter Estimates in 2010 Dollars

| St Dev of Logit Shocks | | Tenant Buyouts | | Moving Costs | | Neighborhood Capital | |
|---|---|---|---|---|---|---|---|
| Young Renters | 7441.178*** | Log Below Market Rent | 1.631*** | Fixed Cost | 42626.11*** | Young Renters | 265.795*** |
| | (1278.596) | (Young Renters) | (0.092) | (Young Renters) | (4776.017) | | (52.9889) |
| Old Renters | 6496.264*** | Log Below Market Rent | 1.404*** | Fixed Cost | 38987.65*** | Old Renters | 291.781*** |
| | (995.629) | (Old Renters) | (0.101) | (Old Renters) | (4005.167) | | (47.4294) |
| | | Years in Zipcode | 164.222*** | MC per Ln Mile | 11426.11*** | | |
| | | (Young Renters) | (107.696) | (Young Renters) | (1816.79) | | |
| | | Years in Zipcode | 141.439*** | MC per Ln Mile | 10066.49*** | | |
| | | (Old Renters) | (90.99) | (Old Renters) | (1437.622) | | |
| | | Old Renter-Direct effect | 70702.05*** | ΔMC wrt Yrs in Zip | -415.607*** | | |
| | | | (12339.43) | (Young Renters) | (74.24046) | | |
| | | | | ΔMC wrt Yrs in Zip | -357.6618*** | | |
| | | | | (Old Renters) | (57.12502) | | |

B.Demand Semi-Elasticities to Remain in Home with respect to 1 year Temporary Changes

| | Log Rent | Tenant Buyouts | | Moving Costs | | Neighborhood Capital | |
|---|---|---|---|---|---|---|---|
| Young Renters | -0.210*** | Log Below Market Rent | -0.327*** | Fixed Cost | 0.580*** | Young Renters | 0.0019*** |
| | (0.040) | (Young Renters) | (0.068) | (Young Renters) | (0.003) | | (0.00007) |
| Old Renters | -0.244*** | Log Below Market Rent | -0.327*** | Fixed Cost | 0.580*** | Old Renters | 0.0024*** |
| | (0.041) | (Old Renters) | (0.068) | (Old Renters) | (0.003) | | (0.00008) |
| | | Years in Zipcode | -0.0012 | MC per Mile | 0.095*** | | |
| | | (Young Renters) | (0.0008) | (Young Renters) | (0.005) | | |
| | | Years in Zipcode | -0.0012 | MC per Mile | 0.096*** | | |
| | | (Old Renters) | (0.0008) | (Old Renters) | (0.005) | | |
| | | Old Renter-Direct effect | -0.583*** | ΔMC wrt Yrs in Zip | -0.003*** | | |
| | | | (0.0082) | (Young Renters) | (-0.0002) | | |
| | | | | ΔMC wrt Yrs in Zip | -0.003*** | | |
| | | | | (Old Renters) | (-0.0002) | | |

Table 5: Welfare Effects of 1994 Rent-Controlled Cohort in 2010 Dollars

**A. Old Residents (Age 40+)**

|  | 1995-2003 | | | 2004-2012 | | | 1995-2012 | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Cumulative | Per Year | Share | Cumulative | Per Year | Share | Cumulative | Per Year | Share |
| Rent | 30,285 | 3,365 | 40.6% | 22,644 | 2,516 | 50.2% | 52,929 | 2,940 | 44.2% |
| Payoff | 25,560 | 2,840 | 34.3% | 10,511 | 1,168 | 23.3% | 36,071 | 2,004 | 30.2% |
| Neighborhood Capital | 812 | 90 | 1.1% | 583 | 65 | 1.3% | 1,395 | 77 | 1.2% |
| Fixed Moving Cost | 8,125 | 903 | 10.9% | 1,352 | 150 | 3.0% | 9,477 | 526 | 7.9% |
| Distance of Moves | 3,857 | 429 | 5.2% | 2,827 | 314 | 6.3% | 6,684 | 371 | 5.6% |
| Amenity | -42 | -5 | -0.1% | -276 | -31 | -0.6% | -318 | -18 | -0.3% |
| Match Value | 5,918 | 658 | 7.9% | 7,470 | 830 | 16.6% | 13,388 | 744 | 11.2% |
| Total per Person | 74,514 | 8,279 |  | 45,111 | 5,012 |  | 119,625 | 6,646 |  |

**B. Young Residents (Age 20-39)**

|  | 1995-2003 | | | 2004-2012 | | | 1995-2012 | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Cumulative | Per Year | Share | Cumulative | Per Year | Share | Cumulative | Per Year | Share |
| Rent | 20,782 | 2,309 | 63.1% | 11,940 | 1,327 | 146.3% | 32,722 | 1,818 | 79.6% |
| Payoff | 12,537 | 1,393 | 38.0% | 6,113 | 679 | 74.9% | 18,650 | 1,036 | 45.4% |
| Neighborhood Capital | 431 | 48 | 1.3% | 750 | 83 | 9.2% | 1,181 | 66 | 2.9% |
| Fixed Moving Cost | 3,741 | 416 | 11.3% | -1,643 | -183 | -20.1% | 2,098 | 117 | 5.1% |
| Distance of Moves | 1,655 | 184 | 5.0% | -949 | -105 | -11.6% | 706 | 39 | 1.7% |
| Amenity | 243 | 27 | 0.7% | 829 | 92 | 10.2% | 1,073 | 60 | 2.6% |
| Match Value | -6,428 | -714 | -19.5% | -8,879 | -987 | -108.8% | -15,308 | -850 | -37.2% |
| Total per Person | 32,960 | 3,662 |  | 8,162 | 907 |  | 41,121 | 2,285 |  |

**C. SF Aggregate**

|  | 1995-2003 | | | 2004-2012 | | | 1995-2012 | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Cumulative | Per Year | Share | Cumulative | Per Year | Share | Cumulative | Per Year | Share |
| Old | 2,766,989,545 | 307,443,283 | 56.6% | 1,675,156,256 | 186,128,473 | 76.2% | 4,442,145,875 | 246,785,882 | 62.7% |
| Young | 2,118,588,225 | 235,398,692 | 43.4% | 524,611,003 | 58,290,111 | 23.8% | 2,643,199,099 | 146,844,394 | 37.3% |
| All | 4,885,577,770 | 542,841,975 |  | 2,199,767,259 | 244,418,584 |  | 7,085,344,974 | 393,630,276 |  |

Figure 1: Historical Trend of Nominal Median Rent



Figure 2: Geographic Distribution of Treated and Control Buildings in San Francisco



Figure 3: Treatment Effect for Tenants in Multi-Family Residence (2-4 Units)

(a) Staying at Same Address



(b) Staying in San Francisco



*Notes*: Sample consists of all tenants between 20 and 65 years old living in SF in 1993 and in small multi-family residences that were built during 1900 − 1990. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. Standard errors are clustered at the person level. Significance levels: * 10%, ** 5%, *** 1%.

54

Figure 4: Heterogeneity by Age and Tenure in Treatment Effect for Tenants of Multi-Family Residence (2-4 Units)



*Notes*: Sample consists of all tenants between 20 and 65 years old living in SF in 1993 and in small multi-family residences that were built during $1900 - 1990$. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. We sort the sample by age group. The young group refers to residents who were aged 20-39 in 1993 and the old group are residents who were aged 40-65 in 1993. We also cut the data by number of years the individual has been living at their 1993 address. We define a "low turnover" group of individuals who had been living at their 1993 address for greater than or equal to four years and a "high turnover" group of individuals who had been living at their address for less than four years. The average treatment effects in the post-1994 period along with 90% CI are plotted. Standard errors are clustered at the person level.

Figure 5: Heterogeneity by Rent Appreciation, Age and Tenure in Treatment Effect for Tenants of Multi-Family Residence (2-4 Units)

(a) High Rent Appreciation, Young and High Turnover     (b) High Rent Appreciation, Young and Low Turnover



(c) High Rent Appreciation, Old and High Turnover     (d) High Rent Appreciation, Old and Low Turnover

*Notes*: Sample consists of all tenants between 20 and 65 years old living in SF in 1993 and in small multi-family residences that were built during 1900 − 1990. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. We first individuals into two groups by whether their 1993 census tract experienced above or below median rent appreciation during 1990-2000. We further sort the sample by age group and tenure following the same definitions as in Figure 4. The treatment effects along with 90% CI are plotted. Standard errors are clustered at the person level.

Figure 6: Heterogeneity by Rent Appreciation, Age and Tenure in Treatment Effect for Tenants of Multi-Family Residence (2-4 Units)



(a) Low Rent Appreciation, Young and High Turnover (b) Low Rent Appreciation, Young and Low Turnover

(c) Low Rent Appreciation, Old and High Turnover (d) Low Rent Appreciation, Old and Low Turnover

*Notes*: Sample consists of all tenants between 20 and 65 years old living in SF in 1993 and in small multi-family residences that were built during $1900-1990$. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. We first individuals into two groups by whether their 1993 census tract experienced above or below median rent appreciation during 1990-2000. We further sort the sample by age group and tenure following the same definitions as in Figure 4. The treatment effects along with 90% CI are plotted. Standard errors are clustered at the person level.

Figure 7: Treatment Effect at the Census Tracts level for Tenants of Multi-Family Residence (2-4 Units) – Dynamic Version



*Notes*: Sample consists of all tenants between 20 and 65 years old living in SF in 1993 and in small multi-family residences that were built during $1900 - 1990$. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. Median rent, median household income and share of residents with college education and above are measured in the census tract that an individual is living in a given year. The treatment effects along with 90% CI are plotted. Standard errors are clustered at the person level.

Figure 8: Treatment Effect at the Census Tracts level for Tenants of Multi-Family Residence (2-4 Units) – Dynamic Version



*Notes*: Sample consists of all tenants between 20 and 65 years old living in SF in 1993 and in small multi-family residences that were built during 1900 − 1990. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. Median house value, share of unemployed and share of residents below poverty line are measured in the census tract that an individual is living in a given year. The treatment effects along with 90% CI are plotted. Standard errors are clustered at the person level.

Figure 9: Treatment Effect at the Census Tracts level for Tenants of Multi-Family Residence (2-4 Units) – Static Version



*Notes*: Sample consists of all tenants between 20 and 65 years old living in SF in 1993 and in small multi-family residences that were built during $1900 - 1990$. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. Median rent, median household income and share of residents with college education and above are measured in the census tract that an individual is living in a given year for the control group, and are measured in their 1993 census tract for the treated group. The treatment effects along with 90% CI are plotted. Standard errors are clustered at the person level.

Figure 10: Treatment Effect at the Census Tracts level for Tenants of Multi-Family Residence (2-4 Units) – Static Version



*Notes*: Sample consists of all tenants between 20 and 65 years old living in SF in 1993 and in small multi-family residences that were built during 1900 − 1990. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. Median house value, share of unemployed and share of residents below poverty line are measured in the census tract that an individual is living in a given year for the control group, and are measured in their 1993 census tract for the treated group. The treatment effects along with 90% CI are plotted. Standard errors are clustered at the person level.

Figure 11: Treatment Effect for Multi-Family Residence (2-4 Units)



*Notes*: Sample consists of all small multi-family residences that were built during $1900 - 1990$. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. The treatment effects along with 90% CI are plotted. Standard errors are clustered at the parcel level.

Figure 12: Treatment Effect for Multi-Family Residence (2-4 Units)



*Notes*: Sample consists of all small multi-family residences that were built during $1900 - 1990$. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. The treatment effects along with 90% CI are plotted. Standard errors are clustered at the parcel level.

Figure 13: Heterogeneity by Rent Appreciation in Treatment Effect for Multi-Family Residence (2-4 Units)



(a) Conversion, High Rent Appreciation

(b) Conversion, Low Rent Appreciation

(c) Accumulative Add/Alter/Repair per Unit, High Rent Appreciation

(d) Accumulative Add/Alter/Repair per Unit, Low Rent Appreciation

*Notes*: Sample consists of all small multi-family residences that were built during 1900−1990. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. We sort our sample by whether their 1993 census tract experienced above or below median rent appreciation during 1990-2000. The treatment effects along with 90% CI are plotted. Standard errors are clustered at the parcel level.

Figure 14: Average Annual Tenant Buyouts



Figure 15: Annual Tenant Buyouts by Zipcode



# A   Appendix Tables

Table A.1: Treatment Effect for Multi-Family Residence (2-4 Units)

| | (1) Permanently Vacant | (2) Vacant | (3) Population/ Avg Pop 90-94 | (4) Renters/ Avg Pop 90-94 | (5) Renters in Rent-Controlled Buildings/ Avg Pop 90-94 | (6) Renters in Redeveloped Buildings/ Avg Pop 90-94 | (7) Owners/ Avg Pop 90-94 | (8) Conversion | (9) Accumulative Add/Alter/Repair per Unit | (10) Ever Received Add/Alter/Repair |
|---|---|---|---|---|---|---|---|---|---|---|
| *Treat×Period* | | | | | | | | | | |
| 1994-1999 | -0.0024 | -0.0085 | -0.0329 | -0.0342 | -0.0434 | 0.0005 | 0.0013 | 0.0100*** | -0.0043 | 0.0140* |
| | (0.0046) | (0.0095) | (0.0604) | (0.0472) | (0.0481) | (0.0084) | (0.0299) | (0.0032) | (0.0085) | (0.0081) |
| 2000-2005 | 0.0048 | -0.0064 | -0.0791 | -0.1059* | -0.1516** | 0.0253 | 0.0269 | 0.0384*** | 0.0234* | 0.0413*** |
| | (0.0067) | (0.0114) | (0.0814) | (0.0638) | (0.0654) | (0.0176) | (0.0394) | (0.0045) | (0.0123) | (0.0111) |
| Post 2006 | 0.0084 | -0.0076 | -0.0642 | -0.1453* | -0.2457*** | 0.0717*** | 0.0811** | 0.0793*** | 0.0459*** | 0.0552*** |
| | (0.0094) | (0.0116) | (0.0933) | (0.0747) | (0.0773) | (0.0225) | (0.0409) | (0.0061) | (0.0144) | (0.0130) |
| Control Mean 1994 − 1999 | 0.0293 | 0.0800 | 1.8291 | 1.3540 | 1.3395 | 0.0232 | 0.4752 | 0.3360 | 0.1825 | 0.2352 |
| Control Mean 2000 − 2005 | 0.0469 | 0.0968 | 2.1917 | 1.6278 | 1.5978 | 0.0502 | 0.5639 | 0.3460 | 0.2473 | 0.3066 |
| Control Mean Post 2006 | 0.1035 | 0.1137 | 2.4287 | 1.8338 | 1.7659 | 0.0965 | 0.5949 | 0.3667 | 0.2976 | 0.3624 |
| Adjusted $R^2$ | 0.565 | 0.354 | 0.600 | 0.569 | 0.555 | 0.404 | 0.603 | 0.747 | 0.803 | 0.763 |
| Observations | 724037 | 724037 | 643589 | 643589 | 643589 | 643589 | 643589 | 769181 | 706633 | 724037 |

*Notes*: Sample consists of all small multi-family residences that were built during $1900 − 1990$. If a building is constructed post 1993 and we observe a tenant living there in 1993, we include it into the treatment group for rent control. Table reports the mean of dependent variables for the control group during $1994 − 1999$, $2000 − 2005$ and post-2006. Standard errors are clustered at the parcel level. Significance levels: * 10%, ** 5%, *** 1%.

Table A.2: Model Estimates

A. Model Parameter Estimates in Exp(Rent) Units

| St Dev of Logit Shocks | | Tenant Buyouts | | Moving Costs | | Neighborhood Capital | |
|---|---|---|---|---|---|---|---|
| Young Renters | 2.55*** | Log Below Market Rent | -17.581*** | Fixed Cost | 25.146*** | Young Renters | 0.1292*** |
| | (0.562) | (Young Renters) | (1.398) | (Young Renters) | (5.551) | | (0.0298) |
| Old Renters | 2.271*** | Log Below Market Rent | -15.658*** | Fixed Cost | 22.377*** | Old Renters | 0.1329*** |
| | (0.453) | (Old Renters) | (1.283) | (Old Renters) | (4.444) | | (0.0258) |
| | | Years in Zipcode | 0.671*** | MC per Mile | 4.129*** | | |
| | | (Young Renters) | (0.152) | (Young Renters) | (0.874) | | |
| | | Years in Zipcode | 0.597*** | MC per Mile | 3.685*** | | |
| | | (Old Renters) | (0.122) | (Old Renters) | (0.706) | | |
| | | Old Renter-Direct effect | 4.625*** | $\Delta$MC wrt Yrs in Zip | -0.1258*** | | |
| | | | (0.927) | (Young Renters) | (0.02515) | | |
| | | | | $\Delta$MC wrt Yrs in Zip | -0.112*** | | |
| | | | | (Old Renters) | (0.02029) | | |

*Notes*: Model parameter estimates in the units of exponential value of monthly rent divided by $1,500$.

Figure A.1: Population Age 18 and above: 1990 Census



*Notes*: The size of marker is proportional to the population of 18 and over in the Census in each census tract. The fitted line is by weighted least square using the population of 18 and over in the Census as weights.

Figure A.2: Population Age 18 and above: 2000 Census

*Notes*: The size of marker is proportional to the population of 18 and over in the Census in each census tract. The fitted line is by weighted least square using the population of 18 and over in the Census as weights.

Figure A.3: Age of Occupied Housing: 1990 Census

(a) Built 1970 to 1990: 1990 Census

(b) Built 1950 to 1969: 1990 Census

(c) Built 1940 to 1949: 1990 Census

(d) Built 1939 or earlier: 1990 Census

*Notes*: The size of marker is proportional to the number of occupied housing units in each census tract. The fitted line is by weighted least square using the number of occupied housing units as weights.

Figure A.4: Age of Occupied Housing: 2000 Census

(a) Built 1980 to 2000: 2000 Census



(b) Built 1960 to 1979: 2000 Census



(c) Built 1950 to 1959: 2000 Census



(d) Built 1940 to 1949: 2000 Census



(e) Built 1930 or earlier: 2000 Census



*Notes*: The size of marker is proportional to the number of occupied housing units in each census tract. The fitted line is by weighted least square using the number of occupied housing units as weights.

Figure A.5: Ownership Rate at Person Level: 1990 Census



*Notes*: Plot shows the ownership rate at the person level from our Infutor sample in 1990 against the ownership rate of occupied housing units in 1990 Census. The size of marker is proportional to the number of occupied housing units in each census tract. The fitted line is by weighted least square using the number of occupied housing units as weights.

Figure A.6: Ownership Rate at Person Level: 2000 Census

*Notes*: Plot shows the ownership rate at the person level from our Infutor sample in 1990 against the ownership rate of occupied housing units in 1990 Census. The size of marker is proportional to the number of occupied housing units in each census tract. The fitted line is by weighted least square using the number of occupied housing units as weights.

**Subject: Testimony to the Housing and Buildings Committee of the City Council**

Dear City Council Members-

I would like to submit the following testimony regarding Intro. 600-A and Resolution 188-A of 2018:

My name is Eva Mallis and I am an owner and operator of buildings in Astoria, Queens. My family has owned and managed properties in Astoria for over 50 years. We take pride in our management.

Before you is the far reaching decision to determine whether the City of New York is experiencing a housing emergency.
I can assure you, we are most definitely experiencing a housing emergency, however, not the type you are assuming.

Our emergency concerns an extreme shortage of two bedroom, resulting directly from the fact the rent stabilized tenants, who occupy the majority of the two bedroom apartments, refuse to vacate, even though they no longer have a need for the additional square footage. They refuse to vacate due to years of public policy favoring the lucky few who are guaranteed life long privileges.

A housing emergency exists because the multi generational inheritors of rent stabilized two bedroom apartments hold onto these apartments, indefinitely.
Most often, the tenant of record remains long enough to ensure another family member returns or begins to cohabitate, for the sole purpose of inheriting this rent regulated apartment.

A housing emergency exists because so many young families cannot find a reasonably priced free market two bedroom apartment due to the fact fair market apartments must absorb the operating costs not covered by rent stabilized rents.
A quick analysis reveals most rent stabilized rents do not cover their fair share of the operating expenses and therefore, many expenses are passed onto free market units.

We repeatedly have to turn away current tenants occupying one bedroom apartments who start families and wish to remain in the City, yet need more space. They cannot

find a two bedroom apartment in an affordable neighborhood because of non-existent turnover in rent stabilized two bedroom apartments.

It isn't good public policy to favor the few who won the rent stabilized lottery while the market rate tenants have to cover more than their fair share of the operating expenses.  They're being priced out of the City because of a lack of turnover.

I urge the City Council to repeal Resolution 188-A of 2018, acknowledging a public emergency no longer exists requiring rent regulation to continue and that we must now begin to repair the imbalance created by a policy that no longer serves the majority of the City's residents.

Thank you,
Eva Mallis


*Eva Mallis*
*MNE Residential Properties LLC*
*P.O. Box 716*
*Harrison, New York  10528*
*Phone/Fax (914) 925-0664*



**PUBLIC ADVOCATE** FOR THE CITY OF NEW YORK
# Letitia James

**Testimony of the Public Advocate for the City of New York, Letitia James,
Before the New York City Council Housing and Buildings Committee
March 19, 2018**

Good Morning. My name is Letitia James and I am the Public Advocate for the City of New York.

I want to thank Chair Cornegy, his staff, and the committee staff for holding today's hearing on the continuing need for rent control and rent regulation.

I would also like to thank Speaker Johnson for introducing the legislation necessary to extend New York's rent control and rent regulation laws.

It is a strange and difficult thing to live in a state of perpetual housing emergency for decades on end.  But that is New York City's reality and we must face it head on and tailor our policy agenda accordingly.

While this year's Housing Vacancy Survey contains some relatively positive news, it also illustrates the depth and persistence of our affordable housing crisis.

For rent stabilized housing the vacancy rate is approximately 2%, and for heavily subsidized units, such as public housing or developments with project-based rental assistance, the vacancy rate is less than 1%.

Clearly we need to redouble our efforts to create and preserve affordable housing and fight to keep units from being unlawfully deregulated by unscrupulous landlords.

However the most surprising, and troubling, data points concerned those vacant properties not available for sale or rent.

A staggering quarter-million homes have no one living in them, yet are not on the market.  Of those, nearly 75,000 were held for recreational and seasonal use, nearly 6,000 were held unoccupied pending the sale of a building and another 27,000 were held vacant for unspecified reasons.

This data points directly to the need to ensure that individuals who own underutilized properties that could be used to house New Yorkers at least pay their fair share.  That means instituting a graduated Pied a Terre Tax where second-home owners who do not pay City income taxes but utilize City services are charged an escalating rate based on the value of their properties.

It is also clear that there is still too much information we're missing in the quest for a full picture of the City's potential for affordable housing.  I believe that a bill I sponsor, Int. 226-2018,

which would create a mandatory registry for all vacant property owners with fines for failure to register, could play a critical role in filling in those gaps.

All over the City, there are countless vacant lots and buildings, many unaccounted for, that could potentially serve as the site of permanent low-income housing. Speculators sit on vacant properties for years, waiting for the most lucrative opportunity and allowing precious resources that could be used for affordable housing to languish. It is basic common-sense that we should know what lots and buildings are vacant, so that we can best understand what resources we have at our disposal.

This registry will help give us the tools we need to combat the shortage of space that keeps people on the streets, forces them out of the City, or crams their kids in a building intended for far fewer children. If New York City is truly dedicated to solving the housing crisis and eradicating homelessness, we need to know what resources we have and where people can live.

At the end of last year, the Council passed two-thirds of the Housing Not Warehousing Act. Now the time has come to finish the job.

I look forward to working with all of you to make that a reality.

Thank you.

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _600A_  Res. No. _188A_

☐ in favor  ☐ in opposition

Date: _3/19/2018_

**(PLEASE PRINT)**

Name: _Abigail Martinez_

Address: _080-58st_

I represent: _Neighbors Helping Neighbors_

Address: _128-32st #106 BK NY 11232_

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _600A_  Res. No. _188A_

☑ in favor  ☐ in opposition

Date: _3-19-2018_

**(PLEASE PRINT)**

Name: _Marcela Aliteres_

Address: _____

I represent: _Neighbors Helping Neighbor_

Address: _128-32 street #106 BKNY 11232_

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _600_  Res. No. _188_

☑ in favor  ☐ in opposition

Date: _03.19.18_

**(PLEASE PRINT)**

Name: _Oscar Mirorova_

Address: _608 Putry Rd, Brooklyn NY 11230_

I represent: _Community Service Society_

Address: _____

*Please complete this card and return to the Sergeant-at-Arms*

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 188 A 600- A   Res. No. 788-A

☒ in favor   ☐ in opposition

Date: *March 19, 2018*

**(PLEASE PRINT)**

Name: Susan Steinberg

Address: 5 STUYVESANT OVAL, 11G

I represent: STPCV TENANTS ASSOC

Address: P O BOX 1202, NYC 10009-1202

---

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 600-A   Res. No. 88 A

☒ in favor   ☐ in opposition

Date: 3-19-18

**(PLEASE PRINT)**

Name: Norma Schreier

Address: 333 Central Park West

I represent: TENANTS & NEIGHBORS

Address: 255 W. 36 St

---

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 188 A   Res. No. 600A

☐ in favor   ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Delsenia Glover

Address: _____

I represent: Tenants & Neighbors

Address: _____

*Please complete this card and return to the Sergeant-at-Arms*

# THE COUNCIL
# THE CITY OF NEW YORK

### *Appearance Card*

I intend to appear and speak on Int. No. *600-A* Res. No. *188-A*

☑ **in favor** ☐ **in opposition**

Date: _____

**(PLEASE PRINT)**

Name: *Ed Viera, Jr.*

Address: *1314 Grand Concourse #1-C, Bx*

I represent: _____

Address: _____

---

# THE COUNCIL
# THE CITY OF NEW YORK

### *Appearance Card*

I intend to appear and speak on Int. No. *600 A* Res. No. _____

☐ **in favor** ☐ **in opposition**

Date: *3/79/13*

**(PLEASE PRINT)**

Name: *Cynthia Chaffee*

Address: *346 East 13th St*

I represent: *STOP CROMAN COALITION*

Address: _____

---

# THE COUNCIL
# THE CITY OF NEW YORK

### *Appearance Card*

I intend to appear and speak on Int. No. *600A* Res. No. _____

☑ **in favor** ☐ **in opposition**

Date: _____

**(PLEASE PRINT)**

Name: *Ellen Davidson*

Address: *199 Water St*

I represent: *The Legal Aid Society*

Address: _____

*Please complete this card and return to the Sergeant-at-Arms*

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 600-A Res. No. 188-A

☑ in favor ☐ in opposition

Date: 3/19/18

**(PLEASE PRINT)**

Name: Lino Diaz

Address: 3730 73rd St. Apt. 4 M, Queen, NY 11372

I represent: LSNYC

Address: 40 worth Street, NY, NY 10013

---

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 600-A Res. No. 188-A

☑ in favor ☐ in opposition

Date: March 19, 2018

**(PLEASE PRINT)**

Name: Rev. Leslie Foltz-Morrison

Address: 3050 Carleon Ave #402; Bronx NY 10463

I represent: Met Council on Housing

Address: _____

---

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 600 Res. No. 188

☑ in favor ☐ in opposition

Date: 03-19-18

**(PLEASE PRINT)**

Name: Vaughn Armour

Address: 570 Lefferts ave

I represent: rent laws

Address: _____

*Please complete this card and return to the Sergeant-at-Arms*

# THE COUNCIL
# THE CITY OF NEW YORK

### *Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor   ☐ in opposition

Date: 3/19/18

**(PLEASE PRINT)**

Name: Matthew N Murphy

Address: 100 Gold

I represent: HPD

Address: _____

# THE COUNCIL
# THE CITY OF NEW YORK

### *Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor   ☐ in opposition

Date: 3/19/18

**(PLEASE PRINT)**

Name: Elizabeth Gaumer

Address: 100 Gold

I represent: HPD

Address: _____

# THE COUNCIL
# THE CITY OF NEW YORK

### *Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor   ☐ in opposition

Date: 3/19/18

**(PLEASE PRINT)**

Name: Francisco Martin

Address: 100 Gold

I represent: HPD

Address: _____

*Please complete this card and return to the Sergeant-at-Arms*

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. 3-19-18
☑ in favor ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: JOSE LUIS RODRIGUEZ

Address: 580 SOUTHERN BLVD

I represent: PICTURE THE HOMELESS

Address: 104 EAST 126 ST NYC

---

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 123A Res. No. 600A
☑ in favor ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: JESSICA BERK

Address: 95 CHRISTOPHER ST R.E.D

I represent: 

Address: SAME

---

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____
☐ in favor ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Bacilio Garcia

Address: 

I represent: Woodside on the Move

Address: 96-10 37th Ave Corona, NY

*Please complete this card and return to the Sergeant-at-Arms*

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____
☑ in favor   ☐ in opposition

Date: 03/19/18

**(PLEASE PRINT)**

Name: Earl Carter

Address: 201 West 11th Fl Apt 3B

I represent: _____

Address: _____

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____
☑ in favor   ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Ava Farkas

Address: 30 Bogardus Place

I represent: Met Council on Housing

Address: _____

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____
☐ in favor   ☐ in opposition

Date: March 19, 2018

**(PLEASE PRINT)**

Name: Scott Hutchins

Address: 52 W 50th St NW 11019

I represent: Picture the Homeless

Address: 104-B E 126th St

*Please complete this card and return to the Sergeant-at-Arms*

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor   ☐ in opposition

Date: 03/19/18

**(PLEASE PRINT)**

Name: JORGEL RODRIGUEZ

Address: 98-23 HH Exp.

I represent: Myself.

Address:

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor   ☐ in opposition

Date: 4/19/18

**(PLEASE PRINT)**

Name: BARIKA WILLIAMS

Address:

I represent: ANHD

Address: 50 Broad St #1402

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 188-A  Res. No. 600-A

☐ in favor   ☐ in opposition

Date: Mar, 19 2018

**(PLEASE PRINT)**

Name: Julie Hanlon   Secure mail:
Box 176, NY NY 10024

Address: 345 W. 86th #1409 NYP 10024

I represent: Tenants Asso Dexter House TA

Address: 345 W.86th NY NY 10024

# Secure mail due to SRO mail abuse

*Please complete this card and return to the Sergeant-at-Arms*