UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- X

COMMUNITY HOUSING IMPROVEMENT PROGRAM,
RENT STABILIZATION ASSOCIATION OF N.Y.C., INC.,
CONSTANCE NUGENT-MILLER, MYCAK ASSOCIATES
LLC, VERMYCK LLC, M&G MYCAK LLC, CINDY
REALTY LLC, DANIELLE REALTY LLC, FOREST              19-cv-04087 (MKB)
REATLTY, LLC,

                                        Plaintiffs,

                        - against -

CITY OF NEW YORK, RENT GUIDELINES BOARD,
DAVID REISS, CECILIA JOZA, ALEX SCHWARZ,
GERMAN TEJEDA, MAY YU, PATTI STONE, J. SCOTT
WALSH, LEAH GOODRIDGE, AND SHEILA GARCIA, IN
THEIR OFFICIAL CAPACITIES AS CHAIR AND
MEMBERS, RESPECTIVELY, OF THE RENT GUIDELINES
BOARD, AND RUTHANNE VISNAUSKAS, IN HER
OFFICIAL CAPACITY AS COMMISSIONER OF NEW
YORK STATE HOMES AND COMMUNITY RENEWAL,
DIVISION OF HOUSING AND COMMUNITY RENEWAL,

                                        Defendants.

----------------------------------------------------------------------- X


# CITY DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

                              GEORGIA M. PESTANA
                        Acting Corporation Counsel of the
                                    City of New York
                            Attorney for City Defendants
                          100 Church Street, Room 5-153
                            New York, New York 10007

November 1, 2019

SHERYL NEUFELD,
MICHELLE GOLDBERG-CAHN,
RACHEL K. MOSTON,
            OF COUNSEL.


CLAUDIA BRODSKY,
*On the Memorandum (Admitted to New York State; not yet admitted to EDNY)*

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT ..............................................................1

RELEVANT STATUTORY PROVISIONS ...........................................3

    A.  Overview of the Enactment of the New York State Rent Stabilization Laws...................................................3

    B.  The New York City Rent Stabilization Law..........................5

ARGUMENT.....................................................................................6

    POINT   I:   PLAINTIFFS' SUBSTANTIVE DUE PROCESS CHALLENGE TO THE RSL FAILS. ...................7

    A.  Precedent Establishes that the RSL is Rationally Related to a Legitimate Government Interest ..........................................................................8

    B.  Plaintiffs' Challenges to the RSL are Best Directed at the Legislature.........................................11

    C. There is No Basis to Apply Strict Scrutiny to the RSL ................................................................................12

    POINT   II:   THE   CITY   COUNCIL'S   2018 DECLARATION OF A HOUSING EMERGENCY DOES NOT VIOLATE DUE PROCESS ...................................13

    A.  The Mandates of the ETPA ...........................................14

    B.  In Declaring a Housing Emergency, the City Council Lawfully and Properly Considered all of the Factors Set Forth in the ETPA ................................15

    POINT III:  PLAINTIFFS FAIL TO STATE A CLAIM FOR A PHYSICAL TAKING...............................................19

    A.  The RSL Does Not Force Landlords of Regulated Units to Rent Their Property ....................................21

    B.  The RSL Does Not Compel Landlords to Stay in the Rental Business ................................................24

POINT IV:  PLAINTIFFS FAIL TO STATE A FACIAL
REGULATORY TAKING CLAIM. ...................................................................25

    A.  The Legal Standard. ...........................................................................26

    B.  Plaintiffs Have Not Alleged that the RSL
       Deprives Them of Commercially Viable Use of
       Their Properties ...................................................................................27

    C.  Plaintiffs' Facial Challenge Fails Under *Penn
       Central* ................................................................................................30

CONCLUSION .................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

1256 Hertel Ave. Assocs., LLC v. Calloway,
    761 F.3d 252 (2d Cir. 2014) ........................................................................34, 35

ABN 51st Street Partners v. New York,
    724 F. Supp. 1142 (S.D.N.Y. 1989) ........................................................................26

Agins v. City of Tiburon,
    447 U.S. 255 (1980) ........................................................................27

All Aire Conditioning, Inc. v. City of New York,
    979 F. Supp. 1010 (S.D.N.Y. 1997) ........................................................................8

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ........................................................................6

Beatie v. City of New York,
    123 F.3d 707 (2d Cir. 1997) ........................................................................8

Bell Atlantic v. Twombly,
    550 U.S. 544 (2007) ........................................................................7

Block v. Hirsh,
    256 U.S. 135 (1921) ........................................................................34

Brace v. United States,
    72 Fed. Cl. 337 (2006) ........................................................................32

Buffalo Teachers Fed'n v. Tobe,
    464 F.3d 362 (2d Cir. 2006) ........................................................................25

Chambers v. Time Warner,
    282 F.3d 147 (2d Cir. 2002) ........................................................................14

Concrete Pipe & Prods. v. Constr. Laborers Pension Trust,
    508 U.S. 602 (1993) ........................................................................31, 34

Day-Brite Lightin, Inc. v. Missouri,
    342 U.S. 421 (1952) ........................................................................11

Euclid v. Ambler Realty Co.,
    272 U.S. 365 (1926) ........................................................................25

Farrell v. Burke,
   449 F.3d 470 (2d Cir. 2006) ................................................................1

Federal Home Loan Mortg. v. DHCR,
   83 F.3d 45 (2d Cir. 1996) ..........................................................*passim*

Greystone Hotel Co. v. City of New York,
   13 F. Supp. 2d 524 (S.D.N.Y. 1998) ...........................................*passim*

Greystone Hotel Co. v. City of New York,
   1999 U.S. App. LEXIS 149600 (2d Cir. 1999) ...............................*passim*

Guggenheim v. City of Goleta,
   638 F.3d 1111 (9th Cir. 2010) .........................................................33

Harmon v. Markus,
   412 Fed. Appx. 420 (2d Cir. 2011)..........................................19, 20, 21

Horne v. Dep't of Agric.,
   135 S. Ct. 2419 (2015) ..................................................................25

Kaluczky v. City of White Plains,
   57 F.3d 202 (2d Cir. 1995) .............................................................8

Keystone Bituminous Coal Ass'n v. DeBenedictis,
   480 U.S. 470 (1987) ...............................................................26, 27, 28

Laurel Park Cmty. LLC v. City of Tumwater,
   698 F.3d 1180 (9th Cir. 2012) .........................................................31

Lingle v. Chevron U.S.A., Inc.,
   544 U.S. 528 (2005) ...............................................................13, 26, 27

Loretto v. Teleprompter Manhattan Catv Corp.,
   458 U.S. 419 (1982) ...........................................................19, 20, 23, 25

Manocherian v. Lenox Hill Hosp.,
   84 N.Y.2d 385 (N.Y. 1994)..............................................................9

MHC Fin. L.P. v. City of San Rafael,
   714 F.3d 1118 (9th Cir. 2013) ......................................................31, 32

Murphy v. Lynn,
   53 F.3d 547 (2d Cir. 1995) ..............................................................13

Palazzolo v. Rhode Island,
   533 U.S. 606 (2001)......................................................................33

Penn Cent. Transp. Co. v. New York City,
    438 U.S. 104 (1978) .................................................................................30, 31, 33, 35

Pennell v. City of San Jose,
    485 U.S. 1 (1988) ...........................................................................................................8

Pennsylvania Coal v. Mahon,
    260 U.S. 393 (1922) ....................................................................................................11

RSA v. Dinkins,
    5 F.3d 591 (2d Cir. 1993) .....................................................................................26, 29

RSA v. Higgins,
    83 N.Y.2d 156 (N.Y. 1993) .................................................................................passim

Seawall Assocs. v. City of N.Y.,
    74 N.Y.2d 92 (1989) ....................................................................................................25

Staten Island Loaders v. Waterfront Commission,
    117 F. Supp. 308 (S.D.N.Y. 1953) ............................................................................11

Suitum v. Tahoe Reg'l Planning Agency,
    520 U.S. 725 (1997) ....................................................................................................26

W. 95 Housing Corp. v. HPD,
    2001 U.S. Dist. LEXIS 7784 ..................................................................................8, 26

W. 95 Housing Corp. v. HPD,
    31 Fed. Appx. 19 (2d Cir. 2002) ............................................................................8, 26

Yee v. City of Escondido,
    503 U.S. 519 (1992) .............................................................................................passim

Ximines v. George Wingate High Sch.,
    516 F.3d 156 (2d Cir. 2008) .........................................................................................1

**Statutes**

ETPA

§ 2 ............................................................................................................4, 10

§ 3 ...............................................................................................4, 14, 15, 18

New York City Admin. Code

§ 26-408 .........................................................................................................22

§ 26-501 ...........................................................................................................5

§ 26-502 ...........................................................................................................4

§ 26-504 ...........................................................................................................4

§ 26-509 .........................................................................................................10

§ 26-510 ..............................................................................................5, 10, 29

§ 26-511 ..............................................................................................6, 24, 30

§ 26-512 ....................................................................................................5, 10

New York City Charter § 396 ...............................................................................1

**Regulations**

9 N.Y.C.R.R.

§ 2202 ...........................................................................................................10

§ 2520.6 .........................................................................................................22

§ 2521.1 ...........................................................................................................9

§ 2521.2 ....................................................................................................9, 28

§ 2522.2 ...........................................................................................................9

§ 2522.3 ...........................................................................................................9

§ 2522.4 ..............................................................................................6, 9, 10

§ 2522.8 ...........................................................................................................9

§ 2523.5 ....................................................................................................9, 23

§ 2524.1 ................................................................................................................. 9

§ 2524.3 ............................................................................................................. 9, 22

§ 2524.4 ................................................................................................................. 22

§ 2524.5 ................................................................................................................. 24

§ 2525.5 ................................................................................................................... 9

§ 2525.6 ................................................................................................................. 23

## Miscellaneous Authority

*Kelo, Lingle, and Sam Remo Hotel: Takings Law Now Applies to the States,*
46 Santa Clara L. Rev. (2006), William A. Fletcher ............................................ 27

Defendants, the City of New York ("City"), the New York City Rent Guidelines Board ("RGB"), David Reiss, Cecelia Joza, Alex Schwarz, German Tejeda, May Yu, Patti Stone, J. Scott Walsh, Leah Goodridge, and Sheila Garcia, in their official capacities as Chair and Members of the RGB (collectively, "City Defendants"), by their attorney, Georgia M. Pestana, Acting Corporation Counsel of the City of New York, submit this memorandum of law in support of their Motion to Dismiss the Complaint ("Compl.") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP").[1]

## PRELIMINARY STATEMENT

This case stems from plaintiffs' sweeping attacks upon the New York State and New York City rent stabilization laws, including the most recent 2019 Amendments thereto, and the New York City Council's ("City Council's") 2018 declaration of a City-wide housing emergency. Enacted in 1969, the City's Rent Stabilization Law ("RSL") was crafted to ensure the availability of affordable housing for millions of New Yorkers. Indeed, nearly one million rent stabilized units exist in the City today. The RSL provides the largest source of low-cost housing in the City, and offers critical tenant protections that enable residents to remain in their homes and communities. The RSL regulates the rents that can be charged for certain apartments, provides succession rights to family members co-residing in those apartments with the tenant of record, establishes procedures for evicting tenants in stabilized units, and provides housing security to the City's vulnerable low-income, senior citizen, and disabled tenants by giving them

---

[1] Plaintiffs' Complaint should be dismissed against RGB and its members, who are only named in their official capacities. As an agency of the City of New York, RGB (and its members) is not a suable entity. Ximines v. George Wingate High Sch., 516 F.3d 156 (2d Cir. 2008); NYC Charter § 396. Thus, RGB and its members are not proper parties in the instant action. In any event, at base, the individual RGB members must be dismissed because plaintiffs have failed to plead facts as to their personal involvement in any of the alleged constitutional violations. Farrell v. Burke, 449 F.3d 470 (2d Cir. 2006).

rights aimed at preventing their dislocation, eviction, harassment, and homelessness. Rent stabilization also promotes and maintains socioeconomic diversity and neighborhood cohesion.

Plaintiffs – individual and corporate landlords and landlord organizations – purport to mount the following *facial* constitutional challenges to take down the entire rent stabilization scheme, claiming: (1) the rent stabilization laws violate the U.S. Constitution's Fourteenth Amendment's Due Process Clause (first claim for relief); (2) the City Council's 2018 declaration of a housing emergency also violates due process (first claim for relief); (3) the rent stabilization laws result in a *per se* physical taking of private property in violation of the Takings Clause (second claim for relief); and (4) the rent stabilization scheme effects a regulatory taking of private property in violation of the Takings Clause of the Fifth Amendment (third claim for relief). See Compl. Plaintiffs' facial challenges fail as a matter of law. A facial challenge must establish that *no* set of circumstances exists under which the challenged act would be valid. Plaintiffs cannot sustain that exacting burden. Nor can plaintiffs overcome the strong presumption of constitutionality that attaches to the challenged legislation.

Plaintiffs' due process challenge fails as a matter of law. Plaintiffs fail to plausibly allege that the rent stabilization laws are irrational and arbitrary. Rather, courts have consistently upheld challenges to rent stabilization laws under rational basis review, finding that they serve the legitimate and rational government interest of protecting tenants and City residents from the City's housing crisis. Plaintiffs also contend that the City Council's declaration of a housing emergency in 2018 is a violation of substantive due process. But such a claim is belied by the legislative record of the City Council's 2018 declaration, which demonstrates the Council's findings were rationally grounded in factual evidence.

Plaintiffs fail to plead a permanent physical takings claim because the rent stabilization laws do not compel property owners to endure a permanent physical occupation. Where, as here, property owners retain statutory rights (including the right to evict tenants and recover possession of property), and where a property owner voluntarily offers property for rental housing in the first instance, the governmental regulation of the rental relationship does not constitute a physical taking.

Plaintiffs' facial regulatory takings claim fares no better. A facial regulatory taking occurs where a regulation denies an owner *any* economically viable use of the owner's property. Plaintiffs do not allege, nor can they, that the RSL has denied *any* property owner, let alone *all* owners of rent stabilized properties, any economically viable use of their property. As plaintiffs acknowledge that they collect rents for the units that they own, and even maintain many market rate units in their buildings, plaintiffs clearly retain economically viable use of their property and thus fail to meet the standard for a facial regulatory taking. Accordingly, plaintiffs' Complaint must be dismissed as a matter of law.

## RELEVANT STATUTORY PROVISIONS

### A.  Overview of the Enactment of the New York State Rent Stabilization Laws

In New York City, the rent stabilization scheme is a product of state and City laws, and is administered by New York State Homes and Community Renewal ("HCR"), designated by state law as the Division of Housing and Community Renewal. State law incorporates by reference the City's Rent Stabilization Law ("RSL") of 1969, as amended, which is codified at Title 26, Chapter 4 of the New York City Administrative Code ("Admin. Code").[2]

---

[2] See §§ 8601-8617 of the Unconsolidated Laws of New York (McKinney's) (also referred to as the Local Emergency Housing Rent Control Act – the enabling legislation for local rent control and stabilization). Additional regulations governing rents and other aspects of tenancies are set forth in the Rent Stabilization Code ("RSC"), codified at 9 N.Y.C.R.R. § 2520.1, et seq.

Rent stabilization generally covers buildings constructed before 1974 with six or more dwelling units. See id. § 26-504.

The New York State Legislature enacted the Emergency Tenant Protection Act of 1974 ("ETPA"), Chapter 576 § 4, 1974 N.Y. Laws 1510, 1512-33, McKinney's Unconsolidated laws § 8621 et seq., in response to its finding that a serious public emergency existed in housing and that "such emergency necessitated the intervention of federal, state and local government in order to prevent speculative, unwarranted and abnormal increases in rent" and "to prevent exaction of unjust, unreasonable, and oppressive rents and rental agreements." See ETPA § 2 (as amended). The ETPA enabled New York City and certain local suburban governments to declare the existence of a housing emergency, and to impose, or in the case of New York City, to extend rent stabilization. Id. Specifically, the ETPA provides that "[a] declaration of emergency may be made as to any class of housing accommodations if the vacancy rate for the housing accommodations … is not in excess of five percent." ETPA § 3. The ETPA authorizes local legislative bodies to declare the existence of a housing emergency after which housing accommodations become subject to the ETPA. In New York City, the ETPA applies in tandem with the Local Emergency Housing Rent Control Act (McKinney's Unconsolidated Laws § 8603), which provides that, as a condition of the continuation of the emergency requiring rent regulation, the City must make a new determination of emergency at least every three years following a survey of the supply of housing accommodations. Thus, in accordance with both statutes, the City reviews the need for its declaration of emergency every three years. The City Council most recently took such action in 2018. Admin. Code § 26-502.

## B. The New York City Rent Stabilization Law

The City Council first passed the City's RSL in 1969 in response to its findings and declaration of emergency. See Admin. Code § 26-501, et seq. The City Council referred to the "serious public emergency" of the housing crisis and the continued "acute shortage of dwellings which creates a special hardship to persons and families occupying rental housing," finding that "unless residential rents and evictions continue to be regulated and controlled, disruptive practices and abnormal conditions will produce serious threats to the public health, safety, and general welfare." Id. § 26-501. Each subsequent enactment by the City Council reaffirms these findings and reasserts the necessity of providing a remedy through government intervention.

The RSL does not set rents, but instead regulates the percentage by which landlords may periodically increase the rent on regulated units. The RGB – a nine-member board comprised of representatives of landlords, tenants, and the general public – determines the permissible percentage of rent increases for lease renewals. Admin. Code § 26-510(a). In adopting annual rent guidelines, RGB must balance owners' costs and needs, with the significant burden that skyrocketing rents place on tenants. To that end, RGB must consider, among other things, the economic condition of the residential real estate industry, the overall supply of housing accommodations and vacancy rates, and the data from current and projected cost of living indices. Id. 26-510(b). Consistent with this scheme, "[n]o owner of property subject to [the RSL] shall charge or collect any rent in excess of the … [legal regulated rent] until such time as a different legal regulated rent shall be authorized pursuant to guidelines adopted by the rent guidelines board." Id. § 26-512(a).

The RSL, however, provides a mechanism for adjusting rents from the amounts set by the RGB's orders, for example, if the owner has substantially improved the physical condition of the unit ("Individual Apartment Improvements" or "IAI") or performed major building-wide capital improvements ("Major Capital Improvements" or "MCI"). See Admin. Code §§ 26-511(c)(6)(b) and 26-511-(c)(13).   In addition, the RSL includes two hardship provisions, a comparative and alternative hardship increase. See Admin. Code §§ 26-511(c)(6) and (6-a).   HCR may increase the rents based upon an owner's application under these provisions. See 9 N.Y.C.R.R. § 2522.4(b)-(c); see also Admin. Code § 26-511(c)(6); (6-a).

On June 14, 2019, the New York State legislature passed the Housing Stability and Tenant Protection Act of 2019 (the "2019 Amendments")[3], which introduced amendments to the RSL, including:  (1) elimination of the provisions of rent regulation that deregulated rent stabilized units when the rents reached a luxury threshold ("Luxury Decontrol") or when the tenants' income exceeded a certain amount ("High Income Decontrol") [see Parts D and Q]; (2) reduction in the amount an owner can recover for MCIs or IAIs [see Part K]; (3) elimination of the landlord's ability to recover more than one apartment for his or her own use [see Part I]; and (4) elimination of the landlord's option to evict tenants from rent stabilized units upon the landlord's conversion of the rental units to cooperative or condominium ownership [see Part N]. Shortly afterward, additional amendments to rent regulations provisions – many of them technical in nature – were enacted in Part Q of Chapter 39 of the Laws of 2019.

## **ARGUMENT**

To survive a Rule 12(b)(6) motion to dismiss, a pleading must contain sufficient factual matter, accepted as true, so as to make a claim plausible on its face. Ashcroft v. Iqbal,

---

[3] The 2019 Amendments – set forth in Chapter 36 of the Laws of 2019 – are divided into 15 sections, Parts A to O.

556 U.S. 662, 678 (2009); Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007). To meet the "facial plausibility" standard, a pleading must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This standard requires a court to reject "threadbare recitals" of the elements of a cause of action "supported by mere conclusory statements," and requires "more than a sheer possibility that a defendant has acted unlawfully." Id.

## POINT I

### PLAINTIFFS' SUBSTANTIVE DUE PROCESS CHALLENGE TO THE RSL FAILS.

Plaintiffs allege that the entire rent stabilization scheme – on its face – violates their substantive due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution because the laws are "irrational" and "fail to serve any of the goals that they purport to set to achieve." Compl. ¶ 356. Plaintiffs mount this facial attack not only to the most recent 2019 Amendments, but to *all* of New York's rent stabilization laws, which, as plaintiffs acknowledge, have "applied in New York City continuously for 50 years[.]" Compl. ¶ 6. Plaintiffs' due process challenge is neither new nor novel, and many of plaintiffs' claims have been squarely repudiated by federal and state courts over the years. Plaintiffs' voluminous Complaint sets forth nothing more than complaints and hypothetical grievances regarding the structure and effect of the rent stabilization scheme that are more appropriately directed at the legislature, rather than this Court. Accordingly, even if plaintiffs' allegations are accepted as true, they do not rise to the level of a due process violation.

**A.** **Precedent Establishes that the RSL is Rationally Related to a Legitimate Government Interest.**

To sustain a facial due process challenge, plaintiffs must demonstrate that the challenged legislation was "arbitrary, conscience-shocking, or oppressive in a constitutional sense," and not merely "incorrect or ill-advised." Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995). Plaintiffs must also overcome the strong presumption of constitutionality that attaches to the challenged legislation. RSA v. Higgins, 83 N.Y.2d 156, 171 (N.Y. 1993) ("[I]n this facial challenge [to the RSL], appellants bear the heavy burden of overcoming the presumption of constitutionality that attaches to the challenged enactments."). Legislative acts, such as the rent stabilization laws, that do not "interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality and must be upheld if rationally related to a legitimate state interest." Beatie v. City of N.Y., 123 F.3d 707, 711 (2d Cir. 1997) (internal citations omitted). Thus, "as long as the City officials responsible for the enforcement guidelines reasonably might have conceived that the policies would serve legitimate interests, those guidelines must be sustained." All Aire Conditioning, Inc. v. City of N.Y., 979 F. Supp. 1010, 1018 (S.D.N.Y. 1997).

Controlling precedent establishes that the challenged rent stabilization scheme is supported by a rational legislative purpose – namely, protecting City tenants and residents from the City's housing crisis. Indeed, courts have consistently and routinely upheld rent control and rent stabilization laws as serving this legitimate and important public interest. See Pennell v. City of San Jose, 485 U.S. 1, 11 (1988) (The purpose of "preventing excessive and unreasonable rent increases caused by the growing shortage of and increasing demand for housing … is a legitimate exercise of [the] police powers."); W. 95 Housing Corp. v. HPD, 2001 U.S. Dist. LEXIS 7784, * 28, aff'd, 31 Fed. Appx. 19 (2d Cir. 2002) ("the RSL and ETPA were enacted to

combat the ill effects of a perceived housing shortage – clearly a valid governmental concern."); Greystone Hotel Co. v. City of N.Y.f, 13 F. Supp. 2d 524, 528 (S.D.N.Y. 1998), aff'd 1999 U.S. App. LEXIS 14960 (2d Cir. 1999) ("the legitimate state interest in the RSL and RSC is coping with an acute shortage of available housing, and preventing unjust and oppressive rents and profiteering."); Manocherian v. Lenox Hill Hosp., 84 N.Y.2d 385, 395-96 (N.Y. 1994) ("The central, underlying purpose of the RSL is to ameliorate the dislocations and risk of widespread lack of suitable dwelling."); Higgins, 83 N.Y.2d at 174 (finding "a close causal nexus between the challenged [rent] regulation and the stated purpose of preventing the eviction and resulting vulnerability to homelessness of the identified beneficiaries.").

Accordingly, it is clear that the RSL – and now the 2019 Amendments thereto – are rationally designed to address the government's legitimate goals of curbing rent profiteering, promoting stability, avoiding disruptions to neighborhoods and communities that would result from rent increases, and generally protecting the many New Yorkers who struggle to afford suitable housing. Admin. Code § 26-501. The rent stabilization scheme serves its stated purpose by providing procedures for establishing the legal maximum rent for each stabilized unit and for calculating permissible rent increases. See 9 N.Y.C.R.R. §§ 2521.1, 2522.2-2522.4, 2522.8. Rent stabilization offers many other tenant-protections as well. An occupying tenant has the right to renew a rent-stabilized lease. Id. §§ 2522.5(b), 2523.5(a) & c(1), 2524.1(a). The RSL also protects tenants against eviction (id. § 2524.1, 2524.3); diminution in services required by the landlord (e.g., heat, hot and cold water, elevator service, etc.); and harassment (id. § 2525.5). The rent stabilization laws provide certain family members with the right to succeed a vacating tenant under a new rent-stabilized lease. Id. § 2523.5(b)(1). And the rent stabilization laws

offer additional rights and benefits to lower-income elderly or disabled tenants.  Id. § 2202.20;
Admin. Code § 26-509.

   The rent stabilization scheme also balances the interests of the property owners,
who understandably seek to maintain their buildings and realize a reasonable profit.  RGB has
the authority to set permissible rent increases for stabilized units, and landlords may collect
accordingly.  Admin. Code §§ 26-510 and 26-512.  Rents may also be increased with the written
informed consent of the tenant if the owner increases services or equipment, or makes IAIs; if
the owner installs a building wide MCI; or if the owner establishes financial hardship.  9
N.Y.C.R.R. § 2522.4.

   In these ways, the rent stabilization scheme directly fulfills the Legislature's
legitimate aims of preventing "uncertainty, hardship and dislocation" for New Yorkers and
"forestall[ing] profiteering, speculation and other disruptive practices."  ETPA § 2.  It is
axiomatic that in New York City, rent stabilization plays a critical role in maintaining
neighborhood cohesion and continuity.  According to the 2017 Housing and Vacancy Survey
(HVS), discussed more fully below, most New Yorkers live in rental housing rather than owning
homes; rental units comprise 62.9% of the City's available housing stock.  See Declaration of
Rachel K. Moston ("Moston Dec."), Exhibit B.[4]  New York City residents must compete for
housing in a tight market characterized by high average rents and very low vacancy rates.  Id.
Without the benefits and protections of rent stabilization, many lower- and middle-income New
Yorkers would be priced out of the City altogether.  The City's rent stabilization laws provide
the necessary framework for protecting the City's working class, middle class, and long-term

---

[4] The 2017 HVS is publicly available at: https://www1.nyc.gov/assets/hpd/downloads/pdf/about/2017-
hvs-initial-findings.pdf (last accessed October 28, 2019); see also, Moston Dec. Exhibit B.

residents from dislocation, uncertainty, and hardship, thereby stabilizing not only individual tenancies but also the City's neighborhoods, families, and communities at large.

**B.      Plaintiffs' Challenges to the RSL are Best Directed at the Legislature.**

Plaintiffs complain that the rent stabilization laws are flawed, ineffective, and unwise policy because they: (1) fail to target affordable housing to those in need (Compl. ¶¶ 84-109); (2) do not ensure socio-economic or racial diversity (id. ¶¶ 110-113); (3) fail to increase the City's vacancy rate or alleviate the housing crisis (id. ¶¶ 114-149); and (4) have a deleterious impact on the community at large (id. ¶¶ 150-155).   Plaintiffs also contend that the 2019 Amendments "exacerbate the RSL's significant adverse impact on housing supply[.]"  Id. ¶ 131.

But it is not for the courts to weigh in on this debate about economic theory and decide if the RSL's proponents or critics make the better claim.  The legislature has already made that finding, and the legislature's sound and rational judgment is entitled to great deference here. Pennsylvania Coal v. Mahon, 260 U.S. 393, 413 (1922) ("The greatest weight is given to the judgment of the legislature[.]").   It is well-settled that courts should not sit as a "superlegislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 423 (1952).  The Courts will not go beyond a limited inquiry to examine or weigh the wisdom, need or appropriateness of the legislation.   Id. at 421; Staten Island Loaders v. Waterfront Commission, 117 F. Supp 308, 310 (S.D.N.Y. 1953), aff'd, 347 U.S. 439 (1954) ("[I]t is not for the judiciary to decide whether the legislature has chosen the best remedy to meet an evil.  The Court decides only whether the means chosen are constitutional and related to the evil sought to be abolished.").

Plaintiffs' challenges to the RSL are a matter for legislative debate, not a basis for striking down the entire rent stabilization scheme as a violation of due process.   In fact, plaintiffs' attacks to the RSL were expressly rejected by the New York Court of Appeals in Higgins, 83 N.Y. 2d at 156.  The Higgins plaintiffs – just as the plaintiffs herein – challenged certain provisions of the RSL and "insist[ed]" that rent regulation "perpetuates rather than alleviates the housing shortage in New York[.]"  Compare, Plaintiffs' Compl. ¶ 73 ("[T]he RSL not only fails to increase the vacancy rate, it exacerbates the vacancy problem[.]").  The Higgins Court flatly rejected the property owners' due process challenge, holding that "[t]he question before us … is not the general wisdom or desirability of present rent regulation (the statutes or regulations combined) to address the State's housing situation – that is a question for the legislature."  Higgins, 83 N.Y.2d at 174 (emphasis added).  Here, plaintiffs' litany of political grievances should be similarly disregarded.  The general wisdom or desirability of the RSL is not under review; rather, the "question [to] decide is whether there is a close causal nexus between the challenged regulations and the stated purpose[.]"  Id.  As set forth above, such a nexus clearly exists (as established by decades of settled jurisprudence), and plaintiffs have failed to satisfy their burden of plausibly alleging otherwise.

C.      **There is No Basis to Apply Strict Scrutiny to the RSL.**

In a transparent attempt to skirt the broad deference afforded to the legislature under rational basis review, plaintiffs urge this Court to apply strict scrutiny and hold that the RSL is not "narrowly tailored" to meet the government's "compelling governmental purpose." Compl. ¶¶ 156-166.  Relying only on the Federalist Papers and the conclusory assertion that property rights are "fundamental," plaintiffs offer no real support for their claim that this Court should apply a heightened standard of review to the RSL.  Id.

In fact, such a notion was foreclosed in <u>Lingle v. Chevron U.S.A. Inc.</u>, 544 U.S. 528 (2005), where the Supreme Court held that a commercial rent-control statute should be analyzed under the test of minimal rationality applicable to all economic regulation: "[W]e have long eschewed … heightened scrutiny when addressing substantive due process challenges to government regulation.  The reasons for deference to legislative judgments about the need for, and likely effectiveness of, regulatory actions are by now well established." <u>Id.</u> at 545.  At bottom, plaintiffs have failed to satisfy their burden of establishing that the legislature acted arbitrarily and irrationally in enacting the RSL, and plaintiffs have not plausibly alleged that the challenged legislation is arbitrary or conscience-shocking under rational basis review.

<b><u>POINT II</u></b>

<b>THE CITY COUNCIL'S 2018 DECLARATION<br>OF A HOUSING EMERGENCY DOES NOT<br><u>VIOLATE DUE PROCESS.</u></b>

Plaintiffs claim that the City Council's declarations of a housing emergency "every three years for the past 50 years," most recently in 2018, violate due process "because they are arbitrary and irrational."  Compl. ¶ 167.  As an initial matter, plaintiffs' purported challenges to the City Council's triennial declarations *prior* to 2018 [<u>see</u> Compl. ¶ 185 (challenging the 2015 declaration); and <u>id.</u> ¶ 186 (challenging the 2012 declaration)], must be dismissed as time-barred by the applicable three-year statute of limitations for § 1983 claims. <u>See</u> <u>Murphy v. Lynn</u>, 53 F.3d 547, 548 (2d Cir. 1995) ("[T]he applicable statute of limitations for § 1983 actions in New York is three years[.]).

As for plaintiffs' due process challenge to the City Council's most recent 2018 declaration, plaintiffs claim that the City Council reflexively declared a housing emergency based *solely* on the 3.63% rental vacancy rate set forth in the 2017 Housing Vacancy Survey

(HVS), and without regard for any of the other factors enumerated in ETPA § 3(a).[5]  Compl. ¶¶ 167-192.   Plaintiffs' claims are belied by the legislative record of the City Council's 2018 declaration,[6] which demonstrates that the City Council appropriately considered a robust record of written and live testimony, reports, and the 2017 HVS.  In doing so, the City Council analyzed the ETPA § 3(a) factors – i.e., the City's vacancy rate, the supply of housing accommodations, the condition of such accommodations, and the need for regulating and controlling residential rents.  See ETPA § 3(a).  In light of these considerations and findings, and given that the vacancy rate was well below 5%, the City Council lawfully and properly declared a housing emergency. Plaintiffs have not plausibly alleged that this declaration was arbitrary and irrational, in violation of due process.

## A.   The Mandates of the ETPA.

The ETPA provides as follows:  "The existence of public emergency requiring the regulation of residential rents for all or any class or classes of housing accommodations … shall be a matter for local determination within each city[.]"  ETPA § 3(a).  A declaration of a housing emergency shall be made "by the local legislative body of such city … on the basis of the supply of housing accommodations within such city, … the condition of such accommodations and the need for regulating and controlling residential rents within such city[.]  Id.  A municipality may

---

[5] It appears that plaintiffs are actually referring to similar considerations set forth in the Local Emergency Housing Rent Control Act, which applies to the determination made every three years.

[6] The documents comprising the legislative record for the City Council's 2018 emergency declaration are available to the public at the following link: https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3344767&GUID=444672A6-29F7-4501-B85C-D1DD1CC07F78 (last accessed October 24, 2019).  See Exhibit C to the Moston Dec.  The legislative record, including transcripts of the testimony before the City Council, the written submissions, and the 2017 HVS, are incorporated by reference throughout the Complaint (see Compl. ¶¶ 167-192) and, thus, appropriately cited and appended by City Defendants herein.  Chambers v. Time Warner, 282 F.3d 147, 152-53 (2d Cir. 2002); see also Moston Dec., Exhibit B (Copy of 2017 HVS).

declare an emergency as to "any class of housing accommodations if the vacancy rate for the housing accommodations in such class within such municipality is not in excess of five percent," and may declare an emergency as to "all housing accommodations if the vacancy rate for the housing accommodations within such municipality is not in excess of five percent." Id.

**B.      In Declaring a Housing Emergency, the City Council Lawfully and Properly Considered all of the Factors Set forth in the ETPA.**

In the City Council's emergency declaration, the Council aptly considered the findings in the 2017 HVS – a survey of the City's housing stock that has been carried out about every three years since 1965. See Moston Dec., Exhibits B and C.  As Elyzabeth Gaumer, HPD's Assistant Commissioner of Research and Evaluation, testified at the March 19, 2018 hearing before the City Council's Committee on Housing and Buildings, the HVS is the "longest running housing survey in the country and is of critical importance for understanding how our City is changing and what we can and should do to support improvements in policy and programming." Exhibit C, Tr. 22.  Conducted by the United States Census Bureau at the request of the City, this triennial survey provides data on the housing and demographic characteristics of City residents, including rent stabilized tenants. Id., Tr. p. 23.  The HVS reports not only the City's net rental vacancy rate (which is used to determine if the vacancy rate remains below 5%), but the HVS also provides the data for examining and analyzing the supply of housing, the condition of housing, and the need for continuing regulation and control of residential rents and evictions, in accordance with ETPA § 3(a).  Id.

At the March 19, 2018 hearing before the City Council's Committee on Housing and Buildings, Assistant Commissioner Gaumer summarized the preliminary findings of the 2017 HVS and analyzed the ETPA § 3 factors for the City Council.  The 2017 data revealed the continuation of an extremely tight New York City housing market.  Id., Tr. p. 23.  The survey

found that the City-wide vacancy rate was 3.63% in 2017, well below the 5% threshold required for rent regulation to continue under the ETPA. Exhibit B. The HVS found vacancy rates varying significantly among different asking rents. Id. The 2017 HVS also examined the supply of City's housing, showing that the 2017 estimate of the City's housing stock comprises 3.47 million units – a net increase of 69,000 units from 2014. Exhibit C, Tr. p. 24. However, as HPD Assistant Commissioner Gaumer explained, "the low vacancy rate, despite this record-breaking housing stock number, indicates that although supply has continued to increase, it has failed to keep pace with the continuing demand for housing." Id.

In accordance with the ETPA, the 2017 HVS also measured housing conditions, which were found to be "good or better on nearly every measure included in the HVS," and neighborhood conditions and quality, which were reported as "excellent or good." Id. Tr. p. 26. According to Assistant Commissioner Gaumer, the HVS data showed that, despite an increase in median income for tenants of rent stabilized units, the City continues to face a severe affordability challenge, thus establishing a "clear and continuing need for rent regulation in New York City." Id. Tr. p. 30. The 2017 HVS shows that while renter incomes have increased more than rents, there continues to be an "affordability crisis." Id. Relying on statistics from the 2017 HVS, HPD Assistant Commissioner Gaumer explained to the Council's Committee on Housing and Buildings, "half of renter households are rent burdened,"[7] "one-third are severely burdened," and "median rents are not affordable to the typical New York household." Id. Tr. p. 30. Speaking to the need for regulating rents, the 2017 HVS data made clear that the City must not only continue to add to the overall housing stock, including lower cost units, but also work to

---

[7] The term "rent burdened" means that more than one-third of a household's income is spent on gross rent. See Exhibit B, p. 6.

retain existing units with lower rents in order to support everyday New Yorkers who continue to face severe affordability challenges. Id. Tr. p. 31.

Moreover, the legislative record of the City Council's 2018 housing emergency declaration is replete with testimony regarding the pressing need for continued rent stabilization. Government officials, tenant advocates, and tenants alike urged the City Council to extend the RSL, citing a plethora of statistics, studies, and personal stories. Exhibit C, Written Testimony. Barika Williams, Deputy Director of the Association for Neighborhood and Housing Development, submitted written testimony highlighting the "tale of two New York Cities:" "For the wealthy, there is a surplus of luxury high-cost housing units, and increasing number of new construction units[.] For the average NYC resident – the vast majority of our households – there are a shrinking number of low-cost units, new market-rate construction units are out of reach, and the rent burden is worsening." Id.

Matt Murphy, Deputy Commissioner of Policy and Strategy at HPD, echoed these sentiments, testifying that "too many of our residents" pay a larger share of income for housing than they can sustain[,] thus forcing many "to make strategic trade-offs – to delay payment of other critical expenses, go into debt, fall short on paying the rent, which we know places them at a greater risk of eviction and, in more dire situations, homelessness." Id. Relying on the 2017 HVS data, Deputy Commissioner Murphy highlighted the problems facing the City and the need for further rent regulation: "[G]rowth in supply alone is not enough to address the housing shortage, which affects all New Yorkers, but acutely falls on those households that are able to afford only the lowest cost units. The pressure of market demand and lack of supply places everyday New Yorkers at risk of sharp rent increases, harassment, and displacement[.]" Id.

Legal Services NYC also urged the City Council to extend the RSL because the RSL's protections are real, important, and necessary: "Without an extension of Rent Stabilization protections, thousands of low income and working families would almost immediately be forced into the City's shelter system." Id. Rent stabilization offers tenants protection against unlawful evictions at the "whim of landlords," ensuring that: "tenants are able to remain in their homes[,]" "children retain the home they've lived in all their lives[,]" and that families aren't evicted "simply because a landlord is litigious." Id.

In light of the extensive record adduced before the City Council and the hard data set forth in the 2017 HVS, the City Council appropriately and rationally declared a housing emergency and extended the RSL for three more years. Significantly, plaintiffs do not purport to challenge the propriety of the testimony submitted to the City Council; nor do they appear to dispute the methodology behind the calculation of the 3.63% vacancy rate. See generally, Compl. Rather, plaintiffs hang their hat on the frivolous notion that the City Council unlawfully considered the vacancy rate and nothing more. As set forth above, the legislative record refutes their allegation: it shows an extensive and robust political review process, as well as the City Council's careful and deliberate consideration of testimony, evidence, and data.

Plaintiffs also appear to challenge the City Council's determination on the basis that the rationale for the housing emergency has shifted over time. Compl. ¶ 372. This argument is unavailing. Under the ETPA and RSL, the City Council is permitted to declare an emergency based upon the vacancy rate, the supply of housing accommodations, the condition of such accommodations, and the need for further regulation or control. ETPA § 3(a). Nowhere in the controlling law is a requirement that the rationale for the emergency must be exactly the same every triennial period. The City Council's justifications for emergency declarations over the

years in no way evidence arbitrary and irrational conduct.[8]  As for the 2018 declaration, the record shows that the declaration was supported by sound evidence demonstrating the dire and compelling need for affordable housing in New York City.

Plaintiffs' mere disagreement with the City Council's legislative findings of a City-wide housing emergency does not render these findings wholly arbitrary, outrageous, and conscience-shocking.  This is simply the political process at play.  And the City Council's sound judgment and legislative findings are entitled to the utmost deference.  Pennsylvania Coal, 260 U.S. at 413; Beatie, 123 F.3d at 711.  Thus, plaintiffs have not satisfied the exacting burden of pleading arbitrary and irrational conduct in violation of due process.

## POINT III

### PLAINTIFFS FAIL TO STATE A CLAIM FOR A PHYSICAL TAKING.

Plaintiffs allege that the RSL and 2019 Amendments constitute a "government-sanctioned physical invasion of private property" amounting to a per se physical taking under Loretto v. Teleprompter Manhattan Catv Corp., 458 U.S. 419 (1982).  Compl. ¶ 194.  However, courts, including the Supreme Court in Yee v. City of Escondido, 503 U.S. 519 (1992), have consistently rejected per se physical takings challenges to rent stabilization statutes.  See also, Harmon v. Markus, 412 Fed. Appx. 420 (2d Cir. 2011); Greystone, 1999 U.S. App. LEXIS at *3; Federal Home Loan Morg. Corp, 83 F.3d. at 46; Higgins, 83 N.Y. at 172.  As in Yee and its progeny, plaintiffs' claim necessarily fails because the RSL, on its face, does not compel

---

[8] Significantly, plaintiffs fail to plead facts alleging that the City Council's rationale has, in fact, shifted as plaintiffs contend.  Compl. ¶ 372 ("Defendants have variously justified the need for rent regulation by citing the unique problems in a post-war housing market, low vacancy rates, lack of affordable housing options, the need to ensure socio-economic and cultural diversity and to combat homelessness).  These rationales are neither "shifting" nor conflicting; rather, they are variations of the same pressing theme – the existence of an extreme shortage of affordable housing in New York City and need for rent stabilization laws to help combat this scarcity.

property owners to open their properties to tenants or keep the property open to tenants, but rather imposes conditions on the use of property that owners have voluntarily held out for rental. Property owners also retain their rights to evict tenants, recover possession, and change the use of their property under the RSL. Thus, plaintiffs' physical takings claim fails.

The Supreme Court's decision in Yee v. City of Escondido forecloses plaintiffs' arguments that the RSL works a physical taking of their property. 503 U.S. at 527-31. In Yee, the Court rejected a Loretto-style challenge to a municipal rent control statute, which set rental rates for the "pads" under tenants' mobile homes and, similar to the RSL, prevented park owners from evicting tenants except for nonpayment of rent, misconduct, or the landlord's wish to change the use of his property. Id. at 524-25 (emphasis in original). The ordinance permitted tenants to sell their mobile homes to buyers who were entitled to the regulated rent, and the park owners were unable to disapprove of the purchase, so long as the purchaser had the ability to pay rent. Id. The Court in Yee concluded that the laws "merely regulate[d] petitioners' *use* of their land by regulating the relationship between landlord and tenant." Id. at 528. The element of forced acquiescence necessary to sustain a physical taking claim was lacking because petitioners "voluntarily rented their land to mobile home owners." Id. at 527. A park owner who wished to change the use of his land could evict tenants on appropriate notice. Id. at 528. The Court, thus, found no physical taking, and held that "[w]hen a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge, or require the landowner to accept tenants he does not like, without automatically having to pay compensation." Id. at 529.

Relying on Yee, the Second Circuit, in Harmon v. Markus, dismissed a physical takings challenge to the RSL, finding that the plaintiffs retained statutory rights to recover

possession of their property and to evict tenants.  Harmon, 412 Fed Appx. at ** 3-4.  The Court observed that where a property owner offers rental housing in the first instance, the government's regulation of the rental relationship does not constitute a physical taking.  Id.  Moreover, the Court found that plaintiffs had acquired their property "with full knowledge that it was subject to the RSL[,]" thereby acquiescing in its continued use as rental housing.  Id.

In Greystone, the Second Circuit also rejected a physical takings challenge to the RSL: "There is no per se physical taking in this case because the statutes in question neither force Greystone to allow guests onto its property in the first instance nor compel Greystone to stay in the rental business."  1999 U.S. App. LEXIS at *3 (citing Yee, 503 U.S. at 528).  In Federal Home Loan Mortg. Corp., the Second Circuit again rejected a physical takings claim to the RSL, finding that the plaintiff had "purchased an occupied building and acquiesced in its continued use as rental housing."  83 F.3d at 47-48.  The RSL did not "subject [the] property to a use which [its owner] neither planned nor desired[;] ... Rather, it regulates the terms under which the owner may use the property as previously planned."  Id. at 48 (internal citations omitted).  Applying the holdings in Yee and its progeny, plaintiffs' physical takings challenge to the RSL and the 2019 Amendments necessarily fails.

## A.    The RSL Does Not Force Landlords of Regulated Units to Rent Their Property

Plaintiffs complain that the RSL imposes on landlords a tenancy of indefinite duration and, thus, results in a permanent physical occupation of plaintiffs' property.  See Compl. ¶¶ 203-220.  However, as the Court explained in Yee, once property owners decide to rent their property, they "cannot assert a *per se* right to compensation based on their inability to exclude particular individuals."  Yee, 503 U.S. at 531.  In Higgins, the New York Court of Appeals rejected a similar challenge directed at the RSL's successorship provision: "That a rent-regulated tenancy might itself be of indefinite duration—as has long been the case under rent

control and rent stabilization—does not, without more, render it a permanent physical occupation of property." <u>Higgins</u>, 83 N.Y.2d at 172.

Plaintiffs object that they are unable to evict tenants who have occupied the unit for more than 15 years, or tenants who are disabled or elderly, even if the landlord wishes to occupy the unit for his personal use. Compl. ¶¶ 237, 239; Chapter 36 of the Laws of 2019, Part I, § 2; Admin. Code § 26-408(b)(1). But in <u>Yee</u>, the Supreme Court upheld a more restrictive rent-control statute that authorized evictions *only* for failure to pay rent, misconduct, or the landlord's desire to change the use of his property. <u>Yee</u>, 503 U.S. at 524. Here, too, plaintiffs retain the ability to evict rent-stabilized tenants, including long-term tenants, the disabled, and the elderly, on a variety of grounds: for failing to pay rent, creating a nuisance, violating the law, refusing the landlord access to the unit for the purpose of making necessary repairs or improvements, and failing to maintain the regulated unit as their primary residence. 9 N.Y.C.R.R. §§ 2524.3, 2524.4; Admin. Code § 26-408(a).

Plaintiffs contend that the 2019 Amendments compel a permanent physical occupation of their property by permitting a court to stay execution of eviction for a period of one year if the tenant can demonstrate "extreme hardship." Compl. ¶¶ 217-18; Chapter 36 of the Laws of 2019, Pt. M § 21. Before the 2019 Amendments, the stay was limited to a period of six months. Once again, <u>Yee</u> controls: a 12-month stay falls far short of a *permanent* physical occupation. <u>See Yee</u>, 503 U.S. at 528 (no taking where the local law required "6 or 12 months notice" before evicting a tenant).

The successorship provisions of the RSL also do not effect a per se taking because successor tenants are subject to eviction under the same rules as any other tenant.[9] Compl.

---

[9] The rent stabilization regulations clarify that in the event a tenant dies or permanently vacates the apartment, the landlord may not evict "family member[s]," as defined in the RSC. 9 N.Y.C.R.R. § 2520.6.

¶¶ 204-07; see Higgins, 83 N.Y.2d at 171-72.  Furthermore, Yee rejected the claim that housing a "stranger" necessarily amounts to a per se taking, since it upheld a statute that precluded a pad owner from disapproving any mobile-home purchaser who was able to pay the rent.  Yee, 503 U.S. at 524.  Plaintiffs, by contrast, have much greater discretion in choosing their tenants once a rent stabilized apartment is vacated.

In addition, while the Complaint calls successor tenants "strangers," Compl. ¶ 197, no doubt to evoke the image of the government foisting an interloper onto a landlord, the RSL confers eviction protections only on family members who have lived in the unit as their primary residence with the known tenant of record.  9 N.Y.C.R.R. § 2523.5(b)(1).  And the landlord has the authority to request from the tenant "the names of all persons other than the tenant" who live in the residence, and whether they are "family member[s]" or may otherwise receive eviction protections under the RSL.  Id. § 2523.5(e).  Successor tenants are, thus, a far cry from "strangers."

Permitting rent-regulated tenants to sublet their units for up to two years in a four-year period also does not effect a per se taking.  A sublease is neither permanent, nor a government-authorized invasion.  Compl. ¶ 210; 9 N.Y.C.R.R. § 2525.6(c); see also Loretto, 458 U.S. at 428 ("[T]his Court has consistently distinguished between … cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion … on the other.").[10]  Finally, plaintiffs also object that the 2019 Amendments require certain units, rented to certain government-contracted services to house vulnerable individuals or individuals with disabilities who are at risk of homelessness, to become subject to the RSL.  Compl. ¶ 220.  This modest expansion of the RSL's scope merely "regulates the terms under

---

[10] This provision of the RSL is also unremarkable, since tenants of market-rate units also have a right to sublet their apartments.  See Real Property Law § 226-b(2)(a).

which the owner may use the property as previously planned." Federal Home Loan Mortg. Corp., 83 F.3d at 48.   Any limitation on plaintiffs' right to exclude does not amount to a permanent physical occupation.

**B.    The RSL Does Not Compel Landlords to Stay in the Rental Business**

The RSL is not a per se physical taking because it does not compel landlords to keep their properties open for rent in perpetuity.  See Greystone Hotel Co., 1999 U.S. App. LEXIS 14960, at *4.  Landlords of regulated units may remove a property from the rental market to use the property for their own business, 9 N.Y.C.R.R. § 2524.5(a)(1)(i), or to use one unit as their primary residence, id. § 2524.4(a); Chapter 36 of the Laws of 2019, Part I; Admin. Code § 26-511(c)(9)(b).  They may remove property from the rental market when Building Code violations would be impracticable to correct, 9 N.Y.C.R.R. § 2524.5(a)(1)(ii), and when HCR approves the demolition of a building, id. § 2524.5(a)(2).

Plaintiffs' suggestion that these exceptions are "illusory" is not relevant to this facial challenge.  Compl. ¶¶ 214, 221.  In Yee, too, the petitioners argued that "the statutory procedure for changing the use of a mobile home park is in practice 'a kind of gauntlet,' in that they are not in fact free to change the use of their land."  503 U.S. at 528.  The Supreme Court concluded that "[b]ecause petitioners do not claim to have run that gauntlet, however, this case provides no occasion to consider how the procedure has been applied to petitioners' property, and we accordingly confine ourselves to the face of the statute."  Id.  Plaintiffs' claims are therefore not relevant to their facial challenge.

Finally, plaintiffs object that limitations on converting regulated units to condominiums and cooperatives unduly restrict their right to dispose of property.  Compl. ¶¶ 257-60.  But restrictions on "condo-conversions" are a permissible regulation on the *use* of an apartment, rather than an authorization of a permanent physical occupation.  The Second Circuit

has explained that "when the government acts in a regulatory capacity, such as when it bans certain uses of private property," it does not effect a categorical, per se taking. Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 374 (2d Cir. 2006) (citing see Euclid v. Ambler Realty Co., 272 U.S. 365, 284-85).   Here, the condo-conversion limitations are a quintessential limitation on "certain uses of private property" and not a physical taking.[11] Id.

Accordingly, plaintiffs have not – and cannot – even come close to alleging government action that establishes a per se physical taking.  Cf., Horne v. Dep't of Ag., 135 S. Ct. 2419 (2015) (finding a taking where the federal government actually took title to a percentage of raisin growers' crop); Seawall Assocs. v. City of N.Y., 74 N.Y.2d 92 (1989) (finding a taking where a local law required certain property owners to change the use of their property and offer their properties for rent to persons with whom they had no existing landlord-tenant relationship).  The RSL and its 2019 Amendments amount to permissible regulation of certain landlords' use of their property.  Accordingly, this Court should dismiss plaintiffs' physical per se takings challenge for failure to state a claim.

## POINT IV

## PLAINTIFFS FAIL TO STATE A FACIAL REGULATORY TAKING CLAIM.

Plaintiffs allege that the mere enactment of the RSL (50 years ago) and the passage of the 2019 Amendments work an unconstitutional facial regulatory taking, in violation

---

[11] The Complaint also includes a grab-bag of grievances having no bearing whatsoever on their physical takings claim: that landlords can no longer obtain records of evictions or purchase data regarding judicial proceedings related to residential tenancy; and that the 2019 Amendments prohibit deregulating rent-stabilized apartments through luxury decontrol and high income decontrol. Compl. ¶¶ 211, 219, 245, 262-72.  These provisions in the RSL do not effect a permanent physical occupation by a third party. Loretto, 458 U.S. at 440 ("So long as … regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity.").

of the Fifth and Fourteenth Amendments of the U.S. Constitution.  Decades' worth of Second

Circuit case law disagrees.  See, e.g., Federal Home Loan Mortg., 83 F.3d at 48 (rejecting

regulatory takings challenge to the RSL because the law did "not deprive [the plaintiff] of

economically viable use of the property"); Greystone Hotel, 1999 U.S. App. LEXIS at *4

(rejecting takings challenge to the RSL where the plaintiff admitted that "its property retains

economic value"); W. 95 Hous. Corp., 31 Fed. Appx. at 21 (observing that "a widely applicable

rent control regulation such as the RSL is not susceptible to facial constitutional analysis under

the Takings Clause").  With the law thus well-settled, this Court should dismiss plaintiffs' claim.

## A.     The Legal Standard

Regulatory action amounts to a taking only where it is "functionally equivalent to

the classic taking in which government directly appropriates private property or ousts the owner

from his domain."  Lingle, 544 U.S. at 539.  Where, as here, the plaintiff mounts only a facial

challenge, as opposed to an as-applied one, the court's inquiry is limited to "whether the mere

enactment of the statutes and regulations constitutes a taking."  Keystone Bituminous Coal Ass'n

v. DeBenedictis, 480 U.S. 470, 493 (1987).  A facial challenge will succeed only where "no set

of circumstances exists under which the challenged act would be valid."  Rent Stabilization

Ass'n v. Dinkins, 5 F.3d 591, 595 (2d Cir. 1993) (internal quotation omitted).

The Supreme Court has explained that "[t]he test to be applied in considering [a]

facial challenge is fairly straightforward.  A statute regulating the uses that can be made of

property effects a taking if it denies an owner economically viable use of his land."  Keystone

Bituminous Coal Ass'n, 480 U.S. at 495 (quotation marks and alterations omitted); see also

Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 736 n.10 (1997) (explaining that

plaintiffs must establish that the "mere enactment of a piece of legislation deprived the owner of

economically viable use of his property") (internal quotation marks omitted); ABN 51st Street

Partners v. N.Y., 724 F. Supp. 1142, 1155 (S.D.N.Y. 1989) (observing that in a facial challenge, the plaintiff must "show that the enforcement of the [challenged law] eliminates economically viable uses of land").[12]

**B      Plaintiffs Have Not Alleged that the RSL Deprives Them of Commercially Viable Use of Their Properties**

Plaintiffs "face an uphill battle in making a facial attack," the Supreme Court warned in Keystone Bituminous Coal, and "[t]he hill is made especially steep because [they] have not claimed … that the Act makes it commercially impracticable for them to continue" their line of work. 480 U.S. at 495-96. The same is true here. Plaintiffs allege that "significant regulatory restrictions" impose below-market rents and diminish property values of rent stabilized buildings and that, thus, the RSL effects a regulatory taking. See Compl. ¶¶ 273-91.

For all its length, the Complaint is most notable for its glaring omissions: plaintiffs do not allege, nor can they possibly, that the RSL has denied *any* property owner, let alone *all* owners of rent stabilized properties, economically viable use of their property. While the Complaint details how the RSL allegedly diminishes property values (see Compl. ¶¶ 283, 286, 296-98), plaintiffs do not assert that they have suffered any monetary loss due to the enactment of the RSL; and they do not allege that the RSL precludes them from profitably renting their properties. See Keystone Bituminous Coal, 480 U.S. at 496 (rejecting facial challenge where the coal-miner plaintiffs had not established that any of their mines could not be

---

[12] Before its decision in Lingle, 544 U.S. 528 (2005), the Supreme Court, in regulatory takings challenges, evaluated whether the challenged law fails to "substantially advance[] legitimate state interests … or denies an owner economically viable use of his land." *Id.* at 540 (citing Agins v. City of Tiburon, 447 U.S. 255 (1980)). The Lingle Court overruled the "substantially advances" test for regulatory takings challenges. Consequently, Lingle significantly narrowed the test for regulatory takings, limiting it to whether the challenged law denies an owner economically viable use of the land. See William A. Fletcher, *Kelo, Lingle, and Sam Remo Hotel: Takings Law Now Belongs to the States*, 46 Santa Clara L. Rev. 767, 772 (2006) (remarking that "after the Court's decision in Lingle, a regulation is a taking only if it effectively denies the landowner all economically viable use of his or her land…").

mined profitably).  Their failure to do so reveals that, even under a system of rent stabilization, their buildings retain significant value, and renting units remains a commercially viable enterprise.  See Federal Home Loan Mortg., 83 F.3d at 48 (rejecting regulatory takings challenge to the RSL because "[r]ent stabilization does not deprive [the plaintiff] of economically viable use of the property.  Although [the plaintiff] will not profit as much as it would under a market-based system, it may still rent apartments and collect the regulated rents").

Indeed, plaintiffs acknowledge that they collect rents for the rent-stabilized units that they own, thus undercutting their takings claim as a matter of law.  Compl. ¶ 273; Higgins, 83 N.Y.2d at 173 (where owner's right to receive regulated rents is not impaired, RSL provision does not deprive owners of all economically beneficial uses of property).  In addition, nearly all of the plaintiffs acknowledge that their buildings contain many *market rate* units, thus undermining any credible claim that the RSL has deprived plaintiffs of economically viable use of their property.  Compl. ¶ 18 (plaintiff Nugent-Miller owns a 6 unit building, 3 three of which are rent stabilized); ¶ 19 (plaintiff Mycak owns a building with 52 units where only 21 are rent stabilized); ¶ 21 (plaintiff M&G owns a 20 unit building and only 3 units are rent stabilized).

Further, as plaintiffs acknowledge, landlords of approximately one-third of rent stabilized units charge the *lower* preferential rent, rather than the *higher* legal rent permitted under the RSL, even though (until the passage of the 2019 Amendments) landlords were entitled to charge the higher amount upon lease renewal.  Compl. ¶ 312; 9 N.Y.C.R.R. § 2521.2(a) ("Where the amount of rent charged to and paid by the tenant is less than the legal regulated rent for the housing accommodation, such rent shall be known as the 'preferential rent.'").  That so many landlords voluntarily chose to charge the lower rent further undermines plaintiffs' assertion that the restrictions on rent increases effect an unconstitutional taking.  Plaintiffs simply have not

alleged that "no set of circumstances exists under which the challenged act would be valid." Dinkins, 5 F.3d at 595.

Plaintiffs allege that the 2019 Amendments foist a "compelled loss" onto landlords of rent stabilized buildings by limiting recovery of investments for capital and individual improvements, eliminating vacancy and longevity increases, prohibiting luxury and high-income decontrol, and removing increases for units offering preferential rents. Compl. ¶¶ 308-331. Plaintiffs' contentions misconstrue the law: nothing in the 2019 Amendments compels a loss because the RGB remains free to authorize greater rent increases. The RSL does not itself limit "rental rate increases to very small amounts."[13] Compl. ¶ 306. Indeed, the City's Admin. Code requires the RGB to consider a number of factors when deciding whether to authorize annual rent increases, including (1) the economic condition of the residential real estate industry, which includes consideration of local taxes and gross operating maintenance costs; (2) cost of living; and (3) any other relevant data. Admin. Code § 26-510(b). The RSL does not compel operating costs to be higher than landlords' rental revenue. Thus, "mere enactment" of the 2019 Amendments does not, on its face, effect a taking.[14]

---

[13] Plaintiffs allege that the rental increases, authorized by the RGB in the past six years, have prevented them from "achieving the growth in rents that would be reasonably expected by any investor." Compl. ¶ 306. In the past, however, the RGB has authorized greater rent increases. For example, in 2013, the RGB authorized rent increases of 4.0% on one-year leases and 7.75% on two-year leases. For a chart of RGB-approved rent increases dating from 1968 until 2020, *see Rent Guidelines Board Apartment Orders #1 through #51 (1969 to 2020)*, available at https://www1.nyc.gov/assets/rentguidelinesboard/pdf/guidelines/aptorders.pdf (last accessed October 15, 2019). The Court may take judicial notice of these historical facts, "whose accuracy cannot reasonably be questioned." See Fed. R. Evid. 201(b).

[14] Plaintiffs allege that, due to the 2019 Amendments' restrictions on recouping certain IAI and MCI costs, "owners faced with such repair costs would *likely* choose to make no such repairs … and *potentially* leave the unit empty." Compl. ¶ 324 (emphases added). This type of speculative language only further underscores that plaintiffs have failed to allege that the RSL is unconstitutional in *all* its applications, as they must to plausibly allege a facial taking.

Plaintiffs further urge that the statute compels losses in certain circumstances because the hardship exemptions are, in practice, unworkable. Compl. ¶¶ 332-50; Admin. Code § 26-511. Because the Complaint does not allege that no landlord has ever received a hardship exemption, plaintiffs have not alleged that the RSL is unconstitutional in *all* its applications. In any event, challenging a statutory scheme as unworkable in practice is not appropriate on a facial challenge. See Yee, 503 U.S. at 528. In Yee, too, the petitioners argued that "the statutory procedure for changing the use of a mobile home park is in practice 'a kind of gauntlet,' in that they are not in fact free to change the use of their land." 503 U.S. at 528. The Supreme Court concluded that "[b]ecause petitioners do not claim to have run that gauntlet, however, this case provides no occasion to consider how the procedure has been applied to petitioners' property, and we accordingly confine ourselves to the face of the statute." Id. Plaintiffs' claims are therefore not relevant to their facial challenge.

## C.      Plaintiffs' Facial Challenge Fails Under *Penn Central*

Plaintiffs' Complaint purports to bring a facial challenge under Penn Central Transp. Co. v. New York City, 438 U.S. 104 (1978) ("*Penn Central*"). Eschewing any "set formula" for judging regulatory takings claims, the *Penn Central* Court articulated three guideposts for evaluating whether a regulation amounts to the functional equivalent of a physical appropriation: (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) the "character of the governmental action," in particular "whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" Penn Central, 438 U.S. at 124.

As an initial matter, it is far from clear that a facial challenge can be brought under *Penn Central*. A facial challenge "present[s] no concrete controversy concerning either

application of" the challenged law on the plaintiffs' property "or its effect on specific parcels of land." Keystone Bituminous Coal Ass'n, 480 U.S. at 495. The "ad hoc, factual inquiry" of the *Penn Central* analysis, by contrast, requires courts to look outside the confines of the statute and evaluate the burden of the regulation on that particular plaintiff and a specific plot of land. Id., 494-95. The factual inquiry required under *Penn Central* is, thus, fundamentally at odds with the strictly legal analysis of a facial challenge. See Laurel Park Cmty., LLC v. City of Tumwater, 698 F.3d 1180, 1189 (9th Cir. 2012) (questioning whether a facial challenge can be made under *Penn Central*). Furthermore, this Court need not go through the *Penn Central* analysis because, as explained above, plaintiffs fail to allege that the RSL denies them economically viable use of their land. Even analyzing plaintiffs' challenges under *Penn Central*, however, the Complaint fails to state a claim, as detailed below.

### 1. Any Diminution in Value Does Not Amount to a Regulatory Taking.

Under the first *Penn Central* factor, courts "compare the value that has been taken from the property with the value that remains in the property." Keystone Bituminous Coal Ass'n, 480 U.S. at 497. Courts analyze whether the challenged regulation has diminished the value of the property so drastically that it has functionally appropriated the property for public use. Even a substantial diminution in value, however, will *not* constitute a taking as a matter of law, so long as the property retains some economic value. Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for S. California, 508 U.S. 602, 645 (1993) (citation omitted) ("[M]ere diminution in value of property, however serious, is insufficient to demonstrate a taking."); see also, Yee, 503 U.S. at 529 ("When a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge."); MHC Fin. L.P. v. City of San Rafael, 714 F.3d 1118, 1127 (9th Cir. 2013) (81%

diminution in value of the plaintiff's mobile home park was not sufficient to show a taking); Brace v. United States, 72 Fed. Cl. 337, 357 (2006) (noting that "diminutions well in excess of 85 percent" required for a regulatory taking).

Plaintiffs compare property values of unregulated units with those of regulated ones. This comparison is irrelevant because most of the plaintiffs acquired their buildings *after* the RSL went into effect, and thus any alleged diminution in property values was not *taken* from them.[15] See MHC, 714 F.3d at 1127 ("[T]he appropriate analysis of the economic impact on [the plaintiff] is a comparison of the economic impact of the 1993 Ordinance in effect when [the plaintiff] purchased the mobile home park, and the economic impact of the 1999 Ordinance enacted after the property acquisition.").

Nevertheless, even treating the comparison between market rate units and regulated ones as the relevant comparison, plaintiffs' allegations still fail to establish a regulatory taking because plaintiffs acknowledge that their rent stabilized properties retain economic value. For instance, plaintiffs allege that buildings with nearly all rent-stabilized units "can expect a price per square foot ($200-300/square foot) of two-thirds less than the price per square foot of buildings where rent stabilized units account for almost 0-20% of the units ($800-900/square foot)."[16] Compl. ¶ 298. For other buildings, the diminution in value is even less so: for rental properties in Manhattan built pre-1973, the value of unregulated properties is twice that of their regulated property counterparts; and for Manhattan buildings constructed post-1973, unregulated properties have a value that is 11% to 45% greater than their regulated

---

[15] Plaintiffs suggest that the 2019 Amendments diminished the value of properties by approximately 15%. See Compl. ¶ 330.

[16] Notably, plaintiffs' admission also demonstrates that rent stabilized buildings retain economic value and commercial viability.

counterparts. Id. ¶ 301.  Plaintiffs acknowledge that the median rent for regulated units across New York is only about "25% less than the rent charged for non-regulated units." Id. ¶ 286.

Even if the RSL diminishes the value of rent-stabilized units by some percentage as described by plaintiffs (which City Defendants do not concede), courts have consistently held that this diminution is not sufficient to establish a taking as a matter of law.  That buildings with rent-stabilized units have diminished value is "an inevitable consequence of the rent-control scheme but not an unconstitutional one." Rancho De Calistoga v. City of Calistoga, 800 F.3d 1083, 1090 (9th Cir. 2015).  As explained above, the Complaint does not allege that the RSL denies owners economically viable use of their land or precludes plaintiffs from collecting rents on their stabilized units.  See Penn Central, 438 U.S. at 136 (no taking where, despite significant diminution in value, the landowners could continue to use the property as it had been used, as a train station with office space and concessions).  Accordingly, the Complaint fails to plausibly allege an economic deprivation that amounts to a regulatory taking.

### 2.  The Enactment of the RSL and the 2019 Amendments Does not Interfere with Reasonable Investment-Backed Expectations

Next, courts analyze whether the challenged regulation interferes with reasonable investment-backed expectations of plaintiffs, again with an eye to whether the magnitude of the law's burden amounts to a taking without just compensation. Courts look to whether the challenged regulation was in place at the time that the plaintiffs acquired their property. See e.g., Guggenheim v. City of Goleta, 638 F.3d 1111, 1120-21 (9th Cir. 2010).  Although the Supreme Court has eschewed any bright-line rule that rejects a challenge to a regulation where the plaintiff came to possess the property after the regulation was enacted, timing remains a relevant factor in the *Penn Central* analysis.  Palazzolo v. Rhode Island, 533 U.S. 606 (2001).

Here, all of the landlord plaintiffs acquired their buildings after the passage of New York City's 1969 RSL, and only three of the landlord plaintiffs have owned their buildings since before the enactment of New York State's Emergency Tenant Protection Act of 1974.[17] Compl. ¶¶ 18-24.   The pre-2019 RSL thus could not have interfered with their investment-backed expectations, since the property they acquired was already long subject to the rent stabilization scheme.   States and localities have used rent stabilization and rent control to mitigate the risks of an overheated housing market for just about a century.   Block v. Hirsh, 256 U.S. 135 (1921) (upholding a rent control law that allowed tenants to remain in the apartment so long as they paid rent on time).   Given this longstanding history of states' intervention in the rental market, plaintiffs cannot plausibly allege that the RSL interfered with their investment-backed expectations.   See 1256 Hertel Ave. Assocs., LLC v. Calloway, 761 F.3d 252, 266 (2d Cir. 2014) (holding that a challenged law did not interfere with reasonable investment-backed expectations where it had "become a background principle of the State's law of property" (internal quotation marks and alteration omitted)); Yee, 503 U.S. at 528-29 (noting that "States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails").

The enactment of the 2019 Amendments does not disturb that analysis. The Supreme Court has explained that, "those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." Concrete Pipe & Prods., 508 U.S. at 645. The 2019 Amendments fall squarely under this rule – they adjusted a prior regulatory scheme, removing what the legislature deemed to be

---

[17] The Complaint does not allege when plaintiff M&G Mycak LLC acquired its residential apartment building. Compl. ¶ 21.

loopholes that undermined the efficacy of the law.  See June 14, 2019 hearing on Emergency Tenant Protection Act, S. 6458 (noting the bill's intent to repeal "many loopholes").  Accordingly, this "buttress[ing]" of the previous version of the RSL does not amount to an interference with plaintiffs' investment-backed expectations under *Penn Central*.

### 3.  The RSL Does Not Unfairly Single Out Plaintiffs

The third prong – the character factor – of the *Penn Central* analysis focuses on whether the plaintiff has been unfairly singled out or whether the challenged law "instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good." 1256 Hertel Ave. Assocs., 761 F.3d at 264 (internal quotation marks omitted).  The RSL is a broadly applicable law; its generality weighs against finding a taking.  See Penn Central, 438 U.S. at 132 (rejecting takings challenge where the "law embodies a comprehensive plan," and does not impermissibly single out selected parcels).  Further, the RSL seeks to mitigate some of the harms associated with an overheated housing market – soaring evictions and increased homelessness.  And, as explained above, the RSL does not require plaintiffs to keep the property open to tenants.  Accordingly, plaintiffs have failed to state a facial regulatory takings claim.

### CONCLUSION

For the reasons set forth above, City Defendants respectfully request that this Court grant their motion to dismiss the Complaint in its entirety.

Dated:       New York, New York
             November 1, 2019

                                      GEORGIA M. PESTANA
                                      Acting Corporation Counsel
                                      of the City of New York
                                      Attorney for City Defendants
                                      100 Church Street
                                      New York, New York 10007
                                      (212) 356-2190

                                      /s/
                          _____
                                      Rachel K. Moston
                                      Assistant Corporation Counsel