UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

COMMUNITY HOUSING IMPROVEMENT PROGRAM,
RENT STABILIZATION ASSOCIATION OF N.Y.C., INC.,
CONSTANCE NUGENT-MILLER, MYCAK ASSOCIATES
LLC, VERMYCK LLC, M&G MYCAK LLC, CINDY REALTY
LLC, DANIELLE REALTY LLC, FOREST REALTY, LLC,

                        Plaintiffs,

                     v.

CITY OF NEW YORK, RENT GUIDELINES BOARD, DAVID
REISS, CECILIA JOZA, ALEX SCHWARZ, GERMAN
TEJEDA, MAY YU, PATTI STONE, J. SCOTT WALSH, LEAH
GOODRIDGE, AND SHEILA GARCIA, IN THEIR OFFICIAL
CAPACITIES AS CHAIR AND MEMBERS, RESPECTIVELY,
OF THE RENT GUIDELINES BOARD, AND RUTHANNE
VISNAUSKAS, IN HER OFFICIAL CAPACITY AS
COMMISSIONER OF NEW YORK STATE HOMES AND
COMMUNITY RENEWAL, DIVISION OF HOUSING AND
COMMUNITY RENEWAL,

                        Defendants.

19-cv-04087 (MKB)

---

## MEMORANDUM OF LAW IN SUPPORT OF COMMISSIONER RUTHANNE VISNAUSKAS'S MOTION TO DISMISS THE COMPLAINT

LETITIA JAMES
Attorney General
State of New York
*Attorney for Commissioner Visnauskas*
28 Liberty Street
New York, New York 10005
(212) 416-8651

MICHAEL A. BERG
JONATHAN D. CONLEY
Assistant Attorneys General
*Of Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

Preliminary Statement ............................................................................................................. 1

Statement of Facts .................................................................................................................... 3

    *A.*   *Overview of the RSL* .................................................................................................. 3
    *B.*   *The History of New York's Rent-Stabilization Laws* ............................................. 6
    *C.*   *Emergency Tenant Protection Act of 1974* .............................................................. 7
    *D.*   *The Introduction of Luxury and High-Income Decontrol* ............................................. 8
    *E.*   *The 2019 Amendments* ........................................................................................... 9
    *F.*   *New York City's Housing Emergency* ...................................................................... 11

LEGAL STANDARDS ............................................................................................................ 12

ARGUMENT ............................................................................................................................ 13

    I.     Plaintiffs Cannot State A Plausible Claim For A Physical Or Regulatory
          Taking Of Their Property ....................................................................................... 13

          A.  The Limited Scope Of The Takings Clause .................................................. 13
          B.  The RSL Does Not Cause A Physical Taking of Property ........................... 16
          C.  The RSL Does Not Effect a Regulatory Taking of Property ........................ 20

    II.    Plaintiffs' Due Process Claim Fails As A Matter Of Law .................................... 24

    III.   Most Of Plaintiffs' Claims Are Time-Barred ...................................................... 28

CONCLUSION ......................................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**     **Page(s)**

*1256 Hertel Ave. Assocs., LLC v. Calloway*,
  761 F.3d 252 (2d Cir. 2014)..................................................................................13, 14

*2910 Georgia Ave. LLC v. D.C.*,
  234 F. Supp. 3d 281 (D.D.C. 2017) ...........................................................................28

*Agins v. City of Tiburon*,
  447 U.S. 255 (1980).....................................................................................................23

*Annis v. Cnty. of Westchester*,
  136 F.3d 239 (2d Cir. 1998).........................................................................................11

*Appolo Fuels, Inc. v. United States*,
  381 F.3d 1338 (Fed. Cir. 2004)....................................................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................................11

*Beatie v. City of N.Y.*,
  123 F.3d 707 (2d Cir. 1997).........................................................................................25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................................................12

*Bowers v. Whitman*,
  671 F.3d 905 (9th Cir. 2012) .......................................................................................26

*Buffalo Teachers Federation v. Tobe*,
  464 F.3d 362 (2d Cir. 2006).........................................................................................13

*Canadian St. Regis Band of Mohawk Indians v. New York*,
  Nos. 5:82-CV-0783, 5:82-CV-1114, 5:89-cv-0829, 2013 WL 3992830
  (N.D.N.Y. July 23, 2013)...............................................................................................3

*CCA Associates v. United States*,
  667 F.3d 1239 (Fed. Cir. 2011)....................................................................................25

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998).....................................................................................................24

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S.
  Cal.*,
  508 U.S. 602 (1993).........................................................................................22, 23, 27

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
   915 F. Supp. 2d 574 (S.D.N.Y. 2013)......................................................................15

*Cranley v. Nat'l Life Ins. Co. of Vt.*,
   318 F.3d 105 (2d Cir. 2003)..................................................................................20

*Dolan v. City of Tigard*,
   512 U.S. 374 (1994)..............................................................................................19

*Duke Power Co. v. Carolina Environmental Study Group, Inc.*,
   438 U.S. 59 (1978)................................................................................................25

*Eagleston v. Guido*,
   41 F.3d 865 (2d Cir. 1994)....................................................................................12

*Eberhart v. Crozier*,
   423 F. App'x 57 (2d Cir. 2011) ............................................................................12

*EklecCo NewCo LLC v. Town of Clarkstown*,
   No. 16-CV-6492 (NSR), 2018 WL 3023159 (S.D.N.Y. Jun. 18, 2018)................28

*Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*,
   87 N.Y.2d 325 (1995) ................................................................................... *passim*

*Fed. Home Loan Mtge. Corp. v. N.Y.S. Div. of Hous. & Cmty. Renewal*,
   83 F.3d 45 (2d Cir. 1996).............................................................................17, 19, 20, 21

*General Elec. Co. v. N.Y.S. Dep't of Labor*,
   936 F.2d 1448 (2d Cir. 1991)................................................................................15

*Greenburgh Eleven Union Free Sch. Dist. v. Thompson*,
   No. 18 CV 67 (VB), 2018 WL 6830865 (S.D.N.Y. Dec. 28, 2018) .................3

*Greystone Hotel Co. v. City of N.Y.*,
   13 F. Supp. 2d 524 (S.D.N.Y. 1998).....................................................................26

*Harmon v. Markus*,
   412 F. App'x 420 (2d Cir. 2011) ..................................................................16, 20

*In re Chateaugay Corp.*,
   53 F.3d 478 (2d Cir. 1995)...........................................................................22, 24, 25

*Jado Assocs., LLC v. Suffolk Cty. Sewer Dist. No. 4-Smithtown Galleria*,
   No. 12 Civ. 3011 (DRH) (ARL), 2014 WL 2944086 (E.D.N.Y. June 30, 2014)..................15

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
   480 U.S. 470 (1987)..............................................................................................20

*Kittay v. Giuliani*,
    252 F.3d 645 (2d Cir. 2001) (per curiam)...........................................................................20

*Knick v. Twp. of Scott, Pa.*,
    139 S. Ct. 2162 (2019) .............................................................................................................11

*Kraebel v. N.Y. City Dep't of Hous. Pres. & Dev.*,
    959 F.2d 395 (2d Cir. 1992)...................................................................................................26

*KSLM-Columbus Apartments, Inc. v. N.Y. State Div. of Hous. & Cmty. Renewal*,
    6 A.D.3d 28 (1st Dep't 2004), *mod. on other grounds,* 5 N.Y.3d 303 (2005) .........................6

*La Guardia v. Cavanaugh*,
    53 N.Y.2d 67 (1981) ............................................................................................................5, 6

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)....................................................................................................... *passim*

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)..........................................................................................12, 15, 17, 18

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)..............................................................................................................14

*Molinari v. Bloomberg*,
    596 F. Supp. 2d 546 (E.D.N.Y.), *aff'd,* 564 F.3d 587 (2d Cir. 2009).....................................24

*Monaghan v. Henry Phipps Plaza W., Inc.*,
    531 F. App'x 127 (2d Cir. 2013) ...........................................................................................21

*Nollan v. Cal. Coastal Comm'n*,
    483 U.S. 825 (1987)................................................................................................................19

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001)................................................................................................................14

*Penn Central Transp. Co. v. New York City*,
    438 U.S. 104 (1978)................................................................................................................15

*Pennell v. City of San Jose*,
    485 U.S. 1 (1988)....................................................................................................................25

*Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*,
    467 U.S. 717 (1984)................................................................................................................24

*Quartararo v. Catterson*,
    917 F. Supp. 919 (E.D.N.Y. 1996) ........................................................................................12

*Quinn v. Bd. of Cty. Commissioners for Queen Anne's Cty., Maryland*,
   862 F.3d 433 (4th Cir. 2017) ...................................................................28

*Ramsey Winch, Inc. v. Henry*,
   555 F.3d 1199 (10th Cir. 2009) ................................................................28

*Rancho de Calistoga v. City of Calistoga*,
   800 F.3d 1083 (9th Cir. 2015) ..................................................................22

*Rent Stabilization Ass'n of City of N.Y. v. Dinkins*,
   5 F.3d 591 (2d Cir. 1993)................................................................. *passim*

*Rent Stabilization Ass'n of N.Y.C., Inc. v. Dinkins*,
   805 F. Supp. 159 (S.D.N.Y. 1992), *aff'd*, 5 F.3d 591 (2d Cir. 1993).....................19

*Roberts v. Tishman Speyer Props., L.P.*,
   62 A.D.3d 71, *aff'd*, 13 N.Y.3d 270 (2009)..........................................................6

*Ruston v. Town Bd. for Skaneateles*,
   610 F.3d 55 (2d Cir. 2010).........................................................................15

*S. Lyme Prop. Owners Ass'n., Inc. v. Town of Old Lyme*,
   539 F. Supp. 2d 524 (D. Conn. 2008).......................................................15

*SB Bldg. Assocs., L.P. v. Borough of Milltown*,
   457 F. App'x 154 (3d Cir. 2012) ...............................................................28

*Southview Assocs., Ltd. v. Bongartz*,
   980 F.2d 84 (2d Cir. 1992)........................................................................14

*Story v. Green*,
   978 F.2d 60 (2d Cir. 1992)........................................................................12

*Suitum v. Tahoe Reg'l Planning Agency*,
   520 U.S. 725 (1997)......................................................................15, 18, 28

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
   535 U.S. 302 (2002).............................................................................13, 16

*United States v. Causby*,
   328 U.S. 256 (1946)..................................................................................19

*United States v. Salerno*,
   481 U.S. 739 (1987)........................................................................15, 16, 19

*W. 95 Hous. Corp. v. New York City Dep't of Hous. Pres. & Dev.*,
   31 F. App'x 19 (2d Cir. 2002) ........................................................16, 19, 20

*Yee v. City of Escondido, Cal.*,
  503 U.S. 519 (1992) ............................................................................ passim

*Yur-Mar, L.L.C. v. Jefferson Parish Council*,
  451 F. App'x. 397 (5th Cir. 2011) ...........................................................28

**CONSTITUTIONS**

First Amendment ..................................................................................... 15

Fifth Amendment ..............................................................................2, 11, 12, 22

Fourteenth Amendment ......................................................................2, 11, 12, 23

**FEDERAL STATUTES**

42 U.S.C. § 1983 .....................................................................................11

**FEDERAL RULES**

Fed. R. Civ. P. 12(b) ................................................................................3

Fed. R. Civ. P. 12 (b)(6) ....................................................................... 1, 11-12

**STATE AND CITY STATUTES**

N.Y.C. Admin. Code
  §§ 26-408 ..........................................................................................4, 9
  §§ 26–501 to 26–520 ...............................................................................2
  § 26-501 *et seq.* ...............................................................................3, 6, 24
  § 26-502 .............................................................................................5
  § 26-504(c) ..........................................................................................5
  § 26-504.3 ...........................................................................................8
  § 26-510(a) ..........................................................................................4
  § 26-510(b) ..........................................................................................4
  § 26-510(c) ..........................................................................................4
  § 26-511(14) .........................................................................................9
  § 26-511(b)(9)(b) ..................................................................................21
  § 26-511(c)(6) .......................................................................................4

N.Y. Gen. Bus. Law
  § 352-eeee ...........................................................................................9

N.Y. Gen. Oblig. Law
  § 7-108(1-a) ..........................................................................................9

1946 N.Y. Laws 723 Ch. 274 ........................................................................5

1962 N.Y. Laws 53, 54-56 Ch. 21
   § 1(4)-(6)......................................................................................................5

1971 N.Y. Laws 1159, 1161–62 Ch. 371
   § 6...............................................................................................................6

1974 N.Y. Laws 1510, 1512-23..........................................................................2

1983 N.Y. Laws 403...........................................................................................7

1993 N.Y. Laws ch. 253..................................................................................7, 8

1997 N.Y. Laws ch. 116......................................................................................8

2011 N.Y. Laws ch. 97...................................................................................7, 8

2015 N.Y. Laws ch. 20........................................................................................7

2019 N.Y. Laws ch. 36, pt. A.............................................................................8

2019 N.Y. Laws ch. 36, pt. B
   §§ 1–7..........................................................................................................9

2019 N.Y. Laws ch. 36, pt. D.............................................................................8

2019 N.Y. Laws ch. 36, pt. E..............................................................................9

2019 N.Y. Laws ch. 36, pt. G.............................................................................8

2019 N.Y. Laws ch. 36, pt. I...............................................................................9

2019 N.Y. Laws ch. 36, pt. K..............................................................................9

2019 N.Y. Laws ch. 36, pt. M.............................................................................9

2019 N.Y. Laws ch. 36, pt. N..............................................................................9

N.Y. Private Hous. Fin. Law
   §§ 10-37.....................................................................................................19

N.Y. Real Prop. Law
   Art. 7.........................................................................................................23
   § 227-f.........................................................................................................9
   § 238-a.........................................................................................................9

N.Y. Real Prop. Tax L.
   § 421-a(2)(f).................................................................................................5

N.Y. Unconsol. Law

§ 8603..............................................................................................................5
§ 8621 *et seq.* ............................................................................................2, 3
§§ 8622, 8624, 8625, 8634.............................................................................8
§ 8623............................................................................................................10
§ 8623(a).........................................................................................................5
§ 8625(a)(5).....................................................................................................5
§ 8626..............................................................................................................4

**STATE REGULATIONS**

9 N.Y.C.R.R.

§ 2520.6(o)......................................................................................................4
§ 2520.11(e)....................................................................................................21
§ 2523.5(a).......................................................................................................4
§ 2523.5(b)(1)...................................................................................................4
§ 2524.3............................................................................................................4
§ 2524.4(a)(2)...................................................................................................5
§ 2524.4(c)........................................................................................................4
§ 2524.5.......................................................................................................5, 21
§ 2524.5(a)(2).................................................................................................21

**MISCELLANEOUS AUTHORITIES**

2018 American Community Survey, U.S. Census Bureau, https://bit.ly/345VkOD
     (last visited October 28, 2019)..............................................................11

HUD's Public Housing Program,
     https://www.hud.gov/topics/rental_assistance/phprog. (last visited October 28,
     2019) .......................................................................................................10

Selected Initial Findings of the 2017 HVS  (Feb. 9, 2018),
     https://www1.nyc.gov/assets/hpd/downloads/pdf/about/2017-hvs-initial-
     findings.pdf .........................................................................................3, 10

Defendant RuthAnne Visnauskas, in her official capacity as Commissioner of the New York State Division of Housing and Community Renewal ("DHCR"), respectfully submits this memorandum of law in support of her motion to dismiss the Complaint, dated July 15, 2019 (ECF No. 1), pursuant to Fed. R. Civ. P. 12(b)(6).

## Preliminary Statement

In this action, New York City property owners seek to dismantle, by judicial fiat, the 50-year-old regime of rent stabilization that protects more than one million tenants and their families from unpredictable and unreasonable rent increases. Their claims are foreclosed by a longstanding and unbroken line of Supreme Court and Second Circuit cases affirming the constitutionality of rent controls in general, and New York State's Rent Stabilization Laws in particular. Indeed, Plaintiffs expressly concede that "prior cases challenging the constitutionality of the RSL on various grounds have been unsuccessful." Compl. ¶ 15. The Court should reject Plaintiffs' invitation to disregard or distinguish this binding precedent.

The New York State Legislature enacted the Rent Stabilization Laws ("RSL") in 1969, re-imposed rent stabilization in 1974 after a disastrous experiment in deregulation, and most recently amended the RSL in 2019. Rent stabilization generally applies to buildings constructed before 1974 with at least six apartments, and later-constructed buildings whose owners elect to participate in rent stabilization in exchange for tax abatements. The RSL limits the rent increases that owners are permitted to charge tenants in regulated apartments, and also restricts the circumstances in which tenants can be evicted. As an incentive to maintain and improve rental housing, the RSL permits additional rent increases to cover the costs of individual apartment renovations, major building improvements, and in other specified circumstances.

Rent stabilization is the response of New York State and New York City to a legislatively

declared housing emergency, as evidenced by vacancy rates that persistently fall short of 5 percent of the rental housing market. To address this crisis and its accompanying social ills, the Legislature adopted the RSL for the purposes of protecting and preserving affordable housing; preventing unreasonable and oppressive rents; reducing disruption in the housing market; providing incentives to maintain and improve rental housing; and encouraging new construction by exempting newly constructed buildings from rent stabilization.

The most recent RSL amendments, signed into law by Governor Andrew Cuomo on June 14, 2019 as part of the Housing Stability and Tenant Protection Act of 2019, were opposed by the real estate lobby. Having lost the legislative fight in Albany, the Plaintiffs – two real estate industry groups and several property owners – seek to strike down not only the 2019 amendments, but the entire 50-year-old regime of rent stabilization. Plaintiffs assert facial challenges to the RSL, alleging both a physical and regulatory taking of private property without just compensation in violation of the Fifth Amendment, and a violation of substantive due process under the Fourteenth Amendment. Plaintiffs also allege a due process violation based on the New York City Council's periodic declaration of a continuing housing emergency.

Plaintiffs' claims fail as a matter of law and should be dismissed for four principal reasons. First, Plaintiffs' physical takings claim fails because the RSL does not result in any physical encroachment upon private property. (*See* Point I.B., *infra*.) Second, their regulatory takings claim fails because, under controlling precedent, rent stabilization laws do not deprive owners of use of their property, but merely govern the landlord-tenant relationship. (*See* Point I.C., *infra*.) Third, Plaintiffs' due process claim fails because the RSL is rationally related to legitimate state interests, and the New York City Council's 2018 declaration of a housing emergency was reasonable and rationally based in evidence of an ongoing housing crisis. (*See*

Point II, *infra*.) And fourth, most of Plaintiffs' claims are time-barred. (*See* Point III, *infra*.)

## Statement of Facts

### A. Overview of the RSL

The RSL was enacted in 1969 to address a housing crisis arising from New York City's volatile housing market and shortage of affordable rental housing.[1] The RSL aims to ensure a stable and fair rental market by preventing the most egregious forms of rent profiteering that the tight housing market would otherwise encourage. *See* N.Y.C. Admin. Code § 26-501 (finding the RSL necessary "to prevent exactions of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive practices"). Specifically, the law limits how much property owners can increase the rent for certain residential properties each year. *Id.* By regulating rent increases and evictions, the RSL protects tenants, particularly the disabled and elderly, from dislocation, and limits the disruption to neighborhoods and communities that would result from dramatic rent increases and rapid turnover of tenants. *See id.*; *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 87 N.Y.2d 325, 332 (1995).

The RSL generally applies to buildings with six or more units constructed before 1974, as well as to buildings whose owners opt into the program in exchange for certain public subsidies. *Id.* The RSL currently applies to nearly one million apartments in New York City, which house more than two million people—or about one in three City residents. *See* Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey (Feb. 9, 2018) ("2017 HVS Initial

---

[1] The Rent Stabilization Laws are codified in the New York City Administrative Code §§ 26–501 to 26–520, as amended (1969) (rent stabilization within New York City), and the Emergency Tenant Protection Act of 1974, ch. 576, § 4, 1974 N.Y. Laws 1510, 1512–23 (reproduced as amended at N.Y. Unconsol. Law § 8621 *et seq.*) ("ETPA") (rent stabilization outside New York City). Further, regulations promulgated under the ETPA, as amended, are codified in 9 N.Y.C.R.R. §§ 2520, *et seq.* Consistent with the Complaint, these laws and regulations will be referred to in this memorandum as the RSL.

3

Findings"), https://www1.nyc.gov/assets/hpd/downloads/pdf/about/2017-hvs-initial-findings.pdf (last visited Nov. 1, 2019).[2] Owners of rent-stabilized apartments are required to register those apartments annually with DHCR, and to provide information concerning rents and services.[3] *Id.* Property owners are permitted to increase rents by a percentage determined annually by the NYC Rent Guidelines Board, and are permitted additional increases for building improvements and in other circumstances specified by the RSL. *Id.*

The RSL fosters stability in the rental-housing market by limiting the pace of rent increases in regulated apartments. The RSL authorizes the Rent Guidelines Board – a body composed of representatives of property owners, tenants, and the general public – to determine annually the permissible percentage of rent increases for lease renewals. N.Y.C. Admin. Code § 26-510(a). The Board is required to consider, among other things, the cost of living and the economic condition of the residential real-estate industry, including the housing supply, maintenance costs, availability of financing, and vacancy rates. *Id.* § 26-510(b). Owners who believe that the guidelines fail to afford them reasonable income may apply to DHCR for a hardship exemption. *Id.* § 26-510(c). In addition to the annual rent increases, the RSL authorizes

---

[2] The Court may properly consider HVS data on this Rule 12(b) motion for two reasons. First, Plaintiffs rely extensively on data from HVS's surveys throughout their Complaint, *see, e.g.*, Compl. ¶¶ 92, 101–109; 143–148; 177–191, which renders the findings from those surveys integral to the Complaint. *See, e.g.*, *Greenburgh Eleven Union Free Sch. Dist. v. Thompson*, No. 18 CV 67 (VB), 2018 WL 6830865, at * 3 (S.D.N.Y. Dec. 28, 2018). Second, HVS surveys are conducted by the Census Bureau. "The Court can take judicial notice of government statistics," including census figures. *Canadian St. Regis Band of Mohawk Indians v. New York*, Nos. 5:82-CV-0783, 5:82-CV-1114, 5:89-cv-0829 (LEK/TWD), 2013 WL 3992830, at *12 (N.D.N.Y. July 23, 2013) (collecting cases).

[3] DHCR is the "sole administrative agency to administer the regulation of residential rents" under the RSL. *See* 1983 N.Y. Laws 1777, 1778, ch. 403, § 3,; *see also* 1985 N.Y. Laws 3357, 3358, ch. 888, § 2. DHCR is vested with broad authority to issue and amend regulations to fulfill the goals of the RSL, such as "provid[ing] safeguards against unreasonably high rent increases," "protect[ing] tenants and the public interest," and "insur[ing] that the level of fair rent increase established under th[e] law will not be subverted and made ineffective." N.Y.C. Admin. Code § 26-511(c)(1)-(2), (5). DHCR also has the authority to enforce the terms of the RSL, adjudicate rent overcharge proceedings, and issue binding administrative orders awarding damages. *See id.* § 26-516.

additional increases when the owner improves the physical condition of the unit or building. *See* N.Y. Unconsol. Law § 8626; N.Y.C. Admin. Code § 26-511(c)(6).

To ensure the security of a tenant's tenure in an apartment, the RSL generally requires an owner to offer rent-stabilized tenants renewal leases upon the expiration of their current leases. *See* N.Y.C. Admin. Code § 26-511(c)(9); 9 N.Y.C.R.R. § 2523.5(a). But when a tenant vacates a regulated apartment, the owner retains discretion to select the next tenant, subject to a limited exception for succession rights. *See* N.Y.C. Admin. Code §§ 2520.6(o), 2523.5(b)(1).[4] Moreover, nothing in the RSL precludes owners from evicting tenants for cause, such as nonpayment of rent or misconduct, *id.* § 2524.3, or refusing to renew a lease if the apartment is not the tenant's primary residence, *id.* § 2524.4(c). An owner may also withdraw one unit from the rental market during a tenancy for use as his primary residence upon a showing of an immediate and compelling necessity. N.Y.C. Admin. Code §§ 26-408; 26-511(c)(9)(b). To protect especially vulnerable tenants, the RSL requires an owner seeking to retake an apartment from a disabled person or senior citizen to ensure that the tenant can obtain equivalent or better housing nearby at the same or lower rent. 9 N.Y.C.R.R. § 2524.4(a)(2).

---

[4] In 1987, DHCR promulgated a regulation giving certain family members cohabitating with the tenant of record of a rent-stabilized unit succession rights when the tenant vacates the unit. *See* 9 N.Y.C.R.R. § 2523.5(b)(1). "DHCR did this in order to protect those who, in its 'experience as sole administrator of residential rent regulation and adjudicator of eviction disputes, are most in need of protection against loss of their homes in a continuing housing emergency.'" *Jourdain v. N.Y. State Div. of Hous. & Cmty. Renewal*, 159 A.D.3d 41, 45 (N.Y. App. Div. 2018) (quoting *Rent Stabilization Ass'n of N.Y.C. v. Higgins*, 83 N.Y. 156, 170 (N.Y. 1993)). Regulations that provide "for succession rights 'serve the important remedial purpose of preventing dislocation of long-term residents due to the vacatur of the head of household.'" *Id.* (citing *Murphy v. N.Y. State Div. of Hous. & Cmty. Renewal,* 21 N.Y.3d 649, 653 (2013)). Succession rights are "in the spirit of the statutory scheme, whose goal is to facilitate the availability of affordable housing for low-income residents and to temper the harsh consequences of the death or departure of a tenant for their 'traditional' and 'non-traditional" family members." *Murphy*, 21 N.Y.3d at 653 (discussing *Mitchell-Lama* housing) (citing *Braschi v. Stahl Assoc. Co.,* 74 N.Y.2d 201 (N.Y. 1989); *Rent Stabilization Ass'n v. Higgins*, 83 N.Y.2d 156 (1993)).[5] This action does not implicate the City's separate regime of "rent control," which was enacted in 1962 and applies today only to a small and dwindling number of units.

An owner may also withdraw a unit or building from the rental market during a tenancy by demonstrating to DHCR either that they intend to use that unit or building in connection with a business they own and operate, or that redressing substantial building-code violations would be financially impracticable. *Id.* § 2524.5. Moreover, an owner may obtain DHCR's authorization to demolish a building based on proof of financial ability and an approved demolition plan, subject to the requirement that affected tenants are relocated to comparable units or paid a stipend. *Id.*

The RSL also seeks to increase the housing stock in New York City and other affected areas by exempting new construction, N.Y. Unconsol. Law § 8625(a)(5), and by offering tax incentives to owners of newly constructed buildings who opt to offer rent-stabilized units for a finite period, *see, e.g.*, N.Y.C. Admin. Code § 26-504(c); N.Y. Real Prop. Tax L. § 421-a(2)(f). State law authorizes rent regulation only so long as the City's rental vacancy rate remains at or below five percent. N.Y. Unconsol. Law § 8623(a). The City Council has reassessed the need for continued rent regulation roughly every three years. *See* N.Y.C. Admin. Code § 26-502; *see also* N.Y. Unconsol. Law § 8603.

### B. *The History of New York's Rent-Stabilization Laws*

The RSL's balanced approach to regulation of tenancies and rent increases reflects New York's long experience with rent regulation. The State enacted its first rent-control statute in 1946 in response to the housing shortage following World War II and the end of federal wartime rent regulation. *See* Ch. 274, 1946 N.Y. Laws 723; *La Guardia v. Cavanaugh*, 53 N.Y.2d 67, 71 (1981). In 1962, the Legislature authorized New York City and certain other municipalities to enact their own rent regulations. *See* Ch. 21, § 1(4)-(6), 1962 N.Y. Laws 53, 54-56. Under this authority, the New York City Council introduced the prevailing scheme of rent regulation with the Rent Stabilization Law of 1969 (codified as amended at N.Y.C. Admin. Code § 26-501 *et*

*seq.*).[5] The chief aim of the RSL was – and remains – to "ameliorate the dislocations and risk of widespread lack of suitable dwellings that accompany a housing crisis." *Fed. Home Loan Mtge. Corp.*, 87 N.Y.2d at 332 (citation omitted).

### C. Emergency Tenant Protection Act of 1974

In 1971, the Legislature, in an "experiment with free-market controls," deregulated newly vacated apartment units that had been subject to the RSL. *KSLM-Columbus Apartments, Inc. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 6 A.D.3d 28, 32 (1st Dep't 2004), *mod. on other grounds*, 5 N.Y.3d 303 (2005); *see* Ch. 371, § 6, 1971 N.Y. Laws 1159, 1161–62. The result was "ever-increasing rents," which was not accompanied by the increase in construction of new housing that the Legislature anticipated. *La Guardia*, 53 N.Y.2d at 74. Three years later, deeming the experiment a failure, the Legislature reaffirmed its commitment to rent stabilization. *See* ETPA; *Roberts v. Tishman Speyer Props., L.P.*, 62 A.D.3d 71, 76 n.4 (1st Dep't), *aff'd*, 13 N.Y.3d 270 (2009).

Before the enactment of the ETPA, Assembly Member Andrew Stein chaired a commission that investigated and prepared a legislative report on the deregulation policies adopted in 1971. *See* Temporary State Comm'n on Living Costs and the Economy of the State of New York, Report on Housing and Rents (Jan. 1974) ("Stein Report"). The Commission found that vacancy decontrol "had [n]o beneficial side effects" and should be abrogated. Stein Report, § A, at 21. In fact, the Commission found that during the three years the decontrol initiatives were in effect, more than 400,000 apartments were removed from the rent regulation system in New York City, rents in decontrolled apartments jumped more than 50%, major capital investment decreased by 50%, new construction was unaffected, and the volume of eviction

---

[5] This action does not implicate the City's separate regime of "rent control," which was enacted in 1962 and applies today only to a small and dwindling number of units.

proceedings against tenants rose significantly. *Id.* §§ A, at 3, 14–15, 21; E.I, at 7. As the Commission put it, "[v]acancy decontrol has placed an extreme hardship on the tenants of this state, particularly on the elderly and the poor, in the form of increased rent and insecurity." *Id.* § A, at 21.

Recognizing the troubling results of these aggressive vacancy-decontrol policies, the Legislature rescinded vacancy decontrol for the City's rent-stabilized housing stock in the ETPA.

### D.  The Introduction of Luxury and High-Income Decontrol

In 1993, the Legislature enacted the Rent Regulation Reform Act, which instituted the first decontrol initiative since 1971. *See* 1993 N.Y. Laws ch. 253. Specifically, the 1993 legislation introduced a provision commonly called "Luxury Decontrol," under which owners could permanently deregulate apartments that had a legal regulated monthly rent of $2,000 or higher when they became vacant. *Id.* In 2011, this statutory threshold was raised to $2,500 per month. *See* 2011 N.Y. Laws ch. 97. In 2015, the Legislature raised it to $2,700 a month, adjusted each year thereafter by the same rate as the one-year rent renewal adjustment adopted by the Rent Guidelines Board. *See* 2015 N.Y. Laws ch. 20.

The 1993 legislation also instituted a high-income deregulation provision ("High Income Decontrol"), which allowed owners to permanently deregulate occupied apartments with rents of $2,000 or more and tenants whose household annual income exceeded $250,000 in each of the prior two years. *See* 1993 N.Y. Laws ch. 253. In 1997, the Legislature reduced the income threshold to $175,000. *See* 1997 N.Y. Laws ch. 116. It also adopted a mandatory formula for rental increases upon vacancy. *Id.* In 2011, these thresholds were increased to $2,500 in rent and a household income of more than $200,000 in each of the two prior years. *See* 2011 N.Y. Laws ch. 97.

E.  *The 2019 Amendments*

On June 14, 2019, Governor Cuomo signed into law the Housing Stability and Tenant

Protection Act of 2019, which amended the RSL. The amendments were based, in part, on the

Legislature's finding that "severe disruption of the rental housing market has occurred and

threatens to be exacerbated as a result of the present state of the law in relation to the

deregulation of housing accommodations upon vacancy," and that "the situation has permitted

speculative and profiteering practices and has brought about the loss of vital and irreplaceable

affordable housing for working persons and families." 2019 N.Y. Laws ch. 36, pt. D (S. 6458).

The amendments to the RSL included:

- *Extension of the RSL Statewide.* The 2019 Amendments permanently codified rent-stabilization and rent-control regulations in New York City, and the ETPA in Nassau, Westchester, and Rockland counties. *See* Housing Stability and Tenant Protection Act of 2019, 2019 N.Y. Laws ch. 36, pt. A (S. 6458). It also created an opt-in program for any city, town, or village in New York satisfying the relevant criteria for rent stabilization. *See* Statewide Tenant Protection Act of 2019, 2019 N.Y. Laws ch. 36, pt. G (S. 6458) (reproduced as amended at N.Y. Unconsol. Law §§ 8622, 8624, 8625, 8634).

- *Elimination of Luxury and High-Income Decontrol.* To mitigate the loss of affordable housing, the 2019 Amendments eliminated Luxury Decontrol and High-Income Decontrol. *See* Housing Stability and Tenant Protection Act of 2019, 2019 N.Y. Sess. Laws ch. 36, Part D (S. 6458). As noted, these provisions permitted an owner to deregulate a unit when the legal regulated rent reached a certain threshold, and the tenant earned over $200,000 a year for two consecutive years. N.Y.C. Admin. Code § 26-504.3 (repealed 2019). Notably, this procedure of excluding high-income households from rent regulation removed an apartment permanently from rent stabilization, regardless of the income of any future tenant. *Id.*

- *Approval Threshold for Cooperative and Condominium Conversions Increased*. The law increased the approval threshold for owners who wish to convert rent-stabilized buildings to condominium or cooperative ownership. Under the 2019 Amendments, these owners must obtain agreements to purchase from 51% of existing tenants, up from 15%. *See* 2019 N.Y. Laws ch. 36, pt. N (S. 6458) (codified as amended at N.Y. Gen. Bus. Law § 352-eeee).

- *Caps Placed on Rent Increases for Individual Apartment Improvements and Major Capital Improvements*. Under the RSL, rent increases are permitted based on owners' investments in Individual Apartment Improvements (IAIs) and building-wide Major Capital Improvements (MCIs). With respect to MCIs, owners can petition DHCR for a rent adjustment equal to the cost of the investment, amortized over a statutorily prescribed

period of time. *See* N.Y.C. Admin. Code § 26-511(c)(6). Before the 2019 Amendments, MCI rent increases were limited to 6% of the tenant's rent. Unlike MCIs, IAIs had no cap before the 2019 Amendments. Recognizing that IAIs and MCIs – coupled with vacancy and longevity increases – could quickly result in steep rent increases for tenants, the 2019 Amendments limited MCI rent increase to 2% of the tenant's rent and imposed caps on rent increases for IAIs. *Id.*

- *Longevity and Vacancy Bonuses Repealed*. Before the 2019 Amendments, owners could raise rents by as much as 20% when a rent-regulated unit became vacant. *See* 2019 N.Y. Laws ch. 36, pt. B, §§ 1–7 (S. 6458). The law also permitted owners who had not claimed a vacancy increase in at least eight years to collect an additional increase in rent. *Id.* Recognizing that these vacancy and longevity increases, together with IAIs and MCIs, were resulting in meaningful rent increases being acutely felt by tenants, the 2019 Amendments repealed these policies. *Id.*

- *Limits Placed on "Owner-Use" Exclusion.* Before the 2019 Amendments, owners could take multiple apartments out of rent stabilization for themselves and their family members to use as residences. *See* N.Y.C. Admin. Code § 26-408 (amended by 2019 N.Y. Laws ch. 36, pt. I). Under the 2019 Amendments, owners are limited to claiming "owner use" for one apartment, and must show an "immediate and compelling necessity" to use it as their primary residence. *See* 2019 N.Y. Laws ch. 36, pt. I.

- *Prohibiting Revocation of Preferential Rents.* The maximum rent that a tenant may be charged for a rent-stabilized apartment is known as the "legal rent." Property owners sometimes charge less than the legal rent, a so-called "preferential rent." *See* N.Y.C. Admin. Code § 26-511(14) (amended by 2019 N.Y. Laws ch. 36, pt. E.) Before the 2019 Amendments, a tenant paying a preferential rent could be required, upon renewal of his lease, to pay the full legal rent—even though that could amount to an increase of several hundred dollars and force tenants out of their apartments. The 2019 Amendments bar this practice, and provide that the rent currently charged to a rent-stabilized tenant, even if less than the legal rent, becomes the basis for any future rent increases charged to that tenant. *See* 2019 N.Y. Laws ch. 36, pt. E. Once the tenant vacates the apartment, however, the owner is permitted to raise the rent to the legal-registered limit. *Id.*

- *Practice of Charging Preferential Rent Disallowed*. Before the 2019 Amendments, owners could charge a tenant a "preferential rent," which means a rent amount that is lower than the legal-registered rent. *See* N.Y.C. Admin. Code § 26-511(14) (amended by 2019 N.Y. Laws ch. 36, pt. E.) This gave owners the option of raising the rent to the legally mandated limit when a lease is renewed—even though that increase could amount to several hundred dollars and force people out of their apartments. The 2019 Amendments bars this practice, and provides that the rent currently charged to a rent-stabilized tenant, even if less than the legal-registered rent, becomes the rent amount from which an owner may implement increases going forward. *See* 2019 N.Y. Laws ch. 36, pt. E. This only applies to lease renewals, however. *Id.* Once the tenant vacates the apartment, the owner is permitted to raise the rent to the legal-registered limit. *Id.*

- *Security Deposit and Certain Leasing Procedures Revised*. Under the 2019 Amendments, security deposits for all rental units in New York City – both market-rate and regulated –

have been capped at one month's rent, *see* 2019 N.Y. Laws ch. 36, pt. M (codified as amended at N.Y. Gen. Oblig. Law § 7-108(1-a)); application fees for apartments have been capped at $20, *Id.* (codified as amended at N.Y. Real Prop. Law § 238-a); and owners can no longer refuse leases to tenants who have been sued in housing court, *Id.* (codified as amended at N.Y. Real Prop. Law § 227-f).

## F.   New York City's Housing Emergency

The RSL authorizes the City of New York to maintain its system of rent stabilization based upon a certification by the New York City Council that a housing emergency continues to exist. *See* N.Y. Unconsol. Law § 8623. A housing emergency may be declared when the citywide vacancy rate falls below 5%. *Id.* The most recent Housing Vacancy Survey in 2017 found that the City's vacancy rate was 3.63% – the equivalent of just 79,190 vacant units out of nearly 2.2 million rental units citywide. *See* 2017 HVS Initial Findings, *see* infra 3, at 9, 14.

Under the RSL, New York City must prepare a housing survey every three years to collect information about the inventory and condition of the City's housing supply, and to assess whether there is a continued need for rent regulation. *See* N.Y. Unconsol. Law § 8623. This survey, which is conducted by the Census Bureau, is commonly known as the triennial Housing and Vacancy Survey (HVS).

HVS data establish that rent-stabilized apartments house hundreds of thousands of low-income residents across New York City. *See* 2017 HVS Initial Findings, *see* infra 3, at 3–4. [6] The 2017 HVS survey shows that over 50% of tenants living in rent-stabilized units in 2016 were considered low-income by federal standards; that the household median income of market-rate tenants in Manhattan was double that of rent-regulated tenants; and that the median income for rent-stabilized households was $44,560, while tenants in unregulated apartments earned a median

---

[6] Low-income households are defined by the U.S. Department of Housing and Urban Development (HUD) as those earning no more than 80% of the Area Median Income. *See* HUD's Public Housing Program, https://www.hud.gov/topics/rental_assistance/phprog (last visited Nov. 1, 2019). In 2016, the low-income limit in New York City's metropolitan area for a three-person household was $65,250.

income of $67,000. *Id.* The 2017 HVS also shows that the City's housing stock is predominately

renter occupied, with rental units comprising 62.9% of the City's available housing, *id.*, in

contrast to the national average of 33.6.[7]

## LEGAL STANDARDS

Plaintiffs bring this action under 42 U.S.C. § 1983, which "guarantees a federal forum

for claims of unconstitutional treatment at the hands of state officials[.]" *Knick v. Twp. of Scott,*

*Pa.*, 139 S. Ct. 2162, 2167 (2019). "A § 1983 claim has two essential elements: (1) the defendant

acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered

a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. Cnty. of*

*Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). A claim brought under Section 1983 will be

dismissed if the defendants' alleged conduct does not implicate any rights secured by the U.S.

Constitution or federal law. *See, e.g., Quartararo v. Catterson*, 917 F. Supp. 919, 933 (E.D.N.Y.

1996) (citing *Eagleston v. Guido*, 41 F.3d 865, 876 (2d Cir. 1994) (additional citations omitted)).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a Section

1983 complaint must "plead enough facts to state a claim to relief that is plausible on its face,

which standard is met when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Eberhart v. Crozier*,

423 F. App'x 57, 58 (2d Cir. 2011) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007);

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted).

The Complaint alleges violations of Plaintiffs' asserted rights under the Takings Clause

of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment. To state a

claim under either provision, Plaintiffs must "allege facts showing that state action deprived

---

[7] 2018 American Community Survey, U.S. Census Bureau, https://bit.ly/345VkOD (last accessed Nov. 1, 2019).

them of a protected property interest." *Story v. Green*, 978 F.2d 60, 62 (2d Cir. 1992) (citations omitted). As demonstrated below, the Complaint fails to satisfy these standards and should be dismissed for failure to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6).

## ARGUMENT

### I.  Plaintiffs Cannot State A Plausible Claim For A Physical Or Regulatory Taking Of Their Property

#### A.  The Limited Scope Of The Takings Clause

"The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citation omitted); U.S. Const., amend. V. "The Supreme Court has recognized two branches of Takings Clause cases: physical takings and regulatory takings." *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 322 (2002)). *Accord Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006).

"The paradigmatic taking requiring just compensation," known as a *physical taking*, "is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). *See also Palazzolo*, 533 U.S. at 617 ("The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use."); *1256 Hertel Ave. Assocs.*, 761 F.3d at 263. "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner[.]" *Tahoe-Sierra*, 535 U.S. at 322. But "the government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992) (italics omitted). *Accord*

*Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 94 (2d Cir. 1992). Government action that does not entail a physical occupation, but merely affects the use and value of private property, including rent control and rent stabilization laws, does not result in a physical taking of property. *See* Point I.B, *infra*.

By contrast, a *regulatory taking* "'occurs where even absent a direct physical appropriation, governmental regulation of private property 'goes too far' and is 'tantamount to a direct appropriation or ouster.''" *1256 Hertel Ave. Assocs.*, 761 F.3d at 263 (quoting *Lingle*, 544 U.S. at 537). Courts may find a regulatory taking *per se* in the rare case where government regulation deprives a property owner of "all economically beneficial or productive use of land," which the Complaint does not allege. *See Palazzolo*, 533 U.S. at 617 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1115 (1992)).

Where the impact of government action falls short of a "complete elimination of value, or a total loss," *see id.*, a regulatory taking "nonetheless may have occurred[.]" *Palazzolo*, 533 U.S. at 617. In determining whether a regulatory taking occurred, courts "must remain cognizant that government regulation – by definition – involves the adjustment of rights for the public good, and that [g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Lingle*, 544 U.S. at 538–39 (citations and internal quotation marks omitted).

Plaintiffs assert that the RSL, on its face, constitutes both an unconstitutional physical and regulatory taking of private property. *See, e.g.,* Compl. ¶ 1; *id.* ¶ 10 (alleging that the RSL effects a "physical taking without compensation" that violates the Takings Clause "on its face"); *id.* ¶ 12 (alleging that "the RSL on its face effects an uncompensated regulatory taking of private property") (emphasis omitted). *See also* Letter of Andrew J. Pincus, Esq., to the Hon. Margo K.

Brodie (Sept. 16, 2019), at 3, ECF No. 33 (describing Plaintiffs' "facial regulatory takings

claim"). To prevail on a facial challenge under the Takings Clause, Plaintiffs must establish that

the RSL "deprive[d] the owner of an economically viable use of his property," *Suitum v. Tahoe*

*Reg'l Planning Agency*, 520 U.S. 725, 736 n.10 (1997), and that "no set of circumstances exist

under which the [challenged statute] would be valid[.]" *Rent Stabilization Ass'n of City of N.Y. v.*

*Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993) ["*RSA*"].[8]

      "A facial challenge to a legislative Act is, of course, the most difficult challenge to

mount successfully, since the challenger must establish that no set of circumstances exists under

which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). *Accord*

*General Elec. Co. v. N.Y.S. Dep't of Labor*, 936 F.2d 1448, 1456 (2d Cir. 1991) (citing *Salerno*,

481 U.S. at 745); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F.

Supp. 2d 574, 613, n.18 (S.D.N.Y. 2013) (holding that the *Salerno* standard remains the basis for

evaluating facial constitutional challenges other than Free Speech and Free Exercise of Religion

claims) (citing *Ruston v. Town Bd. for Skaneateles,* 610 F.3d 55, 58, n.2 (2d Cir. 2010)

(applying *Salerno* to facial challenge to zoning law) (additional citation omitted)); *S. Lyme Prop.*

*Owners Ass'n., Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 524, 535 (D. Conn. 2008); *RSA*, 5

F.3d at 595 (applying *Salerno's* "no set of circumstances" test in Takings Clause context). "As

the *Salerno* Court unambiguously put it, the 'fact that the [legislation] might operate

unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly

_____

[8] Where an individual property owner challenges a statute as applied to a particular property, courts consider several factors to determine whether the government action amounts to a regulatory taking. *See Penn Central Transp. Co. v. New York City,* 438 U.S. 104 (1978). *See also Jado Assocs., LLC v. Suffolk Cty. Sewer Dist. No. 4-Smithtown Galleria*, No. 12 Civ. 3011 (DRH) (ARL), 2014 WL 2944086, at *6 (E.D.N.Y. June 30, 2014) (citations omitted). Applying the *Penn Central* factors is neither necessary nor feasible in the context of a facial challenge. *See S. Lyme Prop. Owners Ass'n.*, 539 F. Supp. 2d at 535 (citing *RSA*, 5 F.3d at 595-97). Moreover, Plaintiffs CHIP and RSA lack Article III standing to assert an as-applied takings claim on behalf of their members. *See RSA*, 5 F.3d at 597.

invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment.'" *RSA*, 5 F.3d at 595 (citing *Salerno*, 481 U.S. at 745).

As demonstrated below, binding Supreme Court and Second Circuit precedent compel the dismissal of Plaintiffs' facial challenge to the RSL.

### B.      The RSL Does Not Cause A Physical Taking of Property

Plaintiffs' claim that the RSL effects a physical taking of property is fundamentally misguided. On its face – and as alleged in the Complaint – New York's regime of rent stabilization laws imposes restrictions on owners' use of rent-regulated properties. *See, e.g.*, Compl. ¶¶ 60-64. It does not result in the condemnation of any property or its seizure by eminent domain for public use. *Cf. Tahoe-Sierra*, 535 U.S. at 322. Nor does the RSL result in a physical encroachment on any property. *Cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 (1982). Plaintiffs fail to state a claim for a physical taking because New York State's regime of rent stabilization does not "require[] the landowner to submit to the physical occupation of his land." *Yee*, 503 U.S. at 527.

Well-settled and binding precedent holds that rent control and rent stabilization laws, specifically including the RSL, do not effect a physical taking of property. As the Second Circuit held in rejecting a physical takings challenge to New York's rent regulations, "the RSL regulates land use rather than effecting a physical occupation." *W. 95 Hous. Corp. v. New York City Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002). *See also Harmon v. Markus*, 412 F. App'x 420, 422 (2d Cir. 2011) (affirming dismissal of physical takings claim on the ground that "the RSL does not effect permanent physical occupation of the [owners'] property").

Both *West 95 Housing Corp.* and *Harmon* relied on the Supreme Court's analysis in *Yee*, which is equally dispositive of Plaintiffs' physical takings claim here. In *Yee*, mobile home park

owners challenged a municipal rent control ordinance and a California statute that "limit[ed] the bases upon which a park owner may terminate a mobile home owner's tenancy." *Yee*, 503 U.S. at 524.[9] They argued that this regime of mobile home regulations effected a physical taking because "what has been transferred from park owner to mobile home owner is no less than a right of physical occupation of the park owner's land." *Id.* at 527.

The Supreme Court rejected the park owners' argument, holding that it "cannot be squared with our cases on physical takings," which occur only when the government "requires the landowner to submit to the physical occupation of his land." *Id.* The local rent controls and state law at issue in *Yee* "authorize[d] no such thing." To the contrary, the park owners "voluntarily rented their land to mobile home owners . . . . Put bluntly, no government has required any physical invasion of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government." *Id.* at 528.

The same is true in this case. The Complaint is rife with baseless allegations that the RSL prohibits owners of rent-stabilized apartments from excluding the current tenants or their lawful successors from the owners' property. *See, e.g.*, Compl. ¶ 212. But these allegations ignore the fact that the owners of rent-stabilized apartments voluntarily open those apartments to tenants subject to the RSL. "[W]here a property owner offers property for rental housing, the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking." *Fed. Home Loan Mtge. Corp. v. N.Y.S. Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47-48 (2d Cir. 1996) ["*FHLMC*"] (citing *Yee*, 503 U.S. at 529).

---

[9] Mobile home owners typically rent plots of land from park owners, and install their mobile homes there permanently. *Yee*, 503 U.S. at 523. "Mobile homes are largely immobile as a practical matter," *id.*, which prompted California to enact legislation protecting mobile home owners from actual or constructive eviction. *Id.* at 524.

17

In *Yee* itself, the Supreme Court acknowledged (as Plaintiffs emphasize here) that the right to exclude others is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Yee*, 503 U.S. at 528. The Supreme Court nevertheless rejected the owners' argument that legal restrictions on their right to evict tenants and terminate their leases violated their constitutionally protected property interests. *Id*. The Court concluded:

> On their face, the state and local laws at issue here merely regulate petitioners' *use* of their land by regulating the relationship between landlord and tenant. "This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails."

*Id.* at 528-29 (quoting *Loretto*, 458 U.S. at 440).

The Complaint cites several provisions of the RSL in a misguided attempt to establish a physical taking. But the cited provisions merely impose terms and conditions on the landlord-tenant relationship. *See, e.g.*, Compl. ¶ 197 (alleging the RSL restricts owners' right to refuse to renew leases to current tenants); *id.* ¶ 198 (alleging the RSL denies owners the right to use, possess, and dispose of their property because they are generally required to continue renting rent-stabilized apartments to tenants); *id.* ¶ 199 (alleging the RSL limits owners' right to cease renting rent-stabilized apartments, requires tenants' approval for condominium and cooperative conversions, and imposes conditions on demotion of buildings containing rent-stabilized apartments). Conspicuously lacking from the Complaint is any allegation that the RSL results in any physical encroachment on Plaintiffs' property, much less the outright appropriation of their property for public use.

Plaintiffs also incorrectly maintain that the RSL deprives owners of their rights to exclude others, and to possess, dispose, and use their own property. *See* Compl. ¶¶ 60–69. That is not true. Among other things, the RSL accords owners of rent-stabilized properties the right to:

- recover possession based on an immediate and compelling necessity for their own use and occupancy, N.Y.C. Admin. Code § 26-511(b)(9)(b);

- remove from rent regulation a building that it is going to demolish after finding tenants suitable housing and paying their relocation expenses, 9 N.Y.C.R.R. § 2524.5(a)(2);

- withdraw a building constructed after 1974 from rent stabilization with a showing of substantial rehabilitation, *id.* § 2520.11(e);

- withdraw a unit from rent stabilization for commercial use, *id.* § 2524.5;

- withdraw a building from rent stabilization upon a showing that redressing substantial building-code violations would be financially impracticable, *id.*; and

- apply to DHCR for a hardship exemption on the basis that that the guidelines do not afford them reasonable income, *id.*

Plaintiffs' mischaracterization of the RSL as effecting a permanent physical occupation of their property has no basis in fact or law.

Moreover, the cases that Plaintiffs cite in connection with their physical takings claim are readily distinguishable, and underscore the deficiencies of their claim. *See id.* ¶ 194. Unlike this action, each case cited by Plaintiff involved a government-mandated physical intrusion on the owner's property. *See Loretto*, 458 U.S. at 435-36 (finding a physical taking where government required telecommunications cable to be permanently attached to building); *Dolan v. City of Tigard*, 512 U.S. 374 (1994) (holding that conditioning a building permit on the property owner granting a public easement for a pedestrian/bicycle pathway effected a taking for which compensation was due); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831-32 (1987) (finding a physical taking where government required a public easement across the plaintiffs' property as a condition of permitting them to rebuild their home); *United States v. Causby*, 328 U.S. 256 (1946) (finding a physical taking where frequent and regular flight path of military aircraft crossed plaintiff's land at low altitude). By contrast, the RSL does not mandate any encroachment on Plaintiffs' property. It merely regulates the terms of the landlord-tenant relationship. As demonstrated above, the Supreme Court and Second Circuit have repeatedly and

19

consistently held that this type of regulation does not amount to a physical taking.

Thus, Plaintiffs' physical takings claim fails as a matter of law because they cannot allege any facts showing that the State has appropriated or occupied any portion of their property.

### C.    The RSL Does Not Effect A Regulatory Taking of Property

"A plaintiff making a facial claim faces an 'uphill battle' because 'it is difficult to demonstrate that mere enactment of a piece of legislation' violates the plaintiff's constitutional rights." *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 110 (2d Cir. 2003) (quoting *Suitum,* 520 U.S. at 736, n.10). *Accord Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987). To prevail "on a facial challenge to a statute, the plaintiff must … 'establish that no set of circumstances exists under which the Act would be valid.'" *Id.* (quoting *Salerno,* 481 U.S. 739; also citing *Kittay v. Giuliani,* 252 F.3d 645, 647 (2d Cir. 2001) (*per curiam*)). *See also RSA*, 5 F.3d at 595 (applying "no set of circumstances" test to Takings Clause claim). "The test to be applied in considering this facial challenge is fairly straightforward. A statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land ....'" *Keystone,* 480 U.S. at 495; *Rent Stabilization Ass'n of N.Y.C., Inc. v. Dinkins*, 805 F. Supp. 159, 162 (S.D.N.Y. 1992), *aff'd,* 5 F.3d 591.

Plaintiffs' facial regulatory taking claim is foreclosed by an unbroken line of Second Circuit precedent. *See W. 95 Hous. Corp.*, 31 F. App'x at 21; *FHLMC*, 83 F.3d at 48; *RSA*, 5 F.3d at 595. In *FHLMC*, the plaintiff sought a declaratory judgment that the re-imposition of rent stabilization on previously deregulated units amounted to both a physical and a regulatory taking. *FHLMC*, 83 F.3d at 48. The Second Circuit rejected both claims, finding no support in the case law for "the view that application of the [RSL] constitutes a regulatory taking. Rent stabilization does not deprive FHLMC of economically viable use of the property. Although FHLMC will not

20

profit as much as it would under a market-based system, it may still rent apartments and collect the regulated rents." *Id.* at 48 (citations omitted).

Similarly, in *West 95 Housing Corp*., the plaintiffs brought a facial regulatory taking challenge to the application of the RSL to apartments constructed under New York's Mitchell-Lama program.[10] 31 F. App'x at 20. The Second Circuit held that the RSL did not effect a physical occupation of property, and thus could be held "unconstitutional only if it 'has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole,' the determination of which 'entails complex factual assessments of the purposes and economic effects of government actions.'" *Id.* at 21 (quoting *Yee*, 503 U.S. at 523). The court dismissed the regulatory taking claim because the complaint failed to plead "facts that would support such a 'complex factual assessment' of the economic effects of the RSL on *all* Mitchell-Lama property owners." *Id.* (emphasis added). Indeed, the Second Circuit held that "the difficulty of such an assessment suggests that a widely applicable rent control regulation such as the RSL is not susceptible to facial constitutional analysis under the Takings Clause." *Id. See also RSA*, 5 F.3d at 595 (affirming dismissal of facial regulatory taking claim for failure to allege the RSL operated unconstitutionally "in every circumstance").

This longstanding and unbroken line of precedent is controlling here, and compels dismissal of Plaintiffs' regulatory takings claim. Indeed, Plaintiffs expressly concede that "prior cases challenging the constitutionality of the RSL on various grounds have been unsuccessful." Compl. ¶ 15 (citing *Harmon*, 412 F. App'x at 420). Plaintiffs cite no authority and offer no

---

[10] "New York State's Mitchell-Lama program . . . encourages construction of affordable housing by providing long-term, low-interest government mortgage loans to developers on the condition that the resulting development be subject to rent regulation." *Monaghan v. Henry Phipps Plaza W., Inc*., 531 F. App'x 127, 128 (2d Cir. 2013); N.Y. Private Hous. Fin. Law §§ 10-37.

reasoning to support their suggestion that this Second Circuit precedent is inapplicable in light of the 2019 amendments to the RSL – because they cannot.

Equally unavailing are Plaintiffs' allegations that the RSL diminishes the value of regulated properties and deprives owners of a reasonable return on their investment. *See, e.g.*, Compl. ¶¶ 273-359. Courts in this Circuit have consistently recognized that a property owner has "no constitutional right to what it could have received in an unregulated market." *Greystone Hotel Co. v. City of N.Y.*, 13 F. Supp. 2d 524, 528 (S.D.N.Y. 1998) (citing *FHLMC*, 83 F.3d at 48). Indeed, *FHLMC* reaffirmed that an owner of rent-regulated property "'is not guaranteed [a] 'reasonable return' on investment.'" 83 F.3d at 48 (citation omitted). *See also id.* (noting that the owner "may still rent apartments and collect the regulated rents").

In sum, it is well settled that the "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) (citing cases where 75% and 92.5% diminution in value was held insufficient to establish a taking). *See also Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1090 (9th Cir. 2015); *Appolo Fuels, Inc. v. United States,* 381 F.3d 1338 (Fed. Cir. 2004); *In re Chateaugay Corp.*, 53 F.3d 478, 496 (2d Cir. 1995).

It also bears emphasis that several of the Plaintiffs acquired their properties after the RSL was enacted in 1969. *See generally* Compl. ¶¶ 18-25.[11] Having chosen to enter the business of owning and leasing rent-stabilized apartments, they cannot now assert a takings claim based on the existence of the underlying statute or the occasional amendment to it. "When a landowner

---

[11] Even if the Plaintiffs acquired their properties before the advent of rent stabilization in New York, their facial challenge would still fail because they do not (and cannot) allege that the RSL is unconstitutional in all cases, including as applied to owners who purchased their buildings after its enactment. *See RSA*, 5 F.3d at 595.

decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge, or require the landowner to accept tenants he does not like, without automatically having to pay compensation." *Yee*, 503 U.S. at 529 (citations omitted). "[T]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Concrete Pipe & Prods. of Cal.*, 508 U.S. at 645 (citations omitted).

Plaintiffs further allege that the RSL does not achieve the State's policy goals, such as providing affordable housing to low-income families, reducing homelessness, and fostering diversity in New York City. *See, e.g.*, Compl. ¶ 79. But Plaintiffs cannot base a regulatory takings claim on their disagreement with legislative policy-making choices. *See Lingle*, 544 U.S. at 544 (cautioning courts not "to substitute their predictive judgments for those of elected legislatures and expert agencies"). In *Lingle*, the Supreme Court clarified language in an earlier regulatory takings case, which stated that "government regulation of private property 'effects a taking if [such regulation] does not substantially advance legitimate state interests[.]'" *See id.* (quoting *Agins v. City of Tiburon*, 447 U.S. 255 (1980)). *Lingle* disposed of the "substantially advances" test, holding that that such a test – which "asks, in essence, whether a regulation of private property is *effective* in achieving some legitimate public purpose" – "is not a valid method of discerning whether private property has been 'taken' for purposes of the Fifth Amendment." *Id.* at 542 (italics in original). Thus, Plaintiffs' extensive discussion of the purported ineffectiveness of rent stabilization cannot salvage their regulatory takings claim.

Finally, Plaintiffs' regulatory takings claim is contradictory and self-defeating. For example, Plaintiffs allege that the RSL "mandates the continued, indefinite occupation of rental properties by tenants," yet recognize that circumstances exist when an owner can refuse to renew

a lease. Compl. ¶ 11. Similarly, Plaintiffs allege the RSL "confers a life estate with inheritance rights once an apartment is rented," *id.,* yet ignore that successor tenants are subject to removal on the same terms as any other tenant, N.Y. Real. Prop. Law Art. 7. Plaintiffs also allege the RSL's "hardship exception," which permits owners to petition DHCR to charge higher rents than those set by the Rent Guidelines Board, is futile as a practical matter. Compl. ¶¶ 332, 334. But Plaintiffs' facial challenge requires more: a showing that the RSL can never be applied constitutionally. To the extent that their claim is based on the alleged futility of the hardship exception, Plaintiffs must – at a minimum – plausibly plead that no such exceptions are granted. The Complaint does not satisfy this standard. As such, Plaintiffs' facial challenge to the RSL as a regulatory taking should be dismissed.

## II.    Plaintiffs' Due Process Claim Fails As A Matter Of Law

Plaintiffs allege the RSL violates their constitutional rights under the Due Process Clause of the Fourteenth Amendment. Compl. ¶¶ 367–375. This claim fails as a matter of law because the RSL is rationally related to a legitimate state interest.[12]

The standard for assessing whether a rent-control law is constitutional under the Due Process Clause is well established: "Price control is 'unconstitutional ... if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt....'" *Pennell v. City of San Jose,* 485 U.S. 1, 11 (1988) (quoting *Basin Area Rate Cases*, 390 U.S. 747, 769–770, (1968)). "Because it burdens no fundamental rights, the [RSL] is 'a classic example of

---

[12] The Complaint does not specify whether Plaintiffs are asserting a procedural or substantive due process claim. *See* Compl. ¶¶ 70–166. It is clear from the nature of Plaintiffs' allegations, however, that they are asserting a substantive-due-process claim. Plaintiffs do not challenge the procedural rights afforded to them under the RSL, nor do they allege that they were denied meaningful process. *Id.* Instead, Plaintiffs allege the RSL, on its face, is so arbitrary and irrational that it offends the due process rights of any landlord affected by it. *Id.* That is a substantive-due-process claim. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

an economic regulation' and is subject only to the minimum scrutiny rational basis test." *In re Chateaugay Corp.*, 53 F.3d 478, 486–87 (2d Cir. 1995) (quoting *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 83 (1978)). The RSL thus need only be rationally related to a legitimate state interest. And here, the RSL is plainly supported by a rational legislative purpose. *Id.* (quoting *Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984)); *see also Beatie v. City of N.Y.*, 123 F.3d 707, 711 (2d Cir. 1997) ("Legislative acts that do not interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality and must be upheld if rationally related to a legitimate state interest." (internal quotation marks omitted)).

The RSL was enacted to protect tenants by "ameliorat[ing] the dislocations and risk of widespread lack of suitable dwellings that accompany a housing crisis." *Fed. Home Loan Mortg. Corp.,* 87 N.Y.2d at 332; *see also* N.Y.C. Admin. Code § 26-501 (finding the RSL necessary "to prevent exactions of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive practices"). Courts have consistently held that these are proper areas of governmental concern: "[T]he purpose of preventing excessive and unreasonable rent increases caused by the growing shortage of and increasing demand for housing … is a legitimate exercise of [the] police powers." *Pennell,* 485 U.S. at 11 (internal quotation marks and alteration marks omitted); *see also CCA Assocs. v. United States*, 667 F.3d 1239 (Fed. Cir. 2011) ("Rent control and rent stabilization laws have been almost invariably held to represent legitimate government acts and not to support either physical or regulatory takings challenges.") (collecting cases); *cf. In re Chateaugay Corp.*, 53 F.3d at 487 ("We are aware of no post–1935 cases in which the Supreme Court invalidated an economic regulation on substantive due process grounds."); *Kraebel v. N.Y. City Dep't of Hous. Pres. & Dev.*, 959 F.2d 395 (2d Cir.

1992) (upholding regulation requiring owners to accept tax abatements rather than increased rent

from elderly tenants); *Greystone Hotel Co. v. City of N.Y.*, 13 F. Supp. 2d 524, 528 (S.D.N.Y.

1998) ("The legitimate state interest in the RSL and RSC is coping with an acute shortage of

available housing, and preventing unjust and oppressive rents and profiteering."); *Rent

Stabilization Ass'n*, 83 N.Y.2d at 174 (finding "a close causal nexus between the challenged

[rent] regulations and the stated purpose of preventing the eviction and resulting vulnerability to

homelessness of the identified beneficiaries").

    It is clear that the RSL is rationally tied to the Legislature's interest in protecting tenants

from unreasonable and unpredictable rent increases. Even taking Plaintiffs' allegations at face

value, they concede that a substantial portion, if not a majority, of rent-stabilized housing is

occupied by low- to middle-income residents. *See* Compl. ¶ 98 (alleging that data from 2010

"confirm that the percentage of low-income households living in rent-stabilized and controlled

units" is 65.8%); ¶ 102 (alleging that 37.7% of rent-stabilized tenants are "severely cost

burdened renters," with incomes below $35,000); ¶ 103 (alleging that 78% of rent-stabilized

units are rented by households with incomes under $100,000). This alone is enough to satisfy

rational basis review.

    Plaintiffs also attempt to state a due process claim by suggesting alternative policies that

they claim would better advance the goals of the RSL, such as subsidies and tax incentives.

Compl. ¶ 365. But this line of argument stretches rational basis review beyond its breaking point.

Courts have consistently held that the judicial branch is not designed to sit as a super-legislature

reviewing matters of economic policy, but should only ask whether a legislature's policy

judgments are rational. "It is by now well established that legislative Acts adjusting the burdens

and benefits of economic life come to the Court with a presumption of constitutionality, and that

the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15 (1976); *see Gen. Motors Corp. v. Romein,* 503 U.S. 181, 191 (1992) (observing that "the test of due process" for economic legislation is satisfied by "a legitimate legislative purpose furthered by rational means" (internal quotation marks omitted)). The RSL easily satisfies this deferential standard of review. *See, e.g.*, *Lingle*, 544 U.S. at 545 ("[t]he reasons for deference to legislative judgments about the need for, and likely effectiveness of, regulatory actions are by now well established"); *Concrete Pipe & Prods. of Cal., Inc.*, 508 U.S. at 639 ("under the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means"); *Pennell*, 485 U.S. at 11 (substantive due process claim requires showing that the challenged law is "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt").

Plaintiffs' suggestion that the "protection of property rights" is a "fundamental right" warranting strict-scrutiny review, Compl. ¶ 70, is frivolous. In *Lingle*, the Supreme Court unanimously rejected the notion that heightened scrutiny applied to due-process claims involving property. 544 U.S. at 545. Noting "the serious practical difficulties" posed by "heightened means-end review of virtually any regulation of private property," the *Lingle* Court explained that because of the "hazards" of "empower[ing] … courts to substitute their predictive judgments for those of elected legislatures and expert agencies" it had "long eschewed such heightened scrutiny when addressing substantive due process challenges to government regulation." *Id.* at 544–45 (citations omitted). Since *Lingle*, circuit courts have uniformly applied rational-basis review to substantive due process claims relating to property. *See, e.g., Quinn v. Bd. of Cty. Commissioners for Queen Anne's Cty., Maryland,* 862 F.3d 433, 443 (4th Cir. 2017); *2910*

*Georgia Ave. LLC v. D.C.*, 234 F. Supp. 3d 281, 312 (D.D.C. 2017); *Bowers v. Whitman*, 671 F.3d 905, 916-17 (9th Cir. 2012); *SB Bldg. Assocs., L.P. v. Borough of Milltown*, 457 F. App'x 154, 157 (3d Cir. 2012); *Yur-Mar, L.L.C. v. Jefferson Parish Council*, 451 F. App'x. 397, 401 (5th Cir. 2011); *Ramsey Winch, Inc. v. Henry*, 555 F.3d 1199, 1210 (10th Cir. 2009). These cases are consistent with longstanding precedent establishing that challenges to economic regulations are presumptively valid absent a showing that they lack a rational basis. Nothing in the Complaint refutes this precedent. Accordingly, Plaintiffs' due process claim fails and should be dismissed.

## III.   Most Of Plaintiffs' Claims Are Time-Barred

To the extent Plaintiffs challenge provisions of the RSL that were in place before July 15, 2016, those claims are time-barred. The applicable statute of limitations for Plaintiffs' claims is three years. *See EklecCo NewCo LLC v. Town of Clarkstown*, No. 16-CV-6492 (NSR), 2018 WL 3023159, at *9–10 (S.D.N.Y. Jun. 18, 2018). Facial challenges under the Takings Clause accrue "the moment the challenged regulation or ordinance is passed." *Suitum*, 520 U.S. at 736, n.10. As Plaintiffs acknowledge, the "RSL has applied in New York City continuously for 50 years," Compl. ¶ 6, and Plaintiffs have owned properties subject to – or have represented property owners who have been subject to – the RSL for several decades, *id.* ¶¶ 16–24. Although Plaintiffs take issue with certain amendments made to the RSL in June 2019, the bulk of Plaintiffs' claims target the totality of the rent-stabilization scheme that has been in effect for half a century. *See id.* ¶¶ 70–359. For example, Plaintiffs argue "[e]ach individual provision of the Rent Stabilization Laws (including those from the 2019 Amendments), and the combined effect of all the provisions, constitutes a per se taking." *Id.* ¶ 196. Plaintiffs similarly object to the "arbitrary" and "methodologically unsound" nature of the 5% threshold for emergency

declarations under the ETPA of 1974. Compl. ¶ 371.[13] But this regulatory scheme has been in place for decades. Any claims challenging aspects of the RSL that existed before the 2019 Amendments accrued well before the three-year limitations period, and should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the action against Commissioner Visnauskas in its entirety, with prejudice, and should grant such other and further relief as the Court deems proper.

Dated: New York, New York       LETITIA JAMES
      November 1, 2019       Attorney General
                                   State of New York
                                   *Attorney for Commissioner Visnauskas*

                            By: _____/s/_____
                                  Michael A. Berg
                                  Jonathan D. Conley
                                  Assistant Attorneys General
                                  28 Liberty Street
                                  New York, New York 10005
                                  (212) 416-8651
                                  michael.berg@ag.ny.gov
                                  jonathan.conley@ag.ny.gov

---

[13] Plaintiffs also appear to challenge the constitutionality of every emergency declaration made by the New York City Council over the last 50 years. *See* Compl. ¶¶ 7, 167. These claims are also time-barred.