UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| COMMUNITY HOUSING IMPROVEMENT PROGRAM, RENT STABILIZATION ASSOCIATION OF N.Y.C., INC., CONSTANCE NUGENT-MILLER, MYCAK ASSOCIATES LLC, VERMYCK LLC, M&G MYCAK LLC, CINDY REALTY LLC, DANIELLE REALTY LLC, FOREST REALTY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF NEW YORK, RENT GUIDELINES BOARD, DAVID REISS, CECILIA JOZA, ALEX SCHWARZ, GERMAN TEJEDA, MAY YU, PATTI STONE, J. SCOTT WALSH, LEAH GOODRIDGE, AND SHEILA GARCIA, IN THEIR OFFICIAL CAPACITIES AS CHAIR AND MEMBERS, RESPECTIVELY, OF THE RENT GUIDELINES BOARD, AND RUTHANNE VISNAUSKAS, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF NEW YORK STATE HOMES AND COMMUNITY RENEWAL, DIVISION OF HOUSING AND COMMUNITY RENEWAL,<br><br>Defendants. | Case No. 19-cv-4087 (MKB) |

## MEMORANDUM OF LAW IN SUPPORT OF INTERVENORS' MOTION TO DISMISS

Date:  November 1, 2019

Sean Baldwin
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
sbaldwin@selendygay.com

*Attorney for Intervenors Tenants and Neighbors, Community Voices Heard, and Coalition for the Homeless*

TABLE OF CONTENTS

Pages

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .........................................................................................................2

ARGUMENT ..............................................................................................................6

I.      Plaintiffs' Physical Taking Claim Should Be Dismissed ...................................6

      A.      Plaintiffs Fail To State a Facial Physical Taking Claim ...........................7

      B.      Plaintiffs' Physical Taking Claim Fails on the Merits.............................8

            1.      The RSL Provisions Governing the Tenant-Landlord Relationship Do Not Compel an Absolute Physical Occupation......................................9

            2.      The RSL's Use Restrictions Impose No Physical Occupation at All ........12

II.      Plaintiffs' Regulatory Taking Claim Should Be Dismissed .............................13

      A.      Plaintiffs Fail To State a Facial Regulatory Taking Claim....................14

      B.      Plaintiffs' Regulatory Taking Claim Fails on the Merits.......................16

            1.      The Second Circuit Has Held that the Largely Identical 1996 RSL Did Not Effect a Regulatory Taking.........................................................16

            2.      The Current RSL Is Not a Regulatory Taking ...........................................17

                 a.      Economic Impact of the Regulation ...............................................17

                 b.      Interference with Investment-Backed Expectations .....................19

                 c.      Character of the Governmental Action ..........................................19

III.      Plaintiffs' Substantive Due Process Claim Should Be Dismissed....................21

      A.      Plaintiffs Fail to State a Facial Substantive Due Process Claim............21

      B.      Plaintiffs' Substantive Due Process Claim Fails on the Merits .............22

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*8200 Realty Corp. v. Lindsay,*
    261 N.E.2d 647 (N.Y. 1970) ............................................................................................ 3

*All. of Auto. Mfrs., Inc. v. Currey,*
    610 F. App'x 10 (2d Cir. 2015) ..................................................................................... 23

*Andrus v. Allard,*
    444 U.S. 51 (1979) ........................................................................................................ 20

*Ansonia Residents Ass'n v. N.Y. Div. of Hous. & Cmty. Renewal,*
    551 N.E.2d 72 (N.Y. 1989) ............................................................................................ 3

*Appolo Fuels, Inc. v. United States,*
    381 F.3d 1338 (Fed. Cir. 2004) ................................................................................... 18

*Balentine v. Tremblay,*
    5:11-cv-196, 2012 WL 1999859 (D. Vt. June 4, 2012) ................................................ 23

*Beatie v. City of New York,*
    123 F.3d 707 (2d Cir. 1997) ................................................................................... 22, 23

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................... 6, 7

*Buffalo Teachers Fed'n v. Tobe,*
    464 F.3d 362 (2d Cir. 2006) ................................................................................... 12, 13

*Chambers v. Time Warner Inc.,*
    282 F.3d 147 (2d Cir. 2002) ......................................................................................... 6

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,*
    508 U.S. 602 (1993) ..................................................................................................... 17

*Exxon Corp. v. Governor of Maryland,*
    437 U.S. 117 (1978) ..................................................................................................... 24

*FCC v. Beach Comms., Inc.,*
    508 U.S. 307 (1993) ..................................................................................................... 23

*Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal,*
    83 F.3d 45 (2d Cir. 1996) ...................................................................................... passim

*Ferguson v. Skrupa,*
    372 U.S. 726 (1963) ............................................................................. 25

*Franklin Mem'l Hosp. v. Harvey,*
    575 F.3d 121 (1st Cir. 2009) ............................................................... 18

*Guggenheim v. City of Goleta,*
    638 F.3d 1111 (9th Cir. 2010) ...................................................... 16, 19

*Hadacheck v. Sebastian,*
    239 U.S. 394 (1915) ............................................................................. 17

*Harmon v. Markus,*
    08-cv-5511, 2010 WL 11530596 (S.D.N.Y. Mar. 1, 2010) ................. 15

*Harmon v. Markus,*
    412 F. App'x 420 (2d Cir. 2011) ........................................ 2, 10, 11, 12

*Heller v. Doe,*
    509 U.S. 312 (1993) ...................................................................... 23, 25

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.,*
    452 U.S. 264 (1981) ...................................................................... 14, 16

*Horne v. Dep't of Agric.,*
    135 S. Ct. 2419 (2015) ........................................................................ 12

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
    480 U.S. 470 (1987) ............................................................................. 13

*Laurel Park Cmty., LLC v. City of Tumwater,*
    698 F.3d 1180 (9th Cir. 2012) ............................................................ 19

*Lingle v. Chevron U.S.A.,*
    544 U.S. 528 (2005) .............................................................. 14, 23, 24

*Lochner v. New York,*
    198 U.S. 45 (1905) ............................................................................... 25

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) .................................................................. 9, 11, 12

*Lucas v. S.C. Coastal Council,*
    505 U.S. 1003 (1992) ........................................................................... 13

*MHC Fin. Ltd. P'ship v. City of San Rafael,*
    714 F.3d 1118 (9th Cir. 2013) ...................................................... 18, 21

*Murr v. Wisconsin,*
    137 S. Ct. 1933 (2017) ................................................................................. 13

*Park Ave. Tower Assocs. v. City of New York,*
    746 F.2d 135 (2d Cir. 1984) ....................................................................... 18

*Penn Cent. Transp. Co. v. City of New York,*
    438 U.S. 104 (1978) ................................................................... 17, 19, 20, 21

*Pennell v. City of San Jose,*
    485 U.S. 1 (1988) ........................................................................... 14, 22, 23

*Planned Parenthood of Se. Pa. v. Casey,*
    505 U.S. 833 (1992) .................................................................................... 22

*Pulte Home Corp. v. Montgomery Cty.,*
    909 F.3d 685 (4th Cir. 2018) ..................................................................... 18

*Pumpelly v. Green Bay & Miss. Canal Co.,*
    80 U.S. 166 (1871) ..................................................................................... 12

*Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. City of New York,*
    914 F.2d 348 (2d Cir. 1990) ....................................................................... 13

*Rent Stabilization Ass'n of N.Y.C. v. Dinkins,*
    5 F.3d 591 (2d Cir. 1993) .................................................................. passim

*Rent Stabilization Ass'n of N.Y.C., Inc. v. Higgins,*
    630 N.E.2d 626 (N.Y. 1993) ........................................................................ 3

*Sadowsky v. City of New York,*
    732 F.2d 312 (2d Cir. 1984) ....................................................................... 13

*Santiago-Monteverde v. Pereira*
    22 N.E.3d 1012 (N.Y. 2014) ...................................................................... 19

*Seawall Assocs. v. City of New York,*
    542 N.E.2d 1059 (N.Y. 1989) .................................................................... 11

*Southview Assocs., Ltd. v. Bongartz,*
    980 F.2d 84 (2d Cir. 1992) ............................................................ 9, 11, 13

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002) ................................................................................ 9, 12

*Tartaglia v. McLaughlin,*
    79 N.E.2d 809 (N.Y. 1948) ........................................................................ 17

*Troy Ltd. v. Renna,*
    727 F.2d 287 (3d Cir. 1984)................................................................................. 12

*U.S. R.R. Ret. Bd. v. Fritz,*
    449 U.S. 166 (1980)......................................................................................... 23

*United States v. Cent. Eureka Mining Co.,*
    357 U.S. 155 (1958)......................................................................................... 12

*United States v. Salerno,*
    481 U.S. 739 (1987)........................................................................................... 7

*Usery v. Turner Elkhorn Mining Co.,*
    428 U.S. 1 (1976)............................................................................................ 22

*Village of Euclid v. Ambler Realty Co.,*
    272 U.S. 365 (1926)......................................................................................... 17

*W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.,*
    31 F. App'x 19 (2d Cir. 2002) ................................................................ 2, 14, 21

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008).......................................................................................... 7

*Yee v. City of Escondido*
    503 U.S. 519 (1992)........................................................................... 10, 11, 12, 13

## Statutes and Regulations

9 NYCRR § 2520 .......................................................................................................... 3

9 NYCRR § 2523.5 ....................................................................................................... 3, 17

9 NYCRR § 2524.3 ....................................................................................................... 17

9 NYCRR § 2524.5 ....................................................................................................... 7, 17

9 NYCRR § 2525.6 ....................................................................................................... 3, 17

L. 1974, ch. 576 § 4 ...................................................................................................... 3

L. 1982, ch. 555, § 2 ..................................................................................................... 3

L. 1983, ch. 403 ............................................................................................................ 3

L. 1993, ch. 253 ............................................................................................................ 4

L. 2003, ch. 82 .............................................................................................................. 4

L. 2011, ch. 93 ........................................................................................................ 4

L. 2015, ch. 20 ........................................................................................................ 4

L. 2019, ch. 36 ........................................................................................................ 4

N.Y. Gen. Bus. Law § 352-eeee .............................................................................. 3

N.Y. Real Prop. Acts. Law § 753 ........................................................................... 10

N.Y. Real Prop. Law § 227-f .................................................................................. 9

N.Y. Real Prop. Tax Law § 421-a ......................................................................... 19

N.Y. Unconsol. Law § 26-502 ................................................................................ 5

N.Y. Unconsol. Law § 26-511 ............................................................................... 18

N.Y. Unconsol. Law § 8621 .................................................................................... 3

N.Y. Unconsol. Law § 8622 .................................................................................... 3

N.Y. Unconsol. Law § 8623 .................................................................................... 3

N.Y. Unconsol. Law § 8625 .................................................................................. 10

New York City Administrative Code § 26-502 ......................................................... 6

New York City Administrative Code § 26-511(c)(9) ................................................ 3

New York City Administrative Code§ 26-501 ........................................................ 24

NY Unconsol. Law § 2522.4 .................................................................................. 15

**Other Authorities**

Gaumer, E. *Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey, New York, NY: New York City Department of Housing Preservation and Development* (Feb. 9, 2018), http://www1.nyc.gov/assets/hpd/downloads/pdf/about/2017-hvs-initial-findings.pdf ................................................................................................................ 5

Sponsor's Mem., Bill Jacket, L. 2019, ch. 36 .................................................... 4, 24

*Testimony by Assistant Commissioners Lucy Joffe and Elyzabeth Gaumer*, https://www1.nyc.gov/assets/hpd/downloads/pdf/about/rent-stabilization-testimony-hpd-05-02-19.pdf ........................................................................................ 6

## PRELIMINARY STATEMENT

New York's rent stabilization laws ("RSL") have been in place since 1969. In the five decades since, the city and state governments have maintained and improved the RSL to address runaway rent prices that many of their constituents face, and both state and federal courts have consistently affirmed the RSL's constitutionality. Generations of New Yorkers have built their lives on this foundation, living in a city they could not otherwise afford, working at jobs they could not otherwise get to, and sending their children to schools they could not otherwise attend. Today, nearly one million residences housing close to 2.5 million New Yorkers are protected by the RSL.

Plaintiffs ask the Court to blow all this up. Plaintiffs—seven landlords and two landlord associations—seek a declaration that the *entire* RSL violates the U.S. Constitution as applied to *every* single regulated unit in the state, and to enjoin the enforcement of *every* single provision of *every* rent stabilization statute and rule. Such a ruling would fundamentally reshape New York's economy and social fabric, replacing the economic policy choices of five decades of democratically-elected state and local governments with those of these landlords. It would provide an enormous windfall to current landlords who bought regulated units at a discount fully aware of their regulated status. It would put millions of tenants in danger of losing their place in our communities, and our communities in danger of losing millions of their members.

For these reasons, Intervenors Tenants and Neighbors, Community Voices Heard, and Coalition for the Homeless ask that Plaintiffs' radical claims be dismissed, with prejudice, in their entirety. Plaintiffs bring a facial challenge, alleging the RSL is unconstitutional as applied to every regulated unit and asking the Court to strike it down root and branch. But the Second Circuit has twice rejected such facial attacks because the RSL includes numerous provisions passed at different times that apply in different combinations with different effects to each of a million regulated units. *See Rent Stabilization Ass'n of N.Y.C. v. Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993); *W. 95*

*Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002) (summary

order). Plaintiffs' facial challenge here fares no better.

Even if Plaintiffs had made an "as applied" rather than a facial challenge to the RSL—

which they have not—their claims would still fail. Every court to opine on the issue—including

the Second Circuit, twice—has agreed the RSL does not violate the Constitution. *See Fed. Home

Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47–48 (2d Cir. 1996)

("*FHL*); *Harmon v. Markus*, 412 F. App'x 420, 422 (2d Cir. 2011) (summary order), *cert. denied*,

566 U.S. 962 (2012). Plaintiffs argue things are different now, but neither the RSL's fundamental

nature nor the relevant law has changed. The RSL does not subject unwilling landlords to absolute

physical occupation, and thus does not effect a physical taking. It allows landlords the economi-

cally viable and intended use of their property, and thus does not effect a regulatory taking. And

the RSL is rationally related to a legitimate purpose, and thus does not violate substantive due

process. Plaintiffs' claims should be dismissed.

## BACKGROUND

The New York City Rent Stabilization Law of 1969 created New York's rent stabilization

regime. N.Y. City Local Law No. 16-1969 (codified as amended at New York City Administrative

Code §§ 26-501 *et seq.* ("Admin. Code") and N.Y. Unconsol. Law §§ 26-501 *et seq.*). The law

responded to "many owners of housing accommodations" who "were demanding exorbitant and

unconscionable rent increases" because of "inflation and . . . an acute housing shortage." Admin.

Code § 26-501. These increases "were causing severe hardship to tenants of such accommodations

and were uprooting long-time city residents from their communities." *Id.* Landlords could in-

crease rents for new leases up to a maximum set by the Rent Guidelines Board ("RGB"), *id.* § 26-

510(b); could recover some major capital improvement costs ("MCIs"), *id.* at § 26-511(c)(6); and

had to give tenants the opportunity to renew leases, *see id.* § 26-511(c)(9). *See generally Rent Stabilization Ass'n of N.Y.C., Inc. v. Higgins*, 630 N.E.2d 626, 628–29 (N.Y. 1993); *Ansonia Residents Ass'n v. N.Y. Div. of Hous. & Cmty. Renewal*, 551 N.E.2d 72, 76 (N.Y. 1989); *8200 Realty Corp. v. Lindsay*, 261 N.E.2d 647, 649–51 (N.Y. 1970) (describing 1969 law).

Five years later, New York State enacted the Emergency Tenant Protection Act of 1974 ("ETPA"), L. 1974, ch. 576 § 4 (codified as amended at N.Y. Unconsol. Law §§ 8621 *et seq.*), "to prevent exaction of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive practices tending to produce threats to the public health, safety and general welfare." N.Y. Unconsol. Laws § 8622. Under the ETPA, localities can opt in to rent stabilization if they experience a housing emergency due to a vacancy rate of less than five percent. *Id.* § 8623.

The legislature transferred administration of rent regulation laws to the Division of Housing and Community Renewal ("DHCR") in 1983, L. 1983, ch. 403, and in 1987 the DHCR adopted the Rent Stabilization Code ("RSC"), which remains in place, codified at 9 NYCRR §§ 2520 *et seq.* Landlords were required, upon the tenant's death, to offer lease renewals to family members who had lived in the home for two years, or one year for the elderly or disabled. 9 NYCRR § 2523.5(b). If the tenant left, landlords had to offer renewals to family members who had lived in the apartment since the tenancy or family relationship began. *Id.*; *see also Higgins*, 630 N.E.2d at 628–29. The RSC also gave tenants subletting rights. 9 NYCRR § 2525.6. Other rent regulations passed around this time include, in 1982, rules governing conversion to condominiums and cooperative ownership. N.Y. Gen. Bus. Law § 352-eeee; L. 1982, ch. 555, § 2.

The state legislature has renewed and modified the RSL several times since 1987, experimenting with various decontrol and rent increase amendments at the margins but consistently

3

finding that the RSL's primary structure—limiting rent increases and requiring lease renewals—best served the people of New York.

In 1993, the legislature exempted from regulation apartments renting for over $2,000 that either became vacant ("vacancy decontrol") or were occupied by persons earning over $250,000 ("high-income decontrol"), and allowed rent increases for individual apartment improvements ("IAIs").  L. 1993, ch. 253.  In 1997, the legislature added a "vacancy allowance" that permitted some rent increases above the regulated amount when certain apartments were vacated, limited succession rights to family members with a close relationship with the original tenant, and modified the vacancy and high-income decontrol thresholds.  L. 1997, ch. 116.  The legislature in 2003 allowed landlords to increase rents to the maximum regulated level regardless of the prior rent ("preferential rent increase").  L. 2003, ch. 82.  In 2011, the legislature readjusted, limiting the frequency of vacancy increases, decreasing the amount recoverable for IAIs, and increasing decontrol thresholds. L. 2011, ch. 93.  In 2015 the legislature again revised the decontrol thresholds and amounts recoverable for MCIs.  L. 2015, ch. 20.[1]

Most recently, in June 2019, the state legislature passed the Housing Stability and Tenant Protection Act of 2019 ("HSTPA").  L. 2019, ch. 36.  The HSTPA was a "response to an ongoing housing shortage crisis, as evidenced by an extremely low vacancy rate.  Under tight rental markets, tenants struggle to secure safe, affordable housing," and as a result, localities "struggle to protect their regulated housing stock, which provides and maintains affordable housing for millions of low and middle income tenants."  Sponsor's Mem., Bill Jacket, L. 2019, ch. 36.[2]

---

[1]  The text of these various acts, from 1997 to 2015, can be found online at https://www1.nyc.gov/site/rentguidelinesboard/resources/rent-regulation-laws.page.

[2]  Available at https://www.nysenate.gov/legislation/bills/2019/s6458.

As with prior amendments, the HSTPA did not alter the twin pillars of the RSL: limiting rent increases for regulated units to the RGB maximum and limiting landlords' ability to remove tenants.  As with prior amendments, the HSTPA worked within that framework to fine-tune how rents can be increased and units can be deregulated, including by:

- Repealing high-income and vacancy decontrol, last adjusted in 2015.  HSTPA, Part D.

- Reducing the rent increases for MCIs and IAIs, set most recently in 2015 and 2011, respectively.  *Id.*, Part K.

- Limiting the number of units an owner can recover from tenants and requiring an immediate and compelling necessity for use as a primary residence.  *Id.*, Part I.

- Repealing the 1997 provisions establishing a vacancy allowance and a "longevity" increase for tenants who had remained in a unit for a long period.  *Id.*, Part B.

- Reforming the 2003 preferential rent provisions so the amount by which regulated rent may increase is based on the preferential rent, not the legal maximum.  *Id.*, Part E.

- Reforming condo and co-op conversions to repeal eviction plan conversions, limit non-eviction plan conversions of rent regulated buildings to preserve rental housing stock, and provide additional protections for senior citizens and disabled tenants.  *Id.*, Part N.

Like the state legislature, the New York City Council has continuously found a need for rent stabilization over the past fifty years.  Reviewing rental conditions every three years, the Council has each time reaffirmed this need—most recently in April 2018, *see* N.Y. Unconsol. Law § 26-502, after holding hearings and considering the United States Census Department's Housing and Vacancy Survey, *see* Compl. ¶¶ 101–09, 174–92.  The 2017 survey showed a vacancy rate of 3.63%, and median household income for rent-stabilized households of $44,560, compared to $67,000 for private non-regulated rent households.[3]  Eighty-six percent of rent stabilized units—

---

[3] Gaumer, E. *Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey, New York, NY: New York City Department of Housing Preservation and Development* (Feb. 9, 2018), http://www1.nyc.gov/assets/hpd/downloads/pdf/about/2017-hvs-initial-findings.pdf.

over 830,000 apartments—house low-, moderate-, or middle-income New Yorkers, and 615,065 of those units are home to low-income households.[4]

In its public hearings, the Council considered extensive oral and written testimony from government officials, the Plaintiffs and Intervenors in this case, groups of affected tenants, and community organizations. Compl. ¶¶ 176, 180–83, 187. Based on this information, the Council found "a serious public emergency continues to exist in the housing of a considerable number of persons within the city of New York," and therefore reaffirmed the emergency declaration through 2021. Admin. Code § 26-502.

## ARGUMENT

Dismissal pursuant to Rule 12(b)(6) should be granted if the complaint fails to plead facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts must construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), but "courts are not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (quotation marks omitted).

## I.    Plaintiffs' Physical Taking Claim Should Be Dismissed

Plaintiffs ask this Court to strike down the RSL in its entirety as a physical taking. However, they focus on only two sets of provisions. The first limits when landlords can remove tenants, which Plaintiffs allege forces them to accept unwelcome physical occupation. Compl. ¶¶ 203–20.

---

[4] *See Testimony by Assistant Commissioners Lucy Joffe and Elyzabeth Gaumer* at 4, 9, https://www1.nyc.gov/assets/hpd/downloads/pdf/about/rent-stabilization-testimony-hpd-05-02-19.pdf. The survey defined low-income households as having an income up to 80% of HUD Income Limits, moderate-income households 80-120%, and middle-income 120-165%. *Id.* at 9.

The second limits landlords' ability to use regulated units for purposes other than rental housing, which Plaintiffs claim "effectively" denies them the ability to "occupy, use and possess" their rental units. *Id.* ¶ 223. Plaintiffs' claims based on both sets of provisions fail.[5]

### A.   Plaintiffs Fail To State a Facial Physical Taking Claim

To succeed on their facial challenge, Plaintiffs "must establish that *no set of circumstances exists*" under which the RSL is valid. *Dinkins*, 5 F.3d at 595 (quotation marks omitted. A facial challenge succeeds only if "the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). That legislation "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Dinkins*, 5 F.3d at 595 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Plaintiffs' complaint does not meet this heavy burden. They allege the RSL effects a physical taking because "owners cannot refuse to renew leases . . . *except under the narrowest of circumstances*," Compl. ¶ 197; the RSL "*substantially* eliminates the owner's ability to evict a tenant," *id.* ¶ 217; and the RSL makes it "*more difficult* to select tenants in the first place," *id.* ¶ 219 (emphases added). Thus, Plaintiffs concede that owners of *some* regulated units *can* refuse to renew leases, evict tenants, and select tenants of their choice. Their facial claim therefore fails.

Plaintiffs admit an owner need not offer tenants an opportunity to renew if the owner wants to live in the unit, withdraw it from the rental market, or demolish it. *Id.* ¶ 214; *see also* 9 NYCRR § 2524.5. Plaintiffs note that a 2019 amendment requires landlords seeking to recover a unit for

---

[5] To the extent Plaintiffs purport to challenge any other RSL provisions as imposing physical takings, *see* Compl. ¶ 196, they have not alleged—let alone plausibly alleged—how those provisions do so. *See Twombly*, 550 U.S. at 545 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." (quotation marks omitted)).

their own use must show an "immediate and compelling necessity" and provide comparable housing for long-term tenants, but they admit these requirements are merely "difficult" to satisfy, not impossible.  Compl. ¶ 223.

Plaintiffs also concede landlords can evict tenants "for failing to pay rent, creating a nuisance, or for violating the law," *id.* ¶ 217, and courts can only stay eviction "if the tenant can demonstrate an inability to obtain other housing or to prevent hardship," *id.* ¶ 218.  Landlords who cannot evict tenants are differently situated.  For example, some may have reasonable grounds and others malicious or discriminatory motives; the latter surely have not experienced a physical taking.  And the 2019 amendment barring landlords from denying applications based on past eviction suits, *id.* ¶ 219, imposes different burdens depending on the nature and timing of the prior dispute.

Plaintiffs' facial challenge to the RSL's use restrictions also fails.  Plaintiffs allege the RSL merely "*limits* property owners' ability to freely dispose of their property," admitting landlords can withdraw a building from the rental market if it "presents a hazard or they seek to use the building for their own (non-rental) business," *id.* ¶ 247 (emphasis added); demolish a building if they obtain necessary permits and provide for tenant relocation, *id.* ¶¶ 252–56; and convert a building to a condominium with purchase agreements from 51% of tenants, *id.* ¶ 257.  These provisions cannot be challenged in the abstract, but only in individual suits about individual units based on specific and demonstrable burdens in a given case.

### B.    Plaintiffs' Physical Taking Claim Fails on the Merits

Plaintiffs' physical taking claim would fail even if they had brought an as-applied challenge on behalf of a landlord actually affected by a specific provision, as the law requires.  To effect a physical taking, the government must (1) compel a physical occupation on an unwilling property owner, which (2) is permanent, absolute, and exclusive.  *See Southview Assocs., Ltd. v. Bongartz,*

8

980 F.2d 84, 93–94 (2d Cir. 1992); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982). This "very narrow" definition does not limit "a State's broad power to impose appropriate restrictions upon an owner's *use* of his property." *Loretto*, 458 U.S. at 441. "Land-use regulations are ubiquitous and most of them impact property values in some tangential way—often in completely unanticipated ways. Treating them all as *per se* takings would transform government regulation into a luxury few governments could afford." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002).

Plaintiffs argue the RSL effects a physical taking by limiting (1) the reasons and ways landlords can remove tenants, and (2) the uses to which they can put their rental units. *See* Compl. ¶¶ 203–60. But the first set of limitations neither *compels* physical occupation, since landlords voluntarily accept the presence of tenants, nor imposes an *absolute* occupation, since landlords may recover vacant units, evict, and decline to renew leases. The second set of provisions imposes no physical occupation at all, but are quintessential use regulations. Accordingly, these claims should be dismissed.

### 1.  The RSL Provisions Governing the Tenant-Landlord Relationship Do Not Compel an Absolute Physical Occupation

Plaintiffs allege the RSL effects a physical taking by requiring landlords to (1) give current tenants the opportunity to renew their lease, Compl. ¶ 203; (2) give that opportunity to family members who have lived in the home for two years, or one for the elderly or disabled, *id.* ¶¶ 204–07; (3) allow subleases for tenants who intend to return as residents, *id.* ¶¶ 210–11; and (4) evict tenants only for limited reasons, *id.* ¶ 217. Plaintiffs claim the 2019 amendments exacerbate this "taking" by prohibiting landlords from declining applicants based on lawsuits with prior landlords, N.Y. Real Prop. Law § 227-f, potentially subjecting units rented to certain charitable housing

organizations to temporary rent stabilization, N.Y. Unconsol. Law § 8625(a)(6), and allowing courts to stay eviction for up to a year, N.Y. Real Prop. Acts. Law § 753. *See* Compl. ¶¶ 218–20.

None of these provisions effect physical takings because none *compel* physical occupation. In *Yee v. City of Escondido*, the Supreme Court rejected a physical taking challenge to a law prohibiting mobile home park owners from objecting when tenants sold their mobile homes, turning the buyers into new tenants. 503 U.S. 519, 524, 527–29 (1992). "When a landowner decides to rent his land to tenants, the government may . . . require the landowner to accept tenants he does not like without automatically having to pay compensation." *Id*. at 529 (citations omitted). Because the landowners "voluntarily rented their land," the law did not "compel[] physical invasion of property." *Id.* at 527.

Following *Yee*, the Second Circuit has twice rejected physical taking challenges to the RSL. In 1996, the court explained that, "where a property owner offers property for rental housing, the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking." *FHL*, 83 F.3d at 47–48. Instead, the RSL "regulates the terms under which the owner may use the property as previously planned." *Id.* The Court reaffirmed that holding in *Harmon* in 2011. 412 F. App'x at 422. In their brief, the *Harmon* plaintiffs relied on many of the very same provisions at issue here: landlords had to offer renewals to tenants or family members, could not unreasonably object to subleases, could evict only for limited reasons, and could recover only one unit to use as their residence, sometimes only if they provided comparable housing. Brief for Plaintiff-Appellants at 16–17, *Harmon*, 412 F. App'x 420 (10-1126, Dkt. No. 44. The Second Circuit rejected this claim, relying on *Yee* and *FHL*. *Harmon*, 412 F. App'x at 422.[6]

---

[6] The New York Court of Appeals likewise rejected a physical taking challenge to the RSL's lease renewal provisions based on the "owner's voluntary acquiescence in the use of its property for

Thus, the Second Circuit has already upheld many of the provisions that Plaintiffs challenge. No later amendments compel landlords to rent vacant units. *Contrast Seawall Assocs. v. City of New York*, 542 N.E.2d 1059, 1061 (N.Y. 1989) (law effected a taking because it "forced [owners] to accept the occupation of their properties by persons not already in residence"). And if requiring landlords to accept strangers as tenants does not effect a physical taking, *Yee*, 503 U.S. at 527–29, nor does barring landlords from rejecting tenant applicants based on prior eviction lawsuits, requiring them to accept continued tenancy of people housed by charitable organizations, or allowing courts to stay evictions for up to a year. As in *FHL* and *Harmon*, the RSL governs the terms of a physical occupation landlords have already accepted.

Plaintiffs' physical taking claim independently fails because these provisions do not impose an *absolute* physical occupation. In *Yee*, the Supreme Court recognized that "compel[ling] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy" might constitute a taking. 503 U.S. at 528. But this requires "*absolute* exclusivity of the occupation, and *absolute* deprivation of the owner's right to use and exclude others from the property." *Southview Assocs.*, 980 F.2d at 93. Qualified, temporary limits are "subject to a more complex balancing process to determine whether they are a taking." *Loretto*, 458 U.S. at 435 n.12.

The RSL allows landlords to evict or decline lease renewals in many cases. The *Harmon* court dismissed a physical taking claim because the plaintiffs:

> retain[ed] statutory rights, among others, (1) to recover possession of housing accommodations because of immediate and compelling necessity for their own personal use and occupancy, (2) to recover possession of housing accommodations for the immediate purpose of demolishing them, provided that such demolition is to be made

rental housing." *Higgins*, 630 N.E.2d at 633. The Second Circuit favorably cited this holding in both *FHL*, 83 F.3d at 48, and *Harmon*, 412 F. App'x at 422.

> for the purpose of constructing other than housing accommodation, and (3) to evict an unsatisfactory tenant.

*Harmon*, 412 F. App'x at 422 (quotation marks, citations, and alterations omitted). *See also Yee*, 503 U.S. at 524, 528 (law did not effect physical taking despite "limit[ing] the bases upon which a park owner may terminate a mobile home owner's tenancy"); *Troy Ltd. v. Renna*, 727 F.2d 287, 290 n.2, 301 (3d Cir. 1984) (40-year eviction moratorium for low-income senior citizen and disabled tenants not a physical taking because tenancies could "terminate by virtue of changing income levels or principal residences, and tenants [could] be evicted on any of thirteen grounds").

As in *Harmon*, Plaintiffs concede landlords can evict unsatisfactory tenants, Compl. ¶ 61; recover units for demolition, *id.* ¶¶ 252–56, or their own personal occupancy based on an "immediate and compelling necessity," *id.* ¶ 223; and use units for their own commercial purposes, *id.* ¶¶ 249–50. And courts can only stay evictions for up to one year. *Id.* ¶ 218. Because tenants' occupation is neither permanent nor absolute, these provisions do not effect physical takings.

## 2. The RSL's Use Restrictions Impose No Physical Occupation at All

"The fact of a taking is fairly obvious in physical takings cases," *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006)—for example, permanent flooding of private land, *Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. 166, 172 (1871); installation of cables and switching boxes on a private building, *Loretto*, 458 U.S. at 421; and seizure of a farmer's crop, *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2428 (2015). In such cases, the government takes "physical possession" of property. *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 166 (1958). By contrast, the government does not effect a physical taking when it "merely . . . bans certain private uses of . . . property," *Tahoe-Sierra*, 535 U.S. at 322–23—for example, when it orders gold mines to cease operation, *Cent. Eureka*, 357 U.S. at 166; requires that coal stay in the ground to support

12

structures above, *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488 n.18 (1987);

or denies a construction permit for a vacation home, *Southview Assocs.*, 980 F.2d at 94–95.[7]

Absent physical occupation, courts apply regulatory, not physical, takings analysis to land-

use provisions like the RSL, including laws preventing development of rental apartments, *Sa-*

*dowsky v. City of New York*, 732 F.2d 312, 317–19 (2d Cir. 1984), "the razing of a landmarked

building," *Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. City of New*

*York*, 914 F.2d 348, 357 (2d Cir. 1990), and the "improvement or separate sale" of a residential

lot, *Murr v. Wisconsin*, 137 S. Ct. 1933, 1939, 1949–50 (2017). Just as these laws limited owners'

ability to use their property for certain purposes, so the RSL limits landlords' abilities to use their

property as their residence, as cooperatives or condominiums, or for non-residential commercial

purposes. Such use restrictions, "while perhaps within the scope of . . . regulatory takings cases,

cannot be squared easily with . . . cases on physical takings. The government effects a physical

taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee*,

503 U.S. at 527. The RSL does no such thing.

## II.   Plaintiffs' Regulatory Taking Claim Should Be Dismissed

Plaintiffs also ask the Court to strike down the entire RSL as a regulatory taking, largely

repeating arguments that the Second Circuit has already rejected. Courts "weigh three factors to

determine whether the interference with property rises to the level of a taking: (1) the economic

impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with

distinct investment-backed expectations; and (3) the character of the governmental action." *Buf-*

*falo Teachers*, 464 F.3d at 375 (quotation marks omitted). The goal is to "identify regulatory

---

[7] A use regulation is only *per se* a taking if it deprives an owner of "*all* economically beneficial uses" of the property. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992). Plaintiffs do not make such a claim, nor could they, not least because landlords can still rent their property.

actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A.*, 544 U.S. 528, 539 (2005).  The RSL does no such thing, and certainly not in every instance.

### A.      Plaintiffs Fail To State a Facial Regulatory Taking Claim

Determining whether a statute imposes a regulatory taking is an "'ad hoc, factual inquir[y]' [that] must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295 (1981).  It is therefore "particularly important in takings cases to adhere to [the Court's] admonition that the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary." *Pennell v. City of San Jose*, 485 U.S. 1, 10 (1988) (quotation marks omitted).

The Second Circuit has twice rejected facial regulatory taking challenges to the RSL.  In *West 95 Housing Corp.*, the court held that "a widely applicable rent control regulation such as the RSL is not susceptible to facial constitutional analysis under the Takings Clause." 31 F. App'x at 21.  In *Dinkins*, the court rejected a challenge by the Rent Stabilization Association ("RSA")—a plaintiff here—based on the allegation that "'many' of its members [were] deprived of a constitutionally adequate return by the across-the-board limitations . . . on annual rent increases." 5 F.3d at 595.  The court held the RSL "has not abridged the constitutional rights of those landlords who *do* obtain an adequate return from the annual rent increases," and because "only certain subgroups are unable to secure constitutionally adequate relief under the hardship provisions." *Id.*

These cases foreclose a facial regulatory taking challenge to the RSL.  *See Harmon v. Markus*, 08-cv-5511, 2010 WL 11530596, at *3 (S.D.N.Y. Mar. 1, 2010), *aff'd*, 412 F. App'x 420

14

(2d Cir. 2011) ("Plaintiffs had to [bring an as applied challenge] in response to the well-settled law that a facial taking challenge to rent stabilization laws will not lie as of right.").

Plaintiffs do not allege that the RSL effects a regulatory taking of every rent stabilized unit, relying instead on generalizations and hypotheticals—for example, "that unregulated properties are *typically* worth 20% to 40% more," Compl. ¶ 274, and that "the income from non-regulated units *can be as much* as 60-90% higher than regulated units," *id.* ¶ 284 (emphases added). They hypothesize that rent increases "are *in many instances* insufficient to recover even the cost of the improvements," *id.* ¶ 277, and improvements necessary when a tenant vacates "*can* significantly exceed $15,000, *potentially* costing $50,000 to $70,000 or more," *id.* ¶ 321 (emphases added). These allegations tacitly admit the RSL has a far less dramatic ecoomic impact on some units than others, and thus interferes less with investment-backed expectations. Indeed, one study Plaintiffs cite, *id.* ¶ 98, found that rent for 19% of regulated units is higher than for comparable, unregulated units, and another 11% have less than a 10% discount from comparable unregulated units, including 42% of regulated units in the Bronx.[8] As in *Dinkins*, "[t]he RSA implicitly concedes, as it must, that the Rent Law has not abridged the constitutional rights of those landlords who *do* obtain an adequate return from the annual rent increases." 5 F.3d at 595.

The RSL also contains a hardship exception allowing landlords to increase rents if their operating expenses equal or exceed 95% of their gross rental income. N.Y. Unconsol. Law § 26-511(c)(6-a). This exception limits the RSL's economic impact and protects landlords' reasonable investment-backed expectations. Plaintiffs' allegations that the exemption is ineffective in practice, Compl. ¶¶ 332–50, do not save their facial challenge. The only question is "whether the 'mere

---

[8] *See* Citizens Budget Commission, *Rent Regulation: Beyond the Rhetoric*, at 11, https://cbcny.org/sites/default/files/REPORT_RentReg_06022010.pdf (cited in Compl. ¶ 98).

enactment' of the [RSL] constitutes a taking." *Hodel*, 452 U.S. at 295. As in *Dinkins*, "the RSA alleges that of the 'many' landlords who do not obtain an adequate return, only certain subgroups are unable to secure constitutionally adequate relief under the hardship provisions." 5 F.3d at 595.

Plaintiffs allege the 2011, 2015, and 2019 amendments abrogated landlords' ability to re- alize a reasonable return on their investment. Compl. ¶¶ 305, 308–31. But landlords who pur- chased regulated units *after* these regulations were passed received a corresponding discount. *See Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010). Moreover, the extent to which these amendments affected expectations for any individual unit varies widely. The impact of elim- inating vacancy increases, preferential rent increases, high-income decontrol provisions, and in- creases for IAIs differs by unit depending on how preferential the rent is, how likely the unit is to become vacant, and how much improvement it needs. Thus, by Plaintiffs' own admission, the RSL has not materially interfered with *all* landlords' reasonable, investment-backed expectations.

### B.    Plaintiffs' Regulatory Taking Claim Fails on the Merits

Again, Plaintiffs' claim would still fail even if they had brought an as-applied challenge on behalf of an individual landlord as the law requires.

### 1.    The Second Circuit Has Held that the Largely Identical 1996 RSL Did Not Effect a Regulatory Taking

In 1996, the Second Circuit held the RSL did not effect a regulatory taking of the property at issue, emphasizing that, although the landlord "will not profit as much as it would under a mar- ket-based system, it may still rent apartments and collect the regulated rents." *FHL*, 83 F.3d at 48. "Rent stabilization [therefore] does not deprive [landlords] of economically viable use of the prop- erty," and so is not a regulatory taking. *Id.*

The vast majority of the provisions challenged here were in place in 1996. New York City has had rent controls and anti-eviction regulations since the 1940s. *See Tartaglia v. McLaughlin*,

79 N.E.2d 809, 810–12 (N.Y. 1948). The RSL's main provisions have been in place since the Rent Stabilization Law of 1969, which required both that owners offer below-market rates, subject to increases determined by the RGB, and that tenants be offered renewals in many cases. *See supra* at 2–4 Many other provisions have been in place since at least 1987, including the requirement that landlords offer renewals to tenants' family members, *see* 9 NYCRR § 2523.5limits on grounds for eviction, 9 NYCRR § 2524.3, and refusing to renew leases, *id.* § 2524.5; and the same subletting rights tenants had in 1996 and have now, *id.* § 2525.6.

### 2. The Current RSL Is Not a Regulatory Taking

The differences between the current RSL and the 1996 RSL upheld by the Second Circuit cannot render the entire RSL a regulatory taking, as confirmed by analysis of the three *Penn Central* factors—the economic impact of the regulation, its effect on reasonable investment-backed expectations, and the character of the government action. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123–28 (1978).

### a. Economic Impact of the Regulation

Plaintiffs estimate the RSL has, "at the extremes," caused some regulated buildings to be valued at "two-thirds less" than unregulated buildings. Compl. ¶ 298. Plaintiffs also allege that, following the 2019 amendments, some "owners of portfolios of stabilized units . . . are reducing the booked value of those assets by 20-30 percent." *Id.* ¶ 331. Supreme Court precedent has "long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (approximately 75% diminution in value) and *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5% diminution)). Courts have therefore rejected regulatory taking challenges to government action that diminished property value even more significantly than the RSL allegedly

17

does here. *See MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (81%); *Pulte Home Corp. v. Montgomery Cty.*, 909 F.3d 685, 696 (4th Cir. 2018) (83%); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348 (Fed. Cir. 2004) (92%).

Plaintiffs also allege the median stabilized rent in New York is "approximately 25% less" than for non-regulated units, Compl. ¶ 286, and rent increases have not kept pace with average costs, *id.* ¶¶ 287–93. But "the inability of [owners] to receive a reasonable return on their investment by itself does not, as a matter of law, amount to an unconstitutional taking." *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 138 (2d Cir. 1984). And the RSL's hardship exception, N.Y. Unconsol. Law § 26-511(c)(6-a), prevents the RSL from having too burdensome an economic impact. *See Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121, 127 (1st Cir. 2009) ("[T]he potentially harsh economic consequences . . . are ameliorated somewhat by the statutory defense to enforcement . . . against hospitals whose 'economic viability . . . would be jeopardized by compliance.'").

Moreover, the 2019 amendments do not materially change the RSL's economic impact as compared with the 1996 RSL, which likewise restricted rents and bases for deregulation. The statutory vacancy allowance and longevity increase, Compl. ¶¶ 309–11, were passed in 1997, *id.* ¶¶ 59(a), (b), and preferential rent increases, *id.* ¶¶ 312–15, began in 2003, L. 2003, ch. 82. Their 2019 repeal simply returned the law to its 1996 state, which the Second Circuit upheld as constitutional. *FHL*, 83 F.3d at 48. Plaintiffs point to the elimination of high-income and vacancy deregulation, Compl. ¶ 316, but allege that in 2016 only 146 units qualified for the former, *id.* ¶ 265, and only ".005%" of all units for the latter, *id.* ¶ 266. And reducing by a few points the percentage of IAI costs that can be passed to tenants every month, and increasing by a few years the minimum amortization period for MCIs, *id.* ¶¶ 317–27, does not significantly alter the RSL's overall economic impact, particularly given the hardship exception.

18

**b.     Interference with Investment-Backed Expectations**

Plaintiffs allege the RSL interferes with investment-backed expectations for the same reason it causes an economic impact.  Compl. ¶ 12.  But if the RSL has in fact reduced a unit's value, then that discount was reflected in the purchase price.  Other landlords affirmatively opted into rent stabilization in exchange for tax benefits.  *See* N.Y. Real Prop. Tax Law § 421-a.  While knowingly purchasing a property subject to a regulatory burden does not *per se* preclude a regulatory taking, it does limit interference with investment-backed expectations.  *See Guggenheim*, 638 F.3d at 1120.  Even assuming fewer units were purchased after recent amendments, the scope of those changes pales against the scope of the provisions in place for decades.  Plaintiffs cannot plausibly allege that all landlords who purchased rent stabilized units paid more in reliance on a belief that marginal regulations, such as the terms of the IAI and MCI, would not change.  Plaintiffs do not seek restoration of investment-backed expectations.  They seek a windfall.

Separately, the RSL "does not interfere with what must be regarded as [Plaintiffs'] primary expectation concerning the use of the parcel."  *Penn Cent.*, 438 U.S. at 136; *see also Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1189–90 (9th Cir. 2012).  Landlords purchased regulated units planning to rent them to residential tenants.  The RSL does not prevent that use.

**c.     Character of the Governmental Action**

The fundamental character of the RSL has not changed since 1996.  It has the same purpose, realized in largely the same way, to largely the same effect.

Plaintiffs focus on *Santiago-Monteverde v. Pereira*, *see* Compl. ¶¶ 12, 52, 352–54, in which the court held a rent-stabilized lease was a public assistance benefit exempt from a bankruptcy estate, 22 N.E.3d 1012, 1015 (N.Y. 2014).  Plaintiffs argue this shows that the RSL forces "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  Compl. ¶¶ 12, 354.

This argument fails. "Legislation designed to promote the general welfare commonly burdens some more than others." *Penn Cent.*, 438 U.S. at 133. In *Penn Central*, for example, the landmarking law directly burdened only the owners of landmarked buildings, yet was not a taking. *Id.* The Supreme Court distinguished between (1) discriminatory laws that "single[] out a particular parcel for different, less favorable treatment than the neighboring ones," which are more likely to be considered takings, and (2) "land-use control as part of some comprehensive plan," which is less likely to be a taking. *Id.* at 132. The landmarking law fell into the second category because it applied general criteria to impose burdens equally across many property owners, subjecting "over 400 landmarks and 31 historic districts" to the law's limits. *Id.*

The RSL applies to nearly one million apartments throughout the city, Compl. ¶ 1, so its burdens are shared across many more people than the landmarking law. *See Sadowsky*, 732 F.2d at 318–19 (regulation restricting conversion of land "applies to all purchasers in plaintiffs' position" and advanced "living and doing business in a civilized community" (quoting *Andrus v. Allard*, 444 U.S. 51, 67 (1979))). And even taking as true Plaintiffs' allegations that the RSL has decreased property tax revenue, Compl. ¶¶ 154–55, 364, that impact on tax coffers would be borne by the public as a whole.

Moreover, Plaintiffs cannot plausibly allege they "do not receive any reciprocal benefits from the RSL program." *Id.* ¶ 355. The RSL facilitates housing for those who otherwise could not afford to live in New York City. Many of these people provide other New Yorkers with vital but undercompensated services. Many would otherwise experience homelessness, contributing to widespread public health and safety problems. All help create a more diverse community, producing intangible benefits for all New Yorkers. Landlords living in New York receive those benefits, and landlords of unregulated New York property (or regulated property with market values

20

below regulated rents) can charge more because of the increased demand for New York real estate that these community benefits allow.

Plaintiffs dismiss these benefits as "in no way approximat[ing] the losses borne solely by regulated owners." *Id.* ¶ 356. That argument is foreclosed by *Penn Central.* There, where far fewer property owners were burdened, the Supreme Court was "unwilling" to "reject the judgment of the New York City Council" that the landmark law "benefits all New York citizens . . . , both economically and by improving the quality of life in the city as a whole." *Penn Central*, 438 U.S. at 134. It therefore could not "conclude that the owners of [Grand Central] Terminal have in no sense benefited from the Landmarks Law." *Id.* at 135. The same applies to the RSL.

Finally, the *Penn Central* Court also noted that a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* at 124 (citation omitted). Contrary to Plaintiffs' allegations, Compl. ¶ 359, the RSL does not effect a physical invasion. *See supra* at 9–13. It governs the landlord-tenant relationship into which landlords willingly entered, placing economic burdens on landlords for the common good. *See W. 95 Hous. Corp.*, 31 F. App'x at 21 (holding "the RSL regulates land use rather than effecting a physical occupation"); *MHC Fin.*, 714 F.3d at 1128.

The Second Circuit has squarely rejected the argument "that application of the Rent Stabilization Law constitutes a regulatory taking." *FHL*, 83 F.3d at 48. Neither the applicable law nor the relevant facts have changed. Plaintiffs' takings claims should be dismissed.

## III.   Plaintiffs' Substantive Due Process Claim Should Be Dismissed

### A.   Plaintiffs Fail to State a Facial Substantive Due Process Claim

Plaintiffs' facial substantive due process attack fails. To state a due process claim, plaintiffs must allege they have been "deprive[d]" of property without due process of law. U.S. Const.

amend. XIV § 1.  The *Dinkins* plaintiffs, including the RSA, brought a facial due process challenge

based on the RSL's purported deprivation of their right to an adequate return on their investment,

and the Second Circuit rejected that claim.  *Dinkins*, 5 F.3d at 597.  "The determination in a par-

ticular case that a landlord has been arbitrarily deprived of this property interest in a constitution-

ally adequate return will depend on the same individualized economic and financial data on which

the takings analysis would depend."  *Id.*  That "'many' landlords arbitrarily may be deprived of a

property interest is not to say that *all* landlords will be deprived."  *Id.*  The same is true here.

Indeed, because market rents for many regulated homes are less than the maximum permissible

regulated rate, many landlords have not been deprived of market rents.  *See supra* n.8 (report cited

in Compl. ¶ 98).  Because the RSL has not deprived these landlords of any property, and so is

constitutional as applied to them, Plaintiffs' facial substantive due process challenge must fail.

### B.      Plaintiffs' Substantive Due Process Claim Fails on the Merits

Even if Plaintiffs had brought an as-applied challenge on behalf of landlords who receive

below-market rents, their substantive due process claim would still fail because the RSL does not

"interfere with fundamental rights or single out suspect classifications" and is "rationally related

to a legitimate state interest."  *Beatie v. City of New York*, 123 F.3d 707, 711 (2d Cir. 1997)

(quotation marks omitted).[9]  Plaintiffs do not contest the legitimacy of the RSL's purpose, nor

---

[9] Plaintiffs allege in passing that strict scrutiny applies because they have a fundamental right to free market rent, Compl. ¶¶ 70, 374, contrary to countless Supreme Court rulings rejecting pre-New Deal decisions based "on fundamentally false factual assumptions about the capacity of a relatively unregulated market to satisfy minimal levels of human welfare," *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 861–62 (1992) (describing rise and fall of *Lochner* era).  "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."  *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).  It is equally "well established" that courts apply rational basis review when "determining whether a state price-control regulation is constitutional under the Due Process Clause."  *Pennell*, 485 U.S. at 11.

could they. *See Pennell*, 485 U.S. at 13 ("[W]e have long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare."). To succeed, Plaintiffs "must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Beatie*, 123 F.3d at 712 (quotation marks omitted).

This is impossible. Plaintiffs must "negative every conceivable basis which might support" the RSL, "whether or not the basis has a foundation in the record," and the government "has no obligation to produce evidence to sustain the rationality" of its laws. *Heller v. Doe*, 509 U.S. 312, 320–21 (1993) (quotation marks omitted). "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Id.* at 321. Legislative choices "may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 315 (1993); *see also Beatie*, 123 F.3d at 713 (neither "a lack of direct empirical support for the [legislature's] assumption" nor "the existence of a scientific dispute" could "rebut the presumption that the statute has a rational basis"). The legislature's actual motivation and the legislation's empirical effects are irrelevant to whether "any reasonably conceivable state of facts . . . could provide a rational basis" for the legislation. *Heller*, 509 U.S. at 320; *see also U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980); *Beatie*, 123 F.3d at 712. "[D]iscovery," therefore, "is not a necessary predicate for this determination." *Balentine v. Tremblay*, 5:11-cv-196, 2012 WL 1999859, at *11 (D. Vt. June 4, 2012); *see also All. of Auto. Mfrs., Inc. v. Currey*, 610 F. App'x 10, 14 (2d Cir. 2015).

The Supreme Court recently underscored the need for deference to the legislature. In *Lingle*, the Court held that a court should not "choose between the views of two opposing economists" or otherwise apply "heightened scrutiny" in adjudicating a substantive due process

challenge to an economic regulation, but must "defer[] to legislative judgments about the need for, and likely effectiveness of, regulatory actions." 544 U.S. at 544–45.

The New York City Council found first in 1969 and most recently in 2018 that many landlords were "demanding exorbitant and unconscionable rent increases," thereby causing "severe hardship to tenants." Admin. Code §§ 26-501, 502); *see also* Compl. ¶¶ 80–81, 84 (testimony from 2018 hearing. Thus, the RSL limits how much landlords can increase rents. In 2019, the state legislature found that "tenants struggle to secure safe, affordable housing, and landlords ha[d] little incentive to keep tenants in place long term by offering consistently low rent increases." Sponsor's Mem., Bill Jacket, L. 2019, ch. 36. In response, the legislature limited the ways units could become deregulated and the reasons landlords could increase rents.

The Court need go no further. Lowering rents, limiting reasons landlords can charge more than regulated rent, and preventing deregulation are plainly related to keeping rents low and tenants in their homes. "The evidence presented by the [landlords] may cast some doubt on the wisdom of the statute, but it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124 (1978) (quotation marks omitted). Because there is a clear connection between the legislature's purpose and the RSL, it does not matter if Plaintiffs' allegations about its efficacy or means-end fit are correct. Compl. ¶¶ 84–166. Allowing this case to proceed to trial would embroil this Court in exactly the superlegislative activity the Supreme Court rejects.

Plaintiffs' claim that the City had no rational basis to extend the RSL in 2018, *id.* ¶¶ 167–192, fails for the same reason—the legislature decides whether there is an emergency justifying continued rent stabilization, not the courts. Plaintiffs' complaint that the City did not sufficiently

explain why there is an emergency, *id.* ¶¶ 189–90, is both incorrect, *see* Admin. Code § 26-502, and irrelevant, as *Plaintiffs* must show that no conceivable justification exists, *Heller*, 509 U.S. at 320–21. And Plaintiffs' insistence that there is no defense for the specific 5% vacancy cutoff, Compl. ¶¶ 191–92, fails because "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations." *Heller*, 509 U.S. at 321 (quotation marks omitted).

The City Council considered extensive testimony before renewing the RSL in 2019. Compl. ¶¶ 176, 180–83, 187. Most of this testimony favored renewal, *id.* ¶ 187, which only confirms the RSL is reasonably related to its legitimate ends. But some was opposed, including CHIP's and the RSA's. *Id.* ¶ 177. Having failed before the legislature, CHIP and the RSA now ask this Court to reconsider all the evidence the democratically-elected City Council heard in 2018, 2015, and 2012, and impose their preferred policy outcome on all New Yorkers.

As Justice Holmes wrote, the "Constitution is not intended to embody a particular economic theory . . . of laissez faire," much less "an economic theory which a large part of the country does not entertain." *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J. dissenting). Since then, the Court has "emphatically refuse[d] to go back to the time when courts used the Due Process Clause to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Ferguson v. Skrupa*, 372 U.S. 726, 731–32 (1963) (quotation marks omitted). Plaintiffs' substantive due process claim should be dismissed.

Dated:   New York, NY
        November 1, 2019

                                      Respectfully submitted,

                                        SELENDY & GAY PLLC

By:

                                        Sean Baldwin
                                        Caitlin Halligan
                                        Thad Eagles (*pro hac vice*)
                                        SELENDY & GAY, PLLC
                                        1290 Avenue of the Americas
                                        New York, NY  10104
                                        Tel: 212-390-9000
                                        sbaldwin@selendygay.com
                                        challigan@selendygay.com
                                        teagles@selendygay.com

                                        Edward Josephson
                                        Pavita Krishnaswamy
                                        Directors of Litigation
                                        Legal Services NYC
                                        105 Court Street, 4th floor
                                        Brooklyn, NY 11201
                                        (718)237-5538
                                        ejosephson@lsnyc.org
                                        pkrishnaswamy@lsnyc.org

                                        Judith Goldiner
                                        Attorney in Charge
                                        Civil Law Reform Unit
                                        Ellen Davidson, of counsel
                                        The Legal Aid Society
                                        199 Water St., 3rd Floor
                                        New York, N.Y. 10038
                                        (212)577-3332
                                        JGoldiner@legal-aid.org

                                        *Attorneys for Intervenors Tenants and Neighbors, Community Voices Heard, and Coalition for the Homeless*

26