UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

COMMUNITY HOUSING IMPROVEMENT PROGRAM,
RENT STABILIZATION ASSOCIATION OF N.Y.C.,
INC., CONSTANCE NUGENT-MILLER, MYCAK
ASSOCIATES LLC, VERMYCK LLC, M&G MYCAK
LLC, CINDY REALTY LLC, DANIELLE REALTY LLC,
FOREST REALTY, LLC,

                Plaintiffs,

      v.

CITY OF NEW YORK, RENT GUIDELINES BOARD,
DAVID REISS, CECILIA JOZA, ALEX SCHWARZ,
GERMAN TEJEDA, MAY YU, PATTI STONE, J. SCOTT
WALSH, LEAH GOODRIDGE, AND SHEILA GARCIA,
IN THEIR OFFICIAL CAPACITIES AS CHAIR AND
MEMBERS, RESPECTIVELY, OF THE RENT
GUIDELINES BOARD, AND RUTHANNE
VISNAUSKAS, IN HER OFFICIAL CAPACITY AS
COMMISSIONER OF NEW YORK STATE HOMES AND
COMMUNITY RENEWAL, DIVISION OF HOUSING
AND COMMUNITY RENEWAL,

                Defendants.

Case No. 19-cv-4087 (EK)
(RLM)

## REPLY MEMORANDUM OF LAW IN SUPPORT OF INTERVENORS' MOTION TO DISMISS

Date: February 7, 2020

Sean Baldwin
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
sbaldwin@selendygay.com

*Attorney for Intervenors Tenants and
Neighbors, Community Voices Heard, and
Coalition for the Homeless*

Pages

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...........................................................................................................2

I.      Plaintiffs' Physical Taking Claim Should Be Dismissed ....................................2

        A.      The RSL Does Not Effect a Physical Taking Because It Does Not Compel
                Physical Occupation...............................................................................3

        B.      The RSL Does Not Effect a Physical Taking Because It Contains Many
                Avenues for Property Owners to Stop Being Landlords ........................5

II.     Plaintiffs' Regulatory Taking Claim Should Be Dismissed ...............................8

        A.      Plaintiffs Do Not Address Clear Second Circuit Precedent That Forecloses
                Their Facial Regulatory Taking Claim ...................................................9

        B.      Plaintiffs Rely on Justice Scalia's Dissent in *Pennell*, Which the Supreme
                Court Has Since Unanimously Rejected...................................................9

        C.      Plaintiffs' Analysis of the Regulatory Taking Factors Is Contrary to Clear,
                Controlling Precedent ..........................................................................12

III.    Plaintiffs' Substantive Due Process Claim Should Be Dismissed...................14

        A.      Plaintiffs Fail to Distinguish Second Circuit Precedent That Dooms Their
                Facial Substantive Due Process Claim ..................................................15

        B.      The Requirement and Finding of a "Housing Emergency" Are Irrelevant
                to the Substantive Due Process Analysis ..............................................15

        C.      Rational Basis Review Applies to Plaintiffs' Challenge ........................16

        D.      Under Rational Basis Review, Plaintiffs Must Negate Every Plausible
                Basis for the RSL, Regardless of Any Purported Expert Empirical
                Analyses ...............................................................................................18

        E.      The RSL Easily Survives Rational Basis Review....................................18

CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Adkins v. Children's Hosp. of the D.C.*,
    261 U.S. 525 (1923) ........................................................................................ 11

*Beatie v. City of New York*,
    123 F.3d 707 (2d Cir. 1997) ........................................................................... 18

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
    438 U.S. 59 (1978) .......................................................................................... 16

*Exxon Corp. v. Governor of Maryland*,
    437 U.S. 117 (1978) ........................................................................................ 20

*FCC v. Beach Comms., Inc.*,
    508 U.S. 307 (1993) ........................................................................................ 20

*FCC v. Florida Power Corp.*,
    480 U.S. 245 (1987) ..................................................................................... 4, 5

*Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*,
    83 F.3d 45 (2d Cir. 1996) ......................................................................... 5, 9, 13

*First English Evangelical Lutheran Church of Glendale v. Los Angeles County.*,
    482 U.S. 304 (1987) ........................................................................................ 11

*Guggenheim v. City of Goleta*,
    638 F.3d 1111 (9th Cir. 2010) ........................................................................ 13

*Harmon v. Markus*,
    412 F. App'x 420 (2d Cir. 2011) ................................................................... 6, 7

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
    452 U.S. 264 ................................................................................................... 12

*Horne v. Dep't of Agric.*,
    135 S. Ct. 2419 (2015) ..................................................................................... 4

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005) ................................................... 10, 11, 12, 13, 14, 17, 18

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) ................................................................................... 4, 5, 7

*MHC Fin. Ltd. P'ship v. City of San Rafael*,
    714 F.3d 1118 (9th Cir. 2013) ...................................................... 13

*Murr v. Wisconsin*,
    137 S. Ct. 1933 (2017) ................................................................ 13

*Nebbia v. People of New York*,
    291 U.S. 502 (1934) .................................................................... 20

*Nollan v. Cal. Coastal Comm'n*,
    483 U.S. 825 (1987) ...................................................................... 8

*Orange Lake Assocs., Inc. v. Kirkpatrick*,
    21 F.3d 1214 (2d Cir. 1994) ...................................................... 17

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001) ...................................................................... 4

*Penn. Cent. Transp. Co. v. New York City*,
    438 U.S. 104 (1978) .................................................................... 12

*Penn. Coal Co. v. Mahon*,
    260 U.S. 393 (1922) ...................................................................... 8

*Pennell v. City of San Jose*,
    485 U.S. 1 (1988) ................................................ 9, 10, 11, 17, 19

*Rent Stabilization Ass'n of N.Y.C. v. Higgins*,
    630 N.E.2d 626 (N.Y. 1993) ............................................ 3, 6, 19

*Rent Stabilization Ass'n of the City of New York v. Dinkins*,
    5 F.3d 591 (2d Cir. 1993) ...................................................... 9, 15

*Schnuck v. City of Santa Monica*,
    935 F.2d 171 (9th Cir. 1991) .................................................... 19

*Sensational Smiles, LLC v. Mullen*,
    793 F.3d 281 (2d Cir. 2015) ...................................................... 16

*Southview Assocs. Ltd. v. Bongartz*,
    980 F.2d 84 (2d Cir. 1992) .......................................................... 7

*United States v. Causby*,
    328 U.S. 256 (1946) ...................................................................... 8

*Village of Euclid v. Ambler Realty Co.*,
    272 U.S. 365 (1926) .................................................................... 17

*W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*,
    31 F. App'x 19 (2d Cir. 2002) ....................................................... 9, 14

*W. Coast Hotel Co. v. Parrish*,
    300 U.S. 379 (1937)........................................................................ 11, 20

*Wash. State Grange v. Wash. State Repub. Party*,
    552 U.S. 442 (2008)............................................................................ 4, 8

*Winston v. City of Syracuse*,
    887 F.3d 553 (2d Cir. 2018)..................................................................... 4

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)................................................................... 3, 4, 5, 7

**Statutes**

N.Y. Unconsol. Law § 8622 ...................................................... 18, 19

**Rules**

9 NYCCR § 2522.4.................................................................... 12

**Other Authorities**

Admin. Code § 26-510(b)............................................................. 13

Admin. Code § 26-511(c)(6)........................................................ 12

## PRELIMINARY STATEMENT

Plaintiffs have a radical goal, which they seek to achieve by radical means. Plaintiffs ask this Court to unravel decades of carefully crafted legislation and regulation, erase a principal source of affordable housing in an increasingly expensive city, and displace millions from their homes. They ask the Court to trigger this earthquake by rejecting binding precedent and resurrecting the long-dead practice of second-guessing the merits of legislative economic judgments. Like every court before it, this Court should reject this invitation and dismiss the Complaint.

Plaintiffs offer no response to the Second Circuit and Supreme Court precedent that squarely forecloses their claims. They allege that the RSL compels physical occupation of every regulated unit in the city. But the Second Circuit has already twice held that it does not. More generally, the Supreme Court has held that regulating the landlord-tenant relationship does not *compel* physical occupation because landlords *invite* tenants to physically occupy their property. Rent regulations simply govern the contours of the occupation landlords not only accept, but affirmatively seek out. Separately, the RSL contains numerous avenues for landlords to stop renting their apartments if they wish. Plaintiffs do not claim that those avenues allow *no* property owner to stop being a landlord, so their facial physical taking challenge fails. These exit options also mean tenants' occupation is not perpetual or absolute, and so is not a *per se* taking, but is instead subject to the balancing test of regulatory taking analysis. Whether those avenues are insufficient for some outlier landlords who genuinely wish to change the use of their property (not just circumvent legitimate regulation) is a question for concrete, as-applied, regulatory taking challenges. Plaintiffs raise no such challenge, so their physical taking claim fails.

Plaintiffs next argue that the RSL is a regulatory taking—the functional equivalent of government appropriation—in every possible instance. But the Second Circuit has already twice held that it is not. Unsurprisingly, application of the *Penn Central* factors confirms that result.

Plaintiffs do not contest that the market rent of many regulated units is lower than the maximum permissible rent under the RSL, so the economic effect on those units is minimal. They do not contest that the purchase price landlords paid for regulated units was discounted because the units were subject to the RSL, so the RSL does not significantly interfere with investment-backed expectations. And they do not contest that the RSL is a comprehensive land-use plan affecting nearly a million units, which cuts heavily against finding a regulatory taking. Instead, Plaintiffs claim that the RSL's purported purpose and method—to impose a price control to help the poor—is impermissible. Plaintiffs are incorrect. The RSL's purpose is to prevent tenant dislocation and avoid oppressive rent increases, and price controls to help the poor are perfectly permissible. But, more importantly, the Supreme Court has squarely held that inquiries into the validity of the government's motive have no place in takings analysis. Plaintiffs' regulatory taking challenge fails.

Finally, Plaintiffs argue that the RSL violates their substantive due process rights. This facial claim also fails because at least some landlords have not been deprived of any significant property interest. It also fails because the RSL's means are rationally related to its ends. Plaintiffs declare that their right to unregulated rent is fundamental and triggers strict scrutiny. There is a mountain of precedent to the contrary. And stabilized rents are plainly related to the concededly legitimate goal of keeping tenants in their homes. Plaintiffs' due process claim thus also fails.

## ARGUMENT

### I.    Plaintiffs' Physical Taking Claim Should Be Dismissed

Plaintiffs' facial physical taking claim fails. First, *compelled* physical occupation or seizure is a necessary (though insufficient) element of a physical taking claim. As the Supreme Court and Second Circuit have repeatedly recognized, landlords invite physical occupation when they become landlords, and regulations like the RSL simply govern the terms of that occupation. Second, the RSL contains numerous avenues for property owners to stop being landlords, meaning

tenants no longer physically occupy the regulated units. Landlords who take advantage of these options have not experienced a physical taking, which is fatal to Plaintiffs' facial claim. Moreover, these exit options mean any physical occupation that the RSL does impose is not absolute, so challenges to that occupation can be decided only under the regulatory takings rubric.

A.      **The RSL Does Not Effect a Physical Taking Because It Does Not Compel Physical Occupation**

"The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992). When landlords open their property to tenants, they invite physical occupation. *Id.* at 528 ("Petitioners' tenants were invited by petitioners, not forced upon them by the government."). The government does not *compel* physical occupation by regulating the terms of tenancies that landlords sought out. *Id.* at 529 ("When a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge or require the landowner to accept tenants he does not like without automatically having to pay compensation.") (citations omitted). "It is the forced occupation, not the identities of the new tenants or the terms of the leases, which deprives the owners of their possessory interests and results in physical takings." *Rent Stabilization Ass'n of N.Y.C. v. Higgins*, 630 N.E.2d 626, 633 (N.Y. 1993) (alterations and citations omitted).

Put another way, a regulation definitively cannot *compel* physical occupation if the same type of physical occupation would continue even absent the regulation.[1] Landlords want to rent their property to tenants—that is why they are landlords. And if a landlord would continue to invite tenants to physically occupy the apartment absent the RSL, then the RSL does not compel the physical occupation of that apartment. That is the case for almost every regulated unit. The

_____

[1] As discussed below, even compelled physical occupations do not effect physical takings if the occupation is not absolute, in which case the action is subject to review only as a regulatory taking.

RSL therefore cannot effect a physical taking in almost any application, much less every application, as is required for a successful facial challenge. *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449 (2008).[2]

To avoid this clear result, Plaintiffs rely on the Supreme Court's rejection of a so-called "acquiescence" defense that Intervenors do not assert. *See* Opp. 19, 25 n.11, 29–31 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), *Horne v. Dep't of Agric.*, 135 S. Ct. 2419 (2015), and *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)). Intervenors do not argue that landlords who purchased regulated units knowing they were regulated can *never* challenge those regulations, or that conditioning market participation on accepting otherwise unwelcome physical seizures could *never* constitute a taking. We argue—as the Supreme Court has held—that landlords willingly accept tenants' physical occupation of apartments they rent, so that physical occupation is not compelled. But for the challenged regulations, the *Loretto* plaintiffs would not have had cable boxes on their roofs nor would the *Horne* plaintiffs have turned over their grape crops to the government. Here, by contrast, landlords welcomed tenants into their apartments when they became landlords; the RSL did not force them to accept occupation by third parties.

The correct analogy, therefore, is not *Loretto* or *Horne*, but *FCC v. Florida Power Corp.*, 480 U.S. 245 (1987), and *Yee* itself. In *Florida Power*, the Supreme Court explicitly distinguished *Loretto* and held that federal price controls limiting "the rents charged by public utility landlords who have voluntarily entered into leases with cable company tenants renting space on utility poles"

---

[2] Plaintiffs cobble together dicta and decades-old concurrences to suggest a different standard. Opp. 31 n.15. But the law is that "a plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State*, 552 U.S. at 449 (alterations and quotation marks omitted); *accord Winston v. City of Syracuse*, 887 F.3d 553, 559 (2d Cir. 2018). In any event, Plaintiffs' facial claims fail even under their invented standard because they cannot plausibly allege that the RSL is unconstitutional in even a "large fraction of cases." Opp. 31 n.15.

did not effect a physical taking because the price controls did not require landlords to rent that space against their will. *Id.* at 252. Likewise, in *Yee* the Supreme Court summarily rejected the landlords' reliance on the same *Loretto* footnote on which Plaintiffs now rely, Opp. 19, "because there has simply been no compelled physical occupation giving rise to a right to compensation that petitioners could have forfeited," *Yee*, 503 U.S. at 531–32. The same is true here.

The Second Circuit has already relied on *Yee* to hold that the RSL does not compel physical occupation and so does not effect a physical taking. *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal* ("*FHL*"), 83 F.3d 45, 47–48 (2d Cir. 1996). Plaintiffs do not cite *FHL* at all, much less distinguish it. And Plaintiffs allege that only *one* of the 290 regulated units they collectively own would not be physically occupied by tenants absent the RSL. Compl. ¶¶ 18–24, 229–31. Setting that unit aside—though certainly not conceding it has been taken—the RSL clearly does not effect a physical taking of the other 289 units that tenants would still occupy even if Plaintiffs succeed. As with the asserted "takings" in *Florida Power* and *Yee*, the RSL does not compel those landlords to rent their property; it just limits the rents they can charge and the reasons they can remove tenants.

If the RSL were repealed today, tenants would still occupy most if not all formerly regulated units. They would just be different, richer tenants, or the same tenants struggling to carry a heavier burden. Plaintiffs do not object to the physical occupation; they object to the democratically-enacted regulations governing the financial terms of that occupation. The absence of compelled physical occupation is fatal to their facial physical taking claim.

### B. The RSL Does Not Effect a Physical Taking Because It Contains Many Avenues for Property Owners to Stop Being Landlords

Plaintiffs' facial physical taking claim fails for the independent reason that the RSL provides numerous ways for landlords to stop renting their apartments, ending all physical occupation.

Plaintiffs admit that "the RSL does provide limited exceptions to the application of the statute." Opp. 31. The RSL does not require that landlords rent vacant units. Landlords can recover units for personal use, if there is an immediate and compelling necessity, and evict tenants who violate the terms of the lease or break the law. And they can, subject to certain conditions, withdraw their property from the market to use as a personal business or for rehabilitation, to demolish the building, or to convert it to condominiums. *See* Intervenor Br. 7–8; City Br. 24; State Br. 18–19.

The Second Circuit has already relied on these exit options to hold that the RSL does not effect a physical taking because, among other reasons, tenants' physical occupation is not perpetual. *Harmon v. Markus*, 412 F. App'x 420, 422 (2d Cir. 2011). The New York Court of Appeals has likewise rejected the assertion that the RSL "created perpetual tenancies" because the "right to evict an unsatisfactory tenant or convert rent-regulated property to other uses remains unaffected." *Higgins*, 630 N.E.2d at 632. Plaintiffs argue at length that, contrary to *Harmon*, the Court should ignore these means of recovering a rental unit because they are too burdensome in practice. Opp. 24–28.[3] But even if these exit options were as narrow as Plaintiffs claim, they would nonetheless preclude Plaintiffs' facial physical taking challenge for two reasons.

*First*, at least some landlords can take advantage of these paths to stop renting regulated units. Plaintiffs summarily assert that the RSL somehow effects a physical taking "even for owners who fall within one of the RSL's permitted exceptions." Opp. 31. That is both contrary to *Harmon* and makes no sense. When landlords recover regulated units from tenants, there is no longer any physical occupation. Without a physical occupation, there is no physical taking. The RSL

_____

[3] These recovery options are not materially narrower than they were in *Harmon*. Plaintiffs focus on the fact that the 2019 amendments limited landlords to recovery of a single unit for personal use, Opp. 24–26, but this change is irrelevant to all corporate landlords, whom the RSL never allowed to recover apartments for *personal* use, and all landlords who do not want to recover more than one unit, including the only individual Plaintiff in this case.

6

therefore has not effected a physical taking of those regulated units that have been or could be successfully removed from the rental market. That alone dooms Plaintiffs' facial claim.

Even if Plaintiffs had alleged that in practice *no* landlord can take advantage of these numerous exit options—which have not done and could not do—arguments premised on how the RSL functions in practice are not cognizable in a facial challenge. In *Yee*, the plaintiffs asserted that "the statutory procedure for changing the use of a mobile home park is in practice 'a kind of gauntlet,' in that they are not in fact free to change the use of their land." 503 U.S. at 528. But because the plaintiffs did "not claim to have run that gauntlet," the Court "confine[d] [itself] to the face of the statute." *Id.* Plaintiffs here likewise have not run the gauntlet, so the Court should confine its review to the face of the RSL, which has numerous exit options.

*Second*, these pathways to repossession mean the RSL does not impose "*absolute* exclusivity of . . . occupation" or "*absolute* deprivation of the owner's right to use and exclude others from the property." *Southview Assocs. Ltd. v. Bongartz*, 980 F.2d 84, 93 (2d Cir. 1992).[4] The Supreme Court has held that such conditional occupations are "subject to a more complex balancing process"—that is, regulatory taking analysis—"to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property." *Loretto*, 458 U.S. at 435 n.12; *see also Yee*, 503 U.S. at 527–28 (regulatory, not physical taking analysis applied because, among other reasons, the challenged law allowed park owners to eventually change the use of their land). The RSL provides many ways

---

[4] In response to *Southview*, Plaintiffs reason that the physical occupation here is absolute because when a unit is occupied owners cannot "post[] 'No Trespassing' signs," "construct alternative structures or use the unit for alternative purposes," or "access the tenant-occupied units." Opp. 24. But those limits are inherent in a landlord-tenant relationship, not imposed by the RSL. And if there are recovery options, as there are here, then there is no absolute occupation. *See Yee*, 503 U.S. at 527–28; *Harmon*, 412 F. App'x at 422.

for those few landlords who so desire to stop renting to tenants. Whether those options are insufficient and the RSL has gone "too far," *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922), is decided under the regulatory takings' rubric on a case-by-case basis.

Plaintiffs respond by attacking straw men. True, the government itself need not do the occupying to effect a physical taking. Opp. 23. But that is irrelevant here because, as discussed above, the government has not mandated any physical occupation on willing landlords. Yes, government-mandated easements might effect physical takings even if the actual physical occupation is intermittent. *Id.* (citing *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) and *United States v. Causby*, 328 U.S. 256 (1946)). That is also irrelevant. The takings in *Nollan* and *Causby* were absolute because the owners completely lost the right to exclusive occupation of that portion of their property in perpetuity. Unlike here, there was no built-in escape valve. And while a physical occupation need not last until the end of the universe to be a taking, *id.* at 24 n.10, temporary, qualified physical occupations are not *per se* takings.

Perhaps someone in New York City who owns a regulated unit wants to stop being a landlord, but for some reason will not take advantage of any of the many provisions giving them that option. That person is free to bring an as-applied, regulatory taking challenge, explain what they wish to do with the regulated unit, and argue the RSL excessively burdens their ability to do so. If such a landlord exists, then that will be a question for another day. But in a facial challenge, the Supreme Court has cautioned that courts should "be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State*, 552 U.S. at 449–50. The Court should therefore dismiss Plaintiffs' facial physical taking claim.

## II. Plaintiffs' Regulatory Taking Claim Should Be Dismissed

Plaintiffs' regulatory taking claim fares no better. Rather than address binding precedent holding that the RSL is not a regulatory taking, Plaintiffs bank on a three-decade-old dissent that

relied on a principle the Supreme Court later unanimously rejected. And rather than carefully evaluate the RSL's economic effects and impacts on investment-backed expectations—which vary widely across units—Plaintiffs ask the Court to rule on the propriety of the means the legislature selected to achieve its end, which is simply irrelevant to a challenge under the Takings Clause.

### A. Plaintiffs Do Not Address Clear Second Circuit Precedent That Forecloses Their Facial Regulatory Taking Claim

The Second Circuit's decisions in *FHL* and *Rent Stabilization Association of the City of New York v. Dinkins*, 5 F.3d 591 (2d Cir. 1993), directly foreclose Plaintiffs' facial regulatory taking claim. In *Dinkins*, the Second Circuit rejected a facial challenge to the RSL's hardship provision, holding that "the Rent Law has not abridged the constitutional rights of those landlords who *do* obtain an adequate return from the annual rent increases." 5 F.3d at 595. Likewise, the Second Circuit squarely held in *FHL* that the RSL in New York City does not effect a regulatory taking because, while landlords "will not profit as much as [they] would under a market-based system, [they] may still rent apartments and collect the regulated rents." 83 F.3d at 48; *see also W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002) (rejecting a facial regulatory taking attack on the RSL).

The RSL has changed at the margins since the Second Circuit decided *Dinkins* and *FHL*, but the fundamental characteristics about which Plaintiffs complain have not. Plaintiffs do not even mention these holdings (nor cite *FHL* at all), much less explain why they do not dispose of their facial regulatory taking claims. *FHL* and *Dinkins* control, and the Court need go no further.

### B. Plaintiffs Rely on Justice Scalia's Dissent in *Pennell*, Which the Supreme Court Has Since Unanimously Rejected

Rather than address these squarely controlling cases, Plaintiffs rely on Justice Scalia's partial dissent in *Pennell v. City of San Jose*, 485 U.S. 1 (1988), in which he claimed that the Takings Clause prohibits partial price controls to help the poor. Opp. 34–35. That dissent, of course, is

not the law.[5]  In fact, the Supreme Court has since rejected the fundamental legal premise of Justice Scalia's dissent, unanimously holding that the Takings Clause is not a vehicle for challenges to the propriety of government purposes.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005).

*Pennell* included a facial regulatory taking challenge to a rent control ordinance requiring a city agency to consider tenants' economic hardship when deciding whether to permit rent increases.  485 U.S. at 5.  The Court did not rule on that challenge, but Justice Scalia would have.  In dissent, Justice Scalia laid out the regulatory taking standard as it was in 1988: A law "effects a taking if [it] does not substantially advance legitimate state interests, or denies an owner economically viable use of his land."  *Id.* at 18 (Scalia, J., dissenting in relevant part) (quoting *Agins v. Tiburon*, 447 U.S. 255, 260–263 (1980) (alteration omitted)).  "The present challenge," he wrote, "is of the former sort."  *Id.*  He went on to contend that "reduction of a rent . . . may not, consistently with the Constitution, be based on consideration of . . . the hardship to the tenant" because landlords did not cause their tenants' poverty.  *Id.* at 21.  In other words, Justice Scalia believed this regulation effected a taking only because he thought it furthered an illegitimate state interest and so was simply impermissible under the Takings Clause.

But in 2005, the Supreme Court unanimously held that the validity of a regulation's purpose "is logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose."  *Lingle*, 544 U.S. at 543.  "[I]f a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process— that is the end of the inquiry.  No amount of compensation can authorize such action."  *Id.*  Contrary

---

[5] Even if it were, Justice Scalia admitted he could "understand how such a claim—that a law applicable to the plaintiffs is, root and branch, invalid—can be readily rejected on the merits, by merely noting that at least some of its applications may be lawful."  *Pennell*, 485 U.S at 16.

to Justice Scalia's position in *Pennell*, and Plaintiffs' position here, the Takings Clause does not prohibit certain government motives or classes of government action; it just requires compensation for "otherwise proper interference amounting to a taking." *Id.* (quoting *First English Evangelical Lutheran Church of Glendale v. Los Angeles County.*, 482 U.S. 304, 315 (1987)).**Error! Bookmark not defined.**[6]

Indeed, the *Pennell* dissent exemplifies why consideration of the validity of a government purpose is better left to due process and equal protection analysis. According to Justice Scalia, the constitutional problem was that the price controls only directly affected "*particular* landlords" rather than *all* landlords. *Pennell*, 485 U.S. at 21. The question, then, is whether the government had a permissible reason to distinguish between the two classes of property owners. Due process or equal protection analysis answers exactly this question.

To be sure, the arguments Plaintiffs now advance under the Takings Clause once regularly succeeded under the Due Process and Equal Protection Clauses. *See, e.g.*, *Adkins v. Children's Hosp. of the D.C.*, 261 U.S. 525, 562 (1923) (striking down minimum wage law, holding that "it amounts to a compulsory exaction from the employer for the support of a partially indigent person, for whose condition there rests upon him no peculiar responsibility, and therefore, in effect, arbitrarily shifts to his shoulders a burden which, if it belongs to anybody, belongs to society as a whole"). But courts have "long eschewed such heightened scrutiny when addressing substantive due process challenges to government regulation." *Lingle*, 544 U.S. at 545. Even Justice Scalia agreed that the substantive due process claims in *Pennell* should be dismissed. *Pennell*, 485 U.S. at 15 (Scalia, J., concurring); *see also W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 399 (1937)

---

[6] Justice Scalia signed on to *Lingle* and noted at oral argument that the Court would have to "eat crow" on this point. See Transcript of Oral Argument at 21, *Lingle*, 544 U.S. 528 (No. 04-163).

(overturning *Adkins* because the minimum wage was not "arbitrary or capricious"). "The reasons for deference to legislative judgments about the need for, and likely effectiveness of, regulatory actions are by now well established, and . . . no less applicable here." *Lingle*, 544 U.S. at 545.

### C. Plaintiffs' Analysis of the Regulatory Taking Factors Is Contrary to Clear, Controlling Precedent

The Supreme Court has held—and Plaintiffs concede, Opp. 41—that regulatory taking analysis involves "ad hoc, factual inquiries" that "must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295 (1981); *see also Penn. Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978).[7] This complex, multi-factor test is ill-suited for a facial challenge, and this one is no exception.

Plaintiffs do not contest that the market rents for many regulated apartments in New York City are below the applicable maximums under the RSL. Compl. ¶ 312. Nor do they allege that *no* landlord can recover the cost of necessary repairs by raising rents with tenant consent, for individual apartment improvements and major capital improvements, or through the RSL's hardship exception. *See* 9 NYCCR § 2522.4; Admin. Code § 26-511(c)(6). Instead, Plaintiffs continue to rely on alleged average economic effects and generalizations about investment-backed expectations. *See* Opp. 44–45. These averages and generalizations are irrelevant to a facial challenge, which requires that the law be unconstitutional in *every* application.

Even the averages Plaintiffs cite are insufficient to support a regulatory taking claim. Plaintiffs argue at length that they need not show that the RSL erases every single bit of each regulated

---

[7] The very definition of "ad hoc" makes clear this review is not compatible with a facial challenge. "Ad hoc" means "for the particular end or case at hand without consideration of wider application." *The Merriam-Webster.com Dictionary*, Merriam-Webster Inc., https://www.merriam-webster.com/dictionary/ad%20hoc.

property's value.  Opp. 36–41.  But regardless, regulatory takings must be "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain."  *Lingle*, 544 U.S. at 539.  Neither a 25% reduction in rental income nor a 50% reduction in property value is "functionally equivalent" to direct appropriation or ouster, which would leave a former property owner with nothing.  *See FHL*, 83 F.3d at 48.

Moreover, most landlords have not suffered the severe economic loss Plaintiffs claim.  Plaintiffs allege that the RSL has depressed property values, Compl. ¶¶ 295–99, meaning landlords who purchased regulated units paid less than they would have if the units were not regulated.  The RSL did not take anything from landlords who received this discount—they got exactly what they paid for.  And the RSL certainly does not meaningfully interfere with those landlords' reasonable investment-backed expectations.  *See Murr v. Wisconsin,* 137 S. Ct. 1933, 1949 (2017) ("Petitioners cannot claim that they reasonably expected to sell or develop their lots separately given the regulations which predated their acquisition of both lots."); *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120–21 (9th Cir. 2010); *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013).  The discounted purchase price reflects landlords' accurate expectation that the units would be subject to the RSL.

Last, the heart of Plaintiffs' economic effect argument is that permissible rent increases have been too small.  *See* Compl. ¶¶ 287–94, 306–07; Opp. 44–45.  But the RSL delegates the responsibility of determining rent increases to the Rent Guidelines Board ("RGB").  Admin. Code § 26-510(b).  The RGB is free to permit rent increases that even Plaintiffs would accept.  The RSL therefore is not unconstitutional in every application, even on the Plaintiffs' incorrect understanding of regulatory takings.  Plaintiffs' facial challenge to the entire statutory and regulatory regime cannot stand when their real complaint is with the RGB's narrow decisions.

Unable to show that the RSL has a universally severe economic impact on all regulated units or owners' reasonable investment-backed expectations, Plaintiffs put all their eggs in the "character of the government action" basket, repeating their claims that the RSL effects an across-the-board taking because it allegedly imposes physical occupation and benefits the poor at the expense of landlords.  Opp. 43.  But, as discussed above, "the RSL regulates land use rather than effecting a physical occupation," *W. 95 Hous. Corp.*, 31 F. App'x at 21, and the propriety of the government's purpose is evaluated under the due process framework, *Lingle*, 544 U.S. at 545. Plaintiffs cite no persuasive or binding authority for the proposition that the government's motive alone can turn a comprehensive land use scheme into a taking of properties that are only minimally affected.  The Court should therefore dismiss Plaintiffs' regulatory taking claim.

## III.     Plaintiffs' Substantive Due Process Claim Should Be Dismissed

Plaintiffs' substantive due process claim is likewise contrary to clear precedent.  The Second Circuit has held that the RSL is not susceptible to a facial due process challenge.  Even if it were, rational basis review would apply and be fatal.  Plaintiffs try to avoid rational basis review in three ways.  First, they ask the court to decide whether the State sufficiently defined "housing emergency" and whether the City sufficiently considered the relevant statutory elements.  Those questions are irrelevant to substantive due process.  Second, they contend that rational basis review does not apply because they have a fundamental right—like the right to privacy—to, for example, convert apartment buildings to condominiums.  Plaintiffs are wrong.  Third, Plaintiffs misstate the basics of rational basis review, asking the Court to substitute their economic beliefs for the legislature's.  The Court should reject that invitation and dismiss the due process claim.

### A.      Plaintiffs Fail to Distinguish Second Circuit Precedent That Dooms Their Facial Substantive Due Process Claim

In *Dinkins*, the Second Circuit rejected a substantive due process challenge to the RSL's rent limitations.  5 F.3d at 597.  That facial challenge was unsustainable because "[t]he determination in a particular case that a landlord has been arbitrarily deprived of this property interest in a constitutionally adequate return will depend on the same individualized economic and financial data on which the takings analysis would depend."  *Id.*  So too here.

Plaintiffs point out that the *Dinkins* plaintiffs challenged only the hardship provisions, while they challenge the entire RSL.  Opp. 18 n.8.  But the Second Circuit explicitly recognized that "the hardship provisions, *standing alone*, obviously cannot effect a taking because they do not limit a landlord's rent in the first instance. . . .  The RSA objects to the hardship provisions only because they are allegedly unable to remedy the confiscatory results of the basic provisions of the Rent Law and Rent Code."  *Dinkins*, 5 F.3d at 595.  This principle is equally applicable to the rest of Plaintiffs' challenge.  "Viewing a regulation that 'goes too far' as an invalid exercise of the police power, rather than as a 'taking' for which just compensation must be paid, does not resolve the difficult problem of how to define 'too far,'" and resolution of that question requires a fact-intensive analysis of the same individualized factors.  *Id.* at 597–98 (citation omitted).  It is therefore "plain that the RSA has failed to assert a facial challenge," *id.* at 597, and Plaintiffs' due process claim should be dismissed.  The Court need go no further.

### B.      The Requirement and Finding of a "Housing Emergency" Are Irrelevant to the Substantive Due Process Analysis

Even if Plaintiffs had properly alleged a facial challenge, it would fail on the merits.  Plaintiffs argue that the RSL somehow violates substantive due process because, when the State permitted localities to opt in to rent stabilization upon the finding of a "housing emergency," it did not define that term with enough specificity.  Opp. 8–9.  Plaintiffs complain that, absent a strict

definition of "emergency," "there is no benchmark against which courts can measure" the constitutionality of the City's determination. Opp. 8. But of course there is. It is the same benchmark used in any substantive due process challenge, and the same that courts would use if the State had imposed the RSL with no prerequisite findings at all: Does the RSL impede a fundamental right and, if not, is it rationally related to a conceivable legitimate state interest? *See, e.g.*, *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (describing the substantive due process inquiry). The statutory definition of "emergency" has nothing to do with that constitutional analysis. The Due Process Clause does not require that municipalities make *any* finding before exercising a broadly delegated right, much less the detailed finding that Plaintiffs demand. Plaintiffs cite not a single case to the contrary, nor could they.

Plaintiffs also contend that the City did not fulfill its statutory mandate to consider the relevant factors in deciding whether a "housing emergency" exists. *See* Opp. 9–10. They are incorrect. *See* City Br. at 13–19. But even if they were right, the City's purported failure to comply with state law would not offend the Due Process Clause, which asks only if the decision impinges on a fundamental right and is rationally related to a legitimate purpose. Plaintiffs' arguments about the emergency declaration are red herrings and do not save their due process claim.

## C. Rational Basis Review Applies to Plaintiffs' Challenge

"[E]conomic regulation—a legislative effort to structure and accommodate the burdens and benefits of economic life"—is presumed constitutional, and "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 83 (1978) (citation and quotation marks omitted). Plaintiffs proclaim that the RSL is not economic regulation, but instead infringes on ill-defined yet fundamental "property rights," and so is subject to strict scrutiny. Opp. 6, 16–17. This argument is frivolous.

The RSL is a classic "economic regulation" that is subject only to rational basis review. The landlord-tenant relationship is economic, and landlords are in the business of renting apartments. Moreover, since 1926, the Supreme Court has directed lower courts to apply rational basis review to zoning regulations that limit what real property owners can do with their land. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926) (zoning ordinances only unconstitutional if they "are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare"). And the Second Circuit has done so. *See, e.g.*, *Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1225 (2d Cir. 1994) ("There is nothing to indicate that the zoning ordinance in question here bears anything other than a rational relationship to a legitimate government objective."). The Supreme Court unanimously applied rational basis review to the rent regulation regime in *Pennell*. *See* 485 U.S. at 11; *id.* at 15 (Scalia, J., concurring). Plaintiffs do not explain why their challenge is different or cite a single authority suggesting that strict scrutiny is warranted.

Plaintiffs attempt to distinguish only *Lingle*, which they simply say is a takings case. Opp. 17. *Lingle* was a challenge to a law prohibiting, among other things, "oil companies from converting existing lessee-dealer stations to company-operated stations." *Lingle*, 544 U.S. at 533. The Supreme Court rejected that challenge and, as discussed above, clarified that whether the law "substantially advance[s] legitimate state interests" is irrelevant to takings analysis. *Id.* at 544. The court's reasoning was, in part, practical: "[H]eightened means-end review of virtually any regulation of private property . . . would require courts to scrutinize the efficacy of a vast array of state and federal regulations" and "to substitute their predictive judgments for those of elected legislatures and expert agencies." *Id.* at 544. To avoid that result, *Lingle* held that the Takings Clause would not allow a backdoor to heightened review that had been rejected in the due process

context. *Id.* at 545. If the Due Process Clause required heightened review of property regulations, as Plaintiffs contend, then *Lingle*'s holding would not solve the practical problem it identified. Thus, under clear Supreme Court precedent, the RSL is subject only to rational basis review.

**D.  Under Rational Basis Review, Plaintiffs Must Negate Every Plausible Basis for the RSL, Regardless of Any Purported Expert Empirical Analyses**

Plaintiffs next argue that rational basis review requires probing the actual effects of a law: "Defendants say that Plaintiffs, to prevail, must negate every conceivable basis for the RSL—whether based in speculation or record evidence, regardless of empirical effects . . . . Even rational basis review does not impose such an insurmountable burden." Opp. 15. But this is exactly the burden rational basis review imposes. "[W]hen reviewing challenged social legislation, a court must look for plausible reasons for legislative action, whether or not such reasons underlay the legislature's action." *Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997) (quotation marks and citation omitted). Challenged legislation survives even if "it may not succeed in bringing about the result it seeks to accomplish," or "the problem could have been better addressed in some other way," or "the statute's classifications lack razor-sharp precision," or "no empirical evidence supports the assumptions underlying the legislative choice." *Id.* Plaintiffs wish it were otherwise, but this is the law.

**E.  The RSL Easily Survives Rational Basis Review**

Plaintiffs accuse Intervenors of suggesting that it is "impossible" for any plaintiff to ever successfully challenge a law under rational basis review. Opp. 15. In fact, Intervenors argue only that it is impossible to successfully challenge *these* laws under rational basis review.

*First*, a reasonable legislator could believe that the RSL promotes neighborhood stability by helping tenants stay in their homes. *Cf.* N.Y. Unconsol. Law § 8622 (the RSL "prevent[s] uncertainty, hardship and dislocation" and "disruptive practices"). Plaintiffs claim this goal is

illegitimate but cite nothing to support that proposition. Opp. 14–15. In fact, the Supreme Court has squarely held that "reducing the costs of dislocation that might otherwise result if landlords were to charge rents to tenants that they could not afford" is a legitimate goal, noting that "the social costs of the dislocation of low-income tenants can be severe." *Pennell*, 485 U.S. at 14 n.8.

Preventing large rent increases and limiting the reasons landlords can remove tenants are plainly related to keeping current tenants in their homes and part of their communities. *See id.*; *Higgins*, 630 N.E.2d at 634 (finding a "close causal nexus" between the RSL and preventing "eviction and resulting vulnerability to homelessness"); *Schnuck v. City of Santa Monica*, 935 F.2d 171, 175 (9th Cir. 1991) (holding that "eviction limits protect tenants from the high cost of dislocation in a tight housing market"). Plaintiffs cite no reason to believe otherwise. For that reason alone, their substantive due process claim fails.

*Second*, a reasonable legislator could believe that that the RSL facilitates affordable housing in the face of a housing shortage. *Cf.* N.Y. Unconsol. Law § 8622 (citing "prevent[ing] speculative, unwarranted and abnormal increases in rents" resulting from "an acute shortage of housing accommodations caused by continued high demand" as a goal of the RSL); Sponsor's Mem., Bill Jacket, L.2019, ch. 36 (citing tenants' struggle "to secure safe, affordable housing"). Plaintiffs do not claim this is an illegitimate goal. *See* Opp. 7. Nor could they, as the Supreme Court has held that "preventing excessive and unreasonable rent increases caused by the growing shortage of and increasing demand for housing . . . is a legitimate exercise of police powers." *Pennell*, 485 U.S. at 12 (quotation marks and citations omitted).

Instead, Plaintiffs—and their amici—argue the counterintuitive point that requiring landlords to keep rents affordable and limiting the reasons landlords can remove tenants actually makes rents unaffordable and housing less accessible. *See* Opp. 11–14. Plaintiffs and the authority on

19

which they rely are wrong, but it does not matter. A "legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 315 (1993). It is at least rational to speculate that limiting rent increases and the reasons landlords can remove tenants will help facilitate access to housing by keeping regulated rents affordable and tenants in regulated units. In fact, governments across the country have concluded exactly that and imposed their own rent regulations.

Upset business owners have long asked courts to invalidate economic regulations that limited their profitability, claiming, perhaps even believing, that those regulations were ill-advised. But the *Lochner* era is long over, and for nearly the last hundred years, courts have consistently held that these protests should be directed to the legislature, not the judiciary. *See, e.g.*, *W. Coast Hotel Co.*, 300 U.S. at 399 ("Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the Legislature is entitled to its judgment."); *Nebbia v. People of New York*, 291 U.S. 502, 537 (1934) ("With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal."). In short, "it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124 (1978) (quotation marks omitted). Plaintiffs ignore these fundamental principles of constitutional law and ask the Court to do the same. Their due process claim, like their entire Complaint, should be dismissed.

## CONCLUSION

For the reasons stated above, and for those in the City's and State's briefs in support of their motions to dismiss, the Court should dismiss Plaintiffs' Complaint.

Dated:    New York, NY
          February 7, 2020

Respectfully submitted,

SELENDY & GAY PLLC

By:    _____
       Sean Baldwin
       Caitlin Halligan
       Thad Eagles
       SELENDY & GAY, PLLC
       1290 Avenue of the Americas
       New York, NY  10104
       Tel: 212-390-9000
       challigan@selendygay.com
       sbaldwin@selendygay.com
       teagles@selendygay.com

       Edward Josephson
       Pavita Krishnaswamy
       Directors of Litigation
       Legal Services NYC
       105 Court Street, 4th floor
       Brooklyn, NY 11201
       (718)237-5538
       ejosephson@lsnyc.org
       pkrishnaswamy@lsnyc.org

       Judith Goldiner
       Attorney in Charge
       Civil Law Reform Unit
       Ellen Davidson, of counsel
       The Legal Aid Society
       199 Water St., 3rd Floor
       New York, N.Y. 10038
       (212)577-3332
       JGoldiner@legal-aid.org

       *Attorneys for Intervenors Tenants and Neighbors,*
       *Community Voices Heard, and Coalition for the*
       *Homeless*