UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

COMMUNITY HOUSING IMPROVEMENT
PROGRAM, RENT STABILIZATION
ASSOCIATION OF N.Y.C., INC., et al.,

        Plaintiffs,

   v.

CITY OF NEW YORK, et al.,

        Defendants.

Case No. 19-cv-4087

---

## PLAINTIFFS' OMNIBUS OPPOSITION TO
## DEFENDANTS' AND INTERVENORS' MOTIONS TO DISMISS

Andrew J. Pincus
Timothy S. Bishop
Reginald R. Goeke
Robert W. Hamburg
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ........................................................................... 2

ARGUMENT ................................................................................................. 6

I.    PLAINTIFFS PLAUSIBLY ALLEGE THAT THE RSL VIOLATES THEIR
DUE PROCESS RIGHTS .......................................................................... 6

    A.    The RSL is Premised on an Undefined "Emergency" and Justified by
Shifting Goals, Which Results in Arbitrary Decision-making That Violates
Due Process ...................................................................................... 8

    B.    The Triennial Emergency Declaration Confirms the Arbitrary Nature of
the RSL ............................................................................................. 9

    C.    The RSL Works Counter to its Stated Purposes ................................. 11

        1.    The RSL Exacerbates Housing Shortages .................................. 11

        2.    The RSL is Not Targeted to Providing Affordable Housing to
Lower-Income New Yorkers ..................................................... 12

        3.    The RSL Does Not Address Rent "Profiteering" ...................... 13

        4.    The RSL's Purported Goal of Promoting Neighborhood Stability
Cannot Withstand Due Process Review ..................................... 14

    D.    The RSL Fails Due Process Scrutiny Because Its Means Are An Entirely
Irrational Way to Further its Purported Ends ..................................... 15

    E.    Plaintiffs' Plausibly Allege a Facial Due Process Claim ..................... 17

II.   PLAINTIFFS PLAUSIBLY ALLEGE THAT THE RSL EFFECTS A
PHYSICAL TAKING .............................................................................. 18

    A.    The RSL Compels a Physical Occupation of Owners' Property ......... 19

        1.    The Law Prevents Owners from Using Their Properties For Any
Other Purpose ........................................................................... 19

        2.    Defendants' Conduct Results in a Permanent Physical Occupation
of Owners' Property .................................................................. 22

    B.    The Compelled Physical Occupation Imposed by the RSL is Not Lessened
By the Few and Limited Options the RSL Purports to Offer Owners ................ 24

    C.    Property Owners' Continued Participation in the Residential Rental
Business Does Not Preclude a Takings Finding ................................. 28

    D.    Plaintiffs' Physical Takings Claim Presents a Proper Facial Challenge to
the RSL ............................................................................................. 31

# TABLE OF CONTENTS
(continued)

**Page**

III.   PLAINTIFFS PLAUSIBLY ALLEGE THAT THE RSL EFFECTS A REGULATORY TAKING ................................................................. 32

    A.   The RSL Forces Some Building Owners to Bear Public Burdens That, in Fairness and Justice, Should be Borne by the Public As a Whole ....................... 32

    B.   Complete Loss of Economic Value as to Every Rent Stabilized Building in New York is Not Required Before a Facial Takings Challenge May be Asserted ................................................................. 36

        1.   Defendants' Argument that All Owners Must Lose All Economically Viable Use of their Property Improperly Conflates the Penn Central Test with the Per Se Use Restriction Cases ................. 37

        2.   Plaintiffs Need Not Demonstrate a Complete Loss of All Value in Order to State a Facial Regulatory Claim ................................. 38

        3.   The RSL is Functionally Equivalent to Government Appropriation of Private Property, which is a Classic Governmental Taking ............... 41

    C.   Plaintiffs State a Facial Claim under the Multi-Factor Regulatory Takings Test ................................................................. 43

        1.   The Character of the RSL is to Physically Invade Private Property to Create A Public Welfare Program ........................ 43

        2.   The RSL Does Not Address Noxious Uses of Property ........................ 44

        3.   The RSL Has Had a Direct and Substantial Economic Impact on Regulated Properties ........................................ 44

        4.   The RSL Does Not Create an Average Reciprocity of Advantage for Building Owners ........................................ 47

IV.   PLAINTIFFS' CLAIMS ARE TIMELY ....................................... 48

CONCLUSION ................................................................. 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agins v. Tiburon*,
    447 U.S. 255 (1980)...................................................................................................41, 46

*Amerada Hess Corp. v. Acampora*,
    109 A.D.2d 719, 486 N.Y.S. 2d 38 (2d Dept. 1985) ............................................50

*Armstrong v. United States*,
    364 U.S. 40 (1960)............................................................................................................33

*Brooklyn School for Special Children v. Crew*,
    2007 WL 539775 (S.D.N.Y. Aug. 28, 2007)....................................................................11

*Cashman v. City of Cotati*,
    374 F.3d 887 (9th Cir. 2004) ......................................................................................50

*Cebe Farms, Inc. v. U.S.*,
    116 Fed. Cl. 179 (Fed. Cl. Ct. 2014)............................................................................26

*Cienega Gardens v. United States*,
    331 F.3d 1319 (Fed. Cir. 2003).....................................................................................47

*Colony Cove Props., LLC v. City of Carson*,
    640 F.3d 948 (9th Cir. 2011) ......................................................................................50

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*,
    508 U.S. 602 (1993)...................................................................................................38, 47

*Doe v. Lima*,
    270 F. Supp. 3d 684 (S.D.N.Y. 2017).......................................................................6, 16

*Dolan v. City of Tigard*,
    512 U.S. 374 (1994)...................................................................................................19, 23

*Eastern Enter. v. Apfel*,
    524 U.S. 498 (1998).......................................................................................................15

*EklecCo NewCo LLC v. Town of Clarkstown*,
    2018 WL 3023159 (S.D.N.Y. June 18, 2018) ..............................................................50

*First English Evangelical Lutheran Church of Glendale v. Los Angeles County*,
    482 U.S. 304 (1987)........................................................................................................33

*Goldblatt v. Hepstead*,
   369 U.S. 590 (1962)..........................................................................................44

*Greene v. Blooming Grove*,
   1988 WL 126877 (S.D.N.Y. Nov. 21, 1988).......................................................50

*Greystone Hotel Co. v. City of New York*,
   13 F. Supp. 2d 524 (S.D.N.Y. 1998)..................................................................46

*Hadacheck v. Sebastian*,
   239 U.S. 394 (1915)................................................................................38, 40, 44

*Harmon v. Markus*,
   412 F. App'x 420 (2d. Cir. 2011) ...............................................................25, 26

*Hendler v. United States*,
   952 F.2d 1364 (Fed. Cir. 1991)..........................................................................24

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
   452 U.S. 264 (1981)................................................................................39, 40, 41

*Horne v. Dep't of Ag.*,
   135 S. Ct. 2419 (2015)....................................................................19, 26, 29, 30

*Janklow v. Planned Parenthood, Sioux Falls Clinic*,
   116 S. Ct. 1582 (Stevens, J. concurring)............................................................32

*Kaiser Aetna v. United States*,
   444 U.S. 164 (1979)............................................................................................43

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
   480 U.S. 470 (1987)................................................................................ *passim*

*Kuhnle Bros., Inc. v. City of Geauga*,
   103 F.3d 516 (6th Cir. 1997) ............................................................................50

*Lingle v. Chevron U.S.A. Inc.*,
   544 U.S. 528 (2005)................................................................17, 33, 37, 42

*Lorretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982)................................................................................ *passim*

*MacEwen v. City of New Rochelle*,
   149 Misc. 251 (Westchester Cty. Sup. Ct. 1933)................................................49

*MHC Fin. Ltd. v. City of San Rafael*,
   2008 WL 440282 (N.D. Cal. Jan. 29, 2008) ......................................................50

*Monongahela Navigation Co. v. United States*,
    148 U.S. 312 (1893)................................................................................33

*Mugler v. Kansas*,
    123 U.S. 623 (1887)................................................................................38

*Murr v. Wisconsin*,
    137 S. Ct. 1933 (2017)...........................................................................33

*Nollan v. Cal. Coastal Comm'n*,
    483 U.S. 825 (1987)..........................................................................23, 43

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001)..........................................................30, 31, 39, 47

*Penn. Cent. Transp. Co. v. New York City*,
    438 U.S. 104 (1978)....................................................................... *passim*

*Pennell v. City of San Jose*,
    485 U.S. 1 (1988)......................................................................... *passim*

*Pennsylvania Coal Co. v. Mahon*,
    260 U.S. 393 (1922)..................................................................... *passim*

*Rent Stabilization Ass'n v. Dinkins*,
    5 F.3d 591 (2d Cir. 1993).......................................................................18

*Richards v. United*
    States, 369 U.S. 1, 11 (1962) ................................................................50

*S. Lyme Prop. Owners Assn. v. Town of Old Lyme*,
    539 F. Supp. 2d 547 (D. Conn 2008).....................................................49

*In re Santiago-Monteverde*,
    24 N.Y. 3d 283 (N.Y. Ct. App. 2014)...............................................34, 44

*Southview Assocs., Ltd. v. Bongartz*,
    980 F.2d 84 (2d Cir. 1992).....................................................................24

*U.S. v. Pewee Coal Co.*,
    341 U.S. 114 (1951)................................................................................42

*U.S. v. Salerno*,
    481 U.S. 739 (1987)................................................................................32

*United States v. Causby*,
    328 U.S. 256 (1946)..........................................................................23, 24

*United States v. Gen. Motors Corp.*,
  323 U.S. 373 (1945) ...................................................................................24

*Village of Euclid v. Ambler Realty Co.*,
  272 U.S. 365 (1926) .................................................................38, 40, 44

*W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*,
  31 F. App'x 19 (2d Cir. 2002) ...............................................................39

*Wash. State Grange. v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ...................................................................................32

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) .............................................................................16, 32

*Wilkinson v. Leland*,
  27 U.S. 627 (1829) .....................................................................................16

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012) ...................................................................15

*Winston v. City of Syracuse*,
  887 F.3d 553 (2d Cir. 2018) .....................................................................8

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) ..................................................................... *passim*

**Statutes**

Emergency Tenant Protection Act ...............................................................3, 4, 47

Housing Stability and Tenant Protect Act of 2019 .............................. *passim*

Pennsylvania Subsidence Act ...............................................................................41

Rent Stabilization Law.......................................................................... *passim*

**Other Authorities**

9 NYCRR § 2524.5 ...................................................................................................27

NYC Charter § 396 ..................................................................................................11

## PRELIMINARY STATEMENT

The Rent Stabilization Law ("RSL") is an irrational effort to address an ill-defined "housing emergency" by singling out some owners of private property for burdens that lack any reasonable relationship to, and in fact hinder achievement of, the law's supposed goals. While the RSL is intended to address a "housing shortage," its restrictions inhibit the redevelopment of existing buildings, thereby exacerbating the problem it is claimed to address. And although the RSL is defended as a measure to make housing more affordable to lower-income New Yorkers, it bears no rational relationship to that purpose because it is not targeted to assist those populations. Indeed, Defendants' insistence that a "housing emergency" has existed for more than fifty years despite the application of the RSL for that entire time confirms that the RSL is not rationally related to addressing the problems caused by the purported housing emergency. Unable to refute those fundamental shortcomings of the RSL, Defendants instead contend that the failings of the RSL must be addressed by the legislature and not by the Court. But the Due Process Clause protects Plaintiffs' property rights—fundamental rights deeply rooted in the Nation's history—from precisely such arbitrary and irrational laws.

The RSL also effects an uncompensated taking of private property in violation of the Constitution. First, the RSL effects a physical taking of regulated owners' property by imposing a uniquely burdensome rent control regime, which results in a government-mandated indefinite physical occupation of owners' property. Unlike other rent control regimes, owners are given no meaningful option—short of the destruction of their own property—to avoid that physical occupation. Defendants argue that property owners do not suffer a physical taking because they voluntarily offered their properties for rental purposes. But it is no longer a "voluntary" decision to rent property when the RSL denies owners the ability to use their properties for any other

1

purpose. And, in any event, recent Supreme Court decisions make clear that Plaintiffs cannot be stripped of their Fifth Amendment protections based on an acquiescence theory.

Second, the RSL also effects a regulatory taking. The New York Court of Appeals has determined that the RSL provides a public assistance benefit paid for by private property owners. This "off budget" public assistance program forces RSL property owners alone to shoulder public burdens that should be borne by the public as a whole, which is the very definition of a regulatory taking. That conclusion applies to all owners of regulated properties, and is confirmed by the factors courts apply to identify regulatory takings: The RSL (i) results in a physical invasion of owners' property; (ii) does not address a noxious use of the property; (iii) does not create a reciprocity of advantage for the owners burdened by the regulations; and (iv) imposes a substantial economic impact on property owners. Defendants' response is that there is no regulatory taking because the RSL does not deprive property owners of *all* the economic value of their properties. That erroneous interpretation of a single factor in the multi-factor regulatory takings analysis conflates different takings standards, exaggerates the degree of economic loss necessary to establish a regulatory taking, and ignores the other factors relevant to determining whether a law effects a regulatory taking. Most fundamentally, Defendants' argument fails to address the overarching question that animates regulatory takings analysis: whether the RSL imposes a burden on a small set of property owners that ought to be paid by the public as a whole, a question the New York Court of Appeals has already answered in the affirmative— acknowledging the fundamental predicate demonstrating the existence of a regulatory taking.

## FACTUAL BACKGROUND

New York's current Rent Stabilization Laws are the latest in an unbroken line of rent regulation that began in 1943, when rent controls were adopted to address the "emergency

2

created by war, the effects of war and the aftermath of hostilities." Compl. ¶¶41-42; 76-77. When first enacted in 1969, the RSL's regulatory burdens were justified by the vestigial wartime rationale. Compl. ¶ 77. In 1974, the New York State legislature enacted the Emergency Tenant Protection Act ("ETPA"), which again cited "war" as driving the need for rent regulation in New York, but shifted the basis of the so-called emergency to an "acute shortage of housing accommodations." Compl. ¶ 78. Over the years, the wartime rationale has been discarded, but the claim of an "emergency" lives on, variously defined as a lack of affordable housing for low-income individuals, a "homelessness crisis," or a "housing crisis." Compl. ¶¶ 79-82. To support the existence of the "emergency," the City Council must, every three years, determine that the "emergency" continues—and the Council for the past fifty years has dutifully held a hearing and found an "emergency." *See* Compl. ¶¶ 7-9, 54-56, 167-92.

That claimed emergency is the basis on which the RSL imposes the government's dominion over buildings in New York City built prior to 1974 that contain six or more units. Compl. ¶ 48. The tenants occupying those units when the RSL was enacted (or those who subsequently rented them) receive the right to renew their leases indefinitely; and the owner can neither evict the tenant nor refuse to renew his lease except in very narrow circumstances. Compl. ¶ 11. Tenants could transfer that indefinite possessory interest to their "successors," thereby receiving from the government a life estate with inheritance rights. *Id.* The RSL also restricted owners' ability to withdraw their buildings from the rental market or convert them to non-housing uses. *Id.* This last step was critical because if owners could repurpose their properties, the State could no longer commandeer those properties for tenants.

Having established control over the use and occupancy of those units, the RSL then limits rent increases to the amounts set by the Rent Guidelines Board (RGB). Compl. ¶ 44. When the

ETPA was adopted in 1974, its architects recognized "[t]he importance of permitting increased rents for essential capital improvements," and that "increased costs must be reflected in the rent." Compl. ¶ 47. Thus, the RSL authorized rent increases to account for individual apartment improvements ("IAIs") and major capital improvements ("MCIs"), and required the RGB to consider the increases in operating and others costs necessary to operate the units. Compl. ¶ 59.

In 1993, recognizing that low-income individuals likely were not renting apartments commanding monthly rents of $2,000 or more, the legislature permitted vacancy deregulation ("Luxury Decontrol") of those apartments. Compl. ¶ 50. For the same reason, the legislature also adopted a "High Income Decontrol" provision, permitting decontrol of units whose tenants' household income exceeded $250,000 (reduced to $175,000 in 1997) and whose rents exceeded the Luxury Decontrol threshold. Compl. ¶ 51. The RSL was again amended in 1997 to permit a "statutory vacancy increase" in rents for units with two-year leases, and a "Longevity Increase" on rents for tenants who had remained in their units a long time. Compl. ¶ 59.

Over the last two decades, however, the government changed course. The RGB authorized rental increases at rates far lower than the RGB's own estimate of the increase in owners' operating costs, relentlessly reducing owners' operating income. Compl. ¶¶ 289-292. In 2011, the Legislature limited the frequency of permitted vacancy increases, reduced the amount that could be recovered for IAIs, and increased the Luxury Decontrol and High-Income Decontrol thresholds. Compl. ¶ 305. In 2015, the Legislature again increased the Luxury Decontrol threshold to $2,700 (and indexed it to the RGB-permitted rent increases), and reduced the amount that could be recovered from MCIs. *Id.*

In 2014, the New York Court of Appeals authoritatively confirmed what city and local legislators already knew: The RSL provides "a local public assistance benefit" paid for by

"private owners of real property." Compl. ¶ 12. With the 2014 inauguration of Mayor Bill de Blasio, the city began squeezing higher subsidies from the owners of regulated properties it controlled. Compl. ¶¶ 269, 306. As a result of Mayor de Blasio's appointments to the RGB, the RGB limited one-year rent increases to at most 1% to 1.5% from 2014 to 2019, and instituted a "rent freeze" (with no annual rent increases) for 2015 and 2016. Compl. ¶¶ 306, 269.

This past June, the New York Legislature passed the Housing Stability and Tenant Protect Act of 2019 ("HSTPA"). The HSTPA was designed to "ensure that rent stabilized apartments remain rent stabilized" by "making it harder to deregulate rent-stabilized units." Compl. ¶ 65. Members of the Legislature made clear that the HSTPA was intended to "protect *their* [ *i.e.*, the government's] regulated housing stock, which provides and maintains affordable housing for millions of low and middle income tenants." Compl. ¶ 66 (emphasis added). To prevent rent stabilized units from escaping regulation, the HSTPA eliminated Luxury Decontrol and High-Income Decontrol. It eliminated owners' ability to recover possession of more than one unit for their personal use (and then permitted recovery only with a showing of immediate and compelling necessity), and effectively eliminated owners' ability to convert their buildings into cooperatives or condominiums. Compl. ¶ 68. To maximize the "public benefit" value of stabilized units, the Legislature foreclosed opportunities for rent increases beyond the RGB-permitted levels. The HSTPA eliminated statutory vacancy allowances and longevity increases, and dramatically reduced owners' ability to recover costs of MCIs and IAIs.

Through the RSL, the Defendants[1] have effected an uncompensated physical taking of each owner's private property, ensuring that tenants enjoy indefinite physical occupation of that

---

[1] Defendants include City of New York, David Reiss, Cecelia Joza, Alex Schwarz, German Tejeda, May Yu, Patti Stone, J. Scott Walsh, Leah Goodridge, and Sheila Garcia, in their official capacities as Chair and Members, respectively, of the New York City Rent Guidelines Board (together, the "City Defendants") and Commissioner Ruthanne Visnauskas (together with the City Defendants, "Defendants"). As used herein, "Invervenors" refers to

property and precluding owners from using their property for any purpose other than leasing it to the tenants they subsidize. Defendants have also effected an uncompensated regulatory taking of owners' property, reducing rental income by 50% to 80% compared to equivalent market units, and cutting property values by 75% compared to the value of market rate units. Compl. ¶ 284-286; 297-299. Defendants' regulatory taking is not justified by preventing any noxious use, nor does it provide any reciprocal advantage to owners. It is simply an "off-budget welfare program privately funded" by regulated owners. *Pennell v. City of San Jose*, 485 U.S. 1, 22 (1988) (Scalia & O'Connor, JJ, concurring in part and dissenting in part); Compl. ¶¶ 351-356. In addition to effecting a taking, the RSL's arbitrary regulations that are not rationally related to achieving any of the identified goals of that program violate property owners' due process rights.

## **ARGUMENT**

## I.  **PLAINTIFFS PLAUSIBLY ALLEGE THAT THE RSL VIOLATES THEIR DUE PROCESS RIGHTS**

The RSL violates the Due Process Clause because it constitutes an arbitrary infringement of the property rights of New York City landowners and bears no rational relationship to the objectives it is meant to serve. Compl. ¶¶ 3-9. Plaintiffs contend that property rights are today, and were at the time the Constitution was drafted, fundamental rights. *See* Compl. ¶ 70. As such, the RSL's clear and continued impingement on the property rights of residential building owners in New York City should be evaluated under strict scrutiny. That is, the RSL must be "narrowly tailored to achieve a compelling state interest." *See, e.g.*, *Doe v. Lima*, 270 F. Supp. 3d 684, 702 (S.D.N.Y. 2017). But even under Defendants' preferred standard—that a "[p]rice control is

---

Tenants and Neighbors, Community Voices Heard, and Coalition for the Homeless. For the convenience of the Court, Plaintiffs respond to the motions to dismiss and accompanying memoranda of law served by Defendant Visnauskas ("State Br."), City Defendants ("City Br."), and Intervenors ("Intervenor Br.") in this single submission.

'unconstitutional . . . if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt." State Br. at 24 (quoting *Pennell*)—the RSL violates due process.

Under the RSL, the City declares an "emergency" every three years—without ever defining the "emergency" standard; to achieve a shifting set of objectives; in order to implement price controls and associated regulations that, according to virtually every economist, are at best ineffective and most likely harmful to those goals. When those policies inevitably fail, the City holds another pretextual hearing three years later at which it rotely renews them.

Plaintiffs do not question the public policy benefits of a robust housing market with units affordable by a range of New York's citizens (if that is the purpose of the RSL). But the RSL establishes an arbitrary standard (remediating some undefined "emergency"), and then deprives Plaintiffs of their fundamental property rights based on a policy that is not rationally related (let alone narrowly tailored) to achieving the supposed goals. The RSL does not target its benefits to lower income tenants—in fact 22 percent of all stabilized units (over 200,000 units) house families with incomes at or above $100,000. Compl. ¶ 104. The RSL has no mechanism to promote socio-economic or racial diversity and actually increases economic segregation. *Id.* ¶¶ 111-112. And the RSL does nothing to increase the housing supply; in fact, it deters development, perhaps hindering development of over 100,000 additional units. *Id.* ¶¶ 119-130.

Defendants' motions to dismiss serve only to highlight the many ways that the RSL violates Plaintiffs' due process rights. Defendants (i) fail to show that either the RSL or the City Council have established any definition of the "emergency" that purportedly justifies the RSL; (ii) rely on findings that *undercut* the existence of any emergency; (iii) fail to address the many ways the RSL actually hinders achievement of its purported goals; and (iv) insist that the legislature can deprive owners of their rights without any meaningful judicial scrutiny.

A.   **The RSL is Premised on an Undefined "Emergency" and Justified by Shifting Goals, Which Results in Arbitrary Decision-making That Violates Due Process**

The foundation for the RSL is the claimed existence of a "housing emergency" or "crisis." Compl. ¶¶ 75-83; City Br. at 8; State Br. at 25. But the RSL does not explain what the "emergency" or "crisis" is, the source of the "emergency," or how the "crisis" is defined or measured. While the "emergency" at one point was premised on the effects of wartime, that rationale has been eliminated. Compl. ¶¶ 76-83. Although a vacancy rate below 5% is a necessary precondition before any emergency can be declared, the RSL makes clear vacancy rate does not by itself define or justify an emergency. Rather, that threshold triggers the City Council's obligation to exercise its judgment, after a hearing, to determine—based on some established standard—whether emergency conditions exist. Compl. ¶¶ 167-175. The Council has fallen woefully short of meeting that obligation. Compl. ¶¶ 176-192.

As one commentator recently noted, no one knows when the housing "crisis" started, how it is quantified, or when it will end because there is no measure of what constitutes the "crisis."[2] A law whose application is premised on a standard that is undefined is the very definition of an arbitrary law violative of due process. If any and all housing conditions can qualify as a "crisis" or "emergency," there is no benchmark against which courts can measure the City Council's every-three-year determination, leaving the legislature free to deploy the RSL at its whim, and leaving the due process protections toothless. *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018) (citing *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (while rational basis review is "indulgent and respectful, it is not meant to be 'toothless.'").

---

[2] Roger Valdez, "How Can We Solve a Housing Crisis that Doesn't Exist?", Forbes Jul 16, 2019, available at https://www.forbes.com/sites/rogervaldez/2019/07/16/mother-jones-government-cant-solve-a-housing-crisis-that-doesnt-exist/#1cea254b7431

Defendants' and Intervenors' motions to dismiss fail to cite any authoritative definition for determining the existence of the statutorily-required "emergency"—whether in the RSL or established by the Council—and the absence of any standard by itself violates due process.

Rather than providing a standard, Defendants and Intervenors and instead offer up a variety of unquantified ills that the RSL is intended to ameliorate. The RSL is purported to (1) address an "acute shortage of housing accommodations;" Compl. ¶ 78; se*e also* City Br. at 8-9; State Br. at 25; (2) provide housing to low income residents and reduce homelessness; Compl. ¶¶ 79-81; *see also* City Br. at 9; State Br. at 26; (3) "curb[] rent profiteering," and "prevent[] unjust and oppressive rents." City Br. at 9; State Br. at 26; and (4) "maintain[] neighborhood cohesion and continuity," and "promot[e] stability." City Br. at 9-10. But those public policy goals do not provide a definition of the "emergency" triggering the RSL. And in addition, as detailed below, the RSL does not rationally address any of those issues.

### B.       The Triennial Emergency Declaration Confirms the Arbitrary Nature of the RSL

The City Council's rote declaration of "emergency" every three years for the past fifty years by itself establishes the RSL's unconstitutional arbitrariness. The hearing records confirm that the Council pays scant attention to the factors identified in the RSL for declaring an emergency, which are supposed to include (1) "the supply of housing accommodations within such city," (2) "the condition of such accommodations," and (3) the "need for regulating and controlling residential rents." Compl. ¶ 168.[3]

---

[3] The RSL also authorizes the City to determine the existence or abatement of an emergency based on the class of accommodation. Compl. ¶ 170. Although the 2018 HVS data confirmed that units renting above $2,000 had a vacancy rate above 5% (City Br. Exhibit C, RSA Letter at 1; CHIP letter at 4), the Council refused to consider whether the emergency abated with respect to that class of accommodation. Compl. ¶ 108. The RSL also authorizes the Council to declare that the regulation of rents "does not serve to abate the emergency." Compl. ¶ 170. Despite fifty-years of experience demonstrating the failure of rent regulation and the nearly unanimous views of economists, the Council has yet to make that determination. Compl. ¶¶ 6, 119.

Rather than consider the factors set forth in the RSL, the record of the 2018 Emergency Declaration hearing confirms that the Council relied solely on the vacancy rate to justify its rote emergency finding. Compl. ¶ 172. Thus, the 2018 hearing process began with New York City Council Speaker Corey Johnson pre-ordaining its result—announcing before any testimony was taken that "[t]oday we are taking the first step by renewing the findings that we are still in a housing crisis." Compl. ¶ 80. The hearing then focused on potential reforms to the rent stabilization system, and delved into personal anecdotes of tenants, without defining or quantifying the nature of any supposed emergency. Compl. ¶¶ 176-180.

But there is a reason why the RSL makes the vacancy rate a necessary but not a sufficient condition for declaring an emergency—low vacancy rates are common in large cities. Indeed, the 5% threshold itself is an arbitrary benchmark, met by at least a quarter of the top 75 metropolitan areas. Compl. ¶ 190.

Although the City Defendants contend that the City Council *did* consider the three statutorily identified factors, that argument only highlights how arbitrary the emergency declaration is. With respect to the supply of housing, the 2018 HVS data showed "a net increase of 69,000 units from 2014," with 3.47 million units, a "record breaking housing stock number," that is the "largest housing stock recorded since the HVS began in 1965." City Br. at 16; City Ex. C, Tr. p. 26. Housing conditions were found to be "good or better on nearly every measure included in the HVS," with 76% of renter occupied households rating the condition of their structures as either excellent or good, "the highest [rating] on record since we began using this measure in 1991." City Br. at 16; City Ex. C., Tr. p 26. With respect to the need to regulate rental rates, the Council heard that household incomes were growing at 10.9%, which was faster in real terms than the increase in rents (6.2%). City Br. at 16; City Ex. C., Tr. p 26. Despite the fact that

housing supply was at an all-time high, housing quality was at an all-time high, and rents were growing slower than income, the Council *still* declared a housing emergency. The 2018 record confirms that the emergency declaration was a foregone conclusion regardless of the positive news about the statutorily mandated factors.[4] Such a process can only be described as arbitrary.[5]

### C.   The RSL Works Counter to its Stated Purposes

Not only is the RSL arbitrary in its design and implementation, it violates due process for the additional reason that the regulations it implements are not rationally related (let alone narrowly tailored) to achieve the articulated goals. The Complaint describes at length the wealth of scholarly studies, reports, articles and analyses demonstrating the utter failure of rent controls to increase the availability of affordable housing. Indeed, economists are nearly uniform in their belief that rent controls reduce the quantity and quality of housing. Compl. ¶ 119. Defendants fail to explain how a legislator could reach the opposite conclusion.

#### 1.   *The RSL Exacerbates Housing Shortages*

The RSL not only fails to ameliorate any "housing shortage," it actually exacerbates the problem. Compl. ¶¶ 114-49. Key features of the RSL—including mandatory lease renewals, succession rights, and limitations on an owner's ability to recover units—prevent owners from redeveloping existing properties, despite the existence of capacity for housing development

---

[4] The City Defendants argue that the emergency declaration was justified by the so-called "affordability crisis." City Br. at 16. But, as Justice Scalia has explained, premising rent stabilization solely on the hardship of the tenant is an unconstitutional method of solving a public social problem. *Pennell v. City of San Jose,* 485 U.S. 1, 23-24 (1988) (Scalia, J. dissenting).

[5] Contrary to City Defendants' footnoted argument (n. 1), RGB and its members are not immune from suit. The City's cited immunity (NYC Charter § 396) applies only to an action for compensatory damages, not an action principally for injunctive or declaratory relief (such as this lawsuit). *See, e.g., Brooklyn School for Special Children v. Crew*, 2007 WL 539775 at *15 (S.D.N.Y. Aug. 28, 2007). And the City provides no support that the RGB, which includes members appointed to serve tenant interests, the public interests, and owner interests, is a City department. *See Ximines v. George Wingate High Sch.,* 516 F.3d 156 (2d Cir. 2008) (departments of the city have been "typically, if not uniformly, created by the City charter."). Because the Complaint shows that the RGB members' conduct gave rise in part to Plaintiffs' claims, the RGB and its members are proper defendants. *E.g.*, Compl. ¶¶ 26-28, 58, 132, and 293.

under New York City's zoning ordinances. Compl. ¶ 127.[6] The 2019 HSTPA compounds the problem by hastening the deterioration and eventual elimination of housing stock by diminishing owners' ability to recover capital investments. Compl. ¶¶ 131-41.

Plaintiffs have (at the very least) plausibly alleged that the RSL is not rationally related to addressing a housing shortage in New York, and Defendants make no attempt to show how price restraints that disincentivize development could be rationally related to addressing the housing shortage. Indeed, Defendants concede that the means the RSL uses to "encourag[e] new construction" is "*exempting* newly constructed buildings from rent stabilization." State Br. at 2 (emphasis added). Thus, even the legislature recognizes that subjecting property to rent stabilization deters the development necessary to address housing shortages.

### 2. The RSL is Not Targeted to Providing Affordable Housing to Lower-Income New Yorkers

The RSL is not a rational means to provide affordable housing for lower-income New Yorkers because the RSL in no way targets its benefits to tenants based on need. *See* Compl. ¶¶ 84-109. Rather, the benefits of the RSL are distributed randomly to those tenants—struggling or otherwise—who happen to rent a regulated unit. The RSL's beneficiaries include multi-millionaire polo players, tobacco executives, professors, and business owners with multiple properties. Compl. ¶¶ 89-91. Data shows the RSL's subsidies are randomly distributed without regard to the household income of tenants who receive those subsidies. Compl. ¶¶ 92-109.

Defendants insist that there is a "clear" relationship between the RSL and benefits to low-income tenants, but their "evidence" (State Br. 26) is not cognizable at this motion to dismiss stage and, moreover, fails to refute the Complaint's allegations demonstrating that the RSL does

---

[6] *See* Compl. ¶ 122 ("Using data from the New York City Department of City Planning, one report estimates that [t]here is 1.8 billion square feet of unused development rights in residential zones alone. Built to their maximum envelope, these properties could accommodate more than a million units of housing.").

not target lower-income families. The State argues that 65.8% of RSL units serve low-income households, but neglects the fact that this number is close to the 53% of market-rate units occupied by low-income households. State Br. 26; Compl. ¶ 98. It states that 78% of RSL units are occupied by tenants earning under $100,000, while omitting that a comparable percentage (64%) of market-rate units are similarly occupied. State Br. 26; Compl. ¶ 103. That rent stabilized buildings serve lower-income tenants in about the same proportion as market-rate units confirms that the RSL is not rationally related to addressing that need, and instead obligates regulated owners to subsidize hundreds of thousands of tenants who are able to pay market rates.

### 3.    The RSL Does Not Address Rent "Profiteering"

That the RSL is not reasonably related to curbing "rent profiteering" is apparent from the fact that neither the RSL nor the DHCR are able to define "profiteering." Defendants fail to explain how rents willingly paid for nearly a million market-rate units are unjust or oppressive.

In any event, there is no "free rent." The forced reduction of rent in the stabilized market causes a rent increase in the uncontrolled units of 22-25%. Compl. ¶ 152. Without the RSL, "lower rents in the uncontrolled market would provide tenants in regulated units with more options, and options that better suited their needs than the regulated units." Compl. ¶151. By creating two separate markets (one regulated and one not), the RSL increases competition for market-rate units, creating the heightened rent rates used to justify the RSL's continuation. Rather than addressing rent "profiteering," the RSL subsidizes prices for the lucky few who live in a stabilized property—regardless of need—while increasing rents for everyone else.

That the RSL is neither designed nor intended to address rent "profiteering" is confirmed by the 2019 HSTPA, which limits the growth of rental rates even for those units that offer "preferential" rent rates—rates that are by definition *below* the supposedly "reasonable" rent

thresholds set by the RSL.[7] Defendants cannot suggest that the rates they themselves set are unreasonable—but the RSL still limits owner's ability to raise rents to those levels upon the renewal of a lease when the tenant previously paid rent lower than the maximum permitted under the RSL. Compl. ¶ 69(e). Defendants do not defend any of these obvious inconsistencies between the law's supposed purpose and its actual design. They assert instead that the connections are "clear" and that "it is not for the courts to weigh in on this debate." City Br. at 9, 11. Such conclusory statements cannot overcome the well-pleaded facts in the Complaint.

### 4. The RSL's Purported Goal of Promoting Neighborhood Stability Cannot Withstand Due Process Review

Attempting to convert a vice into a virtue, Defendants claim that the mandated lease renewal requirements that physically invade owners' property is a means of "avoiding disruptions to neighborhoods," "promoting stability," and "maintaining neighborhood cohesion." City Br. at 9-10. Their view is that the tenant, rather than the owner, is deemed to be the relevant "neighbor" whose "stability" is promoted—and that therefore giving those tenants lifetime possessory interests in owners' property will improve neighborhood cohesion more than if the owner lived in that unit or rented it to varying tenants over time. For example, Defendants presumably believe that "neighborhood cohesion" will be better achieved by permitting the existing tenants to remain in Bryan Liff's building in Harlem, rather than permitting Mr. Liff and his family to live there. Compl. ¶ 233-35. Aside from Defendants' ipse dixit, no evidence shows that a rent-stabilized tenant makes a better neighbor than a market-rate tenant or the owner.

Defendants' argument also exposes the discriminatory effect of the RSL. Existing tenants are given a preference over new tenants, and by extension older tenants are given preference over

---

[7] Where units are offered at rents below the legally permissible regulated rent, this is known as a "Preferential Rent." The operation of Preferential Rents is discussed throughout the Complaint. *See* Compl. ¶¶ 59, 69, 176, 278, 312-15.

the young. Tenants are given a preference over owners, who are not only prevented from enjoying their own property, but must subsidize the tenancy of the existing tenant in order to "avoid disrupting" the neighborhood. And the successors of rent stabilized tenants who can trace their family's occupation of a property back decades are given preference to New Yorkers lacking in those long familial connections.

Validating the State's desire to "maintain neighborhood cohesion" means upholding the segregation that results. Given the state's goal of "avoiding disruptions to neighborhoods," it is perhaps not surprising that the RSL benefits white renters more than any other racial group, with a discount of 36% from market rates, compared to 16% for black renters and 17% for Hispanic renters. Compl. ¶ 111. Nor is it surprising that the RSL results in an increase in economic segregation. Compl. ¶ 112. Even Defendants concede that price controls resulting in such a discriminatory effect cannot satisfy due process review. *See* State Br. 24 (citing *Pennell*).

### D. The RSL Fails Due Process Scrutiny Because Its Means Are An Entirely Irrational Way to Further its Purported Ends

Defendants and Intervenors contend that the failings of the RSL do not matter because irrational laws that destroy property rights are not subject to judicial scrutiny. City Br. 11 (it is "not for the courts to weigh in on this debate"); Intervenor Br. at 24 ("The Court need go no further."). Defendants say that Plaintiffs, to prevail, must negate every conceivable basis for the RSL—whether based in speculation or record evidence, regardless of empirical effects—even though the Intervenors concede (at 23) that such a test is impossible to meet. A due process test so deferential that no legislature could ever flunk it is not the law.  Even rational basis review does not impose such an insurmountable burden. *See Windsor*, 699 F.3d at 180 (rational basis review "not meant to be 'toothless.'"). Where, as here, a government action is "arbitrary and irrational," it fails even rational basis review. *Eastern Enter. v. Apfel*, 524 U.S. 498, 537 (1998).

15

Moreover, the RSL's continued destruction of owners' property rights should be evaluated under a strict scrutiny standard, under which the RSL must be narrowly tailored to achieve a compelling state interest. *See, e.g.*, *Doe*, 270 F. Supp. 3d at 702 (the Due Process Clause forbids *any* encroachment on fundamental rights "no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest"). Defendants and Intervenors make no effort to meet that threshold. *See* State Br. at 24-28, City Br. at 8-11, Intervenor Br. at 22-25. Instead, they contend that no such scrutiny should be applied.

The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," including those "specific freedoms protected by the Bill of Rights." *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997). The Clause "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Id.* at 720-21 (quoting *Moore v. E. Cleveland,* 431 U.S. 494, 502 (1977)). Not only are real property rights expressly protected within the Bill of Rights, but the protection of those rights is deeply rooted in the Nation's history as well. *See* Federalist No. 10, at 78 (Madison) (describing protection of property rights, especially in land, as "the first object of government").

As early as 1829, Justice Story warned that "government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of the legislative body, without any restraint." *Wilkinson v. Leland,* 27 U.S. 627, 657 (1829). Defendants would have this Court ignore that warning, giving unrestrained deference to the legislative will. Defendants argue that a minimum scrutiny rational basis test should apply, with a "strong presumption of constitutionality," but even Defendants concede that this is so only when no fundamental rights

16

are burdened. State Br. at 24-25; City Br. at 8. Defendants never address the Complaint's specific allegation that protection of real property interests *are* fundamental rights. Compl. ¶ 70.

Defendants incorrectly argue that a heightened standard of review is foreclosed by *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528 (2005). City Br. at 13. In *Lingle*, the Court clarified the standard to be applied to a takings claim. The Court concluded that the "substantially advance a legitimate state interest" formula "prescribes an inquiry ***in the nature of a due process***, not a takings test . . ." 544 U.S. at 540 (emphasis added), and held that "the 'substantially advances' formula is not a valid takings test." *Id.* at 548. The Court was *not* presented in *Lingle* with a due process challenge, and did not address when the "substantially advances" test might be used in that context. While the Court noted that heightened scrutiny is disfavored when evaluating substantive due process challenges to government regulation, neither the *Lingle* court nor the cases on which it relied (*see* 544 U.S. at 545) addressed regulations depriving owners of their rights in real property, which have long been protected as fundamental rights. Defendants cannot explain why a heightened scrutiny test should be denied to real property interests that are specifically protected by the Bill of Rights.

### E.     Plaintiffs' Plausibly Allege a Facial Due Process Claim

The Complaint states a facial due process claim because the arbitrary, discriminatory, and demonstrably ineffective regulations of the RSL deprive all regulated property holders of their constitutionally protected property rights. Intervenors argue that Plaintiffs cannot state a *facial* due process claim, because *some* landlords—those who charge preferential rents that are less than the maximum permissible regulated rent—are not deprived of market rents. Intervenor Br. at 22 (quoting *Dinkins*, 5 F.3d at 597). But Intervenors misread the Complaint and ignore the amendments made by the HSTPA.

17

First, the Complaint does not rely solely on an inability to charge market rent to support the due process claim, but instead identifies a host of property rights that the RSL has invaded, including the inability to exclude strangers (including sub-lessors and tenants' successors), the physical occupation of properties, and the inability to freely use or dispose of properties. Compl. ¶ 197-199. Second, even with regard to the application of market rents, after the 2019 HSTPA, even owners of units that charged preferential rents are precluded from raising rates upon lease renewal at rates greater than permitted by the RGB. Compl. ¶ 278.[8]

## II.   PLAINTIFFS PLAUSIBLY ALLEGE THAT THE RSL EFFECTS A PHYSICAL TAKING

The "physical occupation of an owner's property authorized by the government constitutes a 'taking.'" *Lorretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982). Even the "minor" physical occupation in *Lorretto*—placing cables on a building—was held to constitute a taking. *Id.* The RSL involves a far more significant physical invasion of private property, forcing owners to house and subsidize tenants (and their designated successors) in perpetuity, thereby stripping away the key characteristics of property ownership.

The RSL does not simply limit the amount of rents and provide for ancillary restrictions on owners to ensure compliance with the government-established rent levels—and therefore differs materially from the law before the Supreme Court in *Yee v. City of Escondido*, 503 U.S. 519, 529 (1992), which had that limited reach. The RSL, by contrast, targets a particular set of properties (buildings with six-units or more built prior to 1974), precludes those properties from

---

[8] *Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591 (2d Cir. 1993) does not support Intervenors' argument. *Dinkins* concerned New York's administration of hardship adjustment provisions of the RSL. 5 F.3d at 593. The *Dinkins* court reasoned that "[e]very landlord cannot be constitutionally entitled to a hardship rent increase; at best, only landlords burdened by an appropriately severe hardship are so entitled." *Id.* at 597. By contrast, the instant challenge is to the RSL as a whole, and is not limited to a subset of regulated owners, but includes all owners subject to the RSL.

being used for any purpose other than housing rent stabilized tenants, denies owners the right to evict tenants in most circumstances, and mandates that owners renew the leases of tenants and their successors. Having taken physical control over those buildings, the RSL then forces owners to subsidize the housing costs of tenants by holding rental rate increases to levels below the increases in costs of operating the buildings, and precludes owners from obtaining an economic return on investments made to improve the properties.

Through those restrictions, the RSL deprives owners of every important "stick" in the "bundle" of property rights, rendering owners the mere caretakers of property controlled by the government. Defendants contend that these restrictions—and presumably any others that New York might impose—are all permissible because the Defendants "voluntarily held out [the buildings] for rental," or "acquiesce[ed] in its continued use as rental housing." City Br. at 20-21. *See also* State Br. at 17. That is directly contrary to binding Supreme Court precedent.

The Court has repeatedly explained that, "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Loretto*, 458 U.S. at 439, n.17; accord, *Horne v. Dep't of Ag.,* 135 S. Ct. 2419 (2015); *Dolan v. City of Tigard,* 512 U.S. 374, 385 (1994). Moreover, as explained in *Yee*, Plaintiffs' continued participation in the rental market can hardly be considered voluntary where the RSL regulations preclude owners from using the property in any other way.

### A.    The RSL Compels a Physical Occupation of Owners' Property

#### 1.    *The Law Prevents Owners from Using Their Properties For Any Other Purpose*

The RSL differs fundamentally from other rent control ordinances because the RSL gives the government control over owners' property by preventing owners from using their property for any purpose other than renting to rent-stabilized tenants. Indeed, in adopting the

19

HSTPA, New York legislators emphasized that their goal was to "protect *their* [*i.e.*, the government's] regulated housing stock" (emphasis added), to "help prevent the loss of thousands of units of affordable housing by making it harder to deregulate rent-stabilized units," and to "ensure that rent stabilized apartments remain rent stabilized." Compl. ¶¶ 65, 66.

The RSL initially achieved that goal by preventing owners from converting buildings to commercial use, using buildings as their own residence, or even simply exiting the rental business altogether. Compl. ¶¶ 247-251. In order to "ensure rent stabilized apartments remain rent stabilized," the HSTPA closed the few avenues that had permitted an exit from rent stabilization rules by eliminating rent decontrol provisions and effectively eliminating cooperative and condominium conversions. Compl. ¶¶ 257-267. Through the RSL, New York legislators treat owners' property as "*their*" rent stabilized housing stock; to "prevent the loss" of those units, the RSL (particularly as amended through the HSTPA) precludes owners from using that property in any way other than as stabilized property.

Defendants and Intervenors are therefore wrong in asserting that owners "voluntarily" offered their units for housing rental. Invoking *Yee*, 503 U.S. at 529, Intervenors argue that "where a property owner offers property for rental housing . . . government regulation of the rental relationship does not constitute a physical taking." Intervenor Br. at 10 (quoting *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. Of Hous. & Cmty. Renewal,* 83 F.3d 45, 47-48 (2d Cir. 1996)). But that contention misconstrues *Yee.*

*Yee* addressed whether the property owner was "compelled" to rent his property over his objection. The Court answered that question in the negative because it found that, under the law before the Court in that case, "neither the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so." *Yee,* 503 U.S. at 527-28. The Court

20

explained that "a park owner who *wishes to change the use of his land* may evict his tenants, albeit with 6 or 12 months' notice." *Id.* at 528 (emphasis added). It would be a different question, the Court noted, if the statute "compel[led] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.*

Thus, *Yee* never ruled that all governmental regulation of the rental housing market was immunized from takings analysis as long as the property owner had, at one point in time, voluntarily offered the property for rent. Rather, it found that there was no compulsion provided owners were free to put their properties to uses other than as a mobile home trailer park.

Unlike the law in *Yee,* the RSL—in purpose and design—compels owners to continue renting property and prohibits owners from changing the use of the property. In *Yee,* if the owner wanted to use the mobile home park to build a house for himself, he could evict the mobile home tenants and build his home. If he wanted to use his property to construct a building for commercial rental purposes or for multifamily housing, he was free to do so. And if the owner simply wanted to retire from the mobile-home business and leave his property fallow, or change it into a park, he could do that as well. In each of those instances, the *Yee* plaintiffs could terminate the mobile home leases and use the land for their desired purpose.

Under the RSL, building owners have no such freedom. They cannot refuse to renew a lease because they want to use the property for their own or a family member's residence. Nor can they do so to convert the property into a commercial building. They cannot unilaterally convert the building into cooperatives or condominiums, and they cannot withdraw the building from the rental market upon retirement. Unlike in *Yee,* under the RSL building owners are compelled to rent out their units because they are given no feasible alternative option.[9]

---

[9] Contrary to Intervenors' argument (at 8-9), the limits on alternative uses to which an RSL building can be placed and the limits on removal of tenants are not components evaluated under separate takings analysis. Rather, the

21

### 2. Defendants' Conduct Results in a Permanent Physical Occupation of Owners' Property

The RSL mandates the continued physical occupation of owners' properties by tenants, whose leases must be renewed except under the narrowest of circumstances. Compl. ¶¶ 197; 202-203. Owners must suffer the intrusion of strangers (sublessors and successors of the tenant), the selection and admission of whom they have no right to oppose. Compl. ¶¶ 197, 204-212. Owners are denied even the basic tools necessary to make informed decisions about the tenants to whom they do lease—evaluation of prior evictions, judicial proceedings, and landlord tenant actions—and are required to extend lease terms to tenants to whom no lease was entered in the first instance. Compl. ¶¶ 219-220. The RSL's application for the past fifty years highlights the permanence of that occupation, which the HSTPA underscored by eliminating the RSL's sunset provision and by imposing obligations (regarding MCI and IAI costs) that extend more than thirty years into the future. Compl. ¶ 200.

Despite those facts, Defendants argue that "the RSL does not mandate any encroachment on Plaintiffs' property." State Br. at 18-19. That argument is perplexing: the RSL mandates that owners must house rent stabilized tenants indefinitely with only narrow and largely fictional means of removing them. That obviously involves "encroachment on Plaintiffs' property." Just as the City in *Loretto* required that owners permit telecommunications cables to be permanently attached to buildings, the RSL requires owners to renew tenant leases for an indefinite period. Indeed, the easements in *Dolan* and *Nollan* (cited by the State) resulted in only temporary physical encroachment by third parties onto the plaintiffs' property, which did not deprive

---

RSL's restrictions on alternative uses of stabilized buildings are a critical component to enforcing the RSL's physical taking. By preventing owners from using their property for any purpose other than rental to tenants, the RSL mandates that owners' property be used solely for the governmental purpose of housing rent stabilized tenants.

owners of use of the same land. By contrast, the RSL tenants' occupation is continuous and exclusive and wholly deprives owners of any use of those units.

Intervenors argue that physical takings require the government to take "physical possession" of the property, and that such possession must be "absolute." Intervenor Br. at 11-12. But that is incorrect. In *Loretto*, the government did not itself take physical possession of the property, but merely mandated that a third party (cable company) could place an object on the private property. In other physical takings cases, mandated access easements were not for the government's use, but for the use of the public. *See* Compl. ¶ 194. And the Supreme Court has specifically held that granting a "permanent and continuous right to pass to and fro" over private property is a "permanent physical occupation." *Nollan v. Cal. Coastal Comm'n,* 483 U.S. 825, 831-32 (1987); *see also United States v. Causby,* 328 U.S. 256, 265, 267 (1946) (intermittent passage of low-level flights imposed a "servitude . . . upon the land" and this "direct invasion" was a taking). In none of those cases did the physical taking involve the seizure of "absolute" possession by the government.

Intervenors' argument is contradicted not only by Supreme Court precedent but also by the very case on which Intervenors' rely—*Southview Assocs., Ltd. v. Bongartz,* 980 F.2d 84, 93-94 (2d Cir. 1992). The *Southview* Court explained that a permanent physical occupation occurs when government action (i) "deprive[s] the owner of both his right to possess the occupied area and his right to exclude the occupier from possession and use of it;" (ii) "'forever den[ies] the owner any power to control the use of the property,' such that he 'can make no nonpossessory use' of it;" and (iii) "leaves the owner with only 'the bare legal right to dispose of the occupied space,' because the occupier ordinarily renders that right worthless, and 'the purchaser will also be unable to make any use of the property.'" 900 F.2d at 93 (quoting *Loretto,* 458 U.S. at 435).

23

Those exact elements describe the RSL's taking of owners' property. The RSL denies owners the right to possess or occupy the rent stabilized units, the right to exclude third parties, and the right to exercise control over the use of the rent stabilized unit, and leaves them with only the bare legal right to dispose of the unit, because anyone who buys the building will similarly be unable to use that unit.  Unlike in *Southview,* owners cannot exclude the government-mandated tenants by posting "No Trespassing" signs, they do not retain authority to construct alternative structures or use the unit for alternative purposes, and they may not walk through or otherwise access the tenant-occupied units. *See Southview Assocs.,* 900 F.2d at 94.[10]

City Defendants likewise argue that the RSL does not effect a physical taking because "it does not compel landlords to keep their properties open for rent in perpetuity." City Br. at 19-20, 24. That argument is contradicted by the plain terms of the RSL, which requires owners to renew the leases of rent stabilized tenants indefinitely. So long as those tenants (or their successors) seek to remain in the unit and comply with the lease terms, owners are compelled to keep their properties open to those tenants for rent in perpetuity

**B.    The Compelled Physical Occupation Imposed by the RSL is Not Lessened By the Few and Limited Options the RSL Purports to Offer Owners**

Defendants and Intervenors, relying on *Harmon v. Markus*, 412 F. App'x 420 (2d. Cir. 2011), argue that the RSL does not constitute a compelled physical occupation because Plaintiffs

---

[10] To the extent that Intervenors suggest that the RSL does not amount to a "permanent" physical invasion (an argument they did not articulate in their motion), that argument is likewise incorrect. "Very little in property law is 'permanent' in the sense of lasting forever"; *Loretto* instead had in mind as a permanent physical invasion "governmental action that amounts to the imposition of an easement of indefinite duration." Compl. ¶ 200 (quoting Thomas W. Merrill, *The Character of the Governmental Action*, 36 Vt. L. Rev. 649, 658 (2012). Thus, the third party right to occupy a sliver of roof held to be a physical taking in *Loretto* lasted only "[s]o long as the property remain[ed] residential and a [cable] company wishe[d] to retain the installation." 458 U.S. at 439; *see also Causby*, 328 U.S. at 267-268; *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945) (holding physical invasions of limited duration to be physical takings). "[P]ermanent" does not mean forever." *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991).

are permitted to refuse to renew leases in a few limited circumstances. The exceptions upon

which Defendants rely serve only to highlight the RSL's compulsory nature.

Defendants and Intervenors argue that owners can recover possession of units "because

of immediate and compelling necessity for their own personal use and occupancy," and that the

physical occupation by stabilized tenants therefore is not absolute. Intervenor Br. at 11. *See also*

State Br. at 19; City Br. at 24.

But the 2019 HSTPA eliminated that right with respect to all but one dwelling unit in

each regulated building. Compl. ¶ 232. Thus, even in 6-unit buildings (the smallest RSL-

regulated buildings), the RSL deprives owners of that right with respect to 83% of their building.

For larger buildings (e.g., 50-unit buildings), owners forfeit their right of possession to 98% of

their property. Permitting owners to possess a single unit for their own occupancy cannot offset

the denial of that right with respect to the lion's share of the building that they own.  As *Loretto*

explained, "constitutional protection for the rights of private property cannot be made to depend

on the size of the area permanently occupied." 458 U.S. at 436.

That owners are now precluded by statute from recovering possession of most of their

building for the owners' personal use alters a critical factor relied upon by the Second Circuit in

*Harmon*, and removes a fundamental ownership right from Plaintiffs.[11] Owners no longer retain

even a theoretical right to convert their entire property into a home for the owner's personal use,

---

[11] In a ruling that preceded the HSTPA and the Supreme Court decision in *Horne*, the *Harmon* court rejected a plaintiffs' physical takings claim, pointing to the owner's ability to use their property for personal use, demolish the property, or evict an unsatisfactory tenant. The court also found that the plaintiffs acquiesced to the RSL when they acquired their property. As discussed above, the 2019 HSTPA largely eliminated owners' ability to recover possession of a regulated property for personal use, and *Horne* confirmed that acquiescence is not a defense to a physical takings claim.

25

denying owners any alternative but to offer their buildings for use as rental properties, which subjects them to the compulsory and unavoidable RSL occupation.[12]

Defendants and Intervenors next argue that owners are not compelled to rent to stabilized tenants because they can recover possession of their buildings for the immediate purpose of demolishing them. Intervenor Br. at 11; State Br. at 19; City Br. at 24. Requiring an owner to destroy his or her own property to avoid the government's physical occupation of that property is the definition of a taking—not evidence of a lack of taking. *See*, *e.g.*, *Cebe Farms, Inc. v. U.S.*, 116 Fed. Cl. 179, 192 (Fed. Cl. Ct. 2014) ("[P]hysical takings involve physical occupation or destruction of property.") (internal quote omitted). So long as the building exists, the owner must accept rent stabilized tenants, and thus his property is subject to compelled physical occupation.

In any event, owners are not given an unfettered right to refuse to renew tenants' leases even for the purpose of demolishing their own buildings. Rather, owners must pay tenants a stipend and must subsidize the tenants' living expenses for six years if they cannot locate a suitable accommodation with the same or lower rents in a closely proximate area. Compl. ¶¶ 252-256. Those compelled payments to tenants are simply takings in a different form.[13]

Defendants and Intervenors also assert that an owner's ability to evict tenants precludes a finding that there is a permanent physical occupation. City Br. at 22; Intervenor Br. at 11-12. Not so. Tenant eviction remains solely within the tenant's control. Tenants can only be evicted if they

---

[12] Even the ability to occupy a single unit is dramatically curtailed. It is not available to those who own their property through a corporate entity, as is usually the case. Compl. ¶¶ 224-225. It is not available absent a showing of "immediate and compelling necessity," a threshold that New York courts have refused to find in even extreme circumstances. Compl. ¶¶ 241-244. And it is unavailable if the tenant is 62 or older, infirm, or a long-term tenant unless the owner makes available a closely proximate stabilized unit at the same or lower rent. Compl. ¶¶ 237-240.

[13] By way of example, if an owner had to subsidize a tenant's rent by $1000 per month over 72 months, and also pay the mandatory $5000 stipend and $3,000 in moving expenses, the owner would owe $80,000 per tenant in order to "recover" possession of the unit just for demolition purposes. In a building with 20 stabilized units, the owner would be compelled to pay $1.6 million to subsidize the tenants' living expenses.

fail to pay rent, create a nuisance, or violate the law. Compl. ¶ 217. Unlike in *Yee,* where the owner retained the right to evict tenants based on the "park owner's desire to change the use of his land," *Yee,* 503 U.S. at 524, the RSL grants owners no such right. Even for tenants who break the law or refuse to pay rent, the HSTPA dramatically reduces owners' eviction rights, permitting courts to stay tenant evictions up to one year if the tenant demonstrates an inability to obtain alternative housing or other hardship.  By granting such extensive rights to tenants, the RSL not only compels owners to suffer the continued physical occupation of their property, but it also denies owners the right to exclude even the most offensive tenants.

The City Defendants argue that owners are not compelled to offer buildings for rent stabilized use because they retain the ability to withdraw buildings from rent stabilization for the owner's own commercial use or upon a showing that it is not financially practicable to redress substantial building code violations. City Br. at 21-22. But neither of those options permit the owner to obtain any income from the property, either through rental or sale. Compl. ¶¶ 249-250 (9 NYCRR § 2524.5 precludes renting or selling all or any part of land or structure). They therefore in no way ameliorate the taking.

Moreover, converting a building into a commercial property solely for the use of the owner offers no meaningful alternative to the RSL-compelled use. It would require owners to (i) operate a commercial business; (ii) that makes use of a multi-story building; (iii) that can be operated within the zoning restrictions applicable to the housing units; and (iv) that generates sufficient income to replace the rental income and sale value of the building. Such a hypothetical option is practically infeasible and provides no meaningful alternative to the compelled use of the building for stabilized rentals.

The second option offered by City Defendants—withdrawing the building because it is not financially practicable to redress code violations—again only highlights the compulsory nature of the RSL. That option is available only if the "cost of removing such violations would substantially equal or exceed the assessed valuation of the structure." Compl. ¶ 251 (quoting 9 NYCRR § 2524.5). In other words, the only way to avoid the compulsory occupation of one's property is to allow it to degrade to such a state of disrepair that it loses all economic value as a rental building. If the necessary repairs could be completed at less than the value of the entire building, owners are not permitted by to withdraw the property from the market, but are compelled to make those necessary repairs to meet code requirements.

Where the only permissible alternative to housing rent stabilized tenants in perpetuity is to destroy the building, or to permit it to enter such a state of disrepair as to have no economic value, it can no longer be said that owners have "voluntarily rented their land," as in *Yee.* While it may have been true that the current owners, or their predecessors in interest, at one point in time made a decision to offer their property for rental use, the option to withdraw the property from that use has been inexorably chipped away by the RSL, such that now the RSL serves the legislators' goal to "ensure that rent stabilized apartments remain rent stabilized." Compl. ¶ 65.

## C.     Property Owners' Continued Participation in the Residential Rental Business Does Not Preclude a Takings Finding

Even if the RSL permitted owners to use their buildings for any purpose other than renting to rent stabilized tenants—which it does not—"a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Loretto,* 458 U.S. at 439, n. 17. Despite the Supreme Court's express instruction, Defendants and Intervenors argue that regulated owners may not assert takings claims because they "acquired

their property 'with full knowledge that it was subject to the RSL,' thereby acquiescing in its continued use as rental housing." City Br. at 21; *see also* Intervenor Br. at 10 n.6.

The Court in *Loretto* rejected that acquiescence-based argument, holding that it "proves too much" (458 U.S. at 439, n.17):

> For example, it would allow the government to require a landlord to devote a substantial portion of his building to vending and washing machines, with all profits to be retained by the owners of these services and with no compensation for the deprivation of space. It would even allow the government to requisition a certain number of apartments as permanent government offices. The right of a property owner to exclude a stranger's physical occupation of his land cannot be so easily manipulated.

Defendants advance the precise argument that the Loretto Court rejected: that the government can require a landlord to devote his property to housing rent stabilized tenants, with the tenants getting the benefit of rent regulation and with no compensation to the owners for the deprivation of space. Indeed, under Defendants' theory, if the RSL provided that one unit in each building was to be set aside for government offices, owners could not complain because they acquiesced to the application of such regulations when they bought their properties. The Court firmly rejected that argument in *Loretto.*

Defendants rely on *Harmon*'s "acquiescence" theory, but fail to acknowledge the Supreme Court's subsequent decision in *Horne v. Department of Agriculture*, 135 S. Ct. 2419, 2430 (2015). In *Horne,* the Court expressly addressed the question Defendants now pose: "Whether a governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking." *Id*. The Court held that the argument that government-imposed conditions on the use of private property could prevent a taking from occurring was "wrong as a matter of law," stating that in *Loretto* it had "rejected the argument that the New York law was not a taking because a landlord could avoid the

requirement by ceasing to be a landlord. We held instead that 'a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Id.* (quoting *Loretto,* 458 U.S. at 439, n. 17).

In *Horne,* the government argued that a reserve requirement applied to the sale of raisins (which required raisin growers to give a portion of the crop to the government without compensation) was not a compelled taking because the plaintiffs had different options for the use of their property. They could have planted different crops, sold their grapes not for raisins but rather as table grapes or for wine. The Court held that the availability of such options did not preclude the plaintiffs' takings claim.[14]

Defendants likewise fail to explain how their proposed rule—that one who purchases a property subject to the RSL acquiesces to the compelled use of that property as regulated rental housing—can survive *Palazzolo v. Rhode Island,* 533 U.S. 606 (2001). There, the Supreme Court specifically rejected the argument that because the purchaser "took title with notice of the [government] limitation" he could no longer claim any injury from the value lost as a result of that limitation. *Palazzolo*, 533 U.S. at 626. The Court explained that the "State may not put so potent a Hobbesian stick into the Lockean bundle" because to do so would "absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable." *Id.* at 627. It determined that there is no "expiration date on the Takings Clause," and that "[f]uture generations, too, have a right to challenge unreasonable limitations on the use and value of land." *Id.* A contrary rule would impair an owner's ability to transfer its interest in land,

---

[14] The Court in *Horne* also rejected the government's argument that the raisin reserve requirement was a voluntary exchange for a valuable governmental benefit. The Court explained that the government benefit offered—selling produce in interstate commerce—was not a special governmental benefit that the government could hold hostage, to be ransomed by the waiver of constitutional protection. So too here. Leasing a unit to a tenant is not some special governmental benefit that owners were willing to pay for through the sacrifice of their property rights. It is a right that every other building owner in New York City freely enjoys with no comparable restraints.

secure a windfall to the state, and disparately treat young and old owners and owners with the resources to hold onto their properties versus those with the need to sell. *Id.* at 627-628.

In sum, the Supreme Court has made it abundantly clear that owners cannot be stripped of their protections under the Fifth Amendment based on the pretense that they "acquiesced" to a taking. That is true regardless of whether owners purchased a building after the adoption of the RSL, or they at some time "voluntarily" rented their units out.

### D.   Plaintiffs' Physical Takings Claim Presents a Proper Facial Challenge to the RSL

Plaintiffs have stated a proper facial challenge to the RSL. The Complaint alleges that the RSL imposes a state-mandated physical occupation in every regulated unit, denying every owner the right to exclude rent stabilized tenants from their building, constraining every regulated owner's ability to use their property for purposes other than renting to stabilized tenants, and precluding every owner from occupying their own properties. Although the RSL does provide limited exceptions to the application of the statute, Plaintiffs challenge the constitutionality of the RSL even in light of those exceptions. In other words, even for owners who fall within one of the RSL's permitted exceptions, the RSL still impermissibly constitutes a taking in violation of the Fifth Amendment.[15]

---

[15] The Supreme Court has observed that the test announced in *U.S. v. Salerno*, 481 U.S. 739 (1987)—that a facial challenge requires the plaintiff to "establish that no set of circumstances exists under which the Act would be valid"—has itself been criticized by the Court. *Wash. State Grange. v. Wash. State Republican Party,* 552 U.S. 442, 449 (2008). *See also Washington v. Glucksberg,* 521 U.S. 702, 739-740 (1997) (Stevens, J. concurring) ("I do not believe the Court has ever actually applied such a strict standard"); *Janklow v. Planned Parenthood, Sioux Falls Clinic,* 116 S. Ct. 1582 (Stevens, J. concurring) (the dicta in *Salerno* was unsupported by citation, and went beyond the general principal that an act is not wholly invalid just because it might operate unconstitutionally under some conceivable set of circumstances). While the RSL is facially invalid even under the *Salerno* standard, the purpose of the *Salerno* rule, to ensure that laws are adjudicated based on real cases and controversies, would be equally ill-served by upholding a statute based upon a hypothetical instance in which the law might pass muster. Where the law would be unconstitutional with respect to the "large fraction of cases," *Janklow,* 116 S. Ct. at 1582, its constitutionality should not be upheld based only upon hypothetical instances that may or may not even exist. At best, that is all Defendants offer in their Motion to Dismiss.

Defendants argue that because there are narrow circumstances in which building owners may refuse to renew a lease or evict a tenant that a "set of circumstances exist under which the [RSL] would be valid," which precludes a facial takings claim. City Br. at 7; State Br. at 15. But, as explained above, the exceptions do not defeat the takings claim, because they are hedged with restrictions that themselves constitute takings.

Thus, the exception permitting non-renewal when a building is demolished or withdrawal of a building where it is economically infeasible to bring it to code require that the owner demolish his own property or allow it to be reduced to a value-less state of nonrepair. In addition, the statutory exceptions frequently carry with them substantial payment obligations that themselves constitute a taking. And an owner's ability to evict a tenant for malfeasance, in addition to being highly constrained, turns not on the owner's wishes about how to use its property but on the tenant's own choices. The tenant can retain the unit for as long as he or she chooses to pay the below-market, owner-subsidized rent and not commit malfeasance, and can pass on the unit to others. The owner, by contrast, has no right to regain the property at the end of a rent-stabilized lease and is indefinitely saddled with subsidizing a tenant that the owner cannot exclude from the owner's property. The RSL eviscerates the owner's right to exclude others from his or her property, which is "perhaps the most fundamental of all property interests." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).

Even taking account of every statutory exception built into the RSL, that statute on its face constitutes an unconstitutional physical taking of RSL-regulated property.

## III.   PLAINTIFFS PLAUSIBLY ALLEGE THAT THE RSL EFFECTS A REGULATORY TAKING

### A.   The RSL Forces Some Building Owners to Bear Public Burdens That, in Fairness and Justice, Should be Borne by the Public As a Whole

The Fifth Amendment's Takings Clause—at its core—bars the "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960). The Supreme Court has consistently identified that shifting of public burdens to private property as the hallmark of a taking. *See, e.g., Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 ("we have emphasized [the Fifth Amendment's] role in 'barring Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'").[16] "In all instances, the [regulatory takings] analysis must be driven by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (*quoting Palazzolo,* 533 U.S. at 617-18).

The RSL fails this fundamental test. The New York Court of Appeals conclusively determined, in response to a certified question from the Second Circuit, that the RSL is a "local public assistance benefit" paid by private property owners. Compl. ¶ 352. It "provides assistance to a specific segment of the population that could not afford to live in New York City without a rent regulatory scheme." *Id.* While this benefit is *conferred* by the government through regulation, the Court of Appeals found that it is "not *paid for* by the government." *Id.* ¶ 353 (emphasis original). Instead, New York "has created a public assistance benefit through a unique regulatory scheme applied to private owners of real property." *In re Santiago-Monteverde*, 24 N.Y. 3d 283, 289 (N.Y. Ct. App. 2014), *adopted*, 780 F.3d 126 (2d Cir. 2015). In other words,

---

[16] *See also Penn. Cent. Transp. Co. v. New York City,* 438 U.S. 104, 123 (1978); *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 318-19 (1987); *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 325 (1893) (Fifth Amendment prevents the public "from loading upon one individual more than his just share of the burdens of government," and "when he surrenders something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him").

the RSL requires some people alone (private owners of real property) to bear the burden of providing a public assistance benefit (subsidized housing). And "public assistance benefit[s]" are the precise type of public burdens that ought in fairness to be borne by the public as a whole.

Intervenors argue that the holding in *Santiago-Monteverde* does not impact the constitutionality of the RSL because "[l]egislation designed to promote the general welfare commonly burdens some more than others." Intervenor Br. at 20 (quoting *Penn Cent.,* 438 U.S. at 133). But, as Justices Scalia and O'Conner have explained, that is permissible under the Takings Clause only when those who are burdened uniquely caused the issue that the legislation is intended to address. In their *Pennell* dissent, Justices Scalia and O'Conner explained: "Traditional land-use regulation . . . does not violate this principle [of preventing some alone from bearing the public burden] because there is a cause-and-effect relationship between the property use restricted by the regulation and the social evil that the regulation seeks to remedy." 485 U.S. at 20 (1988) (Scalia, J. dissenting). Thus, where a proposed property use (as in the context of zoning) "would otherwise be the cause of excessive congestion," it cannot be said that the property owner is being singled out unfairly.

By contrast, where a price control regulation is invoked to address the social problem that some renters are too poor to afford even reasonably priced housing, "*that* problem is no more caused or exploited by landlords than it is by the grocers who sell needy renters their food, or the department stores that sell them their clothes . . ." *Id.* at 21. "And even if the neediness of renters could be regarded as a problem distinctively attributable to landlords in general, it is not remotely attributable to the *particular* landlords that the [RSL] singles out—namely, those who happen to have [an RSL] tenant at the present time." *Id.* As Justice Scalia explained:

> The traditional manner in which American government has met the problem of
> those who cannot pay reasonable prices for privately sold necessities—a problem

34

> caused by the society at large—has been the distribution to such persons of funds raised from the public at large through taxes, either in cash (welfare payments) or in goods (public housing, publicly subsidized housing, and food stamps). Unless we are to abandon the guiding principle of the Takings Clause that 'public burdens . . . should be borne by the public as a whole,' this is the only manner that our Constitution permits.

*Id.* (citation omitted). Or as Justice Holmes explained, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change"; it is not the case "that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922). In other words, because the owners of rent stabilized buildings are not to blame for the neediness of tenants that motivates the RSL, it is not fair and just to impose the burden of the RSL on those owners alone rather than on the public purse.

Justice Scalia went on to explain in *Pennell* that "[t]he politically attractive feature of regulation is not that it permits wealth transfers to be achieved that could not be achieved otherwise; but rather that it permits them to be achieved 'off budget,' with relative invisibility and thus relative immunity from normal democratic processes." 485 U.S. at 22. "Once the door is opened it is not unreasonable to expect price regulations requiring private businesses to give special discounts to senior citizens (no matter how affluent), or to students, the handicapped, or war veterans." *Id.* at 23. Subsidies for these groups may well be a good idea, but the Takings Clause requires them to be funded through the process of taxing and spending, where the economic effects and competing priorities are more evident. *Id.*

The improper political expedient that Justice Scalia warned against is precisely what has motivated New York legislators to maintain the RSL for 50 years. Indeed, that New York has, in other circumstances, funded such housing subsidies using public funds demonstrates that supplying affordable housing is a goal that should, in all fairness and justice, be borne by the

public as a whole. For example, private housing for more than 100,000 tenants is already subsidized using Section 8 vouchers. Compl. ¶ 158. New York City subsidizes the rent for seniors and disabled individuals through the SCRIE and DRIE programs. Compl. ¶ 160. And New York offers renter's tax credits to help finance housing for renters earning $200,000 or less. Compl. ¶ 162. The existence of those publicly funded plans confirms that subsidized housing is a benefit that can and should be borne by the public as a whole. There is no fairness or justice in imposing that cost uniquely on RSL-regulated owners.

New York's highest court has confirmed that the RSL's mandate violates the very purpose of the Takings Clause—ensuring that some people alone should not bear public burdens that should be borne by the public as a whole. Having answered that question—the question that all the multi-factor regulatory takings analyses were intended to evaluate—there is no need to apply those multi-factor tests. By using its police power to fund a public benefit at the substantial expense of a discrete set of building owners, Defendants have imposed an unconstitutional regulatory taking of regulated owners' property.

### B. Complete Loss of Economic Value as to Every Rent Stabilized Building in New York is Not Required Before a Facial Takings Challenge May be Asserted

Defendants argue that Plaintiffs may assert a facial regulatory takings claim only if they allege that the RSL deprives "*all* owners of rent stabilized properties, economically viable use of their property." City Br. at 27; *see also* State Br. at 20. So long as the RSL permits one owner an economically viable use of its property, according to Defendants, the RSL is facially constitutional, regardless of whether other owners are forced out of their properties or must subsist on the precipice of insolvency. Defendants' argument misconstrues the Supreme Court's takings decisions in order to set an impossibly high barrier to any facial takings claim, thus insulating the RSL from any meaningful Fifth Amendment challenge. No such barrier exists.

1.   ***Defendants' Argument that All Owners Must Lose All Economically Viable Use of their Property Improperly Conflates the Penn Central Test with the Per Se Use Restriction Cases***

The Supreme Court has identified three distinct categories of takings claims: (1) the government regulation requires an owner to suffer a permanent physical invasion of her property (*Loretto*); (2) the regulations completely deprive an owner of "*all* economically beneficial use" of her property (*Lucas*); and (3) the regulations effect a taking under the standards set forth in *Penn Central*, *Pennsylvania Coal*, and other cases. *Lingle*, 544 U.S. at 538.

A regulation that results in destruction of all economically beneficial use results in a *per se* taking (the second category), but a complete loss of value is unnecessary to state a regulatory takings claim (the third category).  As then-Justice Rehnquist explained in *Penn Central*:

> The Court has frequently held that, even where a destruction of property rights would not otherwise constitute a taking, the inability of the owner to make a reasonable return on his property requires compensation under the *Fifth Amendment*. But the converse is not true. A taking does not become a non-compensable exercise of police power simply because the government in its grace allows the owner to make some 'reasonable' use of his property. '[It] is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking.'

*Penn Cent.*, 438 U.S. at 149-50 (dissent) (italics original).

For the same reason, Defendants and Intervenors err in relying on language from use restriction cases that the "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." State Br. at 22; *see* Intervenor Br. at 17; City Br. at 31-32.

In some use restriction cases (*e.g.*, zoning restrictions), owners receive an "average reciprocity of advantage" from the imposition of the same restriction on their neighbors. *Pennsylvania Coal*, 260 U.S. at 415. *E.g.*, *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (reciprocal zoning restrictions); *Penn Central*, 438 U.S. at 147 (Rehnquist J., dissenting). In others, what is precluded is a "noxious use" (*Mugler v. Kansas*, 123 U.S. 623, 669

37

(1887)) in the nature of a public nuisance. *E.g.*, *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (ordinance precluding the making of bricks within certain areas of city); *Penn Central*, 438 U.S. at 145-46 (Rehnquist, J., dissenting). In still others, a balancing of factors tips clearly in favor of the government action. *E.g.*, *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 644-45 (1993) (ERISA withdrawal liability not a taking where there is no physical appropriation by government, no interference in investment-backed expectations, and the diminution in value alone is insufficient).[17]

In such cases, the non-economic factors considered under the *Penn Central* regulatory takings analysis—the nature of the governmental action, reciprocity of benefit, or removal of a nuisance—weighed heavily against a takings finding. The question whether the government regulation effected a taking therefore turned on whether the use restriction disproportionately burdened the plaintiff by depriving it of a high percentage of the property's value.

But where the non-economic *Penn Central* factors *favor* a takings finding, as here, it would be inappropriate also to demand that plaintiffs lose nearly all value from their property before they may state a takings claim. Indeed, if the *Penn Central* test required a near complete loss in value in all cases, the test would collapse into the *per se* takings analysis applicable to regulations that deprive the owner of all economically beneficial use of the property. That is not the law. *E.g.*, *Palazzolo*, 533 U.S. at 631 (even through parcel retained $200,000 in development value, claims under *Penn Central* must still be examined).

## 2. *Plaintiffs Need Not Demonstrate a Complete Loss of All Value in Order to State a Facial Regulatory Claim*

Defendants and Intervenors are similarly incorrect when they argue that a special rule for

---

[17] The lower court cases cited by Defendants and Intervenors talismanically reiterated the language from *Concrete Pipe,* without evaluating the distinct context of that decision or of the decisions cited by *Concrete Pipe*.

facial regulatory takings claims require a plaintiff to demonstrate the loss of all property value.

They assert that three cases—*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987), *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 295 (1981), and *W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19 (2d Cir. 2002)— "foreclose a facial regulatory taking challenge to the RSL." *E.g.*, Intervenor Br. at 14. In the view of Defendants and Intervenors, a government regulation affecting all property owners in a similar manner—*e.g.*, mandating that coal that supports buildings may not be mined, as in *Pennsylvania Coal*—are immune from facial challenge, and can be held unconstitutional one property at a time. Such a proposition would render regulatory takings analysis the poor cousin of the Supreme Court's other takings tests—with each owner of nearly 1 million RSL units required to separately bring suit for each property, and with the RSL's constitutionality determined in patchwork fashion, unconstitutional for some property owners but constitutional as to others.

The decisions cited by Defendants do not require that irrational result. *Hodel* and *Keystone* both involved land use regulations related to the mining of coal. Like other land use cases (*e.g.*, *Village of Euclid*, and *Hadacheck*), the non-economic *Penn Central* factors disfavored finding a taking because there was no physical occupation, the government sought to abate a nuisance, and the regulation created a reciprocity of advantage for mine owners. Thus, the analysis in those cases turned on the economic impact factors, and in both cases, the parties provided little or no evidence to demonstrate the economic impact to the challenged regulations.

The Complaint in this case, by contrast, is replete with evidence of the economic impact of the RSL. Further, the RSL does not merely regulate the use of the land, but goes much further: it targets a discrete group of property owners, mandates who will be present on their property, determines the amounts the owners may charge to those lessees, limits the means by which an

owner may dispose of his property, severely limits alternate uses of the property, and does all this without providing the owner with any reciprocal advantage. Given that context, the non-economic *Penn Central* factors all strongly favor a takings finding.

The contrast between this case and *Hodel* is stark. *Hodel* concerned a pre-enforcement challenge to the Surface Mining Act's requirement that surface miners restore steep slope surface mines to their original contour. "[N]either appellees nor the court identified any property in which appellees have an interest that has allegedly been taken by operation of the Act" or any "concrete controversy concerning either application of the Act to particular surface mining operations or its effect on specific parcels of land." *Hodel*, 452 U.S. at 294-295. Absent some property subject to the regulation—particular mining operations or particular parcels of land—the Court lacked "particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." *Id.* at 295.[18]

The Complaint here, by contrast, alleges in detail the severe economic impact of the RSL on properties across New York City. The median rent for rent stabilized units across New York is 25% lower than market rents, and in some cases 70-80% lower. Compl. ¶¶ 285, 286. The value of properties with rent stabilized units are a quarter to half the value of those with market-rate

---

[18] To the extent *Hodel* suggested that a facial taking can be found only where the statute on its face denies an owner economically viable use of his land, it misinterpreted *Agins v. Tiburon,* 447 U.S. 255 (1980). *See Hodel*, 452 U.S. at 295 (relying solely on *Agins* in support of proposed test for facial challenges). *Agins* referenced the "denial of economically viable use of land" from footnote 36 in *Penn Central*, which noted the defendant's concession that if the *Penn Central* terminal ceased to be "economically viable" in the future, a takings claim might then lie. *Agins,* 447 U.S. at 260. The *Agins* court did *not* suggest that test is the only one that identifies a facial taking. To the contrary, it highlighted that "no precise rule determines when property has been taken." *Id.* at 260-61. In any event, plaintiffs here pass the tests in both cases. In *Agins,* in determining whether the ordinance denied an economically viable use of the land, the Court emphasized that the ordinance did "not extinguish a fundamental attribute of ownership." *Id.* at 262. The Complaint here alleges the extinction of all the fundamental attributes of ownership, including the right to exclude. *Hodel,* in determining whether the Surface Mining Act denied an economically viable use of land, emphasized that "[t]he Act does not purport to regulate alternative uses to which coal-bearing lands may be put." 452 U.S. 296. The RSL precludes owners from using their properties for any other purpose, including commercial leasing, personal use, non-RSL leasing, or conversion to condominiums or cooperatives.

units, and the linear relationship confirms that this lost value is due to rent stabilization. *Id.* ¶¶ 295-299. Investment backed expectations have been dashed due to the repeated renewal of the supposedly temporary RSL, and the continual tightening of restrictions imposed on owners under the RSL (including the near elimination of rental increases, the elimination of decontrol provisions, and the limited recovery of improvement expenses). Compl. ¶¶ 308-331.

Tellingly, the Court in *Keystone* did not apply the truncated economic-impact analysis Defendants advocate even though the challenge was facial. Instead, the Court addressed all of the regulatory takings factors. The Court found that "the nature of the State's action is critical in takings analysis," and described the Pennsylvania Subsidence Act as "abat[ing] activity akin to a public nuisance." 489 U.S. at 488. The Court recognized that a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government," but concluded that the Subsidence Act "involves land use regulation, not a physical appropriation." *Id.* at 488 n.18.  And it perceived that the statute created "reciprocity of advantage." *Id.* at 491.  Only after addressing those factors did the Court find that the Act's prohibition on the mining of 2% of coal did not support a taking. *Id.* at 496. That analysis confirms that Defendants' restrictive standard for facial regulatory takings claims fails.

### 3.    The RSL is Functionally Equivalent to Government Appropriation of Private Property, which is a Classic Governmental Taking

Contrary to Defendants' contention, there is no "set formula" for evaluating regulatory takings claims; instead courts engage in "ad hoc, factual inquiries" focused on "several factors that have particular significance." *Penn Central*, 438 U.S. at 124. The inquiry "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private

property rights." *Lingle*, 544 U.S. at 539.  As alleged in the Complaint, the RSL *is* the functional equivalent of the classic taking: it denies the owner the right to exclude others and the rights to occupy, possess, use, control, and dispose of the property.  The RSL deprives owners of all the most important sticks in the property bundle.  Far lesser incursions have been deemed takings.

For example, in *U.S. v. Pewee Coal Co.*, 341 U.S. 114 (1951), the Court found a taking where the government took temporary control of coal mines and required mine officials to conduct mining activities for the public. The Government's action did not eliminate all economic value from the mine. Rather, the exercise of control over the mine and use of mine employees as the Government's agents sufficed to find a taking. So too here. The RSL effectively grants the government control over the regulated units and renders landlords the governments' agent. The government dictates that the property be used as stabilized housing (preventing owners from using the property for other purposes and mandating renewal of tenant leases), dictates the rental price, dictates the services that must be offered, and limits recovery of investments made to improve either the building as a whole or individual units.

Similarly, in *Nollan v. Cal. Coastal Commn.,* 483 U.S. 825, 831 (1987)*,* a government-mandated easement permitting public beach access was held a taking, even though the public was granted non-exclusive and temporary access to only a small portion of the property. The RSL interferes far more with owners' property rights, mandating that lessees be given exclusive possession of their owner-subsidized units for lengthy and indeterminate periods. In *Kaiser Aetna v. United States*, 444 U.S. 164 (1979), a government mandate that a private marina be opened to the public was found to be a taking, even though the marina owner rented space in the marina to other lessees. For the same reason, the RSL's mandate that tenants be permitted to

renew owner-subsidized leases on terms dictated by the government constitutes a taking even though the property owners may lease out market-rate units in their buildings.

### C. Plaintiffs State a Facial Claim under the Multi-Factor Regulatory Takings Test

Plaintiffs have alleged sufficient facts to support a claim that the RSL, on its face, effects a regulatory taking. As explained above, the RSL is functionally equivalent to the classic taking because it deprives owners of all the sticks in the bundle of property rights and forces a discrete subset of property owners to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. Not surprisingly, when all of the regulatory takings factors are evaluated, they confirm that conclusion.

#### 1. The Character of the RSL is to Physically Invade Private Property to Create A Public Welfare Program

The Supreme Court in *Penn Central* identified "the character of the governmental action" as one of the key factors in a regulatory takings analysis. 438 U.S. at 124; *see also Keystone*, 480 U.S. at 490 ("Many cases before and since *Pennsylvania Coal* have recognized that the nature of the State's action is critical in takings analysis.").

The character of the RSL points clearly to it being a taking. First, as already discussed, the RSL results in a physical invasion by saddling owners with non-removable tenants. A regulatory taking "may more readily be found when the interference with property can be characterized as a physical invasion by the government." *Penn Central*, 438 U.S. at 124.

Second, the RSL confers a "local public assistance benefit" on tenants that is "not paid for by the government" but by a small subset of New York City building owners. *Santiago-Monteverde*, 24 N.Y. 3d at 289.  *See Penn Central*, 438 U.S. at 128 ("government actions that may be characterized as acquisitions of resources to permit or facilitate uniquely public functions have often been held to constitute 'takings.'").

43

### 2.      *The RSL Does Not Address Noxious Uses of Property*

Regulations that preclude a noxious use of property or address a public nuisance typically are not held to be takings. *See Penn Central,* 478 U.S. at 125-127; *id.* at 144-46 (Rehnquist, J. dissenting). Indeed, regulations addressing noxious uses are involved in most of the takings decisions involving use restrictions—and are the reason why those restrictions have been upheld. *See, e.g., Euclid,* 272 U.S. at 388-89; *Hadacheck,* 239 U.S. 394; *Goldblatt v. Hepstead,* 369 U.S. 590 (1962). The RSL, by contrast, does not address a safety issue or noxious interference with other properties, and thus the rights of the state to exercise its police power do not weigh against a takings finding. Neither Defendants nor Intervenors have even acknowledged this factor, let alone suggested that the RSL regulates a noxious use of the property.

### 3.      *The RSL Has Had a Direct and Substantial Economic Impact on Regulated Properties*

"The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations." *Penn Central,* 478 U.S. at 124. As noted above, neither *Penn Central* nor any other decision requires a regulation to deprive landlords of all economically viable use of the property before a claim can be stated. No court has fixed a precise magnitude of economic impact required under the regulatory takings test because the test itself is inherently ad hoc.

The Complaint in this case provides extensive analysis showing that the RSL has had a substantial economic impact on the subject properties across New York City. Rents on stabilized units on average are 25% lower than market rents, and in some cases up to 70-80% lower. Compl. ¶¶ 285-286. RGB-approved rent increases dramatically lag increases in operating costs, resulting in substantial reductions in—and potential elimination of—net operating income. *Id.* ¶¶ 289-292. The values of rent stabilized properties are a quarter to one-half the values of market-

rate units, which is directly related to the imposition of rent stabilization. *Id.* ¶¶ 295-299. And the passage of the HSTPA reduced those property values by another 15 percent or more. *Id.* ¶¶ 329.

The Complaint also demonstrates the many ways the RSL interferes with reasonable investment-backed expectations. For example, the unprecedented rent freezes (and near freezes) over the past five years prevented owners from even covering operational cost increases, thereby interfering with investment-backed returns. Further, the repeated reductions to amortization rates on building improvements interfered with owners' ability to recover the costs of those investments. Compl. ¶¶ 303-308. The HSTPA further interfered with owners' expectations by eliminating statutory vacancy and longevity rental increases, eliminating preferential rent increases, eliminating luxury and high-income decontrol provisions, and limiting rent increases for IAIs and MCIs. Compl. ¶¶ 308-331. Each of those provisions allowed owners to partially offset below market rents and obtain greater return on their investments. The elimination of those modifications interferes with the investment-backed expectations of owners across New York City. No matter when they invested, the named Plaintiffs and the members of CHIP and RSA saw their investment-backed expectations crushed with the adoption of the 2019 Amendments.

Defendants and Intervenors cite to an echo chamber of authority for the proposition that owners are "not guaranteed [a] 'reasonable return' on investment." State Br. at 22 (quoting *Fed. Home Loan Mortg. Corp.,* 83 F.3d at 48); *see also* Intervenor Br. at 18. The cases they cite, like *Greystone Hotel Co. v. City of New York,* 13 F. Supp. 2d 524, 528 (S.D.N.Y. 1998), rely on the *per se* "economic viability" test from *Agins* (the *Lucas* or second category noted above). As explained above, that test is distinct from the multi-factor regulatory takings test, in which economic impact and loss of investment-backed expectations do not stand alone, but instead are two of several factors evaluated together.

Defendants also contend that because the RSL was in place when some owners bought their properties, those owners "who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." State Br. at 22-23 (quoting *Concrete Pipe*, 508 U.S. at 645); City Br. at 33-34. In other words, having succeeded in imposing the rent stabilization scheme in 1969, Defendants argue that no owner can assert a takings claim with respect to any amendment made thereafter, no matter the impact on their property. This argument fails for several reasons. First, the Supreme Court rejected that contention in *Palazzolo*, as discussed above.

Second, the Defendants read too much into the language of *Concrete Pipe & Prods.* As explained in *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003), that language, arising in the context of cases involving ERISA withdrawal liability, "referr[ed] to legislation that merely clarified the originally-intended meaning of an existing statute," not amendments like the 2019 HSTPA, that altered the legislative scheme. *Id.* at 1351. That a field is regulated does not "disqualif[y] parties' expectations without inquiry." *Id.* at 1350.

For example, given that the RSL has for twenty-five years permitted High-Income and Luxury Decontrol, owners would not be unreasonable in assuming they will continue. And given that the government recognized in 1974 the importance of permitting increased rents for essential capital improvements, investors since then could reasonably anticipate that returns on capital improvement projects would be permitted. The existence of pre-existing regulations at best only informs the reasonableness of the investment-backed expectations, and in this case, those regulations reinforced the very expectations that the 2019 HSTPA dashed.[19]

---

[19] Moreover, the 2019 HSTPA amendments do not "buttress . . . the legislative end," as *Concrete Pipe* requires, but in fact contradict it. The 1974 ETPA specifies that "the ultimate objective of state policy" is "the transition from regulation to a normal market of free bargaining between landlord and tenant." Compl. ¶304. The recent amendments to the RSL contradict the goal of transitioning to a normal market. They are designed to make rent

46

####        4.        *The RSL Does Not Create an Average Reciprocity of Advantage for Building Owners*

Restrictions on the use of land that "secure[] an average reciprocity of advantage" are unlikely to constitute a taking. *Pennsylvania Coal,* 260 U.S. at 415. For example, zoning restrictions are typically a reasonable exercise of the police power because their "prohibition applies over a broad cross section of land and thereby secure[s] an average reciprocity of advantage." *Penn Central*, 438 U.S. at 147 (Rehnquist, J., dissenting) (internal quote omitted).

The RSL imposes substantial burdens on building owners with no reciprocal advantages. Owners of buildings subject to RSL restrictions are alone forced to pay the entire cost of the RSL program, yet receive no more from the program than the generalized benefits that accrue to all citizens of New York. As Justice Rehnquist explained, "[t]he Fifth Amendment 'prevents the public from loading upon one individual more than his just share of the burdens of government, and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him.'" *Penn Central*, 438 U.S. at 147 (Rehnquist, J., dissenting) (quoting *Monongahela Navigation*, 148 U.S. at 325). While benefits that flow from the RSL go to subsidized tenants and "accrue to all the citizens of New York City," "[t]here is no reason to believe that [owners] will enjoy a substantially greater share of those benefits" to reciprocate for bearing all of its burdens. *Id.*

Intervenors speculate that rent stabilized units provide housing for (i) people who provide "vital but undercompensated services"; (ii) those who "would otherwise experience homelessness"; and (iii) those who "create a more diverse community"—benefits to all City

---

stabilized units a permanent feature of the New York City rental market. Having promoted the RSL as a temporary means to return to free market conditions, Defendants should be estopped from arguing that Plaintiffs were not reasonable in relying on that goal in forming their investment-backed expectations.

residents. Intervenor Br. at 20. But Intervenors' claims are not grounded in any allegations in the

Complaint and are therefore improper considerations at the motion to dismiss stage. In fact, the

Complaint alleges the contrary: that rent stabilization fails to target households in need and does

not promote racial diversity. Compl. ¶¶ 84-113.

In any event, the indirect generalized societal benefits upon which Intervenors rely

cannot provide the "average reciprocity of advantage" necessary to justify the substantial

burdens imposed on Plaintiffs.  For example, in *Pennsylvania Coal* the Court found that an

average reciprocity of advantage existed where one coal company gave up its right to mine

certain pillars of coal and its neighboring coal company did the same, so that both coal mines

received approximately equal benefits. 260 U.S. at 415. The Court did *not* suggest that the

benefit of avoiding subsidence under public streets—a generalized benefit that would accrue to

the plaintiff coal company as to everyone else—was sufficient to justify the taking in that case. If

generalized benefits to the public were alone sufficient to satisfy the average reciprocity of

advantage, that factor would become meaningless because by definition actions taken for the

public use result in public benefits. As the Court warned, "[w]e are in danger of forgetting that a

strong public desire to improve the public condition is not enough to warrant achieving the desire

by a shorter cut than the constitutional way of paying for the change." *Id.* at 416.

## IV.   PLAINTIFFS' CLAIMS ARE TIMELY

The adverse impact of the RSL, which already imposes a constant physical invasion on

owners' property, has been ratcheted up time and again over the last five years, systematically

eroding Plaintiffs' property rights. Those actions—freezing (or nearly freezing) rent increases,

reducing amortization rates for capital improvements, increasing thresholds for decontrol—

culminated in the 2019 HSTPA, which substantially altered the impact of the RSL regulatory

scheme. Despite that continuous and recent conduct, Commissioner Visnauskas argues that

Plaintiffs' claims are time-barred to the extent they challenge provisions of the RSL in place prior to July 15, 2016. That argument is wrong for several reasons.

First, the RSL constitutes "a continuing invasion of plaintiffs' property rights akin to a continuing trespass—a situation in which a new cause of action arises in plaintiff's favor against the defendant each day." *S. Lyme Prop. Owners Assn. v. Town of Old Lyme*, 539 F. Supp. 2d 547, 557 (D. Conn 2008); *see also MacEwen v. City of New Rochelle*, 149 Misc. 251, 254 (Westchester Cty. Sup. Ct. 1933). The injury from the adoption of the RSL does not result from a single blow, but continues to accrue each day and could be readily avoided if the RSL were repealed. As the Sixth Circuit explained in *Kuhnle Bros., Inc. v. City of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997), "[a] law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within two years of its enactment. 'The continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations.'" *Kuhnle Bros.,* 103 F.3d at 522 (quoting *Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989)).[20]

As detailed above, the government's extraction of Plaintiffs' property interests through the RSL has been incrementally increased, particularly since 2014. Because the RSL is "composed of a series of separate acts that collectively constitute one unlawful practice," it meets the definition of a continuing violation even under the case cited by Defendants. *See EklecCo NewCo LLC v. Town of Clarkstown*, 2018 WL 3023159, at *9-10 (S.D.N.Y. June 18,

---

[20]  For a related reason, the statute of limitations is tolled under applicable New York law. Federal courts evaluating Constitutional claims under Section 1983 adopt both the statute of limitations and any tolling rules from the state where the claim is brought. *Greene v. Blooming Grove,* 1988 WL 126877, at *4-5 (S.D.N.Y. Nov. 21, 1988) (zoning ordinance constituted continuing trespass, such that new right of action arises each day). Under New York law, the statute of limitations is tolled when there is a continuing invasion of property rights, such as a continuing trespass. *See Amerada Hess Corp. v. Acampora*, 109 A.D.2d 719, 722, 486 N.Y.S. 2d 38, 41 (2d Dept. 1985) (six year limitations period did not bar constitutional attack of zoning ordinance, where plaintiff commenced action nine years after accrual).  Applying that New York tolling rule as required, the statute of limitations on Plaintiffs' cause of action is tolled so long as the RSL continues to invade Plaintiffs' property rights.

2018) (alteration omitted). To disallow an action in such cases "would mean that the government entity could engage in conduct that would constitute a taking when viewed in its entirety, so long as no taking occurred over any three-year period." *Id.*

Second, the 2019 HSTPA materially changed the impact of the RSL, thus restarting the clock on all challenges to the constitutionality of that law. The Ninth Circuit has explained that "substantive amendments to a takings statute will give rise to a new cause of action . . . if those amendments 'alter the effect of the ordinance upon the plaintiffs.'" *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 956 (9th Cir. 2011) (internal quote omitted).[21] Given that material change to the RSL, "the constitutionality of [the RSL] can only be determined by evaluating the totality of its provisions and effects, and there is no precedent suggesting that only limited parts of an integrated regulatory scheme should be evaluated in isolation." *MHC Fin. Ltd. v. City of San Rafael*, 2008 WL 440282, at *33 (N.D. Cal. Jan. 29, 2008) (citing *Richards v. United* States, 369 U.S. 1, 11 (1962)).

## CONCLUSION

Defendants' and Intervenors' Motions to Dismiss should be denied.

---

[21] *See also Cashman v. City of Cotati*, 374 F.3d 887, 893 (9th Cir. 2004) (decision vacated and withdrawn on other grounds) (where the terms of amended ordinance differ from prior rent control ordinance, the statute of limitations begins to run upon the adoption of the amended ordinance); *MHC Fin. Ltd. v. City of San Rafael*, 2008 WL 440282, at *31-33 (N.D. Cal. Jan. 29, 2008) (where amended rent control ordinance altered the formula used to calculate rent increases, the amendment started a new statute of limitations period).

Dated: December 13, 2019

Respectfully submitted,

/s/ *Andrew J. Pincus*

Andrew J. Pincus
Timothy S. Bishop
Reginald R. Goeke
Robert W. Hamburg

MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Tel.: (212) 506-2500

*Counsel for Plaintiffs*