UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x

 COMMUNITY HOUSING IMPROVEMENT PROGRAM,
 RENT STABILIZATION ASSOCIATION OF N.Y.C.,
 INC., CONSTANCE NUGENT-MILLER, et al.,

           Plaintiffs,

           -against-                          19-cv-4087(EK)(RLM)

 CITY OF NEW YORK, RENT GUIDELINES BOARD,
 DAVID REISS, CECILIA JOZA, ALEX SCHWARZ,
 GERMAN TEJEDA, MAY YU, et al.,

           Defendants.


-------------------------------------------x      **MEMORANDUM AND ORDER**


 74 PINEHURST LLC, 141 WADSWORTH LLC, 177
 WADSWORTH LLC, DINO PANAGOULIAS, DIMOS
 PANAGOULIAS, et al.,

           Plaintiffs,

           -against-
                                              19-cv-6447(EK)(RLM)
 STATE OF NEW YORK, NEW YORK DIVISION OF
 HOUSING AND COMMUNITY RENEWAL, RUTHANNE
 VISNAUSKAS, et al.,

           Defendants.


-------------------------------------------x

ERIC KOMITEE, United States District Judge:

          Rent regulations have now been the subject of almost a

hundred years of case law, going back to Justice Holmes.  That

case law supports a broad conception of government power to

regulate rents, including in ways that may diminish — even significantly — the value of landlords' property.

In 2019, the New York State legislature amended the state's rent-stabilization laws (RSL).  As amended, the RSL now goes beyond previous incarnations of the New York statute in its limitations on rent increases, deregulation of units, and eviction of tenants in breach of lease agreements, among other subjects.  Plaintiffs claim that in light of the 2019 amendments, the RSL (in its cumulative effect) is now unconstitutional.

This opinion concerns two cases.  Plaintiffs in *Community Housing Improvement Program v. City of New York* (19-cv-4087) are various landlords and two landlord-advocacy groups, the Community Housing Improvement Program and the Rent Stabilization Association (the "CHIP Plaintiffs").  Plaintiffs in *74 Pinehurst LLC v. State of New York* (19-cv-6447) are landlords 74 Pinehurst LLC, Eighty Mulberry Realty Corporation, 141 Wadsworth LLC and 177 Wadsworth LLC, and members of the Panagoulias family (the "Pinehurst Plaintiffs").  Because of the significantly overlapping claims and issues of law in the two cases, the Court addresses them here in a single opinion.[1]

---

[1] The Court does not, however, consolidate the cases.  Accordingly, the Court issues a separate judgment in CHIP, as directed below.

Pursuant to 42 U.S.C. § 1983, Plaintiffs assert (a) a facial claim that the RSL violates the Takings Clause (as both a physical and a regulatory taking); (b) in the case of certain Pinehurst Plaintiffs, a claim that the RSL, as applied to them, violates the Takings Clause (as both a physical and a regulatory taking); (c) a facial claim that the RSL violates their due-process rights; and (d) a claim that the RSL violates the Contracts Clause, as applied to each Pinehurst Plaintiff.[2]  They seek an order enjoining the continued enforcement of the RSL, as amended; a declaration that the amended law is unconstitutional (both on its face and as-applied); and monetary relief for the as-applied Plaintiffs' Takings and Contracts Clause claims.

Supreme Court and Second Circuit cases foreclose most of these challenges.  No precedent binding on this Court has ever found any provision of a rent-stabilization statute to violate the Constitution, and even if the 2019 amendments go beyond prior regulations, "it is not for a lower court to reverse this tide," *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47 (2d Cir. 1996) (*FHLMC*) — at least in response to the instant facial challenges. Accordingly, the Court grants Defendants' motions to dismiss the

---

[2] Each Pinehurst Plaintiff brings as-applied challenges under the Takings Clause and Contracts Clause except for 177 Wadsworth LLC, which only brings an as-applied claim under the Contracts Clause.

facial challenges under the Takings Clause, the as-applied
claims alleging physical takings, the due-process claims, and
the Contracts Clause claims — as to all Plaintiffs.  The Court
denies, at this stage, the motions to dismiss the as-applied
regulatory-takings claims brought by certain Pinehurst
Plaintiffs only.  Those claims may face a "heavy burden," *see*
*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470,
493 (1987), but given their fact-intensive nature, it is a
burden those Plaintiffs should be afforded an opportunity to
carry, at least to the summary-judgment stage.

## I.  Background

New York City has been subject to rent regulation, in
some form, since World War I.  But the RSL is of more recent
vintage.  It traces its roots to 1969, when New York City passed
the law that created the Rent Guidelines Board (RGB) — the body
that, to this day, continues to set rents in New York City.
Five years later, New York State passed its own statute, which
amended the 1969 law.  Together, these laws formed the blueprint
for today's RSL.  The State and City have amended the RSL
repeatedly since its initial enactment, culminating with the
amendments at issue here.

The 2019 amendments, enacted on June 14, 2019, made significant changes.  Most notably, they:

- Cap the number of units landlords can recover for personal use at one unit per building (and only upon a showing of immediate and compelling necessity).  N.Y. Reg. Sess. § 6458, Part I (2019).

- Repeal the "luxury decontrol" provisions, which allowed landlords, in certain circumstances, to decontrol a unit when the rent reached a specified value.  *Id.* at Part D, § 5.

- Repeal the "vacancy" and "longevity" increase provisions, which allowed landlords to charge higher rents when certain units became vacant.  *Id.* at Part B, §§ 1, 2.

- Repeal the "preferential rate" provisions, which allowed landlords who had been charging rates below the legal maximum to increase those rates when a lease ended.  *Id.* at Part E.

- Reduce the value of capital improvements — called "individual apartment improvements" (IAI) and "major capital improvements" (MCI) — that landlords may pass on to tenants through rent increases.  *Id.* at Part K, §§ 1, 2, 4, 11.

- Increase the fraction of tenant consent needed to convert a building to cooperative or condominium use. *Id.* at Part N.

- Extend, from six to twelve months, the period in which state housing courts may stay the eviction of breaching tenants.  *Id.* at Part M, § 21.

## II.  Discussion

A.     State Defendants' Eleventh Amendment Immunity

Before turning to Plaintiffs' constitutional claims, the Court must address certain defendants' assertion of immunity

from suit.  The "State Defendants" — the State of New York, the New York Division of Housing and Community Renewal (DHCR),[3] and DHCR Commissioner RuthAnne Visnauskas — argue that the Eleventh Amendment bars certain claims against them.[4]  State Defendants' Motion to Dismiss for Lack of Jurisdiction in Part, ECF No. 67. The State Defendants did not raise the Eleventh Amendment defense until oral argument on their motion to dismiss for failure to state a claim — after the 12(b)(6) motions had been fully briefed.  This omission is difficult to understand, to say the least; nevertheless, the Court must resolve these arguments, as they implicate its subject-matter jurisdiction.  *See Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990); *see also* Fed. R. Civ. P. 12(h)(3).

The parties agree that sovereign immunity bars Plaintiffs' Due Process and Contracts Clause claims (with certain exceptions).  Plaintiffs' Response to State Defendants' Motion to Dismiss for Lack of Jurisdiction in Part at 1, ECF No.

---

[3] The DHCR is the New York State agency charged with overseeing and administering the RSL.

[4] The Eleventh Amendment provides:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Though the text does not speak to suits against states by their *own* residents, the Supreme Court held in *Hans v. Louisiana*, 134 U.S. 1 (1890), that the amendment also generally precludes such actions in federal court.

71.   Therefore these claims cannot proceed against the State
Defendants, except to the extent they seek declaratory relief
against DHCR Commissioner Visnauskas (as explained below).  The
parties dispute, though, whether the Eleventh Amendment
immunizes states against takings claims.  *Id*.

There is an obvious tension between the Takings Clause
and the Eleventh Amendment.  The Eleventh Amendment provides the
states with immunity against suit in federal court.  Plaintiffs
contend, however, that the Takings Clause's "self-executing"
nature (meaning, its built-in provision of the "just
compensation" remedy) overrides the states' immunity.  In
support, they cite several cases that have reached that
conclusion (or related conclusions).  *See, e.g.*, *Manning v. N.M
Energy, Minerals & Nat. Res. Dep't*, 144 P.3d 87, 97-98 (N.M.
2006) (holding that the State of New Mexico could not claim
immunity from regulatory-takings claims because the "'just
compensation' remedy found in the Takings Clause . . . abrogates
state sovereign immunity"); *see also Hair v. United States*, 350
F.3d 1253, 1257 (Fed. Cir. 2003) (holding that the federal
government cannot claim immunity from takings claims because the
Takings Clause is "self-executing"); *Leistiko v. Sec'y of Army*,
922 F.Supp. 66, 73 (N.D. Ohio 1996) (same).

Despite the fact that the Eleventh Amendment and
Takings Clause date back so long, neither the Supreme Court nor

the Second Circuit has decisively resolved the conflict.  The Second Circuit recently affirmed a decision that held the Eleventh Amendment to bar a takings claim, but in a non-precedential summary order that did not analyze the question in detail.  *Morabito v. New York*, 803 F. App'x 463, 464-65 (2d Cir. 2020) (summary order) (affirming because the Eleventh Amendment "generally bars suits in federal courts by private individuals against non-consenting states"), *aff'g* No. 6:17-cv-6853, 2018 WL 3023380 (W.D.N.Y. June 18, 2018).  Thus the Court must reach the question squarely.

The overwhelming weight of authority among the circuits contradicts the cases cited by Plaintiffs, *supra*. These cases hold that sovereign immunity trumps the Takings Clause — at least where, as here, the state provides a remedy of its own for an alleged violation.[5]  The reasoning of one such case, *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948 (9th Cir. 2008), is instructive.  In that case, the Ninth Circuit analogized the question of Takings Clause immunity to the Supreme Court's holding in *Reich v. Collins*, which concerned a tax-refund due-process claim.  513 U.S. 106 (1994).  In *Reich*,

---

[5] *See* N.Y. Const. art. I, § 7(a) ("Private property shall not be taken for public use without compensation.").  No court has reached the ultimate question of whether the Takings Clause usurps the Eleventh Amendment when no remedy is available in the state courts.  Given New York's express remedy, this Court need not reach that issue.

the plaintiff sued the Georgia Department of Revenue and its commissioner in federal court to recover payments he had made pursuant to a tax provision later found unconstitutional. *Id.* at 108. The Supreme Court held that when states require payment of contested taxes up front, the Due Process Clause requires them to provide, in their own courts, a forum to recover those payments if the revenue provision in question is later held invalid — even if the Eleventh Amendment would bar the due-process claim in federal court. *Id.* at 109.

The Ninth Circuit in *Seven Up* reasoned that the Takings Clause, like the Due Process Clause, "can comfortably co-exist with the Eleventh Amendment immunity of the States," provided state courts make a "constitutionally enforced remedy" available. *Seven Up*, 523 F.3d at 954-55. *Seven Up*'s conclusion is consistent with the weight of circuit authority. *See Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456-57 (5th Cir. 2019) (holding that Eleventh Amendment barred takings claim in federal court, where plaintiff had already sued in state court but received less compensation than he sought); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1213-14 (10th Cir. 2019) (holding that the Eleventh Amendment barred a federal takings claim against the State of Utah, after confirming that Utah offered a forum for the claim); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 552 (4th Cir. 2014) (concluding "that the Eleventh

Amendment bars Fifth Amendment taking claims against States *in federal court* when the *State's courts* remain open to adjudicate such claims"); *Jachetta v. United States*, 653 F.3d 898, 909-10 (9th Cir. 2011) (holding that the Eleventh Amendment barred claims brought against the state in federal court under the federal Takings Clause, but that the plaintiff could seek Supreme Court review if the state court declined to hear the claim); *DLX, Inc. v. Kentucky*, 381 F.3d 511, 526-28 (6th Cir. 2004) (holding that Eleventh Amendment immunity barred federal takings claim, but that state court "would have had to hear that federal claim"), *overruled on other grounds San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323 (2005).

These cases give effect to the Supreme Court's admonition that:

> [T]he sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment.  Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . .

*Alden v. Maine*, 527 U.S. 706, 713 (1999).

There are fleeting suggestions to the contrary in Supreme Court authority, but none of them compel the opposite conclusion.  Most recently, in *Knick v. Twp. of Scott*, 139 S. Ct. at 2162 (2019), the Supreme Court cast doubt on the notion

that the availability of state-law relief should determine whether federal courts may hear takings claims. *Id.* at 2169-71 (stating that the existence of a state-law remedy "cannot infringe or restrict the property owner's federal constitutional claim," and that to hold otherwise would "hand[] authority over federal takings claims to state courts") (internal quotations omitted). Similarly, in *First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304 (1987), the Supreme Court rejected an argument that, based on the "prohibitory nature of the Fifth Amendment, . . . combined with principles of sovereign immunity," the Takings Clause is merely a "limitation on the power of the Government to act," rather than a "remedial provision" that requires compensation. *Id.* at 316 n.9.[6]

But these cases do not control here. They establish, at most, that the Takings Clause can overcome *court-imposed* — rather than constitutional — restrictions on takings claims. *See Knick*, 139 S. Ct. 2167-68 (overruling *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172

---

[6] Some have argued that this footnote proves the Takings Clause trumps sovereign immunity, insofar as it suggests sovereign immunity does not strip the Takings Clause of its remedial nature. *See, e.g.*, Eric Berger, *The Collision of the Takings and State Sovereign Immunity Doctrines,* 63 WASH. & LEE L. REV. 493 (2006). But that reading is far from obvious, and it would, in any event, be dictum (because the defendant in *First English* was a county, which cannot invoke sovereign immunity).

(1985), which had established court-imposed rule requiring plaintiffs to exhaust state remedies before bringing a takings claim in federal court); *First English*, 482 U.S. at 310-11 (invalidating state precedent that prevented plaintiffs from recovering compensation for damages incurred before a state court found there was a taking).  Neither case had occasion to decide whether the Takings Clause overrides other constitutional provisions like the Eleventh Amendment.  *Knick* and *First English*, therefore, do not compel the conclusion that the Takings Clause trumps sovereign immunity.

Accordingly, New York State, the DHCR,[7] and Commissioner Visnauskas (to the extent Plaintiffs seek monetary relief in her official capacity) will be dismissed from this litigation.

This holding may not have the profound impact that one might initially surmise.  Plaintiffs may continue to seek prospective remedies — like an injunction — against state officials under *Ex Parte Young*, 209 U.S. 123 (1908), and New York State remains obligated (via its own consent) to pay just

---

[7] Sovereign immunity extends to state agencies like the DHCR as well, because they are an arm of the state.  *See, e.g.*, *Schiavone v. N.Y. State Office of Rent Admin.*, No. 18-cv-130, 2018 WL 5777029, at *3-*4 (S.D.N.Y. Nov. 2, 2018) (Eleventh Amendment bars suit against DHCR); *Helgason v. Certain State of N.Y. Emps.*, No. 10-cv-5116, 2011 WL 4089913, at *7 (S.D.N.Y. June 24, 2011) (same) *report and recommendation adopted sub nom. Helgason v. Doe*, 2011 WL 4089943 (S.D.N.Y. Sept. 13, 2011); *Gray v. Internal Affairs Bureau*, 292 F. Supp. 2d 475, 476 (S.D.N.Y. 2003) (same).

compensation for takings under the New York State Constitution. Moreover, the Eleventh Amendment does not affect Plaintiffs' claims for money damages against the City of New York, the RGB, or the members of the RGB.

Sovereign immunity also does not bar the remaining damages claims (for just compensation) against Commissioner Visnauskas in her individual capacity.[8]  But to establish individual liability, Plaintiffs must allege that Commissioner Visnauskas was "personal[ly] involve[d]" in the alleged regulatory takings.  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  Although Plaintiffs allege that Commissioner Visnauskas is personally responsible for enforcing and implementing particular aspects of the RSL,[9] the core of their claims is that the *enactment* of the 2019 amendments, as a whole, violates the Constitution.  Because they do not allege that Commissioner Visnauskas had any involvement at that broader stage, these claims must be dismissed under Rule 12(b)(6).  *See*

---

[8] Moreover, the Eleventh Amendment does not bar Plaintiffs' Contracts Clause claims against Commissioner Visnauskas for declaratory relief (in her official capacity) or for damages (in her personal capacity).  As explained below, those claims are dismissed on the merits, as are Plaintiffs' due-process claims against Commissioner Visnauskas for facial declaratory and injunctive relief.

[9] Plaintiffs allege that Commissioner Visnauskas was personally "charged with implementing and enforcing" certain provisions of the RSL, including the personal-use restrictions and the MCI and IAI provisions.  Pinehurst Complaint at ¶¶ 68, 127, ECF No. 1 (Pinehurst Compl.) (citing N.Y.C. Admin. Code § 26-511(b) ("[N]o such amendments shall be promulgated except by action of the commissioner of the division of housing and community renewal").

*Morabito*, 803 F. App'x at 466 (allegation that state official could "modify or abolish" the challenged regulation was inadequate); *Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. New York*, 336 F. Supp. 3d 50, 70 (E.D.N.Y. 2018) (dismissing claim because plaintiffs did not allege that the officials were "involved in the creation or passage" of the challenged regulation).  Commissioner Visnauskas is not completely dismissed from this action, however, because Plaintiffs' surviving claims against her for declaratory relief may proceed under *Ex Parte Young*.

*       *       *       *       *

The Court turns next to Plaintiffs' substantive claims.  Plaintiffs bring two types of challenge under the Takings Clause — they allege physical and regulatory takings. The CHIP Plaintiffs allege only facial challenges under both theories (*i.e.*, they claim that the face of the statute effectuates a physical and regulatory taking in all applications).  Certain Pinehurst Plaintiffs also bring as-applied takings challenges with respect to specific properties under both theories.

B.    <u>Physical Taking:  Facial and As-Applied Challenges</u>

When a government authorizes "a permanent physical occupation" of property, a taking occurs.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982).

Physical takings are characterized by a deprivation of the
"entire bundle of property rights" in the affected property
interest — "the rights to possess, use and dispose of" it.  *See
Horne v. Dep't of Agric.*, 576 U.S. 350, 361-62 (2015) (quoting
*Loretto*, 458 U.S. at 435) (internal quotations omitted).
Examples include the installation of physical items on
buildings, *Loretto*, 458 U.S. at 438, and the seizure of control
over private property, *Horne*, 576 U.S. at 361-62 (crops); *United
States v. Pewee Coal Co.*, 341 U.S. 114, 115-17 (1951) (mines).

In this case, all Plaintiffs retain the first and
third strands in *Horne*'s bundle of rights, *supra*: they continue
to possess the property (in that they retain title), and they
can dispose of it (by selling).  *See Andrus v. Allard*, 444 U.S.
51, 65-66 (1979) ("[W]here an owner possesses a full 'bundle' of
property rights, the destruction of one 'strand' of the bundle
is not a taking, because the aggregate must be viewed in its
entirety.").  The restrictions on their right to use the
property as they see fit may be significant, but that is
insufficient under the standards set forth by the Supreme Court
and Second Circuit to make out a physical taking.

Recognizing as much in prior cases, the Second Circuit
has held that "the RSL regulates land use rather than effecting
a physical occupation." *W. 95 Hous. Corp. v. N.Y.C. Dep't of
Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002) (summary

15

order) (citing *Yee v. City of Escondido*, 503 U.S. 519, 523
(1992)).  The Circuit has rejected physical-takings claims
against the RSL on multiple occasions.  *See Harmon v. Markus*,
412 F. App'x 420 (2d Cir. 2011) (summary order); *Greystone Hotel
Co. v. City of New York*, 98-9116, 1999 U.S. App. LEXIS 14960 (2d
Cir. June 23, 1999) (summary order); *FHLMC*, 83 F.3d at 47-48.
The incremental effect of the 2019 amendments, while significant
to investment value, personal use, unit deregulation, and
eviction rights, is not so qualitatively different from what
came before as to permit a different outcome.

Plaintiffs attempt to overcome these Second Circuit
cases by arguing that they rest in part on reasoning that the
Supreme Court has since disparaged in *Horne*.  In *Harmon* and
*FHLMC*, the Second Circuit had invoked what Plaintiffs here call
the "acquiescence theory" — the notion that the landlords chose,
voluntarily, to enter the rental real estate business, and that
they can exit it if they choose.  In *Horne*, decided
subsequently, this strain of reasoning came under criticism.
*See Horne*, 576 U.S. at 365 (rejecting argument that "raisin
growers voluntarily choose to participate in the raisin market"
and could leave the industry to escape regulation); *see also
Loretto,* 458 U.S. at 439 n.17 (noting that "a landlord's ability
to rent his property may not be conditioned on forfeiting the
right to compensation for a physical occupation").  But *Horne's*

16

rejection of "acquiescence" theory does not save Plaintiffs'
physical-takings claim.  Plaintiffs' argument fails not because
they have acquiesced in the taking of their property, but
because under cases like *Loretto, Horne, Yee,* and others, no
physical taking has occurred in the first place.

The Pinehurst Plaintiffs' as-applied physical
challenges fail for the same reasons (to the extent they make
them, which 177 Wadsworth LLC does not).  No Plaintiff alleges
that they have been deprived of title to their property, or that
they have been deprived of the ability to sell the property if
they choose.  At most, these Plaintiffs allege that the manner
in which they can remove apartments from stabilization — the so-
called "off ramps" from the RSL regime — have been significantly
limited.

Accordingly, the Court finds that Plaintiffs fail to
state physical-taking allegations upon which relief can be
granted, and dismisses these claims — both facial and as-applied
— pursuant to Rule 12(b)(6).

   C.   <u>Regulatory Taking – Facial Challenge</u>

Like the physical-takings challenges, every
regulatory-takings challenge to the RSL has been rejected by the
Second Circuit.  *See W. 95 Hous. Corp.*, 31 F. App'x 19 (summary
order); *Greystone Hotel Co.*, 1999 U.S. App. LEXIS 14960 (summary
order); *FHLMC*, 93 F.3d 45; *see also Rent Stabilization Ass'n v.*

*Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993) (construing plaintiff's facial attacks as as-applied challenges and dismissing them for lack of standing).  Of course, it cannot be said that there is no such thing as a regulatory taking in the world of rent stabilization, and it remains eminently possible that at some point, the legislature will apply the proverbial straw that breaks the camel's back.[10]  If they do, however, it is unlikely that the straw in question will be identified in the context of a facial challenge.  In *Pennell v. City of San Jose*, 485 U.S. 1 (1988), for example, the Supreme Court rejected a regulatory-takings claim, noting that "we have found it particularly important in takings cases to adhere to our admonition that 'the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary.'"  *Id.* at 10 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 294-95 (1981)); *see also Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (regulatory-takings analyses are "essentially ad hoc, factual inquiries").  The Second Circuit has repeatedly

---

[10] The Supreme Court has spoken about the need for takings jurisprudence to redress this kind of incremental deprivation of property rights.  *See, e.g., Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1014 (1992) ("If . . . the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature would be to extend the qualification more and more until at last private property disappeared.'") (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

disparaged facial challenges to the RSL. *See W. 95 Hous. Corp.*, 31 F. App'x at 21 (the difficulty of regulatory-takings analysis "suggests that a widely applicable rent control regulation such as the RSL is not susceptible to facial constitutional analysis under the Takings Clause"); *Dinkins*, 5 F.3d at 595 (trade association's challenge was "simply not facial," despite plaintiff's having characterized it as such, and "the proper recourse is for the aggrieved individuals themselves to bring suit" on an as-applied basis).  This is consistent with limitations on facial challenges generally.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990) (noting that outside of the First Amendment context, "facial challenges to legislation are generally disfavored").

In a facial challenge, Plaintiffs must demonstrate that "no set of circumstances exists under which [the RSL] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Put differently, such a claim fails if Defendants can identify any "possible set of . . . conditions" under which the RSL could be validly applied.  *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1987).

The Supreme Court has identified two distinct strains of regulatory-takings analysis.  The first applies in the case of a regulation that "denies all economically beneficial or productive use of land."  *Palazzolo v. Rhode Island*, 533 U.S.

19

606, 617 (2001); *see also Lucas*, 505 U.S. at 1026 (applying the "categorical rule that total regulatory takings must be compensated"). This analysis is inapplicable here: Plaintiffs do not allege that they have been deprived of *all* economically viable use of their property.[11]

Even without rendering property worthless, a regulatory scheme may still effectuate a taking if it "goes too far," in Justice Holmes's words. *Mahon*, 260 U.S. at 415. In the current era, courts apply the three-factor test of *Penn Central* to determine whether a regulation that works a less-than-total destruction of value has gone too far. The factors are: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with reasonable investment-backed expectations; and (3) the character of the governmental action in question. *See Penn Central*, 438 U.S. at 124. In applying these factors, the ultimate question is "whether justice and fairness require that economic injuries

---

[11] Pinehurst Compl. at ¶ 216 ("The RSL thus results in a decrease of 50 percent or more of a unit's value. The 2019 Amendments exacerbate this decrease in value and have caused rent-stabilized apartments to lose 20 to 40 percent (or more) of their value prior to enactment of the 2019 Amendments."); *id.* at ¶ 97 (the 2019 amendments "have reduced the value of the rent-stabilized buildings owned by Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, [and] 177 Wadsworth LLC . . . by 20 to 40 percent"); *id.* at ¶ 232 (the RSL has "decreas[ed] the resale value of Plaintiffs' properties"); CHIP Complaint at ¶ 274, ECF No. 1 (CHIP Compl.) ("The RSL's regulatory burdens have dramatically reduced the market value of regulated properties, in some cases by over 50%"); *id.* at ¶ 298 ("[B]uildings where rent stabilized units account for almost 100% of the units can expect a price per square foot . . . of two-thirds less" than buildings where "0-20% of the units" are regulated).

20

caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979) (internal quotations omitted).  The Court considers the *Penn Central* factors as they apply, first, to Plaintiffs' facial challenge, and then to the as-applied regulatory challenges, which are discussed in a separate section, *infra*.

Simply to apply these "ad hoc" factors to the instant *facial* challenge is to recognize why the RSL is not generally susceptible to such review.  The first factor — economic impact — obviously needs to be calculated on an owner-by-owner basis, and those calculations will vary significantly depending on when a property was purchased, what fraction of its units are rent-stabilized, what improvements the landlord has made, and many other metrics.  At best, Plaintiffs can make vague allegations about the average diminution in value across regulated properties.  *See, e.g.*, Transcript dated June 23, 2020 at 59:19-24, *Community Housing Improvement Program v. City of New York*, 19-cv-4087, ECF No. 86 ("[CHIP Plaintiffs' counsel]:  . . . . At the complaint stage, we don't have to have developed all of our evidence, even our own evidence, with respect to the

economic impact."). [12]  This lack of clarity surely arises because the diminution in value will vary significantly from property to property — making it virtually impossible to show there is "no set of circumstances," *Salerno*, 481 U.S. at 745, in which the RSL applies constitutionally.

The second *Penn Central* factor is the extent to which the regulation interferes with reasonable investment-backed expectations.  "The purpose of the investment-backed expectation requirement is to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (internal quotations omitted).  Accordingly, the nature of each landlord's investment-backed expectations depends on when they invested in the property and what they expected at that time.  *Meridien Tr. & Safe Deposit Co. v. FDIC*, 62 F.3d 449, 454 (2d Cir. 1995) ("[T]he critical time for considering investment-backed expectations is the time a property is acquired, not the time the challenged regulation is enacted.").  And the reasonableness

---

[12] *See also* Pinehurst Compl. at ¶ 94 (comparing the average "value per square foot" of regulated and unregulated buildings); *id.* at ¶ 101 (comparing landlords' average "operating costs" and "permitted [rate] increases"); CHIP Compl. at ¶ 273 (regulated units charge "on average 40% lower than market-rate rents, and in some units 80% lower"); *id.* at ¶ 274 ("unregulated properties are typically worth 20% to 40% more" than regulated ones), *id.* at ¶ 284 ("the income from non-regulated units can be as much as 60-90% higher than regulated units").

of these expectations will of course vary based on the state of the law when the property was purchased, among other things. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (the expectation must be "reasonable," which means it "must be more than a unilateral expectation or an abstract need") (internal quotations omitted); *see also Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 36-37 (1st Cir. 2002) (courts "should recognize that not every investment deserves protection and that some investors inevitably will be disappointed").

Plaintiffs cannot make broadly applicable allegations about the investment-backed expectations of landlords state- or city-wide. Different landlords bought at different times, and their "reliance," such as it was, would have been on different incarnations of the RSL. *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012) (noting that the reasonable investment-backed expectations analysis is "often informed by the law in force" at the time). Even those who bought at the same time would have done so with different expectations, including some the law still allows. Given this range of expectations — some reasonable, others not — Plaintiffs cannot allege that the RSL frustrates the reasonable investment-backed expectations of every landlord it affects.

Finally, *Penn Central*'s third factor considers the "character of the taking." *See Penn Central*, 438 U.S. at 124

23

("A taking may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.") (internal citations omitted).  But Plaintiffs cannot prevail without alleging the other two *Penn Central* factors at the facial level.  *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005) ("[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.").  Accordingly, Plaintiffs' facial regulatory-takings claim is dismissed.

> D.    Post-Breach Relief Provisions

The RSL provisions that provide the most substantial basis for a facial challenge, in this Court's estimation, are contained in New York's Real Property Actions and Proceedings Law (RPAPL) Sections 749 and 753.  As amended in 2019, these provisions dictate that even after the RSL has operated to eliminate "unjust, unreasonable and oppressive rents," N.Y.C. Admin. Code § 26-501, the state housing courts may still stay (for up to twelve months) the eviction of a tenant who fails to pay the reduced rent, if eviction would cause the tenant "extreme hardship."  RPAPL § 753.  In making the hardship

determination, "the [housing] court shall consider serious ill
health, significant exacerbation of an ongoing condition, a
child's enrollment in a local school, and any other extenuating
life circumstances affecting the ability of the applicant or the
applicant's family to relocate and maintain quality of life."
*Id.*

These "post-breach relief" provisions are aimed at
requiring particular property owners to alleviate the hardships
of particular tenants — including hardships that may arise from
circumstances separate and distinct from the dynamics of supply
and demand in New York's rental housing market.  That aim, while
indisputably noble, nevertheless carries a "heightened risk that
private property is being pressed into some form of public
service," *Lucas*, 505 U.S. at 1018, and correspondingly puts more
pressure on the "usual assumption that the legislature is simply
adjusting the benefits and burdens of economic life" in a way
that requires no recompense.  *Id.* at 1017 (internal quotations
omitted).  Stated in terms of the current case, it can be argued
that in Sections 749 and 753, the New York State legislature is
not "adjusting" the terms of a contract between landlord and
tenant in a regulated market, but rather drafting a landlord who
is no longer subject to *any enforceable contract* at all (because
the tenant is in breach) to provide an additional benefit — of

up to one year's housing — because of the specific tenant's life
circumstances.

Neither the Supreme Court nor the Second Circuit has
squarely considered a regulation like the post-breach relief
provisions here, but the Supreme Court came closest in *Pennell,*
which also involved a statute that called on landlords to
provide additional benefits on the basis of tenant "hardship."
485 U.S. 1.  The City of San Jose had adopted a rent-control
ordinance listing seven factors that a "hearing officer" was
required to consider in determining the rent that a particular
landlord could charge.  *Id.* at 9.  The Court described the
argument that the seventh factor — the "hardship" factor —
worked a taking:

> [T]he Ordinance establishes the seven factors that a
> hearing officer is to take into account in determining the
> reasonable rent increase.  The first six of these factors
> are all objective, and are related either to the landlord's
> costs of providing an adequate rental unit, or to the
> condition of the rental market.  Application of these six
> standards results in a rent that is "reasonable" by
> reference to what appellants contend is the only legitimate
> purpose of rent control: the elimination of "excessive"
> rents caused by San Jose's housing shortage.  When the
> hearing officer then takes into account "hardship to a
> tenant" pursuant to [the seventh factor] and reduces the
> rent below the objectively "reasonable" amount established
> by the first six factors, this additional reduction in the
> rent increase constitutes a "taking."  This taking is
> impermissible because it does not serve the purpose of
> eliminating excessive rents — that objective has already

been accomplished by considering the first six factors —
instead, it serves only the purpose of providing assistance
to "hardship tenants."

*Id.*

In response to this argument, Justice Scalia would
have held that a facial taking occurred.  He concluded that in
any application of the "hardship" provision, the city would not
be "'regulating' rents in the relevant sense of preventing rents
that are excessive; rather, it [would be] using the occasion of
rent regulation (accomplished by the rest of the Ordinance) to
establish a welfare program privately funded by those landlords
who happen to have 'hardship' tenants."  *Id.* at 22 (Scalia, J.,
concurring in part and dissenting in part).

A broad majority of the Court, however, declined to
reach the facial-takings question, on the basis that it would
have been "premature" to do so without record evidence that the
hardship provision had ever actually been relied on to reduce a
proposed rent increase.  *Id.* at 9-10.  The majority noted that
there was nothing in the law *requiring* the hearing officer to
reduce rents on the basis of tenant hardship, and that the Court
therefore lacked a "sufficiently concrete factual setting for
the adjudication of the takings claim" presented.  *Id.*

Applying *Pennell*'s reasoning, the facial challenge to
the post-breach relief provisions here, too, must be deemed
premature.  Though Plaintiffs allege that application of the

27

post-breach relief provisions is "far from uncommon," CHIP
Plaintiffs' Supplemental Memorandum of Law in Opposition to
Defendants' and Intervenors' Motions to Dismiss at 11, ECF No.
87 (quoting *Elmsford Apartment Assocs. v. Cuomo*, 20-cv-4062,
2020 WL 3498456, at *4 (S.D.N.Y. June 29, 2020)), they do not
argue that any named Plaintiff in this case has been harmed by
application of these provisions.

> And the parties do not agree on how the provisions are
likely to work in practice.  Plaintiffs contend that the
statutory provision conditioning stays on the tenant depositing
rent payments is illusory because the statute provides no
"enforcement mechanism" to force tenants to pay, *see* Pinehurst
Plaintiffs' Supplemental Brief in Opposition to Defendants'
Motions to Dismiss at 3, ECF No. 65 ("Although the statute
purports to require a deposit of one year's rent as a condition
of the tenant's post-breach occupancy, the statute contains *no*
enforcement mechanism through which a property owner can require
the tenant to make that deposit.").  Defendants argue, however,
that state courts do, in fact, enforce this requirement in
practice, *see, e.g.*, Pinehurst City Defendants' Supplemental
Brief in Further Support of Their Motion to Dismiss the
Complaint at 3, 5-7, ECF No. 68.  Given these factual disputes,
the Court must heed the *Pennell* majority's admonition to avoid
decision until the provision is challenged in a "factual setting

28

that makes such a decision necessary."  485 U.S. at 10 (quoting
*Hodel*, 452 U.S. at 294-95).

E.       Regulatory Taking – As-Applied Challenge

Even in bringing their as-applied challenges, the
Pinehurst Plaintiffs (except 177 Wadsworth LLC) must "satisfy
the heavy burden placed upon one alleging a regulatory taking."
*Keystone Bituminous Coal Ass'n,* 480 U.S. at 493.  But taking
their allegations as true, certain as-applied Plaintiffs have
alleged enough to survive a motion to dismiss.  Indeed, there
are unanswered questions about virtually every aspect of their
claims.

Applying the first *Penn Central* factor, each as-
applied Plaintiff alleges that the 2019 amendments significantly
diminished the value of their properties.  While the extent of
this diminution remains to be determined with precision,
Plaintiffs 74 Pinehurst LLC and 141 Wadsworth LLC allege that
the 2019 amendments reduced the value of their regulated
properties by twenty to forty percent *beyond* the diminution
already occasioned by the pre-2019 RSL.  Pinehurst Compl. at
¶ 97.  And Eighty Mulberry Realty Corporation and the
Panagouliases allege that the 2019 amendments "significantly
reduced the value" of their rent-stabilized apartments, *id.* at
¶ 96, which now rent for roughly half the rate of unregulated
apartments in the same building (or less), *id.* at ¶ 106.  These

29

alleged economic impacts, though insufficient *on their own*,[13] are
not so minimal to compel dismissal of the complaint at this
stage.

But only two Plaintiffs (Eighty Mulberry Realty
Corporation and the Panagouliases) adequately allege that the
RSL violates their reasonable investment-backed expectations in
its current cumulative effect.  These Plaintiffs bought their
properties at the dawn of the rent-stabilized era — either
before the RSL was first enacted (Eighty Mulberry Realty
Corporation, before 1950, *id.* at ¶ 17) or not long thereafter
(the Panagouliases, in 1974, *id.* at ¶ 13).  And they allege that
the 2019 amendments not only frustrate their expectation to a
reasonable rate of return, but also their expectation that some
units would not be (or remain) regulated at all.  *Id.* at
¶¶ 108-09.[14]  The Panagouliases contend that the DHCR rejected

---

[13] *See Penn Central*, 438 U.S. at 131 (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) (75% diminution in value not a taking); *Hadacheck v. Sebastian*, 239 U.S. 394 (1915) (87.5% diminution; same conclusion)); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 645 (1993) ("[M]ere diminution in the value of property, however serious, is insufficient to demonstrate a taking.").

[14] "The 2019 Amendments further undermine the investment-backed expectations of property owners, including Plaintiffs [the Panagouliases] and Plaintiff Eighty Mulberry [Realty] Corporation, by repealing the luxury- and high-income decontrol provisions described above . . . .  Many property owners, including Plaintiffs [the Panagouliases] and Plaintiff Eighty Mulberry Realty Corporation, undertook significant capital improvements, improving the quality of their units, with the expectation that the apartments could be converted to market-rate rentals under the luxury- and high-income decontrol provisions.  Repeal of the luxury- and high-income

their attempt to reclaim units for personal use, which
effectively prevents them from using the property for other
purposes.  *Id.* at ¶¶ 63-64.[15]  Although questions remain as to
the nature and reasonableness of these expectations, it cannot
be said, at this stage, that these allegations are inadequate.
Discovery is needed to assess these claims.

The same is not true for the other as-applied
Plaintiffs, 74 Pinehurst LLC and 141 Wadsworth LLC.  Unlike
Eighty Mulberry Realty Corporation and the Panagouliases, these
Plaintiffs bought their properties under a different, and more
mature, version of the RSL (as in effect in 2003 and 2008,
respectively, *see id.* at ¶¶ 14-15).[16]  By that point, the RSL had

---

decontrol provisions eliminated the only mechanisms to transition a rent-
stabilized apartment into a market-rate rental unit. . . .  The luxury and
high-income decontrol provisions had been the law for over 25 years, and
formed the backbone of property owners' reasonable investment-backed
expectations that they could eventually charge market rents for their units."
Pinehurst Compl. at ¶¶ 108-09.

[15] *Cf. Yee*, 503 U.S. at 528 (noting that those plaintiffs, unlike the
Panagouliases, had failed to run the "gauntlet" of statutory procedures for
changing the use of their property prior to bringing their takings claim).
The Panagouliases also allege that they cannot put the property to commercial
use due to zoning laws.  *See* Pinehurst Compl. at ¶ 87.

[16]  Whether the time of acquisition matters to the *Penn Central* inquiry
appears to be subject to some debate among the Justices.  *See Palazzolo*, 533
U.S. at 630 (*Penn Central* claims are "not barred by the mere fact that title
was acquired after the effective date of the state-imposed restriction"); *id.*
at 637 (Scalia, J., concurring) ("In my view, the fact that a restriction
existed at the time the purchaser took title . . . should have no bearing
upon the determination of whether the restriction is so substantial as to
constitute a taking.").  But for the moment, at least, the timing of purchase
— even if not dispositive, in and of itself — remains at least significant,
and the as-applied Plaintiffs here have very different purchase profiles in
that regard.  *See id.* at 633, 635 (O'Connor, J., concurring) (the *Palazzolo*
majority's holding "does not mean that the timing of the regulation's

taken its basic shape and become a fixture of New York law.[17] *Cf.* CHIP Compl. at ¶ 303 (the RSL was "nominally established as a temporary measure").

74 Pinehurst LLC and 141 Wadsworth LLC argue that they did not reasonably expect operating costs to outpace rate increases.  Pinehurst Compl. at ¶¶ 98, 101, 237.  Nor, these Plaintiffs claim, did they expect the repeal of luxury decontrol or vacancy, longevity, and preferential-rate increases, *id.* at ¶¶ 102, 104, 114, 120, 124, or the reduction of recoverable IAIs and MCIs, *id.* at ¶¶ 138-42.

But by the time these Plaintiffs invested, the RSL had been amended multiple times, and a reasonable investor would have understood it could change again.  Under the Second Circuit's case law, it would not have been reasonable, at that point, to expect that the regulated rate would track a given figure, or that the criteria for decontrol and rate increases would remain static.  *See, e.g.*, *id.* at ¶¶ 22, 99-100 (RGB sets

---

enactment relative to the acquisition of title is immaterial to the *Penn Central* analysis," and "does not remove the regulatory backdrop against which an owner takes title to property from the purview of the *Penn Central* inquiry"); *1236 Hertel Ave. v. Calloway*, 761 F.3d 252, 266-67 (2d Cir. 2014) (dismissing, despite *Palazzolo*, a *Penn Central* claim because plaintiff acquired title after the challenged law became a "background principle of the State's law of property," which made his expectation that the law would not change unreasonable).

[17] There were some background rent-regulation laws when Eighty Mulberry Realty Corporation and the Panagouliases bought their properties as well.  As stated above, some form of rent regulation has existed in New York City since World War I.  But these were very different regimes, and it is unclear whether and to what extent they applied to the properties at issue here.

permissible rates annually based on the rent set under the RSL in 1974); *id.* at ¶ 38 (luxury-decontrol introduced in 1993); CHIP Compl. at ¶ 59 (vacancy and longevity increases introduced in 1997); Memorandum of Law in Support of Pinehurst State Defendants' Motion to Dismiss at 8, ECF No. 53 (luxury-decontrol amended in 1997).  Because these Plaintiffs made their investments "against a backdrop of New York law" that suggested the RSL could change, *see 1236 Hertel Ave.*, 761 F.3d at 266-67, they cannot allege that the 2019 amendments violated their *reasonable* investment-backed expectations.

Finally, analysis of the RSL's "character" should be determined after discovery, when the precise effects of the RSL on these Plaintiffs becomes clearer.

The claims brought by 74 Pinehurst LLC and 141 Wadsworth LLC are therefore dismissed, while the claims brought by Eighty Mulberry Realty Corporation and the Panagouliases may proceed.

F.    Due Process

Nor do the 2019 amendments violate the Due Process Clause of the Fourteenth Amendment.  Plaintiffs argue that the RSL is not "rationally related" to increasing the supply of affordable housing, helping low-income New Yorkers, or promoting socio-economic diversity.  Instead, they claim the law is counterproductive:  it *perpetuates* New York's housing crisis,

33

and fails to target the people it claims to serve.  *See* CHIP

Compl. at ¶¶ 70-155; Pinehurst Compl. at ¶¶ 159-88.  The CHIP

Plaintiffs also argue that New York City's triennial declaration

of a "housing emergency" (which triggers the RSL) itself

violates due process, because that decision is arbitrary and

irrational.  CHIP Compl. at ¶¶ 167-92.

In support, Plaintiffs allege that economists broadly

agree that laws like the RSL do not work for their intended

purpose, and indeed may do substantially more harm than good.

As one Nobel Prize-winning economist, cited in the Pinehurst

Plaintiffs' complaint, put it in discussing San Francisco's

rent-stabilization scheme:

> The analysis of rent control is among the best-understood
> issues in all of economics, and — among economists, anyway
> — one of the least controversial.  In 1992 a poll of the
> American Economic Association found 93 percent of its
> members agreeing that "a ceiling on rents reduces the
> quality and quantity of housing."  Almost every freshman-
> level textbook contains a case study on rent control, using
> its known adverse side effects to illustrate the principles
> of supply and demand.  Sky-high rents on uncontrolled
> apartments, because desperate renters have nowhere to go —
> and the absence of new apartment construction, despite
> those high rents, because landlords fear that controls will
> be extended?  Predictable. . . .  [S]urely it is worth
> knowing that the pathologies of San Francisco's housing
> market are right out of the textbook, that they are exactly
> what supply-and-demand analysis predicts.

Paul Krugman, *Reckonings; A Rent Affair*, N.Y. Times (June 7,

2000); *see also* Pinehurst Compl. at ¶ 160 (citing Krugman

article).

But the Court is engaged in rational-basis review here, not strict scrutiny.  *See Pennell*, 485 U.S. at 11-12 (considering whether a rent-control statute was "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt"); see *also Lingle*, 544 U.S. at 545 ("[W]e have long eschewed . . . heightened scrutiny when addressing substantive due process challenges to government regulation").  And in that context, the Court is bound to defer to legislative judgments, even if economists would disagree. *See, e.g.*, *Lingle*, 544 U.S. at 544-45  (disapproving of district court's assessment of competing expert testimony on the benefits of Hawaii's rent-control statute, and stating:  "The reasons for deference to legislative judgments about the need for, and likely effectiveness of, regulatory actions are by now well established . . . .").

Moreover, alleviating New York City's housing shortage is not the only justification of the RSL that the legislature offered.  The RSL was also intended to allow people of low and moderate income to remain in residence in New York City — and specific neighborhoods within — when they otherwise might not be able to.  *See* N.Y.C. Admin. Code § 26-501 (extending the RSL to prevent "uprooting long-time city residents from their communities").  The Supreme Court has recognized neighborhood stability and continuity as a valid basis for government

regulation.  *See Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992)

("[T]he State has a legitimate interest in local neighborhood

preservation, continuity, and stability.") (citing *Village of*

*Euclid*, 272 U.S. 365).  And where, as here, there are multiple

justifications offered for regulation, the statute in question

must be upheld so long as any one is valid.  *See Preseault v.*

*I.C.C.*, 494 U.S. 1, 18 (1990) ("There is no requirement that a

law serve more than one legitimate purpose."); *Thomas v.*

*Sullivan*, 922 F.2d 132, 136 (2d Cir. 1990) (on rational-basis

review, "we consider not only contemporaneous articulations of

legislative purpose but also any legitimate policy concerns on

which the legislature might conceivably have relied").

Accordingly, the due-process challenge is dismissed.

G.      Contracts Clause

        The Pinehurst Plaintiffs also claim that the 2019

amendments, as applied to each of them, violate the Contracts

Clause of Article I by repealing the RSL's so-called

"preferential rates" provision.[18]  This provision allowed

landlords to raise rents on an expiring lease to the maximum

rate that would otherwise apply to the unit.  While the

preferential-rates provision existed, many landlords, including

each of the Plaintiffs here, Pinehurst Compl. at ¶ 120,

---

        [18] The Contracts Clause prohibits states from "pass[ing] any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.

allegedly offered "preferential" leases to tenants (*i.e.*, leasing rates discounted below even what the RGB would permit). These landlords expected, prior to repeal, that they could raise rates significantly when a preferential lease term ended.  The 2019 amendments, however, prevent Plaintiffs from doing so by limiting future rates to the amount charged at the time the 2019 amendments were enacted (plus annual increases).  *See* N.Y. Reg. Sess. § 6458, Part E, § 2 (2019).

Plaintiffs claim this violates the Contracts Clause in two ways.  First, they claim that it extends the duration of all Plaintiffs' expiring, preferential leases (since now they must not only renew the lease, but also at the same preferential rates).  Second, 74 Pinehurst LLC claims that, as to it, the 2019 amendments also required the *retroactive* reduction of rent — the most important term in the lease — in two particular lease agreements that it had executed before the amendment passed.

Plaintiffs' first claim — that the 2019 amendments revise the duration of their expiring leases — is unavailing. As applied to future renewals, "[a] contract . . . cannot be impaired by a law in effect at the time the contract was made." *Harmon*, 412 F. App'x at 423.  Future leases will be subject to the 2019 amendments from the onset.  *See 2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1254 (2d Cir. 1991) ("Laws and statutes in existence at the time a

contract is executed are considered a part of the contract, as though they were expressly incorporated therein.").

74 Pinehurst LLC, however, also alleges that the 2019 amendments revised the terms of two of its *already* executed leases.  In resolving this claim, the Court must ask three questions: "(1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedy a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary[?]" *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006).  As explained below, 74 Pinehurst LLC's claim falters at stages two and three.

74 Pinehurst LLC adequately alleges that the 2019 amendments "substantially impair" its executed leases by affecting a critical term of their executed lease agreements — the monthly rent.  *Cf. id.* at 368 (wage freeze substantially impaired unions' labor contracts because compensation is "the most important element[] of a labor contract").  But 74 Pinehurst LLC cannot surmount the second and third steps of the Contracts Clause analysis.  The legislative purposes behind the RSL are valid (as explained above).  *See Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998); *see also Marcus Brown Holding Co v. Feldman*, 256 U.S. 170, 198-99 (1921); *Brontel, Ltd. v. City of New York*, 571 F.Supp. 1065,

1072 (S.D.N.Y. 1983).  And where, as here, the affected contract is between private parties, courts must "accord substantial deference" to the legislature's conclusions about how to effectuate those purposes.  *Buffalo Teachers*, 464 F.3d at 369; *see also Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 994 (2d Cir. 1997).  For the reasons articulated above in Section F (Due Process), the RSL passes muster under this deferential standard.  74 Pinehurst LLC's Contracts Clause claims are, therefore, dismissed.

### III. Conclusion

For the reasons explained above, the Court grants Defendants' motions to dismiss all claims in *Community Housing Improvement Program v. City of New York* (19-cv-4087).  The Court also grants Defendants' motions to dismiss all claims in *74 Pinehurst LLC v. State of New York* (19-cv-6447) except the as-applied regulatory-takings claims brought by Eighty Mulberry Realty Corporation and the Panagouliases.  The Pinehurst Plaintiffs' claims against the State of New York and the DHCR are dismissed for lack of subject-matter jurisdiction, as are their claims for damages against DHCR Commissioner Visnauskas in

her official capacity.  The Clerk of Court is respectfully directed to enter judgment and close the action in *CHIP* (19-cv-4087), given that that action is now dismissed in its entirety.

        SO ORDERED.

                                            _____/s Eric Komitee_____
                                            ERIC KOMITEE
                                            United States District Judge

Dated:  Brooklyn, New York
        September 30, 2020